UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

| | |
|---|---|
| **DONALD ZARDA,** | **AMENDED COMPLAINT** |
| Plaintiff, | 10-cv-04334-JFB -ARL |
| -against- | **JURY TRIAL DEMANDED** |
| **ALTITUDE EXPRESS, INC.,** dba Skydive Long Island, and **RAY MAYNARD,** | |
| Defendants. | |

-------------------------------------------------------------------X

Plaintiff hereby alleges upon personal knowledge and information and belief as follows:

## NATURE OF THIS ACTION

1.   This action is brought by Plaintiff, a gay man, to recover damages for Defendants' discriminatory and otherwise illegal conduct in, among other things, discharging him because of a homophobic customer.

## THE PARTIES

2.   Plaintiff is a citizen of the State of Missouri.

3.   Defendants Altitude Express, Inc., operating as "Skydive Long Island" in Calverton, New York is a corporation organized under the laws of the State of New York, located in Suffolk County, and operates as a "drop zone," i.e., a place

1

where individuals can come to Skydive under the close supervision of experienced Skydive instructors.

4.   Defendant Ray Maynard is the Chief Executive Officer of Skydive Long Island and, upon information and belief, its sole shareholder. Upon information and belief he is a citizen of New York.

5.   Plaintiff is an experienced Tandem and Freefall (i.e., Skydive) instructor, who was an employee at Skydive Long Island for various summers in the last decade until his termination in July 2010.

## JURISDICTION AND VENUE

6.   Jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, among them Title VII of the Civil Rights Act of 1964 as amended and the Fair Labor Standards Act. Jurisdiction is also independently predicated on diversity of citizenship.

7.   Venue is properly placed in this district pursuant to 28 U.S.C. § 1391(c) in that Defendants Skydive Long Island is deemed to reside in this judicial district.

## FACTUAL ALLEGATIONS UNDERLYING PLAINTIFF'S CLAIMS

8.   Plaintiff repeats and realleges the allegations set forth in all previous paragraphs as if fully set forth herein.

9. Plaintiff was employed at Altitude Express, Inc., dba Skydive Long Island (hereinafter "Skydive Long Island") as a Tandem & Accelerated Freefall Instructor in the summers of 2001, 2009 and 2010. Altitude Express has approximately 20-30 employees.

10. Plaintiff is has been a licensed instructor in this field since 1995. He has participated in 3500 jumps over the course of his distinguished career.

11. He worked for the defendants in the summers of 2001, 2009 and 2010. Skydiving is a seasonal sport and defendants operate mostly in the warmer weather, although not exclusively so.

12. While employed by Skydive Long Island, plaintiff was expected to be at work, seven days a week, until released.

13. The hours of operation were either 7:30 AM to sunset or 9:30 AM to sunset.

14. Plaintiff was expected not to leave the premises in case a potential customer came, unless it was raining.

15. Although expected to be on the premises approximately twelve (or more) hours per day, plaintiff was only paid per jump.

16. Some days went by when he would be there all day and not make a dime, not even minimum wage for the hours he spent at work at his employer's insistence.

17. A skydive is a forcibly intimate experience, for the safety of the passenger. Novices who yearn for the thrill of a skydive cannot do so on their own, and thus the instructor must strap himself hip-to-hip and shoulder-to-shoulder with the client.

18. Because of this, before they dive, students at Skydive Long Island must sign a release that contains the following language:

> If I am making a student jump, I understand that I will be wearing a harness which will need to be adjusted by the jumpmaster. If my jump is a tandem jump, I understand that the tandem master will attach my harness to his and that this will put my body in close proximity to that of the tandem master. I specifically agree to this physical contact between the tandem master and myself.

19. Before the client and the instructor jump out of the plane, the client is typically sitting on the instructor's lap. The experience is typically tense for a novice, who is about to jump out of the plane with a stranger strapped to him or her.

20. Notwithstanding the waiver, in order to break the ice and make the client more comfortable, instructors often make light of the intimate situation by making a joke about it.

4

21. For example, when a man is strapped to another man, plaintiff witnessed instructors saying something like, "I bet you didn't know you were going to be strapped so close to a man." Plaintiff also heard instructors state, in reference to a budge protruding from the equipment, "That's the straps you're feeling.".

22. On more than one occasion, plaintiff heard straight instructors say, jokingly, when strapped to male clients, "Don't worry, I'm a lesbian." Or, when a straight man was strapped to a straight man (especially when his girlfriend was present), the instructor might say, "Does you're girlfriend know that you're gay?"

23. This was an openly tolerated form of banter. Plaintiff, as an openly gay man was often the butt of jokes about his sexual orientation. He had mixed feelings about that, but was not troubled when sexual banter was a way of breaking the ice in a tense situation. On occasion, over the years, when he was tightly strapped to a woman he might say something like, "You don't have to worry about us being so close because I'm gay."

24. This was never a problem until one homophobic customer complained about it. On June 18, 2010, plaintiff was suspended for

making this remark to a woman whose name, upon information and belief, is Rosanna.

25. It was known at work that plaintiff is gay and he was open about it. Notwithstanding this, however, the terms and conditions of employment were not the same as compared between plaintiff and other similarly situated employees.

26. Ray Maynard was hostile to any expression of sexual orientation that did not conform to sex stereotypes. Plaintiff has a typically masculine demeanor, but as one example, he criticized plaintiff's wearing of the color pink at work. Women at the workplace were allowed to wear pink, and did without criticism.

27. On one occasion, for example, plaintiff broke his ankle and had to wear a cast. It so happened that the color of the cast plaintiff chose was pink. When Ray saw the pink cast for the first time he scoffed at it and said, "That looks gay!" Later, at a staff meeting he said, "If you're going to remain here for the day, you're going to have to paint that black," pointing to plaintiff's cast.  It was not a joke.

28. Plaintiff's toenails were also painted pink, which at the time was plaintiff's preference. Women often wore open-toed sandals to work, as well as pink toenail polish.

6

29. Additionally, many other instructors were barefoot at the drop zone. When Ray saw plaintiff's pink toenail polish, however, he insisted that plaintiff wear a sock and cover up his foot.

30. Plaintiff would have begrudgingly tolerated these backwards attitudes towards men and their use of certain colors, had plaintiff not been fired for expressing to a customer that he was gay.

31. Ray openly tolerated men discussing women and their physical attributes. Specifically, Ray and the men at the office would ogle at women's breasts, including on videos that the company had procured for passengers who had hired the company for a joy ride skydive with an accompanying video.[1] Men often talked of their sexual exploits, and Ray openly discussed his problematic marriage.

32. Plaintiff mentioning the fact that he is gay to a passenger, however, got him fired.

33. In his termination interview, Ray said that plaintiff was being fired because plaintiff had discussed his "personal escapades" outside of the office with a passenger (Rosanna).

34. This was completely untrue plaintiff merely stated he was gay.

35. Being gay is not an escapade; it is an immutable condition.

---

[1] Customers who hired Altitude were referred to as "passengers."

7

36. All of the men at Altitude made light of the intimate nature of being strapped to a member of the opposite sex. Plaintiff was fired, however, because the levity he used honestly referred to his sexual orientation and did not conform to the straight male macho stereotype.

37. Mentioning one's sexual orientation is as much a protected activity as mentioning to someone that one is Catholic, Scottish, or Hispanic.

38. Ray also made other statements in defense of his termination of plaintiff, including that plaintiff had allegedly touched Rosanna inappropriately.

39. It is unknown to plaintiff at this writing whether Rosanna actually made this statement, or whether Maynard made it up. Maynard told plaintiff that Rosanna had made such a statement about touching, however, in a written objection to plaintiff's request for unemployment benefits, a representative of Long Island Skydiving – Maynard, upon information and belief, did not mention the touching, but rather that plaintiff had revealed "personal information" about himself to a customer.

8

40. The "personal information" revealed was that plaintiff is gay; Maynard argued to the Unemployment Division that this was "misconduct" that should disqualify plaintiff from benefits.

41. Unemployment disagreed and plaintiff was awarded benefits. Neither Maynard nor Unemployment mentioned anything in connection with the alleged touching, either because it did not happen or, in the alternative, even Maynard did not believe it.

42. Again it is unknown at this writing whether Rosanna actually made this complaint of touching. Assuming she did, the fact that Rosanna would simultaneously complain that plaintiff was gay *and* that he touched her inappropriately underscores the facially pretextual manner of the reason for plaintiff's termination, especially in light of the release that all passengers must sign, acknowledging that they will be in close bodily contact with instructors.

43. Maynard, however, did not even investigate Rosanna's allegations by inquiring of plaintiff's side of the story. He did not question plaintiff about the allegations – again, assuming she made them – but decided to accept them as true because, after all, she was a woman, and therefore would give Maynard cover for firing plaintiff since a woman, in general,

9

would be more likely to be believed in the context of a complaint about inappropriate touching by a man.

44.    Even though there was a videotape of the jump that showed no inappropriate touching, Maynard dismissed said evidence and purposely lost custody of the tape so that plaintiff could not use it in his defense.

45.    In all, the allegation of touching, if it were even made by Rosanna, was a false pretext for plaintiff's termination, which happened because of one homophobic customer's complaint about being near a gay person and of because of plaintiff's failure to conform to stereotypical gender roles for men.

46.    Maynard knew that plaintiff is a homosexual and would have no motive to touch a female passenger in any manner other than to protect her safety in accordance with proper procedures.

47.    Maynard knew that Rosanna had signed a release wherein she knew she would in close bodily contact with an instructor.

48.    Maynard's reaction to Rosanna's baseless complaint – without even as much as asking for plaintiff's side of the story -- is an instance of sex stereotyping, insofar as it validates a woman's complaint against a man whereas a man's complaint against a woman – gay or straight –

would never have been accorded any credence in similar circumstances. Ray knew this, yet he was more than happy to use what he knew to be a patently false touching complaint against a man as a pretext for firing for being – and saying – that plaintiff is gay.

49. In the alternative, if Maynard made up the allegation of touching, it was meant to bolster his justification for terminating plaintiff for stating he is gay. Maynard's invoking a sex stereotype – i.e., that a woman who complains of being touched by a man must be believed without investigation – in order to justify an unlawful termination is just as bad as if the sex stereotype originated in Rosanna's mind in order to give credence to her frivolous complaint about being told that someone is gay. Plaintiff now sues for relief.

## FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE VII

50. Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

51. Plaintiff was fired because his behavior did not conform to sex stereotypes.

52. Such actions were in violation of Title VII.

53. By virtue of the foregoing, Plaintiff has been damaged.

## SECOND CAUSE OF ACTION
### SEXUAL ORIENTATION DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

54. Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

55. Plaintiff was fired because of his sexual orientation.

56. Such actions were in violation of the Executive Law of the State of New York.

57. By virtue of the foregoing, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
### GENDER DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

58. Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

59. Plaintiff was fired because his behavior did not conform to sex stereotypes.

60. Such actions were in violation of Title VII.

61. By virtue of the foregoing, Plaintiff has been damaged.

## FOURTH CAUSE OF ACTION
### VIOLATION OF THE FLSA

62. Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

63. At all times mentioned herein, as limited by the applicable statutes of limitation, Defendants failed to comply with the FLSA, in that Defendants frequently required and permitted Plaintiff to work more than 40 hours per week, but provision was not made by Defendants to pay Plaintiff at the rate of one and one-half times the regular rate for the hours worked in excess of the hours provided for in the FLSA.

64. Additionally, and even assuming defendant was not required to pay time and a half, plaintiff was entitled to a minimum wage at all times he was at the premises waiting for customers.

65. Plaintiff was not paid minimum wage for the time he was required to sit and wait around for potential skydive clients to appear and was illegally paid by the job, as if he were an independent contractor.

66. However, plaintiff was not an independent contractor and was entitled to a minimum wage in addition to whatever fee he would earn for each dive that he took.

67. Most of the records concerning the number of hours and excess hours worked by Plaintiff, are in the exclusive possession and under the sole custody and control of the Defendants.

68. Plaintiff is unable to state at this time the exact amount owing to them at this time, and proposes to obtain such information by

13

appropriate discovery proceedings to be taken promptly in this cause.

69. Upon information and belief, Defendants is and was at all relevant times herein aware that overtime pay is mandatory for non-exempt employees who work more than 40 hours per week.

70. Upon information and belief, Defendants are and were at all material times herein fully aware that Plaintiff worked more than 40 hours per week without receiving overtime compensation for such additional work and that plaintiff was entitled to a minimum wage for hours not compensated by diving customers.

71. Based upon the foregoing, Defendants, for violating the FLSA, are liable on Plaintiff's first cause of action in an amount to be determined at trial, plus liquidated damages, attorney's fees and costs.

### FIFTH CAUSE OF ACTION
### VIOLATION OF THE NEW YORK STATE OVERTIME LAW

72. Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

73. At all material times herein Defendants failed to comply with, *inter alia*, NYLL § 663(1) and 12 NYCRR § 142-2.2 in that Plaintiff consistently worked for Defendants in excess of the maximum hours provided by state and federal law, but provision was not made by

14

Defendants to pay Plaintiff at the rate of one and one-half times the regular rate for the hours worked in excess of the hours provided for by state and federal law.

74.   Upon information and belief, Defendants were at all material times herein aware that overtime pay is mandatory for non-exempt employees who work more than 40 hours per week.

75.   Upon information and belief, Defendants' non-payment of overtime pay to Plaintiff was willful.

76. Based upon the foregoing, Defendants, for consistently violating New York's Labor Law and its implementing regulations are liable on Plaintiff's second cause of action in an amount to be determined at trial, plus a 25% statutory penalty, attorney's fees and costs.

<u>SIXTH CAUSE OF ACTION</u>
<u>VIOLATION OF THE NEW YORK MINIMUM WAGE LAW</u>

77.   Plaintiff repeats and realleges the allegations set forth in all previous allegations as if fully set forth herein.

78.   At all material times herein Defendants failed to comply with, *inter alia*, NYLL § 663(1) and 12 NYCRR § 142-2.1 in that Plaintiff consistently worked for Defendants without being paid even a minimum wage for hours in which there were no paying customers.

15

79. Upon information and belief, Defendants were at all material times herein aware that minimum wage is mandatory.

80. Upon information and belief, Defendants' non-payment of minimum wages to Plaintiff was willful.

81. Based upon the foregoing, Defendants, for consistently violating New York's Labor Law and its implementing regulations are liable on Plaintiff's second cause of action in an amount to be determined at trial, plus a 25% statutory penalty, attorney's fees and costs.

**WHEREFORE,** Plaintiff demands as follows:

A.  Compensatory damages in excess of the jurisdictional amount required of this court;

B.  Punitive damages;

C.  Cost of suit and attorneys fees;

D.  Liquidated damages;

E.  Such other relief as the Court may deem just and proper.

Dated: New York, New York
February 22, 2011

                                                /s/
                                      GREGORY ANTOLLINO GA 5950
                                      Attorney for Plaintiff
                                      18-20 West 21st Street, Suite 802
                                      New York, NY 10010