UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

DONALD ZARDA,

                Plaintiff,

         -against-

ALTITUDE EXPRESS, INC.,
dba Skydive Long Island, and RAY MAYNARD,

                Defendants.
----------------------------------------------------------------X

REPLY MEMORANDUM IN SUPPORT OF ADMISSION OF EXPERT TESTIMONY AND PAYMENT OF PREPARATION FEES OWED BY DEFENDANT

10-cv-04334-JFB

## PRELIMINARY STATEMENT

Defense counsel is best when he makes use of the *ad hominem* attack, and does so in his opposition papers, twice making light of my mis-titling of this motion. It's always embarrassing to make a typo, but I think to point one out on several occasions as he did is beyond the pale of subtle criticism. But this is how Mr. Zabell practices, and while it does embarrass me that I feel I have to point it out, I will: While I was away on vacation, I received an unsolicited email from one of Zabell's adversaries in Suffolk Supreme Court, in which litigation he has acted more childishly than this one. In that litigation, Lamarca-Pagano v. Dr. Steven Phillips, P.C., 356441/10, defense counsel (Mr. Zabell, as the Court is aware, plays on both sides), pointed out that Mr. Zabell has had himself mentioned not once, not twice, but three times in treatises and other third party sources for his bad behavior. See Horowitz, Disclosure, VIII, Depositions, 59 Syracuse L. Rev. 693 (2009); see also Haig, New York Practice Series: Commercial Litigation in New York State Courts, §65: 16 Discovery-Depositions, Footnote 11 (3d ed., 2011). See also, "What Lawyers Do," a blog by Eric Dinnocenzo, a self-

1

described "Trial Lawyer Tracking Events that Affect the Legal Rights of Individuals and Consumers." Mr. Zabell's behavior was mentioned at in Mr. Dinncenzo's blog at http://whatlawyersdo.com/2008/11/20/attorneys-sanctioned-for-rude-behavior-during-deposition.

A sanctions motion, not surprisingly, is pending in the Lamarca-Pagano case in which, among other things Mr. Zabell cancelled an expert's deposition at such late notice that the expert had lost his entire schedule for the day, and thus presumably lost that day's billings. Zabell simply left him high and dry, as he did Professor Yoshino in this case. See Antollino Declaration, Exhibit A.[1] Now Zabell has the chutzpah to suggest that he should not have to reimburse Professor Yoshino for reasonably preparing for the deposition that Zabell himself refused to adjourn. This is the game that Mr. Zabell plays – it makes litigation most unpleasant and the Court should not tolerate it. Likely, he spent more of his clients' money on opposing the motion than it would have cost him simply to pay it.

What is more important, Zabell offers nothing to suggest that Professor Yoshino – multiply published and qualified beyond expectation – is not qualified to testify in the area of gender and sexuality studies, a somewhat new but by now established area of academic inquiry, and to opine about sex stereotypes and "covering," a topic that has gained Professor Yoshino world renown.[2] The motion

---

[1] I have only attached the relevant portion of the motion, but if the Court wants to see the whole sordid attack Zabell made on the defense attorney, and vice versa, I'm happy to provide it.

[2] Mr. Zabell keeps forgetting that this is a hybrid sexual orientation discrimination/Title VII lawsuit. See Defendant's brief, footnote 1, arguing that "Title VII does not prohibit sexual orientation discrimination." The point I just

2

should be granted, however, if the Court in any way feels that Professor Yoshino has crossed the line into making the a legal recommendation that is within the province of the jury, then in limine motion may serve as an opportunity for the Court to rule on how far Professor Yoshino may go. This is not a simple case, as defendants suggest. Although this state is one of only one of 21 of 50 states that prohibit employment discrimination on the basis of sexual orientation (see Exhibit A, attached hereto), plaintiff's position is that a gay person's identify is wrapped up in his ability to express that identity. Not every person might see it that way and, if the Court does not grant this finding to plaintiff on summary judgment, plaintiff has the right to make his case with the very best evidence before the jury. Professor Yoshino has, more than any one else in the country, perhaps the world, examined this issue exhaustively. If Professor Yoshino cannot attest to the jury that plaintiff's termination was caused by homophobia, he has the right at least to educate the jury that self-identification with being gay is inextricably intertwined with being gay. If the defendants want to hire their own expert to say the contrary, they are entitled to do so; but the fact that they are free to do so demonstrates that it is an issue that goes to weight, rather than admissibility.

      As for the question of sex stereotypes, this is a question that is perhaps too complex for most if not all-lay juries to understand. Judge Gerhart Gessell recognized this as trier of fact in the seminal case of Price Waterhouse – which defendants, by the

---

quoted is true, but once and for all, plaintiff is bringing a New York state claim for sexual orientation discrimination; his Title VII claim raises the issue of sex stereotypes. There are also two bases for federal jurisdiction – federal question and diversity – plaintiff is a Missouri resident - so this case will conclude in federal court no matter what. I hope this is the last time I have to point this out.

way, wholly misrepresent in their brief. Sex stereotyping is a well-recognized theory of sex discrimination, *and yet federal judges are taught how to address issues pertaining to this theory of discrimination in judges' school*. See Exhibit B, Law Professor Joan William's PowerPoint presentation on stereotyping, Nat'l Workshop for District Judges, September 2008. If an appointed federal judge needs education to feel comfortable adjudicating the issue of sex stereotyping, then certainly a jury does, especially when the stereotyping issue involves a man - a representative of the majority that would normally be associated with engaging in stereotyping. Plaintiff's argument as to this prong of his case is more or less twofold: First, he is arguing that Maynard's failure to conduct any investigation into the allegation of touching – the assumption that the accusation against a man by an attractive woman would certainly be true[3] — is sex stereotyping.

Second, Maynard fired plaintiff because, when he was accused of being improperly close to Ms. Orellana, he identified as a gay man so as to clear himself of any suggestion of impropriety. We contend that if plaintiff were straight and someone had accused him of getting too close to a man as they strapped together for a jump, and he replied, "Hey, no homo – not that there's anything wrong with that," no one would have flinched. But the fact that he used the best arrow in his quiver – that he was gay and was only touching Orellana at the hips for her safety – got him fired. These are subtle arguments that a jury is entitled to hear from an expert in gender studies, especially one who concentrates in the study of gay people. Plaintiff cannot assume that there will be eight gay people on the jury, and it is more than likely that there will be one, or none. It is

---

[3] Maynard testified at his deposition that he thought that Mr. Zarda could switch back and forth between being gay and being straight, and had no obligation to inquire of Ms. Orellana as to whether she was improperly touched. Dep. at 197-98

4

more than likely that most of the jurors will not only not be gay, but will have little or no experience with gay people in their everyday lives. Plaintiff is entitled to have an expert to explain what it is like to be gay; how expressing one's gayness is part of being gay; and how not only Maynard, but also Orellana and her companion used sex stereotypes in evaluating plaintiff's conduct. Whether that was illegal, and whether that amounted to discrimination is a question for the jury. The Court might see Professor Yoshino's report as overbroad to an extent, but that does not render his opinion wholly inadmissible. It is for the Court to determine what is admissible, and to allow the jury to determine whether the admissible evidence is evidence of liability.

## ARGUMENT

**I.     PROFESSOR YOSHINO'S ANALYSIS IS RELEVANT AND NECESSARY**

Defendant cites general cases discussing the admissibility of expert testimony, but not a single case suggesting that Professor Yoshino and his area of inquiry are not "relevant evidence" defined by the rules and the case law as "evidence having *any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphases added). Defendants do not and cannot deny that "[t]he Rule's basic standard of relevance thus is a liberal one," Daubert, 509 U.S. at 587, and that "[t]he rejection of expert testimony is *the exception rather than the rule*." Fed. R .Evid. 702 Advisory Committee's Notes at 424 (emphasis added).  I agree that the purpose of the expert is not to testify to "conclusory condemnations" (def. br at 2). Professor Yoshino, on the other hand, does not do that . He based his opinions almost entirely on the testimony of Ray Maynard, the two complainers, and Rich Winstock, Maynard's

5

employee. He states clearly in his declaration in support of this motion that he

> did not submit the report to urge a legal conclusion on the Court, but rather to highlight the social frameworks through. which stereotyping on the basis of sex or sexual orientation occur. In my view, the general population often overlooks these stereotypes because they remain so deeply engrained in our social life, much as racial stereotypes were deeply engrained before the civil-rights movement…In questioning why Mr. Zabell objected to my expert report as "an amicus brief," I can only assume that he is fixing on my report's one citation to a legal case regarding the sex stereotyping theory…. See Sassaman v. Gamache, 566 F.3d 307 (2nd Cir. 2009). In that case, the Court found that an employer's termination of a male employee on the basis of a single sexual harassment charge against him could reflect sex stereotyping when the employer had made no attempt to investigate the veracity of the charge. I did not invoke this case as a controlling legal authority, but rather as a sociological example of how pervasive such stereotyping can be. Sex stereotyping can be found in law just as it can be found in psychological or sociological studies.

Yoshino Declaration, July 18, 2012, pp.2, 12. Of course, it was not my role to edit Professor Yoshino's report, and I had a feeling that the reference to the Sass man case would ruffle a few feathers. I understand that we don't cite cases to juries, and no matter Professor Yoshino's explanation for putting it in there, I understand the jury is not going to hear about that case. Nevertheless, one doesn't burn the house to roast the pig, and the Court can determine which of the report is admissible or not, and about what Professor Yoshino can testify.

The cases cited by defendants are inapposite. Despite all of the sex stereotype experts who have come before them, they start with the assumption that all Mr. Yoshino has done something improper. No so. In Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992), the Court found that the expert crossed the line in portions of his testimony, but that the error had been harmless because, in the end, the jury instructions had set forth the proper legal standard. Thus in that case, not only had the expert not given the proper legal standard, but he had overstepped his bounds without proper

limitation by the district judge, who, in any case, corrected the error by giving the jury the proper legal standard. In this case, the defendant states simply that the entire opinion is improper, without giving the court any guidance as to why. I would suggest that the citation to Sassaman should be left out, and the Court should decide what and what does not cross the boundary as to admissibility. That is the Court's job, not mine, the litigator, and not Professor Yoshino, who brings his best efforts to the table to the Court to parse in an appropriate manner. Clearly most of the report is admissible – Zabell complains that the report comes to certain conclusions that are not within Yoshino's ambit of expertise. But in fact, every statement that Yoshino made about skydiving came from Maynard and his top employee Winstock. Maynard, for example, admitted he did no investigation into the dubious claim of touching; he expressed - on tape no less – that he believed plaintiff's expression of having a male partner was an expression of an "escapade"; and, by firing plaintiff, he believed that plaintiff had no right to identify as a homosexual. *That such expression is what got plaintiff fired is not in dispute*. For gosh sakes, Maynard *admits* on the tape that he is firing plaintiff because he *said* he was gay; and the "hip touching" is also mentioned. (The tape is not transcribed in deposition, but it is available on YouTube: http://www.youtube.com/watch?v=APQs-0d9TkE&feature=g-upl.) Maynard also put in his opposition to plaintiff's application for unemployment benefits that Zarda was fired for revealing "personal information." See Callanan dep. at 108 Exh. 1-A. These are matters that are not in dispute, so to suggest that Yoshino is going beyond his expertise is simply not fair. The question is do they raise an inference of bias and stereotype. Professor Yoshino is not taking that role away from the jury, and if defense counsel feels he is, he can object and the Court can rule. But

7

the jury, listening to testimony on a sensitive topic, is entitled to listen to the opinion of someone who has studied and published on the subject, not simply Ray Maynard, who believes that gay people can switch back and forth from straight to gay at the bat of an eyelash. Let's not kid ourselves: This is an issue that divides the nation and New Yorkers are lucky to have a law that protects employees in a minority of states. Let's see that law does what it is designed to do and allow the jury to understand what is appropriate and what is not – from the perspective of both the employer and the employee. And as for the sex stereotype aspect of the case, the Court cannot allow a group of lay jurors decide an issue that federal judges are invited to train in. While sex stereotyping is a cognizable theory, it is a highly subtle one, and thus Professor Yoshino's testimony on the subject has the "tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401

## II. PROFESSOR YOSHINO'S ANALYSIS SATISFIES THE DAUBERT TEST

Defendants offer nothing to suggest that a sex-stereotyping expert would not satisfy the Daubert test. The fact that Professor Yoshino teaches law rather than sociology is a question that, at best, goes to weight rather than admissibility. As a law professor, he has written and spoken extensively on gender roles and gender studies; and his book Covering is a landmark treatise that combines personal experience with academic inquiry, and has resulted in his invitation to speak on scores of panels. His book has won numerous awards, and is assigned to first year students at four colleges – notably colleges in states where sexual orientation is not a protected category. Defendant's attempt to distinguish the seminal case of Price Waterhouse as "unwarranted" is itself unwarranted,

8

and disingenuous. First, defendant argues that the defendants in Price Waterhouse did not question Dr. Fiske's qualifications. Br. at 5, citing 490 U.S. 228, 255. No, this is not exactly true. What the plurality opinion said was actually this:

> Without directly impugning Dr. Fiske's credentials or qualifications, Price Waterhouse insinuates that a social psychologist is unable to identify sex stereotyping in evaluations without investigating whether those evaluations have a basis in reality. . . . Fiske testified that she discerned sex stereotyping in the partners' evaluations of Hopkins, and she further explained that it was part of her business to identify stereotyping in written documents. . . . .We are not inclined to accept petitioner's belated and unsubstantiated characterization of Dr. Fiske's testimony as "gossamer evidence" based only on "intuitive hunches" and of her detection of sex stereotyping as "intuitively divined." Nor are we disposed to adopt the dissent's dismissive attitude toward Dr. Fiske's field of study and toward her own professional integrity.

Id. at 255. So it was not the case that Dr. Fiske's testimony was without controversy. Ultimately, this is a question for the jury. If the defense wants to point out that Yoshino does not have a PhD in Sociology, let it do so; we will respond, in turn, that some of the most renown experts in gender studies and sex stereotypes are lawyers, including law professor Joan Williams, who taught the issue to federal judges (See Exhibit B); and law professor William Eskridge, who testified on the issue to the United States Congress. See Antollino Reply Dec. Exhibit D.

As to defendants' reference to the Price Waterhouse decision on remand, that Dr. Fiske "could not, and did not determine 'the precise effect stereotyping had on the decision [to terminate plaintiff]," this is both misleading and irrelevant as it applies to this case. Def. br. at 5. In fact, the District Court – who, again, believed expert testimony on this issue to be essential – said as follows:

> Plaintiff's expert witness at the original trial -- a well-qualified social psychologist specializing in sex stereotyping issues -- testified that sexual stereotyping can lead to negative judgment of women in traditionally male-dominated organizations. She expressed her expert opinion that some Price

9

> Waterhouse partner comments about Ms. Hopkins were influenced by sex stereotypes and concluded that stereotyping "played a major determining role" in the firm's decision on Ms. Hopkins, although the precise effect stereotyping had on the decision could not be determined. It was apparent from the testimony that disentangling stereotyping from fact is difficult. Stereotyping may be conscious or unconscious, and a negative fact may be expressed in words that imply stereotyping and yet be wholly nondiscriminatory.

737 F. Supp. 1202, 1206-07. "Precise" means exact. In the law, we do not search for exactitudes; rather, we search for the preponderance of the evidence. In Price Waterhouse, the expert had to put together a number of sexist statements and render an opinion as to their effect on the plaintiff's employment; of course, the defendants didn't admit to any improprieties. In this case, Yoshino is doing exactly the same thing. That his opinion comes out a little bit stronger than Dr. Fiske's is function of Maynard's *admission on tape* that he was firing plaintiff for telling a customer that he is gay. If his opinion is a little bit stronger than Fiske's it is because the evidence in this case is a lot stronger than what Dr. Fiske had to deal with.

As for the remaining elements of the Daubert analysis, Professor Yoshino goes over them step by step in his declaration at pages 2-12. Defendants do not address any of these contentions; they merely point out that Professor Yoshino does not have a PhD in Sociology. It is a good thing he does not. Perhaps if he had, he would not have brought us such groundbreaking work that is a credit both to him and the field of gender and sexuality studies, and a source of learning for us all.[4]

---

[4] Finally, EEOC v. Morgan Stanley, 324 F.Supp. 451 (S.D.N.Y. 2004) is not the only case in this Circuit that has dealt with sex stereotyping, as defendant wrongly suggests (br. at 7). That case, along with Duling v. Gristede's Operating Corp., 267 F.R.D. 86 (S.D.N.Y. 2010) (admitting expert report) are the only reported decisions on the subject. Significantly, defendant offers not one case suggestion that sex stereotyping is not proper fodder for expert testimony, even if the subject is rare.

10

CONCLUSION

For the foregoing reasons, Professor Yoshino's expert testimony and report should be deemed admissible, and he should be compensated in the amount of $3,500 for preparing for the deposition that Mr. Zabell noticed for June.

Dated:	New York, New York
	August 31, 2012

/s/
GREGORY ANTOLLINO
Attorney for Plaintiff
18 West 21st Street #802
New York, NY 10010