UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

**DONALD ZARDA,**

               Plaintiff,

               -against-

**ALTITUDE EXPRESS, INC., et ano**

               Defendants.
-----------------------------------------------------------------X

REPLY
MEMORANDUM OF LAW
IN OPPOSITION AND SUPPORT

10-cv-04334-JFB

**REPLY ARGUMENT**

I.     **PLAINTIFF'S SEX STEREOTYPING CLAIM SURVIVES SUMMARY JUDGMENT**.

      This is a mind-bending and unusual case; but it is also very important, and at the cutting edge of where we are as a society versus where we were. Plaintiff acted as he always had in protecting his student, but had no idea there was an unemployed, homophobic waiter wanting his money back and ready to complain about anything. Hs girlfriend, who surely wanted to survive the jump, testified she trusted Don's judgment in protecting her life, but mentioned she felt uncomfortable at the hips, and was told – shock – that plaintiff is gay. Now we have a highly federal case.

      In their papers, defendants promulgate numerous bases upon which plaintiff acted inappropriately with Rosana – as if he were sexually attracted to her. Very stupid, when a man, under penalty of perjury is willing to attest to the repulsion he feels at the very thought of male-female sexual relations. This is perhaps the very first case in history where a person is being accused of craving women when he is 100% gay.

      Notably, the complaint Rosana's boyfriend initially report was not that Don acted inappropriately, but that, as Ray said, "He said that he had his hands on her hips and made her feel very uncomfortable". Maynard dep. at 182. That feeling of uncomfortablility morphed into impropriety and many different motivations on Don's part, including that it was sexual harassment, because "He has his hip on my -- his chin on my shoulder  . . . I didn't give him permission to do that." Orelana Dep. at 89. Oh, Rosana, but you had! Antollino Dec. at Exhibit

1

A, ¶ 13. Then she changed her story and admitted it not sexual, Orelana Dep. at 101. Finally she had to admit that she did not know she would be touched on the skydive because she was too troubled or excited or troubled to read the waiver. Nevertheless, Maynard used any basis that he could grasp to fire plaintiff; you might say he "shot from the hip" (pun intended). While certainly plaintiff was fired for expressing that he is gay, he was also fired, as Ray stated, for making Rosana, who was not aware the extent that she would be touched, uncomfortable for being touched when the sport, when you come down to it, is all about touching and risking your life.

So plaintiff was fired for telling Rosana that he is gay, but he was also fired for other reasons, including that he was a victim of Ray's gender stereotype. People can be fired for multiple reasons, and there's an expression for in this area of law: Mixed motives. In this case, plaintiff was fired for expressing that he was gay – which is a function of his *being* gay – and also because of sex stereotypes. See Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

Plaintiff argues three theories upon which he was fired for sexual stereotyping. Argument One: Plaintiff was fired because a facially-pretextual, second-hand, uninvestigated complaint was credited that he had inappropriately touched a woman. This was the theory that got the plaintiff to the jury in Sassaman v. Gamache, 566 F.3d 307 (2d Cir. 2009). Although there is one difference between Sassaman and this case – Ray didn't say "I have to believe the woman over the man," because he never spoke to the woman – but other differences between these cases cut for Don. I explored most of those distinctions in my opening brief, at 6-7, and I'd like to add one more. In Sassaman, the plaintiff and the accuser were co-workers at the Board of Elections and the plaintiff had no arguable reason to touch his complainer in any way. and yet he got to the jury. In plaintiff's case, he had no performance problems, was doing what he was supposed to, but because Orelana refused to educate herself about what was going to happen on the jump. Because of Ray's actions in response, we have a federal case and plaintiff gets to the jury.

Mr. Maynard overblew the evidence he had in his arsenal. Remember the initial complaint was "discomfort – and Ray credited the allegation of improper touching despite having examined the video, which was completely exculpatory toward Don; despite the fact that

2

Ray knew that Don is gay; and despite that Ray knew that Rosana's hip straps would have to be manipulated on the jump. Defendants make a big deal about the fact that more of the manipulation would take place in the aircraft than in the air, but this is a distinction without a difference; if that's their defense in evaluating the testimony of a novice versus an expert, then they have no defense. Her hips were going to be touched in the airplane and in the air. She waved her right to complain about being touched, yet Ray was unwilling to use that waiver against a woman. Instead, rather than even talk to her, he talked only to her boyfriend and his secondhand allegation about her complaint. No matter if she did not complain because "she doesn't like confrontations," Maynard had a duty at least to reach out and ask her what happened. He didn't. He took the allegation as true despute the overwhelming evidence that it was untrue: first, Don is gay; The assumption that all men will be sexually attracted to women, or be prone to sexually harassing them, is a sex stereotype. Second, Rosana's hips needed to be touched for her safety. Third, the videographic evidence showed no impropriety whatsoever. Defendants repeat that the mantra that the video didn't record everything. This is probably true, but nonetheless where is the evidence on their side? Defendants suggest that because the video did not show everything that something must have occurred when the camera was not rolling. This is sheer speculation, and on the <u>Sassaman</u> issues alone, plaintiff gets to get to the jury.

The idea that any investigation took place in this matter insults everyone's intelligence. Zabell argues that the investigation, consisted of (1) a discussion with Kengle; (2) a discussion with Don; and (3) a review of the tape. These are not elements of an investigation; this was a pretext of one to get rid of Don for letting a customer know that he was gay. "Investigation" is defined by Webster's as "to observe or study by close examination and systematic inquiry." The discussion with Kengle was not a study by close examination by any means. Maynard was not privy to what went on in the plane, and he didn't even speak to the other workers present, of which there were three (videographer, other instructor, pilot). In another case with similar complaints of touching by instructors, Ray wrote, "personally if someone was feeling up my

3

girlfriend, I would do something *on the spot* to defend her dignity-unless of course I am [a] fourth-grader." Antollino Dec. Exh. K, p.3. Kengle did nothing to identify what Don was doing wrong on the plane; when he saw it, the pictures show him and his lady having a damned good time. Antollino Dec. Exhibit B. Rather Kengle's statement was the object to be investigated, and Maynard did nothing to effectuate any "study" or "systematic inquiry" of his allegation whatsoever, except to watch the video, which was *exculpatory* toward Don.

To suggest that Maynard's interview with Don at the suspension hearing was part of an investigation is nonsense. According to defendants, Ray had seen the video, yet Don, after thirty or so customers since Rosana, did not remember anyone making any complaint, or anything unusual about any jump in the last few days; yet Maynard refused to allow plaintiff to see the video, which at the end, Rosana and Don are practically kissing. Zarda dec. at ¶¶ 4, 28, 29, 35, 42; Antollino Dec, Exhibit B. This *precluded* the investigation, and is an example of the utmost bad faith: along with Maynard's stealing plaintiff's check for a week; his calling plaintiff's sexuality an "escapade"; and his making fun of his choice of color.

Ray did no investigation. He heard an *unverified, non-sensical allegation* and suspended Don, then watched a video that showed that everything went right. The immediacy of his acceptance of the allegation of impropriety is evidence of sex stereotyping. The court itself expressed understanding of this theory when it denied plaintiff the opportunity to present expert testimony on this point. "[Yoshino] cites the [Sassaman] case as that being a permissible theory. There's no question that that's a permissible theory but first of all, the [Sassaman] case doesn't say anything about experts and whether [one] is needed on that. But it's my view, again, that that issue of stereotyping is not subtle, it's not difficult to understand, it's not complex, it's very straightforward." Transcript, February 22, 2013, pp.8-9 attached as Exhibit 1.

The second argument upon which plaintiff makes his sex-stereotype claim is based upon his freedom as a man to remove himself from the suggestion that he is heterosexual. There was a time when it was defamation per se to call a person homosexual. Those days are gone. See

4

<u>Yonaty v. Mincolla</u>, 97 A.D.3d 141 (3d Dep't 2012), <u>lv.</u> <u>denied</u>, 20 N.Y.3d 855 (2013). Now, not only is calling someone a homosexual not a tort, but, this should be the first case that holds it is discrimination to force a gay person to accept the allegation that he is heterosexual without allowing that gay person to rebut the allegation. Maynard believes the opposite – in other words that Don should have taken the suggestion "like a man." Dep. at 261. Don is very masculine with a super, athletic body; except for his idiosyncratic pink affectations, few non-gays would assume he is gay. I am not nearly as masculine as Don, but depending on the circumstances if someone asks me if I have a girlfriend or a wife, I respond, "Why do you presume I am heterosexual?" And since I am gay and do not want to be considered straight, that is what I have the right to say. Don was accused of being interested in Rosana, and he didn't want her to think he was interested in her when another diver suggested as much. He didn't make a snarky response like mine, but gently told Rosana that he was gay and had the ex-husband to prove it. That is not an expression of telling customers about his "escapades," and he did it for the purpose of making Rosana feel more comfortable, since she was the target of the joke as well. Times have changed. That Rosana did not feel comfortable is unfortunate, but legally not grounds for termination.

Finally, plaintiff presented evidence that Ray showed a discriminatory attitude toward his female-appearing attire. Zarda Dec. at 15-18, dep. at 111. The Second Circuit has said that discrimination based on a "fail[ure] to conform to gender stereotypes [can be stated] in two ways: (1) through behavior or (2) through appearance." Here we have both.[1] No matter whether Ray demanded Don to paint the pink cast or put a sock over its, the difference is immaterial. The point is that he made Don cover his identification with his female side - let's put it that way – not only with the cast, but with the pink-painted toenails. Had this been another venue, Ray might have been on better footing, but this was an skydive center where people walk around half naked, Maynard dep. at 88; where men ogle at women's breasts on video as gravity forces them to flop

---

[1] Behavior includes speech. <u>See</u> <u>Acosta v. City of Costa Mesa</u>, 2013 U.S. App. LEXIS 9066, p. 36 (9th Cir. 2013)

into the air, id. at 133; where parties are titled sexually as in "Pull Your Pork" and "Get Laid," id. at 74; and where tandem instructors and passengers hoist a flute of champagne to the tune of "Make sh*t happen!" Antollino Dec. Exhibit B, Winstock videos. The SDLI is a potty-mouthed free for all where anything goes - except for stating one is gay, or denying one is heterosexual.

The defendants' argument that plaintiff was fired for "poor customer service" is belied by the fact that (1) the contemporaneous evidence shows everyone having a good time; (2) Don was recognized as an outstanding instructor, liked by all; and (3) seemingly ever other complaint made about SDLI was illegitimate: At SDLI the customer has never been right, until Don's case. Defendant's citation to plaintiff at 172 of his deposition is another of Zabell's misrepresentations. Read from the question on page 171 to the end of the last answer on page 173 and that is what Don attested to. Maynard fired plaintiff for a multitude of reasons, one of which was that he immediately credited a facially pretextual allegation that a gay skydiver, better trained and experienced than Ray would touch a woman inappropriately, especially after she practically kissed Don while the tape was running at the end of the jump, pronouncing, "That was awesome!" Antollino Dec. Exhibit B, Rosana jump. If it was awesome, then she enjoyed it.

Finally, defendant dropped the hips "uncomfortable" claim before the unemployment board. This change was made at Ray's behest, even if Lauren Callanan wrote it. Dec. at Exhibit O; Maynard Dep. at 343. A "juror can reasonably view an employer's changing explanations as 'pretextual, developed over time to counter the evidence suggesting …discrimination." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 106 (2d Cir. 2001) (held: remanded for trial)

For these reasons, the Title VII claim must go to the jury

II.    **BEING GAY IS NOT AN "ESCAPADE." PLAINTIFF MUST WIN SUMMARY JUDGMENT AS TO LIABILITY ON HIS SEXUAL ORIENTATION CLAIM.**

There is no dispute that plaintiff was fired, in part, because he told Orellana that he is gay. He said this because he is gay. This is mentioned on the termination tape. Antollino Dec. Exhibit B. It is also mentioned in the unemployment rebuttal, although it is watered down as

6

"discussing personal matters." Antollino Dec. Exhibit O. Defendants attempt to defend the actions on the grounds of Maynard's right to fire employees because of their customers discriminatory beliefs, but that's not true. Chaney v. Plainfield Health Care Ctr., 612 F.3d 908, 913 (7th Cir.2010) (illegal to allow patients to pick race of attendants); Customer preference cannot intrude into the anti-discrimination laws lest they be "allow employ[ers] to avoid liability no matter how many discriminatory actions they took so long as the 'final decision' on placement could be attributed to the client." Katz v. Adecco United States, Inc., 845 F. Supp. 2d 539, 544 (S.D.N.Y. 2012).

Not a single case they cite stands for the proposition that a customer can complain about a worker's protected status and that forming the basis for a legal termination. Imagine Kengle coming to Maynard to complain that his girlfriend had been assigned a black instructor, and Maynard thereupon firing the instructor. Unthinkable, of course, but at one time it was not. Times have changed. The only difference now between plaintiff's termination and a black person's termination in the same situation would be that plaintiff is not obviously gay and had to declare his protected class. If that is forbidden, however, it discriminates in favor of protected classes that are visible versus those that are not, and that would itself be a form of discrimination. In any case, it has long been the case that customer preferences cannot dictate the hiring and firing of customers. Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354, 365 (S.D.N.Y. 2007) (Chin, J.) ("thick cloud of smoke" of discrimination where plaintiff is told he is not being hired by hospital because older scientists get less funding in the marketplace). Therefore, plaintiff's stating – and therefore being – gay was a factor in his termination and he must win this cause of action as a matter of law. Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007). So here we have established an inference of discrimination and there is no legitimate reason in response. It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill

7

that position (Maynard Dep. at 302-04);  . . . or its invidious comments about others in the employee's protected group (pink toenails are "gay" Zarda dep. at 347, dec. at 18; "Gay" is an "escapade) ; Maynard Dep. at 226); or the more favorable treatment of employees not in the protected group (see Winstock dep. at 94,109-110 Winstock refers to his sexuality to passengers, but it is not grounds for discharge in his case, Maynard Dep. at 220, 347) or the sequence of events leading to the plaintiff's discharge." Leibowitz v. Cornell Univ., 584 F.3d 487, 501 (2d Cir.2013) (Bianco, J). In this case we have established the whole rainbow (pun intended) of discriminatory inferences, including, most significantly – singly it stands alone as against the law – plaintiff's termination for telling Orellana he is gay. We don't have to go any further and examine pretext when certain facts are not in dispute; plaintiff was fired, at least in part, for an illegal reason. Summary judgment must be granted as to liability on this claim.

III.    **AN ADVERSE INFERENCE SHOULD BE GIVEN AT CHARGE FOR A GROSSLY NEGLIGENT ELECTRONIC SEARCH**.

There is nothing for plaintiff to add here. Maynard doesn't know what Callanan searched; Callanan admits she doesn't know what she searched, and admits she didn't search everything; and Zarda produced an electronic document from defendants that they cannot account for. All told, the evidence shows that the defendants' electronic search was insufficient, that they lost electronic documents, and plaintiff must be granted an adverse inference. Zubulake v. UBS Warburg LLC, 229 F.R.D. 422 (S.D.N.Y. 2004).

IV.    **PLAINTIFF'S MIMIMUM WAGE CLAIM SHOULD BE GRANTED SUMMARILY**.

Contrary to defendant's misconstruction of the minimum wage laws, state law requires employers to pay at least a minimum hourly rate to employees for every hour they work. N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.2. In this case, defendant kept no records, thus they have no standing to defeat plaintiff's motion on this point.

V.     **DEFENDANTS' BEGINNING THEIR BRIEF WITH A BEEF ABOUT A 56.1 STATEMENT UNDERSCORES THE WEAKNESS IN THIS POSITION**.

If defendants had anything interesting to say about this unusual, important case that might make new law, it would begin with a real argument. Instead, it begins with a two-page tattletale about creativity in legal writing, and a cast of shame on me for not offering the court a stale recitation of deposition testimony. But then, out of the other side of their mouths, defendants do the exact same thing. Plaintiff very plainly stated at ¶ 8 of his 56.1 statement that, "Rosana, who found the experience "crazy and exhilarating," did not want to complain." This was true. Defendant then in response, which I will not repeat here verbatim, go on to argue with the tenor of the plain statement by citing other of her testimony – which was inconsistent throughout – that suggested that she really didn't like the skydive after all, and it was only because she was afraid of confrontation that her boyfriend, "the brains of the operation" who complained for her instead.

Defendants' 56.1 statement is slanted as well – in response to plaintiff's and initially in support of theirs. Their citations to evidence, as I pointed out frequently, did not add up to the testimony cited (suggesting strongly at ¶ 94 that plaintiff had sexual relationships with women at one point). Furthermore, what is particularly galling is that every time plaintiff cited a portion of his affidavit for a contention that wasn't covered in the deposition – because Zabell did not ask about it – Zabell again and again comes up with the suggestion that plaintiff's testimony is "self-serving." Plaintiff testified in a sworn affidavit that he is 100% gay and has no attraction to women, and defendants argue that this is a self-serving remark? In other words, what defendant is suggesting is that you disregard plaintiff's affidavit, assume plaintiff was heterosexual, but then deny plaintiff's motion for summary judgment on the grounds of sexual orientation discrimination because Ray Maynard knew all along that plaintiff is gay. There will never again be another argument like this.

Ultimately, plaintiff's 56.1 statement is no different than any other this Court has seen or will see. I try to make it interesting and tell a story, but all of the contentions come from the depositions. The one discrepancy that the defendant was able to point out was whether plaintiff was asked to put a sock

9

over his pink cast or paint it black. Ultimately, cover the cast is what Maynard demanded plaintiff do, so the difference is immaterial.

VI.     **PLAINTIFF'S AFFIDAVIT DOES NOT CONTRADICT HIS DEPOSITION AND IS AN APPROPRIATE EVIDENTIARY VEHICLE**.

Earlier in this litigation, Mr. Zabell arranged for Rosana Orellana and David Kengle to submit affidavits to the court that *directly contradicted not only their depositions, but their errata sheets*. See Exhibit 2 (Kengle & Orelana contradictory affidavits). The Court accepted these affidavits as absolving Mr. Zabell of lying to the Court. Now comes bell accusing my client of contradicting himself in his affidavit versus his deposition, with no proof. Nothing could be further from the truth. Mr. Zabell conducted his deposition as he saw fit, asking questions that I thought irrelevant and in an order that which I would not have presented to the Court. My client therefore adopted his deposition testimony but told his own story in narrative form. Affidavits are both truthful and easier to read than question and answer, and testimony out of chronological order serves mostly the defendants' agenda. The defendants did not ask all questions that needed answering, either.

There is nothing wrong with this, and the Court does not disregard an affidavit unless it directly contradicts something stated in deposition. See White v. ABCO Eng'g Corp., 221 F.3d 293 (2d Cir. 2000) (affidavit may clarify deposition testimony); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 104 (2010) (same). In this case, the defendant shows no material contradiction, and the only contradiction that I will concede is that plaintiff's affidavit attests that Maynard asked him to paint his cast black, whereas his deposition attested that Maynard asked him to put a sock over it. The issue is that Maynard asked that the pink cast be covered, not the method of covering, since Maynard conceded that the cast was present and he didn't want any casts around the drop zone, dep. at 161-63. The contradiction however, is immaterial, more logical and clarifying. There are no other contradictions.

10

**CONCLUSION**

For these reasons and for all reasons set forth in the evidence submitted, defendants' motion

should be denied and plaintiff's granted.

Dated:                    New York, New York
                          May 19, 2013


                                          _____/s/_____
                                          GREGORY ANTOLLINO
                                          Attorney for Plaintiff


11