UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DONALD ZARDA,

                              Plaintiff,

          – against –

ALTITUDE EXPRESS, INC. d/b/a SKYDIVE LONG
ISLAND and RAY MAYNARD,

                              Defendants.

Case No.:
CV-10-4334 (JFB) (AYS)


# DEFENDANTS' PRE-TRIAL MEMORANDUM OF LAW

Saul D. Zabell, Esq.
ZABELL & ASSOCIATES, P.C.
1 Corporate Drive, Suite 103
Bohemia, New York 11716
Tel.: (631) 589-7242
Fax: (631) 563-7475
szabell@laborlawsny.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     STATEMENT OF FACTS ............................................................................... 1

        Plaintiff's Background Information .......................................................... 2

        Activities at SDLI ..................................................................................... 3

        The Jump in Question ................................................................................ 6

        The Complaint ........................................................................................... 8

        The Suspension and Termination ............................................................ 10

III.    ARGUMENT .................................................................................................. 13

        POINT I: The Second Circuit's Preclusion of Sexual Orientation Claims
        Precludes this Court from Reinstating Plaintiff's Title VII Claims .................. 13

        POINT II: Plaintiff was not subjected to Sexual Orientation Discrimination .......... 14

V.      CONCLUSION ............................................................................................... 18

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT**

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................14, 16

**FEDERAL COURT CASES**

**United States Court of Appeals**

*Dawson v. Bumble & Bumble*, 398 F.3d 211 (2d Cir. 2005) ..........................................................14

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2d Cir.1997) ..........................................................15

*Kiley v. Am. Soc. for Prevention of Cruelty to Animals,*
   296 F. Appx. 107 (2d Cir. 2008) ............................................................................13

*Simonton v. Runyon*, 232 F.3d 33 (2d Cir. 2000) ..........................................................13

**Federal District Court**

*Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294 (E.D.N.Y. 2006) ....................................15

*Cooper v. Morgenthau,*
   2001 WL 868003 (S.D.N.Y. July 31, 2001) ..........................................................15

*Hayes v. Cablevision Sys. New York City Corp.*,
   2012 WL 1106850 (E.D.N.Y. Mar. 31, 2012) ..........................................................16

*Iverson v. Verizon Communications,*
   2009 WL 3334796 (S.D.N.Y. Oct. 13, 2009) ..........................................................16

**STATE COURT CASES**

*Stephenson v. Hotel Employees & Rest. Employees*
   *Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265 (2006) ....................................14

**STATUTES & REGULATIONS**

Title VII of the Civil Rights Act of 1964... ..........................................................13, 14

# I.  **PRELIMINARY STATEMENT**

Defendants, Altitude Express, Inc. d/b/a Skydive Long Island ("SDLI") and Ray Maynard ("Maynard") (collectively "Defendants") did not discriminate against, Donald Zarda ("Zarda") based upon his sexual orientation.  Defendants were aware of Zarda's sexual orientation each and every season (2001, 2008 and 2009) Zarda was welcomed to work for Defendants.  In fact, throughout his employment with Defendants, Zarda was an openly gay male and referred to himself as "gay Don."  Contrary to Plaintiff's allegations, the evidence proves that Plaintiff's termination had nothing to do with the fact that he was gay, but rather was based completely on the fact that he "ruined" the tandem skydive experience for Defendants' customers.

Defendants received a customer complaint regarding Zarda's inappropriate and unprofessional behavior, including putting his hands on a customer's hips, putting his head on her shoulder, whispering in her ear and telling her personal information during a tandem skydive. Throughout SDLI's operation, Zarda is the one and only instructor customers logged complaints against.  Zarda's termination was based solely on his own behavior.  Therefore, the evidence, which will be presented in this matter, contradicts Plaintiffs key allegations against Defendants.

# II.  **STATEMENT OF FACTS**

SDLI is a domestic business corporation operating under the laws of the State of New York. (Zabell Ex. A).  Maynard is the owner and chief executive officer of SDLI. (Maynard Dep. pg. 10:7-9; Zabell Decl. Ex. A).  Maynard has been skydiving for over forty (40) years. (Maynard Dep. pg. 11:9).

Skydiving is a seasonal sport, as such, the skydiving season runs from approximately March to November each year. (Zarda Dep. pg. 286:4-14, 316:13-16). Skydiving can only be performed in good weather: "the sky must be clear, you must have visibility of three statute miles,

you must be 500 feet below clouds, there must be 1,000 feet above the clouds, and 2,000 feet separation from the clouds to be able to jump." (Zarda Dep. pg. 288:9-14). Additionally, skydivers cannot "jump from planes while it's raining." (Zarda Dep. pg. 288:2-4).

A typical skydive takes between ten (10) and twenty (20) minutes to complete. (Zarda Dep. pg. 317:20-25). However, a tandem skydive generally takes anywhere from fifteen (15) to twenty (20) minutes. (Zarda Dep. pg. 318:20-22). The first priority for the instructor on a tandem jump is safety, the next is making the jump enjoyable for the customer. (Zarda Dep. pg. 140-141:18-6; Winstock Dep. pg. 91:20-22). While the airplane is loud, the instructors "can hear each other speak, it's not deafening." (Winstock Dep. pg. 50:22-24). Often jokes are made during the skydive to loosen the tension. (Maynard Dep. pg. 35:2-14, 38:13-18; Winstock Dep. pg. 30:9-12, 31:3-15). These jokes are made to make the situation less tense, "the calmer a passenger is to exiting, generally the safer the skydive will be." (Winstock Dep. pg. 30:16-22).

**Plaintiff's Background Information**

Plaintiff Donald Zarda ("Zarda") resided in Richmond, Missouri. (Zarda Dep. pg. 129:11-12). In 2001, Zarda was an openly gay man, who "came out" sometime between 1999 and 2000. (Zarda Dep. pg. 54:7-12). However, prior to "coming out," Zarda had relationships with women. (Zarda Dep. pg. 54:18).

Zarda was first hired by SDLI in the summer of 2001. (Zarda Dep. pg. 56:2-3). Maynard, the ultimate decision maker, was the person who made the decision to hire Zarda. (Zarda Dep. pg. 56:19-20). During his employment with SDLI, Zarda's sexuality "was known" by everyone who worked at SDLI, including Maynard. (Zarda Dep. pg. 62-63:8-14; Winstock Dep. pg. 18:5-7). Maynard was aware of Zarda's sexual orientation prior to his hire in 2001, as Zarda disclosed it to Maynard the first time they met. (Zarda Dep. pg. 78:11-17; Maynard Dep. pg. 135:17-20;

Winstock Dep. pg. 18:5-7). After working most of the skydiving season in 2001, Zarda was then terminated from SDLI in September, because of a customer complaint. (Zarda Dep. pg. 57:10-19, 216-217:20-6, 285:11-16).

## Activities at SDLI

After not working at SDLI for several years, at the end of the skydive season in 2008, Zarda appeared at the drop zone at SDLI to discuss the possibility of his returning to work at SDLI in 2009. (Zarda Dep. pg. 60-61:12-13; Maynard Dep. pg. 148:24). As a result of these discussions, Maynard decided to re-hire Zarda to work at SDLI for the 2009 summer season (Zarda Dep. pg. 58-59:22-6), as Zarda was a good instructor, a safe instructor, and "a good guy." (Maynard Dep. pg. 149:9-12). Like in 2001, Maynard was fully aware of Zarda's sexual orientation when he made the decision to re-hire Zarda. (Zarda Dep. pg. 78:18-22; Winstock Dep. pg. 101:10-12). During the 2009 season at SDLI, Zarda enjoyed working with his co-workers and had a "great relationship" with everyone at SDLI. (Zarda Dep. pg. 72-73:24-6). However, on July 2, 2009, Zarda fractured his ankle during a landing with a tandem passenger, bringing his jumping season to an early close. (Zarda Dep. pg. 73:7-18, 75:6-22; Maynard Dep. pg. 150:12; Callanan Dep. pg. 44:17-20). After fracturing his ankle, Zarda was put into a cast. (Zarda Dep. pg. 73:19-21). Zarda then showed up at SDLI in a cast. (Winstock Dep. pg. 35:16-20; Callanan Dep. pg. 46:23-24, 47:10-13). Upon noticing the cast, Maynard requested Zarda put a sock over his foot. (Zarda Dep. pg. 347:12-18). Maynard requested the cast be covered up as he did not "appreciate anyone being at the drop zone in a cast and on crutches. The students are nervous enough and if they see someone on crutches with a cast on, it's not going to be very good for the customers." (Maynard Dep. pg. 160-161:24-9; Winstock Dep. pg. 96-97:15-14). This request was not specific to Zarda, as

3

Maynard did not "want anybody, if possible, to be there on crutches in a cast." (Maynard Dep. pg. 162:17-18).

As a result of his injury, Zarda could not work the remainder of the 2009 season. After getting healthy, Maynard allowed Zarda to return for the 2010 season. (Zarda Dep. pg. 76:22-25, 77:17-22; Maynard Dep. pg. 155-156:23-6, 165:15-18). Like in 2001 and 2009, Maynard was fully aware of Zarda's sexual orientation when he allowed him to return to work at SDLI for the 2010 season. (Zarda Dep. pg. 79:2-6). After taking the remainder of the 2009 season off, Zarda returned to work at SDLI on May 15, 2010. (Zarda Dep. pg. 78:4-6).  During his time at SDLI, Zarda behaved like every other employee in his daily mannerisms and could not be distinguished from his co-workers based on his actions. Zarda admits that he acted normally, was "just like everybody else," and "didn't do anything special" that would distinguish him from his co-workers. (Zarda Dep. pg. 79-80:16-17).

Zarda is admittedly masculine in both appearance and actions. (Zarda Dep. pg 121-122:16-6, 365:3-10, 116:21-25, 364:21-23). As an individual who works out frequently and stays in shape, Zarda has an "athletic" appearance, which he admits often leads others to believe he is heterosexual. (Zarda Dep. pg. 87:20-21, 89:10; 121-122:16-6, 365:3-10). Zarda admits that he does not "look like a lot of gay people might look." (Zarda Dep. pg. 121:7-8). Zarda also acts masculine, not feminine. (Zarda Dep. pg. 116:21-25, 364:21-23).  While masculine in appearance, Zarda would occasionally wear a pink baseball cap during work at SDLI to protect his head from the sun. (Zarda Dep. pg. 120:4-14, 125-126:22-7). While Zarda claims that his pink cap was viewed as a "feminine thing," he admits that heterosexual men also occasionally wear pink articles of clothing. (Zarda Dep. pg. 120:15-17, 126-127:13-4). Zarda asserts that some employees of SDLI would comment on his pink cap; however, when asked, he could not identify any individuals who

allegedly made comments, or what comments were made about the cap. (Zarda Dep. pg. 120-121:4-9).  Additionally, Zarda failed to identify Maynard, his boss and SDLI's decision maker, as one of the individuals who allegedly made comments about his pink cap. (Zarda Dep. pg. 120-128).  Nor was Maynard ever heard making comments about Zarda's pink clothing. (Winstock Dep. pg. 36:9-11).  Despite the fact that Zarda claims comments were made about his pink cap, Zarda admits that he "wasn't offended" by any comments made about his cap. (Zarda Dep. pg. 122:15-19).

Zarda admits that his sexual orientation came up "all the time" at SDLI; it was "routine and so ordinary" for it to come up at work. (Zarda Dep. pg. 48:2-23). Zarda was not offended when his sexual orientation was brought up. (Zarda Dep. pg. 51:21-25, 239-240:24-15).     Zarda was open and notorious about his sexual orientation; he even had the nickname "gay Don" at SDLI. (Zarda Dep. pg. 49:6-15). Zarda "referred to himself as gay Don" and made jokes about being "gay Don." (Maynard Dep. pg. 137:14-20). In fact, Winstock was introduced to Zarda as "gay Don." (Winstock Dep. pg. 25:9-12).  Zarda's co-workers would sometimes engage in what he referred to as "gay banter" or "gay fun," saying things like "easy with gay Don." (Zarda Dep. pg. 270-271:5-4).  Again, Zarda conceded he "wasn't offended" when his co-workers referred to him as "gay Don" or engaged in "gay banter," because they did not intend it to be malicious or derogatory. (Zarda Dep. pg. 51:21-25). Zarda conceded that no one at SDLI made "gay jokes" to Zarda out of malice. Zarda didn't believe anyone at SDLI was being malicious toward him when bringing up his sexuality. (Zarda Dep. pg. 239-240:24-15).  Zarda was admittedly not offended by jokes about his sexual orientation. (Zarda Dep. pg. 239:17-23).

Furthermore, it was common for Skydivers to pick on each other; all of the instructors at SDLI got picked on. (Zarda Dep. pg. 342:6-16).  Zarda conceded he was treated just like everyone

else at SDLI; he was not treated differently, or picked on more, because of his sexual orientation. (Zarda Dep. pg. 341:10-15, 343:8-16; Winstock Dep. pg. 87:6-9, 97:22-25). Rather, Zarda enjoyed positive working relationships with all his co-workers during his employment at SDLI in 2009 and 2010. (Zarda Dep. pg. 81:12-16, 82:6-9). If any problems arose at SDLI, Zarda could have brought them to the attention of Rich Winstock, the Chief Instructor ("Winstock"), or Maynard. (Zarda Dep. pg. 101:7-16; Winstock Dep. pg. 89:20-23). Zarda felt comfortable speaking to Winstock about his problems, enough so that he disclosed a personal problem to Winstock in 2009. (Zarda Dep. pg. 102:18-23, 103:9-17). However, Zarda admittedly "didn't make any complaints to the owner, [Maynard], or [Winstock] about" about any gender or sexual orientation discrimination. (Zarda Dep. pg. 335:7-11, 101-102:22-9. The only complaint Zarda made about SDLI was an oral complaint to Winstock, informing him that he had been suspended. (Winstock Dep. pg. 90:9-18).

**The Jump in Question**

On June 18, 2010, David Kengle ("Kengle") brought his girlfriend, Rosana Orellana ("Orellana"), to SDLI for a tandem skydive for her birthday. (Zarda Dep. pg. 201-202:24-4). Zarda was the assigned instructor on the tandem jump with Orellana. (Zarda Dep. pg. 201-202:24-7). During the skydive, Kengle and Orellana were in close proximity to their respective instructors. (Kengle Dep. pg. 18:13-18; Orellana Dep. pg. 43:13-18, 100:17-22). Orellana sat in front and Zarda sat directly behind her. (Orellana Dep. pg. 43:13-18). Kengle was also sitting in front of his instructor. (Kengle Dep. pg. 17:17, 23-25). Zarda then attached Orellana's harness to his harness. (Orellana Dep. pg. 41:12-20). Orellana was not bothered by the close proximity to Zarda. (Orellana Dep. pg. 100:17-22).

6

During the plane ride up, a joke was made to Kengle by another instructor on the plane, stating: "how do you feel about your girlfriend being strapped to another man." (Zarda Dep. pg. 201-202:7-12; Orellana Dep. pg. 44:10-17; Kengle Dep. pg. 19:18-23). Both Orellana and Kengle laughed at the joke made by the instructor (Orellana Dep. pg. 45:5-6), as it was funny and they can both "take a joke." (Orellana Dep. pg. 58:21-23; Kengle Dep. pg. 43:10). This type of joke was often made by the skydiving instructors during a tandem jump. (Zarda Dep. pg. 202:13-18). Customers are not usually bothered when this joke is made. (Zarda Dep. pg. 206-207:21-4).

During the plane ride, sometime prior to the jump, Orellana believed Zarda was touching her inappropriately. She noticed that "[h]e had his hand on [her] hip" and was "resting his chin on [her] shoulder." (Orellana Dep. pg. 47:5-13; 48:15-18, 89:10-20). This contact made her uncomfortable during the jump. (Orellana Dep. pg. 100-101:25-2). During this time, Zarda also "leaned forward to give [Orellana] instructions . . . in her ear." (Zarda Dep. pg. 230-231:21-7). Kengle also noticed Zarda touching Orellana inappropriately in the plane. He observed Zarda putting his "hands on her hips" for practically the entire plane ride. (Kengle Dep. pg. 19-20:24-7, 22:2-4, 23:4-12, 23:16-24, 27:14-23). Kengle observed that no other instructor, including his own instructor, was touching their customer in the same manner Zarda was touching Orellana. (Kengle Dep. pg. 23-24:22-5, 62-63:20-3, 66:15-18). Kengle felt uncomfortable with the behavior he observed from Zarda based on his observations of the other instructors. (Kengle Dep. pg. 23-24:22-5, 27:2-9, 62-63:20-3, 66:15-18). While touching the customer's hips is required at some point during the tandem jump, it does not require the instructor to touch the customer inappropriately. (Zarda Dep. pg. 173:3-6). Then, "[a]t some point during the jump, [Zarda] sensed that [Orellana] was uncomfortable." (Zarda Dep. pg. 174-175:22-6, 173:12-14).

7

After pulling the parachute (Orellana Dep. pg. 50:11-18), in an attempt to allay Orellana's discomfort, Zarda disclosed his sexual orientation to Orellana. (Zarda Dep. pg. 139-140:22-8, 173:15-19; 228-229:2-10). He told her: "I hope I didn't make you feel uncomfortable on the plane, I'm gay," and that he "had recently broken up with his boyfriend." (Orellana Dep. pg. 50:14-18). It was only after Zarda noticed Orellana's discomfort with the jump that he disclosed this information to Orellana. (Zarda Dep. pg. 176:6-9, 177:14-16). Orellana felt uncomfortable after Zarda disclosed this information to her. (Orellana Dep. pg. 52:2-7, 54:11-19, 55:6-9). It made her uncomfortable because she "wanted to learn about the scenery," and "wanted him to speak about what was going on around" them during the jump. She did not "want to hear about his personal life" during the jump. (Orellana Dep. pg. 52:2-7, 54:11-19, 55:6-9). She wanted information about her tandem jump instead. (Orellana Dep. pg. 52:2-7, 100:4-10). Orellana felt that Zarda's conduct, putting his hands on her hips and his chin on her shoulder during the jump, crossed the line. (Orellana Dep. pg. 60:4-8). Orellana complained that "he should have been more professional" in his interactions with her. (Orellana Dep. pg. 49:3-5). In her opinion, Zarda's actions ruined the jump. (Orellana Dep. pg. 54:20-21, 60:6-8). Kengle also felt that the overall experience had been tainted because of Zarda's actions. (Kengle Dep. pg. 31:11-12). After leaving SDLI, Orellana told Kengle that she would have liked the experience better if she had a different instructor. (Kengle Dep. pg. 30:8-9).

**The Complaint**

After thinking over the aforementioned events, on Monday, June 21, 2010, Kengle called the SDLI office to lodge a complaint about Zarda's behavior. (Maynard Dep. pg. 179:14-22, 180:2-14; Kengle Dep. pg. 31:13-15). Kengle believed a complaint was warranted because Zarda's actions were "inappropriate." (Kengle Dep. pg. 35:13-15). When he called SDLI, Kengle spoke

to Lauren Callanan ("Callanan"), who "took [his] story and let [him] know she would pass the information along." (Kengle Dep. pg. 31:15-17; Callanan Dep. pg. 33:21-22).  Callanan relayed to Maynard that a customer complained, and provided him with Kengle's name and phone number. (Maynard Dep. pg. 181:2-3).  Maynard then contacted Kengle later that day, telling Kengle "that he was very unhappy" with what Kengle and Orellana experienced during their skydive. (Kengle Dep. pg. 31:9-16).

During their phone conversation, Kengle complained to Maynard about what he and Orellana believed to be inappropriate touching by Zarda. (Zarda Dep. pg. 156:16-23; Orellana Dep. pg. 69:11-13; Maynard Dep. pg. 181-182:16-12).  Kengle expressed to Maynard "his disappointment" in the company and with what the tandem master, Zarda, did during their jump. (Maynard Dep. pg. 181:16). Kengle explained that the skydive "was a present for [Orellana's] birthday and that her birthday was completely ruined" because of Zarda's behavior.  He further stated that would never recommend SDLI in the future because of the unprofessional conduct. (Maynard Dep. pg. 181:21-23; Callanan Dep. pg. 33-34:24-4).  Kengle explained to Maynard that, during the jump, Zarda had his hands on Orellana's hips, put his head on her shoulder, and whispered in her ear, which made her feel very uncomfortable. (Maynard Dep. pg. 182:6-17; Callanan Dep. pg. 34:7-12). He also explained that Zarda tried to justify his behavior by telling her that he was gay. (Maynard Dep. pg. 182:6-17; Callanan Dep. pg. 34:7-12) He told Maynard that Orellana was upset that Zarda discussed his personal life with her. (Maynard Dep. pg. 182-183:22-8, 289:11-15; Callanan Dep. pg. 34:7-12).

In response to Kengle's complaint, Maynard offered to refund the money Kengle paid for the skydives and accompanying video. (Kengle Dep. pg. 32:9-16). Kengle did not request the refund, Maynard insisted on it. (Kengle Dep. pg. 33:19-22).  In the course of investigating this

9

complaint from Kengle, Maynard did not speak to Orellana, (Maynard Dep. pg. 185:11-13) nor did he speak to the other individuals present on the plane. (Maynard Dep. pg. 199:7-16). However, Maynard did review the video of Zarda's jump with Orellana. (Maynard Dep. pg. 199:17-22). In his twenty plus years at the helm of SDLI and the successful completion of thousands of tandem jumps, no one has complained to Maynard about any instructor, other than the two (2) complaints made against Zarda: (1) by Kengle; and (2) the customer complaint in 2001. (Maynard Dep. pg. 66:8-21, 69:9-14, 297:11-21; Winstock Dep. pg. 19:10-13).

**The Suspension and Termination**

Immediately subsequent Kengle's complaint, Maynard had a conversation with Zarda regarding the jump, in the course of his investigation of the complaint. (Zarda Dep. pg. 36:10-12, 37:7-14, 39:15-17; Maynard Dep. pg. 183:15-21). During the conversation, Maynard questioned Zarda as to whether he remembered the jump with Rosanna Orellana on June 18, 2010. (Zarda Dep. pg. 36:19-25). Zarda responded that he did not remember the specific jump. (Zarda Dep. pg. 37:2-5, 362:18-19, 37:8-11). Maynard then told Zarda that he "took a girl named Rosanna" on a tandem jump that day. (Zarda Dep. pg.). "At that time, [Zarda] didn't remember anything specific about that jump." (Zarda Dep. pg. 37:15-16). Maynard then informed Zarda "there were some customers that came out and jumped, and it was a boyfriend and a girlfriend, and that [he] had taken the girl, and they had called and made a complaint." (Zarda Dep. pg. 37:15-22; Maynard Dep. pg. 187:8-22, 196:10-18). Zarda again did not remember anything about the jump. (Zarda Dep. pg. 38: 3-6).

Maynard informed Zarda that the customer complained about how Zarda touched her, that he "touched her in a way that made her feel uncomfortable", and that he touched her inappropriately "at the hips." (Zarda Dep. pg. 43:10-13, 44:3). Maynard explained that Zarda made

10

Orellana feel "very uncomfortable with the way he was touching her on her legs, the way he was putting his head on her shoulder" and that she was "very uncomfortable for the entire jump" and his actions even led her to believe Zarda "was hitting on her". (Maynard Dep. pg. 196:10-18). Admittedly, this is not a complaint about Zarda's sexual orientation. (Zarda Dep. pg. 360:14-17). Maynard also questioned Zarda whether "anything about [his] sexual orientation came up" during the jump, and Zarda responded that he did not know. (Zarda Dep. pg. 38:8-10). He then told Maynard "that that comes up all the time around here," as it is often joked about at the drop zone by the SDLI staff. (Zarda Dep. pg. 38:12-15). Maynard then informed Zarda that the customers also complained that Mr. Zarda discussed his sexual orientation with the customer during the jump. (Zarda Dep. pg. 40:2-4).

Due to the nature of a tandem jump, discussing the instructor's sexual orientation is not recommended during a jump. (Winstock Dep. pg. 95:5-9). As "that pre-jump phase is one of building trust, . . .there's better ways to build trust." (Winstock Dep. pg. 95:11-15). Following this conversation, Maynard suspended Zarda for a week without pay. (Zarda Dep. pg. 40:6). Zarda's suspension had "nothing to do with him being gay." (Maynard Dep. pg. 189:4-5) Rather, it was a function of the customer's complaint regarding Zarda's behavior. (Maynard Dep. pg. 187:18-22, 196:10-18). After this discussion with Maynard, Zarda "sought Winstock's counsel" to discuss the events that had just occurred. (Zarda Dep. pg. 35:11-22, 207-208:16-6). In response, Winstock notified Zarda he would discuss the matter with Maynard. (Zarda Dep. pg. 208:6-10). After his one-week suspension, Maynard terminated Zarda, based on the complaint from Kengle. (Zarda Dep. pg. 218:20-21, Maynard Dep. pg. 282:3).

The termination conversation between Maynard and Zarda was tape-recorded by Zarda. (Maynard Dep. pg. 221:2-25). During the termination conversation, in response to Zarda's inquiry

11

regarding his sexual orientation, Maynard informed him "[i]t wasn't a gay issue. It was a personal issue . . . Because if it was a heterosexual thing -- if Ritchie Winstock was telling some chick of his escapades, he would be in the same situation. It's not about gay. It's about your personal life, talking to people about it . . . I don't care what you do and I don't care what those guys do, but what I do care about is that it's not shared with my customers." (Maynard Dep. pg. 226:3-16). "It's not a gay thing. It's about your personal escapades and what you're telling people." (Maynard Dep. pg. 226:19-22).   During the termination meeting, Maynard and Zarda discussed Kengle's complaint. They discussed the fact that Orellana felt Zarda touched her inappropriately, which made her uncomfortable. (Maynard Dep. pg. 227:8-10). Maynard explained that Kengle was upset because Orellana's birthday was ruined by Zarda's unprofessional behavior, including him telling her "Don't worry about me, I'm gay." (Maynard Dep. pg. 229:3-21, 247:14-15).

Despite his contention that he could not have touched Orellana inappropriately because of his sexual orientation (Zarda Dep. pg. 43:17-22), Zarda admits that a homosexual man can touch a woman inappropriately. (Zarda Dep. pg. 228:13-15).   Zarda testified that Maynard terminated him because Kengle and Orellana complained about the conduct that occurred on their jump. (Zarda Dep. pg. 235:17-22). Zarda explained that Maynard terminated him because the customers accused him of inappropriately touching a "female passenger in a way that made her feel uncomfortable" and "because the issue of [his] sexuality came up in front of the customers." (Zarda Dep. pg. 172:13-18, 243:11-14, 227:4-15, 227-228:23-7, 281:21-24).   However, contradictorily, Plaintiff testified repeatedly that he believes the reason he was terminated is because of his sexual orientation. (Zarda Dep., pg. 116:9-12, 134:12-15, 215:8, 278-279:11-2, 281:21-24).   If an instructor does something to make a customer uncomfortable, the instructor is responsible for damaging the customer's skydive experience. (Winstock Dep. pg. 92-93:22-4).

## III.   ARGUMENT

Only one (1) contested legal issues remains in this matter:  Plaintiff's sexual orientation claim under the NYSHRL. Additionally, although the Court already dismissed Plaintiff's Title VII claims, Plaintiff's motion requesting this Court to reconsider its decisions and reinstate the Title VII claim is now pending. [ECF Doc. No. 211]

## POINT I

### The Second Circuit's Preclusion of Sexual Orientation Claims Precludes this Court from Reinstating Plaintiff's Title VII Claims

This Court properly dismissed Plaintiff's Title VII's claims. [ECF Doc. No. 145] "Title VII does not, by its express terms, prohibit all arbitrary employment practices. Rather, it is directed only at specific impermissible bases of discrimination such as race, color, religion, sex, or national origin." *Dollinger v. State Ins. Fund.,* F.Supp.2d 467, 475 (N.D.N.Y. 1999).  "Sexual orientation is not included in the statutory protected class." *Kiley v. American Soc. for Prevention of Cruelty to Animals,* 296 Fed. Appx. 107, 109 (2d Cir. 2008); *see also Simonton v. Runyon,* 232 F.3d 33 (2d Cir. 2000) (noting that "[t]he law is well-settled in this circuit . . . that [the Plaintiff] has no cause of action . . . because Title VII does not prohibit harassment or discrimination because of sexual orientation").  Plaintiff's pending motion must be denied in its entirety as the Second Circuit decisions are binding precedent in this Court.  *See Hutto v. Davis*, 454 U.S. 370, 375 (1982); *F.D.I.C. v. Bear Stearns Asset Backed Sec. I LLC,* No. 12CV4000-LTS-MHD, 2015 WL 1311300, at *7 (S.D.N.Y. Mar. 24, 2015).

Despite clear binding precedent, Plaintiff urges this Court to "be the first judge to hold that Title VII protects sexual orientation" and adopt a mere advisory opinion from the U.S. Equal Employment Opportunity Commission's ("EEOC"). [*See* ECF Doc. No. 221 p. 1] *See Anonymous v. Foxx,* EEOC Appeal 0210133080.  Absent an intervening decision from either the Supreme

13

Court or the Second Circuit the holding in *Simonton* continues to be binding upon this Court. Therefore, this Court's original decision, dismissing Plaintiff's Title VII claims, must stand.

## POINT II

### Plaintiff was not subjected to Sexual Orientation Discrimination

Plaintiff cannot prevail on a claim for sexual orientation discrimination under the NYSHRL (or Title VII, in the unlikely this Court reinstates Plaintiff's Title VII claim) *Stephenson v. Hotel Employees & Rest. Employees Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 271 (2006); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 224 (2d Cir. 2005). To prevail on a claim for sexual orientation, Plaintiff must prove that "(1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Even it Plaintiff proves each element, only "a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." *Dawson*, 398 F.3d at 216.

Plaintiff cannot meet the burden under the *McDonnell Douglas* analysis. Plaintiff cannot establish that Zarda was terminated under circumstances which give rise to an inference of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 792. Here, Maynard hired Zarda on three (3) separate occasions: 2001, 2009 and 2010. (Zarda Dep. pg. 56:19-20, 58-59:22-6, 76:22-25, 77:17-22; Maynard Dep. pg. 155-156:23-6, 165:15-18). Each time Maynard invited Zarda to work at SDLI, Maynard had full knowledge of his sexual orientation, as Zarda was openly gay. (Zarda Dep. pg. 54:7-12, 62-63:8-14, 78:11-22, 79:2-6; Maynard Dep. pg. 135:17-20; Winstock Dep. pg. 18:5-7, 101:10-12). Zarda admitted that his sexual orientation came up "all the time" at SDLI; it was "routine and so ordinary" for it to come up at work. (Zarda Dep. pg. 48:2-23). He even had

the nickname "gay Don" at SDLI. (Zarda Dep. pg. 49:6-15). Zarda openly "referred to himself as gay Don" and made jokes about being "gay Don." (Maynard Dep. pg. 137:14-20).

Only after Maynard received a customer complaint did Maynard fire Zarda. (Zarda Dep. pg. 56:19-20, 58-59:22-6, 76:22-25, 77:17-22, 218:20-21; Maynard Dep. pg. 155-156:23-6, 165:15-18, 282:3). Given that Maynard decided to hire Zarda, with full knowledge of his sexual orientation, and subsequently decided to fire him, there can be no inference of discrimination. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294, 304 (E.D.N.Y. 2006) (noting that "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire"); *Cooper v. Morgenthau*, 2001 WL 868003, at *6 (S.D.N.Y. July 31, 2001) (noting that "the 'underlying rationale for the [same actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class'"). Therefore, it is illogical to suggest that Maynard would re-hire Zarda, knowing his sexual orientation, if he had any aversion to homosexuals.

Additionally, Zarda was terminated within two (2) years of his hire date - he was hired late in 2008 and terminated in June 2010. (Zarda Dep. pg. 60-61:12-13, 218:20-21, Maynard Dep. pg. 282:3, 148:24). The short time period between his hire date and his termination bears a strong inference that Zarda was not subjected to invidious discrimination. *Grady*, 130 F.3d at 560; *see Cooper*, 2001 WL 868003, at *6 (holding the inference of no discriminatory animus due when plaintiff was hired and fired by the same person "should be accorded substantial weight where the time period between the hiring and firing is less than two years"). Moreover, Zarda was suspended and terminated in the immediate wake of a customer complaint. (Zarda Dep. pg. 36:10-12, 37:7-

14, 39:15-17, 40:6; Maynard Dep. pg. 183:15-21). The mere proximity between the complaint about Zarda's conduct and his termination confirm that he was not fired under circumstances giving rise to an inference of discrimination.

Assuming, *arguendo*, that Plaintiff can somehow demonstrate that he was terminated under circumstances which give rise to an inference of discrimination, Defendants have a legitimate, non-discriminatory reason for his termination. *McDonnell Douglas*, 411 U.S. 792. Plaintiff's termination was a result of a customer complaint regarding Zarda's behavior. (Zarda Dep. pg. 235:17-22, 172:13-18, 243:11-14, 227:4-15, 227-228:23-7, 281:21-24).

A customer complaint is a legitimate business reason for terminating Plaintiff. *See Iverson v. Verizon Communications*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) (holding plaintiff was terminated for legitimate business reasons because plaintiff had poor performance and received multiple customer complaints); *Hayes v. Cablevision Sys. New York City Corp.*, 2012 WL 1106850, at *15 (E.D.N.Y. Mar. 31, 2012) (holding customer complaints and written reprimands were sufficient to show a legitimate business reason for plaintiff's termination). Defendant SDLI is first and foremost a customer service business, in which the highest priority is customer safety and the second is ensuring an enjoyable experience. (Zarda Dep. pg. 140-141:18-6; Winstock Dep. pg. 91:20-22).

On June 18, 2010, Zarda failed to provide Defendants' customer with an enjoyable experience. (Zarda Dep. pg. 201-202:24-4; Orellana Dep. pg. 49:3-5, 100-101:25-2). Instead, Kengle and Orellana were placed in an uncomfortable position when Zarda put his hands on Orellana's hips, rested his chin on her shoulder, and disclosed intimate details of his personal life. (Orellana Dep. pg. 47:5-13; 48:15-18, 49:3-5, 89:10-20, 100-101:25-2; Kengle Dep. pg. 23-24:22-5, 62-63:20-3, 66:15-18). As a result, Orellana and Kengle had a dissatisfactory experience and

16

called SDLI to lodge a complaint. (Maynard Dep. pg. 179:14-22, 180:2-14; Kengle Dep. pg. 31:13-15, 35:13-15). This alone is the reason Zarda was terminated. (Zarda Dep. pg. 40:6; 218:20-21, 235:17-22, 172:13-18, 243:11-14, 227:4-15, 227-228:23-7, 281:21-24; Maynard Dep. pg. 282:3). Defendant made a business decision to eliminate an employee who failed to provide the customer with one of the core goals of skydiving – an enjoyable experience. This decision was based on SDLI's desire to please its customer base, not Plaintiff's sexual orientation. Even Zarda admitted that the customer's complaint regarding his behavior is unrelated to his sexual orientation. (Zarda Dep. pg. 360:14-17). As Plaintiff is the only instructor which Maynard has received complaints about in his twenty years at SDLI, Maynard properly responded to the complaint with immediate and unbiased corrective action. (Maynard Dep. pg. 66:8-21, 69:9-14, 297:11-21). *Spiess v. Xerox Corp.*, 481 Fed. Appx. 700, 701 (2d Cir. 2012) (stating that "it is not the province of Courts to second-guess business decisions.  What matters is why the employer took action, not whether it was wise to do so").   Parenthetically, this was not the first incidence in which a customer complained about Zarda during a jump; Zarda was the subject of a prior customer complaint in 2001. (Zarda Dep. pg. 57:10-19, 216-217:20-6, 285:11-16). In terminating Plaintiff, Maynard simply eliminated an employee who, on at least two (2) occasions, failed to provide satisfactory customer service. Therefore, Plaintiff was terminated for a legitimate, non-discriminatory reason.

IV.     **CONCLUSION**

This Court should Order judgment for Defendants.

Dated:  October 6, 2015
         Bohemia, New York

                                    **ZABELL & ASSOCIATES, P.C.**
                                    *Attorneys for Defendants*


                              By: _____
                                    Saul D. Zabell, Esq.
                                    Zabell & Associates, P.C.
                                    1 Corporate Drive, Suite 103
                                    Bohemia, New York 11716
                                    Tel.: (631) 589-7242
                                    Fax: (631) 563-7475
                                    szabell@laborlawsny.com

18