669

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


----------------------------------X
DONALD ZARDA,

                        :   CV-10-4334

         Plaintiff,

                        :   US Courthouse
    -against-               Central Islip, NY
                        :
ALTITUDE EXPRESS, INC., d/b/a
SKYDIVE LONG ISLAND and      :
RAY MAYNARD,

                        :   October 20, 2015
         Defendants.         9:30 a.m.
----------------------------------X


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury



APPEARANCES:

For the Plaintiff:         GREGORY ANTOLLINO, ESQ
                         275 Seventh Avenue, Suite 705
                         New York, New York 10001
                              and
                         RICHARD J. CARDINALE, ESQ.
                         26 Court Street, Suite 1815
                         Brooklyn, New York 11242


For the Defendants:        ZABELL & ASSOCIATES, P.C.
                         1 Corporate Drive, Suite 103
                         Bohemia, New York 11716
                         BY:  SAUL D. ZABELL, ESQ.
                            LAURA E. JOHNSON, ESQ.


Official Court Reporter:   Ellen S. Combs, CSR
                         100 Federal Plaza - Suite 1180
                         Central Islip, New York 11722
                         (631) 712-6107

Proceedings recorded by mechanical stenography
Transcript produced by Computer

670

THE CLERK:  Calling case 10-CR-4334, Zarda vs Altitude.

(Appearances previously noted.)

THE COURT:  We're still waiting for some jurors, so I just wanted to use this time to address what I think is the only outstanding issue in this case, which is the use of Mr. Zarda's declaration.  I have read the letters on that.  The one area of the declaration, I don't believe the other portion of the declaration should come in from the reading.  But I'll explain that in a moment.

But the one Mr. Zabell that I need to directly address each and every entry.  But at the end of the declaration, the highlighted portion at the very end that starts, I no linger feel like I can be myself, working jumping.  Ans then it goes on.

MR. ZABELL:  Can I just ask for that paragraph number, your Honor?

THE COURT:  It's the last paragraph, 47.

I don't understand why that portion is not -- I understand your argument why the other portions aren't present and questioning the state of mind.  But certainly the last couple of sentences seems to be that he is describing his state of mind as of April 2013 in terms of emotional distress and why he is continuing to still suffer.

So I don't understand why that wouldn't be an exception to the hearsay rule because the goes purely to his current state of mind, which is relevant on the issue of damages.

I just want to give you a chance to respond to that.

MR. ZABELL:  Sure.

My position is this, your Honor.  This is, this was a document that was created solely for the purpose of opposing the summary judgment motion.

As your Honor -- as I have observed, I don't know what your Honor has observed -- but as I have observed, Mr. Antollino has a certain writing style.  That writing style is echoed throughout this document.  So it is clear that this is a document that was created by counsel for the plaintiff for purposes of opposing a summary judgment motion.  This is not a document that I had an opportunity to examine or cross-examine Mr. Zarda about.

So to allow him to write down a statement about what he and his attorney think might be appropriate to oppose a summary judgment, would be highly prejudicial, even if it is relating to what was crafted as his impression or his feelings.

THE COURT:  Yes?

672

MR. ANTOLLINO:  My client wrote this.  I did not write this.  He wrote most of this declaration.

THE COURT:  Okay, I'm going to allow that last portion.  You can, I guess read it into the record if you want, or redact the whole document so it just has that portion in it.  It might be easier to just to read it into the record.

MR. ZABELL:  I'll read it.  Under penalty of perjury and then right there.

THE COURT:  Right.  State the date that it was sworn to, on April 7, 2013.

MR. ZABELL:  Well, I don't believe it was sworn to, your Honor.

MR. ANTOLLINO:  It's the declaration.

THE COURT:  The declaration.

MR. ZABELL:  And I don't believe he has made the requirements in the declaration necessary for it to be considered a sworn document.  He does declare under penalty of perjury, but it doesn't have his physical address, which is a requirement, nor is it notarized.

MR. ANTOLLINO:  It wasn't.

THE COURT:  I'm going to allow it.  This is the way he signed it.  In terms of admissibility, a statement that is not hearsay can come in, even in it is not sworn, it is not critical that it be sworn for purposes of

673

overcoming the objection to a document that is unsworn.  A business record is unsworn, but that is an exception to the hearsay rule.

MR. ZABELL:  Your Honor, my question is, and I don't want to belabor the point or over-argue.  But if Mr. Zarda was alive today would this document be allowed in?

THE COURT:  I think it could be allowed in, yes. That's my point.

You haven't told me what -- my ruling is, it is not hearsay.  It is an out-of-court statement that goes to his state of mind.  So that is why I'm giving you an opportunity to tell me why it shouldn't come in.  The only thing you told me was that you didn't get a chance to cross-examine him, but --

MR. ZABELL:  In addition, as we pointed out in our brief, it's also contradicted by his direct testimony.

THE COURT:  Id there are some other portions of his deposition that you want to read in your case in response to this, I'll obviously let you read some other portions of the deposition.  I don't know if you read it already.  I don't remember.  But if there is something that addresses this directly in the deposition --

MR. ZABELL:  Can I just get a clarification on what specific sentence, beginning and end point --

674

THE COURT:  Yes, okay.

I understand that he's going to read, Donald Zarda, the plaintiff herein, does hereby declare under penalty of perjury the following.  And then he is going to start:  I no longer feel like I can be myself working, jumping -- until the end of that paragraph.

And then he's going to say, signed on April 7, 2013, Dallas, Texas.

MR. ZABELL:  Your Honor, the statement, I can no longer work in this industry without fear of having been branded as some kind of gay pervert?

THE COURT:  That is his view.  That is, that's, that goes to damages.  That's his view of why he can't continue to work as a skydiver, at least at that time.

MR. ZABELL:  And the language, a stark vivid remainder about what happened to me?

Including, No amount of personal loss, injury or death in this sport has ever pushed me away until now?

THE COURT:  I don't understand why -- again, if he were sitting here today, and there is nothing objectionable about his describing what his emotional state is at the time, why he feels he can no longer work in the industry.

MR. ZABELL:  Right.  But if he was saying it on the stand, I would have the opportunity to examine him

675

about it.  Ans because he is not here it does not give me the opportunity to examine him about it.

It's highly prejudicial to the defendants's case.  The fact that Mr. Zarda could not be here, is not here because of his death, can not be used as a shield to allow statements to go in unrebutted.

And that's what reading this in its entirety allows, just that paragraph in its entirety allows.

I do not have the ability to examine him on these statements, on these feelings with the contradictory statements, so --

MR. ANTOLLINO:  -- contradictory statements.

Judge, he said he didn't want to belabor this.  And we keep hearing one more argument, and one more argument, one more argument after you have already ruled.

THE COURT:  I think you have sufficient use of the deposition.  Again, if there is inconsistencies within the deposition, I think that you can bring those out.  I understand obviously you need to cross-examine him on this particular statement.  But I think under the circumstances there is no other way for Mr. Antollino to bring in that his emotional stress was continuing up to April 13, 2013 because his client had, his client passed away.

So it is an exception to the hearsay rule.  It goes only to his state of mind.  I'll give an instruction

to the jury that this only goes to the state of mind on the issue of damages and nothing else.  Okay?

        MR. ANTOLLINO:  There are a couple of other things I would like to bring up before the trial continues.

        Number 1 is, I have a document that I would like to admit regarding the unemployment insurance that contradicts, I believe in some way, what Mr. Maynard said.

        So there are three ways I can do this.  I can recall him as a witness and introduce it through him.  I can use it during cross-examination.  Or I can call him as a witness if I can't get it in through cross-examination.  Or, we can stipulate that it should come in for the sake of completeness of the unsworn record.

        THE COURT:  What is it?  Just tell me what it is.

        MR. ANTOLLINO:  This is a document from the Unemployment Insurance Commission, Department of Labor, 2002 perhaps.

        And the first question is, Why am I receiving this notice?  And it explains why.  And in it -- it is Don Zarda's claim for unemployment insurance benefits.

        THE COURT:  Okay, what is, what does it show?

        MR. ANTOLLINO:  Revisions to the claim of weekly benefits may also affect your total maximum potential

677

charges.

That is what I want to get in.

THE COURT:  So that his unemployment was being affected by being unemployed?

MR. ANTOLLINO:  The claim is designated as requested for recalculation of the benefit rate using new and/or corrected wage information.  The revision of the claim's weekly benefit rate may also affect your total maximum potential charges.

And that is what led to that letter that we have already put into evidence.

THE COURT:  Okay, what is the relevance of that document?  What does that show the jury?  What does that tell the jury?

I understand why you want to put the letter in because it made reference to his termination.  But I don't understand what that document tells this jury that you want them to know.

MR. ANTOLLINO:  Well, I don't have the exact quotation from Mr. Maynard's testimony.  But he said, yeah, I just wanted to give unemployment as much information as I could.  And I told them about the business that he had, and I told them this.  And he acted as if it was just him supplying information.  But --

THE COURT:  You want to show that in response to

678

that?

        MR. ANTOLLINO:  Yes.

        THE COURT:  Okay, is there any objection?

        MR. ZABELL:  I think it's irrelevant.  And I think it's an additional waste of everybody's continued time.  And I also -- look, he has to see if Mr. Maynard can verify and identify the document.  Counsel seems to think that just because there is a document, it makes it -- it ought to come in.

        THE COURT:  I'll let him do it on redirect.  All right?

        MR. ANTOLLINO:  Thanks, judge.

        And one other thing as far as these other witnesses that are coming in.

        Pursuant to Rule 404 which bars the admission of propensity evidence, plaintiffs are going to move to preclude any testimony by any defendant's non-party witnesses that Don Zarda acted in a particular way in the past, for the purpose of showing that he acted this way during the date in question.

        In other words, by bringing in witnesses to say that Don, that Don wasn't nice to females, Don did this, Don did that.  That's all propensity evidence.

        So I'm going to object to any of that coming in on those grounds.  And I'll make that objection if it

comes up.

THE COURT: Well this is a discrimination case. And so that is the basis for the termination. And in fact the witness yesterday testified that he spoke to Mr. Maynard about it.

So obviously if the employer was made aware of it, then it goes potentially to the employer's decision and the reason for the termination. So it's an exception to 404(b) because the critical issue of this case is the employer's state of mind. I don't know if -- let me ask Mr. Zabell if these other witnesses are going to have similar testimony to that.

MR. ZABELL: They are.

MR. ANTOLLINO: They would also be e-mails, judge.

THE COURT: I don't know if you agree with that. But are they going to state similar to what the witnesses said yesterday, that they brought it to Mr. Maynard's attention?

MR. ZABELL: At least one of them will, and one is going to testify that he brought it to Don Zarda's attention.

THE COURT: I have to think about that one.

MR. ANTOLLINO: That clearly would be hearsay and propensity.

680

THE COURT:  Well, let me think about that one.
Okay?

MR. ZABELL:  We're note far from that.

THE COURT:  Okay.

MR. ZABELL:  And I believe the one issue that
I'm waiting on from your Honor is the EEOC charges.  And I
need to address that when I question.

THE COURT:  How long are you going to be with
your client?

MR. ZABELL:  Very short, 15 minutes.  I expect
to be, if everything goes as planned, I expect to be
finished by lunchtime.

THE COURT:  Okay.  Why don't we finish your
client, and then we'll discuss your case.  I assume you're
going to make a motion at the end of the plaintiff's case.
We'll have to take a break anyway.

MR. ZABELL:  Yes.  But part of the reason, I
believe your Honor instructed the jury that I was going to
be able to exceed direct with Mr. Maynard for purposes of
saving time.  If I'm able to get everything I need done
now, I may not need to call Mr. Maynard again.

THE COURT:  I know.  But what do you want to do
for Mr. Maynard that I need to rule on?

MR. ZABELL:  I want to ask him if he recalls
receiving the EEOC charges.

**681**

THE COURT:  So let me place -- let me discuss the EEOC charge.

MR. ZABELL:  I'm sorry.  I want to get that in through him.

THE COURT:  I understand.

But thi is my view on the EEOC charge.

I am not going to allow you to bring out the fact that in the second paragraph of the EEOC charge, where he says, I'm not making this charge on the ground that I was discriminated on the grounds of my sexual orientation.  Rather I'm making this charge because in addition to being discriminated against because of my sexual orientation, I was also discriminated against because of a finding of gender.

What is clear from that paragraph is because he also said the charge is not based upon sexual orientation. But then said in the very next sentence that he believes he was being discriminated against because of his orientation in addition to his gender.

It's clear that this is framed this way because he is making filing to the EEOC for which there is no federal claim for sexual orientation.  So to put that before the jury I think would be confusing, would be misleading.  And it would require me to give an instruction to them explaining to them what the law was at

682

the time of the filing.

It has no probative value because it's not inconsistent with anything else in this case for him to say that. It's completely consistent with his current claim, which is that he was discriminated against because of his sexual orientation. So you're definitely not placing that into the record because it would be extremely confusing to a lay juror to understand that. And I would have to try to explain it to them. And it has no probative value.

If there is some other statement, I think that declaration, because you said that the other reason you wanted to get it was because there is some inconsistency. I didn't, I didn't see anything in particular. If there is some other sentence in there that you believe is inconsistent factually with what he testified to at his deposition, then I'm willing to entertain that.

But I didn't see anything, nothing jumped out at me. It seems to be very similar to what he said in the deposition. But if there is some other portion I'm happy to look at it at this time.

Okay. So we'll finish. You'll do your cross, Mr. Antollino will redirect and try to get that additional document in. And then you can read that portion from Mr. Zarda's declaration. And them you're going to rest.

683

MR. ANTOLLINO:  Well, yes.  There is one paragraph.  Don had a habit of holding his finger like this.  There is actually a picture that we have which we provided to defense counsel, where he is watching TV at Drop Zone where he is actually holding his finger in exactly that way.

And this goes to show that this was just his normal demeanor, nothing nefarious about it.  It was just the way that he put his finger like someone might twirl their mustache or twirl, or a woman might or someone with long hair might twirl their curls.  Or you know, count their fingers.  I can cane show you the picture.

THE COURT:  Did you show it to Mr. Zabell?

MR. ANTOLLINO:  Mr. Zabell has seen the picture. Would you like to see it again?

THE COURT:  Would you identify it in your exhibits?

MR. ANTOLLINO:  Yes, I will.

All right, this is Exhibit 46, this one.

(Handing)

MR. ZABELL:  Your Honor, our position is there is no indication of when this picture was taken, where it was taken.  If it was taken after the lawsuit was filed or after the deposition occurred.  There is no one here, unless this individual on the right is a witness.  And I

684

don't recognize him.  There is nobody here to authenticate this picture.  For all we know this picture could have been taken information for purposes of evidence here at the trial.

THE COURT:  Where did this picture come from?

MR. ANTOLLINO:  This picture came from, I believe -- I believe this came from the Drop Zone.  One of the crewmen.  And Don gave that -- well actually let me ask Bill if he recognizes this person here.

Okay, this is one of the cruise ships that Don went on.  And this is Frank -- on the cruise, and they're watching TV.

THE COURT:  Okay, that has no probative value.

First of all, if Mr. Maynard wasn't aware of it, assuming he had that mannerism, you know, in some other context, it has no probative value.  The issue is what Mr. Maynard knew and what he based his decision on.

So I'm not allowing that in.  Okay?

Let's bring in the jury.

MR. ZABELL:  I will proceed with Mr. Maynard?

THE COURT:  Yes.

**RAYMOND MAYNARD**

called as a witness, having been first previously duly sworn, was examined and testified further as follows:

685

THE COURT:  Good morning, members of the jury.

It's good to see everyone again this morning.  I know there were some traffic issues this morning, so I appreciate you getting here.

We're ready now to continue with the trial.

As you recall, Mr. Maynard completed his direct examination yesterday at the end.  So we'll start with his cross-examination.

I remind you, Mr. Maynard, you're still under oath.

Do you understand?

THE WITNESS:  Yes, sir.

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. ZABELL:

Q    Good morning, Ray's.  How are you?

A    Good morning.

Q    Yesterday you heard Mr. Kengle testifying about a complaint he made to you.

Is that correct?

A    Yes.

Q    Did he, in fact, make a complaint to you?

A    Yes, he did.

Q    What did he complain about?

A    He felt very uncomfortable about the inappropriate

Maynard - Cross/Mr. Zabell

**686**

touching.  Again, that's putting his head on her shoulder,
whispering in her ear.  And to try to calm her down.
Telling her that he was gay.  And conversations he had
like that under canopy.  It really ruined her day of
skydiving.

Q    Was does that mean, under canopy?

A    After you deploy parachute, that deals with that.

Q    There were some questions yesterday about this.

How long does it take to go from the airplane to
the ground, typically?

A    If the parachute opens?  No.

Q    Yes, parachute opens.

A    Normally a 60 second free fall and then you deploy
your parachute about 5,000 feet.  And the canopy ride,
parachute ride, depending on the conditions of the day, it
could be anywhere from four to seven minutes.

Q    So you can be falling from the airplane for like
eight minutes?

A    Not really.  You know, free fall is about 60 seconds,
canopy ride, yes, I guess almost eight minutes.

Q    Now about free fall, that's where they're falling
fast, there is no parachute and everyone's face is getting
pulled back?

A    Yes.

Q    Everybody looks like they're smiling, right?

A     Yes.

        MR. ANTOLLINO:  Objection.  That is leading, judge.

        THE COURT:  It's cross-examination.

        MR. ANTOLLINO:  There is no client.

        THE COURT:  It doesn't matter.  If he's covering new areas that you didn't cover, then he can.

BY MR. ZABELL:

Q     I'm sorry.  So my question was, everybody looks like they're smiling?

A     Yes, they do.

Q     Why do they look like they're smiling?

A     You're falling at 120 miles an hour, so your skin is being pulled back and it looks like you're smiling.

Q     Okay.  After you received the complaint from Mr. Kengle, what did you do?

A     I started my investigation by calling Don up and asking him about the jump.  And he said he did not remember the jump, that it was three days before.  So I told him, I described what I was told and tried to remind him that it was a couple, the girl was celebrating her birthday, and it happened midday on Friday.  And I gave him all of the details that Mr. Kengle told me.  And he said he still cannot remember it.

Q     What did you do then?

688

A    I told him that I was going to suspend him.  And I then went and watched the video.

Q    Which video did you watch?

A    Rosana's video.

Q    This video?

          MR. ZABELL:  Your Honor, I'm going to play the video that has been introduced into evidence.

          (The tape was played.)

          (The tape was stopped.)

BY MR. ZABELL:

Q    Mr. Maynard, is that the video you watched?

A    Yes, it is.

Q    Did you watch it in its entirety?

A    Yes, I did.

Q    And did you come up with any impressions after watching that video?

A    I came up with -- I believe it corroborated Mr. Kengle's story to the extent that this videotape reenforced that.

Q    What did you see on that videotape that reenforced that?

A    I think that Don was doing it with his mouth and his eyes, looking at her.  That kind of was creepy to me and something that is not normal.  I know we try to have the instructors do things to enhance the video and have fun.

Maynard - Cross/Mr. Zabell

689

And my -- my opinion, that was something that wasn't normal at all.

Q    And what did you do after watching that video?

A    I talked to my attorney and I told him the whole story including that this employee had a history before of customer complaints and was fired after two instances in 2001.  And my attorney advised me that I should terminate Don because knowing this, and now it's three times, and something else happened, and my company could be in jeopardy.

Q    And did you, in fact, terminate Don?

A    Yes, I did.

Q    Why did you terminate Don?

A    Because of customer complaints.  That happened multiple times.  He was warned about it before he was hired back.  I hired him back after the first firing in 2001 and in 2009 and we had a conversation.  I hired him back because he was a good instructor.  He was a good guy.  I liked him.  But I told him if there is one more complaint, if there is one more complaint, Don, I'm going to have to let you go.  And he agreed to those terms.

Q    Now counsel spent a fair amount of time yesterday talking about a release.

         Do you recall that?

A    Yes.

690

Q    Just because Ms. Orellana couldn't sue you for the jump, is that any reason why you wouldn't take action against Don Zarda?

A    No.

Q    It was just that simple; you received a complaint, you investigated a complaint, you came to a conclusion and then you terminated him?

A    It was really just that simple.

MR. ZABELL:  I have nothing further.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. ANTOLLINO:

Q    Now the complaints made in 2001 were simply that Don told the customers that he was gay.

Is that correct?

MR. ZABELL:  Objection.  Asked and answered.

THE COURT:  You asked that.

MR. ANTOLLINO:  But this is redirect and he just said that he spoke to his attorney about these complaints. I just want to make it clear.

THE COURT:  Go ahead.

A    My attorney said that Don, besides telling them that he was gay, told them what he was doing after work on Fire Island.  That was the complaint.

Q    Now in your deposition you were asked these questions

and you gave these answers.  Is it not true?

      Question:  And what was it that Don --

      THE COURT:  What page?

Q    Page 139, line 22.

      And what was it that Don said that made these women cry?

      MR. ZABELL:  Objection, objection, your Honor. This was gone over yesterday.

      THE COURT:  You don't have to go back and reread the deposition.

BY MR. ANTOLLINO:

Q    You didn't testify to anything at your deposition about him improperly touching witnesses, correct? Improperly touching anyone in 2001, correct?

      MR. ZABELL:  Objection.

      THE COURT:  We're not going through this again.

BY MR. ANTOLLINO:

Q    Did your lawyer tell you that you could be held liable if Don Zarda told other customers that he was gay?

      MR. ZABELL:  Objection.

      THE COURT:  Sustained to the form.

BY MR. ANTOLLINO:

Q    What did your lawyer tell you?

A    I told my lawyer the entire story what was going on from 2001 to 2009 and 2015.  He was hired, fired, rehired,

692

got hurt, came back and was rehired again in 2010.  And

then within a very short period of time I received another

customer complaint.  And my attorney advised me this

situation will continue, and you need to look at, to

protect your exposure.  And he told me to have a meeting

with him and he told me use these words:  Don, I'm sorry,

this is not working out.

        And that is why I used those words.  And then I

--

Q    All right.

A    -- responded the whole time as you heard before.

Q    And when you talk about a meeting and exposure,

you're talking about exposure for Don telling customers

that he is gay, correct?

A    No, exposure.

        MR. ZABELL:  Objection.

        THE COURT:  You can answer that.

        What did you mean by exposure?

A    Exposure that my company is built on customer service

and what people say after they experience a skydive.  And

so if I have employees that are to doing other things than

their job, and their job is to talk about the skydive and

not be talking about themselves.  And it doesn't matter

who they are talking to about themselves.  If you're not

talking about the skydive and making that skydive a great

experience, they're not going to leave my place and recommend it.  And that would be detrimental to my business.

Q    So if -- the exposure is that some people will not like it that Don says he is gay, correct?

          MR. ZABELL:  Objection.

          THE COURT:  Overruled.  You can answer that.

A    People -- the instructors that I have, and I have had many of them, are told that when you are taking someone on a skydive, your job, your main job is to get them safely from the air to the ground.  Part of your job is to make it an enjoyable experience.  And that does not mean talking about yourself.  And I don't care who it is, you're not supposed to talk about you, yourself.

          If I get a complaint that somebody did that, then I will take action with it.  Their job, and they know it, and it wasn't done, was to make sure that skydive was enjoyable and talking about the beautiful scenery on eastern Long Island and all of the other things that are going on there.  Not talking about themselves, regardless of what they were talking about.

Q    So the fact that these two women heard about Don's sexuality was what made them come to you in tears, correct?

          MR. ZABELL:  Objection.

Maynard - Redirect/Mr. Antollino

694

        THE COURT:  Sustained.

BY MR. ANTOLLINO:

Q    What about Duncan Shaw's telling David Kengle that he was from New Zealand, correct?  Do you remember that testimony yesterday?

        MR. ZABELL:  Objection.

        THE COURT:  We're not going to go back, Mr. Antollino, okay?

        MR. ANTOLLINO:  Okay.

BY MR. ANTOLLINO:

Q    Now you said that when they're falling at 120 miles an hour everyone looks like they're smiling.  But when you're in the aircraft, you're not moving at 120 miles, are you?

A    No.

Q    So any smile in the aircraft is completely voluntarily, correct?

A    Yes.

Q    And when you reach the ground, any smile is completely voluntary, correct?

A    Correct.

Q    All right.  Now I want to show you what was part of Exhibit 6.  And we'll call this 6 B.  And I'll ask you if you recognize this.

        MR. ZABELL:  I'm sorry, it's not 6 B.  I believe

Maynard - Redirect/Mr. Antollino

695

it's 13.

Q    All right.  We'll call this 13 B and I'll ask you if you recognize this.

A    No, I do not.

Q    All right.  That is addressed to what company?

          MR. ZABELL:  Objection.

          Your Honor, he has testified he doesn't recognize it.

          THE COURT:  Sustained.

BY MR. ANTOLLINO:

Q    Have you received one of these -- well, let me ask you this.

          Has any employee ever applied for unemployment --

          MR. ZABELL:  Objection.

Q    -- in --

          MR. ANTOLLINO:  Can I finish the question?

          THE COURT:  Finish the question.  Go ahead.

BY MR. ANTOLLINO:

Q    Has any employee ever applied for unemployment while working at Skydive Long Island?

          MR. ZABELL:  Objection.

          THE COURT:  Sustained.

          We'll discuss this at another time.

BY MR. ANTOLLINO:

**696**

Q    All right.  Do you recognize the second page?

A    No, I do not.

Q    All right.  Did you know that your response to the unemployment division may affect your total maximum potential charges to unemployment insurance?

       MR. ZABELL:  Objection.

       THE COURT:  Ask him if he knows.

A    No.

       MR. ANTOLLINO:  No further questions.

       MR. ZABELL:  Nothing.

       THE COURT:  You can step down.  Thank you.

       Mr. Antollino, are you going to read a portion of the declaration?

       MR. ANTOLLINO:  Yes.

       Do you want to say something about it first?

       THE COURT:  Yes.  I am allowing Mr. Antollino to read a portion of a declaration that Mr. Zarda submitted in connection with this case.  So he is going to read a portion of the declaration.  This relates, the statement relates only to the issue of damages if you should find that there is a liability, okay?

       Go ahead.

       MR. ANTOLLINO:  Okay.  Donald Zarda, plaintiff, against Altitude Express, Incorporated and others.  Donald Zarda, plaintiff herein, does hereby declare under penalty

of perjury as follows:

I no longer feel like I can be myself working, jumping, especially tandem jumping, having to strap people to me and touch in so many places to perform the job because of what RAY MAYNARD did terminating me for such reasons, regardless of the bogus customer complaint, I can no longer work in this industry without having fear of having been branded as some kind of gay pervert. I cannot even enjoy non-work skydiving because there are tandem jumps taking place at every skydiving center. And it is a stark and vivid reminder about what happened to me, which takes away the enjoyment I get from jumping and keeps me from interacting with friends and social circles developed over two decades. No amount of personal loss, injury or death in this work has ever pushed me away until now.

Dated April 7, 2013, Dallas Texas, signed Donald Zarda.

THE COURT: Okay.

MR. ANTOLLINO: At this point the plaintiff rests.

MR. ZABELL: Your Honor, in response to that, there are a couple of portions of Mr. Zarda's deposition testimony that I would like to --

THE COURT: You can do that in your case.

MR. ZABELL: I think it would be an appropriate

**698**

cross as if Mr. Zarda was here testifying to that.

THE COURT:  No, I'm going let you do it during your case, okay?

The plaintiff rested.  Okay.

Before we continue with the case we seem -- I know you just got out here but we just need to take a short break, okay?  Take a ten minute break, okay?  Thank you.

(The jury left the courtroom.)

THE COURT:  Just so you know, my practice is to reserve decision on all 50 motions as a rule.  Obviously, the motions can be reviewed at the -- if there is an unfavorable verdict, obviously you have to state the grounds for it so that it is preserved.  But I just want to let you know that, okay?

MR. ZABELL:  Yes, your Honor.  I'll make it as quick as possible without any pomp or circumstance.

At this time I would like to make a motion for a judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, and will grant a judgment in defendants' favor against the plaintiff.

Although this case is before your Honor under the state human rights laws analyzed under the all too familiar McDonnell Douglas burden-shifting framework, I believe your Honor decided that in the Uranyi case, Uranyi

**699**

v. MultiPlan, Inc.  I have a 04-CV-2685.  I believe that is the only citation I was able to find for that case.

Your Honor, under the McDonnell Douglas burden-shifting scheme, we'll concede the first three elements.  The fourth element is that a decision or action occurred under circumstances giving rise to an inference of discrimination based upon Mr. Zarda's membership in the protected class of sexual orientation under the State Human Rights Law.

Now the only evidence that has been submitted that Mr. Zarda's sexual orientation was a factor in the decision to terminate his employment is the fact that he is gay.  There has been no evidence submitted to indicate that Mr. Maynard's determination to terminate him was based upon anything other than a legitimate business decision.

Arguably the only comments that the plaintiff has been able to point out has to do with a fluorescent pink cast.  And anyone can see that they were made, and if they were made, they were a year before the termination. They were separated by both a year and Mr. Zarda's rehiring by the very person who is alleged to have discriminated against him.

The testimony that came out during plaintiff's own case is that Don Zarda introduced himself as Gay Don

700

even before he was hired by Mr. Maynard in 2001.  He disclosed his sexuality.  It was part of his over-sharing with a customer.  That customer again, who came and testified as part of the plaintiff's case, very detailed, in a very detailed manner, explained exactly what she was complaining about; not the fact that he was gay and sharing his relationship information with her, but she was complaining because she felt he was getting familiar with her.  He was hitting on her.  He put his hands on her hips, whispering in her ear.  And then when he says that she was uncomfortable, disclosed his orientation and stories regarding his orientation in an effort to allay her discomfort.

That is not discrimination because he disclosed his sexual orientation.  That is a legitimate complaint. She wanted to know about what she was doing when she was jumping out of this plane.  That is exactly what the other instructors did.  That's not what he did.

That brings us to the same act or inference. There has been testimony that RAY MAYNARD hired Don Zarda not once, not twice, but three times.  The Second Circuit has ruled that when the same person hires somebody and then terminates them shortly thereafter, you cannot impart that, and I believe the term they used is invidious motivation to the termination.

701

Why would Mr. Maynard hire Don Zarda knowing full well that he is gay, and then terminate him as a basis, or terminate him because he is gay?  They cannot overcome that hurdle.

The next issue is the legitimate business reason that Mr. Maynard had for terminating Mr. Zarda.  He received a customer complaint.  He investigated that customer complaint.  He acted on his conclusion to that investigation.

Now the Second Circuit has said in Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, that courts should not act as super personnel departments second-guessing an employer's judgment.

Well, if courts shouldn't do it, then juries can't do it.  And there have been decisions coming out of this court, saying that you can't second-guess an employer's non-discriminatory business decision regardless of their wisdom.  And that is Viruet v. Citizen Advice Bureau, 01-Civ-4594.  I'm sorry, that's out of -- 2002 WL 1880731.  And that is a Southern District decision.

The Second Circuit has ruled on this in Parshis v. Riese Organization, 211 F.3d 30.  And that's a 2000 case.

So whether or not we agreed with the conclusions that Mr. Maynard made, he had a right to make those

702

decisions.  And this Court and this jury is not empowered to second-guess those decisions.  He stated a legitimate reason for making those decisions and he acted on them. And as of right now, there is nothing that came out in plaintiff's case that contradicts or chips away at the veracity of Mr. Maynard's decision-making process.

Any argument that there was an insufficient investigation always falls to the wayside under Sassaman v. Gamache, the case that we've discussed at length in this case over prior issues.  That's Sassaman, S-A-S-S-A-M-A-N, v. Gamache, G-A-M-A-C-H-E.  That is 566 F.3d 307.  And that states only where plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination broke the decision and arguably insufficient investigation may not support an inference of discriminatory intent.

And I believe that is precisely what plaintiff's counsel argued to the jury.  That, A, he believed that we had a sufficient investigation.  But to the extent that counsel is arguing that we haven't, the Sassaman case clearly indicates that they have failed to meet the necessary burden of proving that.

And finally, there is the issue that was addressed earlier, the stipulation of Mr. Zarda signing

703

the release.  I believe your Honor has the release.  It has been admitted into evidence based upon stipulation. That is a full and knowing release of all claims against the Dropzone, against the defendants herein.

Although there is case law that says such a release cannot work in the context of a Title VII claim, there is no such case law that says it cannot work in the context of a claim made for discrimination under the New York State Human Rights Law.  If you read the content of that release, Mr. Zarda has waived his rights to sue under any intentional act, unintentional act.  A claim of discrimination could be argued to be an intentional tort. It has in the past been categorized as an intentional tort.

Here --

MR. ANTOLLINO:  Let me just make clear.  That has not been admitted into evidence.  I said that it was his signature, but that was never offered into evidence.

THE COURT:  The agreement we reached was that you -- we agreed that signature was authentic, but it wouldn't be before the jury.  That that would be before the Court.  So I think it's before the Court.

MR. ANTOLLINO:  Okay.

MR. ZABELL:  I believe you identified it as a court exhibit.

704

THE COURT:  Right.  Okay.

MR. ZABELL:  Based upon the content of that release, Mr. Zarda has waived his right to sue based upon that release.  And in addition, he even agreed to cover the costs of the legal fees of us having to defend in this matter.

THE COURT:  There is a case up there that says that you can't waive your rights under the Human Rights Law.  Why would it be different if you can't waive it under Title VII, why would you be able to waive them under the Human Rights Law?  Wouldn't that be the same?

MR. ZABELL:  My presumption is if the analysis was the same, there would be case law that says you can't waive them.  There is no case law.  I'm sure your Honor is going to view it.

THE COURT:  You don't have a case that says that the Court has found such a waiver to apply to state law discrimination claims.

MR. ZABELL:  There is a case law that has found waivers like this to be effective for waiving other types of claims, torts and intentional torts.

THE COURT:  But not discrimination.

MR. ZABELL:  But not discrimination.  I don't want to mislead, your Honor.

THE COURT:  I'm going to look at it.  Go ahead.

705

MR. ZABELL:  So based upon all of the information, all of the evidence that has come out in the plaintiff's case, notwithstanding the fact that I understand what your Honor's practice is with regard to such motions, there just hasn't been a substantial enough showing that Mr. Zarda was terminated because of his orientation.  And if there was, if evidence of that existed, it should have come out during plaintiff's case.

I would imagine defendants -- a lot was covered during plaintiff's case, and much of the defendants' case came out during it.  I would expect to be done by lunch, judge.  But even still, to make us go forward at this point given the overwhelming majority of testimony that has come out, and not any of it supports the indication that Don Zarda was terminated for his sexual orientation as opposed to a legitimate business reason.  They received a complaint about his behavior, not about him being gay, but about his behavior.  And the video supports that.  And the two people who complained, well, the one person who complained testified that he complained, and his girlfriend relayed the information to him to testify.

It's unfair to the defendant at this point to make us proceed based upon the overwhelming evidence in support of the defendants' case.

THE COURT:  Okay.  Mr. Antollino?

706

MR. ANTOLLINO:  Well, it's clear that there is this treatment insofar as, for example, he wouldn't fire Rich Winstock for saying that he was heterosexual to a customer even if there were a complaint.  That's number 1.

Number 2, a jury could very easily look at all those pictures and come to a completely different conclusion that they have come to.  And Sassaman v. Gamache actually takes the position that we do not reach the issue as to whether a failure to investigate a claim of sexual harassment would in every case allow a claim of a violation to go forward.  But in this case it clearly did.

In this case what they have argued again and again and again is that the young delicate flower was being touched and she didn't like it.  And it wasn't what she expected.  And all they have to back that up is a video where my client is making some funny faces, which was explained by Rich Winstock as being, enhancing the video.

As far as the same accurate inference is concerned, I addressed that in my opening statement.  We acknowledge that RAY MAYNARD hired Don knowing that he was gay.  And there was all sorts of testimony that the discussion of Don being gay was something that was mentioned again and again and again and again on the drop

zone.  But the one time Don mentioned it to a customer, all hell breaks loose like it's the worst thing in the world.

And if those customers didn't like the fact that my client told them he's gay, that is not something that you can use -- that they can use to protect themselves against an allegation of discrimination.  It has been held again and again and again that customer preference for wanting to work with a particular class is not a legitimate reason for not hiring or firing or disciplining, except in the most extreme circumstances such as, for example, gynecologists or something like that.

In this case there was only one female skydiver at the drop zone.  They were all men.  We didn't see, obviously, any videos of women.  So there was really no choice but for Don to -- or but for men to carry women. And these people consented to that.  The fact that they were unhappy afterwards and they interpreted Don's conduct three days later is a question, in fact, for the jury. Mr. Kengle said that he had -- he was very outspoken -- and yet he is looking right across from his girlfriend and he doesn't say anything.

Rosana Orellana has every excuse in the book for not saying everything.  I was disoriented.  I was afraid.

708

It was really the wind pressing against my mouth, that is not really a smile, but you see her flirting with the camera in David Kengle's video. And the question is, when RAY MAYNARD is in the state where he has to make a decision as to whether or not that is a legitimate complaint, he allowed the issue of gay to influence that decision because he looked at the video. He saw nothing in that video that corroborated the allegation. And he even testified at his deposition, which was brought up yesterday, that he didn't fire him for making a creepy face. But it was the issue of gay and personal information. But yet other personal information such as Rich Winstock mentioning that he was heterosexual, and RAY MAYNARD mentioning that he was heterosexual on a professional website, that all is okay. That is all fair game.

So there is a double standard here about personal information. I think I have addressed everything that Mr. Zabell has addressed at this point. If there is something else that I have not, and you would like me to address, I'll be happy to. Otherwise, I think that covers it for now.

THE COURT: As I said, I'm going to reserve decision on the ruling. That is permitted. And I'm going to submit the claim to the jury. And then obviously if it

709

is an unfavorable verdict, the defendants can renew it, at which time I would ask for a briefing on the issue, okay?

     MR. ANTOLLINO:  An unfavorable verdict for them.

     THE COURT:  Right, right.  Okay, so...

     MR. ZABELL:  May I just have -- assuming your Honor wants to bring the jury now, if I could just have a few minutes?

     THE COURT:  I do want to -- now I want to rule on the -- there is one witness you said you wanted to think about.  So you have two witnesses?

     MR. ZABELL:  That's correct.

     THE COURT:  They are?

     MR. ZABELL:  They are Mr. Shaw, Duncan Shaw and Curt Kellinger.

     THE COURT:  And you said one of them is going to testify that --

     MR. ZABELL:  That he said stuff.  He had made comments to Don about Don's inappropriate treatment of a female jumper.

     THE COURT:  Okay.  And which one is that?

     MR. ZABELL:  That's Duncan Shaw.

     THE COURT:  And the other one is going to testify to something similar, but he is also going to say he discussed it with Mr. Maynard?

     MR. ZABELL:  Correct.

710

THE COURT: Okay. On the issue of 404(b), any information that was communicated to Mr. Maynard is critical. It's a critical issue in the case in terms of what his state of mind was with respect to the situation that he was confronted with respect to Ms. Orellana and the decision that he made. That is a central issue in the case.

So certainly it's admissible under the Section 404(b) as to his intent or knowledge. And obviously under 403, the analysis is highly probative. It is not substantially outweighed by the danger of unfair prejudice. This is the critical issue in the case.

On the witness who I guess observed something and then did not communicate to Mr. Maynard, but communicated back to Mr. Zarda. I believe based upon the way this trial has played out, although Mr. Zarda's state of mind as it relates to the claim is not an element of the claim, certainly the plaintiff has placed into question the credibility of Ms. Orellana. And has stated over and over again, stated in the opening through a whole series of questions of both Ms. Orellana and Mr. Kengle, and again just stated here in the context of the Rule 50 motion, that they essentially, that Mr. Zarda had no intentionality with respect to any inappropriate touching or gestures or a manner in which he interacted with

711

Ms. Orellana.

So rather than just attack the information that Mr. Maynard received and how he dealt with that information and his state of mind, they have unquestionably and aggressively attacked the complaint itself and suggested to this jury that Mr. Zarda could not have had any intentionality with respect to inappropriate remarks or inappropriate touching.

And therefore, they had certainly placed his intent or lack of, or the absence of a mistake or misunderstanding as relates to Ms. Orellana into this case. And therefore, it certainly is fair game for the defense then to put in evidence what relates to what his intent may or may not have been with respect to his handling of customers, especially female customers, whether there was a misunderstanding or a mistake.

So under, I believe under 403, the balancing, because this has been a central attack of the plaintiff, that it is highly probative for the defendant to be able to rebut that, my observations of other individuals with respect to their interaction with the customers. And again, it also relates as well to Mr. Zarda's state of mind to the extent that it was communicated back to him by a co-worker, that he believed, the co-worker at least believed that there was some issue that goes to his state

of mind on whether or not he understood there was an issue.

But for the reasons I already stated with respect to how the credibility of Orellana, Ms. Orellana, has been placed into question, Mr. Kengle has been placed into question, and the repeated assertion that Don Zarda could not have possibly had any intentionality with respect to his conduct here, I believe it should be come in under 404(b) and the 403 balancing.

I do not believe this is substantially outweighed by any danger of unfair prejudice, given how this trial has played out.

So I'll allow those two witnesses to testify.

And then you're resting.

MR. ZABELL:  Then I'm resting.

THE COURT:  You did want to read another portion, I think.  So show him what you want to read so we don't have a sidebar.

MR. ZABELL:  I don't think it's anything that is not, that hasn't already been read.

THE COURT:  If it has already been read then you don't need to read it.

MR. ZABELL:  I would for the context of cross-examining if we're going to the truth of the statement that Mr. Zarda has made.  I would read, I would

713

ask the questions and read the answers.

        THE COURT:  What page is it?

        MR. ZABELL:  To begin with, it's page 195, lines 10 --

        MR. ANTOLLINO:  -- if I --

        THE COURT:  Obviously you had a chance to cross-examine him regarding those statements, and I was going to let you then read the pieces regarding the deposition because it's a little different.  I'm letting in a statement by your client that he never had a chance to question him regarding.  So it's not exactly the same situation.

        Mr. Maynard was sitting on the witness stand and you, in fact, did impeach him with the statements.

        But what is the page?

        MR. ZABELL:  It's page 195, lines 10 through 17.

        THE COURT:  Okay.

        MR. ZABELL:  Page 7, lines 3 and 4.

        And I would like some additional time.  I do want to bring out some of the answers after he took his two-month vacation in, I believe it was Norway.  He had given me an answer.  I just haven't found that passage yet.

        THE COURT:  Okay.

        MR. ANTOLLINO:  I need to look at those.

714

THE COURT:  One is, How are you feeling today? That was page --

MR. ZABELL:  7.

THE COURT:  And then the other one dealt with, page 195, line 10.  Just give me a second.

It's just demonstrating different tandems.

MR. ANTOLLINO:  195, 10 though 17?

THE COURT:  Right.  And then he is looking for the other one about the cruise?

MR. ZABELL:  No, about the two-month vacation.

On page 181, beginning at line 5 he was talking about his two-month vacation.

I had a great time.  That allowed me to get away from a horrible winter, which I was dealing with this case and the classes and other things that were going on and were difficult.  And it was an unbelievable breath of fresh air and nice place.

THE COURT:  That's fine.  Okay?

MR. ZABELL:  Your Honor, would it be okay if I read just both the question and the answer?  Because it is such a small thing.

THE COURT:  Yes.

Do you want to take break?

MR. ZABELL:  No, I don't.

MR. ANTOLLINO:  Before I forget, on two

occasions during this trial, a juror had sneezed and Mr. Zarda had said, gesundheit, in the middle of the trial.

THE COURT:  Mr. Zabell, you mean?

MR. ANTOLLINO:  Mr. Zabell.

I think that that is inappropriate and against your ruling, we're not supposed to have contact with the jurors.

THE COURT:  Yes.  I mean lawyers sometimes do that just by habit.  But I just ask you don't make any comments to the jury, okay?  But I don't think that was intentional.

All right.  Let's bring the jury in.

MR. ZABELL:  So no gesundheit.

THE COURT:  No gesundheit.

(The jury entered the courtroom.)

THE COURT:  We're ready to proceed.  And I know it's more than ten minutes, but you know by now my estimates are wrong.  But we are going to finish today. That estimate will be correct.

So we are now going to proceed with the defense case.  I have allowed Mr. Zabell to -- a witness was called yesterday on the plaintiff's case regarding the questions of Mr. Maynard, and he wished to question him during the plaintiff's case.  But now he has an

opportunity to present any other evidence he wishes to present.

       Okay.  Go ahead.

       MR. ZABELL:  Thank you, judge.

       In response to the statement I read before.

       THE COURT:  He is going to read a few portions of Mr. Zarda's deposition into the record.

       Okay.  Go ahead.

       MR. ZABELL:  The question posed to Mr. Zarda, page 181, line 5.

       Tell me what you did for the two months and why you're smiling when you're talking about it?

       Answer:  The reason I'm smiling when I talk about it is because it was a very good trip.  I had a great time that allowed me to get away from a horrible winter that I had which was dealing with this case and the classes and other things that were going on that were difficult.  And it was an unbelievable breath of fresh air and a nice place.

       The next passage that I am going to read is page 195, lines 10 through 17.  Mr. Zarda was asked this question and gave this answer.

       Question:  Did you look for any work, other than working for that company during that four or five weeks?

       Answer:  No, I didn't look for any.  So I did

Shaw - Direct/Mr. Zabell

717

some tandems, you know, a couple of weekends I'd drop down

to Texas which is another drop zone that I worked at part

time.  I did some of those.

          And then finally, judge, on page 7 Mr. Zarda was

asked this question and gave this answer, lines 3 and 4.

          How are you feeling today?

          Answer:  Great.

          And I want to point out, your Honor, that that

is the deposition that was taken on December 9th of 2011.

          THE COURT:  All right.  You can call your

witness.

          MR. ZABELL:  At this time I would like to call

Duncan Shaw.

**DUNCAN SHAW**

          called as a witness, having been first duly sworn,

          was examined and testified as follows:

          THE COURT:  If you could please state your name

and spell it for the record.

          THE WITNESS:  Duncan Shaw.

          THE COURT:  Can you spell it.

          THE WITNESS:  D-U-N-C-A-N, S-H-A-W.

          THE COURT:  Okay.  Go ahead, Mr. Zabell.

DIRECT EXAMINATION

BY MR. ZABELL:

Q     Good morning, Mr. Shaw, how are you?

Shaw - Direct/Mr. Zabell

718

A    Okay.

Q    Before you get asked, have you ever met me before?

A    Yes.

Q    Where have you met me before?

A    At Skydive Long Island I met you..  and yesterday.

Q    Are you currently employed?

A    I am an independent contractor and I work at military skydive contracts in Southern California.

Q    Did you ever work at Skydive Long Island?

A    I worked there for 15 years.

Q    And what 15 years did you work there?

A    From May of 2000 to the end of 2014.

Q    And when you worked there, what did you do when you worked for Skydive Long Island?

A    I was a skydive instructor.

Q    Were you a tandem instructor?

A    Tandems and video.

Q    How did your employment come to an end at Skydive Long Island?

A    I left to pursue other stuff, military.

Q    Where was that other stuff located when you left?

A    Southern California, based in San Diego.

Q    So you left Long Island for San Diego?

A    Yes.

Q    Do you know who Don Zarda is?

Shaw - Direct/Mr. Zabell

719

A     Yes.

Q     Who is Don Zarda?

A     He was a tandem instructor that was employed by us three times at Skydive Long Island.

Q     When you say, employed by us?

A     I'm sorry, employed by Skydive.

Q     Were you ever a partner at Skydive Long Island?

A     No.  I'm sorry, no, I was not.

Q     What was your relationship with Don Zarda?

A     When he first worked for us we became friends and I was friendly with him through -- until he was -- his final termination, I guess.  Through his final termination.

Q     Did you just say through his final termination?

A     Yes, the last time that he was employed by us we became less friendly.

Q     Did you -- take a step back.

        When he worked at Skydive Long Island, were you colleagues?

A     Yes.

Q     Did you ever socialize with him?

A     Not really after work.  But after he was first fired from us in 2001, we talked occasionally on the phone.  I had dinner with him and his boyfriend in New York City once or twice.

Q     You actually went out and broke bread with him and

Shaw - Direct/Mr. Zabell

720

his boyfriend.

Is that correct?

A    Yes.

Q    On how many different occasions?

A    Once or twice, I think.  At least once.

Q    And did you maintain telephone contact with Mr. Zarda?

A    Yes, we pretty much talked on the phone.

Q    During what period of time did you make these telephone contacts?

A    After he was first terminated and through when, I guess, he was reemployed in 2009 we talked.

Q    Okay.  Did you know what Don Zarda's sexual orientation was?

A    I do, everybody knows.

Q    How did everybody know?

A    He would tell you.

Q    Well, how would he tell people what his sexual orientation was?

A    It wasn't uncommon for him to introduce himself as Gay Don, which was, you know, no one seemed to care.

Q    How was he introduced to you?

A    I believe we were introduced to him as Don.  We knew he was gay from knowledge.

Q    Did you ever see any of your colleagues tease Don

721

about being gay?

A    I think there would probably be some joking, but Don

would be quiet.  He would be involved in it, but he didn't

care.

Q    How was Don involved in it?

A    He would be making jokes back.

Q    Did you ever see Don bring up the issue of his

sexuality?

A    Many times, yes.

Q    Did he bring it up in a serious manner?

A    Yes, he would.  It wasn't uncommon for him to walk

into our staff room and tell us what he had done the night

before.

Q    What does that mean?

A    Partying and sleeping with people.

Q    Do you recall any specifics of what he would tell

you?

A    He would say specifics of what happened during the

night, yes.

          MR. ANTOLLINO:  Well, this goes beyond, I

believe, your ruling, judge.

          THE COURT:  No, overruled.  You don't have to go

into every detail.

          MR. ZABELL:  No.

BY MR. ZABELL:

722

Q    Not going into every detail, but did he talk about physical acts that he engaged in?

A    Yes.

Q    And who was present when he was talking about those very physical acts?

A    I believe it was the staff, a guy and his wife and a young baby, and -- who is a military vet.

Q    Speaking of that accent, where is that from?

A    New Zealand.

Q    Did you ever tell anybody that you were from New Zealand?

A    Yes.  People ask me.  They can't understand me.

Q    I'm getting most of it.

        Now you said that he had, on one occasion, walked into a staff room and had a discussion about physical acts that he had engaged in the night before in front of a husband, wife and a baby?

A    Yeah.  It would be more than one occasion.  And it was like, it was socially awkward because he would walk in and just sat down with everybody and, you know, and ask them -- we'd be engaged in our own conversations.  That became awkward.

Q    The husband and wife, were they employees of Skydive Long Island?

A    Yes.

723

Q    The baby, was the baby --

A    No.

Q    How old was the baby?

A    Like nine months.

Q    So the baby didn't know what was going on?

A    No.

Q    Now, did any other employees share stories about physical acts that they engaged in?

A    No.

Q    Over their evenings?

A    No.  We didn't talk about it, what happened in the bedroom.

Q    So physical acts were bedroom-related acts, right?

A    Yeah, yeah.

Q    What was said to Don in response?

A    Generally, well, people would get up and leave or it would be like, you know, throw their hands up.  Ask, Why would you say things?

Q    Did anybody ever tell Don that he was over-sharing?

A    Possibly.  I didn't.  I would leave the room.

Q    Did you believe that Don was over-sharing?

A    Yes.

Q    Did you ever have occasion to jump with Don?

A    We shared an aircraft.  We may have made a skydive together.

Shaw - Direct/Mr. Zabell

724

Q    So you were on the same jump.  You weren't strapped
to him but --

A    No.

Q    But you were on the same airplane jumping out with
your own students, right?

A    Yes.

Q    Do you know why Don was fired in 2001?

A    He had complaints against him, about what he was
sharing.

Q    Did you have occasion to see the jumps where the
complaints were lodged?

A    I had a friend of mine who I actually asked Don to
take on tandem and he -- when I asked her that night how
the jump was, she told me that it was --

        MS. JOHNSON:  Objection.  Hearsay.

        THE COURT:  Sustained, sustained.

BY MR. ZABELL:

Q    Did you ever have occasion to observe Don's jumps?

A    We were sharing an aircraft.  You don't see
everything, of course, but yes.

Q    Did you ever have occasion to observe Don jump with
female passengers?

A    Yes.

Q    Did you ever have occasion to observe anything out of
the ordinary in Don's jumps with those female passengers?

Shaw - Direct/Mr. Zabell

725

A     There was a couple of occasions where you could sense how awkward it was becoming.  That if your boyfriend or girlfriend were jumping, you could see that my passenger was getting upset because the girlfriend would be getting upset.

Q     On how many different occasions did that occur?

A     I don't know, more than one.

Q     Did you ever say anything to Don about that?

A     Prior to Don getting rehired, he and I had a pretty lengthy phone conversation about the way that he treated people.  And I asked him to sort that out.  So I probably said something to him, but I couldn't honestly tell you what it was at the time.

Q     Well, that lengthy conversation, what was the specific subject?  What was the subject?

A     Well, he was talking to me as if he was asking for his job back from Ray's.  And Ray's I guess thought about it, and said we can make a decision and he needed to sort it out because Don was a good skydiver.  But skydiving is just part of our job.  You have to be able to be with people, to keep them, you know, comfortable I guess.

Q     And did Don acknowledge his behavior with other skydivers?

A     He acknowledged, yeah.  He knew that we had a long conversation about it and he knew that.  He said to me,

Shaw - Direct/Mr. Zabell

726

Yes, I know I need to sort it out and keep people happy, yeah.

Q    Did Don ever approach you about switching tandem students?

A    He never approached me, no.  I think that perhaps he did, but I don't know.

Q    Did you ever observe him approaching anybody else about switching tandem passengers?

A    Yes.

Q    What did you observe?

A    He would ask to swap if he had a girl and the other instructor had a guy, he would ask to swap.  It was pretty common for him.

Q    Did you ever ask him why he did that?

A    No.  It was pretty obvious.

          MR. ANTOLLINO:  Objection.

          THE COURT:  Sustained.  Disregard the last comment.

BY MR. ZABELL:

Q    Mr. Shaw, do you base jump?

A    I do not.

Q    Do you know what base jumping is?

A    Yes.

Q    What is base jumping?

A    It is jumping off a span or a bridge.

Shaw - Direct/Mr. Zabell

727

Q    Do you know if Don Zarda base jumped?

A    He base jumped for a pretty long time, yes.

Q    Do you recall when he first starting base jumping?

A    I do not recall exactly, but I thought it was in the middle of the 2000's.  It was a long time.

Q    Was he base jumping before he came back to Skydive Long Island for the second time?

A    Yes, yes.

Q    And did he discuss it with you?

A    Yeah, we talked about it, you know, and his gear and stuff to check it out.  This was a fairly new sport with equipment.

Q    Did he express any enthusiasm when he discussed it with you?

A    Yeah, they all do.

Q    What do you mean, they all do?

A    Everybody that base jumps expresses their enthusiasm.

Q    Do you recall what he said to you about base jumping?

A    Not necessarily specific, but I mean he was excited about it.

Q    Do you know what a wing suit is?

A    Yes.

Q    What is a wing suit?

A    It's like a parachute and you can fly.

Q    And did Mr. Zarda ever talk to you about wing suit

Shaw - Direct/Mr. Zabell

728

jumps?

A    He made wing suit jumps from quite early on.

Q    How early on, 2001?

A    Yes.  He was jumping, I believe, could be -- it was a new sport, new area.

Q    But you do recall him talking to you about it back then?

A    I do, yes.

Q    So as far back as 2001 you know that Mr. Zarda was jumping with a wing suit, and then at some time in the mid-2000's you knew that Mr. Zarda was base jumping.

        Is that correct?

A    Yes.

        THE COURT:  Can you just clarify what he just testified about.  I'll allow it.

Q    I'm sorry, your answer was?

A    I believe it was in 2001.

Q    Did you ever hear Mr. Zarda refer to himself as being gay?

A    Yes.

Q    And how do you recall him referring to himself?

        THE COURT:  We don't --

        MR. ANTOLLINO:  He asked that.

        THE COURT:  We don't have to go through that again.

Shaw - Direct/Mr. Zabell

729

MR. ZABELL:  I'm asking specific comments that he would have made, terms that he would have used.

THE COURT:  Go ahead.

A     He would introduce himself as Gay Don.  It was common knowledge that he was Gay Don in conversation.

Q     Did he ever refer to himself as something other than Gay Don?

A     No, well, Don, obviously.

Q     Do you know why Don was terminated in 2010?

MR. ANTOLLINO:  Objection.

THE COURT:  Before he says that, he has to establish how he knows that.

MR. ZABELL:  Yes.

THE COURT:  Go ahead.  You can answer that.

A     Yes.

BY MR. ZABELL:

Q     How do you know how he was fired?

A     Because he was -- had a complaint against him.

Q     No, how did you -- did you hear it from him or from someone else?  Who did you hear it from?

A     I probably heard it through the grapevine at the time.

MR. ANTOLLINO:  Move to strike the testimony, judge.

THE COURT:  Yes, the testimony regarding that

730

issue should be disregarded.

BY MR. ZABELL:

Q    I'm going to show you a video.

A    Okay.

        MR. ZABELL:  It's a video that is already
introduced in evidence, your Honor.

Q    I'm going to ask you if you can identify any of the
parties in that video.

        THE COURT:  We have more than one video.  Just
for the record, do you know the number of this one?

        MR. ZABELL:  It's the Orellana video, your
Honor.

        THE COURT:  Okay.  That is sufficient.

        MR. ZABELL:  That is a three minute or so video.
As the video is playing, Mr. Shaw, if you can identify the
people that you see in it, please.

        (The tape was played.)

A    Right.  Don Zarda.

        THE COURT:  Hold on.

        THE WITNESS:  Sorry.

        THE COURT:  I have to stop the video because we
can't hear him with the video playing.  So if you want do
identify a portion of the video, just stop it, okay?

        MR. ZABELL:  Yes.

        So here is what is I'm going to do to make it

nice and easy.  If you recognize somebody, hold your hand

up and I'll pause the tape and we'll go from there, okay.

       Is that fair, your Honor?

       THE COURT:  Yes.

       MR. ZABELL:  Thank you.

BY MR. ZABELL:

Q    So let me rewind it once.

       (The tape was played.)

       (The tape was stopped.)

A    That is done on the left.

Q    Do you know who the person is on the right?

A    No.  By name, no.

Q    Have you seen her before?

A    Yes.

       (The tape was played.)

       (The tape was stopped.)

A    That was, on the very right, is Duncan Shaw.

Q    Let me just back it up a couple of steps.

A    That is me.

Q    The guy with all of the hair?

A    Yes.

Q    So that was you on that jump, correct?

A    Yes.

Q    Do you remember that jump at all?

A    I do, yes.

Shaw - Direct/Mr. Zabell

732

Q    What do you remember about that jump?

A    I was taking the boyfriend and the girlfriend is
jumping with Don.  And she was becoming increasingly
anxious or disturbed, I guess, and was causing my
passenger to be disturbed.  So I was trying to distract
them, I guess after that so it could work.

Q    Did you see anything in that video that would cause
someone to be disturbed?

A    The weird stuff he is doing with his fingers.

Q    Did you see that already?

A    Yes.  It was creepy.

Q    Okay.  I'm going to play the video and raise your
hand when you see something creepy, and I'll pause and you
can please tell me what you see that is creepy.

            (The tape was played.)

            (The tape was stopped.)

Q    Tell me what you saw that you thought was creepy?

A    Just the way he puts his fingers in his mouth.

            (The tape was played.)

            (The tape was stopped.)

Q    Now, what we saw just then on the video, were you
putting your fingers in your mouth?

A    No, not me.

Q    Sorry?

A    I don't usually put my fingers in my mouth.

Shaw - Direct/Mr. Zabell

733

Q    Is there a legitimate skydiving reason for putting fingers in your mouth?

          MR. ANTOLLINO:  Objection.

          THE COURT:  Sustained.

BY MR. ZABELL:

Q    Let's talk about during a jump where you keep your hands.

          Where do you typically keep your hands when you have a tandem suit strapped to you?

A    Mostly to myself.  It's always very close contact.  I might use my hand on the shoulders in the aircraft, that you're here and you have to take the equipment on and stuff.  So there is moving around a little bit but --

Q    Is there any reason why you would keep your hands on someone's hips or thighs during that time?

A    No.  It's actually far away.  It would be uncomfortable.

Q    I'm going to play the remainder of the videotape and tell me if you see anything else.

          (The tape was played.)

          (The tape was stopped.)

Q    Did you raise your hand?

A    Yes.  That was Marko Markovich.

Q    Let me see if I can get that back.

          (The tape was played.)

Shaw - Direct/Mr. Zabell

734

           (The tape was stopped.)

A    Yes.

Q    That was Marko?

A    Yes.

           (The tape was played.)

           (The tape was stopped.)

Q    And as you're falling, how fast are you falling before the parachute opens?

A    About 120 miles an hour.

Q    Now is there a reason why they're wearing goggles?

A    So they can see.

Q    And is there a reason why their skin is being pushed up?

A    Speed.

Q    Speed?

A    Yeah.

Q    That's the speed of falling through the air?

A    Yes.

Q    Kind of like the same reason why they're struggling to keep their arms down, correct?

A    Yeah, just for flying, I guess.

Q    Now do you recall seeing a video of your jump?

A    A video?

Q    With the boyfriend?

A    Yes.

Shaw - Direct/Mr. Zabell

735

MR. ZABELL:  Your Honor, I would like to introduce the jump of Mr. Shaw and Mr. Kengle as --

THE COURT:  Have you seen that?  Had we seen that already?

MR. ZABELL:  Plaintiff's 54.  I would like to play that video, if I may.

THE COURT:  Yes, go ahead.

BY MR. ZABELL:

Q    I'm going play that video and I'm going to ask you questions afterward.

(The tape was played.)

(The tape was stopped.)

Q    Do you recall that jump other than what you have just observed?

A    Other than the awkwardness in the plane.

Q    Is your answer yes or no?

A    Yes, yes.

Q    Now, did you discuss that awkwardness on the plane with anybody?

A    No.

Q    Why not?

A    My job was to take care of the passenger and focus.

Q    From the time you would jump out of the plane to the time that you land on the ground, about how much time elapsed?

736

A    Four or five minutes.

Q    And what are the stages of those four or five minutes?

A    We're in free fall for about a minute and then with the parachute for three or four minutes.

Q    Do you talk to the student during the free fall?

A    No.

Q    Why is that?

A    Because it's loud, you can't conduct a conversation.

Q    And do you talk to the student after the free fall?

A    Yes.  Once the parachute is opened, it's quiet, you can talk to him.

Q    What do you mean, talk about what is going on?

A    Well, we make some adjustments and, you know, show him the view or talk about a landing or what is going on.

Q    Do you recall that was something you did with Mr. Kengle?

A    I would imagine I did.  But I did hundreds of jumps.

         MR. ZABELL:  I have nothing further, your Honor.

         THE COURT:  Cross-examination?

         MR. ANTOLLINO:  I need a few minutes to set up. Do you want me to do that now or take a break?  It's up to you.

         THE COURT:  Why don't we take a break.

         We'll take a brief break, okay?  We'll take our

Shaw - Cross/Mr. Antollino

737

morning break.  Don't discuss the case.

       (A recess was taken.)

       (After recess the following occurred.)

CROSS-EXAMINATION

BY MR. ANTOLLINO:

Q    Mr. Shaw, you worked for Long Island Skydive Long Island for 14 years?

A    14 years, yes.

Q    So you started in or about 2000?

A    Yes, I think it was 2000.  I went to 2014.

Q    You are here testifying today for RAY MAYNARD?

A    Yes.

Q    And you did not get subpoenaed, did you?

A    I don't think so.

Q    So you don't remember anyone delivering a demand to appear in court?

A    No.

Q    You voluntarily agreed to come from San Diego to testify for RAY MAYNARD?

A    I was asked to come, yes.

Q    And you agreed to, yes?

A    That would be correct, yes.

Q    And he, Mr. Maynard, paid for your flight.

       Isn't that correct?

A    He didn't pay for my flight yet.

738

Q    He did not pay for your flight?

A    Not yet, no.

Q    But he is going to?

A    I hope so.

Q    You hope so, but you're not sure?

A    Yes.

Q    Is he paying for your meals?

A    No.

Q    Where are you staying?

A    At my girlfriend's sister's house.

Q    So he is not paying for your housing?

A    No.

Q    Now, all three of you, Wayne Burrell, Curt Kellinger and yourself worked for Ray's starting in or around 2000.

     Is that true?

A    I started in 2000.

Q    And they started shortly thereafter, correct?

A    I can't speak for them.

Q    Well, can you recall a time in 2003 where all three of you testified for Ray's before the Riverton [sic] Town Council to extend Skydive Long Island's lease?

A    Yes.  That was for me to keep my job.

Q    Yes, it was a benefit for you to keep your job so you went and you testified for Ray's, correct?

A    Yes.

739

Q    And the same is true, you believe, for Curt and Wayne, correct?

A    I can't speak for them, no.

Q    And did you write your statement, you, yourself, or did Ray's write it or someone else write it for you?

A    I wrote it myself.

Q    Now when you say that you're in San Diego now working as an independent contractor, you're an independent contractor, you work as a skydiver, correct?

A    Yes.

Q    All right.  Now the skydiving community is very closely knit.

        Would you not agree with that?

A    Yes.

Q    And, in fact, you belong to a Facebook group called, I Fucking Love Skydiving.

        Is that not true?

A    I don't know.

Q    Well, let me just show you this and ask you if it refreshes your recollection.

A    Possibly, yes.

Q    And this particular organization on Facebook says everything looks better from 12,000 feet, correct?

A    I don't know.

Q    All right.  Well, you believe that, don't you,

Shaw - Cross/Mr. Antollino

740

everything looks better from 12,000 feet.

        Would you agree with that statement?

A    Sure.

Q    You are an inveterate skydiver, correct?

A    I have been skydiving for 21 years, yes.

Q    Would you describe yourself as inveterate?

A    Sure.

Q    You want to continue working in that field for as
long as you can, correct?

A    Yes.

Q    So when you say you left to pursue other stuff in San
Diego, you really meant that you went to pursue the same
stuff in San Diego, correct?

A    It was training military.  It is slightly different
from doing tandems.

Q    It is slightly different, but it's still skydiving,
correct?

A    It's still skydiving, yes.

Q    Now on three occasions when you were asked questions
during your direct examination, you, even though you're
working somewhere else, you referred to Skydive Long
Island as us.

        Isn't that correct?

A    Yes.

Q    That was even after Mr. Zabell clarified that you're

Shaw - Cross/Mr. Antollino

741

not a partner and you don't own any part of Skydive Long Island.

       Is that true?

A    Yes.  When you work with somebody for so long you kind of feel like you're a part of it, so I said yes.

Q    And were you there for 15 years and therefore you feel like you are part of them?

A    Of course.

Q    Okay.  Now, not only did you come in here as a favor for Ray's, you were here all day yesterday.

       Isn't that correct?

A    Yes.  Waiting, yes.

Q    And so how many days in court, total, have you been waiting to testify?

A    I waited yesterday afternoon and this morning since 9:30.

Q    Now when we were in the hallway yesterday I recognized you from the video and I said to you, Are you Duncan Shaw?  Do you remember that?

A    Yes, I do.

Q    And you said, Hello, how are you?  Correct?

A    I asked who you were.

Q    And I told you that I was Don Zarda's lawyer, correct?

A    Yes.

Shaw - Cross/Mr. Antollino

742

Q    And at that point you would not talk to me any further.

        Is that true?

A    I didn't see any benefit talking to you.

Q    Any benefit to you?

A    No benefit to me to talk to you.

Q    It might have been a benefit to me, but you didn't care about that, correct?

A    Not my job.

Q    Okay.  Your job is to be here to testify for Ray's, correct?

A    My job is to be here and tell the truth, yes.

Q    All right.  Well, then why wouldn't you want to tell me about the truth?

A    You're asking me stuff now.

Q    Well, I wanted to find out what you were going to testify to before you got into court.

A    Is that so you could hold that against me?

Q    No.  That was so I knew what you were testifying to.

A    That's your job.  You're a lawyer, right?

Q    That was my job yesterday and you wouldn't allow me to question you yesterday.

        You would agree with that, correct?

A    I asked you if I had to talk to you and you said no, so.

743

Q    You didn't have to talk to me.

A    So I said it's my choice, right?

Q    That's right.  It was your choice and you chose not to talk to me, correct?

A    I did chose not to talk to you.

Q    But you chose to leave with Ray's and his entourage yesterday.  You all left court yesterday?

          MR. ZABELL:  I'm going to object to the term entourage.

          THE COURT:  Sustained to form.

BY MR. ANTOLLINO:

Q    You left with Ray's and his group, his team yesterday from court.

          Is that correct?

          MR. ZABELL:  Objection.

          THE COURT:  He can answer.

A    I left, yes, with the people I know, yes.

Q    The people you know are Ray's, his wife, his attorney?

A    Yes.

Q    Curt Kellinger and Wayne Burrell, correct?

A    Wayne and Curt were not there yesterday.

Q    But you left with all of the other people, correct?

A    Yes.  My girlfriend, yes.

Q    Well, I didn't know about your girlfriend.  Was your

744

girlfriend out there?

A    It's unfortunate, yes.

Q    You brought her here too?

A    She was driving me.  I don't have a car here.

Q    And does she live here or does she live in San Diego?

A    She lives here.

Q    Now, when you testified earlier, you said that you believed that David Kengle was getting upset at some point in the skydive.

        Is that correct?

A    I said in the aircraft, yes.

Q    How did he express this upset to you in the aircraft?

A    Looking in the direction of his girlfriend.

Q    No.  How did Mr. Kengle express his upset to you?

A    He was trying to console his girlfriend and I needed him to do so for us.

Q    What exactly did he do to try to console his girlfriend?

A    His girlfriend was looking at him uncomfortably and he was trying to console her, I believe.

Q    When you say uncomfortably, what is the basis upon which you come to the conclusion that she was uncomfortable?

A    Her actions.

Q    What were her actions?

745

A    She looked uncomfortable.

Q    We're going around in circles.  I'm trying to ask what was it about her that made you conclude that she was uncomfortable?

A    Her actions were making my passenger uncomfortable and he was getting upset.

Q    Okay.  I understand that.  I just want to know what the actions are.  Can you remember any actions?

A    I'm not too sure what you want me to do.

Q    I want you to tell the jury what the actions were --

A    And he --

          THE COURT:  Hold on.

Q    You have to wait for me to ask the question.

          THE COURT:  Let him finish the question.

BY MR. ANTOLLINO:

Q    I want to know what the specific actions were.

A    They were conversing and then he would be trying to touch her and like hold on to her and hold her hand and stuff, I believe.

Q    And so in between, were they facing each other?

A    No, sitting on opposite sides of the aircraft.

Q    And they were conversing about what?

A    I don't know.  She felt uncomfortable.

Q    I don't understand.

A    I didn't ask them specific.

Shaw - Cross/Mr. Antollino

746

Q    Okay, so you didn't ask them specific about what they were conversing about.  As far as you know, she could have said, This is awesome, correct?

A    Did not appear to be saying, This is awesome.

Q    She did not appear to be saying, This is awesome.  But that is your conclusion.  You didn't hear what she said.

          Isn't that true?

A    I did not hear what she said.

Q    So you had to focus your client or your customer on his dive as opposed to his girlfriend's, correct?

A    Yes.

Q    And that is what you did?

A    Yes, I did my job.

Q    Were you aware that before the skydive, that someone, it could have been you, it could have been someone else, said, I bet you didn't know that your girlfriend was going to get strapped up to another guy?

A    No.

Q    You weren't aware of that?

A    That's before the skydive, no, I didn't.

Q    Have you ever heard that joke or comment made before?

A    I'm sure it has been thrown around before.

Q    Well, when someone said it in front of Don, they were implying that Don was being strapped up to Mr. Kengle's

747

girlfriend, correct?

A     Pardon me?  Can you say that again?

Q     Well, if someone -- you heard that phrase before, correct?

A     I have, yes.

Q     And the connotation in the phrase, is that, gee, I bet you didn't know that your significant other was going to be so close to a guy that you don't even know.  Isn't that funny?  Correct?

A     I don't get the question.

Q     Well, the connotation is that it's a surprise that your significant other is so close to someone that is unfamiliar to you, correct?

A     You need to be close together, yes.

Q     Need to be close together?

A     Yes.

Q     And it's a surprise when it happens right in front of a boyfriend or a girlfriend, correct?

A     I can't speak for those people, no.

Q     That is the reason why it is often stated because it brings out the humor in the atmosphere, correct?

A     Yes.  I don't use that, so I don't know.

Q     Well, do you know -- you have been in this business for how many years before you started working for Ray's?

A     21 years.

Shaw - Cross/Mr. Antollino

748

Q    So six years before Ray's.  And all of the time you have been working, you don't know why that comment is made?

A    I don't use that, so I don't know why people use it.

Q    So you have never inquired of any people, one which used it, why would you ask something like that?

A    It makes no difference to my life, so.

Q    Well, if someone said it to Don, don't you think that Don might feel uncomfortable being accused of hitting on someone's girlfriend?

            MR. ZABELL:  Objection.

            THE COURT:  Sustained.

BY MR. ANTOLLINO:

Q    Don't you believe that a reasonable person would feel uncomfortable being strapped to someone else's girlfriend in that situation?

            MR. ZABELL:  Objection.

            THE COURT:  Sustained.

            We're not going to ask an opinion for that, okay?

BY MR. ANTOLLINO:

Q    Now the video we saw showed a portion where Don was swirling with his mouth and swirling with his finger, correct?

A    Yes.

Shaw - Cross/Mr. Antollino

749

Q    And twirling the finger, correct?

A    Putting it in his mouth, yes, and swirling.

Q    You keep offering putting it in his mouth.  Sometimes in life people put their hands in their mouth because something might be bothering them like lips sore or something like that.

        Is that correct?

A    I can't say.

Q    All right.  Now when you are up in the sky, you are taught to enhance the video.

        Isn't that correct?

A    Enhance the video?

Q    Yes.

A    I don't understand what you mean.

Q    Well, to make the video a little bit goofy and more fun for the customer when he or she gets home to watch it, correct?

A    I wouldn't say goofy.  I don't like the term goofy, like I'm an idiot.

Q    Well, as we were sitting here today, I played a video of you pointing your fingers and making your eyes go up and down to one of your tandem passengers.

        Did you see that?

A    I was trying to seem engaged and paying attention for the videographer, yes.

Shaw - Cross/Mr. Antollino

750

Q     Because you want him to be engaged, the video is on and you don't want to be sitting there like a lump.  You want to be interacting with the video, correct?

A     Sure.  We sit in the plane for 20 or 30 minutes and for ten seconds we're on video, so.

Q     So you have to wake up at that ten seconds and you have got to show some, show some feeling.

          Would you agree?

A     I wouldn't say wake up.  I don't sleep in the aircraft, I converse with my passengers.

Q     When I say you would never sleep in the aircraft. When I say wake up, I mean wake up mentally that you're on camera, correct?

A     Sure.

Q     Now there came a point in the video that you saw on cross-examination, in which Don's Zarda realized that he was on camera, correct?

A     Yeah.

Q     I want you to look at this picture here.

          All right.  Now can you see that picture?

A     Yes.

Q     All right.  It doesn't look there like Don is having fun, does it?

A     No, it looks like he's talking with another person.

Q     I'm sorry?

Shaw - Cross/Mr. Antollino

751

A    He is in a weird position.

Q    He is in a weird position?

A    In the aircraft.

Q    He has a tandem passenger on his lap, correct?

A    No, sitting in front of him.

Q    Okay, sitting in front of him but very close to his lap.

        Is that not true?

A    At this point, not attached, so there's space.

Q    How do you know they're not attached at this point?

A    I can see the hooks right here in the front.

Q    So Don is not attached at this point and it doesn't look like he is paying attention or doing anything of interest.

        Would you agree with that?

A    It looks like he is getting ready for the camera to me.

Q    What makes you think that he's looking at his hand, that he is getting ready to look at the camera?

A    Because the cameraman is sitting right in front of him and it's pretty obvious, unless he was completely oblivious.  The camera guy says sit up, so.

Q    So at some point you're going to be completely oblivious that you're being taped and then you're going to pop into action, correct?

Shaw - Cross/Mr. Antollino

752

A     Pop into action?  Those are your words.  Sitting there, the camera is right in front of him about a foot way from him at this point, so.

Q     So you understand what a neutral demeanor is, correct?

A     Sure.

Q     Would you agree that this is a neutral demeanor, correct?

A     Sure.

Q     This is just as the camera is turned on and before anyone realizes that it's turned on, correct?

A     Well, the girl knows it's turned on, so --

Q     How do you know the girl knows that it's turned on?

A     She is looking directly at it.

Q     The fact that she is looking directly at it, how do you know that means that she knows the camera is on?

A     I mean, the same way you're saying that Don doesn't know it's on.

Q     I don't understand.  Can you explain?

A     Well, she is looking directly at the camera and you're saying that Don is looking at his hand.

Q     So she doesn't know what electronically the camera is doing at this point, does she?

          MR. ZABELL:  Objection.

          THE COURT:  Sustained, sustained.

753

BY MR. ANTOLLINO:

Q     Let's keep looking.  Let's keep looking.

Now I want you to look at the change in Don's demeanor at this point.

(The tape was played.)

(The tape was stopped.)

Q     All right.  You just saw that Don woke up and he realized that the camera was on, and he made an expression to it, correct?

A     Yes, a movement.

Q     All right.  Now was there anything that you saw that indicated to you that the girl was uncomfortable?

A     She is playing for the camera just like we do.

Q     So you're saying that she was playing for the camera and not showing her uncomfortability?

A     That is what it appears to be.

Q     That is what it appears.

And just to be clear, your only knowledge that she was uncomfortable is that she was talking to her boyfriend, correct?

A     Yes.

Q     And here is you?

MR. ZABELL:  Excuse me, your Honor, I didn't hear that last part.

THE COURT:  What did you say?

Shaw - Cross/Mr. Antollino

754

THE WITNESS:  I was sitting far behind her, offset from where they're sitting.

BY MR. ANTOLLINO:

Q    You're sitting far behind them, so it's kind of difficult for you to know everything that's going on, either verbally or movement-wise.

Would that be fair to say?

A    I can only say how my passenger was reacting, so.

Q    All right.  So let's go back to how your passenger was reacting.

A    Okay.

Q    Okay.  Your passenger was reacting by talking to Orellana, correct?

A    Yes.  And he was --

Q    And you know that they were boyfriend and girlfriend, correct?

MR. ZABELL:  Your Honor, I am just going to ask the witness be allowed to finish his answer before the next question is asked.

THE COURT:  Were you going to add something?

THE WITNESS:  I think so, but I don't remember.

Q    All right, did you want to add something?

THE COURT:  He said he can't remember.

Go ahead, ask the next question.  Let him finish the answer.  Don't interrupt the answer.

755

MR. ANTOLLINO:  I thought he finished.  I apologize.

(The tape was played.)

(The tape was stopped.)

BY MR. ANTOLLINO:

Q    Is there anything there that makes you think that she is uncomfortable?

A    I can't speak for her but it looks likes she is playing for the camera.

Q    Well, the question was simply whether there was anything there that made you believe that she was uncomfortable.

MR. ZABELL:  Asked and answered.

THE COURT:  Sustained.

(The tape was played.)

(The tape was stopped.)

BY MR. ANTOLLINO:

Q    All right.  Is she playing for the camera?

A    She looks like she's scared out of her brain.  She's about to jump out of an aircraft.

Q    What is it about her look that makes you conclude that she is scared out of her brains?

A    The body language.

Q    What is it about her body language that tells you that she is scared out of her brains?

756

A    She looks tense.

Q    She looks slightly tense?

A    Yes.

Q    Is there anything else that you can use to describe that characterization?

A    Her body position.

Q    But the body position is precisely in a position where it's supposed to be, correct?

A    No.

Q    All right.  Don't you instruct the tandem passengers to cross their arms?

A    I do not, no.

Q    But some passengers -- some instructors do, correct?

A    Yes.

Q    And, in fact, on the video it says that you're supposed to cross your arms so that they don't get caught in the air, correct?

A    So we don't have to deal with them when we first leave the aircraft.

Q    I'm sorry, could you read that back?

A    It was so that we do not have to deal with them when we exit the aircraft.

Q    So it's a safety reason, their hands are put to her chest, correct?

A    Yes.

757

(The tape was played.)

(The tape was stopped.)

Q    Now at this point, she wasn't smiling there, that is all a function of the air blowing in her face?

A    I never said that.

Q    So you believe that she was smiling there, you saw --

A    Generally, once you leave aircraft people feel okay.

Q    And she was smiling there, correct?

A    It looks like it.  I was smiling.

(The tape was played.)

(The tape was stopped.)

Q    How would you rate that landing?

A    It's okay.

Q    Wouldn't you say it was very good?

A    No, I would just say, okay.

Q    What?

A    Mine are better.

Q    Yours are better, okay.

(The tape was played.)

(The tape was stopped.)

Q    How do they look there?  Do they look happy?

A    She looks okay there.

Q    She looks happy, doesn't she?

A    She just jumped out of an aircraft, yes.

Q    She is smiling, she looks happy, doesn't she?

758

A    She seems okay.

Q    You won't admit that she looks happy, will you?

         MR. ZABELL:  Objection.

         THE COURT:  Sustained.  The jury will disregard that.

         (The tape was played.)

         (The tape was stopped.)

Q    All right.  Now there was a video of you and David Kengle.  You have seen that too, correct?

A    I saw part of it this morning.

Q    So let's take a look at that.  That is already in evidence.

         (The tape was played.)

         (The tape was stopped.)

Q    Who would that be, any final words?

A    The video guy.

Q    When you say, any final words, you're suggesting that these were going to be the last words that you're saying.

         Would that be fair to say?

A    In skydiving there is no guarantee we're going to live.

Q    There is no guarantee you're going to live.  And that's something that is explained to them in the video, correct?

A    Yes.

Shaw - Cross/Mr. Antollino

759

Q    That is something that is explained to them in the waiver, correct?

A    I believe so, yes.

Q    So do you think there is any necessity in reminding them that these could be your final words before they get on the plane?

A    That's up to the video guy.  I don't use those words.

Q    How do you think it makes the passenger feel?

A    I don't know.  He laughed.

         (The tape was played.)

         (The tape was stopped.)

Q    Now that is you, correct?

A    That would be me, yes.

         (The tape was played.)

         (The tape was stopped.)

Q    By the way, what is that watch?  We have seen that watch during this trial.  What does that mean?

A    It's an altimeter that tells us how high we are.

Q    All right.  So at 3.6, what is the height?

A    3,600 feet up.

Q    So that is way above 12,000 feet, right?

A    No, that is way below 12,000 feet.

Q    So it's 3,600 as opposed to 12,000?

A    This is in the aircraft on the way up.

Q    So that shows that it's going on the way up and

Shaw - Cross/Mr. Antollino

760

you're going to go how high?

A      To 13,500 feet.

Q      So you have 10,000 feet to go, correct?

A      Correct.

            (The tape was played.)

            (The tape was stopped.)

Q      Do you know what that helmet was?

A      It's a video helmet.

Q      Well, what did the helmet say?

A      ToneFly.

Q      ToneFly?

A      It's a brand.

Q      It's a brand.  But doesn't it say, Get Some, on it?

A      You have to show me again.

Q      Let's look at it again.

            (The tape was played.)

            (The tape was stopped.)

Q      All right.  You just saw Rosana.  Did you say she looks uncomfortable there?

A      No.

Q      Now it looks like, based on what we just saw, that you're catty-corner.  Do you understand what the word catty-corner means?

A      I know what the word catty-corner means, yes.

Q      So it's not the case they were sitting next to each

other, it's not the case that they were sitting in front of each other.  They were sitting diagonally across from each other, correct?

A    Sitting across and he is slightly behind her by one body length.

Q    And it's diagonal, correct?

A    He is across from me, yes.

Q    I just want to focus on diagonal.

        MR. ZABELL:  Objection.

        THE COURT:  You can answer, go ahead.

A    Diagonal, yes, on two separate benches.

Q    Two separate benches that are diagonally opposed, correct?

A    There were benches that run parallel to each other and we're sitting beside each other or slightly offset.

Q    You're sitting here and she's sitting here, correct? Would you characterize --

A    No, they would probably be even with where Don was sitting.

Q    Let's go back and look at it again.

        (The tape was played.)

        (The tape was stopped.)

Q    So does that not appear as you look at it again, that they are diagonal?

A    Diagonal, yes.

Shaw - Cross/Mr. Antollino

762

Q    Okay.  That's all I was asking.

         (The tape was played.)

         (The tape was stopped.)

Q    All right.  You just saw Ms. Orellana make a little

kiss to the camera.  Didn't you?

A    Sure.

Q    Does that, to you, express any fear, making a kiss to

the camera, that in and of itself?

A    Yes, she is playing for the camera, like I said.

Q    She is playing to the camera.

         But the question was, does kissing and playing

to the camera demonstrate any fear or uncomfortability?

A    Well, she is playing for the camera.

Q    So the answer to the question is no, correct?

A    No, sure.

         (The tape was played.)

         (The tape was stopped.)

Q    All right.  Did you notice that David Kengle's arms

were crossed, at least partially?

A    He was holding on to the harness.

Q    He was holding on to the harness.  You instruct your

passengers to hold on to the harness?

A    Yes.

Q    Instead of putting their hands diagonally the way

Kengle -- the way that Orellana did it, correct?

763

A     Yes, because I like them to get an arch in their body position.

Q     That is your preference, correct?

A     Correct.

        (The tape was played.)

        (The tape was stopped.)

Q     Wait a minute.  Did that landing look better or worse than Don's?

A     I don't know.  I didn't see very much of it.

Q     You didn't see very much of it, but your passenger had his knees to the ground and yet Ms. Orellana --

        Wait.  Let me finish asking the question.

        Your passenger had his knees to the ground and yet Ms. Orellana had landed flat on her feet.

        Isn't that true?

        MR. ZABELL:  Objection.

A     He is squatting.

        THE COURT:  Stop.

        Sustained as to relevance.  You don't have to answer that.

        (The tape was stopped.)

        (The tape was stopped.)

BY MR. ANTOLLINO:

Q     That is you hamming up for the camera.  Do you agree with that?

764

A    Sure.

Q    Now you don't know, getting to a different subject, who gave Don the name Gay Don, do you?

A    I think Don did.

Q    You don't know that though, do you?

A    I don't know that.

          MR. ZABELL:  Objection.  Asked and answered.

          THE COURT:  That is okay.

A    I don't know that.  He just introduced himself to be Gay Don.

Q    You don't know how Don felt about it originally when people started referring to him as Gay Don, do you?

          MR. ZABELL:  Objection.

          THE COURT:  Sustained.

BY MR. ANTOLLINO:

Q    It might have been that he just went along with it to fit in with the other skydivers.  Would that be a fair characterization?

          MR. ZABELL:  Objection.

          THE COURT:  Sustained.

BY MR. ANTOLLINO:

Q    You're from New Zealand, correct?

A    That is correct.

Q    Is anyone ever -- and you know that New Zealanders are sometimes referred to as kiwis, correct?

765

A    Yes.  That is a our national bird.

Q    Has anyone at the Dropzone ever referred to you as Kiwi Duncan?

A    Not very often, no.

Q    At all?

A    I don't recall.  I was there 15 years.

Q    And you don't remember once anyone referring to you as Kiwi Duncan, correct?

A    I had other nicknames.

Q    And one of them was not Kiwi Duncan, correct?

A    No, most people think it's a fruit.

Q    And it's not -- it's a bird as well as a fruit, correct?

A    Yes, a kiwi fruit.

Q    A kiwi fruit and kiwi bird.

        And were you never called Kiwi Duncan?

A    They called me kiwi but they never called me Kiwi Duncan.

Q    All right.  You told Mr. Kengle, did you not, that you were from New Zealand, didn't you?

A    Yes.

        MR. ANTOLLINO:  No further questions.

        THE COURT:  Redirect?

        MR. ZABELL:  No redirect, judge.

        THE COURT:  You can step down.  Thank you.

Shaw - Cross/Mr. Antollino

766

Next witness.

MR. ZABELL:  May I just approach for a moment?

THE COURT:  Yes.

(Continued on the following page.

Shaw - Cross/Mr. Antollino

767

(The following occurred at sidebar.)

MR. ZABELL:  I expect Mr. Kellinger to be done with my questioning in about 15 minutes.  I do have a 1 o'clock telephone conference with Judge Gleeson.  I thought we would be breaking during lunch.

THE COURT:  Do you know how long you're going to be with this witness?

MR. ANTOLLINO:  We'll see what he testifies to.

THE COURT:  We'll stop at five to 1:00.

MR. ZABELL:  Very good.  Thank you, judge.

(Continued on the following page.)

Shaw - Cross/Mr. Antollino

768

(The following occurred in open court.)

THE COURT:  Your next witness.

MR. ZABELL:  I'm calling Curt Kellinger.

MR. ANTOLLINO:  Excuse me.  If we could go to sidebar I just want to --

(Continued on the following page.)

769

(The following occurred at sidebar.)

MR. ANTOLLINO:  Judge, I just want to renew my objection on the grounds that we were never provided this person's name, even when we asked for it.  We were never provided with his address.  He was in the joint pretrial order but there was no way we could have contacted him.  And he was not on the amended pretrial disclosures.  And anything he testifies to would be cumulative.

So we again renew our objection under the circumstances to preclude this witness.

THE COURT:  Okay.  As I said, I was going to give a more detailed explanation later on.  I don't want to keep the jury waiting.

MR. ANTOLLINO:  Okay.

(Continued on the following page.)

770

(The following occurred in open court.)

**CURT KELLINGER**

called as a witness, having been first duly sworn,

was examined and testified as follows:

THE COURT:  State your name and spell it for the

record.

THE WITNESS:  Curt Kellinger, C-U-R-T,

K-E-L-L-I-N-G-E-R.

DIRECT EXAMINATION

BY MR. ZABELL:

Q    Good afternoon, Mr. Kellinger.  How are you today?

A    Fine.

Q    Mr. Kellinger, did you ever work at Skydive Long

Island?

A    I did.

Q    From when to when did you work there?

A    From 1992 to the last couple of years, about four

years ago when I moved away.

Q    Where did you move to?

A    Excuse me?

Q    Where did you move to?

A    Salt Lake City, Utah.

Q    Is that where you currently reside?

A    Yes.

Q    What did you do when you worked for Skydive Long

Island?

A    All aspects of the flight line performance, tandems, cameraman, instructor, even pack and mow the lawn sometimes.

Q    For how many of those years were you a tandem instructor?

A    From about '85 on.

Q    During your period of employment, did you ever meet somebody by name of Don Zarda?

A    Yes, I did.

Q    Do you recall when you met Don Zarda?

A    I met Don in Vermont.

Q    Do you recall when?

A    I'm sorry, but I don't remember what year it was.

Q    Do you know how Don Zarda came to be employed at Skydive Long Island?

A    Yes.  I brought him down from Vermont.  I was on a motorcycle trip and I met Don at Vermont Skydiving.  Ray's was expanding and was looking for guys and I brought Don down.

Q    Do you know how, specifically, Don got hired?

A    Well, on my recommendation after I saw Don.  I had taken a guy that I was on the trip with on a tandem and we went skydiving, and I met Don on the ground and in the airplane.  And I watched him exit.  And I had gotten down

772

prior to him and I watched him land.  He was highly rated.

At that time he had about 4,000 jumps.  I called Ray's and

told him I think he would fit in with us.

Q    Did Don introduce himself to you or did you introduce

yourself to him?

A    I don't really recall how we met, you know.

Skydivers are on the flight line getting ready.  We just

met.  I asked him where he was from.  Originally, Kansas,

in the midwest, and where I was from, Skydive Long Island,

and I actually lived in New Jersey.  But we had a

discussion like that.

Q    Did he ever express to you an interest in coming to

be a tandem instructor on Long Island?

A    Yes, he did.  That was actually part of our first --

he asked if we were looking for anyone.  And I said, yes.

And I know Don was a very fit, handsome guy, you know,

told him about the Hamptons, he would love it, it was

great vacation area, you would fit in right out there.

And he said, Well, I don't like the Hamptons.  I like more

of the clubs over in Fire Island.  And I, you know, so I

said okay.  That is where the gays go.  But fine, he is a

great skydiver.

Q    So in that first conversation you had with him where

you were meeting for the first time, he revealed to you

his sexual orientation.

773

Is that correct?

A     Before we were even on the plane.

Q     Did that change in any way your recommendation of Don Zarda to RAY MAYNARD?

A     I called Ray's from Vermont.  Ray's was at a -- when I started with Ray's it was a small company, two little planes.  And he was expanding at the time and had relayed to me to keep my eyes open for anyone, you know, talented.  And I told him I watched, I watched him jump.  I watched him land.  He's a very nice guy and he wants to be near Fire Island because he is gay and that is his lifestyle.

And Ray's said, Tell him to come down.  Bring him down.

Q     Did Ray's say anything about Don being gay?

A     No.  He just asked me how many jumps he had and what his ratings were.

Q     Ratings, to rate somebody.

Did there come a time where you saw Don Zarda introduce himself as Gay Don?

A     Years gone by he would say that to some people.

Q     Do you remember the first year that Don started at Skydive Long Island?

A     No, I'm sorry, I don't.

Q     Would it surprise you if it was 2001?

A     I really don't remember.

Kellinger - Direct/Mr. Zabell

774

Q    Okay.

A    It's quite a long time ago.

Q    Do you know how Don's employment ended that first year?

A    Don had an incident in the landing area.  I think that was the same year.  I don't know, this was quite a long time ago.  But Don had an incident in the landing area with one of customers and Ray's fired him.

Q    Do you recall what that incident was?

A    He -- I was on the load.  He had a young woman and he was on the grounds in a very, you know, like I said, it was a long time ago but he was very agitated, very animated.

        MR. ANTOLLINO:  Who was agitated, your Honor?

        THE COURT:  Who was agitated?

        THE WITNESS:  Excuse me?

        THE COURT:  You're saying he was agitated.  Who was agitated.

        THE WITNESS:  Don.

        THE COURT:  Okay.

A    And it was one of the things that was always, you know, a rule with Ray's was you can have trouble and home troubles with --

        MR. ANTOLLINO:  Objection.  Hearsay.

A    -- the crew --

775

MR. ANTOLLINO:  One of the things that Don knew, that would be hearsay or speculation.

THE COURT:  No, he can testify as to what he understood the rules to be at the employment.  You can cross him on it.

Go ahead.

BY MR. ZABELL:

A    People come in there to jump out of a plane, so it's a monumental undertaking.  They're probably going to do it once in their life.  So we didn't talk about it, if we were having trouble with the crew that day.  Like you would not discuss anything that would take away from their experience.  So his behavior that afternoon caused Ray's to fire him.

Q    How do you know his behavior that day caused Ray's to fire him?

A    Well, at the -- I was on the tarmac and Don was still out there, still ongoing.  And Ray's was saying, What is going on out there?

And I said, he is having some type of meltdown over whatever happened on that little -- later on Ray's dismissed him.

Q    Did you have any discussions with Ray's as to the reason why Ray's dismissed him?

A    Well, there was some discussions afterward but it's,

776

you know, on the flight line you had to act in a professional manner.

Q    You used the term, load.  You were on the load with Don.  What does that mean?

A    The plane holds about 18 people.  So most loads would be one tandem passenger, one tandem instructor and one cameraman.  So we would have anywhere from four or five tandem passengers and the staff to take that load up.

Q    Did you ever have occasion to observe Don Zarda jumping with other female passengers other than that one?

A    Yes, many times.

Q    Did you ever have occasion to observe any of Don's interaction with those female passengers?

A    Well, it was a common discussion amongst the staff.

        MR. ANTOLLINO:  Objection to it was a common discussion.

        THE COURT:  Sustained.

        You can discuss the things that you talked to Don about or that you discussed with Mr. Maynard about, but not other staff people, okay?

        THE WITNESS:  Okay.

BY MR. ZABELL:

Q    What did you observe?

A    Don would become less enthusiastic about taking women, not women but younger women.  Like not so much

Kellinger - Direct/Mr. Zabell

777

middle-aged housewife types by younger girls.  His

demeanor would change.  And there was some speculation

that he didn't like them.

Q    So it would change in a positive or negative way?

A    In a more withdrawn way.  I mean, he would do the

job.  He was a very safe skydiver.  But he just, you know,

there was not that degree of, hey, we're going to have fun

and the reassurance that people -- you're in a small

window and you're trying to get someone you meet, you

might shake their hand and you're trying get them to trust

you in ten minutes so that they can go up in the plane and

enjoy it and they're not terrified.  So it takes a little

bit of effort.

Q    Did Don Zarda ever ask you to switch passengers with

him?

A    Quite a few times.

Q    Could you explain to me what that was about?

A    He would come up and say, you know, I have this girl

and her boyfriend and we would switch.  And it was almost

like a no-brainer, a 100-pound girl or a 200-pound guy, I

thought it was less work so I said sure.

Q    Is it easier to jump with the 100-pound person as

opposed to the 200-pound person?

A    Yes, a lot easier.

Q    Why?

Kellinger - Direct/Mr. Zabell

778

A    Well, the weight you would use to carry a 200-pound sack of potatoes or a 100-pound sack of potatoes.

Q    So you always went for the hundred pounds?

A    Yes.

Q    Did you ever hear Don bring up his sexuality on a jump?

A    He certainly didn't hide it.  But as far as -- I don't understand the question.

Q    Did you ever hear Don refer to himself as being gay in a joking manner?

A    Quite often.  He had a little routine where if the pilot is starting the aircraft, it's a big aircraft and he can't see out or underneath the front of it, so it's in the flight operations, you yell out the window, Clear, to clear the props, and to turn the key.  And there were times when the pilot would yell out, Clear, and Don would go, Queer, right here.  You know, and we would all laugh, and it was just Don being Don.

Q    Did you ever observe your co-workers bring up to Don his sexual orientation in jumps?

A    I don't understand the question.

Q    Did you ever see any of your colleagues, any of the fellow tandem instructors tease Don about his sexuality?

A    Well, there was back and forth between the whole crew.  I mean, my nickname was Fat Bastard.  So it was a

779

very gregarious crew.

Q    Were you, in fact, a fat bastard?

A    No, I was not.  I don't think I was, but that was my nickname.

Q    I'm sorry, it was a joke?  I'm sorry.

A    Yes.

Q    Did you ever see Don being treated differently than any of his other co-workers?

A    No.

Q    Did you ever see Ray's make any comments about Don's sexuality?

A    No.

Q    Did Don dress any differently than anybody else?

A    Did he what?

Q    Dress any differently than anybody else?

A    Slightly.  You know, he had his court jester hat he used to wear over his helmet which was kind of, you know, unique and a little bit from time to time.

        I mean Don was, you know -- this is very hard for a lot of us.  Don was my friend, and I'm very, you know, upset about his passing.  And for us to sit here through this.  We worked with him for years.  I liked Don. I went to dinner with Don.  I saw him shortly before he left for Europe.  It's hard for us to go through this and in this fashion.

MR. ANTOLLINO:  Judge, we're not asking for sympathy.  I object.

THE COURT:  Just object.  No comments.

MR. ANTOLLINO:  I object.

THE COURT:  Sustained.

Okay, next question.

BY MR. ZABELL:

Q    After Don -- did you know why Don was terminated in 2010?

A    The last time?

Q    The last time, yes.

A    Yes.

Q    And how did you find out that Don was terminated?

A    Over the phone.

Q    From whom?

A    I was told from Ray's.

Q    What did Ray's tell you?

A    That he was, he had been fired once for acting inappropriately.  Now this was many years later, and Ray's and I discussed that, discussed the problem.  And I had suggested to Ray's that you should speak to an attorney because it's going to be sensitive.

Q    Did you agree that Don should be terminated in 2010?

A    Well, I had not spoken to him on the plane.  I was far away at that point.  But based on the information I

Kellinger - Direct/Mr. Zabell

781

got, it sounded --

          MR. ANTOLLINO:  Objection as to his opinion.

          THE COURT:  Sustained.

BY MR. ZABELL:

Q    After Don was terminated in 2010, did you speak to him?

A    Yes.

Q    Where and when?

A    I could not recall the dates or times but I did have dinner with him in New York City.  I'm not sure how many times I saw him after he was terminated, but I stayed in touch with him.

Q    Now when Don was hired back to Skydive Long Island in 2009, did you play any role in that?

A    No.

Q    Do you know, did you speak to Don about Don being hired back in 2009?

A    He was happy to be back, and I saw him out on the tarmac.  And I had not jumped that much that year, but then he broke his ankle and I remember seeing him and I felt bad for him.  But not, you know, there was no discussion about -- I had not even seen any of it at all, if that's what you're asking.

Q    Did you ever discuss base jumping with Don?

A    Yes.  We both base jumped and, you know, he used to

782

talk about the antennas out in the west.  He used to jump

off antennas.

Q    And do you recall when Don first starting base

jumping?

A    No, I'm sorry, I don't.

Q    Do you know if it was, if he had base jumped before

he started working at Skydive?

A    I don't recall.

Q    Do you recall when you would discuss base jumping

with Don, if it was during the period of his employment or

not?

A    You're talking a span of quite a few years.  So I

don't even know when I started.  Maybe middle '80s.  I'm

not really sure.

Q    Do you know if Don had started base jumping before

his employment ended at Skydive Long Island?

A    Yes.  I believe he was up in Twin Falls with a crew

of younger guys at some point during his employment there.

Twin Falls, Idaho, is a place where you can legally base

jump.  And I think, I do recall a group of the younger

guys going.

Q    And this was before 2010 when he was terminated?

A    I think it was, but I'm not sure.

Q    When you met up with Don after he was terminated in

2010, did he appear happy?

783

A     He was going to Europe.

          MR. ANTOLLINO:  Objection.

          THE COURT:  At a specific point in time.

          No, that is okay, you can answer.  Go ahead.

A     He was going to Europe so he was excited to get over there.  And I was very envious.  It sounded like a trip that, you know, I would love to have gone.

Q     Did he tell you what he was doing in Norway?

A     He was going to base jump.

          MR. ZABELL:  I have nothing further, judge.

          THE COURT:  We'll take a lunch break now.

          MR. ANTOLLINO:  I just have one question, judge.

          THE COURT:  One question, okay.  We will do it.

          MR. ZABELL:  Is that one total or just one before lunch?

          THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. ANTOLLINO:

Q     I just want to clarify, Don went to Norway in 2011, not 2010, correct?

A     I wouldn't know.

          MR. ANTOLLINO:  All right.  No further questions.

          THE COURT:  You can step down.  Thank you.

          Do you have any other witnesses?

784

MR. ZABELL:  I have no further witnesses, judge.

THE COURT:  The defense rests?

MR. ZABELL:  The defense rests.

THE COURT:  Is there any rebuttal case, Mr. Antollino?

MR. ANTOLLINO:  We would like to discuss that and perhaps we can take the lunch break and/or if you would like us to discuss it in ten minutes.

THE COURT:  Why don't you wait ten minutes.  If there is nothing else in the case, I'm going to send you home.  So just wait in the jury room for ten minutes and I'll come back.  Don't discuss the case.

(The jury left the courtroom.)

MR. ANTOLLINO:  Judge, I want to put on the record.  I don't want him, counsel making jokes of me in front of the jury.  He just said when I went up there, Is that one question total or is it one question followed by another bunch after that?

THE COURT:  Let's just get through the day okay?

MR. ZABELL:  If I can just be excused for five minutes and I'll be right back.

(A recess was taken.)

(After recess the following occurred.)

THE COURT:  I asked the jury to wait.  You said you wanted to hold the witness.  So I'll let the jury take

their lunch break.

MR. ANTOLLINO:  I have about six or seven questions, depending on whether there is objections or anything.

THE COURT:  Who are you calling?

MR. ANTOLLINO:  Mr. Moore.

THE COURT:  What is he going to be testifying about?

MR. ANTOLLINO:  He is going to be testifying to the fact that Don had a chronic condition in his mouth. And I would not be bringing this up but for the fact that they have been mentioning mouth, mouth, mouth, touching his mouth, mouth, mouth, mouth, mouth, throughout the trial.  They have been pointing at his mouth.  And they have been trying to disparage him because he touches his mouth.

And so I am just going to ask Mr. Moore whether he had a chronic condition in his mouth, and what he did to allay the pain in his mouth.  That's it.

MR. ZABELL:  Your Honor, the issue of whether or not Mr. Moore would be called as a witness was something that was brought up by your Honor.  And you said that he could be called as long as he was willing to submit to a deposition.

Mr. Antollino said, well, if he has to sit for a

deposition, for various reasons, we're not going to call him as a witness.

We have specific representation from Mr. Antollino to the Court and to myself saying that he was not going to be called as a witness. If he was, I would have deposed him.

MR. ANTOLLINO: We didn't anticipate this. This is a rebuttal witness. We did not say we would not call him as a rebuttal witness.

This is a small point that has come up and it is pertaining to rebuttal. We never would have put him in our direct case.

THE COURT: My ruling is the same on this issue as it was on the photo.

In other words, whether or not he had some condition or not in his mouth has zero probative value unless someone is going to testify that they told Mr. Maynard that he had a condition with his mouth, the condition with his mouth. But the issue is what Mr. Maynard was aware of, what was told to him, what he observed. If the information was not conveyed to Mr. Maynard it has zero probative value. How would Mr. Maynard know that he has a condition in his mouth?

MR. ANTOLLINO: Mr. Maynard testified that he saw the videotape and he saw him putting his fingers in

787

his mouth.  And that confirmed the complaint.

THE COURT:  Right.  I heard that testimony.

MR. ANTOLLINO:  And there is a reason why he put it in his mouth.  It had nothing to do with --

THE COURT:  But it doesn't mean he had a reason. Again, it's the same ruling I made on the photo.  Whether he had a reason or not, unless Mr. Maynard is aware or Mr. Maynard confronted him with the video or what happened, and Mr. Zarda said, I wasn't doing anything wrong, I have a condition in my mouth, that would be some probative value on his decision-making.

But what Mr. Moore knows has no probative value on Mr. Maynard's decision making.  So I'm not going to allow that.

All right.  Let's bring in the jury.

Do you have anything else?

MR. ANTOLLINO:  Well, I guess the reason I believe that it's relevant is that they have opened the door by saying it's inappropriate for him to touch his mouth.  Duncan Shaw kept mentioning his mouth.  And I think it's prejudicial for Mr. Zarda's estate to have to listen to that without giving a logical explanation as to why he was putting his fingers in his mouth.  It was to allay the pain of the canker sores.

THE COURT:  Again, I understand what you're

788

arguing but it has -- it simply has no probative value unless the decision-maker is aware of it, okay?

So we can bring in the jury.

(The jury entered the courtroom.)

THE COURT:  I appreciate your patience.  I know you want to be able to go home rather than take a lunch break and I can understand that.

We finished the presentation of the evidence now.  There is no rebuttal case.  The evidence presentation is complete.  And therefore, I'm going to send you home.

Just so you understand what is going to happen tomorrow.  First of all, I want you to come in at 10 o'clock tomorrow rather than 9:30 because I need to go over my instructions on the law with the lawyers.  So I'm going to meet with them first and I don't want you to sit back there unnecessarily.  So you can arrive at 10:00, and then we'll have the summations or the closing statements of the attorneys.

In Federal Court the order of the summations is that plaintiff has the burden of proof, so plaintiff goes first, followed by counsel for the defendants.  And then plaintiff gets a short rebuttal summation, again because the plaintiff has the burden of proof.  So that is the order that we'll follow tomorrow.

789

I haven't talked to the lawyers about how long that will take, but depending on how long it is I'll instruct you -- depending on how long it is I'll send you to lunch and instruct you after, or I'll instruct you before the lunch break.

Sometimes people ask, well, what are the hours of deliberations. The hours are the same, 9:30 to 4:30. The hours of deliberations do not change from what we follow. So that is the schedule that we'll follow.

The one thing that does change is, you're provided lunch during your deliberations by the United States government. So because it's possible you will be deliberating by lunchtime tomorrow, you don't need to bring your lunch. You don't need to bring lunch tomorrow. When you get here. Michelle will bring back a menu from the deli and she will put orders in for you so that you will have your lunch in the jury room tomorrow either deliberating, or it will allow you to go quicker so we can bring you back in more quickly.

So just to remind you between now and then, don't discuss the case among yourselves or anyone else. Even though the presentation of the evidence is complete, you haven't heard the summations and you haven't heard my instructions on the law, so it's not proper to start discussing the case. You'll have plenty of time to do

790

that at the appropriate time.

All right, have good night.

I'll see you tomorrow morning at 10 o'clock.

(The jury left the courtroom.)

THE COURT:  So just to -- we have to work on the instructions and they'll be posted at some point later today on ECF.  They're not long, it's only one claim.  But just so you know, the Part I is the standard instructions even though I think at one point you proposed certain language on burden of proof and direct and circumstantial evidence.  I have standard instructions that I think are equivalent to what was proposed.  So that is Part I.

Part II is the sexual orientation claim.  I have decided that pretty much, I think it's verbatim, the PJI instruction.  My practice is on a New York State claim to pretty much go with the pattern jury instructions.  A State judge I think it usually does.  It has been modified slightly to reflect the type of claim.  But just in case you're wondering where the language came from, that is where we got it from.

The damages part is pretty much the damage instruction that I use on Title VII in terms of the language.  Obviously in this case there are two categories of damages; lost wages and the emotional distress/non-monetary damages.  So I think that is my instructions on

that.  Again, I think they're equivalent under Federal and State law.  I think mine do a better job of it, explaining that.

And then Part III is just rules for deliberations.  But if you want to let me know tomorrow if there are any issues.  I did put an instruction in, and I'm not going to give -- when I state what the law is in New York and what categories are included in the protected classes, there is just a sentence after that that says, sexual orientation was added to the statute in 2003.  So that you can obviously make whatever arguments to the jury about what happened in 2001.  But I'm not -- they are more detailed instructions that I'm not going to utilize because that is really just argumentative.

MR. ZABELL:  Your Honor, we had enclosed some proposed language about the legitimate business decision.  And how it's not the Court's purview or the jurors' purview to act as a superhuman resources department.  We believe that would be appropriate considering all of the testimony that we heard regarding the business decision for the termination.  They would have to determine that, A, that business decision was suspect.  That they can determine.  But if they don't determine that the business decision or the complaint was suspect, then they have an obligation to follow the business owner's decision with

792

regard to the termination.

THE COURT:  Again, I'm using the pattern jury instruction.

My recollection is, there is a line in there that doesn't use the language super personnel business, or something in the PJI talks about the fact that an employer can file for a termination for any reason as long as it is not discriminatory.  I think that is the language I'm going to use.  And I know what language you're referring to, it is one of my opinions.  But for the purpose of jury instruction, I'm not going to use the language of the personnel language.  I'm going to stick with the New York language.  You can obviously argue that in terms of business judgment deference by the jury, I'm not going to give them an instruction to defer to a business judgment. The law is that, that -- was reflecting that type of statement.  In other words, that as long as it is not discriminatory, they are not to analyze whether there was a good reason or a bad reason.  I think that is as far as I'm going to go.

MR. ZABELL:  I guess the proper time for me to voice my objection will be when I see the charge.

THE COURT:  You can.  It's not in there.  I saw the language you proposed, I'm familiar with the language. But especially because we're under New York law, I'm just

793

going to utilize the PJI.

          MR. ZABELL:  May I inquire if this was under Title VII, would that language --

          THE COURT:  Why don't we go back to my Title VII instruction.  I think I used something along the lines of, An employer may terminate someone for good reason, bad reason or no reason at all, as long as it is not discriminatory.  I definitely don't use super personnel.  But, so I have used that language in Title VII, but I think the New York language, I go back to the New York language.  I saw what you were proposing.  I went to see if there was something in New York that reflects that.  They're not to look at any condition and say, well, I wouldn't have fired him if I was RAY MAYNARD.  And I don't -- whether it was a good or bad reason.  They only have to find whether it is discriminatory.  But I'll make sure that line is in there.  But we can discuss it more tomorrow.  That is what my reasoning is.

          MR. ZABELL:  I appreciate that.  Thank you.

          THE COURT:  I'm sorry, you have something?

          MR. ANTOLLINO:  Do you have a verdict form?

          THE COURT:  The verdict form, yes.  I think it's pretty straightforward.

          I just want to highlight one other thing, Mr. Antollino.  That in your instruction you are, I think

794

that in your verdict form you're asking for a separate

determination about the suspension or withholding of

wages.

I went back and looked at the amended complaint.

The only area of liability mentioned in the complaint was

terminated based on his sexual orientation.  I was a

little surprised when it came up during the trial to hear

you start arguing and questioning about, for that one week

period between, one week period that his pay was withheld,

that that is somehow a separate theory of liability based

on that.  Because as far as I can tell..  I don't remember

that ever coming up in this case.  And it has been pending

for five years.  Maybe I'm wrong about that.

MR. ANTOLLINO:  I actually did ask in the

interrogatories.  They wanted us to pinpoint every single

discriminatory act.  And we told them every single

discriminatory act, and that included all of those things.

The pleadings of course, you know, this is modified -- but

the pleading was a short and plain statement.  And I

believe that the complaint talks about the withholding of

pay during the suspension.  So I don't think that is

unreasonable to include that as one of the aspects of

adverse inference.  But you're going to make whatever

ruling you are.  And I'm not going to argue with you on it

like Mr. Zabell is.  That is my point.  And you can make

795

the ruling and you will make the ruling whether I like it or not.

MR. ZABELL:  I apologize for arguing with you, judge.

THE COURT:  What?

MR. ZABELL:  I apologize for arguing with you.

THE COURT:  What is your position?

MR. ZABELL:  The amended complaint was submitted after discovery was responded to.

MR. ANTOLLINO:  That is not true.

MR. ZABELL:  The amended complaint came after the summary judgment motion.

MR. ANTOLLINO:  That is not true.  There was a second amended complaint, there was a -- no, wait, hold on.  There was no amended complaint because you said it was inoperative because we didn't need it because I did say at one point in excess of the jurisdictional amount of this Court.  The complaint, however, does talk about the suspension and the withholding of pay, I believe.

THE COURT:  I looked at if there is an amended complaint there not.  I don't know if there is a second amended complaint.  I think --

MR. ANTOLLINO:  The second amended complaint was the inoperative one.

THE COURT:  But the amended complaint which I

796

looked at last night, I think it doesn't, in the discussion of facts, reference the suspension. I don't remember if it referenced withholding of pay, but again, I don't, just because something is referencing that does not mean that is a theory that you can pursue the theory of liability. And I have a real concern that, for example, on the issue of what the damages would be for withholding the wages you made reference to the emotional distress that would result in someone for a week, I guess, not knowing whether they're going to get paid or not. But I don't think Mr. Zarda was questioned on that. I don't think there is any testimony about any emotional distress except for during that one week period. I don't think Mr. Zabell questioned him during that one week period withholding pay. So if it is in the complaint and both sides know that it's in the complaint, obviously certain questions would be asked. I don't know, what would the damages be for that? What would be the damages?

          MR. ANTOLLINO: Some emotional distress and loss of wages in between the suspension. He didn't get any pay for that week that he was suspended. And his pay was withheld for a week. So I'm not saying that they are major damages. I'm not saying that I would have come into court if someone was suspended for a week. But there is an element of damages.

797

So all I'm asking you is to take a look at what I have put in there based on what I said now and make your ruling.

THE COURT:  I have done that already.  I did look at what you put in and I'm surprised because, again, I assumed this was a termination case.  It's not in the complaint in the causes of action.  Causes of action clearly states only termination.  I think it would be prejudicial to allow an amended complaint to include that as a theory of recovery for the reasons I indicated.  That to the extent the argument is that is emotional distress damages in that one week period, Mr. Zarda testified to what his stress level was that related to that particular issue, making no discovery on that.  Mr. Zabell didn't get a chance to question him on that.

It would be prejudicial to add that.  I don't believe that simply having it in the body of the facts puts the defendant on notice.

MR. ANTOLLINO:  I believe there was some testimony on that.  I'll find it if it was.

THE COURT:  So that's my ruling.

MR. ANTOLLINO:  Okay.

THE COURT:  All right now.  So come in at 9:30.  That should give us enough time to get ready by 10:00.

MR. ZABELL:  Thank you, judge.

Kellinger - Cross/Mr. Antollino

798

          MR. ANTOLLINO:  Thank you.

          THE COURT:  Have a good night.

          (Whereupon, the trial adjourned to October 21,

2015 at 9:30 a.m.)

799

# I N D E X

**RAYMOND MAYNARD**                                    684
CROSS-EXAMINATION                                     685
BY MR. ZABELL
REDIRECT EXAMINATION                                  690
BY MR. ANTOLLINO

**DUNCAN SHAW**                                       717
DIRECT EXAMINATION                                    717
BY MR. ZABELL
CROSS-EXAMINATION                                     737
BY MR. ANTOLLINO

**CURT KELLINGER**                                    770
DIRECT EXAMINATION                                    770
BY MR. ZABELL
CROSS-EXAMINATION                                     783
BY MR. ANTOLLINO

1

'

**'80s** [1] - 782:13
**'85** [1] - 771:7

**0**

**01-Civ-4594** [1] - 701:19
**04-CV-2685** [1] - 699:1

**1**

**1** [4] - 669:19, 676:6, 706:4, 767:4
**10** [7] - 713:4, 713:16, 714:5, 714:7, 716:21, 788:14, 790:3
**10,000** [1] - 760:3
**10-CR-4334** [1] - 670:1
**100** [1] - 669:23
**100-pound** [3] - 777:20, 777:22, 778:2
**10001** [1] - 669:15
**103** [1] - 669:19
**10:00** [2] - 788:17, 797:24
**11242** [1] - 669:17
**11716** [1] - 669:20
**11722** [1] - 669:23
**1180** [1] - 669:23
**12,000** [5] - 739:23, 740:1, 759:21, 759:22, 759:23
**120** [4] - 687:13, 694:11, 694:13, 734:9
**13** [3] - 675:22, 695:1, 695:2
**13,500** [1] - 760:2
**139** [1] - 691:4
**14** [2] - 737:7, 737:8
**15** [6] - 680:10, 718:10, 718:11, 741:6, 765:6, 767:3
**17** [3] - 713:16, 714:7, 716:21
**18** [1] - 776:5
**181** [2] - 714:11, 716:10
**1815** [1] - 669:17
**1880731** [1] - 701:20
**195** [5] - 713:3, 713:16, 714:5, 714:7, 716:21
**1992** [1] - 770:17
**1:00** [1] - 767:9

**2**

**2** [1] - 706:5
**20** [2] - 669:8, 750:4
**200-pound** [3] - 777:20, 777:23, 778:1
**2000** [6] - 701:22, 718:12, 737:9, 737:10, 738:14, 738:16
**2000's** [1] - 727:5
**2001** [13] - 689:7, 689:17, 690:13, 691:14, 691:25, 700:1, 719:22, 724:7, 728:3, 728:9,

**728:17, 773:24, 791:12**
**2002** [1] - 701:19
**2003** [2] - 738:19, 791:10
**2009** [5] - 689:17, 691:25, 720:12, 781:14, 781:17
**2010** [8] - 692:1, 729:9, 780:9, 780:23, 781:5, 782:22, 782:25, 783:20
**2011** [2] - 717:9, 783:19
**2013** [5] - 670:23, 672:11, 674:8, 675:22, 697:16
**2014** [2] - 718:12, 737:10
**2015** [3] - 669:8, 691:25, 798:4
**20O2** [1] - 676:19
**21** [3] - 740:5, 747:25, 798:3
**211** [1] - 701:22
**22** [1] - 691:4
**243** [1] - 701:11
**26** [1] - 669:17
**275** [1] - 669:15

**3**

**3** [2] - 713:18, 717:5
**3,600** [2] - 759:20, 759:23
**3.6** [1] - 759:19
**30** [2] - 701:22, 750:4
**307** [1] - 702:12

**4**

**4** [2] - 713:18, 717:5
**4,000** [1] - 772:2
**403** [3] - 710:10, 711:17, 712:9
**404** [1] - 678:15
**404(b** [4] - 679:9, 710:1, 710:9, 712:9
**46** [1] - 683:19
**47** [1] - 670:18
**4:30** [1] - 789:7

**5**

**5** [2] - 714:11, 716:10
**5,000** [1] - 686:14
**50** [2] - 698:11, 710:22
**50(a** [1] - 698:19
**54** [1] - 735:5
**566** [1] - 702:12

**6**

**6** [3] - 694:23, 694:25
**60** [2] - 686:13, 686:19
**631** [1] - 669:24
**684** [1] - 799:2
**685** [1] - 799:3
**690** [1] - 799:4

**7**

**7** [6] - 672:11, 674:7, 697:16, 713:18, 714:3, 717:4
**705** [1] - 669:15
**712-6107** [1] - 669:24
**717** [2] - 799:5, 799:6
**737** [1] - 799:7
**770** [2] - 799:8, 799:9
**783** [1] - 799:10

**9**

**93** [1] - 701:11
**9:30** [6] - 669:8, 741:16, 788:14, 789:7, 797:23, 798:4
**9th** [1] - 717:9

**A**

**a.m** [2] - 669:8, 798:4
**ability** [1] - 675:9
**able** [8] - 680:19, 680:20, 699:2, 699:18, 704:10, 711:19, 725:20, 788:6
**absence** [1] - 711:10
**accent** [1] - 722:8
**accurate** [1] - 706:20
**accused** [1] - 748:9
**acknowledge** [2] - 706:22, 725:22
**acknowledged** [1] - 725:24
**act** [8] - 700:19, 701:12, 703:11, 776:1, 791:18, 794:16, 794:17
**acted** [5] - 677:23, 678:18, 678:19, 701:8, 702:3
**acting** [1] - 780:18
**action** [8] - 690:2, 693:16, 699:5, 702:14, 751:25, 752:1, 797:7
**actions** [7] - 744:24, 744:25, 745:5, 745:8, 745:10, 745:16
**acts** [6] - 722:2, 722:5, 722:16, 723:8, 723:13
**add** [3] - 754:20, 754:22, 797:16
**added** [1] - 791:10
**addition** [4] - 673:16, 681:12, 681:19, 704:4
**additional** [3] - 678:5, 682:23, 713:19
**address** [6] - 670:5, 670:12, 672:20, 680:7, 708:21, 769:5
**addressed** [5] - 695:5, 702:25, 706:21, 708:18, 708:19
**addresses** [1] - 673:23
**adjourned** [1] - 798:3
**adjustments** [1] - 736:14
**admissibility** [1] - 672:23
**admissible** [1] - 710:8
**admission** [1] - 678:15

**admit** [2] - 676:7, 758:2
**admitted** [2] - 703:2, 703:17
**adverse** [2] - 702:13, 794:23
**Advice** [1] - 701:18
**advised** [2] - 689:7, 692:3
**affect** [3] - 676:25, 677:8, 696:4
**affected** [1] - 677:4
**afraid** [1] - 707:25
**afternoon** [3] - 741:15, 770:11, 775:13
**afterwards** [1] - 707:19
**aged** [1] - 777:1
**aggressively** [1] - 711:5
**agitated** [5] - 774:12, 774:14, 774:15, 774:17, 774:18
**ago** [4] - 770:18, 774:2, 774:7, 774:12
**agree** [9] - 679:16, 739:13, 740:2, 742:23, 750:8, 751:15, 752:7, 763:24, 780:23
**agreed** [6] - 689:21, 701:24, 703:20, 704:4, 737:18, 737:21
**agreement** [1] - 711:5
**ahead** [16] - 685:13, 690:21, 695:18, 696:22, 704:25, 716:3, 716:8, 717:22, 729:3, 729:14, 735:7, 754:24, 761:10, 775:6, 783:4, 783:16
**air** [6] - 693:11, 714:17, 716:18, 734:17, 756:17, 757:4
**aircraft** [19] - 694:13, 694:16, 723:24, 724:19, 733:11, 744:11, 744:12, 745:21, 750:10, 750:11, 751:3, 755:20, 756:19, 756:22, 757:7, 757:24, 759:24, 778:12
**airplane** [4] - 686:9, 686:17, 724:4, 771:25
**alive** [1] - 673:6
**allay** [3] - 700:12, 785:19, 787:24
**allegation** [2] - 707:7, 708:8
**alleged** [1] - 699:22
**allow** [12] - 671:20, 672:3, 672:22, 675:6, 681:7, 706:10, 712:13, 728:15, 742:21, 787:14, 789:18, 797:9
**allowed** [4] - 673:6, 673:8, 708:6, 714:13, 715:22, 716:15, 754:18
**allowing** [2] - 684:18, 696:16
**allows** [2] - 675:8
**almost** [2] - 686:20, 777:19
**altimeter** [1] - 759:18
**ALTITUDE** [1] - 669:6
**Altitude** [2] - 670:2, 696:24
**amended** [11] - 769:7, 794:4, 795:8, 795:11, 795:14, 795:15, 795:20, 795:22, 795:23, 795:25, 797:9
**amount** [4] - 674:17, 689:22,

2

**analysis** [2] - 704:12, 710:10
**analyze** [1] - 792:18
**analyzed** [1] - 698:23
**animated** [1] - 774:13
**ankle** [1] - 781:20
**ans** [2] - 670:15, 675:1
**answer** [17] - 692:17, 693:7, 713:22, 714:20, 716:22, 717:5, 728:16, 729:14, 735:16, 743:16, 754:18, 754:25, 761:10, 762:14, 763:20, 783:4
**Answer** [2] - 716:13, 716:25, 717:7
**answered** [3] - 690:16, 755:13, 764:7
**answers** [3] - 691:1, 713:1, 713:20
**antennas** [2] - 782:1, 782:2
**anticipate** [1] - 786:7
**Antollino** [11] - 671:13, 675:21, 682:23, 694:8, 696:12, 696:16, 705:25, 784:5, 785:25, 786:4, 793:25
**ANTOLLINO** [102] - 669:14, 672:1, 672:14, 672:21, 675:12, 676:3, 676:17, 676:24, 677:5, 677:19, 678:2, 678:12, 679:14, 679:24, 683:1, 683:14, 683:18, 684:6, 687:2, 687:5, 690:12, 690:18, 691:11, 691:17, 691:22, 694:2, 694:9, 694:10, 695:10, 695:17, 695:19, 695:25, 696:9, 696:14, 696:23, 697:19, 703:16, 703:23, 706:1, 709:3, 713:5, 713:25, 714:7, 714:25, 715:5, 721:20, 726:16, 728:23, 729:10, 729:23, 733:3, 736:21, 737:5, 743:11, 745:15, 748:13, 748:21, 753:1, 754:3, 755:1, 755:5, 755:17, 763:23, 764:15, 764:21, 765:22, 767:8, 768:4, 769:2, 769:14, 774:14, 774:24, 775:1, 776:15, 780:1, 780:4, 781:2, 783:2, 783:12, 783:18, 783:22, 784:6, 784:14, 785:2, 785:6, 785:9, 786:7, 786:24, 787:3, 787:17, 793:21, 794:14, 795:10, 795:13, 795:23, 796:19, 797:19, 797:22, 798:1, 799:4, 799:7, 799:10
**anxious** [1] - 732:4
**anyway** [1] - 680:16
**apologize** [3] - 755:2, 795:3, 795:6
**appear** [5] - 737:16, 746:4, 746:5, 761:23, 782:25
**Appearances** [1] - 670:3
**APPEARANCES** [1] - 669:13
**applied** [2] - 695:13, 695:20

**apply** [1] - 704:17
**appreciate** [3] - 685:4, 788:5, 793:19
**approach** [2] - 726:3, 766:2
**approached** [1] - 726:5
**approaching** [1] - 726:7
**appropriate** [4] - 671:21, 697:25, 790:1, 791:19
**April** [5] - 670:23, 672:11, 674:7, 675:22, 697:16
**arch** [1] - 763:1
**area** [6] - 670:8, 728:5, 772:18, 774:5, 774:8, 794:5
**areas** [1] - 687:7
**arguably** [2] - 699:17, 702:15
**argue** [3] - 673:5, 792:13, 794:24
**argued** [3] - 702:19, 703:12, 706:13
**arguing** [5] - 702:21, 788:1, 794:8, 795:3, 795:6
**argument** [6] - 670:20, 675:14, 675:15, 702:7, 797:11
**argumentative** [1] - 791:14
**arguments** [1] - 791:11
**arms** [4] - 734:20, 756:11, 756:16, 762:18
**arrive** [1] - 788:17
**aspects** [2] - 771:2, 794:22
**assertion** [1] - 712:6
**ASSOCIATES** [1] - 669:19
**assume** [1] - 680:14
**assumed** [1] - 797:6
**assuming** [2] - 684:15, 709:5
**atmosphere** [1] - 747:21
**attached** [3] - 751:9, 751:10, 751:12
**attack** [2] - 711:2, 711:18
**attacked** [1] - 711:5
**attention** [4] - 679:19, 679:22, 749:24, 751:13
**attorney** [8] - 671:21, 689:4, 689:7, 690:19, 690:22, 692:3, 743:19, 780:21
**attorneys** [1] - 788:19
**authentic** [1] - 703:20
**authenticate** [1] - 684:1
**Avenue** [1] - 669:15
**aware** [7] - 679:6, 684:14, 746:15, 746:20, 786:20, 787:7, 788:2
**awesome** [3] - 746:3, 746:4, 746:5
**awkward** [3] - 722:19, 722:22, 725:2
**awkwardness** [2] - 735:15, 735:18

---

**B**

---

**baby** [6] - 722:7, 722:17, 723:1,

723:3, 723:5
**bad** [4] - 781:21, 792:19, 793:6, 793:15
**balancing** [2] - 711:17, 712:9
**bars** [1] - 678:15
**base** [18] - 726:20, 726:22, 726:24, 727:1, 727:2, 727:3, 727:6, 727:17, 727:18, 728:11, 781:24, 781:25, 782:3, 782:6, 782:9, 782:15, 782:19, 783:9
**based** [6] - 681:16, 684:17, 699:7, 699:15, 703:2, 704:2, 704:3, 705:1, 705:23, 710:15, 718:22, 760:21, 780:25, 794:6, 794:10, 797:2
**basis** [3] - 679:3, 701:3, 744:21
**Bastard** [1] - 778:25
**bastard** [1] - 779:2
**beautiful** [1] - 693:18
**became** [3] - 719:10, 719:15, 722:22
**become** [1] - 776:24
**becoming** [2] - 725:2, 732:3
**bedroom** [2] - 723:12, 723:13
**bedroom-related** [1] - 723:13
**BEFORE** [1] - 669:11
**begin** [1] - 713:3
**beginning** [2] - 673:25, 714:11
**behavior** [5] - 705:17, 705:18, 725:22, 775:13, 775:15
**behind** [3] - 754:1, 754:4, 761:4
**belabor** [2] - 673:5, 675:13
**believes** [1] - 681:17
**belong** [1] - 739:15
**below** [1] - 759:22
**benches** [3] - 761:11, 761:12, 761:14
**benefit** [7] - 677:6, 677:8, 738:23, 742:4, 742:5, 742:6, 742:7
**benefits** [2] - 676:22, 676:25
**beside** [1] - 761:15
**bet** [2] - 746:17, 747:7
**better** [6] - 739:23, 740:1, 757:17, 757:18, 763:7, 791:2
**between** [5] - 745:20, 778:24, 789:20, 794:9, 796:20
**beyond** [1] - 721:20
**BIANCO** [1] - 669:11
**big** [1] - 778:12
**Bill** [1] - 684:9
**bird** [3] - 765:1, 765:12, 765:15
**birthday** [1] - 687:22
**bit** [4] - 733:13, 749:15, 777:13, 779:18
**blowing** [1] - 757:4
**Board** [1] - 701:11
**body** [7] - 755:23, 755:24, 756:6, 756:7, 761:5, 763:1, 797:17
**bogus** [1] - 697:6

**Bohemia** [1] - 669:20
**book** [1] - 707:24
**bothering** [1] - 749:5
**boyfriend** [9] - 719:23, 720:1, 725:2, 732:2, 734:24, 747:18, 753:20, 754:15, 777:19
**brain** [1] - 755:19
**brainer** [1] - 777:20
**brains** [2] - 755:22, 755:25
**brand** [2] - 760:12, 760:13
**branded** [2] - 674:11, 697:8
**bread** [1] - 719:25
**break** [13] - 680:16, 698:7, 714:23, 736:22, 736:24, 736:25, 737:1, 783:11, 784:7, 785:1, 788:7, 789:5
**breaking** [1] - 767:5
**breaks** [1] - 707:2
**breath** [2] - 714:16, 716:18
**bridge** [1] - 726:25
**brief** [2] - 673:17, 736:25
**briefing** [1] - 709:2
**bring** [19] - 675:18, 675:21, 676:4, 681:7, 684:19, 709:6, 713:20, 715:13, 721:7, 721:10, 773:12, 778:5, 778:19, 787:15, 788:3, 789:14, 789:15, 789:19
**bringing** [2] - 678:21, 785:11
**brings** [2] - 700:19, 747:21
**broke** [3] - 702:15, 719:25, 781:20
**Brooklyn** [1] - 669:17
**brought** [7] - 678:18, 679:21, 708:9, 744:3, 771:17, 771:19, 785:22
**built** [1] - 692:19
**bunch** [1] - 784:18
**burden** [6] - 698:24, 699:4, 702:23, 788:21, 788:24, 790:10
**burden-shifting** [2] - 698:24, 699:4
**bureau** [1] - 701:19
**Burrell** [2] - 738:13, 743:21
**business** [16] - 673:2, 677:23, 693:3, 699:15, 701:5, 701:17, 705:16, 747:23, 791:16, 791:20, 791:22, 791:23, 791:25, 792:5, 792:14, 792:15
**BY** [46] - 669:20, 685:15, 687:8, 688:10, 690:12, 691:11, 691:17, 691:22, 694:2, 694:10, 695:10, 695:19, 695:25, 717:24, 721:25, 724:17, 726:19, 729:16, 730:2, 731:6, 733:5, 735:8, 737:5, 743:11, 745:15, 748:13, 748:21, 753:1, 754:3, 755:5, 755:17, 763:23, 764:15, 764:21, 770:10, 775:7, 776:22, 780:7, 781:4, 783:18, 799:3, 799:4, 799:6, 799:7, 799:9, 799:10

3

**Byrnie** [1] - 701:10

**C**

**California** [2] - 718:8, 718:22
**calm** [1] - 686:2
**camera** [23] - 708:3, 750:13, 750:17, 751:16, 751:19, 751:22, 752:2, 752:10, 752:16, 752:20, 752:22, 753:8, 753:13, 753:14, 755:9, 755:18, 762:5, 762:8, 762:9, 762:10, 762:12, 762:13, 763:24
**cameraman** [3] - 751:20, 771:3, 776:7
**cane** [1] - 683:12
**canker** [1] - 787:24
**cannot** [6] - 687:24, 697:8, 700:23, 701:3, 703:6, 703:7
**canopy** [4] - 686:4, 686:6, 686:14, 686:20
**car** [1] - 744:4
**CARDINALE** [1] - 669:16
**care** [5] - 693:13, 720:21, 721:4, 735:22, 742:8
**carry** [2] - 707:17, 778:1
**case** [62] - 670:1, 670:6, 673:19, 675:4, 679:2, 679:9, 680:14, 680:15, 682:3, 696:18, 697:24, 698:3, 698:5, 698:22, 698:25, 699:2, 699:25, 700:4, 701:23, 702:5, 702:9, 702:10, 702:21, 703:5, 703:7, 704:7, 704:13, 704:14, 704:16, 704:19, 705:3, 705:8, 705:10, 705:24, 706:10, 706:11, 706:13, 707:14, 710:3, 710:7, 710:12, 711:12, 714:14, 715:22, 715:23, 715:25, 716:16, 737:1, 760:25, 761:1, 784:4, 784:10, 784:12, 786:12, 788:9, 789:21, 789:25, 790:18, 790:23, 794:12, 797:6
**cast** [1] - 699:19
**categories** [2] - 790:23, 791:8
**categorized** [1] - 703:13
**catty** [3] - 760:22, 760:23, 760:24
**catty-corner** [3] - 760:22, 760:23, 760:24
**caught** [1] - 756:16
**caused** [2] - 775:13, 775:15
**causes** [2] - 797:7
**causing** [1] - 732:4
**celebrating** [1] - 687:21
**center** [1] - 697:10
**central** [2] - 710:6, 711:18
**Central** [2] - 669:5, 669:23
**certain** [4] - 671:13, 790:9, 796:16
**certainly** [6] - 670:21, 710:8, 710:18, 711:9, 711:12, 778:7

**chance** [5] - 671:5, 673:14, 713:6, 713:10, 797:15
**change** [6] - 753:3, 773:3, 777:2, 777:4, 789:8, 789:10
**characterization** [2] - 756:5, 764:18
**characterize** [1] - 761:17
**charge** [7] - 681:2, 681:6, 681:8, 681:9, 681:11, 681:16, 792:22
**charges** [5] - 677:1, 677:9, 680:6, 680:25, 696:5
**check** [1] - 727:11
**chest** [1] - 756:24
**chips** [1] - 702:5
**choice** [3] - 707:17, 743:2, 743:3
**chose** [3] - 743:3, 743:5, 743:6
**chronic** [2] - 785:10, 785:18
**circles** [2] - 697:13, 745:2
**Circuit** [3] - 700:21, 701:10, 701:21
**circumstance** [1] - 698:17
**circumstances** [4] - 675:20, 699:6, 707:11, 769:10
**circumstantial** [1] - 790:10
**citation** [1] - 699:2
**Citizen** [1] - 701:18
**city** [3] - 719:23, 770:22, 781:10
**Civil** [1] - 698:20
**claim** [17] - 676:22, 676:24, 677:5, 681:22, 682:5, 703:6, 703:8, 703:11, 706:9, 706:10, 708:25, 710:17, 710:18, 790:7, 790:13, 790:15, 790:18
**claim's** [1] - 677:8
**claims** [3] - 703:3, 704:18, 704:21
**clarification** [1] - 673:24
**clarified** [1] - 740:25
**clarify** [2] - 728:14, 783:19
**class** [2] - 699:8, 707:9
**classes** [3] - 714:15, 716:17, 791:9
**clear** [10] - 671:15, 681:15, 681:20, 690:20, 703:16, 706:1, 753:18, 778:14, 778:15, 778:16
**clearly** [4] - 679:24, 702:22, 706:11, 797:8
**CLERK** [1] - 670:1
**client** [10] - 672:1, 675:23, 680:9, 680:14, 687:5, 706:17, 707:5, 713:10, 746:10
**close** [6] - 733:10, 747:8, 747:12, 747:14, 747:15, 751:6
**closely** [2] - 702:13, 739:12
**closing** [1] - 788:18
**clubs** [1] - 792:20
**co** [4] - 711:24, 778:19, 779:8
**co-worker** [2] - 711:24
**co-workers** [2] - 778:19, 779:8
**colleagues** [3] - 719:18, 720:25,

778:22
**comfortable** [1] - 725:21
**coming** [5] - 678:14, 678:24, 701:15, 772:12, 794:12
**comment** [3] - 726:18, 746:22, 748:2
**comments** [6] - 699:17, 709:18, 715:11, 729:1, 779:10, 780:3
**Commission** [1] - 676:18
**common** [4] - 726:13, 729:4, 776:14, 776:15
**communicate** [1] - 710:14
**communicated** [3] - 710:2, 710:15, 711:23
**community** [1] - 739:11
**company** [5] - 689:9, 692:19, 695:5, 716:24, 773:6
**complain** [1] - 685:24
**complained** [3] - 705:19, 705:20
**complaining** [2] - 700:6, 700:8
**complaint** [37] - 685:19, 685:22, 687:15, 689:20, 690:5, 690:6, 690:24, 692:3, 693:15, 697:6, 700:15, 701:7, 701:8, 705:17, 706:4, 708:6, 711:5, 729:18, 787:1, 791:24, 794:4, 794:5, 794:20, 795:8, 795:11, 795:14, 795:15, 795:18, 795:21, 795:22, 795:23, 795:25, 796:15, 796:16, 797:7, 797:9
**complaints** [6] - 689:6, 689:14, 690:13, 690:19, 724:8, 724:11
**complete** [2] - 788:10, 789:22
**completed** [1] - 685:6
**completely** [6] - 682:4, 694:16, 694:20, 706:6, 751:21, 751:23
**completeness** [1] - 676:14
**Computer** [1] - 669:25
**concede** [1] - 699:4
**concern** [1] - 796:6
**concerned** [1] - 706:21
**conclude** [2] - 745:3, 755:21
**conclusion** [5] - 690:6, 701:8, 706:7, 744:22, 746:6
**conclusions** [1] - 701:24
**condition** [8] - 785:10, 785:18, 786:16, 786:18, 786:19, 786:23, 787:10, 793:13
**conditions** [1] - 686:15
**conduct** [3] - 707:19, 712:8, 736:9
**conference** [1] - 767:4
**confirmed** [1] - 787:1
**confronted** [2] - 710:5, 787:8
**confusing** [2] - 681:23, 682:8
**connection** [1] - 696:18
**connotation** [2] - 747:6, 747:11
**consented** [1] - 707:18
**considered** [1] - 672:18
**considering** [1] - 791:19
**consistent** [1] - 682:4

**console** [3] - 744:15, 744:17, 744:20
**contact** [3] - 715:7, 720:6, 733:10
**contacted** [1] - 769:6
**contacts** [1] - 720:10
**content** [6] - 699:17, 709:18, 715:11, 729:1, 779:10, 780:3
**content** [5] - 684:16, 703:6, 703:8, 710:22, 712:23
**continue** [5] - 674:14, 685:5, 692:4, 698:5, 740:8
**Continued** [4] - 766:4, 767:11, 768:6, 769:15
**continued** [1] - 678:5
**continues** [1] - 676:5
**continuing** [2] - 670:24, 675:22
**contractor** [3] - 718:7, 739:8, 739:9
**contracts** [1] - 718:8
**contradicted** [1] - 673:17
**contradictory** [2] - 675:10, 675:12
**contradicts** [2] - 676:8, 702:5
**conversation** [7] - 689:17, 725:10, 725:14, 725:25, 729:5, 736:9, 772:23
**conversations** [2] - 686:3, 722:21
**converse** [1] - 750:10
**conversing** [3] - 745:17, 745:22, 746:2
**conveyed** [1] - 786:21
**corner** [3] - 760:22, 760:23, 760:24
**Corporate** [1] - 669:19
**correct** [93] - 685:20, 690:15, 691:13, 691:14, 692:14, 693:5, 693:24, 694:4, 694:17, 694:20, 694:21, 709:11, 709:25, 715:20, 720:2, 728:12, 731:22, 734:20, 737:22, 737:24, 738:17, 738:24, 739:2, 739:9, 739:23, 740:4, 740:9, 740:13, 740:17, 740:23, 741:11, 741:21, 741:24, 742:8, 742:11, 742:23, 743:4, 743:14, 743:21, 743:23, 744:10, 746:3, 746:11, 747:1, 747:4, 747:9, 747:13, 747:18, 747:21, 748:24, 749:1, 749:7, 749:11, 749:17, 750:3, 750:13, 750:17, 751:4, 751:25, 752:5, 752:8, 752:11, 753:9, 753:20, 754:13, 754:16, 756:8, 756:13, 756:17, 756:24, 757:8, 758:9, 758:24, 759:2, 759:12, 760:3, 760:4, 761:3, 761:6, 761:13, 761:16, 762:14, 762:25, 763:3, 763:4, 764:22, 764:23, 764:25, 765:8, 765:10, 765:13, 773:1, 783:20
**corrected** [1] - 677:7

**corroborated** [2] - 688:17, 708:8
**costs** [1] - 704:5
**Council** [1] - 738:21
**counsel** [8] - 671:16, 678:7, 683:4, 689:22, 702:19, 702:21, 784:15, 788:22
**count** [1] - 683:11
**couple** [8] - 670:22, 676:3, 687:21, 697:22, 717:1, 725:1, 731:18, 770:17
**course** [3] - 724:20, 741:8, 794:18
**court** [16] - 673:11, 701:16, 702:1, 703:22, 703:25, 737:16, 741:13, 742:17, 743:7, 743:13, 768:1, 770:1, 779:16, 795:18, 796:24
**COURT** [181] - 669:1, 669:11, 670:4, 670:18, 671:25, 672:3, 672:10, 672:15, 672:22, 673:8, 673:18, 674:1, 674:12, 674:19, 675:16, 676:15, 676:23, 677:3, 677:12, 677:25, 678:3, 678:10, 679:2, 679:16, 679:23, 680:1, 680:4, 680:8, 680:13, 680:22, 681:1, 681:5, 683:13, 683:16, 684:5, 684:13, 684:21, 685:1, 685:13, 687:4, 687:6, 690:10, 690:17, 690:21, 691:3, 691:9, 691:16, 691:21, 692:17, 693:7, 694:1, 694:7, 695:9, 695:18, 695:23, 696:7, 696:11, 696:16, 697:18, 697:24, 698:2, 698:10, 703:19, 704:1, 704:7, 704:16, 704:22, 704:25, 705:25, 708:23, 709:4, 709:8, 709:12, 709:15, 709:20, 709:22, 710:1, 712:16, 712:21, 713:2, 713:6, 713:17, 713:24, 714:1, 714:4, 714:8, 714:18, 714:22, 715:4, 715:9, 715:15, 715:17, 716:6, 717:10, 717:17, 717:20, 717:22, 721:22, 724:16, 726:17, 728:14, 728:22, 728:24, 729:3, 729:11, 729:14, 729:25, 730:9, 730:13, 730:19, 730:21, 731:4, 733:4, 735:3, 735:7, 736:20, 736:24, 743:10, 743:16, 745:12, 745:14, 748:12, 748:18, 752:25, 753:25, 754:20, 754:23, 755:14, 758:4, 761:10, 763:18, 764:8, 764:14, 764:20, 765:23, 765:25, 766:3, 767:6, 767:9, 768:2, 769:11, 770:5, 774:15, 774:17, 774:20, 775:3, 776:17, 780:3, 780:5, 781:3, 783:3, 783:11, 783:13, 783:16, 783:24, 784:2, 784:4, 784:9, 784:19, 784:24, 785:5, 785:7, 786:13, 787:2, 787:5, 787:25,

788:5, 790:5, 792:2, 792:23, 793:4, 793:20, 793:22, 795:5, 795:7, 795:20, 795:25, 797:4, 797:21, 797:23, 798:2
**Court** [5] - 669:17, 669:22, 704:17, 786:4, 788:20
**Court's** [1] - 791:17
**Courthouse** [1] - 669:5
**courtroom** [5] - 698:9, 715:16, 784:13, 788:4, 790:4
**courts** [2] - 701:12, 701:14
**cover** [2] - 687:7, 704:4
**covered** [1] - 705:9
**covering** [1] - 687:6
**covers** [1] - 708:21
**crafted** [1] - 671:23
**created** [2] - 671:9, 671:15
**creepy** [6] - 688:23, 708:10, 732:11, 732:13, 732:14, 732:17
**crew** [5] - 774:25, 775:11, 778:25, 779:1, 782:17
**crewmen** [1] - 684:8
**critical** [2] - 672:25, 679:9, 710:3, 710:12
**Cromwell** [1] - 701:11
**CROSS** [6] - 685:14, 737:4, 783:17, 799:3, 799:7, 799:10
**cross** [16] - 671:18, 673:15, 675:19, 676:11, 676:12, 682:22, 685:8, 687:4, 698:1, 712:24, 713:7, 736:20, 750:16, 756:11, 756:16, 775:5
**cross-examination** [6] - 676:11, 676:12, 685:8, 687:4, 736:20, 750:16
**CROSS-EXAMINATION** [6] - 685:14, 737:4, 783:17, 799:3, 799:7, 799:10
**cross-examine** [4] - 671:18, 673:15, 675:19, 713:7
**cross-examining** [1] - 712:24
**crossed** [1] - 762:19
**cruise** [3] - 684:10, 684:11, 714:9
**cry** [1] - 691:6
**cumulative** [1] - 769:8
**curls** [1] - 683:11
**current** [2] - 671:3, 682:4
**curt** [2] - 739:1, 743:21
**Curt** [5] - 709:14, 738:13, 743:22, 768:3, 770:7
**CURT** [3] - 770:2, 770:7, 799:8
**customer** [14] - 689:6, 689:14, 692:3, 692:19, 697:6, 700:3, 701:7, 701:8, 706:4, 707:1, 707:8, 746:10, 749:16
**customers** [8] - 690:14, 691:19, 692:13, 707:4, 711:15, 711:21, 774:8
**cV-10-4334** [1] - 669:4

## D

**d/b/a** [1] - 669:6
**Dallas** [2] - 674:8, 697:16
**damage** [1] - 790:21
**damages** [13] - 671:4, 674:13, 676:2, 696:20, 790:21, 790:24, 790:25, 796:7, 796:18, 796:23, 796:25, 797:12
**danger** [2] - 710:11, 712:11
**date** [2] - 672:10, 678:20
**dated** [1] - 697:16
**dates** [1] - 781:9
**David** [5] - 694:3, 708:3, 744:8, 758:8, 762:18
**days** [3] - 687:19, 707:20, 741:13
**deal** [2] - 756:18, 756:21
**dealing** [2] - 714:14, 716:16
**deals** [1] - 686:7
**dealt** [2] - 711:3, 714:4
**death** [3] - 674:18, 675:5, 697:15
**decades** [1] - 697:14
**December** [1] - 717:9
**decided** [2] - 698:25, 790:14
**decision** [23] - 679:7, 684:17, 698:11, 699:5, 699:12, 699:16, 701:17, 701:20, 702:6, 702:15, 708:5, 708:7, 708:24, 710:6, 725:18, 787:11, 787:13, 788:2, 791:16, 791:20, 791:22, 791:24, 791:25
**decision-maker** [1] - 788:2
**decision-making** [2] - 702:6, 787:11
**decisions** [4] - 701:15, 702:1, 702:2, 702:3
**declaration** [13] - 670:7, 670:8, 670:9, 670:13, 672:2, 672:14, 672:15, 672:17, 682:12, 682:25, 696:13, 696:17, 696:19
**declare** [3] - 672:18, 674:3, 696:25
**defend** [1] - 704:5
**defendant** [3] - 705:22, 711:19, 797:18
**defendant's** [1] - 678:17
**defendants** [4] - 703:4, 705:9, 709:1, 788:22
**Defendants** [2] - 669:8, 669:19
**defendants'** [3] - 698:21, 705:10, 705:24
**defendants's** [1] - 675:3
**defense** [5] - 683:4, 711:13, 715:21, 784:2, 784:3
**defer** [1] - 792:15
**deference** [1] - 792:14
**definitely** [2] - 682:6, 793:8
**degree** [1] - 777:7
**deli** [1] - 789:16

**deliberating** [2] - 789:13, 789:18
**deliberations** [4] - 789:7, 789:8, 789:11, 791:5
**delicate** [1] - 706:14
**delivering** [1] - 737:15
**demand** [1] - 737:15
**demeanor** [5] - 683:8, 752:4, 752:7, 753:4, 777:2
**demonstrate** [1] - 762:12
**demonstrating** [1] - 714:6
**Department** [1] - 676:18
**department** [1] - 791:18
**departments** [2] - 701:12
**deploy** [2] - 686:7, 686:13
**deposed** [1] - 786:6
**deposition** [18] - 673:19, 673:21, 673:23, 675:17, 675:18, 682:17, 682:20, 683:24, 690:25, 691:10, 691:12, 697:22, 708:9, 713:9, 716:7, 717:9, 785:24, 786:1
**describe** [2] - 740:6, 756:4
**described** [1] - 687:20
**describing** [2] - 670:23, 674:21
**designated** [1] - 677:5
**detail** [2] - 721:23, 722:1
**detailed** [4] - 700:4, 700:5, 769:12, 791:13
**details** [1] - 687:23
**determination** [2] - 699:14, 794:2
**determine** [3] - 791:21, 791:23
**detrimental** [1] - 693:2
**developed** [1] - 697:13
**diagonal** [5] - 761:6, 761:8, 761:11, 761:24, 761:25
**diagonally** [3] - 761:2, 761:12, 762:24
**Diego** [5] - 718:22, 718:23, 737:18, 739:7, 740:12, 740:13, 744:5
**difference** [1] - 748:7
**different** [9] - 704:9, 706:6, 713:9, 714:6, 720:4, 725:6, 740:14, 740:16, 764:2
**differently** [3] - 779:7, 779:13, 779:15
**difficult** [3] - 714:16, 716:18, 754:5
**dinner** [3] - 719:23, 779:23, 781:10
**direct** [6] - 673:17, 680:19, 685:6, 740:20, 786:12, 790:10
**DIRECT** [4] - 717:23, 770:9, 799:6, 799:9
**direction** [1] - 744:13
**directly** [5] - 670:11, 673:23, 752:14, 752:15, 752:20
**disciplining** [1] - 707:11
**disclosed** [3] - 700:2, 700:11,

5

700:14

disclosures [1] - 769:7
discomfort [1] - 700:13
discovery [2] - 795:9, 797:14
discriminated [6] - 681:10, 681:12, 681:13, 681:18, 682:5, 699:23
discrimination [10] - 679:2, 699:7, 700:14, 702:15, 703:8, 703:12, 704:18, 704:22, 704:23, 707:7
discriminatory [8] - 701:17, 702:17, 792:8, 792:18, 793:8, 793:16, 794:16, 794:17
discuss [15] - 680:14, 681:1, 695:24, 727:9, 735:18, 737:1, 775:12, 776:18, 781:24, 782:9, 784:6, 784:8, 784:12, 789:21, 793:17
discussed [6] - 702:9, 709:24, 727:13, 776:19, 780:20
discussing [1] - 789:25
discussion [7] - 706:24, 722:15, 772:11, 776:14, 776:16, 781:22, 796:2
discussions [2] - 775:23, 775:25
dismissed [2] - 775:22, 775:24
disoriented [1] - 707:25
disparage [1] - 785:15
disregard [2] - 726:17, 758:4
disregarded [1] - 730:1
distract [1] - 732:5
distress [5] - 670:24, 796:8, 796:12, 796:19, 797:11
distress/non [1] - 790:24
district [1] - 701:20
DISTRICT [3] - 669:1, 669:1, 669:11
disturbed [3] - 732:4, 732:5, 732:8
dive [1] - 746:11
division [1] - 696:4
document [15] - 671:9, 671:14, 671:15, 671:17, 672:5, 672:18, 673:1, 673:6, 676:6, 676:17, 677:13, 677:17, 678:7, 678:8, 682:24
don [2] - 683:2, 776:24
Don [136] - 676:21, 678:18, 678:22, 678:23, 679:21, 684:8, 684:10, 687:17, 688:22, 689:8, 689:11, 689:13, 689:20, 690:3, 690:13, 690:22, 691:2, 691:5, 691:19, 692:6, 692:13, 693:5, 699:25, 700:20, 701:1, 705:15, 706:22, 706:24, 707:1, 707:17, 709:18, 712:6, 718:25, 719:2, 719:9, 720:13, 720:21, 720:23, 720:25, 721:2, 721:5, 721:7, 723:15, 723:19, 723:21,

723:23, 724:7, 724:12, 724:21, 725:8, 725:9, 725:19, 725:22, 726:3, 727:1, 729:4, 729:5, 729:7, 729:8, 729:9, 730:18, 732:3, 741:23, 746:24, 746:25, 748:8, 748:9, 748:22, 750:22, 751:12, 752:17, 752:21, 753:7, 761:18, 764:3, 764:4, 764:10, 764:11, 764:12, 771:9, 771:11, 771:12, 771:15, 771:18, 771:19, 771:21, 771:22, 771:24, 772:4, 772:16, 773:3, 773:14, 773:18, 773:19, 773:21, 774:5, 774:7, 774:19, 775:1, 775:17, 776:4, 776:9, 776:19, 777:14, 778:5, 778:9, 778:16, 778:18, 778:19, 778:23, 779:7, 779:13, 779:19, 779:20, 779:22, 779:23, 780:8, 780:13, 780:23, 781:5, 781:13, 781:16, 781:24, 782:3, 782:10, 782:15, 782:24, 783:19, 785:10
Don's [11] - 693:22, 707:19, 709:18, 724:18, 724:25, 750:16, 753:3, 763:8, 774:3, 776:12, 779:10
DONALD [1] - 669:3
Donald [4] - 674:2, 696:23, 696:24, 697:16
done [7] - 680:20, 693:17, 705:11, 721:12, 731:10, 767:2, 797:4
door [1] - 787:19
double [1] - 708:17
Douglas [2] - 698:24, 699:3
down [14] - 671:20, 686:2, 696:11, 717:1, 722:20, 734:20, 749:22, 765:25, 771:17, 771:20, 771:25, 773:12, 773:13, 783:24
dress [2] - 779:13, 779:15
Drive [1] - 669:19
driving [1] - 744:4
drop [4] - 706:25, 707:15, 717:1, 717:2
Drop [2] - 683:5, 684:7
Dropzone [1] - 703:4
dropzone [1] - 765:2
duly [3] - 684:24, 717:15, 770:3
DUNCAN [3] - 717:14, 717:21, 799:5
Duncan [13] - 694:3, 709:13, 709:21, 717:13, 717:19, 731:17, 741:19, 765:3, 765:8, 765:10, 765:16, 765:18, 787:20
during [26] - 676:11, 678:20, 698:2, 699:24, 705:8, 705:10, 705:11, 715:1, 715:25, 716:24, 720:9, 721:18, 733:6, 733:15, 736:6, 740:20, 759:17, 767:5, 771:8, 782:10, 782:18, 789:11,

794:7, 794:21, 796:13, 796:14

---

**E**

e-mails [1] - 679:14
ear [2] - 686:2, 700:10
early [2] - 728:2, 728:3
easier [3] - 672:6, 777:22, 777:24
easily [1] - 706:5
eastern [1] - 693:19
EASTERN [1] - 669:1
easy [1] - 731:1
ECF [1] - 790:7
echoed [1] - 671:14
Education [1] - 701:11
EEOC [4] - 680:6, 680:25, 681:2, 681:6, 681:8, 681:21
effective [1] - 704:20
effort [2] - 700:12, 777:13
eight [2] - 686:18, 686:20
either [2] - 754:6, 789:17
elapsed [1] - 735:25
electronically [1] - 752:22
element [3] - 699:5, 710:17, 796:25
elements [1] - 699:5
emotional [8] - 670:24, 674:21, 675:22, 790:24, 796:8, 796:12, 796:19, 797:11
employed [4] - 718:6, 719:3, 719:5, 719:6, 719:14, 771:15
employee [3] - 689:5, 695:13, 695:20
employees [3] - 692:21, 722:23, 723:7
employer [3] - 679:6, 792:6, 793:6
employer's [4] - 679:7, 679:10, 701:13, 701:17
employment [9] - 699:12, 702:13, 718:18, 771:8, 774:3, 775:4, 782:10, 782:16, 782:18
empowered [1] - 702:1
enclosed [1] - 791:15
end [8] - 670:12, 670:13, 673:25, 674:6, 680:15, 685:7, 718:12, 718:18
ended [2] - 774:3, 782:16
engaged [6] - 722:2, 722:16, 722:21, 723:8, 749:24, 750:1
enhance [3] - 688:25, 749:10, 749:12
enhancing [1] - 706:18
enjoy [2] - 697:9, 777:12
enjoyable [2] - 693:12, 693:18
enjoyment [1] - 697:12
entered [2] - 715:16, 788:4
entertain [1] - 682:17
enthusiasm [2] - 727:13, 727:17
enthusiastic [1] - 776:24

entire [1] - 691:24
entirety [3] - 675:7, 675:8, 688:13
entourage [2] - 743:6, 743:9
entry [1] - 670:12
envious [1] - 783:6
equipment [2] - 727:12, 733:12
equivalent [2] - 790:12, 791:1
especially [3] - 697:3, 711:15, 792:25
ESQ [4] - 669:14, 669:16, 669:20, 669:21
essentially [1] - 710:23
establish [1] - 729:12
estate [1] - 787:21
estimate [1] - 715:20
estimates [1] - 715:19
Europe [3] - 779:24, 783:1, 783:5
evenings [1] - 723:10
evidence [22] - 677:11, 678:16, 678:23, 684:3, 688:7, 699:10, 699:13, 702:13, 703:2, 703:17, 703:18, 705:2, 705:7, 705:23, 711:13, 716:1, 730:6, 758:12, 788:8, 788:9, 789:22, 790:11
exact [1] - 677:19
exactly [6] - 683:6, 700:5, 700:17, 713:11, 727:4, 744:17
EXAMINATION [12] - 685:14, 690:11, 717:23, 737:4, 770:9, 783:17, 799:3, 799:4, 799:6, 799:7, 799:9, 799:9, 799:10
examination [8] - 676:11, 676:12, 685:7, 685:8, 687:4, 736:20, 740:20, 750:16
examine [4] - 671:18, 673:15, 674:25, 675:2, 675:9, 675:19, 713:7
examined [3] - 684:24, 717:16, 770:4
examining [1] - 712:24
example [3] - 706:2, 707:12, 796:6
exceed [1] - 680:19
except [2] - 707:11, 796:13
exception [4] - 671:2, 673:2, 675:24, 679:8
excess [1] - 795:17
excited [2] - 727:19, 783:5
excuse [5] - 707:24, 753:23, 768:4, 770:20, 774:16
excused [1] - 784:20
Exhibit [2] - 683:19, 694:23
exhibit [1] - 703:25
exhibits [1] - 683:17
existed [1] - 705:8
exit [2] - 756:22, 771:25
expanding [2] - 771:19, 773:7
expect [4] - 680:10, 680:11, 705:11, 767:2

6

expected [1] - 706:16
experience [4] - 692:20, 693:1, 693:12, 775:13
explain [4] - 670:10, 682:9, 752:19, 777:17
explained [4] - 700:5, 706:18, 758:23, 759:1
explaining [2] - 681:25, 791:2
explains [1] - 676:21
explanation [2] - 769:12, 787:22
exposure [7] - 692:5, 692:12, 692:13, 692:15, 692:18, 692:19, 693:4
EXPRESS [1] - 669:6
express [5] - 727:13, 744:12, 744:14, 762:7, 772:12
Express [1] - 696:24
expresses [1] - 727:17
expression [1] - 753:8
extend [1] - 738:21
extent [4] - 688:18, 702:20, 711:23, 797:11
extreme [1] - 707:11
extremely [1] - 682:7
eyes [3] - 688:23, 749:21, 773:8

**F**

F.3d [3] - 701:11, 701:22, 702:12
face [3] - 686:22, 708:11, 757:4
Facebook [2] - 739:15, 739:22
faces [1] - 706:17
facing [1] - 745:20
fact [20] - 675:4, 679:3, 681:8, 685:22, 689:11, 693:22, 699:12, 700:6, 705:3, 707:4, 707:18, 707:20, 713:14, 739:15, 752:15, 756:15, 779:2, 785:10, 785:11, 792:6
factor [1] - 699:11
facts [2] - 796:2, 797:17
factually [1] - 682:16
failed [1] - 702:22
failure [1] - 706:9
fair [7] - 689:22, 708:15, 711:12, 731:3, 754:7, 758:19, 764:17
fairly [1] - 727:11
fall [6] - 686:13, 686:19, 686:21, 736:4, 736:6, 736:10
falling [7] - 686:17, 686:21, 687:13, 694:11, 734:7, 734:17
Falls [2] - 782:17, 782:19
falls [1] - 702:8
familiar [3] - 698:24, 700:8, 792:24
far [12] - 678:13, 680:3, 706:20, 728:9, 733:16, 746:2, 754:1, 754:4, 778:7, 780:25, 792:19, 794:11
fashion [1] - 779:25

fast [2] - 686:22, 734:7
Fat [1] - 778:25
fat [1] - 779:2
favor [2] - 698:21, 741:9
fear [4] - 674:10, 697:7, 762:7, 762:12
federal [2] - 681:22, 791:1
Federal [3] - 669:23, 698:20, 788:20
feelings [2] - 671:24, 675:10
fees [1] - 704:5
feet [9] - 686:14, 739:23, 740:1, 759:20, 759:21, 759:22, 760:2, 760:3, 763:14
fellow [1] - 778:23
felt [5] - 685:25, 700:8, 745:23, 764:11, 781:21
female [7] - 707:14, 709:19, 711:15, 724:22, 724:25, 776:10, 776:13
females [1] - 678:22
few [9] - 709:7, 716:6, 736:21, 777:16, 782:12
field [1] - 740:8
file [1] - 792:7
filed [1] - 683:23
filing [2] - 681:21, 682:1
final [6] - 719:11, 719:12, 719:13, 758:15, 758:17, 759:5
finally [2] - 702:24, 717:4
fine [3] - 714:18, 770:12, 772:21
finger [5] - 683:2, 683:5, 683:9, 748:23, 749:1
fingers [9] - 683:12, 732:9, 732:18, 732:22, 732:25, 733:2, 749:21, 786:25, 787:23
finish [9] - 680:13, 682:22, 695:17, 695:18, 715:19, 745:14, 754:18, 754:24, 763:12
finished [3] - 680:12, 755:1, 788:8
Fire [2] - 772:20, 773:11
fire [5] - 690:23, 706:2, 708:10, 775:14, 775:16
fired [8] - 689:6, 691:25, 719:21, 724:7, 729:17, 774:8, 780:18, 793:14
firing [1] - 689:16, 707:10
first [22] - 676:20, 684:14, 684:23, 689:16, 696:15, 699:4, 717:15, 719:10, 719:21, 720:11, 727:3, 756:18, 770:3, 772:14, 772:23, 772:24, 773:21, 774:3, 782:3, 788:13, 788:16, 788:22
fit [4] - 764:17, 772:3, 772:16, 772:18
five [7] - 716:24, 736:1, 736:2, 767:9, 776:7, 784:20, 794:13
flat [1] - 763:14
flight [7] - 737:23, 737:25,

738:1, 771:2, 772:7, 776:1, 778:14
flirting [1] - 708:2
flower [1] - 706:14
fluorescent [1] - 699:18
fly [1] - 727:24
flying [1] - 734:21
focus [3] - 735:22, 746:10, 761:8
follow [4] - 788:25, 789:9, 791:25
followed [2] - 784:17, 788:22
following [11] - 674:4, 737:3, 766:4, 767:1, 767:11, 768:1, 768:6, 769:1, 769:15, 770:1, 784:23
follows [4] - 684:25, 697:1, 717:16, 770:4
foot [1] - 752:2
forget [1] - 714:25
form [5] - 691:21, 743:10, 793:21, 793:22, 794:1
forth [1] - 778:24
forward [2] - 705:12, 706:11
four [7] - 686:16, 716:24, 736:1, 736:2, 736:5, 770:17, 776:7
fourth [1] - 699:5
framed [1] - 681:20
framework [1] - 698:24
Frank [1] - 684:11
free [6] - 686:13, 686:19, 686:21, 736:4, 736:6, 736:10
fresh [2] - 714:17, 716:18
Friday [1] - 687:22
friend [2] - 724:12, 779:20
friendly [2] - 719:11, 719:15
friends [2] - 697:13, 719:10
front [11] - 722:17, 746:24, 747:17, 751:5, 751:6, 751:11, 751:20, 752:2, 761:1, 778:13, 784:16
fruit [4] - 765:11, 765:12, 765:14, 765:15
Fucking [1] - 739:16
full [2] - 701:2, 703:3
fun [4] - 688:25, 749:16, 750:23, 777:7
function [1] - 757:4
funny [2] - 706:17, 747:9

**G**

G-A-M-A-C-H-E [1] - 702:11
Gamache [3] - 702:9, 702:11, 706:8
game [2] - 708:16, 711:12
Gay [8] - 699:25, 720:21, 729:4, 729:5, 729:7, 764:3, 764:10, 773:19
gay [25] - 674:11, 686:3, 690:14, 690:23, 691:19, 692:14, 693:5,

697:8, 699:13, 700:6, 701:2, 701:3, 705:17, 706:23, 706:24, 707:5, 708:6, 708:11, 720:24, 721:1, 728:19, 764:12, 773:11, 773:14, 778:9
gays [1] - 772:21
gear [1] - 727:10
gee [1] - 747:6
gender [2] - 681:14, 681:19
generally [2] - 723:16, 757:7
gestures [1] - 710:25
gesundheit [3] - 715:2, 715:14, 715:15
girl [7] - 687:21, 726:11, 752:12, 752:13, 753:12, 777:18, 777:20
girlfriend [18] - 705:21, 707:22, 725:3, 725:4, 732:2, 743:24, 743:25, 744:1, 744:13, 744:15, 744:18, 744:19, 746:17, 747:1, 747:18, 748:10, 748:15, 754:15
girlfriend's [2] - 738:10, 746:11
girls [1] - 777:1
given [3] - 705:13, 712:11, 713:22
Gleeson [1] - 767:4
goggles [1] - 734:10
goofy [3] - 749:15, 749:18
government [1] - 789:12
grant [1] - 698:20
grapevine [1] - 729:21
great [5] - 692:25, 714:13, 716:15, 717:7, 772:18, 772:22
gregarious [1] - 779:1
GREGORY [1] - 669:14
ground [8] - 681:9, 686:10, 693:11, 694:19, 735:24, 763:11, 763:13, 771:24
grounds [5] - 678:25, 681:10, 698:14, 769:3, 774:11
group [3] - 739:15, 743:12, 782:20
guarantee [2] - 782:20, 758:22
guess [15] - 672:4, 686:20, 701:16, 702:2, 710:13, 719:12, 720:12, 725:17, 725:21, 732:4, 732:6, 734:21, 787:17, 792:21, 796:9
guessing [1] - 701:13
guy [13] - 689:18, 722:6, 726:12, 731:20, 746:18, 747:8, 751:22, 758:16, 759:7, 771:23, 772:16, 773:10, 777:20
guys [3] - 771:19, 782:18, 782:21
gynecologists [1] - 707:12

**H**

habit [2] - 683:2, 715:10
hair [2] - 683:11, 731:20
hallway [1] - 741:17

**hamming** [1] - 763:24
**Hamptons** [2] - 772:17, 772:19
**hand** [8] - 731:1, 732:13, 733:11, 733:22, 745:18, 751:18, 752:21, 777:10
**Handing** [1] - 683:20
**handling** [1] - 711:15
**hands** [8] - 700:9, 723:17, 733:7, 733:8, 733:14, 749:4, 756:23, 762:24
**handsome** [1] - 772:16
**happy** [9] - 682:20, 708:21, 726:1, 757:21, 757:23, 757:25, 758:2, 781:18, 782:25
**harassment** [1] - 706:10
**hard** [2] - 779:19, 779:24
**harness** [3] - 762:20, 762:21, 762:22
**hat** [1] - 779:16
**head** [1] - 686:1
**hear** [10] - 728:18, 729:19, 729:20, 730:22, 746:6, 746:9, 753:24, 778:5, 778:9, 794:7
**heard** [10] - 685:18, 692:11, 693:22, 729:21, 746:22, 747:3, 787:2, 789:23, 791:20
**hearing** [1] - 675:14
**hearsay** [9] - 671:2, 672:24, 673:3, 673:11, 675:24, 679:24, 724:15, 774:24, 775:2
**height** [1] - 759:19
**held** [2] - 691:18, 707:7
**hell** [1] - 707:2
**hello** [1] - 741:21
**helmet** [4] - 760:7, 760:8, 760:9, 779:17
**hereby** [2] - 674:3, 696:25
**herein** [3] - 674:3, 696:25, 703:4
**heterosexual** [3] - 706:3, 708:13, 708:14
**hide** [1] - 778:7
**high** [2] - 759:18, 760:1
**highlight** [1] - 793:24
**highlighted** [1] - 670:13
**highly** [5] - 671:22, 675:3, 710:10, 711:19, 772:1
**himself** [10] - 699:25, 720:20, 728:18, 728:21, 729:4, 729:6, 764:9, 772:4, 773:19, 778:9
**hips** [2] - 700:10, 733:15
**hire** [1] - 701:1
**hired** [10] - 689:16, 689:17, 691:25, 700:1, 700:20, 706:22, 771:21, 781:13, 781:17
**hires** [1] - 700:22
**hiring** [1] - 707:10
**history** [1] - 689:5
**hitting** [2] - 700:9, 748:9
**Hold** [1] - 730:19
**hold** [8] - 731:1, 742:18, 745:12, 745:18, 762:22, 784:25, 795:14

**holding** [4] - 683:2, 683:5, 762:20, 762:21
**holds** [1] - 776:5
**home** [5] - 749:16, 774:22, 784:11, 788:6, 788:11
**honestly** [1] - 725:12
**Honor** [35] - 670:17, 671:8, 671:11, 671:12, 672:13, 673:4, 674:9, 680:6, 680:18, 683:21, 688:6, 691:7, 695:7, 697:21, 698:16, 698:22, 698:25, 699:3, 703:1, 704:14, 704:24, 709:6, 714:19, 717:8, 730:6, 730:12, 731:3, 735:1, 736:19, 753:23, 754:17, 774:14, 785:20, 785:22, 791:15
**Honor's** [1] - 705:4
**HONORABLE** [1] - 669:11
**hooks** [1] - 751:11
**hope** [2] - 738:4, 738:5
**horrible** [2] - 714:14, 716:15
**hour** [3] - 687:13, 694:12, 734:9
**hours** [3] - 769:6, 789:7, 789:8
**house** [1] - 738:10
**housewife** [1] - 777:1
**housing** [1] - 738:11
**Human** [4] - 699:9, 703:9, 704:8, 704:11
**human** [1] - 698:23
**humor** [1] - 747:21
**hundred** [1] - 778:3
**hundreds** [1] - 736:18
**hurdle** [1] - 701:4
**hurt** [1] - 692:1
**husband** [2] - 722:17, 722:23

---

**I**

**id** [1] - 673:18
**Idaho** [1] - 782:19
**identified** [1] - 703:24
**identify** [5] - 678:7, 683:16, 730:7, 730:15, 730:23
**idiot** [1] - 749:19
**II** [1] - 790:13
**III** [1] - 791:4
**imagine** [2] - 705:9, 736:18
**impart** [1] - 700:23
**impeach** [1] - 713:14
**implying** [1] - 746:25
**impression** [1] - 671:24
**impressions** [1] - 688:15
**improperly** [2] - 691:13, 691:14
**inappropriate** [7] - 685:25, 709:18, 710:24, 711:7, 711:8, 715:6, 787:19
**inappropriately** [1] - 780:19
**inc** [1] - 699:1
**INC** [1] - 669:6
**incident** [3] - 774:5, 774:7, 774:9

**include** [2] - 794:22, 797:9
**included** [2] - 791:8, 794:17
**including** [2] - 674:17, 689:5
**inconsistencies** [1] - 675:17
**inconsistency** [1] - 682:13
**inconsistent** [2] - 682:3, 682:16
**incorporated** [1] - 696:24
**increasingly** [1] - 732:3
**independent** [3] - 718:7, 739:8
**indicate** [1] - 699:13
**indicated** [2] - 753:12, 797:10
**indicates** [1] - 702:22
**indicating** [1] - 702:14
**indication** [2] - 683:22, 705:14
**individual** [1] - 683:25
**individuals** [1] - 711:20
**industry** [3] - 674:10, 674:23, 697:7
**inference** [5] - 699:6, 700:19, 702:16, 706:20, 794:23
**influence** [1] - 708:6
**information** [15] - 677:7, 677:22, 677:24, 684:3, 700:7, 705:2, 705:21, 708:12, 708:18, 710:2, 711:2, 711:4, 780:25, 786:21
**injury** [2] - 674:17, 697:14
**inoperative** [2] - 795:16, 795:24
**inquire** [1] - 793:2
**inquired** [1] - 748:5
**insofar** [1] - 706:2
**instances** [1] - 689:6
**instead** [1] - 762:24
**instruct** [5] - 756:10, 762:21, 789:3, 789:4
**instructed** [1] - 680:18
**instruction** [10] - 675:25, 681:25, 790:15, 790:22, 791:6, 792:3, 792:11, 792:15, 793:5, 793:25
**instructions** [8] - 788:15, 789:24, 790:6, 790:8, 790:11, 790:16, 790:25, 791:13
**instructor** [9] - 689:18, 718:15, 718:16, 719:3, 726:12, 771:3, 771:6, 772:13, 776:6
**instructors** [5] - 688:25, 693:8, 700:18, 756:13, 778:23
**insufficient** [2] - 702:7, 702:16
**insurance** [3] - 676:7, 676:22, 696:5
**Insurance** [1] - 676:18
**intent** [4] - 702:17, 710:9, 711:10, 711:14
**intentional** [5] - 703:11, 703:12, 703:13, 704:21, 715:12
**intentionality** [3] - 710:24, 711:7, 712:7
**interacted** [1] - 710:25
**interacting** [2] - 697:13, 750:3
**interaction** [2] - 711:21, 776:13

**interest** [2] - 751:14, 772:12
**interpreted** [2] - 702:14, 707:19
**interrogatories** [1] - 794:15
**interrupt** [1] - 754:25
**introduce** [7] - 676:10, 720:20, 729:4, 735:2, 772:4, 773:19
**introduced** [6] - 688:7, 699:25, 720:22, 720:23, 730:6, 764:9
**investigate** [1] - 706:9
**investigated** [2] - 690:6, 701:7
**investigation** [5] - 687:17, 701:9, 702:8, 702:16, 702:20
**inveterate** [2] - 740:4, 740:6
**invidious** [1] - 700:24
**involved** [2] - 721:3, 721:5
**irrelevant** [1] - 678:4
**ISLAND** [1] - 669:7
**Island** [27] - 690:24, 693:19, 695:21, 718:5, 718:9, 718:14, 718:19, 718:23, 719:4, 719:7, 719:17, 722:24, 727:7, 737:6, 737:7, 740:22, 741:2, 770:14, 771:1, 771:16, 772:9, 772:13, 772:20, 773:11, 773:22, 781:13, 782:16
**Island's** [1] - 738:21
**Islip** [2] - 669:5, 669:23
**issue** [26] - 670:6, 671:3, 676:2, 679:9, 680:5, 684:16, 696:20, 701:5, 702:24, 706:9, 708:6, 708:11, 709:2, 710:1, 710:3, 710:6, 710:12, 711:25, 712:2, 721:7, 730:1, 785:20, 786:13, 786:19, 796:7, 797:14
**issues** [3] - 685:3, 702:10, 791:6
**itself** [2] - 711:6, 762:8

---

**J**

**jeopardy** [1] - 689:10
**Jersey** [1] - 772:10
**jester** [1] - 779:16
**job** [20] - 692:22, 693:10, 693:11, 693:16, 697:4, 725:17, 725:20, 735:22, 738:22, 738:23, 742:9, 742:10, 742:12, 742:20, 742:21, 746:14, 777:6, 791:2
**JOHNSON** [2] - 669:21, 724:15
**joint** [1] - 769:5
**joke** [2] - 746:22, 779:5
**jokes** [2] - 721:6, 784:15
**joking** [2] - 721:2, 778:10
**JOSEPH** [1] - 669:11
**judge** [21] - 675:13, 678:12, 679:15, 687:3, 705:12, 716:4, 717:4, 721:21, 729:24, 765:24, 767:4, 767:10, 769:2, 780:1, 783:10, 783:12, 784:1, 784:14, 790:17, 795:4, 797:25
**JUDGE** [1] - 669:11

8

**judgment** [9] - 671:10, 671:17, 671:22, 698:19, 698:21, 701:13, 792:14, 792:15, 795:12
**jump** [24] - 687:18, 687:19, 690:2, 723:23, 724:1, 724:14, 724:21, 726:20, 731:22, 731:24, 732:1, 733:6, 734:22, 735:2, 735:13, 735:23, 755:20, 773:9, 775:8, 777:22, 778:6, 782:1, 782:20, 783:9
**jumped** [7] - 682:18, 727:1, 727:2, 757:24, 781:19, 781:25, 782:6
**jumper** [1] - 709:19
**jumping** [23] - 670:15, 674:6, 697:3, 697:12, 700:17, 724:4, 725:3, 726:22, 726:24, 726:25, 727:3, 727:6, 727:18, 728:4, 728:10, 728:11, 732:3, 776:10, 781:24, 782:4, 782:9, 782:15
**jumps** [11] - 697:10, 724:10, 724:18, 724:25, 727:17, 728:1, 728:2, 736:18, 772:2, 773:15, 778:20
**juries** [1] - 701:14
**jurisdictional** [1] - 795:17
**juror** [2] - 682:8, 715:1
**jurors** [2] - 670:4, 715:8
**jurors'** [1] - 791:17
**Jury** [1] - 669:11
**jury** [38] - 676:1, 677:13, 677:14, 677:17, 680:18, 681:23, 684:19, 685:1, 698:9, 702:1, 702:19, 703:21, 706:5, 707:20, 708:25, 709:6, 711:6, 715:11, 715:13, 715:16, 745:10, 758:4, 769:13, 784:11, 784:13, 784:16, 784:24, 784:25, 787:15, 788:3, 788:4, 789:17, 790:4, 790:16, 791:11, 792:2, 792:10, 792:14

## K

**K-E-L-L-I-N-G-E-R** [1] - 770:8
**Kansas** [1] - 772:8
**keep** [14] - 675:14, 725:21, 726:1, 733:6, 733:8, 733:14, 734:20, 738:22, 738:23, 749:3, 753:2, 769:13, 773:8
**keeps** [1] - 697:12
**Kellinger** [8] - 709:14, 738:13, 743:21, 767:2, 768:3, 770:7, 770:11, 770:13
**KELLINGER** [2] - 770:2, 799:8
**Kengle** [14] - 685:18, 687:16, 687:23, 694:3, 707:21, 710:21, 712:5, 735:2, 736:17, 744:8, 744:14, 758:9, 762:25, 765:19
**Kengle's** [4] - 688:18, 708:3, 746:25, 762:18

**kept** [1] - 787:20
**key** [1] - 778:15
**kind** [17] - 674:11, 688:23, 697:8, 734:19, 741:5, 754:4, 779:17
**kiss** [2] - 762:5, 762:7
**kissing** [1] - 762:11
**Kiwi** [5] - 765:3, 765:8, 765:10, 765:16, 765:17
**kiwi** [4] - 765:14, 765:15, 765:17
**kiwis** [1] - 764:25
**knees** [2] - 763:11, 763:13
**knit** [1] - 739:12
**knowing** [5] - 689:8, 701:1, 703:3, 706:22, 796:10
**knowledge** [4] - 710:9, 720:24, 729:5, 753:18
**knows** [7] - 696:7, 720:15, 729:12, 752:12, 752:13, 752:16, 787:12

## L

**Labor** [1] - 676:18
**lack** [1] - 711:10
**Lake** [1] - 770:22
**land** [3] - 735:24, 772:1, 773:10
**landed** [1] - 763:14
**landing** [5] - 736:15, 757:12, 763:7, 774:5, 774:7
**language** [19] - 674:15, 755:23, 755:24, 790:10, 790:19, 790:23, 791:16, 792:5, 792:8, 792:9, 792:11, 792:12, 792:13, 792:24, 793:3, 793:9, 793:10, 793:11
**lap** [2] - 751:4, 751:7
**last** [11] - 670:18, 670:22, 672:3, 719:14, 726:17, 753:24, 758:18, 770:17, 780:10, 780:11, 796:1
**laugh** [1] - 778:17
**laughed** [1] - 759:9
**LAURA** [1] - 669:21
**Law** [4] - 699:9, 703:9, 704:9, 704:11
**law** [14] - 681:25, 698:19, 703:5, 703:7, 704:13, 704:14, 704:17, 704:19, 788:15, 789:24, 791:2, 791:7, 792:16, 792:25
**lawn** [1] - 771:3
**laws** [1] - 698:23
**lawsuit** [1] - 683:23
**lawyer** [5] - 691:18, 691:23, 691:24, 741:23, 742:20
**lawyers** [3] - 715:9, 788:15, 789:1
**lay** [1] - 682:8
**leading** [1] - 687:2
**lease** [1] - 738:21
**least** [5] - 674:14, 679:20, 711:24, 720:5, 762:19

**leave** [6] - 693:1, 723:16, 723:20, 743:6, 756:19, 757:7
**led** [1] - 677:10
**left** [13] - 698:9, 718:20, 718:21, 718:23, 731:10, 740:11, 743:7, 743:12, 743:17, 743:23, 779:24, 784:13, 790:4
**legal** [1] - 704:5
**legally** [1] - 782:19
**legitimate** [9] - 699:15, 700:15, 701:5, 702:2, 705:16, 707:10, 708:5, 733:1, 791:16
**length** [2] - 702:9, 761:5
**lengthy** [2] - 725:10, 725:14
**less** [3] - 719:15, 776:24, 777:21
**letter** [2] - 677:10, 677:15
**letters** [1] - 670:7
**letting** [1] - 713:9
**level** [1] - 797:13
**liability** [4] - 696:21, 794:5, 794:10, 796:6
**liable** [1] - 691:19
**life** [3] - 748:7, 749:4, 775:10
**lifestyle** [1] - 773:11
**line** [9] - 691:4, 714:5, 714:11, 716:10, 771:2, 772:7, 776:1, 792:4, 793:17
**lines** [6] - 713:3, 713:16, 713:18, 716:21, 717:5, 793:5
**linger** [1] - 670:14
**lips** [1] - 749:5
**listen** [1] - 787:22
**live** [4] - 744:5, 758:21, 758:22
**lived** [1] - 772:10
**lives** [1] - 744:6
**load** [4] - 774:10, 776:3, 776:8
**loads** [1] - 776:5
**located** [1] - 718:21
**lodged** [1] - 724:11
**logical** [1] - 787:22
**LONG** [1] - 669:7
**look** [25] - 678:6, 682:21, 687:12, 692:4, 704:25, 706:5, 713:25, 716:23, 716:25, 750:19, 750:22, 751:13, 751:19, 753:3, 755:21, 757:21, 758:11, 760:15, 761:20, 761:23, 763:7, 793:13, 797:1, 797:5
**looked** [5] - 708:7, 745:1, 794:4, 795:20, 796:1
**looking** [14] - 688:23, 707:22, 714:8, 744:13, 744:19, 751:18, 752:14, 752:15, 752:20, 752:21, 753:2, 771:19, 772:15
**looks** [19] - 686:25, 687:9, 687:14, 694:12, 739:23, 740:1, 750:24, 751:16, 755:8, 755:19, 756:1, 756:2, 757:9, 757:22, 757:23, 757:25, 758:2, 760:19, 760:21

**loose** [1] - 707:2
**loss** [3] - 674:17, 697:14, 796:19
**lost** [1] - 790:24
**loud** [1] - 736:9
**love** [2] - 772:17, 783:7
**Love** [1] - 739:16
**lump** [1] - 750:2
**lunch** [13] - 705:11, 767:5, 783:11, 783:15, 784:7, 785:1, 788:6, 789:4, 789:5, 789:11, 789:14, 789:17
**lunchtime** [2] - 680:12, 789:13

## M

**mails** [1] - 679:14
**main** [1] - 693:10
**maintain** [1] - 720:6
**major** [1] - 796:23
**majority** [1] - 705:13
**maker** [1] - 788:2
**manner** [4] - 700:5, 710:25, 721:10, 776:2, 778:10
**mannerism** [1] - 684:15
**Marko** [1] - 733:23
**marko** [1] - 734:3
**Markovich** [1] - 733:23
**matter** [4] - 687:6, 692:23, 698:19, 704:6
**maximum** [3] - 676:25, 677:9, 696:4
**Maynard** [29] - 676:8, 678:6, 679:5, 680:19, 680:21, 680:23, 684:14, 684:17, 684:20, 685:6, 685:9, 688:11, 700:1, 701:1, 701:6, 701:25, 709:24, 710:2, 710:14, 711:3, 715:24, 737:23, 786:18, 786:20, 786:22, 786:23, 786:24, 787:7, 787:8
**MAYNARD** [12] - 669:7, 684:22, 697:5, 700:20, 706:22, 708:4, 708:14, 737:11, 737:19, 773:4, 793:14, 799:2
**maynard** [2] - 713:13, 776:19
**Maynard's** [5] - 677:20, 679:18, 699:14, 702:6, 787:13
**McDonnell** [2] - 698:24, 699:3
**meals** [1] - 738:7
**mean** [19] - 686:6, 692:18, 693:12, 715:4, 715:9, 721:14, 727:16, 727:19, 736:13, 749:14, 750:12, 752:17, 759:17, 776:4, 777:5, 778:25, 779:19, 787:5, 796:5
**means** [3] - 752:16, 760:23, 760:24
**meant** [1] - 740:12
**mechanical** [1] - 669:25
**meet** [4] - 702:22, 771:8, 777:9, 788:16
**meeting** [3] - 692:5, 692:12,

772:24
**meltdown** [1] - 775:20
**members** [1] - 685:1
**membership** [1] - 699:7
**men** [2] - 707:15, 707:17
**mentally** [1] - 750:12
**mentioned** [3] - 706:25, 707:1, 794:5
**mentioning** [4] - 708:13, 708:14, 785:12, 787:20
**menu** [1] - 789:15
**met** [10] - 718:2, 718:4, 718:5, 771:11, 771:12, 771:18, 771:24, 772:6, 772:8, 782:24
**Michelle** [1] - 789:15
**mid-2000's** [1] - 728:11
**midday** [1] - 687:22
**middle** [4] - 715:2, 727:5, 777:1, 782:13
**middle-aged** [1] - 777:1
**midwest** [1] - 772:9
**might** [11] - 671:21, 672:6, 683:9, 683:10, 683:11, 733:11, 742:7, 748:9, 749:5, 764:16, 777:10
**miles** [4] - 687:13, 694:11, 694:13, 734:9
**military** [4] - 718:7, 718:20, 722:7, 740:14
**mind** [12] - 670:21, 670:23, 671:3, 673:12, 675:25, 676:1, 679:10, 710:4, 710:17, 711:4, 711:23, 712:1
**mine** [3] - 724:12, 757:17, 791:2
**minute** [4] - 698:7, 730:14, 736:4, 763:7
**minutes** [17] - 680:10, 686:16, 686:18, 686:20, 709:7, 715:18, 736:1, 736:3, 736:5, 736:21, 750:4, 767:3, 777:11, 784:8, 784:9, 784:11, 784:21
**mislead** [1] - 704:24
**misleading** [1] - 681:24
**mistake** [2] - 711:10, 711:16
**misunderstanding** [2] - 711:11, 711:16
**modified** [2] - 790:17, 794:18
**moment** [2] - 670:10, 766:2
**monetary** [1] - 790:25
**month** [3] - 713:21, 714:10, 714:12
**months** [2] - 716:11, 723:4
**monumental** [1] - 775:9
**Moore** [4] - 785:6, 785:17, 785:21, 787:12
**morning** [10] - 685:1, 685:2, 685:3, 685:16, 685:17, 717:25, 737:1, 741:15, 758:10, 790:3
**most** [5] - 672:2, 707:11, 722:13, 765:11, 776:5
**mostly** [1] - 733:10

**motion** [6] - 671:10, 671:17, 680:15, 698:18, 710:23, 795:12
**motions** [3] - 698:11, 698:12, 705:5
**motivation** [1] - 700:25
**motorcycle** [1] - 771:18
**mouth** [33] - 688:22, 708:1, 732:18, 732:22, 732:25, 733:2, 748:23, 749:2, 749:3, 749:4, 785:10, 785:12, 785:13, 785:14, 785:16, 785:18, 785:19, 786:16, 786:18, 786:19, 786:23, 787:1, 787:4, 787:10, 787:20, 787:23
**move** [4] - 678:16, 729:23, 770:19, 770:21
**moved** [1] - 770:18
**movement** [2] - 753:10, 754:6
**movement-wise** [1] - 754:6
**moving** [2] - 694:13, 733:13
**mow** [1] - 771:3
**MR** [233] - 670:16, 671:7, 672:1, 672:8, 672:12, 672:14, 672:16, 672:21, 673:4, 673:16, 673:24, 674:9, 674:15, 674:24, 675:12, 676:3, 676:17, 676:24, 677:5, 677:19, 678:2, 678:4, 678:12, 679:13, 679:14, 679:20, 679:24, 680:3, 680:5, 680:10, 680:17, 680:24, 681:3, 683:1, 683:14, 683:18, 683:21, 684:6, 684:20, 685:15, 687:2, 687:5, 687:8, 688:6, 688:10, 690:9, 690:12, 690:16, 690:18, 691:7, 691:11, 691:15, 691:17, 691:20, 691:22, 692:16, 693:6, 693:25, 694:2, 694:6, 694:9, 694:10, 694:25, 695:6, 695:10, 695:15, 695:17, 695:19, 695:22, 695:25, 696:6, 696:9, 696:10, 696:14, 696:23, 697:19, 697:21, 697:25, 698:16, 703:16, 703:23, 703:24, 704:2, 704:12, 704:19, 704:23, 705:1, 706:1, 709:3, 709:5, 709:11, 709:13, 709:17, 709:21, 709:25, 712:15, 712:19, 712:23, 713:3, 713:5, 713:16, 713:18, 713:25, 714:3, 714:7, 714:10, 714:19, 714:24, 714:25, 715:5, 715:14, 716:4, 716:9, 717:12, 717:24, 721:20, 721:24, 721:25, 724:17, 726:16, 726:19, 728:23, 729:1, 729:10, 729:13, 729:16, 729:23, 730:2, 730:5, 730:11, 730:14, 730:24, 731:5, 731:6, 733:3, 733:5, 735:1, 735:5, 735:8, 736:19, 736:21, 737:5, 743:8, 743:11, 743:15, 745:15, 748:11, 748:13, 748:17, 748:21, 752:24, 753:1, 753:23,

754:3, 754:17, 755:1, 755:5, 755:13, 755:17, 758:3, 761:9, 763:16, 763:23, 764:7, 764:13, 764:15, 764:19, 764:21, 765:22, 765:24, 766:2, 767:2, 767:8, 767:10, 768:3, 768:4, 769:2, 769:14, 770:10, 774:14, 774:24, 775:1, 775:7, 776:15, 776:22, 780:1, 780:4, 780:7, 781:2, 781:4, 783:2, 783:10, 783:12, 783:14, 783:18, 783:22, 784:1, 784:3, 784:6, 784:14, 784:20, 785:2, 785:6, 785:9, 785:20, 786:7, 786:24, 787:3, 787:17, 791:15, 792:21, 793:2, 793:19, 793:21, 794:14, 795:3, 795:6, 795:8, 795:10, 795:11, 795:13, 795:23, 796:19, 797:19, 797:22, 797:25, 798:1, 799:3, 799:4, 799:6, 799:7, 799:9, 799:10
**MS** [1] - 724:15
**multiPlan** [1] - 699:1
**multiple** [1] - 689:15
**mustache** [1] - 683:10

## N

**name** [6] - 717:17, 731:12, 764:3, 769:4, 770:5, 771:9
**national** [1] - 765:1
**near** [1] - 773:10
**necessarily** [1] - 727:19
**necessary** [2] - 672:17, 702:23
**necessity** [1] - 759:4
**need** [18] - 670:11, 675:19, 680:7, 680:20, 680:21, 680:23, 692:4, 698:6, 712:22, 713:25, 726:1, 736:21, 747:14, 747:15, 788:14, 789:13, 789:14, 795:16
**needed** [2] - 725:18, 744:15
**nefarious** [1] - 683:8
**negative** [1] - 777:4
**neutral** [2] - 752:4, 752:7
**never** [11] - 703:18, 713:10, 726:5, 748:5, 750:11, 757:5, 765:16, 765:17, 769:3, 769:4, 786:11
**new** [8] - 677:6, 687:7, 727:11, 728:5, 764:22, 764:24, 765:20
**NEW** [1] - 669:1
**New** [19] - 669:15, 669:17, 669:20, 669:23, 694:4, 703:8, 719:23, 722:9, 722:10, 772:10, 781:10, 790:15, 791:8, 792:12, 792:25, 793:10, 793:12
**next** [9] - 681:17, 701:5, 716:20, 754:19, 754:24, 760:25, 766:1, 768:2, 780:6
**nice** [5] - 678:22, 714:17, 716:19, 731:1, 773:10

**nickname** [2] - 778:25, 779:4
**nicknames** [1] - 765:9
**night** [7] - 721:12, 721:19, 722:16, 724:13, 790:2, 796:1, 798:2
**nine** [1] - 723:4
**no-brainer** [1] - 777:20
**nobody** [1] - 684:1
**non** [3] - 678:17, 697:9, 701:17
**non-discriminatory** [1] - 701:17
**non-party** [1] - 678:17
**non-work** [1] - 697:9
**normal** [3] - 683:8, 688:24, 689:2
**normally** [1] - 686:13
**Norway** [3] - 713:21, 783:8, 783:19
**notarized** [1] - 672:20
**note** [1] - 680:3
**noted** [1] - 670:3
**nothing** [12] - 674:20, 676:2, 682:18, 683:8, 690:9, 696:10, 702:4, 708:7, 736:19, 783:10, 784:10, 787:4
**notice** [3] - 676:21, 762:18, 797:18
**notwithstanding** [1] - 705:3
**number** [5] - 670:17, 676:6, 706:4, 706:5, 730:10
**NY** [1] - 669:5

## O

**o'clock** [3] - 767:4, 788:14, 790:3
**oath** [1] - 685:10
**object** [5] - 678:24, 743:8, 780:2, 780:3, 780:4
**objection** [38] - 673:1, 678:3, 678:25, 687:2, 690:16, 691:7, 691:15, 691:20, 692:16, 693:6, 693:25, 694:6, 695:6, 695:15, 695:22, 696:6, 724:15, 726:16, 729:10, 733:3, 743:15, 748:11, 748:17, 752:24, 758:3, 761:9, 763:16, 764:7, 764:13, 764:19, 769:3, 769:9, 774:24, 776:15, 781:2, 783:2, 792:22
**objectionable** [1] - 674:21
**objections** [1] - 785:3
**obligation** [1] - 791:25
**oblivious** [2] - 751:22, 751:24
**observations** [1] - 711:20
**observe** [9] - 724:18, 724:21, 724:24, 726:7, 726:10, 776:9, 776:12, 776:23, 778:19
**observed** [6] - 671:11, 671:12, 671:13, 710:13, 735:14, 786:21
**obvious** [2] - 726:15, 751:21
**obviously** [14] - 673:20, 675:19, 679:6, 698:11, 698:13, 707:16,

708:25, 710:9, 713:6, 729:8, 790:23, 791:11, 792:13, 796:16
**occasion** [9] - 722:14, 722:18, 723:23, 724:10, 724:18, 724:21, 724:24, 776:9, 776:12
**occasionally** [1] - 719:22
**occasions** [5] - 715:1, 720:4, 725:1, 725:6, 740:19
**occur** [1] - 725:6
**occurred** [8] - 683:24, 699:6, 737:3, 767:1, 768:1, 769:1, 770:1, 784:23
**October** [2] - 669:8, 798:3
**OF** [2] - 669:1, 669:10
**offered** [1] - 703:18
**offering** [1] - 749:3
**Official** [1] - 669:22
**offset** [2] - 754:2, 761:15
**often** [3] - 747:20, 765:4, 778:11
**old** [1] - 723:3
**once** [10] - 700:21, 719:24, 720:5, 731:7, 736:11, 757:7, 765:7, 775:10, 780:18
**one** [65] - 670:8, 670:11, 675:14, 675:15, 678:13, 679:20, 679:23, 680:1, 680:5, 683:1, 683:19, 683:24, 684:7, 684:10, 689:19, 689:20, 695:11, 705:19, 707:1, 707:14, 709:9, 709:15, 709:20, 709:22, 714:1, 714:4, 714:9, 720:21, 722:14, 722:18, 725:7, 730:9, 730:10, 748:5, 749:22, 761:4, 765:10, 774:8, 774:21, 775:1, 776:6, 776:10, 783:12, 783:13, 783:14, 784:17, 789:10, 790:7, 790:9, 792:10, 793:24, 794:8, 794:9, 794:22, 795:17, 795:24, 796:13, 796:14, 797:12
**ongoing** [1] - 775:18
**open** [3] - 768:1, 770:1, 773:8
**opened** [2] - 736:11, 787:18
**opening** [2] - 706:21, 710:20
**opens** [3] - 686:11, 686:12, 734:8
**operations** [1] - 778:14
**opinion** [3] - 689:1, 748:19, 781:2
**opinions** [1] - 792:10
**opportunity** [5] - 671:18, 673:13, 674:25, 675:2, 716:1
**oppose** [1] - 671:22
**opposed** [5] - 705:16, 746:11, 759:23, 761:12, 777:23
**opposing** [2] - 671:10, 671:16
**opposite** [1] - 745:21
**order** [3] - 769:6, 788:20, 788:25
**orders** [1] - 789:16
**ordinary** [1] - 724:25
**Orellana** [15] - 690:1, 707:24, 710:5, 710:19, 710:21, 711:1,

711:11, 712:4, 730:11, 754:13, 762:4, 762:25, 763:11, 763:14
**organization** [2] - 701:22, 739:22
**orientation** [20] - 681:11, 681:13, 681:16, 681:19, 681:22, 682:6, 699:8, 699:11, 700:11, 700:12, 700:15, 705:7, 705:15, 720:14, 720:19, 772:25, 778:20, 790:13, 791:10, 794:6
**originally** [2] - 764:11, 772:8
**otherwise** [1] - 708:21
**ought** [1] - 678:9
**out-of-court** [1] - 673:11
**outspoken** [1] - 707:21
**outstanding** [1] - 670:6
**outweighed** [2] - 710:11, 712:11
**over-argue** [1] - 673:5
**over-sharing** [3] - 700:2, 723:19, 723:21
**overcome** [1] - 701:4
**overcoming** [1] - 673:1
**overruled** [2] - 693:7, 721:22
**overwhelming** [2] - 705:13, 705:23
**own** [4] - 699:25, 722:21, 724:5, 741:1
**owner's** [1] - 791:25

---

## P

**P.C** [1] - 669:19
**pack** [1] - 771:3
**page** [18] - 691:3, 691:4, 696:1, 713:2, 713:3, 713:15, 713:16, 713:18, 714:2, 714:5, 714:11, 716:10, 716:21, 717:4, 766:4, 767:11, 768:6, 769:15
**paid** [2] - 737:23, 796:10
**pain** [2] - 785:19, 787:24
**parachute** [10] - 686:7, 686:11, 686:12, 686:14, 686:15, 686:22, 727:24, 734:8, 736:5, 736:11
**paragraph** [7] - 670:16, 670:18, 674:6, 675:8, 681:8, 681:15, 683:2
**parallel** [1] - 761:14
**pardon** [1] - 747:2
**Parshis** [1] - 701:21
**Part** [3] - 790:8, 790:12, 791:4
**part** [15] - 680:17, 693:11, 694:22, 700:2, 700:4, 717:2, 725:20, 741:1, 741:5, 741:7, 753:24, 758:10, 772:14, 790:13, 790:21
**partially** [1] - 762:19
**particular** [6] - 675:20, 678:18, 682:14, 707:9, 739:22, 797:13
**parties** [1] - 730:8

**partner** [2] - 719:7, 741:1
**party** [1] - 678:17
**partying** [1] - 721:15
**passage** [2] - 713:22, 716:20
**passed** [1] - 675:23
**passenger** [12] - 725:3, 732:5, 735:22, 745:5, 751:4, 754:8, 754:9, 754:12, 759:8, 763:10, 763:13, 776:6
**passengers** [12] - 724:22, 724:25, 726:8, 749:22, 750:10, 756:10, 756:13, 762:22, 776:8, 776:10, 776:13, 777:14
**passing** [1] - 779:21
**past** [2] - 678:19, 703:13
**patience** [1] - 788:5
**pattern** [2] - 790:16, 792:2
**pause** [2] - 731:2, 732:13
**pay** [9] - 737:25, 738:1, 794:9, 794:21, 795:19, 796:3, 796:15, 796:20, 796:21
**paying** [4] - 738:7, 738:11, 749:24, 751:13
**penalty** [4] - 672:8, 672:19, 674:4, 696:25
**pending** [1] - 794:12
**people** [30] - 692:20, 693:4, 693:8, 697:3, 705:19, 707:18, 720:18, 721:15, 722:12, 723:16, 725:11, 725:21, 726:1, 730:16, 743:17, 743:18, 743:23, 747:19, 748:4, 748:5, 749:4, 757:7, 764:12, 765:11, 773:20, 775:8, 776:5, 776:20, 777:8, 789:6
**perform** [1] - 697:4
**performance** [1] - 771:2
**perhaps** [3] - 676:19, 726:5, 784:7
**period** [9] - 692:2, 720:9, 771:8, 782:10, 794:9, 796:13, 796:14, 797:12
**perjury** [4] - 672:9, 672:19, 674:4, 697:1
**permitted** [1] - 708:24
**person** [9] - 684:9, 699:22, 700:22, 705:19, 731:11, 748:14, 750:24, 777:22, 777:23
**person's** [1] - 769:4
**personal** [5] - 674:17, 697:14, 708:11, 708:12, 708:18
**personnel** [4] - 701:12, 792:5, 792:12, 793:8
**pertaining** [1] - 786:11
**pervert** [2] - 674:11, 697:8
**phone** [4] - 719:22, 720:8, 725:10, 780:14
**photo** [2] - 786:14, 787:6
**phrase** [2] - 747:3, 747:6
**physical** [6] - 672:19, 722:2, 722:5, 722:16, 723:8, 723:13

**picture** [10] - 683:3, 683:12, 683:14, 683:22, 684:2, 684:5, 684:6, 750:19, 750:20
**pictures** [1] - 706:6
**pieces** [1] - 713:8
**pilot** [2] - 778:12, 778:16
**pink** [1] - 699:19
**pinpoint** [1] - 794:15
**PJI** [3] - 790:14, 792:6, 793:1
**place** [6] - 681:1, 693:1, 697:10, 714:17, 716:19, 782:19
**placed** [4] - 710:18, 711:9, 712:5
**places** [1] - 697:4
**placing** [1] - 682:7
**plain** [1] - 794:19
**plaintiff** [15] - 671:16, 674:3, 696:23, 696:25, 697:19, 698:4, 698:21, 699:17, 702:12, 710:18, 711:18, 788:21, 788:23, 788:24
**Plaintiff** [2] - 669:4, 669:14
**plaintiff's** [11] - 680:15, 699:24, 700:4, 702:5, 702:18, 705:3, 705:8, 705:10, 715:23, 715:25, 735:5
**plaintiffs** [1] - 678:16
**plane** [11] - 700:17, 735:15, 735:18, 735:23, 750:4, 759:6, 773:2, 775:8, 776:5, 777:11, 780:24
**planes** [1] - 773:7
**planned** [1] - 680:11
**play** [6] - 688:6, 732:12, 733:18, 735:6, 735:9, 781:14
**played** [29] - 688:8, 710:16, 712:12, 730:17, 731:8, 731:15, 732:15, 732:19, 733:20, 733:25, 734:5, 735:11, 749:20, 753:5, 755:3, 755:15, 757:1, 757:10, 757:19, 758:6, 758:13, 759:10, 759:14, 760:5, 760:16, 761:21, 762:2, 762:16, 763:5
**playing** [10] - 730:15, 730:22, 753:13, 753:14, 755:9, 755:18, 762:9, 762:10, 762:11, 762:13
**Plaza** [1] - 669:23
**pleading** [1] - 794:19
**pleadings** [1] - 794:18
**plenty** [1] - 789:25
**point** [29] - 673:5, 673:9, 673:25, 697:19, 699:18, 702:13, 705:13, 705:22, 708:19, 717:8, 742:1, 744:8, 750:15, 751:9, 751:10, 751:12, 751:23, 752:3, 752:23, 753:4, 757:3, 780:25, 782:18, 783:3, 786:10, 790:6, 790:9, 794:25, 795:17
**pointed** [1] - 673:16
**pointing** [2] - 749:21, 785:14

**pomp** [1] - 698:17
**pop** [2] - 751:25, 752:1
**portion** [13] - 670:9, 670:13, 670:19, 672:4, 672:6, 682:20, 682:24, 696:12, 696:17, 696:19, 712:17, 730:23, 748:22
**portions** [5] - 670:20, 673:18, 673:21, 697:22, 716:6
**posed** [1] - 716:9
**position** [7] - 671:8, 683:21, 706:8, 751:1, 751:2, 756:6, 756:7, 763:2, 795:7
**positive** [1] - 777:4
**possible** [2] - 698:17, 789:12
**possibly** [3] - 712:7, 723:20, 739:21
**posted** [1] - 790:6
**potatoes** [1] - 778:2
**potential** [3] - 676:25, 677:9, 696:5
**potentially** [1] - 679:7
**pounds** [1] - 778:3
**practice** [3] - 698:10, 705:4, 790:15
**precisely** [2] - 702:18, 756:7
**preclude** [2] - 678:17, 769:10
**preference** [2] - 707:8, 763:3
**prejudice** [2] - 710:12, 712:11
**prejudicial** [5] - 671:22, 675:3, 787:21, 797:9, 797:16
**present** [4] - 670:21, 716:1, 716:2, 722:4
**presentation** [3] - 788:8, 788:10, 789:22
**preserved** [1] - 698:14
**pressing** [1] - 708:1
**presumption** [1] - 704:12
**pretrial** [2] - 769:5, 769:7
**pretty** [10] - 720:8, 725:9, 726:12, 726:15, 727:2, 751:21, 790:14, 790:16, 790:21, 793:23
**previously** [2] - 670:3, 684:23
**probative** [11] - 682:2, 682:10, 684:13, 684:16, 710:10, 711:19, 786:16, 786:22, 787:11, 787:12, 788:1
**problem** [1] - 780:20
**Procedure** [1] - 698:20
**proceed** [4] - 684:20, 705:23, 715:17, 715:21
**Proceedings** [1] - 669:25
**process** [1] - 702:6
**produced** [1] - 669:25
**professional** [2] - 708:15, 776:2
**proof** [3] - 788:21, 788:24, 790:10
**propensity** [3] - 678:16, 678:23, 679:25
**proper** [2] - 789:24, 792:21
**proposed** [4] - 790:9, 790:12, 791:16, 792:24

**proposing** [1] - 793:11
**props** [1] - 778:15
**protect** [2] - 692:5, 707:6
**protected** [2] - 699:8, 791:8
**provided** [4] - 683:4, 769:3, 769:5, 789:11
**proving** [1] - 702:23
**pulled** [2] - 686:23, 687:14
**purely** [1] - 671:2
**purpose** [3] - 671:9, 678:19, 792:10
**purposes** [4] - 671:16, 672:25, 680:19, 684:3
**pursuant** [2] - 678:15, 698:19
**pursue** [4] - 718:20, 740:11, 740:12, 796:5
**purview** [2] - 791:17, 791:18
**pushed** [2] - 674:18, 697:15, 734:12
**put** [16] - 677:11, 677:15, 681:22, 683:9, 700:9, 711:13, 732:25, 749:4, 756:23, 784:14, 786:11, 787:3, 789:16, 791:6, 797:2, 797:5
**puts** [2] - 732:18, 797:18
**putting** [8] - 686:1, 732:22, 733:1, 749:2, 749:3, 762:24, 786:25, 787:23

**Q**

**queer** [1] - 778:17
**questioned** [2] - 796:11, 796:14
**questioning** [3] - 670:21, 767:3, 794:8
**questions** [12] - 686:8, 690:25, 696:9, 710:21, 713:1, 715:24, 735:10, 740:19, 765:22, 783:23, 785:3, 796:17
**quick** [1] - 698:17
**quicker** [1] - 789:18
**quickly** [1] - 789:19
**quiet** [2] - 721:3, 736:11
**quite** [6] - 728:2, 774:2, 774:6, 777:16, 778:11, 782:12
**quotation** [1] - 677:20

**R**

**raise** [2] - 732:12, 733:22
**rate** [4] - 677:6, 677:8, 757:12, 773:17
**rated** [1] - 772:1
**rather** [4] - 681:11, 711:2, 788:6, 788:14
**ratings** [2] - 773:16, 773:17
**RAY** [10] - 669:7, 697:5, 700:20, 706:22, 708:4, 708:13, 737:11, 737:19, 773:4, 793:14
**Ray's** [34] - 685:16, 725:17, 738:14, 738:20, 738:24, 739:5,

741:10, 742:10, 743:6, 743:12, 743:18, 747:24, 748:1, 771:18, 772:2, 773:5, 773:6, 773:12, 773:14, 774:8, 774:22, 775:13, 775:15, 775:18, 775:21, 775:23, 775:24, 779:10, 780:16, 780:17, 780:19, 780:21
**RAYMOND** [2] - 684:22, 799:2
**reach** [2] - 694:19, 706:8
**reached** [1] - 703:19
**reacting** [2] - 754:8, 754:10, 754:12
**read** [26] - 670:7, 672:4, 672:6, 672:8, 673:19, 673:20, 673:21, 674:2, 682:24, 696:12, 696:17, 696:18, 703:9, 712:16, 712:17, 712:20, 712:21, 712:22, 712:25, 713:1, 713:8, 714:20, 716:5, 716:6, 716:20, 756:20
**reading** [2] - 670:10, 675:7
**ready** [6] - 685:5, 715:17, 751:16, 751:19, 772:7, 797:24
**real** [1] - 796:6
**realized** [2] - 750:16, 753:8
**realizes** [1] - 752:11
**really** [12] - 686:4, 686:19, 690:8, 707:16, 708:1, 708:2, 719:21, 740:12, 772:6, 773:25, 782:14, 791:14
**reason** [28] - 679:8, 680:17, 682:12, 690:2, 701:5, 702:3, 705:16, 707:10, 716:13, 733:1, 733:14, 734:10, 734:12, 734:19, 747:20, 756:23, 775:24, 787:3, 787:5, 787:7, 787:17, 792:7, 792:19, 793:6, 793:7, 793:15
**reasonable** [1] - 748:14
**reasonably** [1] - 702:14
**reasoning** [1] - 793:18
**reasons** [4] - 697:6, 712:3, 786:1, 797:10
**reassurance** [1] - 777:8
**rebut** [1] - 711:20
**rebuttal** [6] - 784:4, 786:8, 786:9, 786:11, 788:9, 788:23
**recalculation** [1] - 677:6
**received** [7] - 687:15, 690:5, 692:2, 695:11, 701:7, 705:16, 711:3
**receiving** [2] - 676:20, 680:25
**recess** [4] - 737:2, 737:3, 784:22, 784:23
**recognize** [6] - 684:1, 694:24, 695:3, 695:8, 696:1, 731:1
**recognized** [1] - 741:18
**recognizes** [1] - 684:9
**recollection** [2] - 739:20, 792:4
**recommend** [1] - 693:2
**recommendation** [2] - 771:22, 773:3

**record** [10] - 672:4, 672:7, 673:2, 676:14, 682:7, 716:7, 717:18, 730:10, 770:6, 784:15
**recorded** [1] - 669:25
**recovery** [1] - 797:10
**redact** [1] - 672:5
**REDIRECT** [2] - 690:11, 799:4
**redirect** [6] - 678:10, 682:23, 690:10, 690:18, 765:23, 765:24
**reemployed** [1] - 720:12
**reenforced** [2] - 688:19, 688:20
**refer** [3] - 728:18, 729:6, 778:9
**reference** [3] - 677:16, 796:2, 796:8
**referenced** [1] - 796:3
**referencing** [1] - 796:4
**referred** [3] - 740:21, 764:25, 765:2
**referring** [4] - 728:21, 764:12, 765:7, 792:9
**reflect** [1] - 790:18
**reflecting** [1] - 792:16
**reflects** [1] - 793:12
**refreshes** [1] - 739:20
**regard** [2] - 705:4, 792:1
**regarding** [8] - 676:7, 700:12, 713:7, 713:8, 713:11, 715:23, 729:25, 791:20
**regardless** [2] - 693:20, 697:6, 701:17
**rehired** [3] - 691:25, 692:1, 725:9
**rehiring** [1] - 699:22
**related** [2] - 723:13, 797:13
**relates** [6] - 696:19, 696:20, 710:17, 711:11, 711:13, 711:22
**relating** [2] - 671:23
**relationship** [2] - 700:7, 719:9
**relayed** [2] - 705:21, 773:7
**release** [8] - 689:23, 703:1, 703:3, 703:6, 703:10, 704:3, 704:4
**relevance** [2] - 677:12, 763:19
**relevant** [2] - 671:3, 787:18
**remainder** [2] - 674:16, 733:18
**remarks** [1] - 711:8
**remember** [18] - 673:22, 687:19, 687:24, 694:4, 731:24, 732:1, 737:15, 741:19, 745:8, 754:21, 754:23, 765:7, 771:14, 773:21, 773:25, 781:20, 794:11, 796:3
**remind** [3] - 685:9, 687:20, 789:20
**reminder** [1] - 697:11
**reminding** [1] - 759:4
**renew** [3] - 709:1, 769:2, 769:9
**repeated** [1] - 712:6
**Reporter** [1] - 669:22
**representation** [1] - 786:3
**requested** [1] - 677:6
**require** [1] - 681:24

11

12

**requirement** [1] - 672:20
**requirements** [1] - 672:17
**reread** [1] - 691:9
**reserve** [2] - 698:11, 708:23
**reside** [1] - 770:23
**resources** [1] - 791:18
**respect** [8] - 710:4, 710:5, 710:24, 711:7, 711:14, 711:21, 712:4, 712:8
**respond** [1] - 671:5
**responded** [2] - 692:11, 795:9
**response** [6] - 673:20, 677:25, 696:3, 697:21, 716:5, 723:15
**rest** [1] - 682:25
**rested** [1] - 698:4
**resting** [2] - 712:14, 712:15
**rests** [3] - 697:20, 784:2, 784:3
**result** [1] - 796:9
**revealed** [1] - 772:24
**reviewed** [1] - 698:12
**revision** [1] - 677:7
**Revisions** [1] - 676:24
**rewind** [1] - 731:7
**Rich** [3] - 706:3, 706:18, 708:13
**RICHARD** [1] - 669:16
**ride** [3] - 686:14, 686:15, 686:20
**Riese** [1] - 701:22
**Rights** [4] - 699:9, 703:9, 704:8, 704:11
**rights** [3] - 698:23, 703:10, 704:8
**rise** [1] - 699:6
**Riverton** [1] - 738:20
**role** [1] - 781:14
**room** [5] - 721:12, 722:15, 723:20, 784:11, 789:17
**Rosana** [2] - 707:24, 760:18
**Rosana's** [1] - 688:4
**routine** [1] - 778:11
**ruined** [1] - 686:4
**Rule** [2] - 678:15, 710:22
**rule** [8] - 671:2, 673:3, 675:24, 680:23, 698:11, 698:19, 709:8, 774:22
**ruled** [3] - 675:15, 700:22, 701:21
**rules** [2] - 775:4, 791:4
**Rules** [1] - 698:20
**ruling** [11] - 673:10, 708:24, 715:7, 721:21, 786:13, 787:6, 794:24, 795:1, 797:3, 797:21
**run** [1] - 761:14

**S**

**S-H-A-W** [1] - 717:21
**sack** [2] - 778:2
**safe** [1] - 777:6
**safely** [1] - 693:10
**safety** [1] - 756:23
**sake** [1] - 676:13

**Salt** [1] - 770:22
**San** [7] - 718:22, 718:23, 737:18, 739:7, 740:11, 740:13, 744:5
**Sassaman** [2] - 702:8, 702:10, 702:21, 706:7
**SASSAMAN** [1] - 702:11
**sat** [1] - 722:20
**SAUL** [1] - 669:20
**saving** [1] - 680:20
**saw** [21] - 708:7, 732:17, 732:21, 748:22, 750:15, 753:7, 753:11, 757:6, 758:10, 760:18, 760:21, 762:4, 771:22, 773:18, 779:23, 781:11, 781:18, 786:25, 792:23, 793:11
**scared** [2] - 755:19, 755:22, 755:25
**scenery** [1] - 693:18
**schedule** [1] - 789:9
**scheme** [1] - 699:4
**second** [11] - 681:8, 686:13, 696:1, 701:13, 701:16, 702:2, 714:5, 727:7, 795:14, 795:21, 795:23
**Second** [3] - 700:21, 701:10, 701:21
**second-guess** [2] - 701:16, 702:2
**second-guessing** [1] - 701:13
**seconds** [3] - 686:19, 750:5, 750:6
**Section** [1] - 710:8
**see** [36] - 678:6, 682:14, 682:18, 683:15, 685:2, 688:20, 699:19, 707:15, 708:2, 720:25, 721:7, 724:10, 724:19, 725:3, 730:16, 732:7, 732:10, 732:13, 732:14, 733:19, 733:24, 734:11, 742:4, 749:23, 750:20, 751:11, 763:9, 763:10, 767:8, 778:13, 778:22, 779:7, 779:10, 790:3, 792:22, 793:11
**seeing** [2] - 734:22, 781:20
**seem** [2] - 698:5, 749:24
**send** [3] - 784:10, 788:11, 789:3
**sense** [1] - 725:1
**sensitive** [1] - 780:22
**sentence** [4] - 673:25, 681:17, 682:15, 791:9
**sentences** [1] - 670:22
**separate** [4] - 761:11, 761:12, 794:1, 794:10
**separated** [1] - 699:21
**series** [1] - 710:21
**serious** [1] - 721:10
**service** [1] - 692:19
**set** [1] - 736:21
**seven** [2] - 686:16, 785:2
**Seventh** [1] - 669:15
**sexual** [17] - 681:10, 681:13,

681:16, 681:22, 682:6, 699:8, 699:11, 700:15, 705:15, 706:10, 720:13, 720:18, 772:25, 778:20, 790:13, 791:10, 794:6
**sexuality** [6] - 693:23, 700:2, 721:8, 778:5, 778:23, 779:11
**shake** [1] - 777:10
**share** [1] - 723:7
**shared** [1] - 723:24
**sharing** [4] - 700:2, 700:7, 723:19, 723:21, 724:9, 724:19
**Shaw** [13] - 709:13, 709:21, 717:13, 717:19, 717:25, 726:20, 730:15, 731:17, 735:2, 737:6, 741:19, 787:20
**skydiver** [7] - 674:14, 707:14, 725:19, 739:9, 740:4, 772:22, 777:6
**SHAW** [2] - 717:14, 799:5
**Shaw's** [1] - 694:3
**shield** [1] - 675:5
**shifting** [2] - 698:24, 699:4
**ships** [1] - 684:10
**short** [5] - 680:10, 692:2, 698:7, 788:23, 794:19
**shortly** [3] - 700:23, 738:17, 779:23
**shoulder** [1] - 686:1
**shoulders** [1] - 733:11
**show** [14] - 676:23, 677:13, 677:25, 683:7, 683:12, 683:13, 694:22, 712:17, 730:3, 736:14, 739:19, 750:7, 760:14
**showed** [1] - 748:22
**showing** [3] - 678:19, 705:6, 753:15
**shows** [1] - 759:25
**sic** [1] - 738:20
**sidebar** [4] - 712:18, 767:1, 768:5, 769:1
**sides** [2] - 745:21, 796:16
**signature** [2] - 703:18, 703:20
**signed** [3] - 672:23, 674:7, 697:16
**significant** [2] - 747:7, 747:12
**signing** [1] - 702:25
**similar** [4] - 679:12, 679:17, 682:19, 709:23
**simple** [2] - 690:5, 690:8
**simply** [4] - 690:13, 755:10, 788:1, 797:17
**single** [2] - 794:15, 794:16
**sister's** [1] - 738:10
**sit** [5] - 750:4, 751:22, 779:21, 785:25, 788:16
**sitting** [20] - 674:20, 713:13, 745:21, 749:20, 750:2, 751:5, 751:6, 751:20, 752:1, 754:1, 754:2, 754:4, 760:25, 761:1, 761:2, 761:4, 761:15, 761:16, 761:19
**situation** [4] - 692:4, 710:4, 713:12, 748:16

**six** [2] - 748:1, 785:2
**skin** [2] - 687:13, 734:12
**sky** [1] - 749:9
**SKYDIVE** [1] - 669:7
**skydive** [13] - 692:20, 692:22, 692:25, 693:10, 693:17, 718:8, 718:15, 723:24, 744:9, 746:15, 746:21, 782:7
**Skydive** [22] - 695:21, 718:5, 718:9, 718:14, 718:18, 719:4, 719:6, 719:7, 719:17, 722:23, 727:6, 737:6, 738:21, 740:21, 741:1, 770:13, 770:25, 771:16, 772:9, 773:22, 781:13, 782:16
**skydiver** [7] - 674:14, 707:14, 725:19, 739:9, 740:4, 772:22, 777:6
**skydivers** [3] - 725:23, 764:17, 772:7
**skydiving** [12] - 686:5, 697:9, 697:10, 725:19, 733:1, 739:11, 740:5, 740:16, 740:18, 758:20, 771:18, 771:24
**Skydiving** [1] - 739:16
**sleep** [2] - 750:9, 750:11
**sleeping** [1] - 721:15
**slightly** [7] - 740:14, 740:16, 756:2, 761:4, 761:15, 779:16, 790:18
**small** [4] - 714:21, 773:6, 777:8, 786:10
**smile** [3] - 694:16, 694:19, 708:2
**smiling** [12] - 686:25, 687:10, 687:12, 687:14, 694:12, 716:12, 716:13, 757:3, 757:6, 757:8, 757:9, 757:25
**sneezed** [1] - 715:1
**so..** [1] - 709:4
**social** [1] - 697:13
**socialize** [1] - 719:20
**socially** [1] - 722:19
**solely** [1] - 671:9
**someone** [18] - 683:9, 683:10, 693:9, 729:20, 732:8, 739:5, 746:15, 746:16, 746:24, 747:3, 747:12, 748:8, 748:15, 777:9, 786:17, 793:6, 796:9, 796:24
**sometimes** [5] - 715:9, 749:3, 764:25, 771:4, 789:6
**somewhere** [1] - 740:21
**sore** [1] - 749:5
**sores** [1] - 787:24
**sorry** [18] - 681:3, 687:9, 692:6, 694:25, 701:19, 719:6, 719:8, 728:16, 730:20, 732:24, 750:25, 756:20, 771:14, 773:23, 779:5, 782:5, 793:20
**sort** [3] - 725:11, 725:18, 726:1
**sorts** [1] - 706:23
**sounded** [2] - 781:1, 783:6
**southern** [1] - 701:20, 718:8,

13

718:22
**space** [1] - 751:9
**span** [2] - 726:25, 782:12
**speaking** [1] - 722:8
**specific** [9] - 673:25, 725:15, 727:19, 729:1, 745:16, 745:25, 746:1, 783:3, 786:3
**specifically** [1] - 771:21
**specifics** [2] - 721:16, 721:18
**speculation** [2] - 775:2, 777:2
**speed** [3] - 734:14, 734:15, 734:17
**spell** [3] - 717:18, 717:20, 770:5
**spent** [1] - 689:22
**spoken** [1] - 780:24
**sport** [3] - 674:18, 727:11, 728:5
**squatting** [1] - 763:17
**staff** [6] - 721:12, 722:6, 722:15, 776:8, 776:14, 776:20
**stages** [1] - 736:2
**stand** [2] - 674:25, 713:13
**standard** [3] - 708:17, 790:8, 790:11
**stark** [2] - 674:15, 697:11
**start** [4] - 674:5, 685:7, 789:24, 794:8
**started** [11] - 687:17, 737:9, 738:16, 738:17, 747:24, 764:12, 773:6, 773:21, 782:7, 782:13, 782:15
**starting** [4] - 727:3, 738:14, 778:12, 782:3
**starts** [1] - 670:14
**State** [1] - 703:9
**state** [26] - 670:21, 670:23, 671:3, 672:10, 673:12, 674:22, 675:25, 676:1, 679:10, 679:17, 698:13, 698:23, 699:8, 704:17, 708:4, 710:4, 710:16, 711:4, 711:22, 711:25, 717:17, 770:5, 790:15, 790:17, 791:2, 791:7
**statement** [15] - 671:20, 672:23, 673:11, 674:9, 675:20, 682:11, 696:19, 706:21, 712:25, 713:10, 716:5, 739:4, 740:2, 792:17, 794:19
**statements** [7] - 675:6, 675:10, 675:11, 675:12, 713:7, 713:14, 788:18
**States** [1] - 789:12
**states** [2] - 702:12, 797:8
**STATES** [2] - 669:1, 669:11
**statute** [1] - 791:10
**stayed** [1] - 781:11
**staying** [1] - 738:9
**stenography** [1] - 669:25
**step** [4] - 696:11, 719:16, 765:25, 783:24
**steps** [1] - 731:18
**stick** [1] - 792:12
**still** [5] - 670:4, 670:24, 685:9,

687:24, 705:12, 740:16, 740:18, 775:17, 775:18
**stipulate** [1] - 676:13
**stipulation** [2] - 702:25, 703:2
**stop** [4] - 730:21, 730:23, 763:18, 767:9
**stopped** [27] - 688:9, 731:9, 731:16, 732:16, 732:20, 733:21, 734:1, 734:6, 735:12, 753:6, 755:4, 755:16, 757:2, 757:11, 757:20, 758:7, 758:14, 759:11, 759:15, 760:6, 760:17, 761:22, 762:3, 762:17, 763:6, 763:21, 763:22
**stories** [2] - 700:12, 723:7
**story** [3] - 688:18, 689:5, 691:24
**straightforward** [1] - 793:23
**strap** [1] - 697:3
**strapped** [5] - 724:1, 733:9, 746:18, 746:25, 748:15
**Street** [1] - 669:17
**stress** [2] - 675:22, 797:13
**strike** [1] - 729:23
**struggling** [1] - 734:19
**student** [2] - 736:6, 736:10
**students** [2] - 724:5, 726:4
**stuff** [10] - 709:17, 718:20, 718:21, 727:11, 732:9, 733:13, 740:11, 740:13, 742:15, 745:19
**style** [2] - 671:13, 671:14
**subject** [3] - 725:15, 764:2
**submit** [2] - 708:25, 785:23
**submitted** [4] - 696:17, 699:10, 699:13, 795:8
**subpoenaed** [1] - 737:13
**substantial** [1] - 705:5
**substantially** [2] - 710:11, 712:10
**sue** [3] - 690:1, 703:10, 704:3
**suffer** [1] - 670:25
**sufficient** [3] - 675:16, 702:20, 730:13
**suggested** [2] - 711:6, 780:21
**suggesting** [1] - 758:17
**suit** [6] - 727:21, 727:23, 727:25, 728:2, 728:10, 733:9
**Suite** [4] - 669:15, 669:17, 669:19, 669:23
**summary** [4] - 671:10, 671:17, 671:22, 795:12
**summation** [1] - 788:23
**summations** [3] - 788:18, 788:20, 789:23
**super** [3] - 701:12, 792:5, 793:8
**superhuman** [1] - 791:18
**supplying** [1] - 677:24
**support** [2] - 702:16, 705:24
**supports** [2] - 705:14, 705:18
**supposed** [4] - 693:14, 715:7, 756:8, 756:16
**surprise** [3] - 747:11, 747:17,

773:24
**surprised** [2] - 794:7, 797:5
**suspect** [2] - 791:22, 791:24
**suspend** [1] - 688:1
**suspended** [2] - 796:21, 796:24
**suspension** [5] - 794:2, 794:21, 795:19, 796:2, 796:20
**sustained** [21] - 691:21, 694:1, 695:9, 695:23, 724:16, 726:17, 733:4, 743:10, 748:12, 748:18, 752:25, 755:14, 758:4, 763:19, 764:14, 764:20, 776:17, 780:5, 781:3
**swap** [2] - 726:11, 726:12
**swirling** [1] - 748:23, 749:2
**switch** [2] - 777:14, 777:19
**switching** [2] - 726:3, 726:8
**sworn** [8] - 672:11, 672:12, 672:18, 672:24, 672:25, 684:24, 717:15, 770:3
**sympathy** [1] - 780:2

---

T

---

**talented** [1] - 773:8
**talks** [2] - 792:6, 794:20
**tandem** [18] - 697:3, 697:9, 718:16, 719:3, 724:13, 726:3, 726:8, 733:9, 749:22, 751:4, 756:10, 771:5, 771:23, 772:13, 776:6, 776:8, 778:23
**tandems** [5] - 714:6, 717:1, 718:17, 740:15, 771:2
**tape** [54] - 688:8, 688:9, 730:17, 731:2, 731:8, 731:9, 731:15, 731:16, 732:15, 732:16, 732:19, 732:20, 733:20, 733:21, 733:25, 734:1, 734:5, 734:6, 735:11, 735:12, 753:5, 753:6, 753:3, 755:4, 755:15, 755:16, 757:1, 757:2, 757:10, 757:11, 757:19, 757:20, 758:6, 758:7, 758:13, 758:14, 759:10, 759:11, 759:14, 759:15, 760:5, 760:6, 760:16, 760:17, 761:21, 761:22, 762:2, 762:3, 762:16, 762:17, 763:5, 763:6, 763:21, 763:22
**taped** [1] - 751:24
**tarmac** [2] - 775:17, 781:19
**taught** [1] - 749:10
**team** [1] - 743:12
**tears** [1] - 693:23
**tease** [2] - 720:25, 778:23
**telephone** [3] - 720:6, 720:10, 767:4
**tell.** [1] - 794:11
**ten** [8] - 698:7, 715:18, 750:5, 750:6, 777:11, 784:8, 784:9, 784:11
**tense** [2] - 756:1, 756:2

**term** [4] - 700:24, 743:8, 749:18, 776:3
**terminate** [8] - 689:7, 689:11, 689:13, 699:12, 699:14, 701:2, 701:3, 793:6
**terminated** [13] - 690:7, 705:6, 705:15, 720:11, 729:9, 780:8, 780:13, 780:23, 781:5, 781:11, 782:22, 782:24, 794:6
**terminates** [1] - 700:23
**terminating** [2] - 697:5, 701:6
**termination** [13] - 677:16, 679:3, 679:8, 699:20, 700:25, 719:12, 719:13, 791:21, 792:1, 792:7, 797:6, 797:8
**terms** [7] - 670:23, 672:23, 689:21, 710:3, 729:2, 790:22, 792:13
**terrified** [1] - 777:12
**testified** [15] - 679:4, 682:16, 684:24, 695:7, 700:4, 705:20, 708:9, 717:16, 728:15, 738:20, 738:24, 744:7, 770:4, 786:24, 797:12
**testifies** [2] - 767:8, 769:8
**testify** [12] - 679:21, 691:12, 705:21, 709:16, 709:23, 712:13, 737:19, 741:14, 742:10, 742:17, 775:3, 786:17
**testifying** [6] - 685:18, 698:1, 737:11, 742:19, 785:7, 785:9
**testimony** [16] - 673:17, 677:20, 678:17, 679:12, 694:5, 697:23, 699:24, 700:20, 705:13, 706:23, 729:23, 729:25, 787:2, 791:20, 796:12, 797:20
**Texas** [3] - 674:8, 697:16, 717:2
**THE** [191] - 669:11, 670:1, 670:4, 670:18, 671:25, 672:3, 672:10, 672:15, 672:22, 673:8, 673:18, 674:1, 674:12, 674:19, 675:16, 676:15, 676:23, 677:3, 677:12, 677:25, 678:3, 678:10, 679:2, 679:16, 679:23, 680:1, 680:4, 680:8, 680:13, 680:22, 681:1, 681:5, 683:13, 683:16, 684:5, 684:13, 684:21, 685:1, 685:12, 685:13, 687:4, 687:6, 690:10, 690:17, 690:21, 691:3, 691:9, 691:16, 691:21, 692:17, 693:7, 694:1, 694:7, 695:9, 695:18, 695:23, 696:7, 696:11, 696:16, 697:18, 697:24, 698:2, 698:10, 703:19, 704:1, 704:7, 704:16, 704:22, 704:25, 705:25, 708:23, 709:4, 709:8, 709:12, 709:15, 709:20, 709:22, 710:1, 712:16, 712:21, 713:2, 713:6, 713:17, 713:24, 714:1, 714:4, 714:8, 714:18, 714:22, 715:4, 715:9, 715:15, 715:17, 716:6, 717:10, 717:17, 717:19,

717:20, 717:21, 717:22, 721:22, 724:16, 726:17, 728:14, 728:22, 728:24, 729:3, 729:11, 729:14, 729:25, 730:9, 730:13, 730:19, 730:20, 730:21, 731:4, 733:4, 735:3, 735:7, 736:20, 736:24, 743:10, 743:16, 745:12, 745:14, 748:12, 748:18, 752:25, 753:25, 754:1, 754:20, 754:21, 754:23, 755:14, 758:4, 761:10, 763:18, 764:8, 764:14, 764:20, 765:23, 765:25, 766:3, 767:6, 767:9, 768:2, 769:11, 770:5, 770:7, 774:15, 774:16, 774:17, 774:19, 774:20, 775:3, 776:17, 776:21, 780:3, 780:5, 781:3, 783:3, 783:11, 783:13, 783:16, 783:24, 784:2, 784:4, 784:9, 784:19, 784:24, 785:5, 785:7, 786:13, 787:2, 787:5, 787:25, 788:5, 790:5, 792:2, 792:23, 793:4, 793:20, 793:22, 795:5, 795:7, 795:20, 795:25, 797:4, 797:21, 797:23, 798:2

**themselves** [4] - 692:23, 692:24, 693:20, 707:6
**theory** [4] - 794:10, 796:5, 797:10
**thereafter** [2] - 700:23, 738:17
**therefore** [4] - 711:9, 711:12, 741:6, 788:10
**thi** [1] - 681:6
**thighs** [1] - 733:15
**three** [12] - 676:9, 687:19, 689:8, 694:4, 700:21, 707:20, 719:4, 730:14, 736:5, 738:13, 738:19, 740:19
**throughout** [2] - 671:14, 785:13
**throw** [1] - 723:17
**thrown** [1] - 746:23
**tied** [1] - 702:13
**Title** [6] - 703:6, 704:10, 790:22, 793:3, 793:4, 793:9
**today** [9] - 673:6, 674:20, 714:1, 715:19, 717:6, 737:11, 749:20, 770:11, 790:7
**together** [3] - 723:25, 747:14, 747:15
**tomorrow** [9] - 788:13, 788:14, 788:25, 789:13, 789:14, 789:17, 790:3, 791:5, 793:18
**toneFly** [2] - 760:10, 760:11
**took** [1] - 713:20
**tort** [2] - 703:12, 703:14
**torts** [2] - 704:21
**total** [6] - 676:25, 677:8, 696:4, 741:13, 783:14, 784:17
**touch** [4] - 697:4, 745:18, 781:12, 787:19
**touched** [1] - 706:15

**touches** [1] - 785:15
**touching** [6] - 686:1, 691:13, 691:14, 710:24, 711:8, 785:12
**town** [1] - 738:20
**Town** [1] - 701:11
**traffic** [1] - 685:3
**training** [1] - 740:14
**TRANSCRIPT** [1] - 669:10
**Transcript** [1] - 669:25
**treated** [2] - 725:10, 779:7
**treatment** [2] - 706:2, 709:18
**trial** [11] - 676:4, 684:4, 685:5, 710:16, 712:12, 715:1, 715:3, 759:17, 785:14, 794:7, 798:3
**TRIAL** [1] - 669:10
**tried** [1] - 687:20
**trip** [4] - 716:14, 771:18, 771:23, 783:6
**trouble** [2] - 774:22, 775:11
**troubles** [1] - 774:23
**true** [11] - 691:1, 738:15, 739:1, 739:17, 741:3, 742:3, 746:8, 751:8, 763:15, 795:10, 795:13
**trust** [1] - 777:10
**truth** [3] - 712:24, 742:12, 742:14
**try** [5] - 682:9, 682:23, 686:2, 688:24, 744:17
**trying** [9] - 732:5, 744:15, 744:20, 745:2, 747:17, 749:24, 777:9, 777:10, 785:15
**turn** [1] - 778:15
**turned** [4] - 752:10, 752:11, 752:12, 752:13
**TV** [2] - 683:4, 684:12
**twice** [3] - 700:21, 719:24, 720:5
**Twin** [2] - 782:17, 782:19
**twirl** [3] - 683:9, 683:10, 683:11
**twirling** [1] - 749:1
**two** [15] - 689:6, 693:22, 697:14, 705:19, 709:10, 712:13, 713:21, 714:10, 714:12, 714:25, 716:11, 761:11, 761:12, 773:6, 790:23
**two-month** [3] - 713:21, 714:10, 714:12
**type** [3] - 775:20, 790:18, 792:16
**types** [2] - 704:20, 777:1
**typically** [2] - 686:10, 733:8

## U

**unbelievable** [2] - 714:16, 716:18
**uncomfortability** [2] - 753:15, 762:12
**uncomfortable** [15] - 685:25, 700:11, 733:17, 744:23, 745:1, 745:4, 745:5, 745:23, 748:9, 748:15, 753:12, 753:19, 755:7,

755:12, 760:19
**uncomfortably** [2] - 744:19, 744:21
**uncommon** [2] - 720:20, 721:11
**under** [28] - 672:8, 672:18, 674:3, 675:20, 685:9, 686:4, 686:6, 696:25, 698:22, 698:23, 699:3, 699:6, 699:8, 702:8, 703:8, 703:10, 704:8, 704:10, 710:8, 710:9, 711:17, 712:9, 769:9, 791:1, 792:25, 793:2
**underneath** [1] - 778:13
**understood** [2] - 712:1, 775:4
**undertaking** [1] - 775:9
**unemployed** [1] - 677:4
**unemployment** [8] - 676:7, 676:22, 677:3, 677:21, 695:14, 695:20, 696:4, 696:5
**Unemployment** [1] - 676:18
**unfair** [3] - 705:22, 710:11, 712:11
**unfamiliar** [1] - 747:13
**unfavorable** [3] - 698:13, 709:1, 709:3
**unfortunate** [1] - 744:2
**unhappy** [1] - 707:19
**unintentional** [1] - 703:11
**unique** [1] - 779:18
**United** [1] - 789:11
**UNITED** [2] - 669:1, 669:11
**unless** [5] - 683:25, 751:21, 786:17, 787:7, 788:2
**unnecessarily** [1] - 788:17
**unquestionably** [1] - 711:5
**unreasonable** [1] - 794:22
**unrebutted** [1] - 675:6
**unsworn** [3] - 673:1, 673:2, 676:14
**up** [46] - 675:22, 676:4, 679:1, 687:17, 688:15, 688:17, 704:7, 706:16, 708:9, 721:7, 721:10, 723:16, 723:17, 731:2, 731:18, 734:13, 736:21, 736:22, 746:18, 746:25, 749:9, 749:21, 750:6, 750:9, 750:12, 751:22, 753:7, 759:7, 759:20, 759:24, 759:25, 763:24, 776:8, 777:11, 777:18, 778:5, 778:19, 782:17, 782:24, 784:16, 785:11, 785:22, 786:10, 794:7, 794:12
**upset** [7] - 725:4, 725:5, 744:8, 744:12, 744:14, 745:6, 779:21
**Uranyi** [2] - 698:25
**US** [1] - 669:5
**Utah** [1] - 770:22
**utilize** [2] - 791:13, 793:1

## V

**vacation** [4] - 713:21, 714:10, 714:12, 772:18

**value** [9] - 682:2, 682:10, 684:13, 684:16, 786:16, 786:22, 787:11, 787:12, 788:1
**various** [1] - 786:1
**veracity** [1] - 702:6
**verbally** [1] - 754:6
**verbatim** [1] - 790:14
**verdict** [6] - 698:13, 709:1, 709:3, 793:21, 793:22, 794:1
**verify** [1] - 678:7
**Vermont** [4] - 771:12, 771:17, 771:18, 773:5
**vet** [1] - 722:7
**video** [50] - 688:2, 688:3, 688:4, 688:5, 688:7, 688:11, 688:16, 688:25, 689:3, 705:18, 706:17, 706:19, 708:3, 708:7, 708:8, 718:17, 730:3, 730:5, 730:8, 730:9, 730:11, 730:14, 730:15, 730:21, 730:22, 730:23, 732:7, 732:12, 732:21, 734:22, 734:23, 735:6, 735:9, 741:18, 748:22, 749:10, 749:12, 749:15, 749:20, 750:1, 750:3, 750:5, 750:15, 756:15, 758:8, 758:16, 758:23, 759:7, 760:8, 787:8
**videographer** [1] - 749:25
**videos** [1] - 707:16
**videotape** [4] - 688:18, 688:20, 733:18, 786:25
**view** [5] - 674:12, 674:13, 681:6, 704:15, 736:15
**VII** [6] - 703:6, 704:10, 790:22, 793:3, 793:4, 793:9
**violation** [1] - 706:11
**Viruet** [1] - 701:18
**vivid** [2] - 674:15, 697:11
**voice** [1] - 792:22
**voluntarily** [2] - 694:17, 737:18
**voluntary** [1] - 694:20
**vs** [1] - 670:1

## W

**wage** [1] - 677:7
**wages** [4] - 790:24, 794:3, 796:8, 796:20
**wait** [7] - 745:13, 763:7, 763:12, 784:9, 784:11, 784:24, 795:14
**waited** [1] - 741:15
**waiting** [5] - 670:4, 680:6, 741:12, 741:14, 769:13
**waive** [4] - 704:8, 704:9, 704:10, 704:14
**waived** [2] - 703:10, 704:3
**waiver** [2] - 704:17, 759:2
**waivers** [1] - 704:20
**waiving** [1] - 704:20
**wake** [4] - 750:6, 750:9, 750:12
**walk** [2] - 721:11, 722:19

**walked** [1] - 722:15
**wants** [2] - 709:6, 773:10
**warned** [1] - 689:15
**waste** [1] - 678:5
**watch** [5] - 688:3, 688:13, 749:16, 759:16, 759:17
**watched** [7] - 688:2, 688:11, 771:25, 772:1, 773:9
**watching** [4] - 683:4, 684:12, 688:16, 689:3
**Wayne** [4] - 738:13, 739:2, 743:21, 743:22
**ways** [1] - 676:9
**wayside** [1] - 702:8
**wear** [1] - 779:17
**wearing** [1] - 734:10
**website** [1] - 708:15
**week** [9] - 794:8, 794:9, 796:9, 796:13, 796:14, 796:21, 796:22, 796:24, 797:12
**weekends** [1] - 717:1
**weekly** [2] - 676:24, 677:8
**weeks** [1] - 716:24
**weight** [1] - 778:1
**weird** [3] - 732:9, 751:1, 751:2
**west** [1] - 782:1
**whispering** [2] - 686:2, 700:10
**whole** [5] - 672:5, 689:4, 692:11, 710:20, 778:24
**wife** [4] - 722:6, 722:17, 722:23, 743:18
**willing** [2] - 682:17, 785:23
**wind** [1] - 708:1
**window** [2] - 777:9, 778:14
**wing** [5] - 727:21, 727:23, 727:25, 728:2, 728:10
**Winstock** [3] - 706:3, 706:18, 708:13
**winter** [2] - 714:14, 716:16
**wisdom** [1] - 701:18
**wise** [1] - 754:6
**wished** [1] - 715:24
**wishes** [1] - 716:1
**withdrawn** [1] - 777:5
**withheld** [2] - 794:9, 796:22
**withholding** [6] - 794:2, 794:20, 795:19, 796:3, 796:7, 796:15
**witness** [23] - 676:10, 676:12, 679:4, 683:25, 684:23, 709:9, 710:13, 713:13, 715:22, 717:11, 717:15, 754:18, 766:1, 767:7, 768:2, 769:10, 770:3, 784:25, 785:21, 786:2, 786:5, 786:8, 786:9
**WITNESS** [10] - 685:12, 717:19, 717:21, 730:20, 754:1, 754:21, 770:7, 774:16, 774:19, 776:21
**witnesses** [10] - 678:14, 678:18, 678:21, 679:11, 679:17, 691:13, 709:10, 712:13, 783:25, 784:1

**WL** [1] - 701:19
**woke** [1] - 753:7
**woman** [2] - 683:10, 774:10
**women** [7] - 691:6, 693:22, 707:16, 707:17, 776:25
**wondering** [1] - 790:19
**word** [2] - 760:22, 760:24
**words** [11] - 678:21, 692:6, 692:8, 752:1, 758:15, 758:17, 758:18, 759:5, 759:7, 786:15, 792:17
**worker** [2] - 711:24
**workers** [2] - 778:19, 779:8
**world** [1] - 707:3
**worse** [1] - 763:7
**worst** [1] - 707:2
**write** [5] - 671:20, 672:2, 739:4, 739:5
**writing** [2] - 671:13, 671:14
**wrote** [3] - 672:1, 672:2, 739:6

---

## Y

**year** [7] - 699:20, 699:21, 771:14, 773:21, 774:4, 774:6, 781:19
**years** [18] - 718:10, 718:11, 737:7, 737:8, 740:5, 741:6, 747:24, 747:25, 748:1, 765:6, 770:17, 770:18, 771:5, 773:20, 779:22, 780:19, 782:12, 794:13
**yell** [2] - 778:14, 778:16
**yesterday** [7] - 679:4, 679:18, 685:7, 685:18, 686:8, 689:22, 691:8, 694:5, 708:10, 715:23, 718:5, 741:10, 741:15, 741:17, 742:21, 742:22, 743:7, 743:12, 743:22
**YORK** [1] - 669:1
**York** [15] - 669:15, 669:17, 669:20, 669:23, 703:9, 719:23, 781:10, 790:15, 791:8, 792:12, 792:25, 793:10, 793:12
**you.** [1] - 718:5
**young** [3] - 706:14, 722:7, 774:10
**younger** [4] - 776:25, 777:1, 782:18, 782:20
**yourself** [6] - 693:13, 693:14, 738:14, 739:4, 740:6, 772:5
**yourselves** [1] - 789:21

---

## Z

**Zabell** [13] - 670:11, 679:11, 683:13, 683:14, 708:19, 715:4, 715:5, 715:22, 717:22, 740:25, 794:25, 796:14, 797:14
**ZABELL** [134] - 669:19, 669:20, 670:16, 671:7, 672:8, 672:12, 672:16, 673:4, 673:16, 673:24,

674:9, 674:15, 674:24, 678:4, 679:13, 679:20, 680:3, 680:5, 680:10, 680:17, 680:24, 681:3, 683:21, 684:20, 685:15, 687:8, 688:6, 688:10, 690:9, 690:16, 691:7, 691:15, 691:20, 692:16, 693:6, 693:25, 694:6, 694:25, 695:6, 695:15, 695:22, 696:6, 696:10, 697:21, 697:25, 698:16, 703:24, 704:2, 704:12, 704:19, 704:23, 705:1, 709:5, 709:11, 709:13, 709:17, 709:21, 709:25, 712:15, 712:19, 712:23, 713:3, 713:16, 713:18, 714:3, 714:10, 714:19, 714:24, 715:14, 716:4, 716:9, 717:12, 717:24, 721:24, 721:25, 724:17, 726:19, 729:1, 729:13, 729:16, 730:2, 730:5, 730:11, 730:14, 730:24, 731:5, 731:6, 733:5, 735:1, 735:5, 735:8, 736:19, 743:8, 743:15, 748:11, 748:17, 752:24, 753:23, 754:17, 755:13, 758:3, 761:9, 763:16, 764:7, 764:13, 764:19, 765:24, 766:2, 767:2, 767:10, 768:3, 770:10, 775:7, 776:22, 780:7, 781:4, 783:10, 783:14, 784:1, 784:3, 784:20, 785:20, 791:15, 792:21, 793:2, 793:19, 795:3, 795:6, 795:8, 795:11, 797:25, 799:3, 799:6, 799:9
**Zarda** [52] - 670:1, 671:18, 673:6, 674:3, 675:4, 678:18, 690:3, 691:19, 696:17, 696:23, 696:25, 697:17, 698:1, 699:25, 700:20, 701:1, 701:6, 702:25, 703:10, 704:3, 705:6, 705:15, 710:15, 710:23, 711:6, 712:6, 712:25, 715:2, 716:9, 716:21, 717:4, 718:25, 719:2, 719:9, 720:7, 727:1, 727:25, 728:9, 728:11, 728:18, 730:18, 750:16, 771:9, 771:11, 771:15, 773:4, 773:18, 776:9, 777:14, 787:9, 796:11, 797:12
**ZARDA** [1] - 669:3
**Zarda's** [14] - 670:7, 676:22, 679:21, 682:25, 697:22, 699:7, 699:11, 699:21, 710:16, 711:22, 716:7, 720:13, 741:23, 787:21
**Zealand** [5] - 694:4, 722:9, 722:11, 764:22, 765:20
**Zealanders** [1] - 764:24
**zero** [2] - 786:16, 786:22
**Zone** [2] - 683:5, 684:7
**zone** [3] - 707:1, 707:15, 717:2