800

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


----------------------------------X
DONALD ZARDA,
                           :   CV-10-4334
        Plaintiff,
                           :   US Courthouse
   -against-              Central Islip, NY
                           :
ALTITUDE EXPRESS, INC., d/b/a
SKYDIVE LONG ISLAND and       :
RAY MAYNARD,
                           :   October 21, 2015
        Defendants.        9:30 a.m.
----------------------------------X


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury


APPEARANCES:

For the Plaintiff:          GREGORY ANTOLLINO, ESQ
                        275 Seventh Avenue, Suite 705
                        New York, New York 10001
                              and
                        RICHARD J. CARDINALE, ESQ.
                        26 Court Street, Suite 1815
                        Brooklyn, New York 11242


For the Defendants:         ZABELL & ASSOCIATES, P.C.
                        1 Corporate Drive, Suite 103
                        Bohemia, New York 11716
                        BY:  SAUL D. ZABELL, ESQ.
                            LAURA E. JOHNSON, ESQ.


Official Court Reporter:    Ellen S. Combs, CSR
                        100 Federal Plaza - Suite 1180
                        Central Islip, New York 11722
                        (631) 712-6107


Proceedings recorded by mechanical stenography
Transcript produced by Computer

801

1              (The following took place at 9:47 a.m. outside

2      the presence of the jury.)

3              Calling case 10-CR-4334, Zarda vs Altitude.

4              (Appearances previously noted.)

5              THE COURT:  Good morning.

6              We posted a copy of the proposed instructions

7      and the verdict sheet.  I ask you both if you reviewed

8      that last night?

9              MR. ANTOLLINO:  Yes.

10             MR. ZABELL:  Yes, your Honor.

11             THE COURT:  I just want to note two things that

12     happened after we talked yesterday.

13             The one was, in response to Mr. Zabell, your

14     request, I went back and I looked at the PJI, and it did

15     not have a line similar to the one you were requesting.

16     And when I looked back it did not gave anything reflecting

17     that.  So I did incorporate the short two sentences that

18     reflect what I think is correct under both federal law and

19     New York law.

20             And also Mr. Antollino had submitted a proposed

21     instruction to make clear that customer preference, in

22     terms of if a customer did not want to be served by a

23     person of a particular sexual orientation, that an

24     employer couldn't just fire someone because of a customer

25     complaint.  But I did add a second sentence just to make

802

1  clear that if there was something beyond, if the person's

2  status in a protected class was the basis for the

3  complaint, that the court could take action.

4          So those are the two things.  Obviously you

5  could object to those.  But those are the two things that

6  I did in addition, that I did discuss yesterday.

7          So let me go through it section by section.

8  We'll start with Part I, which is relatively

9  noncontroversial.  Are.

10         There any issues or any objections to the Part I

11 instructions, Mr. Antollino?

12         MR. ANTOLLINO:  First line.

13         THE COURT:  The first line?

14         MR. ANTOLLINO:  First one goes up to page.

15         THE COURT:  16.  Yes, sir, 15.

16         MR. ANTOLLINO:  Well, okay.  On part 2 of part

17 2.

18         THE COURT:  No, I'm still on Part I, up to page

19 15.  I want to know if there are any objections.

20         MR. ANTOLLINO:  I understand.  The parts are

21 separated by numbers.  The jury charge Part I, general

22 rules, judge of the facts.  No problem.

23         THE COURT:  Okay.  You don't have go through

24 each one.  I just want to know from page 2 or page 1 to

25 page 15 if you have any objections to any of those

803

1    instructions.

2             MR. ANTOLLINO:  Yes, I do.

3             THE COURT:  What?

4             MR. ANTOLLINO:  I would like you to add under

5    page 3, unless and somewhere else.  However, do not

6    abandon your comments and/or life experience.  That

7    somewhere else, that is fine.

8             THE COURT:  That instruction, the first sentence

9    of the instruction says, Although as jurors you are

10   encouraged to use all of your life experiences.

11            So, I'm not going change that.

12            MR. ANTOLLINO:  All right on page 4, I would ask

13   you to add, If you heard testimony about the advice of a

14   lawyer from either side, you are to apply these rules and

15   not speculate about the directions given by either party

16   by another lawyer.

17            And that might not fall under this particular

18   subheading, but I did submit that as a proposed charge

19   because there has been testimony that Ray Maynard went to

20   his lawyer and his lawyer told him that he could be

21   liable.

22            MR. ZABELL:  I don't believe that the testimony

23   bore that out.  And I think that the content of at least

24   Part I of your charge addresses how the jury should

25   consider the facts and the law as you charge them, judge.

804

1      THE COURT:  Yes.  I tell them this is the law.

2  And I don't think there is any, any issue that any

3  testimony -- there wasn't any testimony about what the

4  lawyer said in terms of what the law is.  So I don't think

5  I'll give any instruction specific to that.

6      MR. ANTOLLINO:  And at page 7, the section

7  Conduct of Counsel.

8      THE COURT:  Yes.

9      MR. ANTOLLINO:  I would get rid of, procedural,

10  the words, procedural and other, and just say these

11  involve matters that are beyond your consideration.

12      THE COURT:  I'm not changing that.  These have

13  been my instructions for ten years.  Nothing problematic

14  by telling them procedural and other matters.

15      Let's not nitpick, okay?

16      MR. ANTOLLINO:  Okay.  I'm not, judge.

17      Page 8.  I would ask you for, unless it's

18  included elsewhere, add the letter G.  In the event there

19  is a dispute about what you recall as evidence, you may

20  ask for a read-back, or in some cases the court might have

21  a printed transcript for you to read in the jury room.

22      THE COURT:  In the closing remarks it tells them

23  that they can request a read-back.  During deliberations

24  you can request a read-back.

25      In terms of sending in the transcript, that is

805

1   not my practice.

2           MR. ANTOLLINO:  Okay.

3           THE COURT:  So I'm not going to put that in.

4           MR. ZABELL:  I have a question.  I'm looking at

5   document 241 on the ECF.  I don't see a G.

6           THE COURT:  He said just to add G, right?  Am I

7   correct?

8           MR. ANTOLLINO:  Right, add G.

9           MR. ZABELL:  Okay.

10          MR. ANTOLLINO:  On page 13, Prior Inconsistent

11  Statements, which is Section 11 under part 1, Prior

12  Inconsistent Statements.

13          I would like to add that the inconsistent

14  statement of a party, that is, in this case that is either

15  Donald Zarda or Raymond Maynard, may be considered by you

16  to be actual or affirmative evidence for the opposing

17  side.  We know that's true.

18          I could get up there and read depositions for

19  Mr. Maynard as I had intended to do until Don Zarda died.

20  And so his deposition testimony is not just impeaching,

21  it's actual evidence.

22          MR. ZABELL:  I'm not sure I understand that

23  basis.  And I think that your Honor's charge regarding

24  prior inconsistent statements, which is the charge that I

25  have seen both from your Honor and from other judges

806

1    before, appropriately advises the jury as to how they can

2    consider the prior inconsistent statements.

3              MR. ANTOLLINO:  But it's just that --

4              THE COURT:  What he is asking me for doesn't

5    really go to prior inconsistent statements.  He wants a

6    straight charge that basically says, for example;

7    Mr. Zarda's deposition transcript comes in as affirmative

8    proof.  That deposition -- I think that's what you're

9    asking.

10             MR. ANTOLLINO:  Yeah.

11             THE COURT:  And Mr. Maynard, I guess to the

12   extent he's a party to a deposition could be affirmative

13   proof under the rules of civil procedure, not just

14   impeachment.  I think is what he -- is that what you're

15   saying?

16             MR. ANTOLLINO:  Precisely.

17             THE COURT:  I'm not going to give -- there is

18   another instruction that just says deposition testimony

19   should be considered in the same way as any other

20   testimony.  I'm not going to put any prior inconsistent

21   statement instruction, because I think that by

22   inconsistent statements being deposition statements can

23   mean anything.  I don't want to put in a particular

24   instruction.  But if you want to call that an instruction,

25   a two sentence instruction.  Okay?

807

1          MR. ZABELL:  I have no objection.

2          MR. ANTOLLINO:  And both sides could ask for a

3    falsus in uno falsus in omnibus charge.  I don't know that

4    you put that either.

5          THE COURT:  Yes.  The Second Circuit -- I don't

6    have the case in front of me -- this comes up more, quite

7    often.  The Second Circuit has suggested and Judge Sand in

8    the federal jury instructions has suggested that that

9    instruction, it's recommended it not be given.

10          And the way I have -- so I don't give that

11    instruction.  But I do put in, as you can see, in the

12    inconsistent statement section, states that, If you find

13    something to be inconsistent, whether it be under oath,

14    not under oath, you can use that to determine whether you

15    should believe all or part or none of the witness

16    testimony.

17          So I specifically put, you know, put that in

18    there so that it allows you to argue that if you want,

19    that somebody said something inconsistent under oath or

20    not under oath then they should reject all of their

21    testimony.  But to propel evidence instruction the Second

22    Circuit says, they said, I can't remember the words of the

23    case.  That it's not inconsistent with life experiences,

24    that simply because someone says something false about one

25    matter, that all their testimony should be rejected.

808

1   So I don't think -- I don't give that

2   instruction.

3       MR. ANTOLLINO:  All right.  On page 15 a couple

4   of little nicks here.

5       In this case one of the defendants is a

6   corporation and one is an estate.  And I would just ask,

7   the mere fact that one or more parties or that a party --

8   you should change it to, the mere fact that one or more,

9   or the mere fact that a party.

10      THE COURT:  I'll put, a party.

11      MR. ANTOLLINO:  And then after the next

12  sentence.

13      MR. ZABELL:  If I could, if I may.

14      I think that, as I'm reading it, the mere fact

15  that one of the parties is not a live person, that one of

16  the parties -- I think a corporation is not a live person.

17  So I don't -- I think it would be the mere fact that some

18  of the parties are not a live person does not mean that

19  they are, should have any lesser,

20      THE COURT:  Just saying, a party, just talking

21  about general, a party, whether it be a corporation, an

22  estate, any party, that is not a live person, doesn't get

23  lesser consideration.  It's just generalizing it.  Okay?

24      MR. ZABELL:  Okay.

25      MR. ANTOLLINO:  The next sentence.  All

809

1    litigants are equal before the law.

2            And I would add or estates, big or small,

3    etcetera.  And the rest I have no objection to.

4            THE COURT:  I just want point out that I got

5    this instruction from you.  You're talking about your own

6    instruction now.

7            MR. ANTOLLINO:  And that's it for Part I.

8            THE COURT:  Mr. Zabell, anything on Part I?

9            MR. ZABELL:  No.  We have addressed it.

10           THE COURT:  All right, let's just do Part II,

11   the claim under damages.  Let's just do pages 16 to 18.

12           Mr. Antollino?

13           MR. ANTOLLINO:  All right, under A.  In this

14   case plaintiff claims the defendants terminated

15   Mr. Maynard because he was gay or because he had

16   identified as such.

17           I'm sorry -- in this case plaintiff claims

18   defendants terminated Mr. Zarda because he was gay or

19   because he identified as such.

20           THE COURT:  I think that is fair.

21           Do you have any objection to that?

22           MR. ZABELL:  Yes.  The only places that has been

23   claimed was in Mr. Antollino's opening statement.  Their

24   claim throughout the complaint and the amended complaint

25   was that he was terminated because he was gay.  And

810

1    counsel has chosen to make the argument that, and I

2    believe I'm quoting him, one pinkie out of the closet was

3    all that it took.

4         But that is not what his claim is.  The claim

5    was that he was terminated because the decision to

6    terminate him was made because he was gay.  That's

7    different than the proof that came out.

8         The proof that came out indicates that, no, he

9    was terminated because of the complaint.  Was the

10   complaint because he was gay, or was the complaint for

11   some other reason is ultimately what we believe the jury

12   is going to have to decide.

13        THE COURT:  I mean we could slice his complaint,

14   his claim, that when someone says because, they were

15   terminated because they were gay.  I don't think this is a

16   surprise to you.  It's always been the facts in this case

17   that they allege that because he said that he was gay that

18   that is why he was terminated.  This is your claim, the

19   first time we ever heard it, because he was gay, that was

20   it, you know, for five years.

21        MR. ZABELL:  Correct.

22        THE COURT:  In addition to, that he terminated

23   him because he was gay -- your client says over and over

24   on the stand that he didn't care if he was gay.  I didn't

25   care if he identified as gay.

811

1           So that is not what this case is about, right.

2           MR. ZABELL:  Could you repeat that?  Could I ask

3     you to repeat what you just said to the jury.

4           THE COURT:  No.  But it's not, that is not what

5     the case is about.  So obviously he couldn't, he couldn't

6     be terminated just for identifying himself as gay.  That

7     if someone knows someone is gay, and the party has

8     identified himself as gay, I think they're intertwined.  I

9     don't think the controversial -- addition to his claim.

10          MR. ZABELL:  My point is, if we put in the two

11    statements --

12          THE COURT:  -- someone says they're gay, they're

13    identified as gay.

14          MR. ZABELL:  So then perhaps it should be

15    changed so that in this case plaintiff claims the

16    defendant terminated Mr. Zarda because he identified

17    himself as gay.

18          THE COURT:  Well, it could be either though.  It

19    could be because he was gay, or because he identified

20    himself as gay.  It could be either.

21          MR. ZABELL:  Okay.  I just object to that.  I

22    don't think it's necessary.  But I have your ruling.

23          THE COURT:  Okay.

24          MR. ANTOLLINO:  All right, on page 17.  I'm just

25    going to make a point.  And this comes up again and again.

1        I would ask you change the word from terminating

2   to motivating because when you change, when you use

3   motivating, it takes it out of what the federal courts

4   have interpreted the state courts, and to hold.  So a

5   motivating factor is different than a determining factor.

6   And I think that it's a lesser standard.  And if you

7   charge on terminating factor, it makes it different under

8   Title VII.

9        And the Second Circuit has always, except for

10  the A D D A, which we know is but for, the Second Circuit

11  has always interpreted Title VII as motivating factor, not

12  determining factor.

13       MR. ZABELL:  I think that the, determining, word

14  was taken right out of the PJI.  And I think determining

15  factor is the proper standard.  I have an issue with that

16  sentence not for what it says, but just how it's worded.

17  But not with determining.

18       THE COURT:  I spent sometime, because I could

19  see you used the word motivating.  And I looked at this a

20  long time.  The PJI does use the term determining factor

21  in a mixed motive case.  The word, motivating factor, is

22  used by the mixed motivating, which this is not a mixed

23  motivating case, which is when someone may have budgetary

24  issues and terminated someone because of a legitimate

25  reason, budgetary issues, but also based upon something

813

1    from the permissible category.  That would be a mixed

2    motivation case.  But when you use motivating factor that

3    context, then the employer has the ability to show -- this

4    is in pattern jury instruction 2 under mixed motive, that

5    they would have made the decision, the same decision but,

6    but even, even regardless of the person's protected class.

7          So there, when you use motivating factor in the

8    context of a mixed motive instruction, it's a different

9    paradigm.  This case is a pretext case.  The instruction

10   that PJI 91 utilizes is for a pretext case.

11         It uses, this is the 2014 pattern jury

12   instruction, New York law, which uses determining factor.

13   And in fact I looked at the federal law, a Third Circuit

14   case.  Maybe I'll put it on the record later.  I don't

15   have it in front of me.  Actually I read it last night.

16   It makes clear the difference between determining factor

17   under pretext cases and mixed motive cases where

18   motivating factor is used.

19         So as I said, this is what the New York courts

20   utilize.  I don't believe it is inconsistent with federal

21   law.  I'm going to use determining factor.

22         I do want to say that the instruction says, a

23   determining factor, not -- and it makes clear that there

24   is more than one determining factor.  So it doesn't

25   suggest that has to be the only cause.  It defines a

814

1    determining factor is that would make a difference in the

2    decision.

3            So there is still room to argue that doesn't

4    have to be the only factor under the determining factor

5    instruction.  Okay?

6            So I'm overruling that objection.

7            MR. ZABELL:  Your Honor?

8            THE COURT:  I just want to make sure he is done.

9            MR. ANTOLLINO:  I'm done on page 17.

10           MR. ZABELL:  On that passage, I am not objecting

11   to what it says.  But as I read it, and I have to read

12   that a couple of times over, I think how it's worded, it

13   might be a little misleading to the jury.

14           I'm reading, In order for plaintiff to recover

15   on his claim, Mr. Zarda's estate must prove by a

16   preponderance of the evidence that Mr. Zarda's sexual

17   orientation was a determining factor in Mr. Maynard's

18   decision to terminate him.

19           Is there a way we can make that somewhat more

20   condensed?  Because it requires me to read that two or

21   three times to get the gist of what the court was saying.

22   And I'm concerned that the jury is not going to take the

23   time to parse it out as a lawyer would.

24           THE COURT:  I don't have any problem -- first of

25   all, the language is right out of the PJI.  And I'm not

815

1    sure what is confusing about that.  It's not a long

2    sentence.  It just has to be a determining factor.  And

3    the remainder of the paragraph defines what a determining

4    factor is that would have to make a difference in whether

5    or not he would continue to work there or not.

6           I really -- if anything the PJI is, you know,

7    shorter and clearer than the federal instructions.  So I

8    don't, I don't know how I can make that sentence any

9    simpler.  It's as simple as I can make it.  So I don't

10   know what you're asking me to change it to.  But this is

11   completely clear.  Maybe it's just you.

12          MR. ZABELL:  Maybe.

13          THE COURT:  Just kidding.

14          MR. ZABELL:  I get it.  In this trial many

15   things -- so forget that.

16          THE COURT:  Just kidding.

17          MR. ZABELL:  That is fine.  I get that.  I have

18   your Honor's ruling.

19          THE COURT:  Anything else on that?

20          MR. ZABELL:  No.

21          THE COURT:  All right, then we go through

22   damages.

23          MR. ANTOLLINO:  Wait a minute.  Page 18.

24          THE COURT:  Okay.

25          MR. ANTOLLINO:  We have some problems with 18,

816

1    judge.

2          First, the portion, the first portion from a

3    paragraph and the second paragraph are basically -- the

4    Second Circuit has instructed judges not to give the jury

5    McDonald Douglas factors to consider.  That is an issue

6    for the court.

7          And so I think that that issue just ended at

8    other, discrimination is really, may be inferred from the

9    existence of other facts.  On page 17, cut out the next

10   two paragraphs.  And then talk about, defendant's have

11   produced.  Because you're getting into McDonald Douglas

12   here.  And that first summary judgment, that's not for

13   trial.

14         THE COURT:  Well first of all, obviously the

15   elements are the elements that, you know, the part of the

16   McDonald Douglas test is the fact that a person, there has

17   to be an adverse action in order to be in a protected

18   class, part of the McDonald Douglas test.  Those are the

19   elements.

20         In terms of the Second Circuit saying, don't

21   give the McDonald Douglas test to the jury.  I'm aware of

22   those cases.  I would say two things in response to that.

23         First of all, again under New York law, this is

24   how the New York courts instruct under New York law.  So

25   what the Second Circuit thinks should be done under a

1   federal law claim, does not necessarily apply to New York

2   law.

3          The second thing is, this doesn't really, even

4   though it tracks sort of the framework of this case, what

5   the Second Circuit doesn't like to do, and it's usually

6   the defendants that object to the McDonald Douglas

7   instruction, that it shifts the burden to the, back and

8   forth.  And what the Second Circuit says, is that is

9   confusing to say that once the, once the plaintiff makes a

10  prima facie case then the burden shifts.  And they said

11  it's too confusing for a jury to be concerned about burden

12  shifting to the defendant.

13         Here we don't talk about any shifting of burden.

14  It just says, these are the threshold questions.  And if

15  those are met, then you should look at the reasons.  So,

16  it does track McDonald Douglas.  But I don't think it goes

17  so far to evoke a concern that the Second Circuit has even

18  under federal law, which is that it moved the burden back

19  and forth.  That's the concern.

20         But this, again this is the PJI instruction.

21  You don't have any issue with that, Mr. Zabell?

22         MR. ZABELL:  I do not.  I agree it's just the

23  elements.

24         MR. ANTOLLINO:  All right, and then if I get

25  overruled on that.  After Mr. Zarda was qualified for the

818

1    tandem skydiving instructor position, I would ask you to

2    put, or its -- because that is what all of the evidence

3    says.

4          THE COURT:  Mr. Zabell?

5          MR. ZABELL:  I think it's ultimately for the

6    jury to determine.  I'm not arguing that he wasn't

7    qualified for the position.  I don't think any testimony

8    came out that he wasn't qualified for the position other

9    than the fact that on the jump he couldn't behave himself.

10   And the jury gets to determine if that impacted his

11   qualifications.

12         THE COURT:  I don't -- Mr. Antollino, you can

13   handle that in the summation.  If both sides agree that

14   something is undisputed and they want me to highlight that

15   and focus the jury, I'll do it.  But if he doesn't want

16   this particular instruction on what is disputed or

17   undisputed, I don't think there is any reason for me to

18   get into that.

19         MR. ANTOLLINO:  All right.  It says -- and then

20   you would also overrule my suggestion that a second

21   statement for Mr. Zarda was terminated, the parties

22   disagree on this -- you would overrule that objection on

23   the same ground?

24         THE COURT:  Yes.  I think you have established

25   -- I don't think -- maybe Mr. Zabell, maybe has a problem.

**819**

1   You can certainly get up and say, there is no, there is no

2   evidence, there is no argument that he wasn't qualified or

3   that he wasn't terminated -- I mean, I think, if we

4   haven't convinced the jury of that, we're in a lot of

5   trouble.  All right?

6           MR. ANTOLLINO:  I have a problem with the second

7   full paragraph beginning, defendants.  Are you with me?

8           THE COURT:  Yes.

9           MR. ANTOLLINO:  Defendants have produced

10  evidence Mr. Zarda was terminated based on a customer

11  complaint.

12          I would like to add the following clause.

13  Although plaintiff agrees there was a customer complaint,

14  he claimed that this is not the real reason for his

15  termination.

16          MR. ZABELL:  I think that is implicit in your

17  Honor's sentence, that plaintiff claims that this is not

18  the real reason.

19          THE COURT:  I don't think -- he just wants to

20  clarify that that complaint was made.

21          MR. ANTOLLINO:  Right.

22          THE COURT:  That's fine.

23          So read that again, Mr. Antollino.

24          MR. ANTOLLINO:  Although plaintiff agrees there

25  was a customer complaint --

820

1              THE COURT:  Hold on.  I can't write that fast.

2              Although plaintiff agrees --

3              MR. ANTOLLINO:  -- there was a customer

4   complaint, he claims that this is not the real reason for

5   his termination.  And that follows --

6              THE COURT:  Okay, that is fine.

7              MR. ZABELL:  And I have no objection.

8              MR. ANTOLLINO:  And I have no other problems

9   with 18.

10             THE COURT:  Okay, and then so damages pages 19

11  through 23.

12             MR. ANTOLLINO:  I have no problem with 19.

13             MR. ZABELL:  Your Honor, I do.

14             THE COURT:  Let me just go through.  I just want

15  to go through the whole damages section with him.  And

16  then I'll go through with you.

17             MR. ANTOLLINO:  All right, I have no problem

18  with 19.

19             When we talk about mitigation.  On this

20  particular issue if you find the plaintiff has proven lost

21  wages.  I would add a carat and say, It is the defendant's

22  burden then to prove by a preponderance of the evidence

23  that Mr. Zarda failed to mitigate his damages.  In other

24  words -- I'll read it as I would like it read.

25             On this particular issue if you find that

821

1    plaintiff has proven lost wages by a preponderance of the

2    evidence, it is then the burden to the defendant to prove

3    by a preponderance of the evidence that Mr. Zarda failed

4    to mitigate his damages, etcetera, etcetera.

5         THE COURT:  No.  I'll put in the word then, must

6    then prove.

7         MR. ANTOLLINO:  And then, after the date of his

8    death, I would add the sentence.  If the defendant proves

9    work was available that would lead to compensation to

10   replace the lost work, the lost employment that was of

11   like nature, or another similar area of work because he

12   doesn't have to take the same job.  He can go to school.

13   There are any number of ways he can mitigate damages.

14        MR. ZABELL:  Judge, there has been no testimony

15   on damages at all.  We don't even know that they said he

16   passed.  That is not information that the jury even knows.

17        So I think the charge to provide any charge on

18   damages would be damages for lost wages is inappropriate,

19   considering there is no testimony that was elicited at

20   trial regarding damages for lost wages.

21        MR. ANTOLLINO:  Yes.  The Mr. Koplan (ph)

22   testified that Mr. Zarda died in October of 2014.  So, and

23   I believe I put the, and you put in here October 4th.

24   That was the actual date.  If you want to change it to

25   October 1st, that is fine.  But Mr. Helfand testified it

1   was October of 2014.

2            MR. ZABELL:  We're checking that now.  I don't

3   think that is the case.  I don't recall that.

4            THE COURT:  I'm not going to strike their

5   ability to recover damages because they didn't put in the

6   date of his death, if that is what you're asking me to do.

7   The real date to put in the date of his death, that is

8   ridiculous, Mr. Zabell.

9            MR. ZABELL:  Is it judge?  Because we spent more

10  days here.

11           THE COURT:  Yes, because the jury heard that he

12  died.  You know -- yes, that's not appropriate.  I don't

13  have Mr. Helfand's testimony in front of me.  Do we have a

14  transcript for that?

15           MR. ZABELL:  We do.  We're looking for that now.

16           THE COURT:  Check the index for the word

17  October.  That would probably make it easier.

18           MR. ANTOLLINO:  There is more on the date of

19  death if he is going to make a stink about this.  We even

20  have the court file, his death certificate, which you can

21  take additional notice of.

22           MR. ZABELL:  The only mention of October was a

23  reference to coming back tomorrow.  Or we're in October

24  now.

25           MR. ANTOLLINO:  Mr. Zabell made a suggestion

823

1    that if that is on the record of October 5th, 2014, the

2    day after my client died.  Thereafter a couple of months

3    we substituted the date.

4              THE COURT:  I don't understand what Mr. Zabell's

5    -- reopening the evidence is a discretionary matter for

6    the court.  It's clear on the issues here, lost wages.

7    It's clear that lost wages would end at the, on the date

8    of his death.

9              And I'm not going to allow the jury to go back

10   in there not knowing what the date of his death is,

11   because the money would probably calculate the lost

12   damages.  So it's my discretion, if you want to put

13   Mr. Moore on to say the date, or you can stipulate that he

14   deed October 4, 2014.  Or you can put Mr. Moore on the

15   stand.

16             MR. ZABELL:  I'll grudgingly stipulate to

17   October 14th, judge.

18             THE COURT:  4th.

19             MR. ZABELL:  4th, excuse me.

20             But I object because I believe this is something

21   that should have come out during plaintiff's lengthy

22   presentation of their case.  I think it's --

23             THE COURT:  Well it's a discretionary matter.  I

24   understand you're objecting to preserve.  But it's

25   discretionary matter.  Everybody knows the date he died.

824

1   It has been in the record for years.  If you failed to put

2   the actual date, in my view it should be reopened.  There

3   is no prejudice.  And the jury needs to have it to

4   calculate damages appropriately.

5          MR. ZABELL:  That figure is set back to just

6   general damages, judge.

7          Again, my argument is there has been no

8   testimony about damages.  There has been no testimony

9   about how much he made, or how much he could have made.

10  There is no testimony about how much he made after he

11  left.

12         MR. ANTOLLINO:  That is not true.

13         THE COURT:  Well, first of all, I think there

14  was a document that Mr. Antollino put in.

15         MR. ANTOLLINO:  Yes.

16         THE COURT:  About what he made.

17         MR. ANTOLLINO:  And I also questioned Ray

18  Maynard.

19         MR. ZABELL:  No.  He tried.  There was one

20  document that went in that talked about quarter's worth of

21  earnings.  But it does not by any stretch of the

22  imagination encompass what his earnings were.  No

23  discussion of income tax returns for any of the years that

24  he was either employed there or not employed there.

25         MR. ANTOLLINO:  I also questioned Mr. Maynard

1    about what a skydiver on a good day, how many jumps on a

2    good weekday, how much per jump on a good weekend, how

3    many jumps.  And we know that the summer is one-fourth of

4    the year, which it is 13 weeks.  So that is how I'm going

5    to argue to them.

6              THE COURT:  Okay, there is an objection that has

7    been lodged.  I'm going to let the loss of wages issue go

8    to the jury, whether or not there is sufficient evidence

9    to support whatever verdict may come out, then obviously

10   again, if there is an unfavorable verdict to the

11   defendant, you can make a motion after trial if you don't

12   think it was supported by the record.  Okay.

13             MR. ZABELL:  Thank you, judge.

14             THE COURT:  All right, I think we lost track.

15             Any other objections to damages, Mr. Antollino?

16             MR. ANTOLLINO:  Well, you know, perhaps that, I

17   think that you cover my mitigation issues with the second

18   sentence.  But if you could put in there, that something

19   like a, a person can mitigate damages by studying for

20   another degree or going to school.

21             If they want to argue he was going to school

22   anyway, let them do it.  We're going to argue that he

23   ramped up his studies.  And there was evidence through Ira

24   Helfand and through Mr. Zarda that it was that.

25             MR. ZABELL:  If they want to argue it, they can

826

1    argue it, judge.  I believe that your charge adequately,

2    over-addresses the issue of damages.  I don't think that

3    it needs to be any modification.

4              THE COURT:  I'm not going to say anything about

5    schooling.  It does talk about earned by reasonable

6    effort.  And you can argue to the jury that he was going

7    to school.

8              MR. ANTOLLINO:  Okay.

9              THE COURT:  He couldn't work.  I'm not going to

10   put anything more in like that.

11             MR. ANTOLLINO:  All right now, as far as the

12   rest of the part, the rest of damages, we have no other

13   objections.

14             THE COURT:  Mr. Zabell?

15             MR. ZABELL:  Nothing other than what I have

16   already put up, judge.

17             THE COURT:  Okay.

18             The closing remarks, 24 to the end.

19             There was one thing I did want to highlight,

20   actually.  It relates to the verdict sheet.  Because I

21   don't think, Mr. Zabell you submitted a verdict sheet.

22             But on page 24 I instruct them at the bottom

23   that the decision reached must unanimous.  That you should

24   also consider each claim.  That's wrong because there is

25   only one claim.  And you should consider them separately.

827

1        But on that issue, if you saw my instructions, I

2   basically tell them that, because Mr. Maynard is being the

3   sole owner, and with the decision there is no evidence

4   there was any other decision-maker that essentially in the

5   company are -- for purposes of this case.

6        So I just want to make sure that you have on the

7   verdict sheet, that we only have one question.  It doesn't

8   separate out by defendant.  And it also doesn't cover the

9   other, for example you could have a special interrogatory

10  saying, did the plaintiff prove that he was terminated,

11  did the plaintiff prove that he was in a protected class.

12  You could break it down.  '

13        But as we talked about it, those aren't disputed

14  here.  So I just want to make sure that you're okay with

15  the verdict sheet and with me not instructing them that

16  they should treat each defendant separately.  Because I

17  think under New York law, and federal law is obviously

18  different though.  But under New York law Mr. Maynard

19  would be liable as well as the company.

20        MR. ZABELL:  I understand your Honor's reasoning

21  behind that.  I'm not objecting.

22        MR. ANTOLLINO:  Yes.  So that was the only

23  objection we had to Par III, to take out the second

24  sentence.

25        THE COURT:  So I'm taking that out.  And again,

828

1    just so I'm clear.  If the jury found, answered yes to

2    question 1 on the verdict sheet, then you agree that the

3    judgment, whatever damages would be -- obviously I'm not

4    suggesting damages, but the judgment would be against both

5    Altitude Express, Inc and Mr. Maynard.

6              MR. ZABELL:  I believe that that is what the

7    current case law is.

8              THE COURT:  And you don't want me to instruct

9    separately?

10             MR. ZABELL:  No.  If you were to instruct

11   separately on each defendant then you would have to put

12   aider and abettor language in.

13             THE COURT:  That would be confusing to do that.

14   But I just want you to know -- first of all I think if

15   they would find one and not the other it would be an

16   inconsistent verdict and I would have to send this back

17   in.  Because I don't see how in this particulars case one

18   could be liable and not the other.  Because there is no

19   one else involved in the decision making.  But I just want

20   to make sure you're okay with that.

21             MR. ZABELL:  I am, judge.

22             THE COURT:  Okay.  So are there any issues?  If

23   I take out that second sentence on 24, do you have any

24   issues on Part III, Mr. Zabell?

25             MR. ZABELL:  No, judge.

829

1          THE COURT:  Okay.  And then on the verdict

2    sheet, Mr. Antollino?

3          MR. ANTOLLINO:  Well, based on your Honor's

4    ruling, we have no objection to the verdict sheet.

5          But we carry over our objections to determining

6    factors.

7          THE COURT:  Right, I understand.  It is

8    preserved.

9          Mr. Zabell, do you have any objection to the

10    verdict sheet?

11          MR. ZABELL:  No objection, judge.

12          MR. ANTOLLINO:  Are we going take a break before

13    we start?

14          MR. ZABELL:  Once last thing before we start.

15          I think it appropriate that I renew my motion

16    for a judgment in the defendant's favor against the

17    plaintiff as a matter of law pursuant to 50(a).  Under the

18    federal rules I believe I need to do that at this point to

19    preserve my right.

20          THE COURT:  Sure.  It's preserved.  And my

21    ruling is again that I'm going to submit the claim to the

22    jury, and if there is an unfavorable verdict to your

23    client --

24          MR. ANTOLLINO:  We found out that it is not

25    required any more.  Renewal is not required any more.  I

830

1   made that argument in another case and they changed the

2   rules.  So the rule is, not required.

3          THE COURT:  I think you're right.  But whenever

4   a defense lawyer does it, every defense lawyer does it.

5   Also there is another law in that state court

6   practitioners, that every time I rule against them, with

7   the exception.

8          MR. ANTOLLINO:  The exception.

9          THE COURT:  Exception noted.  The exception is

10  noted.  But I looked at the federal, and it specifically

11  says it is preserved, you don't have to say it if the

12  judge rules against you.  That is a state court thing.

13         MR. ANTOLLINO:  No, it is not.  The state courts

14  don't have the exceptions.  I have been practicing for

15  many, many years and that is what I remember.

16         THE COURT:  Okay.

17         MR. ZABELL:  Judge, I have one thing I want to

18  bring up before closing.

19         THE COURT:  Yes.

20         MR. ZABELL:  I so desperately don't want to have

21  to object during Mr. Antollino's closing.

22         I'm going to ask your Honor to remind all of us

23  that only documents that are displayed to the jury that

24  are introduced into evidence, nothing else gets shown to

25  the jury that is not part of the evidence.  I think that

831

1    that's --

2             MR. ANTOLLINO:  Well let me bring one thing up,

3    judge in terms of the wage claim.  I just want to

4    demonstrate to the jury how I reach, how much they make

5    per summer.  And I'm going to say $40 per jump times 12 on

6    a good day, six jumps on a weekday times 40.  So that

7    makes so much per week.  And then how many weeks in a

8    summer, and round it down.

9             And I have a document that I just make those

10   calculations.  And I can do it on a -- I was going to

11   bring a big poster board to do it as we spoke.  But

12   instead I did it on the iPad, and it can go up as we

13   speak.

14            THE COURT:  That is demonstrative.  Where you do

15   the math it's okay.  It wouldn't go back to the jury room.

16   Obviously it is not an exhibit.  But for purpose of your

17   summation, if you have a document that does math, that's

18   fine.

19            MR. ANTOLLINO:  All right, so I'll explain to

20   the jury that this is just demonstrative.  It didn't come

21   into evidence.  I'm just showing you the math and how I

22   reached this number.

23            THE COURT:  That is fine.

24            MR. ZABELL:  Two things.  One, as long as what

25   he is referencing is referencing to actual testimony.

832

1        And two, he mentioned the wage claim.  I'm

2   assuming he is talking about damages because he has

3   withdrawn his wage claim.

4        THE COURT:  Lost wages.

5        MR. ANTOLLINO:  Lost wages, of course.

6        THE COURT:  In terms of again whether or not

7   it's supported by the record.  You know, I give a general

8   instruction to the jury in the beginning of the summations

9   that they're arguments by counsel, not evidence.  If the

10  evidence is different from what they say, your

11  recollection controls.  And then I give the instruction

12  that if you say something about the law that is different

13  from what I say, what I say controls.

14        So I hope that those instructions eliminates a

15  number of objections.  But if someone makes a -- you can

16  obviously point that out to the jury.  But I don't want

17  constant objections for either side.  I don't think that

18  is fair.

19        So let's take a short break.

20        MR. ANTOLLINO:  Thank you.

21        MR. ZABELL:  Thank you, judge.

22        (A recess was taken.)

23        (After recess the following occurred.)

24        THE COURT:  Good morning, members of the jury.

25  Good to see you again.  I apologize for keeping you

833

1    waiting, but we are ready to proceed now and proceed with

2    the summations or closing statements.

3            Before we begin I just want to give you a few

4    instructions about closing statements.  The first one, I

5    said at the beginning of the case, but I just want to

6    reiterate.  The statements by the attorneys, the opening

7    statements and now closings statements are not evidence.

8    These are argument they're making to you about the

9    evidence or lack of evidence.  And you're free to accept

10   or reject those arguments as you see fit.  But the

11   lawyers' statements to the jury are not evidence.

12           The second thing is, if a lawyer says something

13   about what the evidence was, and your recollection of the

14   evidence differs from what the lawyers said it was, it's

15   what your recollection is of the evidence that controls,

16   not what the lawyer says it was.  And if you have any

17   doubt about that during your deliberations, again as I

18   said at the beginning of the case, you can ask to have the

19   testimony ready back by the court reporter.  You can ask

20   for any exhibit.  But it is your recollection that

21   controls, not the lawyers' statements.

22           And finally.  I have gone over my instructions

23   on the law with the lawyers.  That is what we, the time

24   was that we were spending.  So they make reference during

25   their summations, to say something along the lines of, I

Summation - Plaintiff/Mr. Antollino

834

1    anticipate that Judge Bianco will tell you that or why.

2    They're permitted to make reference to my instructions.

3    But I just want to emphasize if they say something about

4    the law in their summations, and then when you hear my

5    instruction on the law it's different from what the

6    lawyers said, obviously my statement of the law is what

7    controls, not what the lawyers say during his or her

8    summation.

9              Okay, so with those explanations, we'll begin.

10             Go ahead, Mr. Antollino.

11

12             **SUMMATION FOR THE PLAINTIFF**

13             MR. ANTOLLINO:  Thank you, judge.

14             And thank you, ladies and gentlemen for being so

15   attentive for these two weeks.  This experiment in

16   democracy, which is exactly what it is.  It's quality is

17   not given.  It has to be fought for and it has to be won.

18   This is a theme we have seen throughout world history.

19   And I'm not going to start from the very beginning, but

20   I'll give you some highlights.

21             We have seen it from the tensions between the

22   negotiations of the landlords and the king in the

23   establishment of the Magna Carta, which is the very

24   foundation of democracy; and to the US revolutionary war.

25   We've seen conflict and the fight for equal rights; to the

Summation - Plaintiff/Mr. Antollino

835

1   liberation of the slaves; to the fight for women and the

2   right to vote; to the civil rights movements of the 1960's

3   and the fight for equal opportunity in employment for

4   African-Americans.

5          And this leads us to the gay rights fights of

6   the last several decades.  These fights are never

7   pleasant.  But this is one of the more pleasant of the

8   ones that I have mentioned.

9          This trial might have been unpleasant for you at

10  times.  I know it was for me.  It was tough for me to

11  cross-examine a young woman about what we contend were her

12  bogus allegations of sexual impropriety against her by a

13  gay man.  She, with claustrophobic tendencies, had no idea

14  what she was getting into when she signed up for a

15  skydive.  And in the end, someone had to be there and ask

16  her the tough questions.

17         Considering all of the evidence, her story

18  simply does not hold up.  Duncan Shaw, really what

19  happened was this; that she was scared out of her mind to

20  be going on a skydive and risking her life.  Duncan Shaw,

21  the man from Zealand testified yesterday that there are

22  only ten minutes between someone getting strapped up and

23  going into the airplane and going up in the air.

24         And what happened in those ten minutes to Rosana

25  Orellana?  One, they make a joke to her boyfriend about

Summation - Plaintiff/Mr. Antollino

836

1    his last words, suggesting that he is not going to speak

2    any more.  Suggesting of course that he is going to die.

3    That is not going to make anyone happy.

4           Two.  A joke about his girlfriend being strapped

5    to another guy.  Gosh that certainly is not a reasonable

6    way to make people comfortable.

7           Rosana couldn't remember who made the jokes.

8    But then all of a sudden she said it was my client.  But

9    you remember David Kengle said he was certain that it was

10   not my client who made that joke.

11          You also heard Rosana testify that she looked

12   around the airplane and she saw that her instructor was

13   acting differently from other instructors.  But in fact

14   she also testified that she could not see behind her.  And

15   as you saw on the video, and I'm not going to play the

16   video again, but you can ask for it in deliberations if

17   you would like to see it a tenth time, that she could not

18   see in the back of her head because she was right in the

19   front of the airplane.

20          Now, after the joke about sexual content, and

21   after the joke about death, she had an opportunity to

22   learn what was going to happen to her.  This was not a

23   fine dining experience in the sky.  This was a rowdy bunch

24   of yahoos who were going to go up and jump out of a plane

25   to their potential death.

837

1    She didn't complain during the episode.  We saw

2    that in the tape.  And I'll show you a few pictures.  But

3    she complained to her boyfriend as they were leaving the

4    drop zone.  And her boyfriend relayed those complains to

5    Ray Maynard.

6         Ray Maynard did not ask her any questions.  So

7    it's the situation where I tell two friends, and they tell

8    two friends, and they tell two friends, and so on and so

9    on and so on.  But the one thing that Ray Maynard did

10   remember is that Don Zarda said he was gay.

11        Ray Maynard was too afraid to speak to her about

12   those allegations.  And too afraid to speak about the

13   boyfriend's allegations.  But he knew that telling the

14   client that he was gay was true.

15        You know that a false allegation of touching

16   hurts both men and women.  Because if a woman is to be

17   believed, the woman is going to be placed on some societal

18   pedestal and not treated as equal.  And the man, when the

19   circumstances do not call for it, is going to get in

20   trouble, possibly lose his job, possibly go to jail.

21        In this case, as you saw in David Kengle's

22   video, and as you heard in his testimony, he didn't notice

23   anything was wrong until the car ride was home.  Or if he

24   said that he noticed something was different, you didn't

25   see that on the tape.

838

1        What we do know is that he was very happy after

2   the jump.  And he was very happy on the plane.

3        His position versus says Rosana was, as I

4   described catty-corner, diagonal.  They could not talk to

5   each other.  And it was not until three days later after

6   talking to Rosana and thinking about it that he made any

7   complaint whatsoever.  If it were so horrible that he had

8   to make a complaint, one would think that he would make a

9   complaint immediately, not think about it for three days.

10        But as Mr. Kengle testified, he is a bartender

11   and he knows the culture in restaurants.  He knows that

12   some restaurants will comp you if you don't like the food.

13        At the time of the skydive, he was unemployed.

14   He testified that he did remember that he was unemployed.

15   But if you look at his waiver, there is a space there for

16   occupation, and it is left blank.

17        So $660 was a lot for an unemployed person at

18   the time.  And he figured out a way over the course of

19   three days to get his money back.  And he was successful.

20        But even now, five years later, Don's activity,

21   Don's activities on the plane didn't ruin the experience

22   for him.  He testified that it was, quote-unquote,

23   tainted, quote-unquote, less than perfect.

24        But as Ray Maynard explained, he makes it clear

25   to all of his potential passengers that no skydive is

Summation - Plaintiff/Mr. Antollino

839

1  perfect, no parachute is perfect, no customer is perfect,

2  no skydive instructor is perfect.

3       So the fact that it was less than perfect and

4  ended up with his life and no injuries means that it was

5  as good as it could possibly be.

6       Ray used the complaint to invoke the gay issue,

7  which he tried to morph into personal information.  But

8  Don brought up that personal information to protect

9  someone's life.  He testified, as you heard in his

10  deposition, that Rosana was uncomfortable about the

11  comment that I didn't know your girlfriend was going to

12  get strapped up to another guy.  And he reassured in his

13  best judgment, that he had no interest in her, and she

14  should disregard that comment.  That's completely fair

15  game.

16       She was uncomfortable because there was an

17  implication of some sexual interest.  And he took himself

18  out of it as best he could.

19       Rosana said afterwards she didn't like it that

20  Don's mouth was one inch from her ear.  Well, I'm sorry,

21  Rosana but that's just the way it works.  The instructor,

22  as Ray Maynard explained, can not bump his teeth into the

23  back of the skydiver's head.  He has got to go either to

24  the left or to the right.  And because they're strapped so

25  closely together, it's going to be about an inch that

Summation - Plaintiff/Mr. Antollino

840

1   they're going to be separated.

2        That way no one gets injured; not the passenger

3   nor the instructor, and the passenger keeps her life

4   without injury.  Would she rather that he had loosened the

5   straps and they'd been farther apart, and that perhaps she

6   had fallen to her death?  Certainly not.  Don's job was to

7   protect her and give her appropriate instructions as his

8   4000 jumps and experience taught him to.

9        She, Rosana, didn't like it because they simply

10  didn't explain it well enough at the drop zone.  They

11  didn't explain the process, or she didn't read the waiver,

12  or listen to the video, or understand the process as well

13  as she should have..

14       All she had walking to the plane was her woman's

15  intuition that Don was being sensual when he was talking

16  to her.  He was using, in fact, the voice thank God gave

17  him, to get her attention so that she would follow

18  instructions and be safe.  And instead of investigating,

19  Maynard chose to accept the secondhand allegation of

20  Kengle, who was one step removed from the drop and wasn't

21  always there.

22       Perhaps her woman's intuition should have told

23  her not to engage in an inherently dangerous activity in

24  which you can die.  The reality is, that either she

25  shouldn't have gone on the skydive or perhaps she is proud

Summation - Plaintiff/Mr. Antollino

841

1    to have done it, but there were some complications along

2    the way.  She didn't want to complain, but David Kengle

3    saw this as an opportunity to get his money back.

4         This was a life or death experience with

5    goofiness in the sky.  This is not first class on United.

6    This is not a fine dining experience.  This is where the

7    instructor has to maintain a balance between making the

8    customer safe and making the experience fun.

9         Don had had over 4000 dives.  And in this

10   particular situation, he was put in a corner when someone

11   else accused him of strapping up to a woman for sexual

12   gratification.  And we know that that's not true because

13   he was gay, and he mentioned that to make her feel better.

14   He had no physical interest in her despite what someone

15   else had said at the drop zone.

16        He was between the proverbial rock and a hard

17   place.  When he is told in front of the woman, in front of

18   her boyfriend that he is getting too close to her he did

19   the best thing that he could have under the situation.

20   There is nothing else that he could have done other than

21   to say, Oh, I'm not interested in her.  She's not my type.

22        I'm not going to play the video again as you

23   have watched it over again, including the part where Don

24   touches his lip.  Not one second of that video, however,

25   shows that Rosana was uncomfortable.  Not one second of

Summation - Plaintiff/Mr. Antollino

842

1  that video shows that her boyfriend was uncomfortable.

2  Not one second of that video shows that Don Zarda, a gay

3  man, felt her up in any inappropriate way.  She was given

4  full notice that there was no perfect skydive.  And at the

5  very end of it they both said, Awesome.

6        What more can you expect from something

7  inherently dangerous and as unusual as a skydive, no

8  injury, have an awesome time, and no death.

9        The only thing they didn't like was that Don

10 said he was gay.  But there were no rules that Maynard

11 showed at the workplace that said that an employee could

12 not share personal information with customers.  And in

13 fact the evidence shows that employees shared personal

14 information with customers all the time.

15       Duncan Shaw testified that he shared with

16 customers that he was from New Zealand.  That is personal

17 information.  That is an identification of who you are,

18 just as it is an identification of who you are when you

19 say you are gay.

20       Even Ray Maynard went into detail both at the

21 drop zone and on his business Facebook page that he was

22 having a bad divorce, and he was having a great time with

23 his new girlfriend.

24       I don't need to hear that.  I don't really care.

25 But that's personal information.  So don't say that

Summation - Plaintiff/Mr. Antollino

843

1   personal information is not allowed at the workplace.  It

2   was the fact that he said he was gay.

3        Rich Winstock told customers, you heard Rich

4   Winstock who worked for Ray for many years and now owns

5   his own drop zone, that he saw nothing improper in the way

6   Don was handling the drop.  And he also said that in his

7   judgment he mentioned at times that he is married and has

8   children to ease the tension that someone might feel.

9        That is personal information.  Ray's testified

10  he knew that and he would not fire Rich Winstock for that.

11       Now if Don told women in 2001 that he was gay,

12  as the judge will instruct you, it was not until 2003 that

13  it was against the law to discriminate against gay people.

14  Gay people could be fired simply because they were gay

15  until 2003 in this state.  In other states they can still

16  be fired.  But in New York in 2003 the legislators and the

17  governor got together and they said, we have to have this

18  new law.

19       So in 2001, when the women mentioned they were

20  gay or these women mentioned that Don said he was gay,

21  apparently they came to Maynard in tears.  I ask you in

22  your collective judgment; do you really think that someone

23  is going to cry because they learn that someone is gay?

24  And don't let them try to fool you that there was anything

25  other than him saying that he was gay, because he

844

1    testified at his deposition.

2              Question:  What was it that Don said that made

3    these women cry?

4              Answer:  Him talking about being gay.

5              Question:  Anything else?

6              Answer:  No.

7              That is what he testified to at his deposition.

8    They try to he embellish it now, but in his deposition he

9    was under oath and he was sworn to tell the truth.

10             So in 2010, when Don said he was gay, he was

11   protected under the law to do that.  He said he was gay

12   because he was gay, and because he was gay he said he was

13   gay.  It's okay to say you're gay.  That's what the law

14   says.  Gay rights are human rights, and human rights are

15   gay rights.

16             This whole nonsense about personal information

17   is a code word for gay.  The personal information that Ray

18   Maynard didn't like, was gay.  But as I told you before,

19   what was Don supposed to do in the situation in which he

20   was presented as moving in on someone else's girlfriend.

21   He had the right as a gay person to take himself out of

22   the insinuation that he was interested in someone's woman.

23             Ray's admitted -- and don't tell me by the way

24   that any complaint leads to termination.  Ray admitted

25   several scenarios that would not be grounds for

845

1    termination, including the scenario that someone

2    complained that Rich Winstock was married with children.

3        Also, take a look at the rip off report.  I'm

4    not exactly sure what number exhibit that is, but the rip

5    off report says all sorts of things about the drop zone.

6    And Ray's doesn't fire anyone.  He merely questions the

7    person who makes the complaint.  The person who makes the

8    complaint even goes so far as to say that the skydive

9    instructors were feeling our girlfriends' breasts.

10       And what does Ray say in response to that?

11   Personally, if someone was feeling up my girlfriend I

12   would do something on the spot to defend her dignity,

13   unless of course I am a fourth grader.

14       David Kengle did nothing to defend his

15   girlfriend's dignity because Don did nothing to insult her

16   dignity.

17       There is also in evidence Exhibit 6, a Yelp

18   complaint where a customer complains about a videographer

19   who didn't give him a tape that he paid for on time, and

20   the receptionist who was in his words, incredibly rude.

21   No one was fired.  No investigation was undertaken.

22   Anyone can complain in any service industry.  It's very

23   common.  Clients have even complained about me as a

24   lawyer.  But sometimes they might not understand what I

25   have to do in order to get my job done.  Sometimes they

846

1    might not understand, for example that cases take five

2    years to get to trial.

3            So, Don gave Rosana proper instructions,

4    protected her person.  And because of that, she is here

5    today to tell her story.  And she is alive without a

6    scratch from that dive.

7            Her boyfriend's complaint got Don fired.  And

8    there is no testimony that anyone got fired because of any

9    of these other complaints.  But in Don's case it did,

10   simply because while Don was doing his job he mentioned

11   that he was gay.  And Maynard refused to probe the

12   ridiculous claim of improper touching.  Something he knew

13   that he could rely on because it's so inflammatory.

14           And so when you fire someone for touching a

15   woman, it's almost self-evident that that is a reason to

16   fire someone.  But you wouldn't think someone was going to

17   take him and expose his lies to a jury.

18           Now all he has is witnesses telling you over and

19   over again about Don touching his mouth while he is in the

20   aircraft.  That's all they got.  And they keep making that

21   scene like it's so obscene as to justify a termination.

22           But remember, Rosana never complained about

23   that.  She complained that she was touched at the hips

24   where the straps are.  And that he whispered in her ear.

25   Even though, I don't believe that she testified to that.

Summation - Plaintiff/Mr. Antollino

847

1    I'm not sure.  But you have to whisper in someone's ear to

2    get their attention.

3          Don had done 4000 jumps.  And if she didn't like

4    Don's sensual voice, that's her right.  But that's not a

5    termination offense.  That was his voice and that was the

6    voice he used to get the client's attention so the client

7    was safe.

8          Now, Maynard also testified that he did not fire

9    Don because of any creepy expression you made, that he

10   made on his face.  They use that over and over again.

11   They start every showing of that video with the face and

12   him touching his mouth, because they want to put in your

13   mind that he is a sick pervert weirdo.  But you heard from

14   Rich Winstock that what instructors are taught to do is to

15   enhance the video, so that when a person comes home, it's

16   not simply an instructor sitting there with his eyes

17   closed or just looking out into space.

18         Don was on film.  And you can see the minute

19   before he realized he was on film he was just looking at

20   his thumb.  And then when he realized he was on film, he

21   started pointing to the camera and going all over and

22   making all sorts of expressions.  In fact, Rosana was in

23   front of him.  And so the only thing that Don had to

24   enhance the videos and make it interesting was his head

25   and his hand.  So he used them in whichever way he felt or

848

1    that came to him naturally.

2         You saw another video of him behind an

3    African-American man where he had both hands available.

4    And you saw him doing things like this and putting his

5    hands on his head and shaking back and forth.

6         The rule in the sky is to be goofy, so that when

7    you bring your video home there is some entertaining value

8    to it.  You went up in the sky with these goofy people.

9    You fell out of the sky.  And you landed without any

10   accident.

11        Now, why do we know that it was Ray's -- I'm

12   sorry -- Don's being gay that made Ray so angry?  There

13   are lots of forms of evidence.  There's paper evidence.

14   There's evidence by testimony.  And there is also evidence

15   in the tone of one's voice.  If one speaks slowly and

16   softly, that is evidence that they are timid.  If someone

17   shows rage in his voice, that shows that they're angry.

18        Now, when this case was taken, it was a week

19   after the complaints, and a week after Don was sent home

20   without any pay.  And Ray Maynard is still angry.

21        All right, this picture has nothing to do with

22   the case.  It's only the voice, so I'm going to unplug the

23   picture.  And play the tape of the firing.

24             (The tape was played.)

25             (The tape was stopped.)

Summation - Plaintiff/Mr. Antollino

849

1    You can hear at the very end of that video, Don

2    begging to see -- I'm sorry -- you can hear in that audio

3    Don begging to see the, the video for the precise reason

4    that he knew that video had been taken and it would

5    exonerate him.

6         And I'm just going to try to show you a few

7    pictures of the video which are in evidence.  And this is

8    Orellana just before she is about to jump.  She looks very

9    happy there.

10        Here is another picture of her.  She looks like

11   she is in ecstasy.  If you close up on her face you see

12   the expression of a very happy person.  And this is pretty

13   much the same thing from a different angle.  And that's

14   it.

15        The one thing you notice about what Ray said of

16   the video, and I didn't hope you can forgive me, is that

17   Don was telling people that he's doing what he's doing.

18   No.  Being gay is not doing something.  Being gay is being

19   something.  He also referred to being gay as escapades.

20   No.  Being gay is not escapades.  Being gay is how you

21   are, and how you are either born or socialized and have an

22   attraction to the same sex.  It's not an escapade.  It's a

23   way of being.  It's a protected class written in the books

24   of law.

25        You heard the rage in Ray's voice.  And you

Summation - Plaintiff/Mr. Antollino

850

1   heard him use the excuse, personal information.  But

2   remember, personal information is the code word for gay.

3   Because everyone else who talked about personal

4   information was allowed to, even people who talked to Don

5   Zarda about his personal information.

6         You heard Maynard say on the tape, I don't care

7   what they do as long as my customers don't hear it.  But

8   they're making fun of Don in the process.  So they're

9   taking to Don about his personal information and poking

10  fun of him.  And maybe Don gets used to it for some

11  reason.  That's okay.

12        And for some reason telling someone who you are

13  when you're put in a corner and accused of hitting up on

14  someone's girlfriend is not.  It just does not make any

15  sense.  And, you can reasonably conclude that there is no

16  belief in Maynard's mind that Don was feeling her up,

17  because he knew he was gay.  He knew Don had to touch the

18  passenger for safety.

19        These women who were crying in 2001, cried

20  because Don was gay.  I would suggest that that is an

21  outright lie.  People don't cry because strangers say that

22  they're gay.

23        Finally, you have got the unemployment response

24  which mentions nothing about touching.  And you have got

25  the rip off report which is not so important in the

Summation - Plaintiff/Mr. Antollino

851

1   complaint, but in Ray's response where he says if someone

2   was hitting up on my girlfriend I would defend her dignity

3   on the spot.  In this case Kengle waited three days.

4         Since 2001 or 2003, society has evolved

5   precisely because law makers don't want gay people to be

6   defamed because of their sexuality.  They don't want them

7   to be defamed because they are sexual perverts.  That is a

8   stereotype that Mr. Maynard wants you to rely on, and that

9   he relied on to validate the preposterous contention that

10  a gay man who was hired to hold and protect only wanted a

11  squeeze.

12        Don was proud to be gay.  He walked to the beat

13  of his own drum.  People joked about him in the workplace.

14  And according to the testimony you heard, he got used to

15  it.

16        But Don couldn't for some reason tell customers

17  that he's gay.  Why?  Why?  I'll tell you the reason why.

18  It's homophobia.  He was allowed to be gay in the

19  workplace with the workers, but don't stick your pinkie

20  out of the closet and let my customers know that you're

21  gay, because I don't want my customers to know that anyone

22  here is gay.

23        And the judge will instruct you customer

24  preference is not a basis upon which you can discriminate

25  against a worker.  In fact, Don didn't tell everyone that

Summation - Plaintiff/Mr. Antollino

852

1   he was gay.  He just so happened to tell this one person

2   that he was gay, because it came up and he was put in a

3   corner.

4          The skydive jump is something so predictable

5   that even an experienced skydiver has to improvise as best

6   he can in each circumstance.  Someone accused him of

7   wanting to move in on his girlfriend and he used his best

8   judgment; one, to make the woman comfortable; and two, to

9   take him out of the situation.  There is nothing else he

10  could have done other than say, I'm not going to do this

11  jump.

12         Now, the judge is going to give you a verdict

13  sheet.  And the first question on the verdict sheet is

14  going to be, Do you find Altitude Express liable for

15  discrimination on the basis of sexual orientation.  And

16  your answer to that should be, yes, for all of the reasons

17  that I have given you, and all of the reasons the judge

18  will describe to you in describing the law.  And without a

19  finding that Don's gayness was a determining factor in his

20  termination.

21         Now remember, there can be many determining

22  factors in a termination.  You might make a decision for

23  any number of reasons.  But you can't let an illegal

24  reason enter the thought-making process.  Because that, if

25  you let the illegal reason come in, that's discrimination.

853

1          And so, when you check, yes, for discrimination,

2   that will allow you to go on and calculate damages.  And I

3   want to talk to you about damages.

4          Damages is, might be easier for you to reach or

5   it might be harder.  But I have figured out a way for you

6   to ascertain what Don lost in the four years that he could

7   not work at Skydive Long Island.  And remember, he

8   testified in his declaration that he no longer feels like

9   he can be himself working, jumping, specially jumping,

10  having to strap people to me and touching so many places

11  to perform the job because of what Ray Maynard did

12  terminating me for such reasons, regardless of the bogus

13  customer complaints.  I can no longer work in this

14  industry without fear of having being branded some kind of

15  gay pervert.  I can not even enjoy non-work skydiving

16  because there are tandem jumps taking place at every

17  skydiving center, and it is a stark and vivid reminder

18  about what happened to me which takes away the enjoyment I

19  get from jumping, and keeps me from interacting with

20  friends in social circles developed over two decades.  No

21  amount of personal loss, injury or death in this sport has

22  ever pushed me away until now.

23          Don supported himself by skydiving for years.

24  You heard testimony that he did a couple of skydives in

25  Texas after this happened but his heart wasn't in it.  And

854

1  whose would be with this hanging over your head, this

2  allegation of sexual impropriety.

3         When Don was fired, he was fired with double

4  whammy.  Number 1, he was discriminated against on the

5  basis of saying he was gay.

6         And number two, perhaps worse, he was

7  discriminated against on the pretext of touching a woman

8  he was supposed to touch to protect her life.

9         I can't imagine the horror that he went through

10  in those years.  And you heard Ira Helfand testify that

11  during this period he was depressed and even suicidal.

12  And yes, he did go on a couple of cruises.  But for the

13  rest of the year he was in a snowed-in airport in Missouri

14  trying to get food.

15         And yes, he did go to Norway.  And that was

16  precisely because he was trying to develop a career as a

17  base jumper, something he had flirted with for many years

18  that he was trying to use to take over skydiving in its

19  entirety.

20         Whether or not that led to any income is not the

21  question.  The question is simply, did he try to find

22  another field that was similar given his credentials?  You

23  also heard that he doubled up on his studies, and he got

24  A's in all of his classes in these condensed semesters

25  that they had at Emory Brill University.

Summation - Plaintiff/Mr. Antollino

855

1    Now Maynard told you that on a good weekday a

2    skydiver would make -- no, a skydiver always made $40 per

3    jump no matter when the jump was and whatever day.  But on

4    a good weekday a skydiver could get 12 jumps.  40 times 12

5    is 2400.  In addition, as Ray Maynard testified, it's

6    about half that; 6 jumps on a good weekend day, that's

7    240.

8    The Skydive drop zone is open seven days a week.

9    So 200 and -- I'm sorry -- $2400 plus 480 is $2800

10   hundreds.

11   In one year we all know we have 52 weeks.  And

12   in each of the seasons is one-fourth of that, which is 13

13   weeks.

14   So what you have is $2800, the maximum.  I'm not

15   saying this is what he would have gotten, but the maximum

16   is $2800 times 13 weeks, times the four years that he

17   could not work in skydiving.  You can do the calculations

18   yourself.  But it comes out to around $140,000 for those

19   four years.

20   Remember they were getting tips as well in

21   addition to the $40 jumps, times 12, times 5, times 13.

22   Customers left tips.  And you heard Lauren Callahan say

23   that there were many happy customers, just like the e-mail

24   that was put into evidence.  Just wanted to drop a note

25   and compliment your tandem jump instructor, Don from

Summation - Plaintiff/Mr. Antollino

856

1  Kansas.  He was very professional in every way, and that

2  made the entire experience even better.  Employees like

3  Don would be a reason for the continued success.  Looking

4  forward to my next jump.  Jim McVee.  This was in 2009.

5           Now another element of damages is pain and

6  suffering.  Now we are not looking for any physical pain

7  and suffering, but emotional pain and suffering.

8  Depression hurts.  Being suicidal hurts.  One has to think

9  of the horror, the nightmares one would have had to have

10  experienced having been accused of something so horrific,

11  whether or not it was true.  Because it was attacks to him

12  and third parties could see it.

13           Whether or not Raymond Maynard believed this, he

14  would not even let Don review the tape to refute it.  It

15  was not until a year after he was fired, a year

16  and-a-half, that he finally saw that tape and he saw that

17  he had done nothing wrong.

18           And I would suggest to you that the reason

19  Maynard withheld that tape is because he knew the

20  allegation of touching was a load of nonsense, and he

21  didn't want Don calling him out on it.

22           So how much money do you award a man who lives

23  with this horror for four years as I have read to you?

24           I in my role as a lawyer will not suggest a

25  number to you.  It is your collective wisdom that can come

Summation - Plaintiff/Mr. Antollino

857

1    up with a number for emotional distress that would fairly

2    compensate a man who was fired for telling someone he was

3    gay, and under the aegis of touching a woman.

4           For me to pick a number would be to pick a pig

5    in a poke.  It is for your deliberations to decide what is

6    fair, so I'm going to leave that number blank.

7           I believe the maximum in lost wages is $140,000.

8    But the maximum in emotional distress, that is up to your

9    discretion as the finders of fact.

10          Now this is an important case.  And you're being

11   asked to find something very important, not just for Don

12   Zarda and his memory, but for all victims of

13   discrimination, both gay and straight.

14          And imagine if these quote/unquote shenanigans

15   had taken place in a straight bar, in a gay bar, and a

16   heterosexual who plays a piano in the bar was fired for

17   not being gay enough.  I would stand here just as proudly

18   and defend this person as I defend Don Zarda, as I

19   advocate for his rights.

20          John F Kennedy says, In giving rights to others

21   which belong to them, we give rights to ourselves and to

22   our country.

23          As I told you in the beginning of this trial,

24   one of the highest calls you can have as a citizen is not

25   only to sit on a jury, but to be in a position to enforce

858

1    its civil rights laws.

2           In the end Don was fired for being who he was.

3    And we are here today because Don would rather be a rebel

4    than a slave.  Fights for equality are never pleasant.  I

5    had to take on a young lady half my age to expose the

6    holes in her claim of women's intuition.

7           I too would rather be a rebel than a slave to

8    injustice even if it meant I had to take her on and ask

9    every single question until the judge made clear that I

10   had gone one question too far.

11          So I know that I asked everything that I could

12   have to expose the ridiculousity of her complaint under

13   the circumstances of going up in a plane and falling out

14   to your possible death.

15          Don protected Rosana.  She didn't like the

16   entire experience.  She liked some of it, but she had a

17   few complaints.  She can complain to her boyfriend.  Her

18   boyfriend can complain to Maynard.  But the fact that the

19   experience was not perfect was not Don's fault, because no

20   skydive is perfect.  It's a highly unusual, inherently

21   dangerous activity.  And you might not like every aspect

22   of it.  But the most important thing is that you end up

23   out of it alive.

24          Rosana doesn't like to get into small places.

25   She shouldn't have gone on this jump.

Summation - Plaintiff/Mr. Antollino

859

1    You were selected from a whole courtroom of

2  potential jurors.  And you were chosen for a reason;

3  because you could be fair to a gay man, and you could be

4  fair to a man gay or straight who is accused of touching a

5  woman.

6    You also all took an oath that you would sit

7  fairly.  And my colleagues and I have watched you closely

8  throughout the trial.  I have observed you personally when

9  I could.  And I have observed that you listened to the

10  testimony extremely carefully.  You have paid attention.

11    I have done the best job that I can do for Don

12  Zarda and his memory.  And I trust you to do the right

13  thing for him too.  I will have a few more words to say on

14  rebuttal.  But now it's time for me to give the case to

15  you for justice to the estate of a dead man who did

16  nothing except say he was gay in his attempt to defuse a

17  situation and make a passenger more comfortable.  No

18  matter whether it was personal information, it was the

19  information he had at his fingertips that he used as best

20  he could.

21    Ray Maynard should have done a competent

22  investigation and not tainted this complaint with such

23  gross accusations which would turn out to ruin the

24  remaining years of a young man's life.

25    THE COURT:  We'll take a break.

Summation - Defense/Mr. Zabell

860

1    Your lunch is supposed to come at one o'clock.

2    So we'll take a ten minute break and we'll continue with

3    the summations until your lunch comes.  All right?

4    Don't discuss the case.

5    (A recess was taken.)

6    (After recess the following occurred.)

7    THE COURT:  Ready, Mr. Zabell?

8    MR. ZABELL:  I am.

9    THE COURT:  Bring in the jury.

10    (The jury entered the courtroom.)

11    THE COURT:  Members of the jury, now we're going

12    to hear the summation by defense counsel, Mr. Zabell.

13

14    **SUMMATION FOR THE DEFENSE**

15    MR. ZABELL:  Thank you, your Honor.

16    Your Honor, ladies and gentlemen of the jury.

17    Law is reason, free from action.  Aristotle said

18    that.

19    Some people think Elle Woods said that in

20    Legally Blonde.  But the meaning behind that is there is

21    no place for passion in the presentation of the facts when

22    determining the law.

23    You know that's not what you just heard.  What

24    you heard isn't the facts.  What you heard was the

25    passion.

861

1    Counsel was so blinded by his passion for this

2    case and his desire to help his client --

3            MR. ANTOLLINO:  Objection, judge.

4            THE COURT:  Overruled.

5            Go ahead.

6            MR. ZABELL:  -- and his desire to help his

7    client that he was blinded by all of the facts that were

8    presented at this trial.

9            Now I said to you during my opening statement, I

10   don't think he can prove any of that.  And think about all

11   of the fantastical things counsel told you he was going to

12   prove in his case, and how many of them actually came out

13   in the testimony of the witnesses.

14           All the hubris about one pinkie out of the

15   closet being the reason why Don Zarda was terminated, and

16   nobody testified that that was the reason why he was

17   terminated.  They testified that a couple jumped.  She

18   complained to him.  He complained to him.  He took action

19   based upon that complaint.

20           That's what the testimony is.

21           Let's look at the witnesses that the plaintiff

22   called to support his case.

23           Now first there was Ira Helfand.  Ira Helfand

24   was the emergency room doctor that for some reason

25   befriended Don Zarda.  Aside from the oddness of that

## Summation - Defense/Mr. Zabell

862

1    relationship --

2              MR. ANTOLLINO:  Objection.

3              THE COURT:  Overruled.

4              MR. ZABELL:  He could not tell you how many

5    times he spoke to Don Zarda, how many times he saw Don

6    Zarda.  He didn't know if Don Zarda was terminated in 2001

7    and for what reason he was terminated in 2001.  He didn't

8    know about Don Zarda being snowed into his apartment.  He

9    didn't know about Don Zarda getting all A's.  If fact he

10   testified that, yeah, I imagine he got A's because he

11   reduced his case load.

12             You heard counsel correctly relate to you that

13   Don Zarda didn't reduce his class schedule after 2010.  He

14   took the same amount of classes that he had always

15   intended to take.

16             He, Doctor Helfand didn't know about Don Zarda's

17   partner losing his husband.  He didn't know about Don

18   Zarda taking two relaxing cruises.  He didn't know about

19   the fun jumps.  He didn't know about the tandem jumps that

20   Don Zarda did after he was terminated in Texas.

21             But what did he know?  He knew that Don Zarda

22   was somebody that he wanted to help, and that was a friend

23   of his.  And he thought that skydiving and base jumping

24   was suicidal conduct.  And he tried to talk him out of it

25   for as long as he knew Don.  That didn't come out during

863

1    the closing argument.

2            Look, Doctor Helfand was here to testify to help

3    a friend.  But it just wasn't relevant because he didn't

4    know the full story.  I didn't know.

5            Now the next person that the plaintiff called

6    was Laura Callahan.  She was here for a little bit.  I'm

7    not quite sure what she testified to other than to the

8    only complaints about an instructor she recalls were

9    complaints about Don.  And look, she said on page 155, 156

10   of this transcript, the transcript of this proceeding.

11           Question:  How many complaints have there been

12   about Don?

13           Answer:  I couldn't tell you off the top of my

14   head.

15           Question:  Were there more than one?

16           Answer:  There may have been.

17           Question:  You don't know if there were or not,

18   correct?

19           Answer:  I can not remember specific complaints

20   but I do believe that, yes, multiple complaints had been

21   made.

22           Do you know why Don Zarda was terminated?

23           I believe so.

24           Why do you think he was terminated?

25           I believe it was because the customer complaint

864

1   that we talked about earlier.  That a gentleman came in

2   and he was upset with the experience.

3           That was Laura Callahan.  That was their

4   witness.  They called her.

5           Now, then they brought in Rich Winstock.  Rich

6   Winstock similarly testified -- well I'm sorry, Rich

7   Winstock testified just like everybody else that Don Zarda

8   introduced himself as Gay Don.  In fact Rich Winstock

9   testified that Don Zarda introduced himself to him as Gay

10  Don, not even at Skydive Long Island, but in Vermont,

11  another drop zone.  At a previous time before he started

12  working at Skydive Long Island.

13          All of the testimony that you heard was that Don

14  Zarda was out and open, and his sexuality was known when

15  he was hired by Ray Maynard all three times.  It's not a

16  matter of sticking a pinkie out of the closet.  He said he

17  was gay.  He talked about being gay.

18          Duncan Shaw related a situation where not only

19  did he talk about being gay, he was talking about graphic

20  sexual experiences in front of other staff members.  He

21  didn't get fired for that.  It wasn't impacting the

22  customer.  It was just stuff that he was talking about in

23  the workplace.  Nobody cared.  It wasn't an issue.

24          Now, in terms of Rich Winstock sharing his

25  personal information.  Rich Winstock related -- I just

865

1    want to make sure I get it quoted correctly -- see I don't

2    want my passion for this case to interfere with the

3    presentation of the accurate facts.

4           Have you ever informed a passenger at a tandem

5    jump that you were married and have children?

6           Answer:  Yes, I have.

7           Question:  For what reason?

8           Answer:  Usually I do that usually with older

9    women when they are extremely nervous.  You tell them you

10   are married with children.  Tends to calm them down.

11   You're giving them a little bit of security knowing you

12   have a reason to make this work.

13          That sounds like a legitimate reason for sharing

14   some personal information.  It's different than saying,

15   You know what?  I was married.  I'm now broken up and I

16   have no reason to live.  And you know what?  We might

17   crash.

18          Now there was no testimony that that was said.

19   I just made up that story.  But there is a difference

20   between relating to someone that you just broke up with

21   your boyfriend while you're falling from the sky and

22   saying to someone, Look, I'm married.  I got kids.  I have

23   a reason to make it to the ground.  You're going to be

24   safe.  There is no need to worry here.

25          I think that there is a difference, and I think

Summation - Defense/Mr. Zabell

866

1  that, I know that you guys are smart enough to pick up on

2  that.

3          Now, then we have Rosana Orellana.  Counsel

4  wants to make Ms. Orellana out as the villain here because

5  she was on a skydive and she sensed something

6  inappropriate.

7          Now again, I don't want to put words in her

8  mouth.  This is her testimony.  Page 344.  In response to

9  questions from Mr. Antollino.  Mr. Antollino asked her:

10         Don Zarda did not make that joke, did he?

11         Answer:  He was part of the joke.  I don't

12  remember who exactly -- actually he did make the joke.

13  Yes, he did make the joke.

14         Question from Mr. Antollino:  He was part of the

15  joke?

16         Answer:  He made the joke.  He said to my

17  boyfriend, How do you feel that I'm strapped to your

18  girlfriend, or something along those lines.  I don't

19  remember the exact words.

20         That was her testimony.  And that was her

21  testimony in response to questions asked by Mr. Antollino

22  during his case.  He called her in.  He subpoenaed her

23  here to testify.

24         And she goes on to testify on page 354.  Again,

25  I'm not summarizing her testimony, I'm reading it.  This

867

 1    is exactly what you heard.  Page 354, line 10.

 2              Question by Mr. Antollino:  Oh, it was the

 3    whispering that you didn't like?

 4              Answer:  It was the sensual whispering that I

 5    didn't like, yes.

 6              Question:  What does sensual whispering mean?

 7              Answer:  What exactly did he say?  I have no

 8    idea.  But talking to me in a very sensual, sexual manner.

 9              Question:  Sensual, sexual manner?

10              Answer:  Sensual.  Well, you know what sensual

11    is, like very soft in my ear, right in my ear, very close

12    to my head.

13              Question:  Perhaps he was trying to make you

14    feel comfort?

15              Answer:  It made me feel uncomfortable.  Because

16    like I had mentioned before, I communicated with my

17    boyfriend sitting right next to me and I could hear him

18    perfectly okay.  There was no need for him to whisper in

19    my ear in a sensual way.

20              That's Ms. Orellana.

21              Now she goes on to talk about what made her,

22    what else made her feel uncomfortable.

23              Now in response to a question asked, What made

24    you feel uncomfortable with regard to Mr. Zarda's

25    interactions with you on the jump?

Summation - Defense/Mr. Zabell

868

1          That's at page 369.

2          Answer:  On the jump the constant, I felt like

3    every woman you have your, you know, you have your

4    intuitions or whatever.  It just felt like sensual, not as

5    a woman but as a human being, you know, when someone is

6    being sensual.  It just felt like he was being that, you

7    know, I didn't see my boyfriend's instructor whispering in

8    his ear.  So I was like, why is he whispering in my ear,

9    so close in a sensual way?  And after that he kept, you

10   know, putting his chin on my shoulder which I found to be

11   like inappropriate.  My boyfriend's instructor didn't put

12   his chin on his shoulder.  I didn't see anybody putting

13   their chin on anybody's shoulder.  And I felt like he did

14   that and it made me uncomfortable.

15         Question:  How about Mr. Zarda's hands.  Were

16   his hands at any place that made you feel uncomfortable?

17         Answer:  I do remember him putting his knees

18   near my legs or on like around.  I don't remember which

19   part of my leg, but around the leg which was unnecessary.

20         Question:  I'm sorry, could you repeat that?  He

21   was putting his what?

22         Answer:  His hands, his hands on my legs.

23         That's her testimony.  That's the witness

24   Mr. Antollino called.

25         She goes on to say what was said under the

869

1  canopy, or under the parachute as they were coming down.

2         Page 375.  He was talking about his personal

3  life.  I can't remember the whole conversation, but

4  something about a breakup with his, you know, significant

5  other, and how upset he was because they had broken up.

6  That's, that was the main conversation that period of

7  time.

8         That's not telling somebody, Don't worry, I've

9  got a partner.  We've got a reason to make it to the

10  ground.  That's saying, I just broke up with my boyfriend.

11  I don't know.  That's comments that are made to somebody

12  that aren't meant to calm somebody down.

13         Now she goes on to explain what her issue is

14  with those comments on page 376.

15         And then I had mentioned, you know, my boyfriend

16  had mentioned that, you know, did you know what was on the

17  other side?  And he, you know, said that was this body of

18  water, which I can't remember because I never know where I

19  am.  That was that.  And I said, Oh, that's funny my

20  instructor didn't.  I felt disappointed that he didn't

21  mention any of this to me.  He just, you know, talked

22  about his personal life.  Which, you know, is not what we

23  were there for.  I was there to experience a skydive.  And

24  you know, had it been under different circumstances, you

25  know, maybe if we were on the ground and, you know, he is

870

1    like I need a friend, can I talk to you?  It would have

2    been different.  But I just felt that the time was

3    inappropriate.  Like we were, you know, my life is in his

4    hands, we're free falling.  And you know, I know knowing.

5    I don't know him.  I have no interest in anything that has

6    to do with him to be honest, you know.  I'm interested in

7    my funds that I paid, that we both paid $1,000 together to

8    jump out of a plane.  We wanted it to be a fun experience

9    and I just thought it was just out of line for him to tell

10   me this about his life.

11           That is not what Mr. Antollino characterizes as

12   Rosana Orellana being upset because Don Zarda put one

13   pinkie out of the closet and said he was gay.  That is a

14   complaint about something other than the landscape, the

15   bodies of water, what's happening as we're falling.  There

16   is no need to discuss your personal life when you're

17   falling.

18           Now Mr. Antollino will tell you that he just

19   said that to make her feel more comfortable.  More

20   comfortable because somebody made a joke about her being

21   strapped to her boyfriend in a sexual way.  Well first of

22   all, there was plenty of testimony about the harnesses.  I

23   don't think anybody said that the fact that they were

24   strapped to somebody, meant that they were strapped to

25   somebody in a sexual way.  In fact, Ms. Orellana was able

871

1   to differentiate between appropriate touching on that jump

2   and inappropriate touching.

3       She said, during the jump when he reached out

4   and grabbed her hand to give it to the cameraman, that

5   that was appropriate and that was normal.  She also talked

6   about times where it was appropriate to touch her in the

7   airplane.

8       But Mr. Antollino wants to make that all about,

9   well, he had to tighten the harness, he had to adjust the

10  harness.  If we hear any more testimony about this harness

11  it's really just a waste of time.  Because that's not what

12  she was talking about.

13      She testified that he rested his hands on her

14  legs and nobody else did.  She testified that he was

15  whispering into her ear when nobody else was whispering in

16  anybody else's ear.  You saw the video.  I don't need to

17  play it again.

18      Yes, there is a portion of the video that looks

19  creepy.  Everybody testified to it.  You get to make the

20  determination with your own observations if it was

21  reasonable that when Ray Maynard saw that video said,

22  Yeah, it kind of does look creepy and it supports the

23  complaint that I received about Don Zarda in his jump with

24  Ms. Orellana.

25      She doesn't work for Skydive Long Island.  She

872

1    is not getting paid to come here.  You can make all the

2    references you want to having lunch before your

3    deposition, but she wasn't bribed to give that testimony.

4    You saw her testify.  Did she testify honestly?  Why was

5    she called by Mr. Antollino if she wouldn't testify

6    honestly?  I'm not characterizing her testimony.  I'm just

7    reading it.

8            Now, after that you have David Kengle, the

9    boyfriend.  Now he didn't look happy to be here.  And I

10   don't know if I blame him.  This is a skydive that he paid

11   money for years ago, that he made a complaint about, and

12   now he is getting dragged back into this.

13           But the most important thing to remember is that

14   he testified that he actually made the complaint.  He

15   testified that he called up Ray Maynard and said, Look,

16   this guy was inappropriately touching her.  He was being

17   sensual with her.  And he ruined the skydive.

18           What else is Ray Maynard to do?  This wasn't the

19   first time.  He was terminated before because there were

20   two other complaints made by female jumpers.  Not that

21   they were crying.  The only person who said they were

22   crying was Mr. Antollino.  That was deposition testimony

23   that they had come to him almost in tears.

24           Well, that is what you call an inferential leap

25   or a stretch.  Not that they were crying.  Nobody is

873

1    asking you to say, if somebody tells you they're gay, does

2    that mean you should cry?  No, that's not the truth.  That

3    is a passionate misrepresentation of facts.

4            Two other people complained about him in 2001.

5    We took action in 2001.  The testimony that was read in

6    from Mr. Zarda said he had no idea why he was fired,

7    doesn't believe it was discriminatory.  It was read into

8    the testimony.  You'll see it.

9            Now, notwithstanding the fact that he was

10   previously terminated, nobody is disputing that he was a

11   competent jumper.  He was a good jumper.

12           So eight years later he asks for his job back.

13   The testimony was from Mr. Maynard, You can have your job

14   back, but you have got to behave.  You have got to make

15   sure you treat everybody appropriately, not just men, not

16   just women.  You're job is to get them from here to there

17   safely, and to have a good time.  And make sure they're

18   having a good time.  Why?  So they come back.

19           So the second time there was a complaint --

20   actually no, in 2009 there was no complaint.  That is when

21   he broke his ankle.  So he left with his broken ankle.

22   That 's the only time that he left Skydive on good terms.

23   He left.  Went back to Texas, did whatever he did.  Asked

24   to come back another year in 2010, and we let him come

25   back another year.

Summation - Defense/Mr. Zabell

874

1    Ray Maynard made the decision to hire him in

2    2001 knowing his sexual orientation.  In 2009 knowing his

3    sexual orientation.  And again in 2010, knowing his sexual

4    orientation.

5    Why would we discriminate against Mr. Zarda

6    because he is gay when we hired him knowing he was gay?

7    It just strains all credibility to think that.

8    Now Duncan Shaw, Wayne Burrell, Curt Kellinger

9    all testified.  They were all friendly with Don Zarda and

10   they maintained contact.  Actually it was Curt Kellinger

11   and Duncan Shaw who maintained contact with him after he

12   left employment.  They all said, Look, this guy has been

13   base jumping forever, certainly since the beginning of his

14   employment.  Yes, he had been doing wing suiting since the

15   mid-2000's.  They never once thought he was treated

16   differently based upon his sexual orientation.

17   They never once said he was made fun of, or

18   teased, or acted like it was uncomfortable.  In fact they

19   testified to quite the opposite.  They testified that he

20   introduced himself as Gay Don.

21   They testified that he would make jokes about

22   his orientation.  They testified that he openly discussed

23   his orientation and in some distances discussed it in

24   graphic detail.

25   And they all testified that that was not the

875

1    reason why he was terminated.  In fact it was Curt

2    Kellinger who said, Yeah, he also had this joke that when

3    the pilot started the plane and was saying, clear, to make

4    sure nobody is under the propeller, Don's response was,

5    Queer?  I'm right here.  That didn't get him fired.  That

6    is more than a pinkie out of the closet.  That is out of

7    the closet.

8           He was out of the closet when he was hired.  He

9    was out of the closet when he was fired in 2001.  He was

10   out of the closet when he was rehired in 2009.  And he was

11   out of the closet when he was rehired in 2010.

12          This is not about Don Zarda being gay.  This is

13   about a customer complaint.

14          Now, Mr. Antollino brought up the tape of the

15   termination meeting where Don Zarda surreptitiously taped

16   when he was being terminated.  If you listen to the tape,

17   the very first person to bring up gay was Don Zarda.  Ray

18   didn't bring it up.  In fact Ray's response is, This is

19   not a gay thing.

20          Again, Mr. Antollino wants to bring up the word,

21   escapades.  Well the first time escapades were used in

22   that termination meeting was Ray saying, and I'm not happy

23   that he used the term chick.  But he said, If Rich

24   Winstock was telling some chick about his escapades, he

25   would be out of here too.  That's the first time escapades

Summation - Defense/Mr. Zabell

876

1    was used.

2            Now Don is there.  Don is taping it and he knows

3    he is taping it and he is baiting Ray.  But you didn't

4    hear the passion and the anger in Ray's voice when he was

5    terminating him.  You heard him say, It's over.  I have

6    made my decision.  It's done.

7            And you heard Don trying to get more and more

8    information out of him.  But he just said, It's not a gay

9    thing.  You don't share your personal information when

10   you're coming down the sky with a skydiver strapped to

11   you.

12           Now is that a hard and fast rule?  Nobody said

13   it's a hard and fast rule.  This is a termination meeting.

14   Nobody is at their best.  And I certainly wasn't there

15   writing down everything on the script and handing it to

16   him to say.  He is a skydive owner, company owner, not a

17   human resources professional.  He is not a lawyer.  He is

18   not a judge.  He is telling him, Look, I received a

19   complaint.  You touched her.  You were sensual.  You were

20   whispering in her ear.  I made the decision.

21           Now during the opening statement Mr. Antollino

22   said many times, there was no investigation.  Except the

23   testimony of Don Zarda confirmed that there was an

24   investigation.  He talked about how Ray asked him about

25   the jump, told him what the allegations were, and asked

Summation - Defense/Mr. Zabell

877

1    him if he remembered anything about the jump.  And he

2    said, no, he didn't remember anything about the jump.  And

3    then you heard Ray testify that he took a look at the

4    video afterwards.  And the video to him confirmed that

5    something weird was going on.

6            Look, it's not a matter of somebody opening

7    their mouth like that.  We all do that.  Everybody in this

8    courtroom at some point during this trial did it.  I know,

9    I looked.

10           But what you saw was, Hey, look at this one I'm

11   jumping with.

12           That's my interpretation of it.  He doesn't say

13   that.  I'm not presenting that as fact.  But I'm

14   presenting that as a reasonable conclusion based upon what

15   is observed.  That certainly was Ray Maynard's conclusion.

16           So we had a customer saying that Don Zarda

17   ruined his girlfriend's jump.  Ruined it because he was

18   touching her inappropriately.  He was whispering in her

19   ear.  And then when they were jumping, rather than talking

20   about what they were observing, what they were flying

21   over, what they're landing on, decided to tell her,

22   decided to say, that that was a perfect time to say, I

23   just broke up with my boyfriend.  I don't know what I'm

24   going to do.

25           You heard Ms. Orellana say words to the effect

Summation - Defense/Mr. Zabell

878

1    that she wasn't his psychologist.  There is no reason for

2    that.  That doesn't make somebody relax, does it?

3         Unlike when you compare it to what Rich Winstock

4    said, Look, I've got a wife.  I've got kids.  There's a

5    reason for me to land.  I just broke up my boyfriend.  I

6    don't know what I'm going to do.  There is no reason for

7    me to land?  There is no reason for me to get you safely

8    to the ground?  There is a difference.

9         There is also a difference with Ray bitching at

10   the drop zone about a bad divorce he's going through.  Now

11   yes, he should not be doing that, nobody should do it.

12   But it happens.  And it's realistic.  But he is not

13   sharing it with customers during the free fall to the

14   ground.  And I know that there may be some discussion

15   about free fall and falling.  There is the free fall

16   before the parachute opens.  And then there is a fall

17   after the parachute opens.  And I'm sorry for using the

18   two incorrectly.

19        But Ray Maynard is not complaining about his

20   ex-wife.  He is not talking about anything that is going

21   on with his then girlfriend while somebody is strapped to

22   him falling from an airplane.  Just wasn't happening.  And

23   to say that they're the same thing -- really?  It's just a

24   disingenuous representation to you.  They're trying to

25   pull on heart strings, and it's just not appropriate.

879

1    Now, Don Zarda acknowledged that Mr. Kengle made

2    a complaint about him.  In fact on page 48 -- I'm sorry,

3    408 -- of the trial transcript beginning at line 5.

4    Do you believe that Mr. Kengle actually called

5    up Ray, Ray Maynard and complained?

6    Oh, yes.  I believe he called.

7    Do you believe that he complained that you were

8    getting familiar with his girlfriend on the jump?

9    Yes.  I believe he made a complaint.  I believe

10   that he was testifying under oath that the day he said

11   that.  I wasn't privy to the conversation that he had with

12   Ray, so I have to take him at his word under oath that

13   that is what he said when he called Ray.  To that extent,

14   yes.

15   Question:  It doesn't sound like Mr. Kengle

16   complained about you being gay, correct?

17   Answer:  In that one complaint, no, no, not in

18   that part.

19   You in fact testified that Mr. Kengle complained

20   that you were getting familiar with his girlfriend,

21   correct?

22   That's what I said.

23   Now, I think now is the time you should probably

24   talk about the release for about an hour.  What do you

25   think?  No.  Okay, I'm sorry.  I couldn't pass that up.

Summation - Defense/Mr. Zabell

880

1     I guess Mr. Antollino wants you to believe that

2  because the release said that Ms. Orellana could not sue,

3  then; A, she got what she deserved; or B, we didn't have

4  to take any steps to make sure that she enjoyed her jump

5  or that her jump was safe.  That's not the case.

6     Yes, there is a release.  The release is to

7  protect the liability of the company from the jump.  It

8  does not mean that we have no interest in protecting the

9  safety of our jumpers or taking every possible step we

10  could possibly take to make sure they have fun.  Because

11  let's face it, I know I said it in the opening, nobody has

12  to jump out of a plane.  It's not one of those mandatory

13  things.

14     Now, let's talk about emotional damages for a

15  little bit.  Counsel brought it up.

16     Don Zarda left the jump zone, went and did fun

17  jumps, something he calls fun jumps in a place called

18  Chicago.  After that he went to take classes.  Classes

19  that he said, and I don't want to misrepresent the facts

20  here.

21     Page 414 of the trial transcript.

22     So, since 2006 every November you're going to be

23  attending school on line?

24     Answer:  I hadn't made that commitment to the

25  level back in '06 or '07.  But certainly in the last, I

Summation - Defense/Mr. Zabell

881

1  think four Novembers, I have been at that, yeah.

2           Question:  So from November of 2008?

3           I believe so.  I would have to look and see

4  about that.  But I think that's right, 8, 9, 10, 11, yes.

5           So he had committed himself to taking his

6  classes.  That was his decision.  That has nothing to do

7  with whether or not he was terminated from Skydive Long

8  Island.  And he testified that after he took his first

9  semester of classes he went out to California and went on

10 a cruise to Mexico.  His testimony.  Said he had a great

11 time.

12          Said after the cruise he went and did some more

13 fun jumps out in California.  His testimony.  Nobody is

14 putting those words in his mouth.  Then he came back, took

15 some more classes because that's what he scheduled himself

16 to do.  And after that he went and took a cruise to the

17 Caribbean.  He testified he had a great time.

18          He had fun, got to socialize, got to have

19 friends, got to hang out with his friends and not attend

20 to his class work.  Then, after that he testified that he

21 went on a two month vacation to Norway.  Not one week, not

22 two weeks, two months.

23          What college kids take a two month vacation?

24 And when he came back he talks about the great time he

25 had.  Hold on, I don't want to put words in his mouth.

Summation - Defense/Mr. Zabell

882

1          Page 423 of the testimony.

2          Tell me did what you for the two months and why

3    you're smiling when you're talking about it?

4          Answer:  The reason I'm smiling when I talk

5    about it is because it was a very good trip.  I had a

6    great time that allowed me to get away from the horrible

7    winter that I had, which was dealing with this case and

8    the classes and other things that were going on that were

9    difficult.  And it was an unbelievable breath of fresh air

10   and a nice place.

11         That's even after the two fatalities that

12   occurred on that trip to Norway.  Can you imagine how

13   great this trip must have been if two people he was

14   jumping with were killed and he still had a fantastic

15   time?

16         The testimony, Don Zarda's testimony does not

17   support the story that is being presented to you in the

18   passionate opening and closing statements that

19   Mr. Antollino has presented.

20         The facts, the testimony that you heard supports

21   the premise that Don Zarda was terminated because of a

22   customer complaint.  It has nothing to do with the fact

23   that he was being gay, or gay, other than the fact that he

24   brought up on the fall down that he had just broken up

25   with his partner.  That's it.

Summation - Defense/Mr. Zabell

883

1    The fact that Don Zarda was gay was out and

2  discussed with everybody.  He brought it up.  He made a

3  point of bringing it up.  Hi, Gay Don, nice to meet you.

4  That's what the testimony was.

5    If you're introduced to me as Gay Don, nice to

6  meet you, and I hire you, do you think I have a problem

7  with gay people?  Just doesn't make sense.

8    One thing, something else that doesn't make

9  sense.  When Mr. Antollino was explaining to you damages,

10  and doing the math calculations that he did, something

11  that he tried to kind of slip by you.  He said, 40 times

12  12 is 2400.  His testimony.  Now, is 40 times 12, 2400?

13  40 times 10 is 400.  40 times 2 is 80.  When you add the

14  two together you get 480, not 2400.

15    So I need you to be real skeptical about the

16  presentation that Mr. Antollino was making to you.

17    Now, he wants you to believe that in four years

18  at Skydive Long Island Don would have made $140,000 based

19  upon; A, his math; and B, the premise that he would have

20  jumped every day.  But did he talk to you about rainy

21  days?

22    Now I know we didn't have many this summer.  But

23  I'm pretty sure you guys remember rainy days in the

24  summer.  It gets really hot.  If I had hair it would

25  frizz.  We had rain days.  Did he bring those up?  How

Summation - Defense/Mr. Zabell

884

1    about days off?  Did he bring those up?  How about foggy

2    days where you can't jump?  How about windy days where you

3    can't jump?  How about presenting to you some evidence of

4    what Don actually made?  How about presenting you with

5    some evidence of what Don made after he left Skydive Long

6    Island?

7              Now, there was a document that was introduced

8    into evidence, and that is Exhibit 13 A, it's in evidence.

9              Now you can see, or can you zoom in on it a

10   little bit, a little bit more, out a little bit.

11             Okay, so from April 1st of 2010 to June 30th of

12   2010 he made $5,085.  That's what he made in the 2010

13   season.

14             Let's multiply $5,085 by 4.  We'll wipe out the

15   85 to make it easy.  That's $20,000.

16             Let's say that he made double that.  Let's say

17   that he made $10,000, you times that by 4.  That's

18   $40,000.  How do you get $140,000?  I tell you how you get

19   it.  You get it by saying 40 times 12 is $2400 when it's

20   really 480.  So be careful about what's presented to you.

21   It's being presented with the passion that belongs in the

22   pursuit of the facts, but not the passion that belongs in

23   the presentation of those facts.

24             This is not a gay rights case.  This is not even

25   a case about discrimination.  This is a case about taking

885

1  ownership for one's actions.  He made a mistake.  He made

2  a mistake.  You own up, I made a mistake.  I ruined the

3  jump for somebody.  Which by the way, you also heard from

4  his friends the other jumpers that he was constantly

5  trying to haggle with them to take the male passengers as

6  opposed to the female passengers.  And you heard Ray say,

7  and you heard some of the jumpers say, he has got a

8  history of problems with female jumpers.

9      What happened on this jump, I don't know.  I was

10  not in between Don Zarda and Rosana Orellana.  All I know

11  is, the testimony that you heard was from Rosana Orellana,

12  and you heard some from Don Zarda, from his deposition.

13      Ray Maynard had a reasonable basis to believe or

14  a legitimate business reason to believe that Don Zarda did

15  what he was accused of doing.  And for counsel to say,

16  impossible, couldn't happen, no way he was acting sensual

17  to her because he was gay; doesn't comport to the facts.

18      There was testimony that came out that Don Zarda

19  had physical relationships with members of the opposite

20  sex.  That was his testimony.

21      If Ray was to believe that Don Zarda could not

22  possibly have touched this woman inappropriately or acting

23  towards this woman inappropriately because he's gay,

24  wouldn't he be discriminating against gay people by

25  concluding that they could never touch a woman

886

1    inappropriately?  Don Zarda said it's possible for a gay

2    man to touch a woman inappropriately.  This wasn't about

3    sex.  It was about a customer complaint.  And that's it.

4         Ray Maynard had that complaint.  He made a

5    legitimate business decision based upon that complaint.

6    And the previous behavior with Don Zarda was terminated

7    back in 2001.  He saw the video.  There was some support

8    for the allegations.

9         He asked Don, What do you remember.

10        Don said, I don't know.

11        And most importantly, in that tape-recording Don

12   was the first person to bring out the word gay.

13        Ray immediately said to him, It's not a gay

14   thing.  If Rich Winstock was taking some chick up there

15   talking about his escapades, I would fire him too.

16        And then the first statement Don says is, Ray,

17   Marco says gay this gay that.  It was a specific complaint

18   that Ray made to protect his business.  It's a legitimate

19   business reason and he terminated him.

20        And you're going to get instructions on the law

21   from the judge.  I'm not going to comment about that.  I

22   would love to tell the judge what the law is, but I don't

23   get to do that.  That's his decision.

24        You're also going to get a jury verdict.  And

25   the jury verdict is going to ask you if Ray Maynard

887

1    discriminated against Don Zarda because of his sexual

2    orientation.  I think all the facts, the fact that you

3    actually heard, not the stories that you were told,

4    indicates that he wasn't.

5            I want to you thank you very much for your time

6    and your patience.  And I know we've tried your patience.

7            Thank you very much.

8            THE COURT:  Members of the jury, again it's

9    1:05.  The lunch isn't in the jury room yet.  So the

10   rebuttal summation is supposed to be about ten minutes.

11   So I'm going to try to get that in now.

12           So go ahead, Mr. Antollino.

13

14        **REBUTTAL SUMMATION FOR THE PLAINTIFF**

15           MR. ANTOLLINO:  All right, judge.  Thank you.  I

16   just need a second to get some notes.

17           I admit being extremely passionate about this

18   case.  I admit looking at the facts and knowing what the

19   law is, that I am passionate about the facts.  But as you

20   know, for nearly an hour I talked to you about the facts.

21   I very rarely quoted from the testimony because you as the

22   jury have the right to hear the testimony read back in

23   case you have any questions.

24           In addition, Mr. Zabell read only snipits and

25   parts of the testimony without putting them in the right

Rebuttal Summation - Plaintiff/Mr. Antollino

888

1    context.  He also misrepresented certain things that I

2    did.

3              Number one.  I never said 480 times 12 equals

4    2400.  I said 40 times 5 times 12 is 2400.  That's what I

5    said.

6              And I also told you that the maximum amount at

7    the end of the summer would be somewhere in the range of

8    147, and that you could cut down that amount.  That you in

9    your discretion could say, well, you know maybe ten

10   percent of the days are going to be rain and so we're not

11   going to give him that.

12             With regard to what money Don earned after he

13   was fired.  As the judge will explain to you, that's their

14   obligation to show that he didn't earn money that he was

15   supposed to have earned to mitigate his damages.

16             As you know, Don felt that the only thing that

17   he could do, that he was trained to do, was Skydive.  And

18   he felt afraid to Skydive because he was afraid of being

19   accused of touching another woman, a horrific accusation

20   that ruined the rest of his life.

21             I am passionate about this because I know that

22   an accusation -- forget about what I know -- anyone knows

23   what an accusation of improper touching would be when it

24   had not happened.  Anyone knows about that, especially

25   when there is no investigation.

889

1          And Mr. Zabell wants to say that the

2     investigation was that he called Don in on the date of the

3     complaint.  But you heard testimony that Don said, who

4     were these people?  Can I see the video?  Can I at least

5     have an opportunity to rebut these allegations?

6          And then a week later when he had the recorder

7     in his hands, you can hear him begging, Lauren, can you

8     see if these people got videotapes?  I want to know who

9     these people are who thought that I had improperly touched

10    someone.

11         And yes, it was Don that brought up the sex, the

12    issue of gay first.  But as you heard Don testify in his

13    deposition during the suspension meeting a week later, Ray

14    brought him in and spoke to him.  And someone, and told

15    him that someone said that a gay issue came up.

16         And so what Don was trying to do was clarify

17    what the allegation was.  And we don't dispute in any way

18    whatsoever that he was trying to collect evidence so that

19    he would be able to prove a wrongful termination case.

20    And he heeded the advice of his friends, including Ira

21    Helfand.  And there were many statements that Mr. Zabell

22    made in his closing arguments that were homophobic and

23    that appealed toward the idea that a gay person has

24    perverted sexual tendencies.

25         Number one, the oddness of the relationship

Rebuttal Summation - Plaintiff/Mr. Antollino

890

1    between Ira Helfand and Don Zarda.

2           You heard that Ira Helfand testified that he was

3    a doctor.  And he treated Don and they stayed in touch.

4    And Don looked up to him as a father figure.  His father

5    had died as Ira testified, and Ira --

6           MR. ZABELL:  Objection.

7           THE COURT:  Sustained.

8           MR. ANTOLLINO:  He looked up to Ira --

9           MR. ZABELL:  Objection.

10          MR. ANTOLLINO:  -- as a figure to whom he could

11   obtain advice.  And he gave him that advice.  To call it

12   an odd relationship is an insult that calls into

13   question --

14          MR. ZABELL:  My objection?

15          THE COURT:  Sustained as to what Don Zarda's

16   relationship was.  I don't remember testimony about that.

17          MR. ANTOLLINO:  All right.

18          What Ira testified to --

19          MR. ZABELL:  Your Honor, I move to strike that

20   portion of the closing argument that made reference to

21   that.

22          THE COURT:  There is no testimony about the

23   reason for their relationship.  You can disregard that.

24          MR. ANTOLLINO:  He did refer to the oddness of

25   the relationship.

Rebuttal Summation - Plaintiff/Mr. Antollino

891

1    THE COURT:  I'm just saying there was no
2  testimony testifying about what the reason for the
3  relationship was.  There was no testimony about that.
4    MR. ANTOLLINO:  There was testimony that people,
5  rather Don called Ira and they stayed in touch and Don
6  spoke to Ira repeated times about what had happened to him
7  and what he was feeling.
8    To refer to that relationship as odd is just
9  like them pointing again and again and again to Don
10  touching his finger, trying to invoke passion on their
11  point, Oh, isn't that disgusting.  There must have been
12  something disgusting going on between Ira Helfand and Don
13  Zarda.  The same too witness mentioned graphic sexual
14  experiences.
15    Now, very interesting that Mr. Zabell argues
16  that Rich Winstock mentioning his reason to get to the
17  ground by mentioning his relationship with his wife and
18  his children is legitimate.  But somehow when someone
19  accused Don of moving in on his girlfriend, it was not
20  okay, not exactly the same situation.  But it was not okay
21  for Don to take himself out of that situation.
22    You know that she never complained to Don about
23  anything that he was doing.  She gave every excuse in the
24  book for not complaining.  But there was no way Don would
25  know, especially with those pictures that I showed you.

Rebuttal Summation - Plaintiff/Mr. Antollino

892

1   And there is nothing passionate about those pictures.

2   Those pictures were just pictures, and they were of a

3   woman who was very happy on her skydive.

4           How would she know what an appropriate skydive

5   is and how a skydiver is supposed to manipulate the

6   handles and the straps.

7           Furthermore, David Kengle never said that the

8   experience was ruined.  All he said was that it was

9   tainted and less than perfect.

10          Well nothing in life is perfect, as we all know.

11  And the reason you give the release to the passengers is

12  to explain to them that they are going on something that

13  is going to be extremely unusual, and that there is no

14  perfect parachute, airplane, skydiver, student, etcetera,

15  and so on.

16          Don was the one who brought up the issue of gay.

17  But Ray was the one who referred to being gay as

18  escapades.  And the only thing we know that Don said was,

19  that I broke up with my boyfriend.  There is a difference

20  of the testimony between Don Zarda and Rosana Kengle.  But

21  it's very small.

22          Don testified that he believed he said, You

23  don't have to worry about me, I'm gay and I have an

24  ex-husband to prove it.  She said something similar.  But

25  the bottom line is that he used his judgment under the

Rebuttal Summation - Plaintiff/Mr. Antollino

893

1   circumstances to take himself out of the situation.  That

2   was the little pinkie he was sticking out of the closet to

3   the customer to let the customer know that I'm not, I'm

4   not on your team, so to speak.

5           THE COURT:  Mr. Antollino, you're coming up to

6   ten minutes.

7           MR. ANTOLLINO:  All right.  Just give me one

8   more minute.

9           I just wanted to say in the end that Ray Maynard

10  did testify that women were crying.  He was asked, And

11  what was it that Don said that made these women cry?

12          Answer:  Him talking about being gay.

13          That was in 2001 when it was illegal to

14  discriminate against people because they're gay.

15          The fact that he took two months in Norway was

16  his way of trying to start a new career in base jumping.

17  It was him mitigating his damages.

18          I'm not going to go through every single point

19  of the testimony that Mr. Zabell read to you.  If you have

20  any question about it you can ask for it to be read.

21          I have done my very best in presenting the case

22  as it is.  And you listened to that tape.  You can hear

23  the anger in Ray Maynard's voice.  And that tape is

24  evidence.  That is not passion.

25          And if its anyone's passion, it's Ray Maynard's

Rebuttal Summation - Plaintiff/Mr. Antollino

894

1   passion and it's Ray Maynard's passion because he didn't

2   want Don to tell his customers that he was gay, which is

3   what he was.

4          Thank you.

5          THE COURT:  Okay, members of the jury, that

6   completes the summations.

7          Michele was just bringing your lunch into the

8   jury room so it should be there when you go back there.

9          Again, when you're having lunch together you

10  can't start deliberating yet.  You don't have my

11  instructions on the law.  So do not start deliberating.

12  Again, you will have plenty of time to do that in a little

13  while.

14         So I'm going to try to, if the court reporter is

15  okay, shorten the lunch break a little bit.  Since you're

16  not going out I think you can probably eat in 40 minutes.

17  Is that enough time?

18         So we'll reconvene at two o'clock and I think my

19  instructions on the law will be about 45 minutes to an

20  hour.  And then you'll be in deliberations.  Okay?

21         Have a good lunch.

22         (The jury left the courtroom.)

23         THE COURT:  You can be seated.

24         Two things.  First, in terms of the objections

25  during Mr. Zabell's summation.  There were two objections.

895

1    One made reference to Mr. Antollino's passion rather than

2    the facts.  I overruled that objection for two reasons.

3            The first is, if Mr. Antollino did numerous

4    times during his summation insert himself into the case.

5    I didn't, I can't remember every instance.  But he talked

6    about the difficulty in questioning Ms. Orellana.  He said

7    he asked every question he could have, so I stopped him,

8    for Don.  For the fact that he would rather be a rebel, I

9    don't remember the exact line but a rebel.

10            MR. ANTOLLINO:  And a slave.

11            THE COURT:  And a slave.

12            So in light of that by inserting himself into

13    his own summation.  And independent of that, even if he

14    hadn't done that, what Mr. Zabell said is I think fair for

15    a lawyer.  He wasn't personally insulting him.  At this

16    point his argument was that it was a lot of passion, not a

17    lot of facts.  I think a lawyer can say that.  I don't

18    think that crosses the line to personally disparaging an

19    attorney.

20            The other objection was on him characterizing

21    the relationship between the doctor and Mr. Zarda as odor.

22    Again that is fair for a lawyer to do in terms of the

23    credibility of witnesses, what relationships may have

24    existed is fair argument, arguing that it was odd.  He

25    obviously responded to that and that is what trials are

896

1    for.  So that's why I overruled that objection.

2          We placed the, the things I said I would place

3    in the instructions, new copies of the charge.  There is

4    one thing, Mr. Antollino, I just wanted to ask you because

5    I heard it one way and my clerk in another way.

6          You wanted to say chided Mr. Zarda because he

7    was gay, or because he identified -- the way I have it now

8    is because he identified as such, or because he identified

9    as gay?

10          MR. ANTOLLINO:  I said identified as gay.

11          THE COURT:  Okay, that is what I heard.

12          So we'll make that, you should come back at like

13    five to two to just to look at the corrections and make

14    sure they're accurate.  Okay?

15          All right, thank you.

16          MR. ZABELL:  Your Honor, one last issue.

17          I would like your Honor to consider -- I am

18    actually moving for your Honor to strike that portion of

19    Mr. Antollino's closing that referred to parts of my

20    closing as homophobic.  It's inappropriate.  That crosses

21    the line, and that becomes an attack on an attorney.

22          THE COURT:  Yes.  I would prefer that he not

23    characterize it that way.  But I'm not going to give an

24    instruction on that.

25          I don't think it so crossed the line that I

897

1    should give an instruction.  So I'm not going to give an

2    instruction on that.  Okay?

3                MR. ZABELL:  Thank you, your Honor.

4                THE COURT:  All right.

5                (A luncheon recess was taken at 1:21 p.m.)

6

7                          -      -        -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

898

1        **AFTERNOON SESSION**

2            (Outside the presence of the jury.)

3            THE COURT:  My law clerk is going to give each

4    of you a final version of the charge.  If you would just

5    take a minute to just look at the pages that we made the

6    corrections.

7            MR. ANTOLLINO:  I have one aspect on something

8    Mr. Zabell said in summation.  I wanted to add to the

9    charge.

10            I have what is known as an adverse witness

11    charge.  And it's simply a couple of sentences.

12            The parties are free -- an it went something

13    like this.  The parties are free to call adverse

14    witnesses.  One or more parties has called an adverse

15    witness in this case.  A party may call an adverse witness

16    for any reason he or she deems fit.  That party is not

17    bound to the testimony and you are to treat the testimony

18    of an adverse witness like any other.

19            Something simple like that.  It's in Judge

20    Sand's rules.  And there is a specific one for adverse

21    witness.  And I proposed it in many cases.  And it hasn't

22    come up until today.

23            THE COURT:  Look, I don't think -- I think that

24    it's self-evident.  It's fair for a lawyer to point out

25    that he didn't call, to the extent that there was an

899

1   argument made that certain witnesses that he called were

2   part of the Maynard team.  It's fair game for him to say,

3   I didn't call these witnesses, the plaintiff's counsel

4   did.  That's fine.

5          In terms of whether they be treated like any

6   other witness, I think the jury knows that.  And that fact

7   that they are adverse, I think the jury knows that as

8   well.

9          So I'm not going to add that.  Okay?

10          MR. ANTOLLINO:  Okay.

11          THE COURT:  Just take a minute.  I just want to

12   make sure.

13          MR. ANTOLLINO:  Where are the changes, did you

14   note them?

15          THE COURT:  We didn't note them, but I think my

16   prior version -- on page 15 we made a change about, we

17   added the words, or estates, and changed, one of the

18   parties, to, a party.

19          MR. ANTOLLINO:  Okay.

20          THE COURT:  On the next page we added, because

21   he was gay, but because -- well actually the next page we

22   added the deposition instruction from Judge Sand.

23          On page 16 you wanted to consider the deposition

24   separately from impeachment purposes.

25          MR. ANTOLLINO:  Okay.

900

1          THE COURT:  The next page, we put in, because he

2     was gay, or because he identified as gay.

3          MR. ANTOLLINO:  Okay.

4          THE COURT:  And on page 19 the second full

5     paragraph, it says, although plaintiff agrees there was a

6     customer complaint, plaintiff claims that this ways not

7     the real reason for Mr. Zarda's termination.

8          MR. ANTOLLINO:  Okay.

9          COURT:  Page 21, we added the word, then, so the

10    defendants must then prove by a preponderance of the

11    evidence.

12         MR. ANTOLLINO:  Okay.

13         THE COURT:  And then on page 25 we took out the

14    second sentence, so that paragraph at the bottom.

15         MR. ANTOLLINO:  Do you remember what that

16    referred to?

17         THE COURT:  I'm sorry?

18         MR. ANTOLLINO:  Do you remember what that

19    referred to?

20         THE COURT:  You all must consider each claim,

21    each defendant separately.  We took that out.

22         MR. ANTOLLINO:  Yes.

23         THE COURT:  I think that was it.

24         MR. ANTOLLINO:  Okay.

25         THE COURT:  All right, so my practice is to tell

**JURY CHARGE**

901

1   them that they can request a copy of the instructions,

2   because otherwise the note takers on the jury are

3   frantically trying to get down every word that I say.  So

4   I tell them that.  There are always some note takers.

5            So let's bring the jury in.  We'll mark the

6   final version as Exhibit F.

7            Let's bring the jury in

8            (The jury entered the courtroom.)

9

10           **JUDGE'S CHARGE TO THE JURY**

11           THE COURT:  All right, I hope you all enjoyed

12   your lunch.  If you didn't, you can complain to Michele,

13   because she picked the place, not me.  But we're ready to

14   continue now with my instructions on the law.

15           I just want to let you know up front that as you

16   already know, I think, I don't do these from the top of my

17   head.  Everything I'm about to tell you I have written

18   down, and I'm reading it to you.  The law requires me to

19   read it out loud to you.  But I just want you to know that

20   if you want a copy of the instructions I'm reading to you,

21   you can just send a note during your deliberations saying,

22   I want a copy of your legal instructions.  And I'll send

23   the back.

24           You're obviously free to take notes during my

25   instructions, but I didn't want you to think you couldn't

1   have a printed version of it if you wanted.  Okay?

2            Members of the jury, you have now heard all of

3   the evidence in the case as well as the final arguments of

4   the parties.  We have reached the point where you're about

5   to undertake your final functions as jurors.  You have

6   paid careful attention to the evidence.  And I am

7   confident that you will act together with fairness and

8   impartiality to reach a just verdict in the case.

9            At this point it is my responsibility to

10  instruct you as to the law that governs this case.  My

11  instructions will be in three parts.

12           First, I will give you instructions regarding

13  the general rules that define and govern the duties of a

14  jury in a civil case.

15           Second, I will instruct you as to the legal

16  elements of the causes of action relative to this case.

17           And third, I will give you some general rules

18  regarding your deliberations.

19           Part I.

20           It is your responsibility and duty to find the

21  facts from all the evidence in this case.  You are the

22  sole judges of the facts, not the parties and not I.  I

23  want to impress upon you the importance of that role.  It

24  is for you and you alone to pass upon the weight of the

25  evidence, to resolve such conflicts as may have appeared

1    in the evidence, and to draw such inferences as you deem

2    to be reasonable and warranted from the evidence or lack

3    of evidence.

4            Although as jurors you are encouraged to use all

5    of your life experiences in analyzing testimony and

6    reaching a fair verdict, you may not communicate any

7    personal or professional expertise you might have, or

8    other facts not in evidence, to the other jurors during

9    deliberations.  You must base your discussions and

10   decisions solely on the evidence presented to you during

11   the trial, and that evidence alone.  You may not consider

12   or speculate on matters not in evidence or matters outside

13   the case.

14           With respect to any question concerning the

15   facts, it is your recollection of the evidence and yours

16   alone that controls.  You must apply the law in accordance

17   with my instructions to the facts as you find them.  While

18   the parties may have commented on some of these rules, you

19   must be guided only by what I say about them.  You must

20   follow all the rules as I explain them to you.  You may

21   not follow some and ignore others.  Even in you disagree

22   or do not understand the reason for some of the rules,

23   you're bound to follow them.  You must not substitute your

24   own notions or opinions of what the law is or ought to be.

25           This case should be considered and decided by

**JURY CHARGE**

904

1   you as an action between parties of equal standing in the

2   community.  You are to evaluate the evidence calmly and

3   objectively without prejudice or sympathy.  You are to be

4   completely fair and impartial.  Your verdict must be based

5   solely on the evidence developed at this trial or the lack

6   of evidence.

7          The parties in this case are entitled to a trial

8   free from prejudice and bias.  The parties here are

9   entitled to your equal consideration and none are entitled

10  to sympathy or favor.

11         Under your oath as jurors you're not to be

12  swayed by sympathy.  You should be guided solely by the

13  evidence presented during the trial without regard to the

14  consequences of your decision.  You have been chosen to

15  try the issues of fact and reach a verdict on the basis of

16  the evidence or lack of evidence.

17         If you let sympathy interfere with your clear

18  thinking there is a risk that you will not arrive at a

19  just verdict.  All parties to a civil lawsuit are entitled

20  to a fair trial.  You must make a fair and impartial

21  decision so that you will arrive at a just verdict.

22         It is the duty of representatives for each side

23  to object when the other side offers testimony or other

24  evidence that they believe is not properly admissible.

25  Therefore, you should draw no inference from the fact that

**JURY CHARGE**

905

1    a party objected to any evidence, nor should you draw any

2    inference from the fact that I might have sustained or

3    overruled an objection.

4         From time to time the parties and I have sidebar

5    conferences and other conferences outside of your hearing.

6    These conferences involve procedural and other matters and

7    none of the events related to these conferences should

8    enter into your deliberations at all.

9         You will look to the evidence in order to decide

10   what the facts are.  Evidence comes in several forms.

11        A.   Sworn testimony of witnesses both on direct

12   and cross-examination and regardless of who called them;

13        B.   Exhibits that the court received in

14   evidence.  On the other hand, certain things are not

15   evidence.  Let me list them for you.  A, arguments or

16   statements by lawyers are not evidence.  In this regard,

17   what they said to you in their opening statements and in

18   their summations is intended to help you understand the

19   evidence to reach your verdict.  If your recollection of

20   the facts did differs from the parties' statements,

21   however, it is your recollection that controls.

22        B.   The questions put to the witnesses are not

23   evidence.

24        C.   Objections to questions are not evidence.

25   In this regard, the parties have a duty to object when

906

1   they believe evidence should not be received.  You should

2   not be influenced by the objection or by the court's

3   rulings on it.  If the objection was sustained, ignore the

4   question.  If the objection was overruled, treat the

5   answer like any other answer.

6            D.  Anything the court may have said including

7   these instructions is not evidence.

8            E.  Testimony that has been excluded, stricken

9   or that you have been instructed to disregard is not

10  evidence.

11           F.  Anything you may have seen or heard outside

12  the courtroom is not evidence.  I told you that evidence

13  comes in various forms, such as the sworn testimony of

14  witnesses and exhibits.  There are in addition different

15  kinds of evidence; direct and circumstantial.

16           Direct evidence is the communication of a fact

17  by a witness who testifies to the knowledge of that fact

18  as having been obtained through one of the five senses.

19  So for example, a witness who testifies to knowledge of a

20  fact because he saw it, heard it, smelled it, tasted it or

21  touched it, is giving evidence which is direct.  What

22  remains is your responsibility to pass upon the

23  credibility of that witness.

24           Circumstantial evidence is evidence which tends

25  to prove a fact in issue by proof of other facts from

**JURY CHARGE**

1   which the fact in issue may be inferred.  The word, infer,

2   or the expression, to draw an inference, means to find a

3   fact exists from proof of another fact.

4          For example, if a fact in issue is whether it is

5   raining at the moment, neither of us can testify directly

6   to that fact sitting as we are in this windowless

7   courtroom.  Assume however that as we are sitting here a

8   person walks into the courtroom wearing a raincoat that is

9   soaking wet and carrying an umbrella dripping water.  We

10  may infer that it is raining outside.  In other words, the

11  fact of rain is an inference that could be in drawn from

12  the wet raincoat and the dripping umbrella.

13         An inference is to be drawn only if it is

14  logical and reasonable to do so.  In deciding whether to

15  draw an inference you must look at and consider all the

16  facts in the light of reason, common sense and experience.

17  Whether a given inference is or is not to be drawn is

18  entirely a matter for you, the jury, to decide.  Please

19  bear in mind however that an inference is not to be drawn

20  by guesswork or speculation.

21         Circumstantial evidence does not necessarily

22  prove less than direct evidence, nor does it necessarily

23  prove more.  You are to consider all the evidence in the

24  case direct and circumstantial in determining what the

25  facts are and in arriving at your verdict.

**JURY CHARGE**

908

1          Now I will give you an instruction about burden

2    of proof.

3          The burden of proof rests on the plaintiff.

4    That means that it must be established by a fair

5    preponderance of the credible evidence that the claim

6    plaintiff makes is true.  The credible evidence means the

7    testimony or exhibits that you find to be worthy to be

8    believed.

9          A preponderance of the evidence means the

10   greater part of such evidence.  That does not mean the

11   greater number of witnesses or the greater length of time

12   taken by either side.  The phrase refers to the quality of

13   the evidence, that is, its convincing quality, the weight

14   and the effect that it has on your minds.

15         The law requires that for the plaintiff to

16   prevail on a claim the evidence that supports plaintiff's

17   claim must appeal to you as more nearly representing what

18   took place than the evidence opposed to plaintiff's claim.

19   If it does not, or if it weighs so evenly that you are

20   unable to say that there is a preponderance on either

21   side, then you must decide the question in favor of the

22   defendant.  It is only if the evidence favoring the

23   plaintiff's claim outweighs the evidence opposed to it

24   that you can find in favor of plaintiff.

25         Now I'm going to give you an instruction

**JURY CHARGE**

909

1    regarding witness credibility.

2           You had the opportunity to observe the

3    witnesses.  It is now your job to decide how believable

4    each witness was in his or her testimony.  You are the

5    sole judges of the credibility of each witness and of the

6    importance of his or her testimony.

7           You should carefully scrutinize all the

8    testimony of each witness, the circumstances under which

9    each witness testified, the impression the witness made

10   when testifying, and any other matter in evidence that may

11   help you decide the truth and the importance of each

12   witness's testimony.

13          In other words, what you must try to do in

14   deciding credibility is to size a witness up in light of

15   his or her demeanor, the explanations given, and all of

16   the other evidence in the case.  Always remember that you

17   should use your common sense, your good judgment, and your

18   everyday experiences in life to make your credibility

19   determinations.

20          This is an instruction on prior inconsistent

21   statements.  I made reference to this during the trial.

22   I'm going to give you the complete instruction.

23          You have heard evidence that at some earlier

24   time witnesses have said or Don something that one party

25   argues is inconsistent with their trial testimony.

**JURY CHARGE**

910

1     Evidence of a prior inconsistent statement was

2  place before you for the purpose of helping you decide

3  whether to believe the trial testimony of a witness who

4  may have contradicted a prior statement.  If you find that

5  the witness made an earlier statement that conflicts with

6  the witness's trial testimony, you may consider that fact

7  in deciding how much of the witness's trial testimony, if

8  any, to believe.

9     In making this determination you may consider

10 whether the witness purposely made a false statement, or

11 whether it was an innocent mistake; whether the

12 inconsistency concerns an important fact, or whether it

13 had to do with a small detail; and whether the witness had

14 an explanation for the inconsistency, and if so, whether

15 that explanation appealed to your common sense.

16     It is exclusively your duty, based upon all the

17 evidence and your own good judgment to determine whether

18 the prior statement was inconsistent, and if so how much,

19 if any, weight to give to the inconsistent statement in

20 determining whether to believe all, or part, or none of

21 the witness's testimony.

22     In deciding whether to believe a witness you

23 should specifically note any evidence of hostility or

24 affection that a witness may have toward one of the

25 parties.  Likewise, you should consider evidence of any

**JURY CHARGE**

911

1    interest or motive that a witness may have in cooperating

2    with a particular party.  You should also take into

3    account any evidence that a witness may benefit in some

4    way from the outcome of the case.

5         It is your duty to consider whether the witness

6    has permitted any such bias or interest to color his or

7    her testimony.  In short, if you find that witness is

8    biased you should view his or her testimony with caution,

9    weigh it with care, and subject it to close and searching

10   scrutiny.

11        Of course the mere fact that a witness is

12   interested in the outcome of a case does not mean he or

13   she has not told the truth.  It is for you to decide from

14   your observations and applying your common sense and

15   experience and all the other considerations mentioned

16   whether the possible interest of any witness or any party

17   has intentionally or otherwise colored or distorted his or

18   her testimony.  You are not required to disbelieve an

19   interested witness.  You may accept as much of his or her

20   testimony as you deem reliable and reject as much as you

21   deem unworthy of acceptance.

22        In this case one of the defendants is a

23   corporation and one is an estate.  The mere fact that a

24   party is not a live person does not mean it is entitled to

25   any lesser consideration by you.  All litigants are equal

1  before the law, and corporations or estates, big or small,

2  are entitled to the same fair consideration as you would

3  give any other individual parties.  In addition, since a

4  corporation is not a natural person, it can only act

5  through it officers, employees or other agents.  Thus, any

6  act by any of Altitude Express, Inc doing business as

7  Skydive Long Island's officers or employees that is

8  undertaken in the scope of employment is an act by

9  defendant Altitude Express, Inc doing business as Skydive

10  Long Island.

11          Conduct is undertaken within the scope of

12  employment if it is reasonably foreseeable in light of the

13  employer's business or the employee's responsibilities.

14  In this case the plaintiff has not claimed that anyone

15  other than Raymond Maynard committed any act in violation

16  of the statute that I have described to you.  And it is

17  undisputed that Mr. Maynard was the sole owner of Altitude

18  Express, Inc doing business as Skydive Long Island.

19          A claim for money damages to be won at trial is

20  like any asset that can be handed down from a plaintiff to

21  his estate, just like an inheritance that is in the bank,

22  or any other personal property owned by the deceased at

23  the time of his death.  You may not sympathize with the

24  estate because of Mr. Zarda's death, but if the estate has

25  proven Mr. Zarda's claim by a preponderance of the

1  evidence, you must find for his estate.  Conversely, and

2  again, if the estate has not proved Mr. Zarda's claim by a

3  preponderance of the evidence, you must find for the

4  defendants.

5       Some of the testimony before you is in the form

6  of depositions which have been received in evidence.  A

7  deposition is simply a procedure where prior to trial the

8  attorneys from one side may question a witness or an

9  adversary party under oath before a court stenographer.

10  This is part of the pretrial discovery, and each side is

11  entitled to take their positions.  You may consider the

12  testimony of a witness given at a deposition according to

13  the same standard you would use to evaluate the testimony

14  of a witness given at trial.

15       That ends Part I.

16       Beginning Part II.

17       Part II.  Principles of law.

18       I will now discuss the second part of these

19  instructions, the principles of law that you must apply to

20  the facts as you determine them to be.

21       The plaintiff, the Estate of Donald Zarda

22  represented by executors Melissa Zarda and William Allen

23  Moore, Junior is asserting a legal claim under New York

24  State Human Rights Law, which makes it an unlawful

25  discriminatory practice for an employer to discriminate

**JURY CHARGE**

914

1   based on sexual orientation.

2         I will now proceed to explain the elements of

3   plaintiff's claim.  Let me remind you, that should you

4   find for the plaintiff you must find that the plaintiff

5   met its burden to prove each of the elements by a

6   preponderance of the evidence.

7         Moving to employment discrimination under New

8   York State Human Rights Law, Section 296.

9         As you have heard, this is an action to recover

10  damages for employment discrimination.  The law prohibits

11  employment discrimination based on sexual orientation,

12  whether that discrimination is intentional or not.  In

13  this case plaintiff claims that defendants terminated

14  Mr. Zarda because he was gay or because he identified as

15  gay.

16        The New York State Human Rights Law, Executive

17  Law 296, defines and prohibits unlawful discriminatory

18  practices by private and public employers.  Executive Law

19  296(1)(a) provides in pertinent part that it is -- and now

20  I'm quoting the pertinent part from the statute.

21        "An unlawful discriminatory practice for an

22  employer because of an individual's sexual orientation, to

23  refuse to hire or employ or to bar or to discharge from

24  employment such individual, or to discriminate against

25  such individual in compensation or in terms, conditions or

1   privileges of employment."  Sexual orientation was added

2   to the statute as a protected class in 2003.

3          An employer must follow non-discrimination laws

4   that protect his or her employees, even if the employer's

5   customers might hold biases against the protected class at

6   issue, which in this case is sexual orientation.  An

7   employer cannot take adverse action against an employee on

8   the grounds that one or more customers might not prefer to

9   associate with or are offended by the employee's protected

10  class, whatever that might be.  However, an employer can

11  take adverse action against an employee if the customer

12  complaint is not based upon the employer's protected class

13  -- the employee's protected class.

14         In order for plaintiff to recover on his claim,

15  Mr. Zarda's estate must prove by a preponderance of the

16  evidence that Mr. Zarda's sexual orientation was a

17  determining factor in Mr. Maynard's decision to terminate

18  him.  There can be more than one determining factor in any

19  decision.  Therefore, Mr. Zarda's estate need not prove

20  that his sexual orientation was the only reason for

21  Mr. Maynard's decision.  Mr. Zarda's sexual orientation is

22  a determining factor if he would have continued to work

23  for Altitude Express doing business as Skydive Long Island

24  and Mr. Maynard, except for the fact that he was gay.  In

25  other words, sexual orientation is a determining factor if

1    it made a difference in whether or not Mr. Zarda would

2    have continued working for defendants.

3            Mr. Zarda's estate is not required to produce

4    direct evidence that Mr. Maynard discriminated against him

5    on the basis of his sexual orientation.  Discrimination is

6    rarely admitted and may inferred from the existence of

7    other facts.

8            In deciding whether the fact that Mr. Zarda was

9    gay was a determining factor in Mr. Maynard's decision,

10   you must first consider whether Mr. Zarda's estate has

11   established the following facts by a preponderance of the

12   evidence.

13           First.  Mr. Zarda's estate must prove that

14   Mr. Zarda was qualified for the tandem skydive instructor

15   position.

16           Second.  The estate must prove that Mr. Zarda

17   was terminated.

18           Third.  The estate must prove that the

19   termination occurred under circumstances giving rise to an

20   inference of discrimination.

21           If you find that the estate of Mr. Zarda failed

22   to prove any of these facts, you will find for the

23   defendants.  If you find that the estate proved all of

24   these facts, then you must proceed to consider the reason

25   defendants have given for terminating Mr. Zarda.

**JURY CHARGE**

917

1          Defendants have produced evidence that Mr. Zarda

2     was terminated based upon a customer complaint.  Although

3     plaintiff agrees there was a customer complaint, plaintiff

4     claims that this is not the real reason for Mr. Zarda's

5     termination.  Mr. Zarda's estate has the burden of

6     establishing by a preponderance of the evidence, that the

7     reason offered by the defendants was not really the reason

8     Mr. Zarda was terminated, and that Mr. Zarda's sexual

9     orientation was a determining factor in the decision.  An

10    employer may take adverse decisions against an employee

11    for any reason good or bad, as long as it is not

12    discriminatory.  However, you should scrutinize the

13    reasons proffered by the defendants, just as you would any

14    other evidence.

15          If you find Mr. That Zarda's estate has failed

16    to prove that the reason offered by the defendants was not

17    really the reason Mr. Zarda was terminated, you will find

18    for the defendants.  If you find that the Estate of

19    Mr. Zarda has proved that the reason offered by the

20    defendants was an excuse for discrimination, then you will

21    find for Mr. Zarda's estate and you should proceed to

22    determine the amount of damages.

23          I'm going to provide you with a written verdict

24    form.

25          I'm now moving to the instructions on damages.

**JURY CHARGE**

918

1      If you find that the plaintiff has proven its

2   claim then you must consider the issue of damages.  I will

3   now give you instructions regarding computing the amount

4   of damages.  The fact that I am giving you instructions on

5   damages, however, should not be considered as an

6   indication of any view of mine on what your verdict should

7   be.  Rather, instructions on damages are given only so

8   that you will have them in the event that you should find

9   in favor of the plaintiff on the question of liability.

10      In computing damages, should you award damages,

11   you may not engage in speculation or arbitrary guesswork.

12   On the on the hand, the law does not require a plaintiff

13   to prove the amount of his or her losses with mathematical

14   precision, but only with respect to as much definiteness

15   and accuracy as the circumstances permit.  I instruct you

16   that the plaintiff's attorney's statements, if any, to you

17   of the amount of damages you should award the plaintiff

18   are not binding upon you.  It is not evidence.  It is only

19   the statement of the plaintiff's attorney.  It is the sole

20   and exclusive function of the jury to determine the amount

21   of money, if any, that will justly and fairly compensate

22   the plaintiff for any injuries and damages she has

23   sustained.  You are to make that determination based, that

24   determination solely on the basis of the evidence in this

25   case, and on the law I will give you, and not on the basis

919

1    of an attorney's or party's statement, claim or argument.

2            I will now discuss each category of damages in

3    turn.

4            First.  Damages for lost wages.

5            With respect to the issue of lost wages, you may

6    award as actual damages an amount that reasonably

7    compensates the plaintiff for any lost wages and benefits

8    taking into consideration any increases in salary and

9    benefits that Mr. Zarda would have received from the

10   defendants had he not been subject to the intentional

11   discrimination.

12           The plaintiff has the burden of proving these

13   lost wages and benefits by a preponderance of the

14   evidence.  If you chose to award the plaintiff damages for

15   lost wages, damages would apply from the date that

16   Mr. Zarda's employment ended until the date of his death.

17   Therefore, any award of damages for lost wages to the

18   plaintiff must be determined only for the period between

19   June 21, 2010 and October 4, 2014.  The parties have

20   stipulated that October 4, 2014 was the date of

21   Mr. Zarda's death.

22           In addition, if you award damages for lost wages

23   to plaintiff, you must deduct from the amount whatever

24   wages Mr. Zarda obtained from other employment during this

25   period.  You are not required to deduct from the award of

1    lost wages social security benefits, unemployment

2    compensation and pension benefits.  You must also reduce

3    any damages for lost wages you award to the plaintiff by

4    the amount of expenses Mr. Zarda would have incurred in

5    making those earnings.

6        You are further instructed that Mr. Zarda was

7    required to make every reasonable effort to minimize or

8    reduce his damages for loss of compensation by seeking

9    employment.  This is referred to as mitigation of damages.

10   On this particular issue, if you find that the plaintiff

11   has proven lost wages by a preponderance of the evidence,

12   defendants must then prove by a preponderance of the

13   evidence that Mr. Zarda failed to mitigate his damages for

14   loss of compensation.

15       If you determine plaintiff is entitled to

16   damages, you must reduce these damages by; one, what

17   Mr. Zarda earned; and 2, what Mr. Zarda could have earned

18   by reasonable effort during the period from his discharge

19   until the date of his death.  Mr. Zarda must have accepted

20   employment that was of a like nature.  In determining

21   whether employment is of alike nature you may consider;

22   one, the type of work; two, the hours worked; three, the

23   compensation; four, the job security; five, the working

24   conditions; and six, other conditions of employment.

25       You must decide whether Mr. Zarda acted

**JURY CHARGE**

921

1   reasonably in not seeking or accepting a particular job.

2   If you determine Mr. Zarda did not make reasonable efforts

3   to obtain a similar job, you must decide whether any

4   damages resulted from his failure to do so.

5          You must not compensate plaintiff for any

6   portion of plaintiff's damages resulting from Mr. Zarda's

7   failure to make reasonable efforts to reduce his damages.

8          Moving to emotional damages.

9          With respect to emotional damages, you must

10  award plaintiff such sum of money that you believe will

11  fairly and justly compensate plaintiff for the damages you

12  believe Mr. Zarda actually sustained as a direct

13  consequence of the allegedly discriminatory conduct of the

14  defendants.

15         You should award compensatory damages only for

16  those injuries that you find plaintiff has proven by a

17  preponderance of the evidence.  Moreover, you shall award

18  compensatory damages only for those injuries that you find

19  plaintiff has proven by a preponderance of the evidence to

20  have been proximately caused by defendants' unlawful

21  conduct.  In other words, to recover compensatory damages

22  plaintiff must prove by a preponderance of the evidence

23  that the defendants' actions were a proximate cause of

24  Mr. Zarda's injuries.

25         Proximate cause means that there must be a

922

1    sufficient causal connection between the act of the

2    defendants and any injury or damage sustained by

3    Mr. Zarda.  An act is a proximate cause if it was a

4    substantial factor in bringing about or actually causing

5    the injury.  That is, if the injury or damage was a

6    reasonably foreseeable consequence of the defendants'

7    acts.  If an injury was a direct result or a reasonably

8    probable consequence of the defendants' acts, it was

9    proximately caused by such act.  In other words, if

10   defendants' acts had such an effect in producing an injury

11   that reasonable persons would regard as being a cause of

12   the injury, then the acts were a proximate cause.  A

13   proximate cause need not always be the nearest cause

14   either in space or time.  In addition, there may be more

15   than one proximate cause of an injury or damage.

16          Many factors or the conduct of two or more

17   people may operate at the same time, either independently

18   or together, to cause an injury.  Defendants are not

19   liable if Mr. Zarda's injury was caused by a new or

20   independent source of an injury that intervened between

21   the defendants' act and the injury, and that produced a

22   result that was not reasonably foreseeable by the

23   defendants.  Likewise, defendants are not liable for an

24   injury that they did not cause, such as for example an

25   injury that existed before the defendants conduct in

**JURY CHARGE**

923

1    question.

2          With respect to proximately caused injuries,

3    compensatory damages in this case can include any

4    suffering, inconvenience, loss of enjoyment of life, and

5    oath non-monetary losses that plaintiff proves were

6    experienced as a consequence of the actions of a

7    defendant.

8          There is no requirement that evidence of a

9    monetary value of such intangible things as injury, pain

10   and suffering be introduced into evidence.  There is no

11   exact standard for fixing the compensation to be awarded

12   for these types of damages, and no expert testimony need

13   be introduced.  Any award you make should be fair in light

14   of the evidence presented at the trial.

15         Compensatory damages must not be based upon

16   speculation or sympathy.  However, they must be based on

17   the evidence presented at trial, and only on that

18   evidence.

19         Plaintiff can only recover for damages, if any,

20   that plaintiff proves by a preponderance of the evidence

21   were caused by the unlawful conduct of the defendants.  If

22   you find that plaintiff has proven that Mr. Zarda suffered

23   an injury and that these injuries were caused by the

24   defendants' conduct, you must fix the amount of damages

25   that will, as much as money can, fairly compensate the

**JURY CHARGE**

924

1  plaintiff for such injuries.

2  The purpose of such an award of damages is not

3  to punish the defendants, nor is plaintiff entitled to be

4  compensated for any injury not caused by unlawful conduct.

5  In determining the amount of any damages that

6  you decide to award, you had should be guided by

7  dispassionate common sense.  You must use sound discretion

8  in fixing an award of damages, drawing reasonable

9  inferences from the facts in evidence.

10  Part III.  The closing remarks.

11  They're a little shorter.

12  Before I allow you to retire to the jury room to

13  deliberate, I would like to offer you some closing

14  remarks.  By way of reminder, I charge you once again that

15  it is your responsibility to judge the facts in this case

16  only from the evidence presented during the trial, and to

17  apply the law as I have given it to you to the facts as

18  you find them from them evidence.  Keep in mind that

19  nothing I have said in these instructions is intended to

20  suggest to you in any way what I think your verdict should

21  be.  That is entirely for you to decide.

22  Your deliberations should include a rational

23  discussion of the evidence in the case by all of you.  In

24  your deliberations you are entitled to your own opinion,

25  but you should exchange views with your fellow jurors and

**JURY CHARGE**

925

1    listen carefully to each other.  You should not hesitate

2    to reconsider your opinions from time to time and to

3    change them if you are convinced that they are wrong.

4    However, do not surrender an honest conviction as to

5    weight and effect of the evidence simply to arrive at a

6    verdict.

7            If the plaintiff has carried its burden of proof

8    by establishing every essential element of the claim by a

9    preponderance of the evidence, your sworn duty is to find

10   for plaintiff.  If the plaintiff has failed to establish

11   any essential element of a claim, your sworn duty is to

12   find for the defendants.

13           I instruct you that the decision you reach must

14   be unanimous.  I instruct you to consider each question on

15   the verdict sheet separately.  And your decision on each

16   question must be unanimous.

17           Remember also that your verdict must be based

18   solely on the evidence in the case and the law as the

19   court has given it to you, not on anything else.  Opening

20   statements, closing arguments or other statements or

21   arguments of the parties are not evidence.  If your

22   recollection of the facts differs from the way the parties

23   have stated the facts to be, then your recollection

24   controls.

25           When you get into the jury room, before you

926

1   begin your deliberations your first act will be to select

2   one of you to be the foreperson.  The foreperson will be

3   responsible for signing all communications to the court,

4   and for handing them to my deputy Michele, during your

5   deliberations.  But of course the foreperson's vote is

6   entitled to no greater weight than any other juror.

7          During the trial I permitted the taking of notes

8   by those of you who wish to do so.  At that time I pointed

9   out that while you could take notes, there is no need for

10  you doing so, because the court reporter takes down

11  everything that is said in the courtroom.  And during your

12  deliberations the court reporter will read back to you any

13  portion of the transcript you may ask for.

14         For those of you who did take notes during the

15  trial, I point out to you and your fellow jurors that your

16  notes are simply an aid to memory for the particular juror

17  who takes the notes.  You are instructed that your notes

18  are only a tool to aid your own individual memory.  You

19  should not compare your notes with other jurors in your

20  deliberations.  Jurors who did not take notes should not

21  be influenced by the fact that other jurors have taken

22  notes.  Your notes are not evidence.  They may be

23  inaccurate, and are by no means a complete recording of

24  the trial testimony.  Any difference between a juror's

25  recollection and another juror's notes should be settled

1    by asking to have the court reporter read back the

2    transcript, for it is the court record rather than any

3    juror's notes upon which the jury must base its

4    determination of the facts and its verdict.

5           It is very important that you not communicate

6    with anyone outside the jury room about your deliberations

7    or about anything touching this case.  There is only one

8    exception to this rule.  If it becomes necessary during

9    your deliberations to communicate with me, you may send a

10   note through my deputy Michele signed by your foreperson

11   or by one or more members of the jury.

12          No member of the jury should ever attempt to

13   communicate with me except by a signed writing.  And I

14   will never communicate with any member of the jury on any

15   subject touching on the merits of this case, other than in

16   writing or orally here in open court.

17          If you send any notes to the court, do not

18   disclose anything about your deliberations.  Specifically,

19   do not disclose to anyone, not even to me, how the jury

20   stands numerically or otherwise until after you have

21   reached a unanimous verdict or have been discharged.

22          If during deliberations you want to see any of

23   the exhibits, they will be sent to you in the jury room

24   upon written request.  If you want any of the testimony

25   read, that can also be Don.  But please remember that it

**JURY CHARGE**

928

1   is not always easy to locate what you might want, so be as

2   specific as you possibly can requesting exhibits or

3   portions of testimony which you may want.

4          If you request a read-back of testimony, please

5   be patient as it may take some time to locate and agree

6   upon the specific testimony required.  Your request for a

7   read-back may be as narrow or extensive as you decide it

8   to be.

9          I just want to emphasize that if you do request

10  a read-back, and I don't bring out immediately, that

11  doesn't mean that I didn't get the note.  That just means

12  once I get that, we have to work with the court reporter

13  and the lawyers to isolate that testimony for you before I

14  bring you out.

15         I have prepared a verdict sheet which will be

16  given to you.  The verdict sheet is given to you to record

17  your verdict after you have reached a verdict in this

18  case.  When you have reached a decision, have the

19  foreperson sign the verdict form and put the date on it

20  and notify my deputy, Michele, by a note that you have

21  reached a verdict.  I reiterate that any verdict you reach

22  must be unanimous.

23         Your oath sums up your duty, and that is without

24  fear or favor to any person you will well and truly try

25  the issues in this case according to the evidence given to

**JURY CHARGE**

929

1    you in court and the laws of the United States.

2            This concludes my instructions.

3            I want to thank you for your close and careful

4    attention.  Members of the jury, and then you will retire

5    to deliberate after I swear in my deputy.  I do ask that

6    your first order of business you elect a foreperson and

7    send me a note, dated and timed, identifying that

8    foreperson.

9            Okay, we will give you a copy of the verdict

10   sheet.  I'm just going to give a copy of the verdict sheet

11   to Juror Number 1 to bring back into the jury room.  You

12   will see the verdict sheet is self-explanatory.

13           It has questions and it has instructions on how

14   to answer question one.  And it has instructions following

15   question one.

16           If you have any questions regarding the verdict

17   sheet, obviously you just send me a note.  I also want to

18   -- I just noticed this that there is no line here on the

19   second portion.  There should be a signature line there.

20   It's missing.  That is where the foreperson would sign

21   once the verdict has been reached.

22           Okay.  Let me give the oath to Michele.

23           (The court's deputy was duly sworn.)

24           THE COURT:  Just one other the thing I want to

25   point out.

**JURY CHARGE**

930

1    When you're deliberating, if a juror is using

2    the restroom or sometimes we have jurors that are smokers

3    and want to go outside for a smoke, Michele will escort

4    you out for a smoke break, out of the building.  You can't

5    continue deliberations when a juror is missing.  The only

6    time the jury should deliberate is when all eight of you

7    are together.  So if somebody, if a juror is not present,

8    you have to stop and wait for the juror to come back.  All

9    right?

10    Do the lawyers need to speak to e before I send

11    the jury back?  Is there anything you need to speak to me

12    about?

13    MR. ANTOLLINO:  I have nothing.

14    MR. ZABELL:  Defendant has nothing, your Honor.

15    THE COURT:  Okay, I'm asking ask you to retire

16    to the jury room to begin your deliberations.

17    (Whereupon, the jury left the courtroom to begin

18    deliberations at 2:52 p.m.)

19    THE COURT:  I don't require lawyers to stay in

20    the courtroom the whole time they're deliberating.  As

21    long as you're in the building and as long as Michele has

22    your cell phone number, that is fine.  If you want to hang

23    around for a few minutes, because usually we get a few

24    notes right away, and I want to put other things on the

25    record as soon as I get my notes together.

931

1          MR. ANTOLLINO:  There were a couple of mistakes.

2     I think you took care of them.

3          THE COURT:  There were a couple of typos and I

4     caught them early.  And my law clerk marked them down to

5     make sure she got them too.  If they ask for the written

6     instructions we will make those corrections.

7          MR. ANTOLLINO:  Is there bathroom in the jury

8     room?

9          THE COURT:  There is.  I was telling them if

10    someone is in the bathroom.  But you won't see the jurors.

11    There is bathroom in there.

12         I just want to put -- there was an objection to

13    the business judgment rule.  But I want to put in what

14    that was based upon.

15         As I discussed yesterday when Mr. Zabell raised

16    that.  And I do give that language which is referred to as

17    the business judgment rule language in Title VII cases.

18    And I have given that before.  I think it's an accurate

19    statement of the law.  And even though it was not in the

20    pattern jury instruction, I first determined that I

21    thought it was necessary, given some of the arguments that

22    were made in the case.

23         I'm not suggesting they were improper arguments,

24    but because those arguments were made, I think it

25    important that the juror understand that they can't

**932**

1    second-guess the lawyers' decision for non-discriminatory

2    reason.  In other words, if they were sitting in the jury

3    room thinking, Well, if I were Mr. Maynard I would have

4    Don more investigation, or I would have only suspended

5    him, I wouldn't have terminated him.  That would not be a

6    proper assessment in the absence of a discriminatory

7    motive.  And because there were arguments, certainly

8    arguments, and a lot of arguments in the case about how

9    much investigation should have been Don; whether he should

10   have spoken to Ms. Orellana.  There was testimony about

11   the different levels of employment actions that could be

12   taken.  And I think that instruction was necessary in this

13   case, even though it was not in the pattern jury

14   instructions.  Even though it was not in the pattern jury

15   instructions, it is an accurate statement of New York law.

16           There is a case, Murhanda V E S A Hudson Valley,

17   Inc.  It's a Third Department case, 124 AD 3rd 1158,

18   January of 2015, which actually was, it was a sexual

19   orientation case like this one is.  It was a summary

20   judgment case.  It wasn't in the context of a jury

21   instruction.  But in reciting New York law there is a

22   statement in there of the business judgment.  It was a

23   challenge by a discharged employee to the correctness of

24   an employer's decision.

25           It does not without more give rise to the

933

1    inference that the employer's discharge was due to

2    discrimination.  Stated another way, there is enough of

3    plaintiff to show that the employer made an unwise

4    business decision or an unnecessary personnel move, nor is

5    there enough to show that the employer acted arbitrarily

6    or with ill will.  And I think that's just another

7    characterization of the business judgment rule that I

8    instructed them on.

9         The motivating factor versus determining factor,

10   I have already stated the basis for that ruling, and it's

11   the language of the PJI.  But there is also a case, a New

12   York case that described it in the terms of a determining

13   factor.  That is Dickerson v Health Management Corporation

14   of America, 21 AD 3rd 326, a First Department case of

15   2005.

16        Just getting back to the business judgment rule

17   for a minute.  There actually are federal cases, they're

18   not in this circuit -- that show the importance of giving

19   that instruction.  And the Second Circuit hasn't found

20   this, but again this is the Eighth Circuit in a case

21   Walker v AT&T Technologies, 995 F.2d 846, a 1993 case,

22   actually reversed a jury verdict where the judge refused

23   to give a business judgment instruction.

24        Other courts, I believe in the Fifth Circuit in

25   a case called Julian v City of Eastern Texas, 314 F.3d

934

1    721, Fifth Circuit, 2002.  It's not gone that far.  In

2    fact there is an Eighth Circuit case that says that it's

3    not reversible in every situation.  But it is clear under

4    federal law that that type of instruction should be part

5    of the discrimination instruction.  And I think it's

6    similar under New York law.

7         I said I was going to give a -- Hill ruling with

8    regard to why the witness -- Mr. Burrell and Mr. Kellinger

9    testified over the objection of plaintiff.

10        The first thing is, even though they were not in

11   the initial disclosure, the amended disclosure, they were

12   in the pretrial order as witnesses.  And I didn't get the

13   transcript, but it's --

14        We just got a note which we marked as Court

15   Exhibit 1.  I'll give a copy to both sides in the case.

16   That Mr. Niczky, Juror Number 1 is the foreperson.

17        I have a copy of the transcript of that

18   conference.  But my recollection is similar to Mr.

19   Zabell's at the time.  Which was that Mr. Antollino raised

20   an objection to -- and I think that when this came up

21   during the trial that there was an objection to the number

22   of witnesses that Mr. Zabell had identified in the

23   pretrial order.  I don't remember what the number was.

24   And there was a discussion and Mr. Zabel explained the

25   transient nature of people who work in the skydiving

935

1    industry, and that he was doing that in an abundance of

2    caution, because he wasn't sure who he was going to

3    actually be able to obtain as a witness at the time of the

4    trial.

5         I went to, the other day I went to look back at

6    the docket sheet to see if there was any other motion made

7    with respect to that list of witnesses.  And I don't, I

8    didn't remember, and I wasn't able to find any further

9    motion to preclude based on, for example that an address

10   wasn't provided for Mr. Kellinger.  I wouldn't have

11   granted a motion to preclude him if that had been Don.

12   But I would have at least asked Mr. Zabell to provide

13   whatever the last known address was for Mr. Kellinger.

14        So there was no motion practice with respect to

15   the witnesses on this list, other than there were too

16   many.  I would have, Mr. Antollino, on that issue if you

17   had asked me a couple of weeks ago, to ask Mr. Zabell to

18   narrow at least who he anticipated his witnesses would be,

19   you know.  When we were arriving closer to the trial I

20   would have asked him to narrow the list of people who he

21   thought he was going to have out of the 60.  But that

22   request wasn't made.  So, and I did, there were mentions

23   of these individuals.

24        I remember reading excerpts of Mr. Zarda's

25   transcript where he was asked questions about, I think

936

1   all, I'm not sure Mr. Shaw and Mr. Kellinger.  But, so I

2   don't think this was a surprise that those weren't names

3   that nobody ever encountered.  And I believe that their

4   testimony was important to the case.  And that given that

5   they were in the pretrial order, the remedy was not to

6   preclude them simply because they were not in the amended

7   disclosure.

8         I don't believe that, there is no basis for me

9   to conclude that Mr. Zabell inflated the number, that the

10  pretrial order was gamesmanship on his part.  And again, I

11  would have tried to address any other issues with respect

12  to people on the list if a motion was made prior to the

13  trial.  So, and I think based upon that analysis that it

14  was appropriate to allow them to testify in the case.

15        On the issue of the -- this is the last thing I

16  have, I promise.

17        On the issue of Mr. Zarda's declaration.  I just

18  want to clarify two actions -- of the ruling.  First, I

19  want to clarify why I allowed the portion that I allowed

20  in.

21        The first is, I determined that because it

22  related to his current state of mind as of the time of the

23  declaration, 2013 I believe it was, that it's an exception

24  to the hearsay rule.  And therefore, it's not qualified as

25  hearsay.  Independent of that, I would admit that in the

937

1    alternative under Rule 807, the residual exception to the

2    hearsay rule.

3         The requirements for that are, that the

4    statement has an equivalent circumstantial guarantee of

5    trustworthiness.

6         Two, it is offered into evidence of a material

7    fact.

8         Three, it is more probative on the point for

9    which it is offered than any on other evidence that the

10   proponent could obtain through reasonable efforts.

11        And four, admitting it will serve, will best

12   serve the purpose of these rules and the interests of

13   justice.

14        Under those factors I think Mr. Zabell has a

15   fair point that it was prepared in connection with a

16   summary judgment motion.  And so under normal

17   circumstances when something is prepared in connection

18   with litigation, and this is not particular to his desire

19   or this is a general view that those types of documents do

20   not have the highest degree of trustworthiness because

21   they're prepared in connection with litigation.

22        However, that is only one factor.  And here,

23   notwithstanding that I determined that it was offered as

24   evidence of a material fact, which is his ongoing

25   emotional state, it is more probative on that point for

938

1   which it is offered than any other that the proponent can

2   obtain through reasonable efforts.  Because obviously if

3   Mr. Zarda were still alive I would not have allowed it

4   under the residual exception, because he could certainly

5   testify as to his current state of mind.  But he is

6   deceased, so there was no other way for Mr. Antollino to

7   put in what his mental state was in the past.  Not the

8   only way, he did have a doctor testify to that.  But there

9   is no other way to do it from Mr. Zarda's standpoint

10  itself then through that declaration.  He had no other

11  means to do that.  He couldn't call Mr. Zarda.  And I

12  believe that it would serve the purpose of the rule and

13  the interests of justice, again, to allow him to make

14  arguments regarding the ongoing nature of emotional

15  distress.

16          To the extent that Mr. Zabell's argument was a

17  reasonable argument that he didn't get a chance to

18  cross-examine Mr. Zarda on that statement, I believe that

19  the deposition, certain questions -- he certainly

20  questioned Mr. Zarda on his emotional state in the

21  deposition and read in portions of it in rebuttal to that

22  declaration.  And so I believe there were sufficient items

23  in the deposition for him to attack that declaration in

24  terms of what his emotional distress was and whether or

25  not he continued to skydive or not, notwithstanding his

939

1  ability to question Mr. Zarda regarding it.  And in fact

2  he, I think in addition to Mr. Zarda's deposition, got

3  that out through some other witnesses as well as in terms

4  of his ongoing activities and mental state after the

5  termination.

6         So I believe that it was admissible and

7  non-hearsay.  It's admissible under the residual exception

8  to the hearsay rule.

9         With respect to the rest of the declaration

10  which I excluded, the rest of it.  First of all, it's not,

11  doesn't lead to his present state of mind.  It doesn't

12  relate to -- he is recounting essentially all of the

13  circumstances from the time he was employed.  And so it

14  doesn't come under the state of mind exception to the

15  hearsay rule.  He is just recounting his version of events

16  leading up to that point in the litigation.  Those other

17  portions were completely covered in the deposition and

18  statements regarding those in the deposition.  So there

19  was no reason, no necessity for the statement to put in

20  the declaration on those issues.  There was a complete

21  opportunity to explore those issues.  And the were

22  explored thoroughly in the deposition.

23         So under the residual exception, I believe the

24  analysis is different.  I did not think it was more

25  probative on the point for which it was offered and on the

940

1  other evidence that was already in the record.  And again,

2  because it's a declaration in connection with a summary

3  judgment, it's not as trustworthy as other documents would

4  be.  And I did not believe that it would serve the

5  interests of justice to put those other statements in,

6  when they were fully covered in the deposition.

7           So that was the basis for that ruling.  Okay?

8           So we'll take a break.  And just give Michele

9  your phone number if you're going to go downstairs or

10  something like that.  Okay?

11           (A recess was taken.)

12           (The following took place at 3:39 p.m. outside

13  the presence of the jury.)

14           THE COURT:  I have received a note that has been

15  given to both sides, saying -- this note has been marked

16  as Court Exhibit 2 saying:  We have unanimously reached a

17  verdict.

18           So we'll bring in jury for the verdict.

19           (The jury entered the courtroom.)

20           THE COURT:  Members of the jury I have received

21  your note which is marked Court Exhibit 2, saying:  We

22  have unanimously reached a verdict.

23           Mr. Foreperson, has the jury reached a unanimous

24  verdict?

25           THE FOREPERSON:  Yes, we have.

941

1           THE COURT:  Can you hand it up to my deputy so I

2    can inspect the verdict sheet?

3           (Handing)

4           We will mark it as Court Exhibit 3.

5           Hand it back to the foreperson, and we can read

6    the verdict.

7           Mr. Foreperson, if you could stand.

8           With respect to Part I, liability question one:

9    Did plaintiff prove by a preponderance of the evidence

10   that Donald Zarda's sexual orientation was a determining

11   factor in the termination of his employment at Altitude

12   Express, Inc, doing business as Skydive Long Island in

13   2010?

14          Is the jury's unanimous verdict yes or no?

15          THE FOREPERSON:  No.

16          THE COURT:  Okay, you can be seated.

17          Members of the jury, please listen to your

18   verdict as recorded by the court.

19          With respect to liability, Part I, question one.

20          Did plaintiff prove by a preponderance of the

21   evidence that Donald Zarda's sexual orientation was a

22   determining factor in the termination of his employment at

23   Altitude Express, Inc, doing business as Skydive Long

24   Island in 2010?

25          The jury's unanimous verdict, No.

942

1              Members of the jury, is that your unanimous

2    verdict, so say you all?

3              THE JURORS:  Yes.

4              THE COURT:  I'm going to poll the jury.

5              Juror Number 1, is that your verdict?

6              JUROR 1:  Yes.

7              THE COURT:  Juror Number 2, is that your

8    verdict?

9              JUROR 2:  Yes.

10             THE COURT:  Juror Number 3, is that your

11   verdict?

12             JUROR 3:  Yes.

13             THE COURT:  Juror Number 4, is that your

14   verdict?

15             JUROR 4:  Yes.

16             THE COURT:  Juror Number 5, is that your

17   verdict?

18             JUROR 5:  Yes.

19             THE COURT:  Juror Number 6, is that your

20   verdict?

21             JUROR 6:  Yes.

22             THE COURT:  Juror Number 7, is that your

23   verdict?

24             JUROR 7:  Yes.

25             THE COURT:  Juror Number 8, is that your

943

1    verdict?

2              JUROR 8:  Yes.

3              THE COURT:  Okay, the jury has been polled.  The

4    verdict is unanimous.  I'll let the lawyers inspect the

5    verdict sheet before I dismiss the jury at sidebar.

6              (The following occurred at sidebar.)

7              THE COURT:  Is there anything before I dismiss

8    it jury.

9              MR. ANTOLLINO:  No.

10             MR. ZABELL:  Not for the defendant.

11             (The following occurred in open court.)

12             THE COURT:  Members of the jury, your jury

13   service is complete.  Before I send you on your way, I

14   just want to you give you a few comments.

15             First thing, and the most important thing I want

16   to do is to thank you for your jury service in this case.

17   I know the lawyers thanked you at the end of the case, but

18   I want to thank you again.

19             As you know, during the jury selection, this

20   happens in every jury selection no matter what the length

21   of the case is, when I ask people if they have any

22   extraordinary personal hardship, that line forms,

23   sometimes out the door.  And a lot of people have

24   compelling reasons for health or job or family for not

25   serving.  But if you were at the sidebar with me you would

**944**

1    hear a lot of people who just don't want to serve and

2    they're just trying to come up with some reason not to

3    serve.

4            And although you had the opportunity to get on

5    that line and to try to come up with a reason not to

6    serve, each of you did not do that, but were willing to

7    put aside your busy lives and step up to the plate and

8    perform your civic obligation.  And for citizens to serve

9    on a jury, and it is one of the most important rights that

10   we have in this country, the right to a trial by jury.

11           And when I give that naturalization speech

12   downstairs, that is one of the things that makes this

13   country great.  And each of were you willing to step up

14   and perform that obligation.  And you should be proud of

15   that.  And you should be proud of the way that you did

16   perform your duty.  As the lawyers commented and mentioned

17   in the closing, you were listening to the evidence, and

18   you should be proud you have done that as well.

19           It's not my practice to talk to jurors after the

20   case.  Some judges do that.  My practice is to thank you

21   here in open court and respect your privacy and let you go

22   on your way.  So don't think I'm being rude and I'm not

23   thankful.  I think it's better to do that here.

24           And the rule that I have been giving you about

25   not discussing the case is over.  You can discuss the case

945

1   with anyone that you wish, or no one at all.  It's up to

2   you.  It's a personal decision whatever a juror wants to

3   discuss it with anyone.  It's up to you.

4          Another thing that I'll ask you to do is, it's

5   important, and I mentioned this at the beginning of the

6   case, and I emphasize, that as a judge it's very important

7   to me that everyone who walks through that courtroom door;

8   whether it be the lawyers, the litigants, the court

9   reporter or a juror is treated with respect and

10  professionalism, and how all of you were treated by the

11  court system.  And it's very important to me as a judge.

12         So I do ask jurors after they're Don serving,

13  and I'm not asking about the substance of the case but I

14  mean about how you were treated, how you felt about the

15  scheduling, anything, any suggestion that you have that

16  you think would make better jurors in the future, pass

17  them along to Michele.  She will pass it along.  Because I

18  don't know if you realize this, but federal judges are

19  appointed for life.  So I, hopefully I have a long way to

20  go.  And if I can do something better, I would rather know

21  it now, rather than 10 or 20 years from now, if there is

22  something I could be doing better for jurors' service to

23  the court.

24         So with that, I want to thank you again.  And I

25  wish you and your families the best.

946

1          Thank you for your service.  You're excused.

2          (The jury left the courtroom.)

3          THE COURT:  Is there is anything else we need to

4     address?

5          MR. ANTOLLINO:  No, I don't think so.

6          Thank you very much.

7          THE COURT:  You're welcome.

8          MR. ZABELL:  Thank you, judge, for your time and

9     effort.

10         (The proceedings were concluded at 3:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

947

<u>I N D E X</u>

SUMMATION FOR THE PLAINTIFF                834

SUMMATION FOR THE DEFENSE                 860

REBUTTAL SUMMATION FOR THE PLAINTIFF      887

JUDGE'S CHARGE TO THE JURY                901

**$**

**$1,000** [1] - 870:7
**$10,000** [1] - 884:17
**$140,000** [4] - 855:18, 857:7, 883:18, 884:18
**$20,000** [1] - 884:15
**$2400** [2] - 855:9, 884:19
**$2800** [3] - 855:9, 855:14, 855:16
**$40** [1] - 831:5, 855:2, 855:21
**$40,000** [1] - 884:18
**$5,085** [2] - 844:12, 884:14
**$660** [1] - 838:17

**'**

**'06** [1] - 880:25
**'07** [1] - 880:25

**1**

**1** [10] - 800:19, 802:24, 805:11, 828:2, 854:4, 929:11, 934:15, 934:16, 942:5, 942:6
**10** [4] - 867:1, 881:4, 883:13, 945:21
**10-CR-4334** [1] - 801:3
**100** [1] - 800:23
**10001** [1] - 800:15
**103** [1] - 800:19
**11** [2] - 805:11, 881:4
**11242** [1] - 800:17
**1158** [1] - 932:17
**11716** [1] - 800:20
**11722** [1] - 800:23
**1180** [1] - 800:23
**12** [9] - 831:5, 855:4, 855:21, 883:12, 884:19, 888:3, 888:4
**124** [1] - 932:17
**13** [6] - 805:10, 825:4, 855:12, 855:16, 855:21, 884:8
**147** [1] - 888:8
**14th** [1] - 823:17
**15** [5] - 802:15, 802:19, 802:25, 808:3, 899:16
**155** [1] - 863:9
**156** [1] - 863:9
**16** [3] - 802:15, 809:11, 899:23
**17** [3] - 811:24, 814:9, 816:9
**18** [4] - 809:11, 815:23, 815:25, 820:9
**1815** [1] - 800:17
**19** [4] - 820:10, 820:12, 820:18, 900:4
**1960's** [1] - 835:2
**1993** [1] - 933:21
**1:05** [1] - 887:9
**1:21** [1] - 897:5
**1st** [2] - 821:25, 884:11

**2**

**2** [10] - 802:16, 802:17, 802:24, 813:4, 883:13, 920:17, 940:16, 940:21, 942:7, 942:9
**20** [1] - 945:21
**200** [1] - 855:9
**2001** [12] - 843:11, 843:19, 850:19, 851:4, 862:6, 862:7, 873:4, 873:5, 874:2, 875:9, 886:7, 893:13
**2002** [1] - 934:1
**2003** [5] - 843:12, 843:15, 843:16, 851:4, 915:2
**2005** [1] - 933:15
**2006** [1] - 880:22
**2008** [1] - 881:2
**2009** [4] - 856:4, 873:20, 874:2, 875:10
**2010** [11] - 844:10, 862:13, 873:24, 874:3, 875:11, 884:11, 884:12, 919:19, 941:13, 941:24
**2013** [1] - 936:23
**2014** [7] - 813:11, 821:22, 822:1, 823:1, 823:14, 919:19, 919:20
**2015** [2] - 800:8, 932:18
**21** [4] - 800:8, 900:9, 919:19, 933:14
**23** [1] - 820:11
**24** [3] - 826:18, 826:22, 828:23
**240** [1] - 855:7
**2400** [6] - 855:5, 883:12, 883:14, 888:4
**241** [1] - 805:5
**25** [1] - 900:13
**26** [1] - 800:17
**275** [1] - 800:15
**296** [2] - 914:8, 914:17
**296(1)(a** [1] - 914:19
**2:52** [1] - 930:18

**3**

**3** [4] - 803:5, 941:4, 942:10, 942:12
**30th** [1] - 884:11
**314** [1] - 933:25
**326** [1] - 933:14
**344** [1] - 866:8
**354** [2] - 866:24, 867:1
**369** [1] - 868:1
**375** [1] - 869:2
**376** [1] - 869:14
**3:39** [1] - 940:12
**3:48** [1] - 946:10
**3rd** [2] - 932:17, 933:14

**4**

**4** [8] - 803:12, 823:14, 884:14,

884:17, 919:19, 919:20, 942:13, 942:15
**40** [9] - 831:6, 855:4, 883:11, 883:12, 883:13, 884:19, 888:4, 894:16
**400** [1] - 883:13
**4000** [3] - 840:8, 841:9, 847:3
**408** [1] - 879:3
**414** [1] - 880:21
**423** [1] - 882:1
**45** [1] - 894:19
**48** [1] - 879:2
**480** [4] - 855:9, 883:14, 884:20, 888:3
**4th** [3] - 821:23, 823:18, 823:19

**5**

**5** [5] - 855:21, 879:3, 888:4, 942:16, 942:18
**50(a)** [1] - 829:17
**52** [1] - 855:11
**5th** [1] - 823:1

**6**

**6** [4] - 845:17, 855:6, 942:19, 942:21
**60** [1] - 935:21
**631** [1] - 800:24

**7**

**7** [3] - 804:6, 942:22, 942:24
**705** [1] - 800:15
**712-6107** [1] - 800:24
**721** [1] - 934:1

**8**

**8** [4] - 804:17, 881:4, 942:25, 943:2
**80** [1] - 883:13
**807** [1] - 937:1
**834** [1] - 947:2
**846** [1] - 933:21
**85** [1] - 884:15
**860** [1] - 947:3
**887** [1] - 947:4

**9**

**9** [1] - 881:4
**901** [1] - 947:5
**91** [1] - 813:10
**995** [1] - 933:21
**9:30** [1] - 800:8
**9:47** [1] - 801:1

**A**

**A's** [3] - 854:24, 862:9, 862:10
**a.m** [2] - 800:8, 801:1
**abandon** [1] - 803:6
**abettor** [1] - 828:12
**ability** [3] - 813:3, 822:5, 939:1
**able** [4] - 870:25, 889:19, 935:3, 935:8
**absence** [1] - 932:6
**abundance** [1] - 935:1
**accept** [3] - 833:9, 840:19, 911:19
**acceptance** [1] - 911:21
**accepted** [1] - 920:19
**accepting** [1] - 921:1
**accident** [1] - 848:10
**accordance** [1] - 903:16
**according** [3] - 851:14, 913:12, 928:25
**account** [1] - 911:3
**accuracy** [1] - 918:15
**accurate** [4] - 865:3, 896:14, 931:18, 932:15
**accusation** [3] - 888:19, 888:22, 888:23
**accusations** [1] - 859:23
**accused** [8] - 841:11, 850:13, 852:6, 856:10, 859:4, 885:15, 888:19, 891:19
**acknowledged** [1] - 879:1
**act** [10] - 902:7, 912:4, 912:6, 912:8, 912:15, 922:1, 922:3, 922:9, 922:21, 926:1
**acted** [3] - 874:18, 920:25, 933:5
**acting** [3] - 836:13, 885:16, 885:22
**action** [10] - 802:3, 816:17, 860:17, 861:18, 873:5, 902:16, 904:1, 914:9, 915:7, 915:11
**actions** [5] - 885:1, 921:23, 923:6, 932:11, 936:18
**activities** [2] - 838:21, 939:4
**activity** [3] - 838:20, 840:23, 858:21
**acts** [4] - 922:7, 922:8, 922:10, 922:12
**actual** [6] - 805:16, 805:21, 821:24, 824:2, 831:25, 919:6
**AD** [2] - 932:17, 933:14
**add** [14] - 801:25, 803:4, 803:13, 804:18, 805:6, 805:8, 805:13, 809:2, 819:12, 820:21, 821:8, 883:13, 898:8, 899:9
**added** [5] - 899:17, 899:20, 899:22, 900:9, 915:1
**addition** [11] - 802:6, 810:22, 811:9, 855:5, 855:21, 887:24, 906:14, 912:3, 919:22, 922:14, 939:2

2

**additional** [1] - 822:21
**address** [4] - 935:9, 935:13, 936:11, 946:4
**addressed** [1] - 809:9
**addresses** [2] - 803:24, 826:2
**adequately** [1] - 826:1
**adjust** [1] - 871:9
**admissible** [3] - 904:24, 939:6, 939:7
**admit** [3] - 887:17, 887:18, 936:25
**admitted** [3] - 844:23, 844:24, 916:6
**admitting** [1] - 937:11
**adversary** [1] - 913:9
**adverse** [11] - 816:17, 898:10, 898:13, 898:14, 898:15, 898:18, 898:20, 899:7, 915:7, 915:11, 917:10
**advice** [4] - 803:13, 889:20, 890:11
**advises** [1] - 806:1
**advocate** [1] - 857:19
**aegis** [1] - 857:3
**affection** [1] - 910:24
**afraid** [4] - 837:11, 837:12, 888:18
**African** [2] - 835:4, 848:3
**African-American** [1] - 848:3
**African-Americans** [1] - 835:4
**AFTERNOON** [1] - 898:1
**afterwards** [2] - 839:19, 877:4
**age** [1] - 858:5
**agents** [1] - 912:5
**ago** [2] - 872:11, 935:17
**agree** [4] - 817:22, 818:13, 828:2, 928:5
**agrees** [5] - 819:13, 819:24, 820:2, 900:5, 917:3
**ahead** [3] - 834:10, 861:5, 887:12
**aid** [2] - 926:16, 926:18
**aider** [1] - 828:12
**air** [2] - 835:23, 882:9
**aircraft** [1] - 846:20
**airplane** [6] - 835:23, 836:12, 836:19, 871:7, 878:22, 892:14
**airport** [1] - 854:13
**alike** [1] - 920:21
**alive** [3] - 846:5, 858:23, 938:3
**allegation** [5] - 837:15, 840:19, 854:2, 856:20, 889:17
**allegations** [6] - 835:12, 837:12, 837:13, 876:25, 886:8, 889:5
**allege** [1] - 810:17
**allegedly** [1] - 921:13
**Allen** [1] - 913:22
**allow** [5] - 823:9, 853:2, 924:12, 936:14, 938:13
**allowed** [7] - 843:1, 850:4, 851:18, 882:6, 936:19, 938:3

**allows** [1] - 807:18
**almost** [2] - 846:15, 872:23
**alone** [3] - 902:24, 903:11, 903:16
**alternative** [1] - 937:1
**ALTITUDE** [1] - 800:6
**Altitude** [9] - 801:3, 828:5, 852:14, 912:6, 912:9, 912:17, 915:23, 941:11, 941:23
**amended** [3] - 809:24, 934:11, 936:6
**America** [1] - 933:14
**American** [1] - 848:3
**Americans** [1] - 835:4
**amount** [14] - 853:21, 862:14, 888:6, 888:8, 917:22, 918:3, 918:13, 918:17, 918:20, 919:6, 919:23, 920:4, 923:24, 924:5
**analysis** [2] - 936:13, 939:24
**analyzing** [1] - 903:5
**and-a-half** [1] - 856:16
**anger** [2] - 876:4, 893:23
**angle** [1] - 849:13
**angry** [3] - 848:12, 848:17, 848:20
**ankle** [2] - 873:21
**Answer** [20] - 844:4, 844:6, 863:13, 863:16, 863:19, 865:6, 865:8, 866:11, 866:16, 867:4, 867:7, 867:10, 867:15, 868:2, 868:17, 868:22, 879:17, 880:24, 882:4, 893:12
**answer** [4] - 852:16, 906:5, 929:14
**answered** [1] - 828:1
**anticipate** [1] - 834:1
**anticipated** [1] - 935:18
**Antollino** [34] - 801:20, 802:11, 809:12, 818:12, 819:23, 824:14, 825:15, 829:2, 834:10, 866:9, 866:14, 866:21, 867:2, 868:24, 870:11, 870:18, 871:8, 872:5, 872:22, 875:14, 875:20, 876:21, 880:1, 882:19, 883:9, 883:16, 887:12, 893:5, 895:3, 896:4, 934:19, 935:16, 938:6
**ANTOLLINO** [88] - 800:14, 801:9, 802:12, 802:14, 802:16, 802:20, 803:2, 803:4, 803:12, 804:6, 804:9, 804:16, 805:2, 805:8, 805:10, 806:3, 806:10, 806:16, 807:2, 808:3, 808:11, 808:25, 809:7, 809:13, 811:24, 814:9, 815:23, 815:25, 817:24, 818:19, 819:6, 819:9, 819:21, 819:24, 820:3, 820:8, 820:12, 820:17, 821:7, 821:21, 822:18, 822:25, 824:12, 824:15, 824:17, 824:25, 825:16, 826:8, 826:11, 827:22, 829:3, 829:12, 829:24, 830:8, 831:03, 831:2,

831:19, 832:5, 832:20, 834:13, 861:3, 862:2, 887:15, 890:8, 890:10, 890:17, 890:24, 891:4, 893:7, 895:10, 896:10, 898:7, 899:10, 899:13, 899:19, 899:25, 900:3, 900:8, 900:12, 900:15, 900:18, 900:22, 900:24, 930:13, 931:1, 931:7, 943:9, 946:5
**Antollino's** [4] - 809:23, 830:21, 895:1, 896:19
**anyway** [1] - 825:22
**apart** [1] - 840:5
**apartment** [1] - 862:8
**apologize** [1] - 832:25
**appeal** [1] - 908:17
**appealed** [2] - 889:23, 910:15
**APPEARANCES** [1] - 800:13
**Appearances** [1] - 801:4
**appeared** [1] - 902:25
**apply** [6] - 803:14, 817:1, 903:16, 913:19, 919:15, 924:17
**applying** [1] - 911:14
**appointed** [1] - 945:19
**appropriate** [7] - 822:12, 829:15, 840:7, 871:1, 871:5, 871:6, 878:25, 892:4, 936:14
**appropriately** [3] - 806:1, 824:4, 873:15
**April** [1] - 884:11
**arbitrarily** [1] - 933:5
**arbitrary** [1] - 918:11
**area** [1] - 821:11
**argue** [8] - 807:18, 814:3, 825:5, 825:21, 825:22, 825:25, 826:1, 826:6
**argues** [2] - 891:15, 909:25
**arguing** [2] - 818:6, 895:24
**argument** [13] - 810:1, 819:2, 824:7, 830:1, 833:8, 863:1, 890:20, 895:16, 895:24, 899:1, 919:1, 938:16, 938:17
**arguments** [14] - 832:9, 833:10, 889:22, 902:3, 905:15, 925:20, 925:21, 931:21, 931:23, 931:24, 932:7, 932:8, 938:14
**Aristotle** [1] - 860:17
**arrive** [3] - 904:18, 904:21, 925:5
**arriving** [2] - 907:25, 935:19
**ascertain** [1] - 853:6
**aside** [2] - 861:25, 944:7
**aspect** [2] - 858:21, 898:7
**asserting** [1] - 913:23
**assessment** [1] - 932:6
**asset** [1] - 912:20
**associate** [1] - 915:9
**ASSOCIATES** [1] - 800:19
**assume** [1] - 907:7
**assuming** [1] - 832:2
**AT&T** [1] - 933:21

**attack** [2] - 896:21, 938:23
**attacks** [1] - 856:11
**attempt** [2] - 859:16, 927:12
**attend** [1] - 881:19
**attending** [1] - 880:23
**attention** [6] - 840:17, 847:2, 847:6, 859:10, 902:6, 929:4
**attentive** [1] - 834:15
**attorney** [3] - 895:19, 896:21, 918:19
**attorney's** [2] - 918:16, 919:1
**attorneys** [2] - 833:6, 913:8
**attraction** [1] - 849:22
**audio** [1] - 849:2
**available** [2] - 821:9, 848:3
**Avenue** [1] - 800:15
**award** [16] - 856:22, 918:10, 918:17, 919:6, 919:14, 919:17, 919:22, 919:25, 920:3, 921:10, 921:15, 921:17, 923:13, 924:2, 924:6, 924:8
**awarded** [1] - 923:11
**aware** [1] - 816:21
**Awesome** [1] - 842:5
**awesome** [1] - 842:8

**B**

**bad** [3] - 842:22, 878:10, 917:11
**baiting** [1] - 876:3
**balance** [1] - 841:7
**bank** [1] - 912:21
**bar** [4] - 857:15, 857:16, 914:23
**bartender** [1] - 838:10
**base** [6] - 854:17, 862:23, 874:13, 893:16, 903:9, 927:3
**based** [21] - 812:25, 819:10, 829:3, 861:19, 874:16, 877:14, 883:18, 886:5, 904:4, 910:16, 914:1, 914:11, 915:12, 917:2, 918:23, 923:15, 923:16, 925:17, 931:14, 935:9, 936:13
**basis** [13] - 802:2, 805:23, 851:24, 852:15, 854:5, 885:13, 904:15, 916:5, 918:24, 918:25, 933:10, 936:8, 940:7
**bathroom** [3] - 931:7, 931:10, 931:11
**bear** [1] - 907:19
**beat** [1] - 851:12
**becomes** [2] - 896:21, 927:8
**BEFORE** [1] - 800:11
**befriended** [1] - 861:25
**begging** [3] - 849:2, 849:3, 889:7
**begin** [5] - 833:3, 834:9, 926:1, 930:16, 930:17
**beginning** [10] - 819:7, 832:8, 833:5, 833:18, 834:19, 857:23, 874:13, 879:3, 913:16, 945:5
**behave** [2] - 818:9, 873:14

**behavior** [1] - 886:6
**behind** [4] - 827:21, 836:14, 848:2, 860:20
**belief** [1] - 850:16
**believable** [1] - 909:3
**belong** [1] - 857:21
**belongs** [2] - 884:21, 884:22
**benefit** [1] - 911:3
**benefits** [5] - 919:7, 919:9, 919:13, 920:1, 920:2
**best** [11] - 839:13, 839:18, 841:19, 852:5, 852:7, 859:11, 859:19, 876:14, 893:21, 937:11, 945:25
**better** [6] - 841:13, 856:2, 944:23, 945:16, 945:20, 945:22
**between** [17] - 813:16, 834:21, 835:22, 841:7, 841:16, 865:20, 871:1, 885:10, 890:1, 891:12, 892:20, 895:21, 904:1, 919:18, 922:1, 922:20, 926:24
**beyond** [2] - 802:1, 804:11
**BIANCO** [1] - 800:11
**Bianco** [1] - 834:1
**bias** [2] - 904:8, 911:6
**biased** [1] - 911:8
**biases** [1] - 915:5
**big** [3] - 809:2, 831:11, 912:1
**binding** [1] - 918:18
**bit** [7] - 863:6, 865:11, 880:15, 884:10, 894:15
**bitching** [1] - 878:9
**blame** [1] - 872:10
**blank** [2] - 838:16, 857:6
**blinded** [2] - 861:1, 861:7
**Blonde** [1] - 860:20
**board** [1] - 831:11
**bodies** [1] - 870:15
**body** [1] - 869:17
**bogus** [2] - 835:12, 853:12
**Bohemia** [1] - 800:20
**book** [1] - 891:24
**books** [1] - 849:23
**bore** [1] - 803:23
**born** [1] - 849:21
**bottom** [3] - 826:22, 892:25, 900:14
**bound** [2] - 898:17, 903:23
**boyfriend** [17] - 835:25, 837:3, 837:4, 841:18, 842:1, 858:17, 858:18, 865:21, 866:17, 867:17, 869:10, 869:15, 870:21, 872:9, 877:23, 878:5, 892:19
**boyfriend's** [4] - 837:13, 846:7, 868:7, 868:11
**branded** [1] - 853:14
**break** [8] - 827:12, 829:12, 832:19, 859:25, 860:2, 894:15, 930:4, 940:8
**breakup** [1] - 869:4

**breasts** [1] - 845:9
**breath** [1] - 882:9
**bribed** [1] - 872:3
**Brill** [1] - 854:25
**bring** [7] - 830:18, 831:2, 831:11, 848:7, 860:9, 875:17, 875:18, 875:20, 883:25, 884:1, 886:12, 901:5, 901:7, 928:10, 928:14, 929:11, 940:18
**bringing** [3] - 883:3, 894:7, 922:4
**broke** [6] - 865:20, 869:10, 873:21, 877:23, 878:5, 892:19
**broken** [4] - 865:15, 869:5, 873:21, 882:24
**Brooklyn** [1] - 800:17
**brought** [9] - 839:8, 864:5, 875:14, 880:15, 882:24, 883:2, 889:11, 889:14, 892:16
**budgetary** [2] - 812:23, 812:25
**building** [2] - 930:4, 930:21
**bump** [1] - 839:22
**bunch** [1] - 836:23
**burden** [13] - 817:7, 817:10, 817:11, 817:13, 817:18, 820:22, 821:2, 908:1, 908:3, 914:5, 917:5, 919:12, 925:7
**Burrell** [1] - 874:8
**burrell** [1] - 934:8
**business** [20] - 842:21, 885:14, 886:5, 886:18, 886:19, 912:6, 912:9, 912:13, 912:18, 915:23, 929:6, 931:13, 931:17, 932:22, 933:4, 933:7, 933:16, 933:23, 941:12, 941:23
**busy** [1] - 944:7
**BY** [1] - 800:20

## C

**calculate** [3] - 823:11, 824:4, 853:2
**calculations** [3] - 831:10, 855:17, 883:10
**California** [2] - 881:9, 881:13
**Callahan** [3] - 855:22, 863:6, 864:3
**calm** [2] - 865:10, 869:12
**calmly** [1] - 904:2
**camera** [1] - 847:21
**cameraman** [1] - 871:4
**cannot** [1] - 915:7
**canopy** [1] - 869:1
**car** [1] - 837:23
**carat** [1] - 820:21
**CARDINALE** [1] - 800:16
**care** [6] - 810:24, 810:25, 842:24, 850:6, 911:9, 931:2
**cared** [1] - 864:23
**career** [2] - 854:16, 893:16
**careful** [3] - 884:20, 902:6,

929:3
**carefully** [3] - 859:10, 909:7, 925:1
**Caribbean** [1] - 881:17
**carried** [1] - 925:7
**carry** [1] - 829:5
**carrying** [1] - 907:9
**Carta** [1] - 834:23
**case** [104] - 801:3, 805:14, 807:6, 807:23, 808:5, 809:14, 809:17, 810:16, 811:1, 811:5, 811:15, 812:21, 812:23, 813:2, 813:9, 813:10, 813:14, 817:4, 817:10, 822:3, 823:22, 827:5, 828:7, 828:17, 830:1, 833:5, 833:18, 837:21, 846:9, 848:18, 848:22, 851:3, 857:10, 859:14, 860:4, 861:2, 861:12, 861:22, 862:11, 865:2, 866:22, 880:5, 882:7, 884:24, 884:25, 887:18, 887:23, 889:19, 893:21, 895:4, 898:15, 902:3, 902:8, 902:10, 902:14, 902:16, 902:21, 903:13, 903:25, 904:7, 907:24, 909:16, 911:4, 911:12, 911:22, 912:14, 914:13, 915:6, 918:25, 923:3, 924:15, 924:23, 925:18, 927:7, 927:15, 928:18, 928:25, 931:22, 932:8, 932:13, 932:16, 932:17, 932:19, 932:20, 933:11, 933:12, 933:14, 933:20, 933:21, 933:25, 934:2, 934:15, 936:4, 936:14, 943:16, 943:17, 943:21, 944:20, 944:25, 945:6, 945:13
**cases** [8] - 804:20, 813:17, 816:22, 846:1, 898:21, 931:17, 933:17
**category** [2] - 813:1, 919:2
**catty** [1] - 838:4
**catty-corner** [1] - 838:4
**caught** [1] - 931:4
**causal** [1] - 922:1
**caused** [7] - 921:20, 922:9, 922:19, 923:2, 923:21, 923:23, 924:4
**causes** [1] - 902:16
**causing** [1] - 922:4
**caution** [2] - 911:8, 935:2
**cell** [1] - 930:22
**center** [1] - 853:17
**Central** [2] - 800:5, 800:23
**certain** [5] - 836:9, 888:1, 899:1, 905:14, 938:19
**certainly** [10] - 819:1, 836:5, 840:6, 874:13, 876:14, 877:15, 880:25, 932:7, 938:4, 938:19
**certificate** [1] - 822:20
**challenge** [1] - 932:23
**chance** [1] - 938:17
**change** [8] - 803:11, 808:8,

812:1, 812:2, 815:10, 821:24, 899:16, 925:3
**changed** [3] - 811:15, 830:1, 899:17
**changes** [1] - 899:13
**changing** [1] - 804:12
**characterization** [1] - 933:7
**characterize** [1] - 896:23
**characterizes** [1] - 870:11
**characterizing** [2] - 872:6, 895:20
**charge** [17] - 802:21, 803:18, 803:24, 803:25, 805:23, 805:24, 806:6, 807:3, 812:7, 821:17, 826:1, 896:3, 898:4, 898:9, 898:11, 924:14
**CHARGE** [2] - 901:10, 947:5
**check** [2] - 822:16, 853:1
**checking** [1] - 822:2
**Chicago** [1] - 880:18
**chick** [3] - 875:23, 875:24, 886:14
**chided** [1] - 896:6
**children** [5] - 843:8, 845:2, 865:5, 865:10, 891:18
**chin** [3] - 868:10, 868:12, 868:13
**chose** [2] - 840:19, 919:14
**chosen** [3] - 810:1, 859:2, 904:14
**circles** [1] - 853:20
**Circuit** [17] - 807:5, 807:7, 807:22, 812:9, 812:10, 813:13, 816:4, 816:20, 816:25, 817:5, 817:8, 817:17, 933:19, 933:20, 933:24, 934:1, 934:2
**circuit** [1] - 933:18
**circumstance** [1] - 852:6
**circumstances** [9] - 837:19, 858:13, 869:24, 893:1, 909:8, 916:19, 918:15, 937:17, 939:13
**circumstantial** [5] - 906:15, 906:24, 907:21, 907:24, 937:4
**citizen** [1] - 857:24
**citizens** [1] - 944:8
**City** [1] - 933:25
**civic** [1] - 944:8
**civil** [5] - 806:13, 835:2, 858:1, 902:14, 904:19
**claim** [33] - 809:11, 809:24, 810:4, 810:14, 810:18, 811:9, 814:15, 817:1, 826:24, 826:25, 829:21, 831:3, 832:1, 832:3, 846:12, 858:6, 900:20, 908:5, 908:16, 908:17, 908:18, 908:23, 912:19, 912:25, 913:2, 913:23, 914:3, 915:14, 918:2, 919:1, 925:8, 925:11
**claimed** [3] - 809:23, 819:14, 912:14
**claims** [8] - 809:14, 809:17,

4

811:15, 819:17, 820:4, 900:6, 914:13, 917:4

**clarify** [4] - 819:20, 889:16, 936:18, 936:19

**class** [13] - 802:2, 813:6, 816:18, 827:11, 841:5, 849:23, 862:13, 881:20, 915:2, 915:5, 915:10, 915:12, 915:13

**classes** [8] - 854:24, 862:14, 880:18, 881:6, 881:9, 881:15, 882:8

**clause** [1] - 819:12

**claustrophobic** [1] - 835:13

**clear** [13] - 801:21, 802:1, 813:16, 813:23, 815:11, 823:6, 823:7, 828:1, 838:24, 858:9, 875:3, 904:17, 934:3

**clearer** [1] - 815:7

**clerk** [3] - 896:5, 898:3, 931:4

**client** [9] - 810:23, 823:2, 829:23, 836:8, 836:10, 837:14, 847:6, 861:2, 861:7

**client's** [1] - 847:6

**clients** [1] - 845:23

**close** [6] - 841:18, 849:11, 867:11, 868:9, 911:9, 929:3

**closed** [1] - 847:17

**closely** [2] - 839:25, 859:7

**closer** [1] - 935:19

**closet** [12] - 810:2, 851:20, 861:15, 864:16, 870:13, 875:6, 875:7, 875:8, 875:9, 875:10, 875:11, 893:2

**closing** [16] - 804:22, 826:18, 830:18, 830:21, 833:2, 833:4, 863:1, 882:18, 889:22, 890:20, 896:19, 896:20, 924:10, 924:13, 925:20, 944:17

**closings** [1] - 833:7

**code** [2] - 844:17, 850:2

**colleagues** [1] - 859:7

**collect** [1] - 889:18

**collective** [2] - 843:22, 856:25

**college** [1] - 881:23

**color** [1] - 911:6

**colored** [1] - 911:17

**comfort** [1] - 867:14

**comfortable** [5] - 836:6, 852:8, 859:17, 870:19, 870:20

**coming** [4] - 822:23, 869:1, 876:10, 893:5

**comment** [3] - 839:11, 839:14, 886:21

**commented** [2] - 903:18, 944:16

**comments** [4] - 803:6, 869:11, 869:14, 943:14

**commitment** [1] - 880:24

**committed** [2] - 881:5, 912:15

**common** [6] - 845:23, 907:16, 909:17, 910:15, 911:14, 924:7

**communicate** [5] - 903:6,

927:5, 927:9, 927:13, 927:14

**communicated** [1] - 867:16

**communication** [1] - 906:16

**communications** [1] - 926:3

**community** [1] - 904:2

**comp** [1] - 838:12

**company** [4] - 827:5, 827:19, 876:16, 880:7

**compare** [1] - 878:3, 926:19

**compelling** [1] - 943:24

**compensate** [5] - 857:2, 918:21, 921:5, 921:11, 923:25

**compensated** [1] - 924:4

**compensates** [1] - 919:7

**compensation** [7] - 821:9, 914:25, 920:2, 920:8, 920:14, 920:23, 923:11

**compensatory** [5] - 921:15, 921:18, 921:21, 923:3, 923:15

**competent** [1] - 859:21, 873:11

**complain** [6] - 837:1, 841:2, 845:22, 858:17, 858:18, 901:12

**complained** [13] - 837:3, 845:2, 845:23, 846:22, 846:23, 861:18, 873:4, 879:5, 879:7, 879:16, 879:19, 891:22

**complaining** [2] - 878:19, 891:24

**complains** [2] - 837:4, 845:18

**complaint** [48] - 801:25, 802:3, 809:24, 810:9, 810:10, 810:13, 819:11, 819:13, 819:20, 819:25, 820:4, 838:7, 838:8, 838:9, 839:6, 844:24, 845:7, 845:8, 845:18, 846:7, 851:1, 858:12, 859:22, 861:19, 863:25, 870:14, 871:23, 872:11, 872:14, 873:19, 873:20, 875:13, 876:19, 879:2, 879:9, 879:17, 882:22, 886:3, 886:4, 886:5, 886:17, 889:3, 900:6, 915:12, 917:2, 917:3

**complaints** [10] - 846:9, 848:19, 853:13, 858:17, 863:8, 863:9, 863:11, 863:19, 863:20, 872:20

**complete** [4] - 909:22, 926:23, 939:20, 943:13

**completely** [4] - 815:11, 839:14, 904:4, 939:17

**completes** [1] - 894:6

**complications** [1] - 841:1

**compliment** [1] - 855:25

**comport** [1] - 885:17

**Computer** [1] - 800:25

**computing** [2] - 918:3, 918:10

**concern** [2] - 817:17, 817:19

**concerned** [2] - 814:22, 817:11

**concerning** [1] - 903:14

**concerns** [1] - 910:12

**conclude** [2] - 850:15, 936:9

**concluded** [1] - 946:10

**concludes** [1] - 929:2

**concluding** [1] - 885:25

**conclusion** [2] - 877:14, 877:15

**condensed** [1] - 814:20, 854:24

**conditions** [3] - 914:25, 920:24

**Conduct** [1] - 804:7

**conduct** [9] - 862:24, 912:11, 921:13, 921:21, 922:16, 922:25, 923:21, 923:24, 924:4

**conference** [1] - 934:18

**conferences** [4] - 905:5, 905:6, 905:7

**confident** [1] - 902:7

**confirmed** [2] - 876:23, 877:4

**conflict** [1] - 834:25

**conflicts** [2] - 902:25, 910:5

**confusing** [4] - 815:1, 817:9, 817:11, 828:13

**connection** [5] - 922:1, 937:15, 937:17, 937:21, 940:2

**consequence** [4] - 921:13, 922:6, 922:8, 923:6

**consequences** [1] - 904:14

**consider** [21] - 803:25, 806:2, 816:5, 826:24, 826:25, 896:17, 899:23, 900:20, 903:11, 907:15, 907:23, 910:6, 910:9, 910:25, 911:5, 913:11, 916:10, 916:24, 918:2, 920:21, 925:14

**consideration** [6] - 804:11, 808:23, 904:9, 911:25, 912:2, 919:8

**considerations** [1] - 911:15

**considered** [4] - 805:15, 806:19, 903:25, 918:5

**considering** [2] - 821:19, 835:17

**constant** [2] - 832:17, 868:2

**constantly** [1] - 885:4

**contact** [2] - 874:10, 874:11

**contend** [1] - 835:11

**content** [2] - 803:23, 836:20

**contention** [1] - 851:9

**context** [4] - 813:3, 813:8, 888:1, 932:20

**continue** [4] - 815:5, 860:2, 901:14, 930:5

**continued** [4] - 856:3, 915:22, 916:2, 938:25

**contradicted** [1] - 910:4

**controls** [8] - 832:11, 832:13, 833:15, 833:21, 834:7, 903:16, 905:21, 925:24

**controversial** [1] - 811:9

**conversation** [3] - 869:3, 869:6, 879:11

**conversely** [1] - 913:1

**conviction** [1] - 925:4

**convinced** [2] - 819:4, 925:3

**convincing** [1] - 908:13

**cooperating** [1] - 911:1

**copies** [1] - 896:3

**copy** [8] - 801:6, 901:1, 901:20, 901:22, 929:9, 929:10, 934:15, 934:17

**corner** [2] - 838:4, 841:10, 850:13, 852:3

**Corporate** [1] - 800:19

**Corporation** [1] - 933:13

**corporation** [5] - 808:6, 808:16, 808:21, 911:23, 912:4

**corporations** [1] - 912:1

**correct** [6] - 801:18, 805:7, 810:21, 863:18, 879:16, 879:21

**corrections** [3] - 896:13, 898:6, 931:6

**correctly** [2] - 862:12, 865:1

**correctness** [1] - 932:23

**counsel** [10] - 810:1, 832:9, 860:12, 861:1, 861:11, 862:12, 866:3, 880:15, 885:15, 899:3

**Counsel** [1] - 804:7

**country** [3] - 857:22, 944:10, 944:13

**couple** [10] - 808:3, 814:12, 823:2, 853:24, 854:12, 861:17, 898:11, 931:1, 931:3, 935:17

**course** [6] - 832:5, 836:2, 838:18, 845:13, 911:11, 926:5

**court** [29] - 802:3, 804:20, 814:21, 816:6, 822:20, 823:6, 830:5, 830:12, 833:19, 894:14, 905:13, 906:6, 913:9, 925:19, 926:3, 926:10, 926:12, 927:1, 927:2, 927:16, 927:17, 928:12, 929:1, 941:18, 943:11, 944:21, 945:8, 945:11, 945:23

**COURT** [136] - 800:1, 800:11, 801:5, 801:11, 802:13, 802:18, 802:23, 803:3, 803:8, 804:1, 804:8, 804:12, 804:22, 805:3, 805:6, 806:4, 806:11, 806:17, 807:5, 808:10, 808:20, 809:4, 809:8, 809:10, 809:20, 810:13, 810:22, 811:4, 811:12, 811:18, 811:23, 812:18, 814:8, 814:24, 815:13, 815:16, 815:19, 815:21, 815:24, 816:14, 818:4, 818:12, 818:24, 819:8, 819:19, 819:22, 820:1, 820:6, 820:10, 820:14, 821:5, 822:4, 822:11, 822:16, 823:4, 823:18, 823:23, 824:13, 824:16, 825:6, 825:14, 826:4, 826:9, 826:14, 826:17, 827:25, 828:8, 828:13, 828:22, 829:1, 829:7, 829:20, 830:3, 830:9, 830:16, 830:19, 831:14, 831:23, 832:4, 832:6, 832:24, 859:25, 860:7, 860:9, 860:11, 861:4, 862:3, 887:8, 890:7, 890:15, 890:22, 891:1, 893:5, 894:5, 894:23, 895:11, 896:11,

896:22, 897:4, 898:3, 898:23, 899:11, 899:15, 899:20, 900:1, 900:4, 900:9, 900:13, 900:17, 900:20, 900:23, 900:25, 901:11, 929:24, 930:15, 930:19, 931:3, 931:9, 940:14, 940:20, 941:1, 941:16, 942:4, 942:7, 942:10, 942:13, 942:16, 942:19, 942:22, 942:25, 943:3, 943:7, 943:12, 946:3, 946:7

**Court** [6] - 800:17, 800:22, 934:14, 940:16, 940:21, 941:4

**court's** [2] - 906:2, 929:23

**Courthouse** [1] - 800:5

**courtroom** [14] - 859:1, 860:10, 877:8, 894:22, 901:8, 906:12, 907:7, 907:8, 926:11, 930:17, 930:20, 940:19, 945:7, 946:2

**courts** [6] - 812:3, 812:4, 813:19, 816:24, 830:13, 933:24

**cover** [2] - 825:17, 827:8

**covered** [2] - 939:17, 940:6

**crash** [1] - 865:17

**credentials** [1] - 854:22

**credibility** [7] - 874:7, 895:23, 906:23, 909:1, 909:5, 909:14, 909:18

**credible** [2] - 908:5, 908:6

**creepy** [3] - 847:9, 871:19, 871:22

**cried** [1] - 850:19

**cross** [3] - 835:11, 905:12, 938:18

**cross-examination** [1] - 905:12

**cross-examine** [2] - 835:11, 938:18

**crossed** [1] - 896:25

**crosses** [2] - 895:18, 896:20

**cruise** [3] - 881:10, 881:12, 881:16

**cruises** [2] - 854:12, 862:18

**cry** [5] - 843:23, 844:3, 850:21, 873:2, 893:11

**crying** [5] - 850:19, 872:21, 872:22, 872:25, 893:10

**culture** [1] - 838:11

**current** [3] - 828:7, 936:22, 938:5

**Curt** [3] - 874:8, 874:10, 875:1

**customer** [24] - 801:21, 801:22, 801:24, 819:10, 819:13, 819:25, 820:3, 839:1, 841:8, 845:18, 851:23, 853:13, 863:25, 864:22, 875:13, 877:16, 882:22, 886:3, 893:3, 900:6, 915:11, 917:2, 917:3

**customers** [14] - 842:12, 842:14, 842:16, 843:3, 850:7, 851:16, 851:20, 851:21, 855:22, 855:23, 878:13, 894:2, 915:5, 915:8

**cut** [2] - 816:9, 888:8

**cV-10-4334** [1] - 800:4

**D**

**d/b/a** [1] - 800:6

**damage** [3] - 922:2, 922:5, 922:15

**damages** [73] - 809:11, 815:22, 820:10, 820:15, 820:23, 821:4, 821:13, 821:15, 821:18, 821:20, 822:5, 823:12, 824:4, 824:6, 824:8, 825:15, 825:19, 826:2, 826:12, 828:3, 828:4, 832:2, 853:2, 853:3, 853:4, 856:5, 880:14, 883:9, 888:15, 893:17, 912:19, 914:10, 917:22, 917:25, 918:2, 918:4, 918:5, 918:7, 918:10, 918:17, 918:22, 919:2, 919:4, 919:6, 919:14, 919:15, 919:17, 919:22, 920:3, 920:8, 920:9, 920:13, 920:16, 921:4, 921:6, 921:7, 921:8, 921:9, 921:11, 921:15, 921:18, 921:21, 923:3, 923:12, 923:15, 923:19, 923:24, 924:2, 924:5, 924:8

**dangerous** [3] - 840:23, 842:7, 858:21

**date** [18] - 821:7, 821:24, 822:6, 822:7, 822:18, 823:3, 823:7, 823:10, 823:13, 823:25, 824:2, 889:2, 919:15, 919:16, 919:20, 920:19, 928:19

**dated** [1] - 929:7

**David** [6] - 836:9, 837:21, 841:2, 845:14, 872:8, 892:7

**days** [13] - 822:10, 838:5, 838:9, 838:19, 851:3, 855:8, 883:21, 883:23, 883:25, 884:1, 884:2, 888:10

**dead** [1] - 859:15

**dealing** [1] - 882:7

**death** [19] - 821:8, 822:6, 822:7, 822:19, 822:20, 823:8, 823:10, 836:21, 836:25, 840:6, 841:4, 842:8, 853:21, 858:14, 912:23, 912:24, 919:16, 919:21, 920:19

**decades** [2] - 835:6, 853:20

**deceased** [2] - 912:22, 938:6

**decide** [14] - 810:12, 857:5, 905:9, 907:18, 908:21, 909:3, 909:11, 910:2, 911:13, 920:25, 921:3, 924:6, 924:21, 928:7

**decided** [2] - 877:21, 877:22, 903:25

**deciding** [5] - 907:14, 909:14, 910:7, 910:22, 916:8

**decision** [30] - 810:5, 813:5, 814:2, 814:18, 826:23, 827:3, 827:4, 828:19, 852:22, 874:1,

876:6, 876:20, 881:6, 886:5, 886:23, 904:14, 904:21, 915:17, 915:19, 915:21, 916:9, 917:9, 925:13, 925:15, 928:18, 932:1, 932:24, 933:4, 945:2

**decision-maker** [1] - 827:4

**decisions** [2] - 903:10, 917:10

**declaration** [8] - 853:8, 936:17, 936:23, 938:10, 938:22, 938:23, 939:9, 939:20, 940:2

**deduct** [2] - 919:23, 919:25

**deed** [1] - 823:14

**deem** [3] - 903:1, 911:20, 911:21

**deems** [1] - 898:16

**defamed** [2] - 851:6, 851:7

**defend** [5] - 845:12, 845:14, 851:2, 857:18

**defendant** [14] - 811:16, 817:12, 821:2, 821:8, 825:11, 827:8, 827:16, 828:11, 900:21, 908:22, 912:9, 923:7, 930:14, 943:10

**defendant's** [3] - 816:10, 820:21, 829:16

**Defendants** [2] - 800:8, 800:19

**defendants** [30] - 808:5, 809:14, 809:18, 817:6, 819:7, 819:9, 900:10, 911:22, 913:4, 914:13, 916:2, 916:23, 916:25, 917:1, 917:7, 917:13, 917:16, 917:18, 917:20, 919:10, 920:12, 921:14, 922:2, 922:18, 922:23, 922:25, 923:21, 924:3, 925:12

**defendants'** [7] - 921:20, 921:23, 922:6, 922:8, 922:10, 922:21, 923:24

**DEFENSE** [2] - 860:14, 947:3

**defense** [3] - 830:4, 860:12

**define** [1] - 902:13

**defines** [3] - 813:25, 815:3, 914:17

**definiteness** [1] - 918:14

**defuse** [1] - 859:16

**degree** [2] - 825:20, 937:20

**deliberate** [3] - 924:13, 929:5, 930:6

**deliberating** [4] - 894:10, 894:11, 930:1, 930:20

**deliberations** [22] - 804:23, 833:17, 836:16, 857:5, 894:20, 901:21, 902:18, 903:9, 905:8, 924:22, 924:24, 926:1, 926:5, 926:12, 926:20, 927:6, 927:9, 927:18, 927:22, 930:5, 930:16, 930:18

**demeanor** [1] - 909:15

**democracy** [1] - 834:16, 834:24

**demonstrate** [1] - 831:4

**demonstrative** [2] - 831:14, 831:20

**Department** [2] - 932:17, 933:14

**deposition** [26] - 805:20, 806:7, 806:8, 806:12, 806:18, 806:22, 839:10, 844:1, 844:7, 844:8, 872:3, 872:22, 885:12, 889:13, 899:22, 899:23, 913:7, 913:12, 938:19, 938:21, 938:23, 939:2, 939:17, 939:18, 939:22, 940:6

**depositions** [2] - 805:18, 913:6

**depressed** [1] - 854:11

**depression** [1] - 856:8

**deputy** [6] - 926:4, 927:10, 928:20, 929:5, 929:23, 941:1

**describe** [1] - 852:18

**described** [3] - 838:4, 912:16, 933:12

**describing** [1] - 852:18

**deserved** [1] - 880:3

**desire** [3] - 861:2, 861:6, 937:18

**desperately** [1] - 830:20

**despite** [1] - 841:14

**detail** [3] - 842:20, 874:24, 910:13

**determination** [5] - 871:20, 910:9, 918:23, 918:24, 927:4

**determinations** [1] - 909:19

**determine** [9] - 807:14, 818:6, 818:10, 910:17, 913:20, 917:22, 918:20, 920:15, 921:2

**determined** [4] - 919:18, 931:20, 936:21, 937:23

**determining** [34] - 812:5, 812:12, 812:13, 812:14, 812:17, 812:20, 813:12, 813:16, 813:21, 813:23, 813:24, 814:1, 814:4, 814:17, 815:2, 815:3, 829:5, 852:19, 852:21, 860:22, 907:24, 910:20, 915:17, 915:18, 915:22, 915:25, 916:9, 917:9, 920:20, 924:5, 933:9, 933:12, 941:10, 941:22

**develop** [1] - 854:16

**developed** [2] - 853:20, 904:5

**diagonal** [1] - 838:4

**Dickerson** [1] - 933:13

**die** [2] - 836:2, 840:24

**died** [6] - 805:19, 821:22, 822:12, 823:2, 823:25, 890:5

**difference** [10] - 813:16, 814:1, 815:4, 865:19, 865:25, 878:8, 878:9, 892:19, 916:1, 926:24

**different** [16] - 810:7, 812:5, 812:7, 813:8, 827:18, 832:10, 832:12, 834:5, 837:24, 849:13, 865:14, 869:24, 870:2, 906:14, 932:11, 939:24

**differentiate** [1] - 871:1

**differently** [2] - 836:13, 874:16

**differs** [3] - 833:14, 905:20, 925:22

difficult [1] - 882:9
difficulty [1] - 895:6
dignity [4] - 845:12, 845:15, 845:16, 851:2
dining [2] - 836:23, 841:6
direct [9] - 905:11, 906:15, 906:16, 906:21, 907:22, 907:24, 916:4, 921:12, 922:7
directions [1] - 803:15
directly [1] - 907:5
disagree [2] - 818:22, 903:21
disappointed [1] - 869:20
disbelieve [1] - 911:18
discharge [3] - 914:23, 920:18, 933:1
discharged [2] - 927:21, 932:23
disclose [2] - 927:18, 927:19
disclosure [3] - 934:11, 936:7
discovery [1] - 913:10
discretion [4] - 823:12, 857:9, 888:9, 924:7
discretionary [3] - 823:5, 823:23, 823:25
discriminate [6] - 843:13, 851:24, 874:5, 893:14, 913:25, 914:24
discriminated [4] - 854:4, 854:7, 887:1, 916:4
discriminating [1] - 885:24
discrimination [17] - 816:8, 852:15, 852:25, 853:1, 857:13, 884:25, 914:7, 914:10, 914:11, 914:12, 915:3, 916:5, 916:20, 917:20, 919:11, 933:2, 934:5
discriminatory [8] - 873:7, 913:25, 914:17, 914:21, 917:12, 921:13, 932:1, 932:6
discuss [7] - 802:6, 860:4, 870:16, 913:18, 919:2, 944:25, 945:3
discussed [4] - 874:22, 874:23, 883:2, 931:15
discussing [1] - 944:25
discussion [4] - 824:23, 878:14, 924:23, 934:24
discussions [1] - 903:9
disgusting [2] - 891:11, 891:12
disingenuous [1] - 878:24
dismiss [2] - 943:5, 943:7
disparaging [1] - 895:18
dispassionate [1] - 924:7
displayed [1] - 830:23
dispute [2] - 804:19, 889:17
disputed [2] - 818:16, 827:13
disputing [1] - 873:10
disregard [3] - 839:14, 890:23, 906:9
distances [1] - 874:23
distorted [1] - 911:17
distress [4] - 857:1, 857:8, 938:15, 938:24

DISTRICT [3] - 800:1, 800:1, 800:11
dive [1] - 846:6
dives [1] - 841:9
divorce [2] - 842:22, 878:10
docket [1] - 935:6
doctor [4] - 861:24, 890:3, 895:21, 938:8
Doctor [2] - 862:16, 863:2
document [6] - 805:5, 824:14, 824:20, 831:9, 831:17, 884:7
documents [3] - 830:23, 937:19, 940:3
don [1] - 876:2
Don [137] - 805:19, 837:10, 839:8, 840:15, 841:9, 841:23, 842:2, 842:9, 843:6, 843:11, 843:20, 844:2, 844:10, 844:19, 845:15, 846:3, 846:7, 846:10, 846:19, 847:3, 847:9, 847:18, 847:23, 848:19, 849:1, 849:3, 849:17, 850:4, 850:8, 850:9, 850:10, 850:16, 850:17, 850:20, 851:12, 851:16, 851:25, 853:6, 853:23, 854:3, 855:25, 856:3, 856:14, 856:21, 857:11, 857:18, 858:2, 858:3, 858:15, 859:11, 861:15, 861:25, 862:5, 862:6, 862:8, 862:9, 862:13, 862:16, 862:17, 862:20, 862:21, 862:25, 863:9, 863:12, 863:22, 864:7, 864:8, 864:9, 864:10, 864:13, 866:10, 870:12, 871:23, 874:9, 874:20, 875:12, 875:15, 875:17, 876:2, 876:7, 876:23, 877:16, 879:1, 880:16, 882:16, 882:21, 883:1, 883:3, 883:5, 883:18, 884:4, 884:5, 885:10, 885:12, 885:14, 885:18, 885:21, 886:1, 886:6, 886:9, 886:10, 886:11, 886:16, 887:1, 888:12, 888:16, 889:2, 889:3, 889:11, 889:12, 889:16, 890:1, 890:3, 890:4, 890:15, 891:5, 891:9, 891:12, 891:19, 891:21, 891:22, 891:24, 892:16, 892:18, 892:20, 892:22, 893:11, 894:2, 895:8, 909:24, 927:25, 932:4, 932:9, 935:11, 945:12
Don's [10] - 838:20, 838:21, 839:20, 840:6, 846:9, 847:4, 848:12, 852:19, 858:19, 875:4
DONALD [1] - 800:3
Donald [4] - 805:15, 913:21, 941:10, 941:21
done [15] - 814:8, 814:9, 816:25, 841:1, 841:20, 845:25, 847:3, 852:10, 856:17, 859:11, 859:21, 876:6, 893:21, 895:14, 944:18
door [2] - 943:23, 945:7

double [2] - 854:3, 884:16
doubled [1] - 854:23
doubt [1] - 833:17
Douglas [7] - 816:5, 816:11, 816:16, 816:18, 816:21, 817:6, 817:16
down [14] - 827:12, 831:8, 865:10, 869:1, 869:12, 876:10, 876:15, 882:24, 888:8, 901:3, 901:18, 912:20, 926:10, 931:4
downstairs [2] - 940:9, 944:12
dragged [1] - 872:12
draw [5] - 903:1, 904:25, 905:1, 907:2, 907:15
drawing [1] - 924:8
drawn [4] - 907:11, 907:13, 907:17, 907:19
dripping [2] - 907:9, 907:12
Drive [1] - 800:19
drop [12] - 837:4, 840:10, 840:20, 841:15, 842:21, 843:5, 843:6, 845:5, 855:8, 855:24, 864:11, 878:10
drum [1] - 851:13
due [1] - 933:1
duly [1] - 929:23
Duncan [6] - 835:18, 835:20, 842:15, 864:18, 874:8, 874:11
during [35] - 804:23, 823:21, 830:21, 833:17, 833:24, 834:7, 837:1, 854:11, 861:9, 862:25, 866:22, 871:3, 876:21, 877:8, 878:13, 889:13, 894:25, 895:4, 901:21, 901:24, 903:8, 903:10, 904:13, 909:21, 919:24, 920:18, 924:16, 926:4, 926:7, 926:11, 926:14, 927:8, 927:22, 934:21, 943:19
duties [1] - 902:13
duty [9] - 902:20, 904:22, 905:25, 910:16, 911:5, 925:9, 925:11, 928:23, 944:16

## E

e-mail [1] - 855:23
ear [12] - 839:20, 846:24, 847:1, 867:11, 867:19, 868:8, 871:15, 871:16, 876:20, 877:19
early [1] - 931:4
earn [1] - 888:14
earned [2] - 826:5, 888:12, 888:15, 920:17
earnings [3] - 824:21, 824:22, 920:5
ease [1] - 843:8
easier [2] - 822:17, 853:4
Eastern [1] - 933:25
EASTERN [1] - 800:1
easy [2] - 884:15, 928:1
eat [1] - 894:16

ECF [1] - 805:5
ecstasy [1] - 849:11
effect [4] - 877:25, 908:14, 922:10, 925:5
effort [4] - 826:6, 920:7, 920:18, 946:9
efforts [4] - 921:2, 921:7, 937:10, 938:2
eight [2] - 873:12, 930:6
Eighth [2] - 933:20, 934:2
either [15] - 803:14, 803:15, 805:14, 807:4, 811:18, 811:20, 824:24, 832:17, 839:23, 840:24, 849:21, 908:12, 908:20, 922:14, 922:17
elect [1] - 929:6
element [3] - 856:5, 925:8, 925:11
elements [7] - 816:15, 816:19, 817:23, 902:16, 914:2, 914:5
elicited [1] - 821:19
eliminates [1] - 832:14
Elle [1] - 860:19
elsewhere [1] - 804:18
embellish [1] - 844:8
emergency [1] - 861:24
Emory [1] - 854:25
emotional [10] - 856:7, 857:1, 857:8, 880:14, 921:8, 921:9, 937:25, 938:14, 938:20, 938:24
emphasize [3] - 834:3, 928:9, 945:6
employ [1] - 914:23
employed [3] - 824:24, 939:13
employee [5] - 842:11, 915:7, 915:11, 917:10, 932:23
employee's [3] - 912:13, 915:9, 915:13
employees [5] - 842:13, 856:2, 912:5, 912:7, 915:4
employer [10] - 801:24, 813:3, 913:25, 914:22, 915:3, 915:7, 915:10, 917:10, 933:3, 933:5
employer's [5] - 912:13, 915:4, 915:12, 932:24, 933:1
employers [1] - 914:18
employment [20] - 821:10, 835:3, 874:12, 874:14, 912:8, 912:12, 914:7, 914:10, 914:11, 914:24, 915:1, 919:16, 919:24, 920:9, 920:20, 920:21, 920:24, 932:11, 941:11, 941:22
encompass [1] - 824:22
encountered [1] - 936:3
encouraged [2] - 803:10, 903:4
end [10] - 823:7, 826:18, 835:15, 842:5, 849:1, 858:2, 858:22, 888:7, 893:9, 943:17
ended [3] - 816:7, 839:4, 919:16
ends [1] - 913:15
enforce [1] - 857:25

engage [2] - 840:23, 918:11
enhance [2] - 847:15, 847:24
enjoy [1] - 853:15
enjoyed [2] - 880:4, 901:11
enjoyment [2] - 853:18, 923:4
enter [2] - 852:24, 905:8
entered [3] - 860:10, 901:8, 940:19
entertaining [1] - 848:7
entire [2] - 856:2, 858:16
entirely [1] - 907:18, 924:21
entirety [1] - 854:19
entitled [11] - 904:7, 904:9, 904:19, 911:24, 912:2, 913:11, 920:15, 924:3, 924:24, 926:6
episode [1] - 837:1
equal [7] - 809:1, 834:25, 835:3, 837:18, 904:1, 904:9, 911:25
equality [1] - 858:4
equals [1] - 888:3
equivalent [1] - 937:4
escapade [1] - 849:22
escapades [8] - 849:19, 849:20, 875:21, 875:24, 875:25, 886:15, 892:18
escort [1] - 930:3
especially [2] - 888:24, 891:25
ESQ [4] - 800:14, 800:16, 800:20, 800:21
essential [2] - 925:8, 925:11
essentially [2] - 827:4, 939:12
establish [1] - 925:10
established [3] - 818:24, 908:4, 916:11
establishing [2] - 917:6, 925:8
establishment [1] - 834:23
estate [22] - 808:6, 808:22, 814:15, 859:15, 911:23, 912:21, 912:24, 913:1, 913:2, 915:15, 915:19, 916:3, 916:10, 916:13, 916:16, 916:18, 916:21, 916:23, 917:5, 917:15, 917:21
Estate [2] - 913:21, 917:18
estates [3] - 809:2, 899:17, 912:1
etcetera [4] - 809:3, 821:4, 892:14
evaluate [2] - 904:2, 913:13
evenly [1] - 908:19
event [2] - 804:18, 918:8
events [2] - 905:7, 939:15
everyday [1] - 909:18
evidence [143] - 804:19, 805:16, 805:21, 807:21, 814:16, 818:2, 819:2, 819:10, 820:22, 821:2, 821:3, 823:5, 825:8, 825:23, 827:3, 830:24, 830:25, 831:21, 832:9, 832:10, 833:7, 833:9, 833:11, 833:13, 833:14, 833:15, 835:17, 842:13,

845:17, 848:13, 848:14, 848:16, 849:7, 855:24, 884:3, 884:5, 884:8, 889:18, 893:24, 900:11, 902:3, 902:6, 902:21, 902:25, 903:1, 903:2, 903:3, 903:8, 903:10, 903:11, 903:12, 903:15, 904:2, 904:5, 904:6, 904:13, 904:16, 904:24, 905:1, 905:9, 905:10, 905:14, 905:15, 905:16, 905:19, 905:23, 905:24, 906:1, 906:7, 906:10, 906:12, 906:15, 906:16, 906:21, 906:24, 907:21, 907:22, 907:23, 908:5, 908:6, 908:9, 908:10, 908:13, 908:16, 908:18, 908:22, 908:23, 909:10, 909:16, 909:23, 910:1, 910:17, 910:23, 910:25, 911:3, 913:1, 913:3, 913:6, 914:6, 915:16, 916:4, 916:12, 917:1, 917:6, 917:14, 918:18, 918:24, 919:14, 920:11, 920:13, 921:17, 921:19, 921:22, 923:8, 923:10, 923:14, 923:17, 923:18, 923:20, 924:9, 924:16, 924:18, 924:23, 925:5, 925:9, 925:18, 925:21, 926:22, 928:25, 937:6, 937:9, 937:24, 940:1, 941:9, 941:21, 944:17
evident [2] - 846:15, 898:24
evoke [1] - 817:17
evolved [1] - 851:4
ex [2] - 878:20, 892:24
ex-husband [1] - 892:24
ex-wife [1] - 878:20
exact [3] - 866:19, 895:9, 923:11
exactly [6] - 834:16, 845:4, 866:12, 867:1, 867:7, 891:20
examination [1] - 905:12
examine [1] - 835:11, 938:18
example [7] - 806:6, 827:9, 846:1, 906:19, 907:4, 922:24, 935:9
except [5] - 812:9, 859:16, 876:22, 915:24, 927:13
exception [11] - 830:7, 830:8, 830:9, 927:8, 936:23, 937:1, 938:4, 939:7, 939:14, 939:23
exceptions [1] - 830:14
excerpts [1] - 935:24
exchange [1] - 924:25
excluded [2] - 906:8, 939:10
exclusive [1] - 918:20
exclusively [1] - 910:16
excuse [4] - 823:19, 850:1, 891:23, 917:20
excused [1] - 946:1
Executive [2] - 914:16, 914:18
executors [1] - 913:22
Exhibit [7] - 845:17, 884:8, 901:6, 934:15, 940:16, 940:21,

941:4
exhibit [3] - 831:16, 833:20, 845:4
exhibits [5] - 905:13, 906:14, 908:7, 927:23, 928:2
existed [2] - 895:24, 922:25
existence [2] - 816:9, 916:6
exists [1] - 907:3
exonerate [1] - 849:5
expect [1] - 842:6
expenses [1] - 920:4
experience [16] - 803:6, 836:23, 838:21, 840:8, 841:4, 841:6, 841:8, 856:2, 858:16, 858:19, 864:2, 869:23, 870:8, 892:8, 907:16, 911:15
experienced [3] - 852:5, 856:10, 923:6
experiences [6] - 803:10, 807:23, 864:20, 891:14, 903:5, 909:18
experiment [1] - 834:15
expert [1] - 923:12
expertise [1] - 903:7
explain [8] - 831:19, 840:10, 840:11, 869:13, 888:13, 892:12, 903:20, 914:2
explained [3] - 838:24, 839:22, 934:24
explaining [1] - 883:9
explanation [2] - 910:14, 910:15
explanations [2] - 834:9, 909:15
explanatory [1] - 929:12
explore [1] - 939:21
explored [1] - 939:22
expose [3] - 846:17, 858:5, 858:12
Express [8] - 828:5, 852:14, 912:6, 912:9, 912:18, 915:23, 941:12, 941:23
EXPRESS [1] - 800:6
expression [3] - 847:9, 849:12, 907:2
expressions [1] - 847:22
extensive [1] - 928:7
extent [4] - 806:12, 879:13, 898:25, 938:16
extraordinary [1] - 943:22
extremely [4] - 859:10, 865:9, 887:17, 892:13
eyes [1] - 847:16

F

F.2d [1] - 933:21
F.3d [1] - 933:25
face [4] - 847:10, 847:11, 849:11, 880:11
Facebook [1] - 842:21
facie [1] - 817:10
fact [60] - 808:7, 808:8, 808:9,

808:14, 808:17, 813:13, 816:16, 818:9, 836:13, 839:3, 840:16, 842:13, 843:2, 847:22, 851:25, 857:9, 858:18, 862:9, 864:8, 870:23, 870:25, 873:9, 874:18, 875:1, 875:18, 877:13, 879:2, 879:19, 882:22, 882:23, 883:1, 887:2, 893:15, 895:8, 899:6, 904:15, 904:25, 905:2, 906:16, 906:17, 906:20, 906:25, 907:1, 907:3, 907:4, 907:6, 907:11, 910:6, 910:12, 911:11, 911:23, 915:24, 916:8, 918:4, 926:21, 934:2, 937:7, 937:24, 939:1
factor [36] - 812:5, 812:7, 812:11, 812:12, 812:15, 812:20, 812:21, 813:2, 813:7, 813:12, 813:16, 813:18, 813:21, 813:23, 813:24, 814:1, 814:4, 814:17, 815:2, 815:4, 852:19, 915:17, 915:18, 915:22, 915:25, 916:9, 917:9, 922:4, 933:9, 933:13, 937:22, 941:11, 941:22
factors [5] - 816:5, 829:6, 852:22, 922:16, 937:14
facts [41] - 802:22, 803:25, 810:16, 816:9, 860:21, 860:24, 861:7, 865:3, 873:3, 880:19, 882:20, 884:22, 884:23, 885:17, 887:2, 887:18, 887:19, 887:20, 895:2, 895:17, 902:21, 902:22, 903:8, 903:15, 903:17, 905:10, 905:20, 906:25, 907:16, 907:25, 913:20, 916:7, 916:11, 916:22, 916:24, 924:9, 924:15, 924:17, 925:22, 925:23, 927:4
failed [7] - 820:23, 821:3, 824:1, 916:21, 917:15, 920:13, 925:10
failure [2] - 921:4, 921:7
fair [19] - 809:20, 832:18, 839:14, 857:6, 859:3, 859:4, 895:14, 895:22, 895:24, 898:24, 899:2, 903:6, 904:4, 904:20, 908:4, 912:2, 923:13, 937:15
fairly [5] - 857:1, 859:7, 918:21, 921:11, 923:25
fairness [1] - 902:7
fall [6] - 803:17, 878:13, 878:15, 878:16, 882:24
fallen [1] - 840:6
falling [7] - 858:13, 865:21, 870:4, 870:15, 870:17, 878:15, 878:22
false [3] - 807:24, 837:15, 910:10
falsus [2] - 807:3
familiar [2] - 879:8, 879:20
families [1] - 945:25

8

**family** [1] - 943:24
**fantastic** [1] - 882:14
**fantastical** [1] - 861:11
**far** [5] - 817:17, 826:11, 845:8, 858:10, 934:1
**fast** [3] - 820:1, 876:12, 876:13
**fatalities** [1] - 882:11
**father** [2] - 890:4
**fault** [1] - 858:19
**favor** [5] - 829:16, 904:10, 908:21, 908:24, 918:9, 928:24
**favoring** [1] - 908:22
**fear** [2] - 853:14, 928:24
**Federal** [1] - 800:23
**federal** [14] - 801:18, 807:8, 812:3, 813:13, 813:20, 815:7, 817:1, 817:18, 827:17, 829:18, 830:10, 933:17, 934:4, 945:18
**fell** [1] - 848:9
**fellow** [2] - 924:25, 926:15
**felt** [11] - 842:3, 847:25, 868:2, 868:4, 868:6, 868:13, 869:20, 870:2, 888:16, 888:18, 945:14
**female** [3] - 872:20, 885:6, 885:8
**few** [8] - 833:3, 837:2, 849:6, 858:17, 859:13, 930:23, 943:14
**field** [1] - 854:22
**Fifth** [2] - 933:24, 934:1
**fight** [3] - 834:25, 835:1, 835:3
**fights** [3] - 835:5, 835:6, 858:4
**figure** [3] - 824:5, 890:4, 890:10
**figured** [2] - 838:18, 853:5
**file** [1] - 822:20
**film** [3] - 847:18, 847:19, 847:20
**final** [4] - 898:4, 901:6, 902:3, 902:5
**finally** [3] - 833:22, 850:23, 856:16
**finders** [1] - 857:9
**fine** [11] - 803:7, 815:17, 819:22, 820:6, 821:25, 831:18, 831:23, 836:23, 841:6, 899:4, 930:22
**finger** [1] - 891:10
**fingertips** [1] - 859:19
**fire** [7] - 801:24, 843:10, 845:6, 846:14, 846:16, 847:8, 886:15
**fired** [16] - 843:14, 843:16, 845:21, 846:7, 846:8, 854:3, 856:15, 857:2, 857:16, 858:2, 864:21, 873:6, 875:5, 875:9, 888:13
**firing** [1] - 848:23
**first** [40] - 802:12, 802:13, 802:14, 803:8, 810:19, 814:24, 816:2, 816:12, 816:14, 816:23, 824:13, 828:14, 833:4, 841:5, 852:13, 861:23, 870:21, 872:19, 875:17, 875:21, 875:25, 881:8, 886:12, 886:16, 889:12, 894:24, 895:3, 902:12,

916:10, 916:13, 919:4, 926:1, 929:6, 931:20, 934:10, 936:18, 936:21, 939:10, 943:15
**First** [1] - 933:14
**fit** [2] - 833:10, 898:16
**five** [6] - 810:20, 838:20, 846:1, 896:13, 906:18, 920:23
**fix** [1] - 923:24
**fixing** [2] - 923:11, 924:8
**flirted** [1] - 854:17
**flying** [1] - 877:20
**focus** [1] - 818:15
**foggy** [1] - 884:1
**follow** [5] - 840:17, 903:20, 903:21, 903:23, 915:3
**following** [6] - 801:1, 819:12, 832:23, 860:6, 916:11, 929:14, 940:12, 943:6, 943:11
**follows** [1] - 820:5
**food** [2] - 838:12, 854:14
**fool** [1] - 843:24
**FOR** [6] - 834:12, 860:14, 887:14, 947:2, 947:3, 947:4
**FOREPERSON** [2] - 940:25, 941:15
**foreperson** [11] - 926:2, 927:10, 928:19, 929:6, 929:8, 929:20, 934:16, 940:23, 941:5, 941:7
**foreperson's** [1] - 926:5
**foreseeable** [2] - 912:12, 922:6, 922:22
**forever** [1] - 874:13
**forget** [2] - 815:15, 888:22
**forgive** [1] - 849:16
**form** [3] - 913:5, 917:24, 928:19
**forms** [4] - 848:13, 905:10, 906:13, 943:22
**forth** [3] - 817:8, 817:19, 848:5
**forward** [1] - 856:4
**fought** [1] - 834:17
**foundation** [1] - 834:24
**four** [8] - 853:6, 855:16, 855:19, 856:23, 881:1, 883:17, 920:23, 937:11
**fourth** [3] - 825:3, 845:13, 855:12
**framework** [1] - 817:4
**frantically** [1] - 901:3
**free** [10] - 833:9, 860:17, 870:4, 878:13, 878:15, 898:12, 898:13, 901:24, 904:8
**fresh** [1] - 882:9
**friend** [3] - 862:22, 863:3, 870:1
**friendly** [1] - 874:9
**friends** [5] - 837:7, 837:8, 853:20, 881:19, 885:4, 889:20
**frizz** [1] - 883:25
**front** [9] - 807:6, 813:15, 822:13, 836:19, 841:17, 847:23, 864:20, 901:15
**full** [4] - 819:7, 842:4, 863:4,

900:4
**fully** [1] - 940:6
**fun** [11] - 841:8, 850:8, 850:10, 862:19, 870:8, 874:17, 880:10, 880:16, 880:17, 881:13, 881:18
**function** [1] - 918:20
**functions** [1] - 902:5
**funds** [1] - 870:7
**funny** [1] - 869:19
**furthermore** [1] - 892:7
**future** [1] - 945:16

## G

**game** [2] - 839:15, 899:2
**gamesmanship** [1] - 936:10
**Gay** [5] - 864:8, 864:9, 874:20, 883:3, 883:5
**gay** [122] - 809:15, 809:18, 809:25, 810:6, 810:10, 810:15, 810:17, 810:19, 810:23, 810:24, 810:25, 811:6, 811:7, 811:8, 811:12, 811:13, 811:17, 811:19, 811:20, 835:5, 835:13, 837:10, 837:14, 839:6, 841:13, 842:2, 842:10, 842:19, 843:2, 843:11, 843:13, 843:14, 843:20, 843:23, 843:25, 844:4, 844:10, 844:11, 844:12, 844:13, 844:14, 844:15, 844:17, 844:18, 844:21, 846:11, 848:12, 849:18, 849:19, 849:20, 850:2, 850:17, 850:20, 850:22, 851:5, 851:10, 851:12, 851:17, 851:18, 851:21, 851:22, 852:1, 852:2, 853:15, 854:5, 857:3, 857:13, 857:15, 857:17, 859:3, 859:4, 859:16, 864:17, 864:19, 870:13, 873:1, 874:6, 875:12, 875:17, 875:19, 876:8, 879:16, 882:23, 883:1, 883:7, 884:24, 885:17, 885:23, 885:24, 886:1, 886:12, 886:13, 886:17, 889:12, 889:15, 889:23, 892:16, 892:17, 892:23, 893:12, 893:14, 894:2, 896:7, 896:9, 896:10, 899:21, 900:2, 914:14, 914:15, 915:24, 916:9
**gayness** [1] - 852:19
**general** [7] - 802:21, 808:21, 824:6, 832:7, 902:13, 902:17, 937:19
**generalizing** [1] - 808:23
**gentleman** [1] - 864:1
**gentlemen** [2] - 834:14, 860:16
**girlfriend** [11] - 836:4, 839:11, 842:23, 844:20, 845:11, 850:14, 851:2, 852:7, 866:18, 878:21, 879:8, 879:20, 891:19
**girlfriend's** [2] - 845:15, 877:17

**girlfriends'** [1] - 845:9
**gist** [1] - 814:21
**given** [21] - 803:15, 807:9, 834:17, 842:3, 852:17, 854:22, 907:17, 909:15, 913:12, 913:14, 916:25, 918:7, 924:17, 925:19, 928:16, 928:25, 931:18, 931:21, 936:4, 940:15
**God** [1] - 840:16
**goofiness** [1] - 841:5
**goofy** [2] - 848:6, 848:8
**gosh** [1] - 836:5
**govern** [1] - 902:13
**governor** [1] - 843:17
**governs** [1] - 902:10
**grabbed** [1] - 871:4
**grader** [1] - 845:13
**granted** [1] - 935:11
**graphic** [3] - 864:19, 874:24, 891:13
**gratification** [1] - 841:12
**great** [7] - 842:22, 881:10, 881:17, 881:24, 882:6, 882:13, 944:13
**greater** [2] - 908:10, 908:11, 926:6
**GREGORY** [1] - 800:14
**gross** [1] - 859:23
**ground** [7] - 818:23, 865:23, 869:10, 869:25, 878:8, 878:14, 891:17
**grounds** [2] - 844:25, 915:8
**grudgingly** [1] - 823:16
**guarantee** [1] - 937:4
**guess** [3] - 806:11, 880:1, 932:1
**guesswork** [2] - 907:20, 918:11
**guided** [3] - 903:19, 904:12, 924:6
**guy** [4] - 836:5, 839:12, 872:16, 874:12
**guys** [2] - 866:1, 883:23

## H

**haggle** [1] - 885:5
**hair** [1] - 883:24
**half** [3] - 855:6, 856:16, 858:5
**hand** [6] - 847:25, 871:4, 905:14, 918:12, 941:1, 941:5
**handed** [1] - 912:20
**handing** [2] - 876:15, 926:4
**Handing** [1] - 941:3
**handle** [1] - 818:13
**handles** [1] - 892:6
**handling** [1] - 843:6
**hands** [9] - 848:3, 848:5, 868:15, 868:16, 868:22, 870:4, 871:13, 889:7
**hang** [2] - 881:19, 930:22
**hanging** [1] - 854:1
**happy** [9] - 836:3, 838:1, 838:2,

849:9, 849:12, 855:23, 872:9, 875:22, 892:3
**hard** [3] - 841:16, 876:12, 876:13
**harder** [1] - 853:5
**hardship** [1] - 943:22
**harness** [3] - 871:9, 871:10
**harnesses** [1] - 870:22
**have.** [1] - 840:13
**head** [8] - 836:18, 839:23, 847:24, 848:5, 854:1, 863:14, 867:12, 901:17
**health** [1] - 943:24
**Health** [1] - 933:13
**hear** [13] - 834:4, 842:24, 849:1, 849:2, 850:7, 860:12, 867:17, 871:10, 876:4, 887:22, 889:7, 893:22, 944:1
**heard** [43] - 803:13, 810:19, 822:11, 836:11, 837:22, 839:9, 843:3, 847:13, 849:25, 850:1, 850:6, 851:14, 853:24, 854:10, 854:23, 855:22, 860:23, 860:24, 862:12, 864:13, 867:1, 876:5, 876:7, 877:3, 877:25, 882:20, 885:3, 885:6, 885:7, 885:11, 885:12, 887:3, 889:3, 889:12, 890:2, 896:5, 896:11, 902:2, 906:11, 906:20, 909:23, 914:9
**hearing** [1] - 905:5
**hearsay** [6] - 936:24, 936:25, 937:2, 939:7, 939:8, 939:15
**heart** [2] - 853:25, 878:25
**heeded** [1] - 889:20
**Helfand** [11] - 821:25, 825:24, 854:10, 861:23, 862:16, 863:2, 889:21, 890:1, 890:2, 891:12
**Helfand's** [1] - 822:13
**help** [6] - 861:2, 861:6, 862:22, 863:2, 905:18, 909:11
**helping** [1] - 910:2
**hesitate** [1] - 925:1
**heterosexual** [1] - 857:16
**hi** [1] - 883:3
**highest** [2] - 857:24, 937:20
**highlight** [2] - 818:14, 826:19
**highlights** [1] - 834:20
**highly** [1] - 858:23
**Hill** [1] - 934:7
**himself** [18] - 811:6, 811:8, 811:17, 811:20, 818:9, 839:17, 844:21, 853:9, 853:23, 864:8, 864:9, 874:20, 881:5, 881:15, 891:21, 893:1, 895:4, 895:12
**hips** [1] - 846:23
**hire** [3] - 874:1, 883:6, 914:23
**hired** [4] - 851:10, 864:15, 874:6, 875:8
**history** [2] - 834:18, 885:8
**hitting** [2] - 850:13, 851:2

**hold** [6] - 812:4, 820:1, 835:18, 851:10, 881:25, 915:5
**holes** [1] - 858:6
**home** [4] - 837:23, 847:15, 848:7, 848:19
**homophobia** [1] - 851:18
**homophobic** [2] - 889:22, 896:20
**honest** [2] - 870:6, 925:4
**honestly** [2] - 872:4, 872:6
**Honor** [13] - 801:10, 805:25, 814:7, 820:13, 830:22, 860:15, 860:16, 890:19, 896:16, 896:17, 896:18, 897:3, 930:14
**Honor's** [5] - 805:23, 815:18, 819:17, 827:20, 829:3
**HONORABLE** [1] - 800:11
**hope** [2] - 832:14, 849:16, 901:11
**hopefully** [1] - 945:19
**horrible** [2] - 838:7, 882:6
**horrific** [2] - 856:10, 888:19
**horror** [3] - 854:9, 856:9, 856:23
**hostility** [1] - 910:23
**hot** [1] - 883:24
**hour** [3] - 879:24, 887:20, 894:20
**hours** [1] - 920:22
**hubris** [1] - 861:14
**Hudson** [1] - 932:16
**Human** [3] - 913:24, 914:8, 914:16
**human** [4] - 844:14, 868:5, 876:17
**hundreds** [1] - 855:10
**hurts** [2] - 837:16, 856:8
**husband** [2] - 862:17, 892:24

## I

**idea** [4] - 835:13, 867:8, 873:6, 889:23
**identification** [2] - 842:17, 842:18
**identified** [14] - 809:16, 809:19, 810:25, 811:8, 811:13, 811:16, 811:19, 896:7, 896:8, 896:10, 900:2, 914:14, 934:22
**identifying** [2] - 811:6, 929:7
**ignore** [2] - 903:21, 906:3
**II** [3] - 809:10, 913:16, 913:17
**III** [3] - 827:23, 828:24, 924:10
**ill** [1] - 933:6
**illegal** [3] - 852:23, 852:25, 893:13
**imagination** [1] - 824:22
**imagine** [4] - 854:9, 857:14, 862:10, 882:12
**immediately** [3] - 838:9, 886:13, 928:10
**impacted** [1] - 818:10

**impacting** [1] - 864:21
**impartial** [2] - 904:4, 904:20
**impartiality** [1] - 902:8
**impeaching** [1] - 805:20
**impeachment** [2] - 806:14, 899:24
**implication** [1] - 839:17
**implicit** [1] - 819:16
**importance** [4] - 902:23, 909:6, 909:11, 933:18
**important** [14] - 850:25, 857:10, 857:11, 858:22, 872:13, 910:12, 927:5, 931:25, 936:4, 943:15, 944:9, 945:5, 945:6, 945:11
**importantly** [1] - 886:11
**impossible** [1] - 885:16
**impress** [1] - 902:23
**impression** [1] - 909:9
**improper** [4] - 843:5, 846:12, 888:23, 931:23
**improperly** [1] - 889:9
**impropriety** [2] - 835:12, 854:2
**improvise** [1] - 852:5
**inaccurate** [1] - 926:23
**inappropriate** [7] - 821:18, 842:3, 866:6, 868:11, 870:3, 871:2, 896:20
**inappropriately** [6] - 872:16, 877:18, 885:22, 885:23, 886:1, 886:2
**Inc** [7] - 828:5, 912:6, 912:9, 912:18, 932:17, 941:12, 941:23
**INC** [1] - 800:6
**inch** [2] - 839:20, 839:25
**include** [2] - 923:3, 924:22
**included** [1] - 804:18
**including** [4] - 841:23, 845:1, 889:20, 906:6
**income** [2] - 824:23, 854:20
**inconsistency** [2] - 910:12, 910:14
**Inconsistent** [2] - 805:10, 805:12
**inconsistent** [17] - 805:13, 805:24, 806:2, 806:5, 806:20, 806:22, 807:12, 807:13, 807:19, 807:23, 813:20, 828:16, 909:20, 909:25, 910:1, 910:18, 910:19
**inconvenience** [1] - 923:4
**incorporate** [1] - 801:17
**incorrectly** [1] - 878:18
**increases** [1] - 919:8
**incredibly** [1] - 845:20
**incurred** [1] - 920:4
**independent** [3] - 895:13, 922:20, 936:25
**independently** [1] - 922:17
**index** [1] - 822:16
**indicates** [2] - 810:8, 887:4

**indication** [1] - 918:6
**individual** [4] - 912:3, 914:24, 914:25, 926:18
**individual's** [1] - 914:22
**individuals** [1] - 935:23
**industry** [3] - 845:22, 853:14, 935:1
**infer** [2] - 907:1, 907:10
**inference** [10] - 904:25, 905:2, 907:2, 907:11, 907:13, 907:15, 907:17, 907:19, 916:20, 933:1
**inferences** [2] - 903:1, 924:9
**inferential** [1] - 872:24
**inferred** [3] - 816:8, 907:1, 916:6
**inflammatory** [1] - 846:13
**inflated** [1] - 936:9
**influenced** [2] - 906:2, 926:21
**information** [22] - 821:16, 839:7, 839:8, 842:12, 842:14, 842:17, 842:25, 843:1, 843:9, 844:16, 844:17, 850:1, 850:2, 850:4, 850:5, 850:9, 859:18, 859:19, 864:25, 865:14, 876:8, 876:9
**informed** [1] - 865:4
**inherently** [3] - 840:23, 842:7, 858:20
**inheritance** [1] - 912:21
**initial** [1] - 934:11
**injured** [1] - 840:2
**injuries** [8] - 839:4, 918:22, 921:16, 921:18, 921:24, 923:2, 923:23, 924:1
**injury** [19] - 840:4, 842:8, 853:21, 922:2, 922:5, 922:7, 922:10, 922:12, 922:15, 922:18, 922:19, 922:20, 922:21, 922:24, 922:25, 923:9, 923:23, 924:4
**injustice** [1] - 858:8
**innocent** [1] - 910:11
**insert** [1] - 895:4
**inserting** [1] - 895:12
**insinuation** [1] - 844:22
**inspect** [2] - 941:2, 943:4
**instance** [1] - 895:5
**instead** [2] - 831:12, 840:18
**instruct** [11] - 816:24, 826:22, 828:8, 828:10, 843:12, 851:23, 902:10, 902:15, 918:15, 925:13, 925:14
**instructed** [5] - 816:4, 906:9, 920:6, 926:17, 933:8
**instructing** [1] - 827:15
**instruction** [42] - 801:21, 803:8, 803:9, 804:5, 806:18, 806:21, 806:24, 806:25, 807:9, 807:11, 807:21, 808:2, 809:5, 809:6, 813:4, 813:8, 813:9, 813:12, 813:22, 814:5, 817:7, 817:20,

818:16, 832:8, 832:11, 834:5, 896:24, 897:1, 897:2, 899:22, 908:1, 908:25, 909:20, 909:22, 931:20, 932:12, 932:21, 933:19, 933:23, 934:4, 934:5
**instructions** [39] - 801:6, 802:11, 803:1, 804:13, 807:8, 815:7, 827:1, 832:14, 833:4, 833:22, 834:2, 840:7, 840:18, 846:3, 886:20, 894:11, 894:19, 896:3, 901:1, 901:14, 901:20, 901:22, 901:25, 902:11, 902:12, 903:17, 906:7, 913:19, 917:25, 918:3, 918:4, 918:7, 924:19, 929:2, 929:13, 929:14, 931:6, 932:14, 932:15
**instructor** [13] - 818:1, 836:12, 839:2, 839:21, 840:3, 841:7, 847:16, 855:25, 863:8, 868:7, 868:11, 869:20, 916:14
**instructors** [3] - 836:13, 845:9, 847:14
**insult** [2] - 845:15, 890:12
**insulting** [1] - 895:15
**intangible** [1] - 923:9
**intended** [4] - 805:19, 862:15, 905:18, 924:19
**intentional** [2] - 914:12, 919:10
**intentionally** [1] - 911:17
**interacting** [1] - 853:19
**interactions** [1] - 867:25
**interest** [8] - 839:13, 839:17, 841:14, 870:5, 880:8, 911:1, 911:6, 911:16
**interested** [5] - 841:21, 844:22, 870:6, 911:12, 911:19
**interesting** [2] - 847:24, 891:15
**interests** [3] - 937:12, 938:13, 940:5
**interfere** [2] - 865:2, 904:17
**interpretation** [1] - 877:12
**interpreted** [2] - 812:4, 812:11
**interrogatory** [1] - 827:9
**intertwined** [1] - 811:8
**intervened** [1] - 922:20
**introduced** [8] - 830:24, 864:8, 864:9, 874:20, 883:5, 884:7, 923:10, 923:13
**intuition** [1] - 840:15, 840:22, 858:6
**intuitions** [1] - 868:4
**investigating** [1] - 840:18
**investigation** [8] - 845:21, 859:22, 876:22, 876:24, 888:25, 889:2, 932:4, 932:9
**invoke** [2] - 839:6, 891:10
**involve** [1] - 804:11, 905:6
**involved** [1] - 828:19
**iPad** [1] - 831:12
**Ira** [14] - 825:23, 854:10, 861:23, 889:20, 890:1, 890:2, 890:5,

890:8, 890:18, 891:5, 891:6, 891:12
**Island** [12] - 853:7, 864:10, 864:12, 871:25, 881:8, 883:18, 884:6, 912:10, 912:18, 915:23, 941:12, 941:24
**ISLAND** [1] - 800:7
**Island's** [1] - 912:7
**Islip** [2] - 800:5, 800:23
**isolate** [1] - 928:13
**issue** [27] - 804:2, 812:15, 816:5, 816:7, 817:21, 820:20, 820:25, 825:7, 826:2, 827:1, 839:6, 864:23, 869:13, 889:12, 889:15, 892:16, 896:16, 906:25, 907:1, 907:4, 915:6, 918:2, 919:5, 920:10, 935:16, 936:15, 936:17
**issues** [12] - 802:10, 812:24, 812:25, 823:6, 825:17, 828:22, 828:24, 904:15, 928:25, 936:11, 939:20, 939:21
**items** [1] - 938:22
**itself** [1] - 938:10

### J

**jail** [1] - 837:20
**January** [1] - 932:18
**Jim** [1] - 856:4
**job** [15] - 821:12, 837:20, 840:6, 845:25, 846:10, 853:11, 859:11, 873:12, 873:13, 873:16, 909:3, 920:23, 921:1, 921:3, 943:24
**John** [1] - 857:20
**JOHNSON** [1] - 800:21
**joke** [13] - 835:25, 836:4, 836:10, 836:20, 836:21, 866:10, 866:11, 866:12, 866:13, 866:15, 866:16, 870:20, 875:2
**joked** [1] - 851:13
**jokes** [2] - 836:7, 874:21
**JOSEPH** [1] - 800:11
**judge** [35] - 802:22, 803:25, 804:16, 816:1, 821:14, 822:9, 823:17, 824:6, 825:13, 826:1, 826:16, 828:21, 828:25, 829:11, 830:12, 830:17, 831:3, 832:21, 834:13, 843:12, 851:23, 852:12, 852:17, 858:9, 861:3, 876:18, 886:21, 886:22, 887:15, 888:13, 924:15, 933:22, 945:6, 945:11, 946:8
**JUDGE** [1] - 800:11
**Judge** [4] - 807:7, 834:1, 898:19, 899:22
**JUDGE'S** [2] - 901:10, 947:5
**judges** [6] - 805:25, 816:4, 902:22, 909:5, 944:20, 945:18

**judgment** [20] - 816:12, 828:3, 828:4, 829:16, 839:13, 843:7, 843:22, 852:8, 892:25, 909:17, 910:17, 931:13, 931:17, 932:20, 932:22, 933:7, 933:16, 933:23, 937:16, 940:3
**Julian** [1] - 933:25
**jump** [34] - 818:9, 825:2, 831:5, 836:24, 838:2, 849:8, 852:4, 852:11, 855:3, 855:25, 856:4, 858:25, 865:5, 867:25, 868:2, 870:8, 871:1, 871:3, 871:23, 876:25, 877:1, 877:2, 877:17, 879:8, 880:4, 880:5, 880:7, 880:12, 880:16, 884:2, 884:3, 885:3, 885:9
**jumped** [2] - 861:17, 883:20
**jumper** [1] - 854:17, 873:11
**jumpers** [5] - 872:20, 880:9, 885:4, 885:7, 885:8
**jumping** [9] - 853:9, 853:19, 862:23, 874:13, 877:11, 877:19, 882:14, 893:16
**jumps** [14] - 825:1, 825:3, 831:6, 840:8, 847:3, 853:16, 855:4, 855:6, 855:21, 862:19, 880:17, 881:13
**June** [2] - 884:11, 919:19
**Junior** [1] - 913:23
**JUROR** [8] - 942:6, 942:9, 942:12, 942:15, 942:18, 942:21, 942:24, 942:3
**juror** [16] - 926:6, 926:16, 930:1, 930:5, 930:7, 930:8, 931:25, 942:7, 942:10, 942:13, 942:16, 942:19, 942:22, 942:25, 945:2, 945:9
**Juror** [3] - 929:11, 934:16, 942:5
**juror's** [2] - 926:24, 926:25, 927:3
**jurors** [16] - 803:9, 859:2, 902:5, 903:4, 903:8, 904:11, 924:25, 926:15, 926:19, 926:20, 926:21, 930:2, 931:10, 944:19, 945:12, 945:16
**JURORS** [1] - 942:3
**jurors'** [1] - 945:22
**JURY** [2] - 901:10, 947:5
**jury** [102] - 801:2, 802:21, 803:24, 804:21, 806:1, 807:8, 810:11, 811:3, 813:4, 813:11, 814:13, 814:22, 816:4, 816:21, 817:11, 818:6, 818:10, 818:15, 819:4, 821:16, 822:11, 823:9, 824:3, 825:8, 826:6, 828:1, 829:22, 830:23, 830:25, 831:4, 831:15, 831:20, 832:8, 832:16, 832:24, 833:11, 846:17, 857:25, 860:9, 860:10, 860:11, 860:16, 886:24, 886:25, 887:8, 887:9, 887:22, 894:5, 894:8,

894:22, 898:2, 899:6, 899:7, 901:2, 901:5, 901:7, 901:8, 902:2, 902:14, 907:18, 918:20, 924:12, 925:25, 927:3, 927:6, 927:11, 927:12, 927:14, 927:19, 927:23, 929:4, 929:11, 930:6, 930:11, 930:16, 930:17, 931:7, 931:20, 932:2, 932:13, 932:14, 932:20, 933:22, 940:13, 940:18, 940:19, 940:20, 940:23, 941:17, 942:1, 942:4, 943:3, 943:5, 943:8, 943:12, 943:16, 943:19, 943:20, 944:9, 944:10, 946:2
**Jury** [1] - 800:11
**jury's** [2] - 941:14, 941:25
**justice** [4] - 859:15, 937:13, 938:13, 940:5
**justify** [1] - 846:21
**justly** [2] - 918:21, 921:11

### K

**Kansas** [1] - 856:1
**keep** [2] - 846:20, 924:18
**keeping** [1] - 832:25
**keeps** [2] - 840:3, 853:19
**Kellinger** [7] - 874:8, 874:10, 875:2, 934:8, 935:10, 935:13, 936:1
**Kengle** [13] - 836:9, 838:10, 840:20, 841:2, 845:14, 851:3, 872:8, 879:1, 879:4, 879:15, 879:19, 892:7, 892:20
**Kengle's** [1] - 837:21
**Kennedy** [1] - 857:20
**kept** [1] - 868:9
**kidding** [2] - 815:13, 815:16
**kids** [3] - 865:22, 878:4, 881:23
**killed** [1] - 882:14
**kind** [3] - 853:14, 871:22, 883:11
**kinds** [1] - 906:15
**king** [1] - 834:22
**knees** [1] - 868:17
**knowing** [8] - 823:10, 865:11, 870:4, 874:2, 874:3, 874:6, 887:18
**knowledge** [2] - 906:17, 906:19
**known** [3] - 864:14, 898:10, 935:13
**knows** [10] - 811:7, 821:16, 823:25, 838:11, 876:2, 888:22, 888:24, 899:6, 899:7
**Koplan** [1] - 821:21

### L

**lack** [4] - 833:9, 903:2, 904:5, 904:16
**ladies** [2] - 834:14, 860:16

10

11

**lady** [1] - 858:5
**land** [2] - 878:5, 878:7
**landed** [1] - 848:9
**landing** [1] - 877:21
**landlords** [1] - 834:22
**landscape** [1] - 870:14
**language** [5] - 814:25, 828:12, 931:16, 931:17, 933:11
**last** [9] - 801:8, 813:15, 829:14, 835:6, 836:1, 880:25, 896:16, 935:13, 936:15
**Laura** [2] - 863:6, 864:3
**LAURA** [1] - 800:21
**Lauren** [2] - 855:22, 889:7
**law** [60] - 801:18, 801:19, 803:25, 804:1, 804:4, 809:1, 813:12, 813:13, 813:21, 816:23, 816:24, 817:1, 817:2, 817:18, 827:17, 827:18, 828:7, 829:17, 830:5, 832:12, 833:23, 834:4, 834:5, 834:6, 843:13, 843:18, 844:11, 844:13, 849:24, 851:5, 852:18, 860:17, 860:22, 886:20, 886:22, 887:19, 894:11, 894:19, 898:3, 901:14, 901:18, 902:10, 903:16, 903:24, 908:15, 912:1, 913:17, 913:19, 914:10, 918:12, 918:25, 924:17, 925:18, 931:4, 931:19, 932:15, 932:21, 934:4, 934:6
**Law** [6] - 913:24, 914:8, 914:16, 914:17, 914:18
**laws** [3] - 858:1, 915:3, 929:1
**lawsuit** [1] - 904:19
**lawyer** [17] - 803:14, 803:16, 803:20, 804:4, 814:23, 830:4, 833:12, 833:16, 845:24, 856:24, 876:17, 895:15, 895:17, 895:22, 898:24
**lawyers** [12] - 833:14, 833:23, 834:6, 834:7, 905:16, 928:13, 930:10, 930:19, 943:4, 943:17, 944:16, 945:8
**lawyers'** [3] - 833:11, 833:21, 932:1
**lead** [2] - 821:9, 939:11
**leading** [1] - 939:16
**leads** [2] - 835:5, 844:24
**leap** [1] - 872:24
**learn** [2] - 836:22, 843:23
**least** [4] - 803:23, 889:4, 935:12, 935:18
**leave** [1] - 857:6
**leaving** [1] - 837:3
**led** [1] - 854:20
**left** [13] - 824:11, 838:16, 839:24, 855:22, 873:21, 873:22, 873:23, 874:12, 880:16, 884:5, 894:22, 930:17, 946:2

**leg** [2] - 868:19
**legal** [3] - 901:22, 902:15, 913:23
**Legally** [1] - 860:20
**legislators** [1] - 843:16
**legitimate** [6] - 812:24, 865:13, 885:14, 886:5, 886:18, 891:18
**legs** [2] - 868:18, 868:22, 871:14
**length** [2] - 908:11, 943:20
**lengthy** [1] - 823:21
**less** [4] - 838:23, 839:3, 892:9, 907:22
**lesser** [4] - 808:19, 808:23, 812:6, 911:25
**letter** [1] - 804:18
**level** [1] - 880:25
**levels** [1] - 932:11
**liability** [4] - 880:7, 918:9, 941:8, 941:19
**liable** [6] - 803:21, 827:19, 828:18, 852:14, 922:19, 922:23
**liberation** [1] - 835:1
**lie** [1] - 850:21
**lies** [1] - 846:17
**life** [11] - 803:6, 803:10, 807:23, 835:20, 839:4, 839:9, 840:3, 841:4, 854:8, 859:24, 869:3, 869:22, 870:3, 870:10, 870:16, 888:20, 892:10, 903:5, 909:18, 923:4, 945:19
**light** [5] - 895:12, 907:16, 909:14, 912:12, 923:13
**likewise** [2] - 910:25, 922:23
**line** [16] - 801:15, 802:12, 802:13, 867:1, 870:9, 879:3, 880:23, 892:25, 895:9, 895:18, 896:21, 896:25, 929:18, 929:19, 943:22, 944:5
**lines** [2] - 833:25, 866:18
**lip** [1] - 841:24
**list** [5] - 905:15, 935:7, 935:15, 935:20, 936:12
**listen** [4] - 840:12, 875:16, 925:1, 941:17
**listened** [2] - 859:9, 893:22
**listening** [1] - 944:17
**litigants** [3] - 809:1, 911:25, 945:8
**litigation** [3] - 937:18, 937:21, 939:16
**live** [6] - 808:15, 808:16, 808:18, 808:22, 865:16, 911:24
**lives** [2] - 856:22, 944:7
**load** [2] - 856:20, 862:11
**locate** [2] - 928:1, 928:5
**lodged** [1] - 825:7
**logical** [1] - 907:14
**LONG** [1] - 800:7
**Look** [5] - 865:22, 872:15, 874:12, 876:18, 878:4
**look** [18] - 817:15, 838:15,

845:3, 861:21, 863:2, 863:9, 871:22, 872:9, 877:3, 877:6, 877:10, 881:3, 896:13, 898:5, 898:23, 905:9, 907:15, 935:5
**looked** [6] - 801:14, 801:16, 812:19, 813:13, 830:10, 836:11, 877:9, 890:4, 890:8
**looking** [7] - 805:4, 822:15, 847:17, 847:19, 856:3, 856:6, 887:18
**looks** [3] - 849:8, 849:10, 871:18
**loosened** [1] - 840:4
**lose** [1] - 837:20
**losing** [1] - 862:17
**loss** [5] - 825:7, 853:21, 920:8, 920:14, 923:4
**losses** [2] - 918:13, 923:5
**lost** [24] - 820:20, 821:1, 821:10, 821:18, 821:20, 823:6, 823:7, 823:11, 825:14, 832:4, 832:5, 853:6, 857:7, 919:4, 919:15, 919:7, 919:13, 919:15, 919:17, 919:22, 920:1, 920:3, 920:11
**loud** [1] - 901:19
**love** [1] - 886:22
**lunch** [9] - 860:1, 860:3, 872:2, 887:9, 894:7, 894:9, 894:15, 894:21, 901:12
**luncheon** [1] - 897:5

---

## M

**Magna** [1] - 834:23
**mail** [1] - 855:23
**main** [1] - 869:6
**maintain** [1] - 841:7
**maintained** [2] - 874:10, 874:11
**maker** [1] - 827:4
**makers** [1] - 851:5
**male** [1] - 885:5
**man** [12] - 835:13, 835:21, 837:18, 842:3, 848:3, 851:10, 856:22, 857:2, 859:3, 859:4, 859:15, 886:2
**man's** [1] - 859:24
**Management** [1] - 933:13
**mandatory** [1] - 880:12
**manipulate** [1] - 892:5
**manner** [2] - 867:8, 867:9
**Marco** [1] - 886:17
**mark** [2] - 901:5, 941:4
**marked** [4] - 931:4, 934:14, 940:15, 940:21
**married** [6] - 843:7, 845:2, 865:5, 865:10, 865:15, 865:22
**material** [2] - 937:6, 937:24
**math** [5] - 831:15, 831:17, 831:21, 883:10, 883:19
**mathematical** [1] - 918:13
**matter** [12] - 807:25, 823:5,

823:23, 823:25, 829:17, 855:3, 859:18, 864:16, 877:6, 907:18, 909:10, 943:20
**matters** [5] - 804:11, 804:14, 903:12, 905:6
**maximum** [1] - 855:14, 855:15, 857:7, 857:8, 888:6
**MAYNARD** [1] - 800:7
**Maynard** [51] - 803:19, 805:15, 805:19, 806:11, 809:15, 824:18, 824:25, 827:2, 827:18, 828:5, 837:5, 837:6, 837:9, 837:11, 838:24, 839:22, 840:19, 842:10, 842:20, 843:21, 844:18, 846:11, 847:8, 848:20, 850:6, 851:8, 853:11, 855:1, 855:5, 856:13, 856:19, 858:18, 859:21, 864:15, 871:21, 872:15, 872:18, 873:13, 874:1, 878:19, 879:5, 885:13, 886:4, 886:25, 893:9, 899:2, 912:15, 912:17, 915:24, 916:4, 932:3
**Maynard's** [9] - 814:17, 850:16, 877:15, 893:23, 893:25, 894:1, 915:17, 915:21, 916:9
**McDonald** [7] - 816:5, 816:11, 816:16, 816:18, 816:21, 817:6, 817:16
**McVee** [1] - 856:4
**mean** [12] - 806:23, 808:18, 810:13, 819:3, 867:6, 873:2, 880:8, 908:10, 911:12, 911:24, 928:11, 945:14
**meaning** [1] - 860:20
**means** [9] - 839:4, 907:2, 908:4, 908:6, 908:9, 921:25, 926:23, 928:11, 938:11
**meant** [3] - 858:8, 869:12, 870:24
**mechanical** [1] - 800:25
**meet** [2] - 883:3, 883:6
**meeting** [4] - 875:15, 875:22, 876:13, 889:13
**Melissa** [1] - 913:22
**member** [2] - 927:12, 927:14
**members** [13] - 832:24, 860:11, 864:20, 885:19, 887:8, 894:5, 902:2, 927:11, 929:4, 940:20, 941:17, 942:1, 943:12
**memory** [4] - 857:12, 859:12, 926:16, 926:18
**men** [2] - 837:16, 873:15
**mental** [2] - 938:7, 939:4
**mention** [2] - 822:22, 869:21
**mentioned** [14] - 832:1, 835:8, 841:13, 843:7, 843:19, 843:20, 846:10, 867:16, 869:15, 869:16, 891:13, 911:15, 944:16, 945:5
**mentioning** [2] - 891:16, 891:17

**mentions** [2] - 850:24, 935:22
**mere** [7] - 808:7, 808:8, 808:9, 808:14, 808:17, 911:11, 911:23
**merely** [1] - 845:6
**merits** [1] - 927:15
**met** [2] - 817:15, 914:5
**Mexico** [1] - 881:10
**Michele** [10] - 894:7, 901:12, 926:4, 927:10, 928:20, 929:22, 930:3, 930:21, 940:8, 945:17
**mid-2000's** [1] - 874:15
**might** [18] - 803:17, 804:20, 814:13, 835:9, 843:8, 845:24, 846:1, 852:22, 853:4, 853:5, 858:21, 865:16, 903:7, 905:2, 915:5, 915:8, 915:10, 928:1
**mind** [9] - 835:19, 847:13, 850:16, 907:19, 924:18, 936:22, 938:5, 939:11, 939:14
**minds** [1] - 908:14
**mine** [1] - 918:6
**minimize** [1] - 920:7
**minute** [7] - 815:23, 847:18, 860:2, 893:8, 898:5, 899:11, 933:17
**minutes** [7] - 835:22, 835:24, 887:10, 893:6, 894:16, 894:19, 930:23
**misleading** [1] - 814:13
**misrepresent** [1] - 880:19
**misrepresentation** [1] - 873:3
**misrepresented** [1] - 888:1
**missing** [2] - 929:20, 930:5
**Missouri** [1] - 854:13
**mistake** [4] - 885:1, 885:2, 910:11
**mistakes** [1] - 931:1
**mitigate** [6] - 820:23, 821:4, 821:13, 825:19, 888:15, 920:13
**mitigating** [1] - 893:17
**mitigation** [3] - 820:19, 825:17, 920:9
**mixed** [4] - 812:21, 812:22, 813:1, 813:4, 813:8, 813:17
**modification** [1] - 826:3
**moment** [1] - 907:5
**monetary** [2] - 923:5, 923:9
**money** [11] - 823:11, 838:19, 841:3, 856:22, 872:11, 888:12, 888:14, 912:19, 918:21, 921:10, 923:25
**month** [2] - 881:21, 881:23
**months** [4] - 823:2, 881:22, 882:2, 893:15
**Moore** [3] - 823:13, 823:14, 913:23
**moreover** [1] - 921:17
**morning** [2] - 801:5, 832:24
**morph** [1] - 839:7
**most** [5] - 858:22, 872:13, 886:11, 943:15, 944:9

**motion** [8] - 825:11, 829:15, 935:6, 935:9, 935:11, 935:14, 936:12, 937:16
**motivating** [12] - 812:2, 812:3, 812:5, 812:11, 812:19, 812:21, 812:22, 812:23, 813:2, 813:7, 813:18, 933:9
**motivation** [1] - 813:2
**motive** [6] - 812:21, 813:4, 813:8, 813:17, 911:1, 932:7
**mouth** [1] - 839:20, 846:19, 847:12, 866:8, 877:7, 881:14, 881:25
**move** [3] - 852:7, 890:19, 933:4
**moved** [1] - 817:18
**movements** [1] - 835:2
**moving** [9] - 844:20, 891:19, 896:18, 914:7, 917:25, 921:8
**MR** [147] - 801:9, 801:10, 802:12, 802:14, 802:16, 802:20, 803:2, 803:4, 803:12, 803:22, 804:6, 804:9, 804:16, 805:2, 805:4, 805:8, 805:9, 805:10, 805:22, 806:3, 806:10, 806:16, 807:1, 807:2, 808:3, 808:11, 808:13, 808:24, 808:25, 809:7, 809:9, 809:13, 809:22, 810:21, 811:2, 811:10, 811:14, 811:21, 811:24, 812:13, 814:9, 814:10, 815:12, 815:14, 815:17, 815:20, 815:23, 815:25, 817:22, 817:24, 818:5, 818:19, 819:6, 819:9, 819:16, 819:21, 819:24, 820:3, 820:7, 820:8, 820:12, 820:13, 820:17, 821:7, 821:14, 821:21, 822:2, 822:9, 822:15, 822:18, 822:22, 822:25, 823:16, 823:19, 824:5, 824:12, 824:15, 824:17, 824:19, 824:25, 825:13, 825:16, 825:25, 826:8, 826:11, 826:15, 827:20, 827:22, 828:6, 828:10, 828:21, 828:25, 829:3, 829:11, 829:12, 829:14, 829:24, 830:8, 830:13, 830:17, 830:20, 831:2, 831:19, 831:24, 832:5, 832:20, 832:21, 834:13, 860:8, 860:15, 861:3, 861:6, 862:2, 862:4, 887:15, 890:6, 890:8, 890:9, 890:10, 890:14, 890:17, 890:19, 890:24, 891:4, 893:7, 895:10, 896:10, 896:16, 897:3, 898:7, 899:10, 899:13, 899:19, 899:25, 900:3, 900:8, 900:12, 900:15, 900:18, 900:22, 900:24, 930:13, 930:14, 931:1, 931:7, 943:9, 946:5
**multiple** [1] - 863:20
**multiply** [1] - 884:14
**Murhanda** [1] - 932:16
**must** [52] - 814:15, 821:5,

826:23, 882:13, 891:11, 900:10, 900:20, 903:9, 903:16, 903:19, 903:23, 904:4, 904:20, 907:15, 908:4, 908:17, 908:21, 909:13, 913:1, 913:3, 913:19, 914:4, 915:3, 915:15, 916:10, 916:13, 916:16, 916:18, 916:24, 918:2, 919:18, 919:23, 920:2, 920:12, 920:16, 920:19, 920:25, 921:3, 921:5, 921:9, 921:22, 921:25, 923:15, 923:16, 923:24, 924:7, 925:13, 925:16, 925:17, 927:3, 928:22

## N

**names** [1] - 936:2
**narrow** [3] - 928:7, 935:18, 935:20
**natural** [1] - 912:4
**naturalization** [1] - 944:11
**naturally** [1] - 848:1
**nature** [5] - 821:11, 920:20, 920:21, 934:25, 938:14
**near** [1] - 868:18
**nearest** [1] - 922:13
**nearly** [2] - 887:20, 908:17
**necessarily** [3] - 817:1, 907:21, 907:22
**necessary** [4] - 811:22, 927:8, 931:21, 932:12
**necessity** [1] - 939:19
**need** [16] - 829:18, 842:24, 865:24, 867:18, 870:1, 870:16, 871:16, 883:15, 887:16, 915:19, 922:13, 923:12, 926:9, 930:10, 930:11, 946:3
**needs** [2] - 824:3, 826:3
**negotiations** [1] - 834:22
**nervous** [1] - 865:9
**never** [11] - 835:6, 846:22, 858:4, 869:18, 874:15, 874:17, 885:25, 888:3, 891:22, 892:7, 927:14
**NEW** [1] - 800:1
**new** [6] - 842:16, 842:23, 843:18, 893:16, 896:3, 922:19
**New** [22] - 800:15, 800:17, 800:20, 800:23, 801:19, 813:12, 813:19, 816:23, 816:24, 817:1, 827:17, 827:18, 843:16, 913:23, 914:7, 914:16, 932:15, 932:21, 933:11, 934:6
**next** [9] - 808:11, 808:25, 816:9, 856:4, 863:5, 867:17, 899:20, 899:21, 900:1
**nice** [3] - 882:10, 883:3, 883:5
**nicks** [1] - 808:4
**Niczky** [1] - 934:16
**night** [2] - 801:8, 813:15
**nightmares** [1] - 856:9

**nitpick** [1] - 804:15
**nobody** [13] - 861:16, 864:23, 871:14, 871:15, 872:25, 873:10, 875:4, 876:12, 876:14, 878:11, 880:11, 881:13, 936:3
**non** [5] - 853:15, 915:3, 923:5, 932:1, 939:7
**non-discrimination** [1] - 915:3
**non-discriminatory** [1] - 932:1
**non-hearsay** [1] - 939:7
**non-monetary** [1] - 923:5
**non-work** [1] - 853:15
**noncontroversial** [1] - 802:9
**none** [4] - 807:15, 904:9, 905:7, 910:20
**nonsense** [2] - 844:16, 856:20
**normal** [2] - 871:5, 937:16
**Norway** [4] - 854:15, 881:21, 882:12, 893:15
**note** [17] - 801:11, 855:24, 899:14, 899:15, 901:2, 901:4, 901:21, 910:23, 927:10, 928:11, 928:20, 929:7, 929:17, 934:14, 940:14, 940:15, 940:21
**noted** [3] - 801:4, 830:9, 830:10
**notes** [17] - 887:16, 901:24, 926:7, 926:9, 926:14, 926:16, 926:17, 926:19, 926:20, 926:22, 926:25, 927:3, 927:17, 930:24, 930:25
**nothing** [19] - 804:13, 826:15, 830:24, 841:20, 843:5, 845:14, 845:15, 848:21, 850:24, 852:9, 856:17, 859:16, 881:6, 882:22, 892:1, 892:10, 924:19, 930:13, 930:14
**notice** [4] - 822:21, 837:22, 842:4, 849:15
**noticed** [2] - 837:24, 929:18
**notify** [1] - 928:20
**notions** [1] - 903:24
**notwithstanding** [3] - 873:9, 937:23, 938:25
**November** [2] - 880:22, 881:2
**Novembers** [1] - 881:1
**number** [19] - 821:13, 831:22, 832:15, 845:4, 852:23, 854:4, 854:6, 856:25, 857:1, 857:4, 857:6, 888:3, 889:25, 908:11, 930:22, 934:21, 934:23, 936:9, 940:9
**Number** [10] - 929:11, 934:16, 942:5, 942:7, 942:10, 942:13, 942:16, 942:19, 942:22, 942:25
**numbers** [1] - 802:21
**numerically** [1] - 927:20
**numerous** [1] - 895:3
**NY** [1] - 800:5

13

# O

o'clock [2] - 860:1, 894:18
oath [13] - 807:13, 807:14, 807:19, 807:20, 844:9, 859:6, 879:10, 879:12, 904:11, 913:9, 923:5, 928:23, 929:22
object [7] - 802:5, 811:21, 817:6, 823:20, 830:21, 904:23, 905:25
objected [1] - 905:1
objecting [3] - 814:10, 823:24, 827:21
objection [26] - 807:1, 809:3, 809:21, 814:6, 818:22, 820:7, 825:6, 827:23, 829:4, 829:9, 829:11, 861:3, 862:2, 890:6, 890:14, 895:2, 895:20, 896:1, 905:3, 906:2, 906:3, 906:4, 931:12, 934:9, 934:20, 934:21
Objection [1] - 890:9
objections [11] - 802:10, 802:19, 802:25, 825:15, 826:13, 829:5, 832:15, 832:17, 894:24, 894:25, 905:24
objectively [1] - 904:3
obligation [3] - 888:14, 944:8, 944:14
obscene [1] - 846:21
observations [2] - 871:20, 911:14
observe [1] - 909:2
observed [3] - 859:8, 859:9, 877:15
observing [1] - 877:20
obtain [5] - 890:11, 921:3, 935:3, 937:10, 938:2
obtained [2] - 906:18, 919:24
obviously [13] - 802:4, 811:5, 816:14, 825:9, 827:17, 828:3, 831:16, 832:16, 834:6, 895:25, 901:24, 929:17, 938:2
occupation [1] - 838:16
occurred [6] - 832:23, 860:6, 882:12, 916:19, 943:6, 943:11
October [13] - 800:8, 821:22, 821:23, 821:25, 822:1, 822:17, 822:22, 822:23, 823:1, 823:14, 823:17, 919:19, 919:20
odd [3] - 890:12, 891:8, 895:24
oddness [3] - 861:25, 889:25, 890:24
odor [1] - 895:21
OF [2] - 800:1, 800:10
offended [1] - 915:9
offense [1] - 847:5
offer [1] - 924:13
offered [8] - 917:7, 917:16, 917:19, 937:6, 937:9, 937:23, 938:1, 939:25
offers [1] - 904:23

officers [2] - 912:5, 912:7
Official [1] - 800:22
often [1] - 807:7
older [1] - 865:8
omnibus [1] - 807:3
once [8] - 817:9, 829:14, 874:15, 874:17, 924:14, 928:12, 929:21
one [92] - 801:13, 801:15, 802:14, 802:24, 807:24, 808:5, 808:6, 808:7, 808:8, 808:15, 810:2, 813:24, 824:19, 825:3, 826:19, 826:25, 827:7, 828:15, 828:17, 828:19, 830:17, 831:2, 831:24, 833:4, 835:7, 835:25, 837:9, 838:8, 839:20, 840:2, 840:20, 841:24, 841:25, 842:2, 845:21, 848:15, 849:15, 852:1, 852:8, 855:11, 855:12, 856:8, 856:9, 857:24, 858:10, 860:1, 861:14, 863:15, 870:12, 877:10, 877:17, 880:12, 881:21, 883:8, 888:3, 889:25, 892:16, 892:17, 893:7, 895:1, 896:4, 896:5, 896:16, 898:7, 898:14, 898:20, 899:17, 906:18, 909:24, 910:24, 911:22, 911:23, 913:8, 915:8, 915:18, 920:16, 920:22, 922:15, 926:2, 927:7, 927:11, 929:14, 929:15, 929:24, 932:19, 937:22, 941:8, 941:19, 944:9, 944:12, 945:1
one's [2] - 848:15, 885:1
one-fourth [2] - 825:3, 855:12
ones [1] - 835:8
ongoing [3] - 937:24, 938:14, 939:4
open [5] - 855:8, 864:14, 927:16, 943:11, 944:21
opening [9] - 809:23, 833:6, 861:9, 876:21, 877:6, 880:11, 882:18, 905:17, 925:19
openly [1] - 874:22
opens [2] - 878:16, 878:17
operate [1] - 922:17
opinion [1] - 924:24
opinions [2] - 903:24, 925:2
opportunity [7] - 835:3, 836:21, 841:3, 889:5, 909:2, 939:21, 944:4
opposed [1] - 885:6, 908:18, 908:23
opposing [1] - 805:16
opposite [2] - 874:19, 885:19
orally [1] - 927:16
order [10] - 814:14, 816:17, 845:25, 905:9, 915:14, 929:6, 934:12, 934:23, 936:5, 936:10
Orellana [14] - 835:25, 849:8, 866:3, 866:4, 867:20, 870:12,

870:25, 871:24, 877:25, 880:2, 885:10, 885:11, 895:6, 932:10
orientation [24] - 801:23, 814:17, 852:15, 874:2, 874:3, 874:4, 874:16, 874:22, 874:23, 887:2, 914:1, 914:11, 914:22, 915:1, 915:6, 915:16, 915:20, 915:21, 915:25, 916:5, 917:9, 932:19, 941:10, 941:21
otherwise [3] - 901:2, 911:17, 927:20
ought [1] - 903:24
ourselves [1] - 857:21
outcome [2] - 911:4, 911:12
outright [1] - 850:21
Outside [1] - 898:2
outside [6] - 801:1, 903:12, 905:5, 906:11, 907:10, 927:6, 930:3, 940:12
outweighs [1] - 908:23
over-addresses [1] - 826:2
overrule [2] - 818:20, 818:22
overruled [7] - 817:25, 861:4, 862:3, 895:2, 896:1, 905:3, 906:4
overruling [1] - 814:6
own [10] - 809:5, 843:5, 851:13, 871:20, 885:2, 895:13, 903:24, 910:17, 924:24, 926:18
owned [1] - 912:22
owner [4] - 827:3, 876:16, 912:17
ownership [1] - 885:1
owns [1] - 843:4

# P

P.C [1] - 800:19
p.m [4] - 897:5, 930:18, 940:12, 946:10
page [35] - 802:14, 802:18, 802:24, 802:25, 803:5, 803:12, 804:6, 804:17, 805:10, 808:3, 811:24, 814:9, 815:23, 816:9, 826:22, 842:21, 863:9, 866:8, 866:24, 867:1, 868:1, 869:2, 869:14, 879:2, 880:21, 882:1, 899:16, 899:20, 899:21, 899:23, 900:1, 900:4, 900:9, 900:13
pages [3] - 809:11, 820:10, 898:5
paid [7] - 845:19, 859:10, 870:7, 872:1, 872:10, 902:6
pain [4] - 856:5, 856:6, 856:7, 923:9
paper [1] - 848:13
Par [1] - 827:23
parachute [5] - 839:1, 869:1, 878:16, 878:17, 892:14
paradigm [1] - 813:9

paragraph [6] - 815:3, 816:3, 819:7, 900:5, 900:14
paragraphs [1] - 816:10
parse [1] - 814:23
Part [13] - 802:8, 802:10, 802:18, 802:21, 803:24, 809:7, 809:8, 809:10, 828:24, 913:15, 913:16, 941:8, 941:19
part [25] - 802:16, 805:11, 807:15, 816:15, 816:18, 826:12, 830:25, 841:23, 866:11, 866:14, 868:19, 879:18, 899:2, 902:19, 908:10, 910:20, 913:10, 913:17, 913:18, 914:19, 914:20, 924:10, 934:4, 936:10
particular [12] - 801:23, 803:17, 806:23, 818:16, 820:20, 820:25, 841:10, 911:2, 920:10, 921:1, 926:16, 937:18
particulars [1] - 828:17
parties [24] - 808:7, 808:15, 808:16, 808:18, 818:21, 856:12, 898:12, 898:13, 898:14, 899:18, 902:4, 902:22, 903:18, 904:1, 904:7, 904:8, 904:19, 905:4, 905:25, 910:25, 912:3, 919:19, 925:21, 925:22
parties' [1] - 905:20
partner [3] - 862:17, 869:9, 882:25
parts [4] - 802:20, 887:25, 896:19, 902:11
party [19] - 803:15, 805:14, 806:12, 808:7, 808:9, 808:10, 808:20, 808:21, 808:22, 811:7, 898:15, 898:16, 899:18, 905:1, 909:24, 911:2, 911:16, 911:24, 913:9
party's [1] - 919:1
pass [5] - 879:25, 902:24, 906:22, 945:16, 945:17
passage [1] - 814:10
passed [1] - 821:16
passenger [5] - 840:2, 840:3, 850:18, 859:17, 865:4
passengers [4] - 838:25, 885:5, 885:6, 892:11
passion [14] - 860:21, 860:25, 861:1, 865:2, 876:4, 884:21, 884:22, 891:10, 893:24, 893:25, 894:1, 895:1, 895:16
passionate [6] - 873:3, 882:18, 887:17, 887:19, 888:21, 892:1
past [1] - 938:7
patience [2] - 887:6
patient [1] - 928:5
pattern [5] - 813:4, 813:11, 931:20, 932:13, 932:14
pay [1] - 848:20
pedestal [1] - 837:18

14

**pension** [1] - 920:2
**people** [27] - 836:6, 843:13, 843:14, 848:8, 849:17, 850:4, 850:21, 851:5, 851:13, 853:10, 860:19, 873:4, 882:13, 883:7, 885:24, 889:4, 889:8, 889:9, 891:4, 893:14, 922:17, 934:25, 935:20, 936:12, 943:21, 943:23, 944:1
**per** [5] - 825:2, 831:5, 831:7, 855:2
**percent** [1] - 888:10
**perfect** [13] - 838:23, 839:1, 839:2, 839:3, 842:4, 858:19, 858:20, 877:22, 882:9, 892:10, 892:14
**perfectly** [1] - 867:18
**perform** [4] - 853:11, 944:8, 944:14, 944:16
**perhaps** [7] - 811:14, 825:16, 840:5, 840:22, 840:25, 854:6, 867:13
**period** [5] - 854:11, 869:6, 919:18, 919:25, 920:18
**permissible** [1] - 813:1
**permit** [1] - 918:15
**permitted** [3] - 834:2, 911:6, 926:7
**person** [25] - 801:23, 808:15, 808:16, 808:18, 808:22, 816:16, 825:19, 838:17, 844:21, 845:7, 846:4, 847:15, 849:12, 852:1, 857:18, 863:5, 872:21, 875:17, 886:12, 889:23, 907:8, 911:24, 912:4, 928:24
**person's** [2] - 802:1, 813:6
**personal** [27] - 839:7, 839:8, 842:12, 842:13, 842:16, 842:25, 843:1, 843:9, 844:16, 844:17, 850:1, 850:2, 850:3, 850:5, 850:9, 853:23, 859:18, 864:25, 865:14, 869:2, 869:22, 870:16, 876:9, 903:7, 912:22, 943:22, 945:2
**personally** [4] - 845:11, 859:8, 895:15, 895:18
**personnel** [1] - 933:4
**persons** [1] - 922:11
**pertinent** [2] - 914:19, 914:20
**pervert** [2] - 847:13, 853:15
**perverted** [1] - 889:24
**perverts** [1] - 851:7
**ph** [1] - 821:21
**phone** [2] - 930:22, 940:9
**phrase** [1] - 908:12
**physical** [3] - 841:14, 856:6, 885:19
**piano** [1] - 857:16
**pick** [3] - 857:4, 866:1
**picked** [1] - 901:13

**picture** [3] - 848:21, 848:23, 849:10
**pictures** [6] - 837:2, 849:7, 891:25, 892:1, 892:2
**pig** [1] - 857:4
**pilot** [1] - 875:3
**pinkie** [7] - 810:2, 851:19, 861:14, 864:16, 870:13, 875:6, 893:2
**PJI** [8] - 801:14, 812:14, 812:20, 813:10, 814:25, 815:6, 817:20, 933:11
**place** [13] - 801:1, 841:17, 853:16, 857:15, 860:21, 868:16, 880:17, 882:10, 896:2, 901:13, 908:18, 910:2, 940:12
**placed** [2] - 837:17, 896:2
**places** [2] - 809:22, 853:10, 858:24
**Plaintiff** [2] - 800:4, 800:14
**PLAINTIFF** [4] - 834:12, 887:14, 947:2, 947:4
**plaintiff** [63] - 809:14, 809:17, 811:15, 814:14, 817:9, 819:13, 819:17, 819:24, 820:2, 820:20, 821:1, 827:10, 827:11, 829:17, 861:21, 863:5, 900:5, 900:6, 908:3, 908:6, 908:15, 908:24, 912:14, 912:20, 913:21, 914:4, 914:13, 915:14, 917:3, 918:1, 918:9, 918:12, 918:17, 918:22, 919:7, 919:12, 919:14, 919:18, 919:23, 920:3, 920:10, 920:15, 921:5, 921:10, 921:11, 921:16, 921:19, 922:12, 923:5, 923:19, 923:20, 923:22, 924:1, 924:3, 925:7, 925:10, 933:3, 934:9, 941:9, 941:20
**plaintiff's** [9] - 823:21, 899:3, 908:16, 908:18, 908:23, 914:3, 918:16, 918:19, 921:6
**plane** [8] - 836:24, 838:2, 838:21, 840:14, 858:13, 870:8, 875:3, 880:12
**plate** [1] - 944:7
**play** [4] - 836:15, 841:22, 848:23, 871:17
**played** [1] - 848:24
**plays** [1] - 857:16
**Plaza** [1] - 800:23
**pleasant** [3] - 835:7, 858:4
**plenty** [2] - 870:22, 894:12
**plus** [1] - 855:9
**point** [20] - 809:4, 811:10, 811:25, 829:18, 832:16, 877:8, 883:3, 891:11, 893:18, 895:16, 898:24, 902:4, 902:9, 926:15, 929:25, 937:8, 937:15, 937:25, 939:16, 939:25
**pointed** [1] - 926:8
**pointing** [2] - 847:21, 891:9

**poke** [1] - 857:5
**poking** [1] - 850:9
**poll** [1] - 942:4
**polled** [1] - 943:3
**portion** [2] - 816:2, 871:18, 890:20, 896:18, 921:6, 926:13, 929:19, 936:19
**portions** [3] - 928:3, 938:21, 939:17
**position** [6] - 818:1, 818:7, 818:8, 838:3, 857:25, 916:15
**positions** [1] - 913:11
**possible** [4] - 858:14, 880:9, 886:1, 911:16
**possibly** [6] - 837:20, 839:5, 880:10, 885:22, 928:2
**posted** [1] - 801:6
**poster** [1] - 831:11
**potential** [3] - 836:25, 838:25, 859:2
**practice** [7] - 805:1, 900:25, 913:25, 914:21, 935:14, 944:19, 944:20
**practices** [1] - 914:18
**practicing** [1] - 830:14
**practitioners** [1] - 830:6
**precise** [1] - 849:3
**precisely** [3] - 806:16, 851:5, 854:16
**precision** [1] - 918:14
**preclude** [3] - 935:9, 935:11, 936:6
**predictable** [1] - 852:4
**prefer** [2] - 896:22, 915:8
**preference** [2] - 801:21, 851:24
**prejudice** [3] - 824:3, 904:3, 904:8
**premise** [2] - 882:21, 883:19
**prepared** [4] - 928:15, 937:15, 937:17, 937:21
**preponderance** [24] - 814:16, 820:22, 821:1, 821:3, 900:10, 908:5, 908:9, 908:20, 912:25, 913:3, 914:6, 915:15, 916:11, 917:6, 919:13, 920:11, 920:12, 921:17, 921:19, 921:22, 923:20, 925:9, 941:9, 941:20
**preposterous** [1] - 851:9
**presence** [3] - 801:2, 898:2, 940:13
**present** [2] - 930:7, 939:11
**presentation** [5] - 823:22, 860:21, 865:3, 883:16, 884:23
**presented** [11] - 844:20, 861:8, 882:17, 882:19, 884:20, 884:21, 903:10, 904:13, 923:14, 923:17, 924:16
**presenting** [5] - 877:13, 877:14, 884:3, 884:4, 893:21
**preserve** [2] - 823:24, 829:19
**preserved** [3] - 829:8, 829:20,

830:11
**pretext** [4] - 813:9, 813:10, 813:17, 854:7
**pretrial** [5] - 913:10, 934:12, 934:23, 936:5, 936:10
**pretty** [2] - 849:12, 883:23
**prevail** [1] - 908:16
**previous** [2] - 864:11, 886:6
**previously** [2] - 801:4, 873:10
**prima** [1] - 817:10
**principles** [2] - 913:17, 913:19
**printed** [2] - 804:21, 902:1
**privacy** [1] - 944:21
**private** [1] - 914:18
**privileges** [1] - 915:1
**privy** [1] - 879:11
**probable** [1] - 922:8
**probative** [3] - 937:8, 937:25, 939:25
**probe** [1] - 846:11
**problem** [7] - 802:22, 814:24, 818:25, 819:6, 820:12, 820:17, 883:6
**problematic** [1] - 804:13
**problems** [3] - 815:25, 820:8, 885:8
**procedural** [4] - 804:9, 804:10, 804:14, 905:6
**procedure** [2] - 806:13, 913:7
**proceed** [5] - 833:1, 914:2, 916:24, 917:21
**proceeding** [1] - 863:10
**Proceedings** [1] - 800:25
**proceedings** [4] - 840:11, 840:12, 850:8, 852:24
**produce** [1] - 916:3
**produced** [5] - 800:25, 816:11, 819:9, 917:1, 922:21
**producing** [1] - 922:10
**professional** [2] - 856:1, 876:17, 903:7
**professionalism** [1] - 945:10
**proffered** [1] - 917:13
**prohibits** [2] - 914:10, 914:17
**promise** [1] - 936:16
**proof** [9] - 806:8, 806:13, 810:7, 810:8, 906:25, 907:3, 908:2, 908:3, 925:7
**propel** [1] - 807:21
**propeller** [1] - 875:4
**proper** [3] - 812:15, 846:3, 932:6
**properly** [1] - 904:24
**property** [1] - 912:22
**proponent** [2] - 937:10, 938:1
**proposed** [4] - 801:6, 801:20, 803:18, 898:21
**protect** [7] - 839:8, 840:7, 851:10, 854:8, 880:7, 886:18, 915:4

15

**protected** [13] - 802:2, 813:6, 816:17, 827:11, 844:11, 846:4, 849:23, 858:15, 915:2, 915:5, 915:9, 915:12, 915:13
**protecting** [1] - 880:8
**proud** [5] - 840:25, 851:12, 944:14, 944:15, 944:18
**proudly** [1] - 857:17
**prove** [27] - 814:15, 820:22, 821:2, 821:6, 827:10, 827:11, 861:10, 861:12, 889:19, 892:24, 900:10, 906:25, 907:22, 907:23, 914:5, 915:15, 915:19, 916:13, 916:16, 916:18, 916:22, 917:16, 918:13, 920:12, 921:22, 941:9, 941:20
**proved** [3] - 913:2, 916:23, 917:19
**proven** [8] - 820:20, 821:1, 912:25, 918:1, 920:11, 921:16, 921:19, 923:22
**proverbial** [1] - 841:16
**proves** [3] - 821:8, 923:5, 923:20
**provide** [5] - 821:17, 917:23, 935:12
**provided** [1] - 935:10
**provides** [1] - 914:19
**proving** [1] - 919:12
**proximate** [6] - 921:23, 921:25, 922:3, 922:12, 922:13, 922:15
**proximately** [3] - 921:20, 922:9, 923:2
**psychologist** [1] - 878:1
**public** [1] - 914:18
**pull** [1] - 878:25
**punish** [1] - 924:3
**purpose** [5] - 831:16, 910:2, 924:2, 937:12, 938:12
**purposely** [1] - 910:10
**purposes** [2] - 827:5, 899:24
**pursuant** [1] - 829:17
**pursuit** [1] - 884:22
**pushed** [1] - 853:22
**put** [43] - 805:3, 806:20, 806:23, 807:4, 807:11, 807:17, 808:10, 811:10, 813:14, 818:2, 821:5, 821:23, 822:5, 822:7, 823:12, 823:14, 824:1, 824:14, 825:18, 826:10, 826:16, 828:11, 841:10, 847:12, 850:13, 852:2, 855:24, 866:7, 868:11, 870:12, 881:25, 900:1, 905:22, 928:19, 930:24, 931:12, 931:13, 938:7, 939:19, 940:5, 944:7
**putting** [7] - 848:4, 868:10, 868:12, 868:17, 868:21, 881:14, 887:25

## Q

**qualifications** [1] - 818:11
**qualified** [6] - 817:25, 818:7, 818:8, 819:2, 916:14, 936:24
**quality** [3] - 834:16, 908:12, 908:13
**quarter's** [1] - 824:20
**Queer** [1] - 875:5
**questioned** [3] - 824:17, 824:25, 938:20
**questioning** [1] - 895:6
**questions** [13] - 817:14, 835:16, 837:6, 845:6, 866:9, 866:21, 887:23, 905:22, 905:24, 929:13, 929:16, 935:25, 938:19
**quite** [3] - 807:6, 863:7, 874:19
**quote** [2] - 838:22, 838:23
**quote-unquote** [2] - 838:22, 838:23
**quote/unquote** [1] - 857:14
**quoted** [2] - 865:1, 887:21
**quoting** [2] - 810:2, 914:20

## R

**rage** [2] - 848:17, 849:25
**rain** [3] - 883:25, 888:10, 907:11
**raincoat** [2] - 907:8, 907:12
**raining** [2] - 907:5, 907:10
**rainy** [2] - 883:20, 883:23
**raised** [2] - 931:15, 934:19
**ramped** [1] - 825:23
**range** [1] - 888:7
**rarely** [2] - 887:21, 916:6
**rather** [11] - 840:4, 858:3, 858:7, 877:19, 891:5, 895:1, 895:8, 918:7, 927:2, 945:20, 945:21
**rational** [1] - 924:22
**Ray** [51] - 803:19, 824:17, 837:5, 837:6, 837:9, 837:11, 838:24, 839:6, 839:22, 842:20, 843:4, 844:17, 844:24, 845:10, 848:12, 848:20, 849:15, 853:11, 855:5, 859:21, 864:15, 871:21, 872:15, 872:18, 874:1, 875:17, 875:22, 876:3, 876:24, 877:3, 877:15, 878:9, 878:19, 879:5, 879:12, 879:13, 885:6, 885:13, 885:21, 886:4, 886:13, 886:16, 886:18, 886:25, 889:13, 892:17, 893:9, 893:23, 893:25, 894:1
**RAY** [1] - 800:7
**Ray's** [8] - 843:9, 844:23, 845:6, 848:11, 849:25, 851:1, 875:18, 876:4
**Raymond** [3] - 805:15, 856:13, 912:15
**reach** [7] - 831:4, 853:4, 902:8, 904:15, 905:19, 925:13, 928:21

**reached** [12] - 826:23, 831:22, 871:3, 902:4, 927:21, 928:17, 928:18, 928:21, 929:21, 940:16, 940:22, 940:23
**reaching** [1] - 903:6
**read** [29] - 804:20, 804:21, 804:23, 804:24, 805:18, 813:15, 814:11, 814:20, 819:23, 820:24, 840:11, 856:23, 873:5, 873:7, 887:22, 887:24, 893:19, 893:20, 901:19, 926:12, 927:1, 927:25, 928:4, 928:7, 928:10, 938:21, 941:5
**read-back** [5] - 804:20, 804:23, 804:24, 928:4, 928:7, 928:10
**reading** [7] - 808:14, 814:14, 866:25, 872:7, 901:18, 901:20, 935:24
**ready** [4] - 833:1, 833:19, 860:7, 901:13
**real** [7] - 819:14, 819:18, 820:4, 822:7, 883:15, 900:7, 917:4
**realistic** [1] - 878:12
**reality** [1] - 840:24
**realize** [1] - 945:18
**realized** [2] - 847:19, 847:20
**really** [13] - 806:5, 815:6, 816:8, 817:3, 835:18, 842:24, 843:22, 871:11, 878:23, 883:24, 884:20, 917:7, 917:17
**reason** [57] - 810:11, 812:25, 818:17, 819:14, 819:18, 820:4, 846:15, 849:3, 850:11, 850:12, 851:16, 851:17, 852:24, 852:25, 856:3, 856:18, 859:2, 860:17, 861:15, 861:16, 861:24, 862:7, 865:7, 865:12, 865:13, 865:16, 865:23, 869:9, 875:1, 878:1, 878:5, 878:6, 878:7, 882:4, 885:14, 886:19, 890:23, 891:2, 891:16, 892:11, 898:16, 900:7, 903:22, 907:16, 915:20, 916:24, 917:4, 917:7, 917:11, 917:16, 917:17, 917:19, 932:2, 939:19, 944:2, 944:5
**reasonable** [16] - 826:5, 836:5, 871:21, 877:14, 885:13, 903:2, 907:14, 920:7, 920:18, 921:2, 921:7, 922:11, 924:8, 937:10, 938:2, 938:17
**reasonably** [7] - 850:15, 912:12, 919:6, 921:1, 922:6, 922:7, 922:22
**reasoning** [1] - 827:20
**reasons** [8] - 817:15, 852:16, 852:17, 852:23, 853:12, 895:2, 917:13, 943:24
**reassured** [1] - 839:12
**rebel** [4] - 858:3, 858:7, 895:8,

895:9
**rebut** [1] - 889:5
**rebuttal** [3] - 859:14, 887:10, 938:21
**REBUTTAL** [2] - 887:14, 947:4
**received** [8] - 871:23, 876:18, 905:13, 906:1, 913:6, 919:9, 940:14, 940:20
**receptionist** [1] - 845:20
**recess** [6] - 832:22, 832:23, 860:5, 860:6, 897:5, 940:11
**reciting** [1] - 932:21
**recollection** [11] - 832:11, 833:13, 833:15, 833:20, 903:15, 905:19, 905:21, 925:22, 925:23, 926:25, 934:18
**recommended** [1] - 807:9
**reconsider** [1] - 925:2
**reconvene** [1] - 894:18
**record** [9] - 813:14, 823:1, 824:1, 825:12, 832:7, 927:2, 928:16, 930:25, 940:1
**recorded** [2] - 800:25, 941:18
**recorder** [1] - 889:6
**recording** [2] - 886:11, 926:23
**recounting** [2] - 939:12, 939:15
**recover** [6] - 814:14, 822:5, 914:9, 915:14, 921:21, 923:19
**reduce** [5] - 862:13, 920:2, 920:8, 920:16, 921:7
**reduced** [1] - 862:11
**refer** [2] - 890:24, 891:8
**reference** [6] - 822:23, 833:24, 834:2, 890:20, 895:1, 909:21
**references** [1] - 872:2
**referencing** [2] - 831:25
**referred** [7] - 849:19, 892:17, 896:19, 900:16, 900:19, 920:9, 931:16
**refers** [1] - 908:12
**reflect** [1] - 801:18
**reflecting** [1] - 801:16
**refuse** [1] - 914:23
**refused** [2] - 846:11, 933:22
**refute** [1] - 856:14
**regard** [7] - 867:24, 888:12, 904:13, 905:16, 905:25, 922:11, 934:8
**regarding** [10] - 805:23, 821:20, 902:12, 902:18, 909:1, 918:3, 929:16, 938:14, 939:1, 939:18
**regardless** [3] - 813:6, 853:12, 905:12
**rehired** [2] - 875:10, 875:11
**reiterate** [2] - 833:6, 928:21
**reject** [3] - 807:20, 833:10, 911:20
**rejected** [1] - 807:25
**relate** [2] - 862:12, 939:12
**related** [4] - 864:18, 864:25, 905:7, 936:22

**relates** [1] - 826:20
**relating** [1] - 865:20
**relationship** [10] - 862:1, 889:25, 890:12, 890:16, 890:23, 890:25, 891:3, 891:8, 891:17, 895:21
**relationships** [2] - 885:19, 895:23
**relative** [1] - 902:16
**relatively** [1] - 802:8
**relax** [1] - 878:2
**relaxing** [1] - 862:18
**relayed** [1] - 837:4
**release** [5] - 879:24, 880:2, 880:6, 892:11
**relevant** [1] - 863:3
**reliable** [1] - 911:20
**relied** [1] - 851:9
**rely** [2] - 846:13, 851:8
**remainder** [1] - 815:3
**remaining** [1] - 859:24
**remains** [1] - 906:22
**remarks** [4] - 804:22, 826:18, 924:10, 924:14
**remedy** [1] - 936:5
**remember** [33] - 807:22, 830:15, 836:7, 836:9, 837:10, 838:14, 846:22, 850:2, 852:21, 853:7, 855:20, 863:19, 866:12, 866:19, 868:17, 868:18, 869:3, 869:18, 872:13, 877:2, 883:23, 886:9, 890:16, 895:5, 895:9, 900:15, 900:18, 909:16, 925:17, 927:25, 934:23, 935:8, 935:24
**remembered** [1] - 877:1
**remind** [2] - 830:22, 914:3
**reminder** [2] - 853:17, 924:14
**removed** [1] - 840:20
**renew** [1] - 829:15
**renewal** [1] - 829:25
**reopened** [1] - 824:2
**reopening** [1] - 823:5
**repeat** [3] - 811:2, 811:3, 868:20
**repeated** [1] - 891:6
**replace** [1] - 821:10
**report** [3] - 845:3, 845:5, 850:25
**Reporter** [1] - 800:22
**reporter** [7] - 833:19, 894:14, 926:10, 926:12, 927:1, 928:12, 945:9
**representation** [1] - 878:24
**representatives** [1] - 904:22
**represented** [1] - 913:22
**representing** [1] - 908:17
**request** [9] - 801:14, 804:23, 804:24, 901:1, 927:24, 928:4, 928:6, 928:9, 935:22
**requesting** [2] - 801:15, 928:2
**require** [2] - 918:12, 930:19
**required** [8] - 829:25, 830:2,

911:18, 916:3, 919:25, 920:7, 928:6
**requirement** [1] - 923:8
**requirements** [1] - 937:3
**requires** [3] - 814:20, 901:18, 908:15
**residual** [4] - 937:1, 938:4, 939:7, 939:23
**resolve** [1] - 902:25
**resources** [1] - 876:17
**respect** [13] - 903:14, 918:14, 919:5, 921:9, 923:2, 935:7, 935:14, 936:11, 939:9, 941:8, 941:19, 944:21, 945:9
**responded** [1] - 895:25
**response** [10] - 801:13, 816:22, 845:10, 850:23, 851:1, 866:8, 866:21, 867:23, 875:4, 875:18
**responsibilities** [1] - 912:13
**responsibility** [4] - 902:9, 902:20, 906:22, 924:15
**responsible** [1] - 926:3
**rest** [7] - 809:3, 826:12, 854:13, 888:20, 939:9, 939:10
**rested** [1] - 871:13
**restroom** [1] - 930:2
**rests** [1] - 908:3
**result** [2] - 922:7, 922:22
**resulted** [1] - 921:4
**resulting** [1] - 921:6
**retire** [3] - 924:12, 929:4, 930:15
**returns** [1] - 824:23
**reversed** [1] - 933:22
**reversible** [1] - 934:3
**review** [1] - 856:14
**reviewed** [1] - 801:7
**revolutionary** [1] - 834:24
**Rich** [15] - 843:3, 843:10, 845:2, 847:14, 864:5, 864:6, 864:8, 864:24, 864:25, 875:23, 878:3, 886:14, 891:16
**RICHARD** [1] - 800:16
**rid** [1] - 804:9
**ride** [1] - 837:23
**ridiculous** [2] - 822:8, 846:12
**ridiculousity** [1] - 858:12
**rights** [13] - 834:25, 835:2, 835:5, 844:14, 844:15, 857:19, 857:20, 857:21, 858:1, 884:24, 944:9
**Rights** [3] - 913:24, 914:8, 914:16
**rip** [3] - 845:3, 845:4, 850:25
**rise** [2] - 916:19, 932:25
**risk** [1] - 904:18
**risking** [1] - 835:20
**rock** [1] - 841:16
**role** [2] - 856:24, 902:23
**room** [14] - 804:21, 814:3, 831:15, 861:24, 887:9, 894:8,

924:12, 925:25, 927:6, 927:23, 929:11, 930:16, 931:8, 932:3
**Rosana** [20] - 835:24, 836:7, 836:11, 838:3, 838:6, 839:10, 839:19, 839:21, 840:9, 841:25, 846:3, 846:22, 847:22, 858:15, 858:24, 866:3, 870:12, 885:10, 885:11, 892:20
**round** [1] - 831:8
**rowdy** [1] - 836:23
**rude** [2] - 845:20, 944:22
**ruin** [2] - 838:21, 859:23
**ruined** [6] - 872:17, 877:17, 885:2, 888:20, 892:8
**Rule** [1] - 937:1
**rule** [16] - 830:2, 830:6, 848:6, 876:12, 876:13, 927:8, 931:13, 931:17, 933:7, 933:16, 936:24, 937:2, 938:12, 939:8, 939:15, 944:24
**rules** [14] - 802:22, 803:14, 806:13, 829:18, 830:2, 830:12, 842:10, 898:20, 902:13, 902:17, 903:18, 903:20, 903:22, 937:12
**ruling** [8] - 811:22, 815:18, 829:4, 829:21, 933:10, 934:7, 936:18, 940:7
**rulings** [1] - 906:3

## S

**safe** [5] - 840:18, 841:8, 847:7, 865:24, 880:5
**safely** [2] - 873:17, 878:7
**safety** [2] - 850:18, 880:9
**salary** [1] - 919:8
**Sand** [2] - 807:7, 899:22
**Sand's** [1] - 898:20
**SAUL** [1] - 800:20
**saw** [18] - 827:1, 836:12, 836:15, 837:1, 837:21, 841:3, 843:5, 848:2, 848:4, 856:16, 862:5, 871:16, 871:21, 872:4, 877:10, 886:7, 906:20
**scared** [1] - 835:19
**scenario** [1] - 845:1
**scenarios** [1] - 844:25
**scene** [1] - 846:21
**schedule** [1] - 862:13
**scheduled** [1] - 881:15
**scheduling** [1] - 945:15
**school** [5] - 821:12, 825:20, 825:21, 826:7, 880:23
**schooling** [1] - 826:5
**scope** [2] - 912:8, 912:11
**scratch** [1] - 846:6
**script** [1] - 876:15
**scrutinize** [2] - 909:7, 917:12
**scrutiny** [1] - 911:10
**searching** [1] - 911:9

**season** [1] - 884:13
**seasons** [1] - 855:12
**seated** [2] - 894:23, 941:16
**Second** [12] - 807:5, 807:7, 807:21, 812:9, 812:10, 816:4, 816:20, 816:25, 817:5, 817:8, 817:17, 933:19
**second** [21] - 801:25, 816:3, 817:3, 818:20, 819:6, 825:17, 827:23, 828:23, 833:12, 841:24, 841:25, 842:2, 873:19, 887:16, 900:4, 900:14, 902:15, 913:18, 916:16, 929:19, 932:1
**second-guess** [1] - 932:1
**secondhand** [1] - 840:19
**Section** [2] - 805:11, 914:8
**section** [5] - 802:7, 804:6, 807:12, 820:15
**security** [3] - 865:11, 920:1, 920:23
**see** [27] - 805:5, 807:11, 812:19, 828:17, 832:25, 833:10, 836:14, 836:17, 836:18, 837:25, 847:18, 849:2, 849:3, 849:11, 856:12, 865:1, 868:7, 868:12, 873:8, 881:3, 884:9, 889:4, 889:8, 927:22, 929:12, 931:10, 935:6
**seeking** [2] - 920:8, 921:1
**select** [1] - 926:1
**selected** [1] - 859:1
**selection** [2] - 943:19, 943:20
**self** [3] - 846:15, 898:24, 929:12
**self-evident** [2] - 846:15, 898:24
**self-explanatory** [1] - 929:12
**semester** [1] - 881:9
**semesters** [1] - 854:24
**send** [9] - 828:16, 901:21, 901:22, 927:9, 927:17, 929:7, 929:17, 930:10, 943:13
**sending** [1] - 804:25
**sense** [8] - 850:15, 883:7, 883:9, 907:16, 909:17, 910:15, 911:14, 924:7
**sensed** [1] - 866:5
**senses** [1] - 906:18
**sensual** [5] - 840:15, 847:4, 867:4, 867:6, 867:8, 867:9, 867:10, 867:19, 868:4, 868:6, 868:9, 872:17, 876:19, 885:16
**sent** [2] - 848:19, 927:23
**sentence** [14] - 801:25, 803:8, 806:25, 808:12, 808:25, 812:16, 815:2, 815:8, 819:17, 821:8, 825:18, 827:24, 828:23, 900:14
**sentences** [2] - 801:17, 898:11
**separate** [1] - 827:8
**separated** [2] - 802:21, 840:1
**separately** [7] - 826:25, 827:16, 828:9, 828:11, 899:24, 900:21,

925:15

**serve** [8] - 937:11, 937:12, 938:12, 940:4, 944:1, 944:3, 944:6, 944:8

**served** [1] - 801:22

**service** [5] - 845:22, 943:13, 943:16, 945:22, 946:1

**serving** [2] - 943:25, 945:12

**SESSION** [1] - 898:1

**set** [1] - 824:5

**settled** [1] - 926:25

**seven** [1] - 855:8

**Seventh** [1] - 800:15

**several** [3] - 835:6, 844:25, 905:10

**sex** [4] - 849:22, 885:20, 886:3, 889:11

**sexual** [35] - 801:23, 814:16, 835:12, 836:20, 839:17, 841:11, 851:7, 852:15, 854:2, 864:20, 867:8, 867:9, 870:21, 870:25, 874:2, 874:3, 874:16, 887:1, 889:24, 891:13, 914:1, 914:11, 914:22, 915:1, 915:6, 915:16, 915:20, 915:21, 915:25, 916:5, 917:8, 932:18, 941:10, 941:21

**sexuality** [2] - 851:6, 864:14

**shaking** [1] - 848:5

**shall** [1] - 921:17

**share** [2] - 842:12, 876:9

**shared** [2] - 842:13, 842:15

**sharing** [3] - 864:24, 865:13, 878:13

**Shaw** [7] - 835:18, 835:20, 842:15, 864:18, 874:8, 874:11, 936:1

**sheet** [21] - 801:7, 826:20, 826:21, 827:7, 827:15, 828:2, 829:2, 829:4, 829:10, 852:13, 925:15, 928:15, 928:16, 929:10, 929:12, 929:17, 935:6, 941:2, 943:5

**shenanigans** [1] - 857:14

**shifting** [2] - 817:12, 817:13

**shifts** [2] - 817:7, 817:10

**short** [5] - 801:17, 832:19, 911:7

**shorten** [1] - 894:15

**shorter** [2] - 815:7, 924:11

**shoulder** [3] - 868:10, 868:12, 868:13

**show** [7] - 813:3, 837:2, 849:6, 888:14, 933:3, 933:5, 933:18

**showed** [2] - 842:11, 891:25

**showing** [2] - 831:21, 847:11

**shown** [1] - 830:24

**shows** [6] - 841:25, 842:1, 842:2, 842:13, 848:17

**sick** [1] - 847:13

**side** [10] - 803:14, 805:17, 832:17, 869:17, 904:22,

904:23, 908:12, 908:21, 913:8, 913:10

**sidebar** [4] - 905:4, 943:5, 943:6, 943:25

**sides** [4] - 807:2, 818:13, 934:15, 940:15

**sign** [2] - 928:19, 929:20

**signature** [1] - 929:19

**signed** [3] - 835:14, 927:10, 927:13

**significant** [1] - 869:4

**signing** [1] - 926:3

**similar** [7] - 801:15, 821:11, 854:22, 892:24, 921:3, 934:6, 934:18

**similarly** [1] - 864:6

**simple** [2] - 815:9, 898:19

**simpler** [1] - 815:9

**simply** [12] - 807:24, 835:18, 840:9, 843:14, 846:10, 847:16, 854:21, 898:11, 913:7, 925:5, 926:16, 936:6

**single** [2] - 858:9, 893:18

**sit** [2] - 857:25, 859:6

**sitting** [5] - 847:16, 867:17, 907:6, 907:7, 932:2

**situation** [7] - 837:7, 841:10, 841:19, 844:19, 852:9, 859:17, 864:18, 891:20, 891:21, 893:1, 934:3

**six** [2] - 831:6, 920:24

**size** [1] - 909:14

**skeptical** [1] - 883:15

**sky** [7] - 836:23, 841:5, 848:6, 848:8, 848:9, 865:21, 876:10

**skydive** [20] - 835:15, 835:20, 838:13, 838:25, 839:2, 840:25, 842:4, 842:7, 845:8, 852:4, 858:20, 866:5, 869:23, 872:10, 872:17, 876:16, 892:3, 892:4, 916:14, 938:25

**SKYDIVE** [1] - 800:7

**Skydive** [17] - 853:7, 855:8, 864:10, 864:12, 871:25, 873:22, 881:7, 883:18, 884:5, 888:17, 888:18, 912:7, 912:9, 912:18, 915:23, 941:12, 941:23

**skydiver** [4] - 825:1, 852:5, 855:2, 855:4, 876:10, 892:5, 892:14

**skydiver's** [1] - 839:23

**skydives** [1] - 853:24

**skydiving** [8] - 818:1, 853:15, 853:17, 853:23, 854:18, 855:17, 862:23, 934:25

**slave** [4] - 858:4, 858:7, 895:10, 895:11

**slaves** [1] - 835:1

**slice** [1] - 810:13

**slip** [1] - 883:11

**slowly** [1] - 848:15

**small** [5] - 809:2, 858:24, 892:21, 910:13, 912:1

**smart** [1] - 866:1

**smelled** [1] - 906:20

**smiling** [2] - 882:3, 882:4

**smoke** [2] - 930:3, 930:4

**smokers** [1] - 930:2

**snipits** [1] - 887:24

**snowed** [2] - 854:13, 862:8

**snowed-in** [1] - 854:13

**soaking** [1] - 907:9

**social** [2] - 853:20, 920:1

**socialize** [1] - 881:18

**socialized** [1] - 849:21

**societal** [1] - 837:17

**society** [1] - 851:4

**soft** [1] - 867:11

**softly** [1] - 848:16

**sole** [5] - 827:3, 902:22, 909:5, 912:17, 918:19

**solely** [5] - 903:10, 904:5, 904:12, 918:24, 925:18

**someone** [35] - 801:24, 807:24, 810:14, 811:7, 811:12, 812:23, 812:24, 832:15, 835:15, 835:22, 841:10, 841:14, 843:8, 843:22, 843:23, 844:20, 845:1, 845:11, 846:14, 846:16, 848:16, 850:12, 851:1, 852:6, 857:2, 865:20, 865:22, 868:5, 889:10, 889:14, 889:15, 891:18, 931:10

**sometime** [1] - 812:18

**sometimes** [4] - 845:24, 845:25, 930:2, 943:23

**somewhat** [1] - 814:19

**somewhere** [3] - 803:5, 803:7, 888:7

**soon** [1] - 930:25

**sorry** [11] - 809:17, 839:20, 848:12, 849:2, 855:9, 864:6, 868:20, 878:17, 879:2, 879:25, 900:17

**sort** [1] - 817:4

**sorts** [2] - 845:5, 847:22

**sound** [2] - 879:15, 924:7

**sounds** [1] - 865:13

**source** [1] - 922:20

**space** [3] - 838:15, 847:17, 922:14

**speaks** [1] - 848:15

**special** [1] - 827:9

**specially** [1] - 853:9

**specific** [6] - 804:5, 863:19, 886:17, 898:20, 928:2, 928:6

**specifically** [4] - 807:17, 830:10, 910:23, 927:18

**speculate** [2] - 803:15, 903:12

**speculation** [3] - 907:20, 918:11, 923:16

**speech** [1] - 944:11

**spending** [1] - 833:24

**spent** [2] - 812:18, 822:9

**spoken** [1] - 932:10

**sport** [1] - 853:21

**spot** [2] - 845:12, 851:3

**squeeze** [1] - 851:11

**staff** [1] - 864:20

**stand** [4] - 810:24, 823:15, 857:17, 941:7

**standard** [4] - 812:6, 812:15, 913:13, 923:11

**standing** [1] - 904:1

**standpoint** [1] - 938:9

**stands** [1] - 927:20

**stark** [1] - 853:17

**start** [8] - 802:8, 829:13, 829:14, 834:19, 847:11, 893:16, 894:10, 894:11

**started** [3] - 847:21, 864:11, 875:3

**State** [3] - 913:24, 914:8, 914:16

**state** [13] - 812:4, 830:5, 830:12, 830:13, 843:15, 936:22, 937:25, 938:5, 938:7, 938:20, 939:4, 939:11, 939:14

**statement** [23] - 805:14, 806:21, 807:12, 809:23, 818:21, 834:6, 861:9, 876:21, 886:16, 901:4, 910:4, 910:5, 910:10, 910:18, 910:19, 918:19, 919:1, 931:19, 932:15, 932:22, 937:4, 938:18, 939:19

**Statements** [1] - 805:11, 805:12

**statements** [24] - 805:24, 806:2, 806:5, 806:22, 811:11, 833:2, 833:4, 833:6, 833:7, 833:11, 833:21, 882:18, 889:21, 905:16, 905:17, 905:20, 909:21, 918:16, 925:20, 939:18, 940:5

**states** [2] - 807:12, 843:15

**States** [1] - 929:1

**STATES** [2] - 800:1, 800:11

**status** [1] - 802:2

**statute** [3] - 912:16, 914:20, 915:2

**stay** [1] - 930:19

**stayed** [2] - 890:3, 891:5

**stenographer** [1] - 913:9

**stenography** [1] - 800:25

**step** [4] - 840:20, 880:9, 944:7, 944:13

**steps** [1] - 880:4

**stereotype** [1] - 851:8

**stick** [1] - 851:19

**sticking** [1] - 864:16, 893:2

**still** [6] - 802:18, 814:3, 843:15, 848:20, 882:14, 938:3

**stink** [1] - 822:19

**stipulate** [2] - 823:13, 823:16

**stipulated** [1] - 919:20

18

**stop** [1] - 930:8
**stopped** [2] - 848:25, 895:7
**stories** [1] - 887:3
**story** [5] - 835:17, 846:5, 863:4, 865:19, 882:17
**straight** [4] - 806:6, 857:13, 857:15, 859:4
**strains** [1] - 874:7
**strangers** [1] - 850:21
**strap** [1] - 853:10
**strapped** [10] - 835:22, 836:4, 839:12, 839:24, 866:17, 870:21, 870:24, 876:10, 878:21
**strapping** [1] - 841:11
**straps** [3] - 840:5, 846:24, 892:6
**Street** [1] - 800:17
**stretch** [1] - 824:21, 872:25
**stricken** [1] - 906:8
**strike** [3] - 822:4, 890:19, 896:18
**strings** [1] - 878:25
**student** [1] - 892:14
**studies** [2] - 825:23, 854:23
**studying** [1] - 825:19
**stuff** [1] - 864:22
**subheading** [1] - 803:18
**subject** [3] - 911:9, 919:10, 927:15
**submit** [2] - 803:18, 829:21
**submitted** [2] - 801:20, 826:21
**subpoenaed** [1] - 866:22
**substance** [1] - 945:13
**substantial** [1] - 922:4
**substitute** [1] - 903:23
**substituted** [1] - 823:3
**success** [1] - 856:3
**successful** [1] - 838:19
**sudden** [1] - 836:8
**sue** [1] - 880:2
**suffered** [1] - 923:22
**suffering** [5] - 856:6, 856:7, 923:4, 923:10
**sufficient** [3] - 825:8, 922:1, 938:22
**suggest** [5] - 813:25, 850:20, 856:18, 856:24, 924:20
**suggested** [2] - 807:7, 807:8
**suggesting** [4] - 828:4, 836:1, 836:2, 931:23
**suggestion** [3] - 818:20, 822:25, 945:15
**suicidal** [3] - 854:11, 856:8, 862:24
**Suite** [4] - 800:15, 800:17, 800:19, 800:23
**suiting** [1] - 874:14
**sum** [1] - 921:10
**summarizing** [1] - 866:25
**summary** [4] - 816:12, 932:19, 937:16, 940:2
**SUMMATION** [6] - 834:12,

860:14, 887:14, 947:2, 947:3, 947:4
**summation** [9] - 818:13, 831:17, 834:8, 860:12, 887:10, 894:25, 895:4, 895:13, 898:8
**summations** [7] - 832:8, 833:2, 833:25, 834:4, 860:3, 894:6, 905:18
**summer** [6] - 825:3, 831:5, 831:8, 883:22, 883:24, 888:7
**sums** [1] - 928:23
**support** [4] - 825:9, 861:22, 882:17, 886:7
**supported** [3] - 825:12, 832:7, 853:23
**supports** [3] - 871:22, 882:20, 908:16
**supposed** [6] - 844:19, 854:8, 860:1, 887:10, 888:15, 892:5
**surprise** [2] - 810:16, 936:2
**surrender** [1] - 925:4
**surreptitiously** [1] - 875:15
**suspended** [1] - 932:4
**suspension** [1] - 889:13
**sustained** [7] - 890:7, 890:15, 905:2, 906:3, 918:23, 921:12, 922:2
**swayed** [1] - 904:12
**swear** [1] - 929:5
**sworn** [6] - 844:9, 905:11, 906:13, 925:9, 925:11, 929:23
**sympathize** [1] - 912:23
**sympathy** [5] - 904:3, 904:10, 904:12, 904:17, 923:16
**system** [1] - 945:11

## T

**tainted** [3] - 838:23, 859:22, 892:9
**takers** [2] - 901:2, 901:4
**talks** [1] - 881:24
**tandem** [6] - 818:1, 853:16, 855:25, 862:19, 865:4, 916:14
**tape** [15] - 837:2, 837:25, 845:19, 848:23, 848:24, 848:25, 850:6, 856:14, 856:16, 856:19, 875:14, 875:16, 886:11, 893:22, 893:23
**tape-recording** [1] - 886:11
**taped** [1] - 875:15
**taping** [2] - 876:2, 876:3
**tasted** [1] - 906:20
**taught** [2] - 840:8, 847:14
**tax** [1] - 824:23
**team** [2] - 893:4, 899:2
**tears** [2] - 843:21, 872:23
**teased** [1] - 874:18
**Technologies** [1] - 933:21
**teeth** [1] - 839:22
**ten** [7] - 804:13, 835:22, 835:24,

860:2, 887:10, 888:9, 893:6
**tendencies** [2] - 835:13, 889:24
**tends** [2] - 865:10, 906:24
**tension** [1] - 843:8
**tensions** [1] - 834:21
**tenth** [1] - 836:17
**term** [2] - 812:20, 875:23
**terminate** [3] - 810:6, 814:18, 915:17
**terminated** [36] - 809:14, 809:18, 809:25, 810:5, 810:9, 810:15, 810:18, 810:22, 811:6, 811:16, 812:24, 818:21, 819:3, 819:10, 827:10, 861:15, 861:17, 862:6, 862:7, 862:20, 863:22, 863:24, 872:19, 873:10, 875:1, 875:16, 881:7, 882:21, 886:6, 886:19, 914:13, 916:17, 917:2, 917:8, 917:17, 932:5
**terminating** [5] - 812:1, 812:7, 853:12, 876:5, 916:20
**termination** [18] - 819:15, 820:5, 844:24, 845:1, 846:21, 847:5, 852:20, 852:22, 875:15, 875:22, 876:13, 889:19, 900:7, 916:19, 917:5, 939:5, 941:11, 941:22
**terms** [15] - 801:22, 804:4, 804:25, 816:20, 831:3, 832:6, 864:24, 873:22, 894:24, 895:22, 899:5, 914:25, 933:12, 938:24, 939:3
**test** [3] - 816:16, 816:18, 816:21
**testified** [44] - 821:22, 821:25, 835:21, 836:14, 838:10, 838:14, 838:22, 839:9, 842:15, 843:9, 844:1, 844:7, 846:25, 847:8, 853:8, 855:5, 861:16, 861:17, 862:10, 863:7, 864:6, 864:7, 864:9, 871:13, 871:14, 871:19, 872:14, 872:15, 874:9, 874:19, 874:21, 874:22, 874:25, 879:19, 881:8, 881:17, 881:20, 890:2, 890:5, 890:18, 892:22, 909:9, 934:9
**testifies** [2] - 906:17, 906:19
**testify** [15] - 836:11, 854:10, 863:2, 866:23, 866:24, 872:4, 872:5, 877:3, 889:12, 893:10, 907:5, 936:14, 938:5, 938:8
**testifying** [2] - 879:10, 891:2, 909:10
**testimony** [99] - 803:13, 803:19, 803:22, 804:3, 805:20, 806:18, 806:20, 807:16, 807:21, 807:25, 818:7, 821:14, 821:19, 822:13, 824:8, 824:10, 831:25, 833:19, 837:22, 846:8, 848:14, 851:14, 853:24, 859:10, 861:13, 861:20, 864:13, 865:18, 866:8, 866:20, 866:21,

866:25, 868:23, 870:22, 871:10, 872:3, 872:6, 872:22, 873:5, 873:8, 873:13, 876:23, 881:10, 881:13, 882:1, 882:16, 882:20, 883:4, 883:12, 885:11, 885:18, 885:20, 887:21, 887:22, 887:25, 889:3, 890:16, 890:22, 891:2, 891:3, 891:4, 892:20, 893:19, 898:17, 903:5, 904:23, 905:11, 906:8, 906:13, 908:7, 909:4, 909:6, 909:8, 909:12, 909:25, 910:3, 910:6, 910:7, 910:21, 911:7, 911:8, 911:18, 911:20, 913:5, 913:12, 913:13, 923:12, 926:24, 927:24, 928:3, 928:4, 928:6, 928:13, 932:10, 936:4
**Texas** [4] - 853:25, 862:20, 873:23, 933:25
**thanked** [1] - 943:17
**thankful** [1] - 944:23
**THE** [145] - 800:11, 801:5, 801:11, 802:13, 802:15, 802:18, 802:23, 803:3, 803:8, 804:1, 804:8, 804:12, 804:22, 805:3, 805:6, 806:4, 806:11, 806:17, 807:5, 808:10, 808:20, 809:4, 809:8, 809:10, 809:20, 810:13, 810:22, 811:4, 811:12, 811:18, 811:23, 812:18, 814:8, 814:24, 815:13, 815:16, 815:19, 815:21, 815:24, 816:14, 816:4, 818:12, 818:24, 819:8, 819:19, 819:22, 820:1, 820:6, 820:10, 820:14, 821:5, 822:4, 822:11, 822:16, 823:4, 823:18, 823:23, 824:13, 824:16, 825:6, 825:14, 826:4, 826:9, 826:14, 826:17, 827:25, 828:8, 828:13, 828:22, 829:1, 829:7, 829:20, 830:3, 830:9, 830:16, 830:19, 831:14, 831:23, 832:4, 832:6, 832:24, 834:12, 859:25, 860:7, 860:9, 860:11, 860:14, 861:4, 862:3, 887:8, 887:14, 890:7, 890:15, 890:22, 891:1, 893:5, 894:5, 894:23, 895:11, 896:11, 896:22, 897:4, 898:3, 898:23, 899:11, 899:15, 899:20, 900:1, 900:4, 900:13, 900:17, 900:20, 900:23, 900:25, 901:10, 901:11, 929:24, 930:15, 930:19, 931:3, 931:9, 940:14, 940:20, 940:25, 941:1, 941:15, 941:16, 942:3, 942:4, 942:7, 942:10, 942:13, 942:16, 942:19, 942:22, 942:25, 943:3, 943:7, 943:12, 946:3, 946:7, 947:2, 947:3, 947:4, 947:5
**theme** [1] - 834:18
**thereafter** [1] - 823:2

19

**therefore** [4] - 904:25, 915:19, 919:17, 936:24
**thinking** [3] - 838:6, 904:18, 932:3
**thinks** [1] - 816:25
**third** [3] - 856:12, 902:17, 916:18
**Third** [2] - 813:13, 932:17
**thoroughly** [1] - 939:22
**thought-making** [1] - 852:24
**three** [9] - 814:21, 838:5, 838:9, 838:19, 851:3, 864:15, 902:11, 920:22, 937:8
**threshold** [1] - 817:14
**throughout** [3] - 809:24, 834:18, 859:8
**thumb** [1] - 847:20
**tighten** [1] - 871:9
**timed** [1] - 929:7
**timid** [1] - 848:16
**tips** [2] - 855:20, 855:22
**Title** [3] - 812:8, 812:11, 931:17
**TO** [2] - 901:10, 947:5
**today** [3] - 846:5, 858:3, 898:22
**together** [9] - 839:25, 843:17, 870:7, 883:14, 894:9, 902:7, 922:18, 930:7, 930:25
**tomorrow** [1] - 822:23
**tone** [1] - 848:15
**took** [17] - 801:1, 810:3, 839:17, 859:6, 861:18, 862:14, 873:5, 877:3, 881:8, 881:14, 881:16, 893:15, 900:13, 900:21, 908:18, 931:2, 940:12
**tool** [1] - 926:18
**top** [2] - 863:13, 901:16
**touch** [7] - 850:17, 854:8, 871:6, 885:25, 886:2, 890:3, 891:5
**touched** [5] - 846:23, 876:19, 885:22, 889:9, 906:21
**touches** [1] - 841:24
**touching** [20] - 837:15, 846:12, 846:14, 846:19, 847:12, 850:24, 853:10, 854:7, 856:20, 857:3, 859:4, 871:1, 871:2, 872:16, 877:18, 888:19, 888:23, 891:10, 927:7, 927:15
**tough** [1] - 835:10, 835:16
**toward** [2] - 889:23, 910:24
**towards** [1] - 885:23
**track** [2] - 817:16, 825:14
**tracks** [1] - 817:4
**trained** [1] - 888:17
**transcript** [13] - 804:21, 804:25, 806:7, 822:14, 863:10, 879:3, 880:21, 926:13, 927:2, 934:13, 934:17, 935:25
**TRANSCRIPT** [1] - 800:10
**Transcript** [1] - 800:25
**transient** [1] - 934:25
**treat** [4] - 827:16, 873:15,

898:17, 906:4
**treated** [7] - 837:18, 874:15, 890:3, 899:5, 945:9, 945:10, 945:14
**trial** [36] - 815:14, 816:13, 821:20, 825:11, 835:9, 846:2, 857:23, 859:8, 861:8, 877:8, 879:3, 880:21, 903:11, 904:5, 904:7, 904:13, 904:20, 909:21, 909:25, 910:3, 910:6, 910:7, 912:19, 913:7, 913:14, 923:14, 923:17, 924:16, 926:7, 926:15, 926:24, 934:21, 935:4, 935:19, 936:13, 944:10
**TRIAL** [1] - 800:10
**trials** [1] - 895:25
**tried** [6] - 824:19, 839:7, 862:24, 883:11, 887:6, 936:11
**trip** [3] - 882:5, 882:12, 882:13
**trouble** [2] - 819:5, 837:20
**true** [6] - 805:17, 824:12, 837:14, 841:12, 856:11, 908:6
**truly** [1] - 928:24
**trust** [1] - 859:12
**trustworthiness** [2] - 937:5, 937:20
**trustworthy** [1] - 940:3
**truth** [4] - 844:9, 873:2, 909:11, 911:13
**try** [10] - 843:24, 844:8, 849:6, 854:21, 887:11, 894:14, 904:15, 909:13, 928:24, 944:5
**trying** [13] - 854:14, 854:16, 854:18, 867:13, 876:7, 878:24, 885:5, 889:16, 889:18, 891:10, 893:16, 901:3, 944:2
**turn** [2] - 859:23, 919:3
**two** [41] - 801:11, 801:17, 802:4, 802:5, 806:25, 811:10, 814:20, 816:10, 816:22, 831:24, 832:1, 834:15, 836:4, 837:7, 837:8, 852:8, 853:20, 854:6, 862:18, 872:20, 873:4, 878:18, 881:21, 881:22, 881:23, 882:2, 882:11, 882:13, 883:14, 893:15, 894:18, 894:24, 894:25, 895:2, 896:13, 920:22, 922:16, 936:18, 937:6
**type** [3] - 841:21, 920:22, 934:4
**types** [2] - 923:12, 937:19
**typos** [1] - 931:3

---

## U

**ultimately** [2] - 810:11, 818:5
**umbrella** [2] - 907:9, 907:12
**unable** [1] - 908:20
**unanimous** [10] - 826:23, 925:14, 925:16, 927:21, 928:22, 940:23, 941:14, 941:25, 942:1, 943:4

**unanimously** [2] - 940:16, 940:22
**unbelievable** [1] - 882:9
**uncomfortable** [10] - 839:10, 839:16, 841:25, 842:1, 867:15, 867:22, 867:24, 868:14, 868:16, 874:18
**under** [49] - 801:18, 803:4, 803:17, 805:11, 806:13, 807:13, 807:14, 807:19, 807:20, 809:11, 809:13, 812:7, 813:4, 813:17, 814:4, 816:23, 816:24, 816:25, 817:18, 827:17, 827:18, 829:17, 841:19, 844:9, 844:11, 857:3, 858:12, 868:25, 869:1, 869:24, 875:4, 879:10, 879:12, 892:25, 904:11, 909:8, 913:9, 913:23, 914:7, 916:19, 934:3, 934:6, 937:1, 937:14, 937:16, 938:4, 939:7, 939:14, 939:23
**undertake** [1] - 902:5
**undertaken** [3] - 845:21, 912:8, 912:11
**undisputed** [3] - 818:14, 818:17, 912:17
**unemployed** [3] - 838:13, 838:14, 838:17
**unemployment** [2] - 850:23, 920:1
**unfavorable** [2] - 825:10, 829:22
**UNITED** [2] - 800:1, 800:11
**United** [2] - 841:5, 929:1
**University** [1] - 854:25
**unlawful** [6] - 913:24, 914:17, 914:21, 921:20, 923:21, 924:4
**unless** [3] - 803:5, 804:17, 845:13
**unlike** [1] - 878:3
**unnecessary** [2] - 868:19, 933:4
**uno** [1] - 807:3
**unpleasant** [1] - 835:9
**unplug** [1] - 848:22
**unquote** [2] - 838:22, 838:23
**unusual** [2] - 842:7, 858:20, 892:13
**unwise** [1] - 933:3
**unworthy** [1] - 911:21
**up** [702] - 802:14, 802:18, 805:18, 807:6, 811:25, 819:1, 825:23, 826:16, 830:18, 831:2, 831:12, 835:14, 835:18, 835:22, 835:23, 836:24, 839:4, 839:8, 839:12, 841:11, 842:3, 845:11, 848:8, 849:11, 850:13, 850:16, 851:2, 852:2, 854:23, 857:1, 857:8, 858:13, 858:22, 865:15, 865:19, 865:20, 866:1, 869:5, 869:10, 872:15, 875:14, 875:17, 875:18, 875:20,

**unanimously** and continued right column

877:23, 878:5, 879:5, 879:25, 880:15, 882:24, 883:2, 883:3, 883:25, 884:1, 885:2, 886:14, 889:11, 889:15, 890:4, 890:8, 892:16, 892:19, 893:5, 898:22, 901:15, 909:14, 928:23, 934:20, 939:16, 941:1, 944:2, 944:5, 944:7, 944:13, 945:1, 945:3
**upset** [3] - 864:2, 869:5, 870:12
**US** [2] - 800:5, 834:24
**uses** [2] - 813:11, 813:12
**utilize** [1] - 813:20
**utilizes** [1] - 813:10

---

## V

**vacation** [2] - 881:21, 881:23
**validate** [1] - 851:9
**Valley** [1] - 932:16
**value** [2] - 848:7, 923:9
**various** [1] - 906:13
**verdict** [66] - 801:7, 825:9, 825:10, 826:20, 826:21, 827:7, 827:15, 828:2, 828:16, 829:1, 829:4, 829:10, 829:22, 852:12, 852:13, 886:24, 886:25, 902:8, 903:6, 904:4, 904:15, 904:19, 904:21, 905:19, 907:25, 917:23, 918:6, 924:20, 925:6, 925:15, 925:17, 927:4, 927:21, 928:15, 928:16, 928:17, 928:19, 928:21, 929:9, 929:10, 929:12, 929:16, 929:21, 933:22, 940:17, 940:18, 940:22, 940:24, 941:2, 941:6, 941:14, 941:18, 941:25, 942:2, 942:5, 942:8, 942:11, 942:14, 942:17, 942:20, 942:23, 943:1, 943:4, 943:5
**Vermont** [1] - 864:10
**version** [5] - 898:4, 899:16, 901:6, 902:1, 939:15
**versus** [2] - 838:3, 933:9
**victims** [1] - 857:12
**video** [24] - 836:15, 836:16, 837:22, 840:12, 841:22, 841:24, 842:1, 842:2, 847:11, 847:15, 848:2, 848:7, 849:1, 849:3, 849:4, 849:7, 849:16, 871:16, 871:18, 871:21, 877:4, 886:7, 889:4
**videographer** [1] - 845:18
**videos** [1] - 847:24
**videotapes** [1] - 889:8
**view** [4] - 824:2, 911:8, 918:6, 937:19
**views** [1] - 924:25
**VII** [3] - 812:8, 812:11, 931:17
**villain** [1] - 866:4
**violation** [1] - 912:15

**vivid** [1] - 853:17
**voice** [10] - 840:16, 847:4, 847:5, 847:6, 848:15, 848:17, 848:22, 849:25, 876:4, 893:23
**vote** [2] - 835:2, 926:5
**vs** [1] - 801:3

## W

**wage** [3] - 831:3, 832:1, 832:3
**wages** [21] - 820:21, 821:1, 821:18, 821:20, 823:6, 823:7, 825:7, 832:4, 832:5, 857:7, 919:4, 919:5, 919:7, 919:13, 919:15, 919:17, 919:22, 919:24, 920:1, 920:3, 920:11
**wait** [2] - 815:23, 930:8
**waited** [1] - 851:3
**waiting** [1] - 833:1
**waiver** [2] - 838:15, 840:11
**walked** [1] - 851:12
**Walker** [1] - 933:21
**walking** [1] - 840:14
**walks** [2] - 907:8, 945:7
**wants** [10] - 806:5, 819:19, 851:8, 866:4, 871:8, 875:20, 880:1, 883:17, 889:1, 945:2
**war** [1] - 834:24
**warranted** [1] - 903:2
**waste** [1] - 871:11
**watched** [2] - 841:23, 859:7
**water** [3] - 869:18, 870:15, 907:9
**Wayne** [1] - 874:8
**ways** [2] - 821:13, 900:6
**wearing** [1] - 907:8
**week** [7] - 831:7, 848:18, 848:19, 855:8, 881:21, 889:6, 889:13
**weekday** [4] - 825:2, 831:6, 855:1, 855:4
**weekend** [2] - 825:2, 855:6
**weeks** [8] - 825:4, 831:7, 834:15, 855:11, 855:13, 855:16, 881:22, 935:17
**weigh** [1] - 911:9
**weighs** [1] - 908:19
**weight** [5] - 902:24, 908:13, 910:19, 925:5, 926:6
**weird** [1] - 877:5
**weirdo** [1] - 847:13
**welcome** [1] - 946:7
**wet** [2] - 907:9, 907:12
**whammy** [1] - 854:4
**whatsoever** [2] - 838:7, 889:18
**whichever** [1] - 847:25
**whisper** [1] - 847:1, 867:18
**whispered** [1] - 846:24
**whispering** [9] - 867:3, 867:4, 867:6, 868:7, 868:8, 871:15, 876:20, 877:18

**whole** [5] - 820:15, 844:16, 859:1, 869:3, 930:20
**wife** [1] - 878:4, 878:20, 891:17
**William** [1] - 913:22
**willing** [1] - 944:6, 944:13
**windowless** [1] - 907:6
**windy** [1] - 884:2
**wing** [1] - 874:14
**Winstock** [15] - 843:3, 843:4, 843:10, 845:2, 847:14, 864:5, 864:6, 864:7, 864:8, 864:24, 864:25, 875:24, 878:3, 886:14, 891:16
**winter** [1] - 882:7
**wipe** [1] - 884:14
**wisdom** [1] - 856:25
**wish** [3] - 926:8, 945:1, 945:25
**withdrawn** [1] - 832:3
**withheld** [1] - 856:19
**witness** [18] - 807:15, 864:4, 868:23, 891:13, 898:10, 898:15, 898:18, 898:21, 899:6, 906:17, 906:19, 906:23, 909:1, 909:4, 909:5, 909:8, 909:9, 909:14, 910:3, 910:5, 910:10, 910:13, 910:22, 910:24, 911:1, 911:3, 911:5, 911:7, 911:11, 911:16, 911:19, 913:8, 913:12, 913:14, 934:8, 935:3
**witness's** [4] - 909:12, 910:6, 910:7, 910:21
**witnesses** [19] - 846:18, 861:13, 861:21, 895:23, 898:14, 899:1, 899:3, 905:11, 905:22, 906:14, 908:11, 909:3, 909:24, 934:12, 934:22, 935:7, 935:15, 935:18, 939:3
**woman** [19] - 835:11, 837:16, 837:17, 841:11, 841:17, 844:22, 846:15, 852:8, 854:7, 857:3, 859:5, 868:3, 868:5, 885:22, 885:23, 885:25, 886:2, 888:19, 892:3
**woman's** [2] - 840:14, 840:22
**women** [11] - 835:1, 837:16, 843:11, 843:19, 843:20, 844:3, 850:19, 865:9, 873:16, 893:10, 893:11
**women's** [1] - 858:6
**won** [2] - 834:17, 912:19
**Woods** [1] - 860:19
**word** [14] - 812:1, 812:13, 812:19, 812:21, 821:5, 822:16, 844:17, 850:2, 875:20, 879:12, 886:12, 900:9, 901:3, 907:1
**worded** [2] - 812:16, 814:12
**words** [18] - 804:10, 807:22, 820:24, 836:1, 845:20, 859:13, 866:7, 866:19, 877:25, 881:14, 881:25, 899:17, 907:10, 909:13, 915:25, 921:21, 922:9,

932:2
**worker** [1] - 851:25
**workers** [1] - 851:19
**workplace** [5] - 842:11, 843:1, 851:13, 851:19, 864:23
**works** [1] - 839:21
**world** [1] - 834:18
**worry** [3] - 865:24, 869:8, 892:23
**worse** [1] - 854:6
**worth** [1] - 824:20
**worthy** [1] - 908:7
**write** [1] - 820:1
**writing** [3] - 876:15, 927:13, 927:16
**written** [5] - 849:23, 901:17, 917:23, 927:24, 931:5
**wrongful** [1] - 889:19

## Y

**yahoos** [1] - 836:24
**year** [7] - 825:4, 854:13, 855:11, 856:15, 873:24, 873:25
**years** [20] - 804:13, 810:20, 824:1, 824:23, 830:15, 838:20, 843:4, 846:2, 853:6, 853:23, 854:10, 854:17, 855:16, 855:19, 856:23, 859:24, 872:11, 873:12, 883:17, 945:21
**Yelp** [1] - 845:17
**yesterday** [4] - 801:12, 802:6, 835:21, 931:15
**YORK** [1] - 800:1
**York** [22] - 800:15, 800:17, 800:20, 800:23, 801:19, 813:12, 813:19, 816:23, 816:24, 817:1, 827:17, 827:18, 843:16, 913:23, 914:8, 914:16, 932:15, 932:21, 933:12, 934:6
**young** [3] - 835:11, 858:5, 859:24
**yourself** [1] - 855:18

## Z

**Zabel** [1] - 934:24
**Zabell** [26] - 801:13, 809:8, 817:21, 818:4, 818:25, 822:8, 822:25, 826:14, 826:21, 828:24, 829:9, 860:7, 860:12, 887:24, 889:1, 889:21, 891:15, 893:19, 895:14, 898:8, 931:15, 934:22, 935:12, 935:17, 936:9, 937:14
**ZABELL** [65] - 800:19, 800:20, 801:10, 803:22, 805:4, 805:9, 805:22, 807:1, 808:13, 808:24, 809:9, 809:22, 810:21, 811:2, 811:10, 811:14, 811:21, 812:13, 814:7, 814:10, 815:12,

815:14, 815:17, 815:20, 817:22, 818:5, 819:16, 820:7, 820:13, 821:14, 822:2, 822:9, 822:15, 822:22, 823:16, 823:19, 824:5, 824:19, 825:13, 825:25, 826:15, 827:20, 828:6, 828:10, 828:21, 828:25, 829:11, 829:14, 830:17, 830:20, 831:24, 832:21, 860:8, 860:15, 861:6, 862:4, 890:6, 890:9, 890:14, 890:19, 896:16, 897:3, 930:14, 943:10, 946:8
**Zabell's** [4] - 823:4, 894:25, 934:19, 938:16
**ZARDA** [1] - 800:3
**Zarda** [92] - 801:3, 805:15, 805:19, 809:18, 811:16, 817:25, 818:21, 819:10, 820:23, 821:3, 821:22, 825:24, 837:10, 842:2, 850:5, 857:12, 857:18, 859:12, 861:15, 861:25, 862:5, 862:6, 862:8, 862:9, 862:13, 862:18, 862:20, 862:21, 863:22, 864:7, 864:9, 864:14, 866:10, 870:12, 871:23, 873:6, 874:5, 874:9, 875:12, 875:15, 875:17, 876:23, 877:16, 879:1, 880:16, 882:21, 883:1, 885:10, 885:12, 885:14, 885:18, 885:21, 886:1, 886:6, 887:1, 890:1, 891:13, 892:20, 895:21, 896:6, 913:21, 913:22, 914:14, 916:1, 916:8, 916:14, 916:16, 916:21, 916:25, 917:1, 917:8, 917:17, 917:19, 919:9, 919:24, 920:4, 920:6, 920:13, 920:17, 920:19, 920:25, 921:2, 921:12, 922:3, 923:22, 938:3, 938:11, 938:18, 938:20, 939:1
**Zarda's** [35] - 806:7, 814:15, 814:16, 862:16, 867:24, 868:15, 882:16, 890:15, 900:7, 912:24, 912:25, 913:2, 915:15, 915:16, 915:19, 915:21, 916:3, 916:10, 916:13, 917:4, 917:5, 917:8, 917:15, 917:21, 919:16, 919:21, 921:6, 921:24, 922:19, 935:24, 936:17, 938:9, 939:2, 941:10, 941:21
**Zealand** [2] - 835:21, 842:16
**zone** [10] - 837:4, 840:10, 841:15, 842:21, 843:5, 845:5, 855:8, 864:11, 878:10, 880:16
**zoom** [1] - 884:9