465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


---------------------------------X
DONALD ZARDA,

                         :   CV-10-4334

         Plaintiff,

                         :   US Courthouse
    -against-                    Central Islip, NY
                         :

ALTITUDE EXPRESS, INC., d/b/a
SKYDIVE LONG ISLAND and       :
RAY MAYNARD,

                         :   October 19, 2015
         Defendants.       9:30 a.m.
---------------------------------X


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE, and a Jury



APPEARANCES:

For the Plaintiff:          GREGORY ANTOLLINO, ESQ
                         275 Seventh Avenue, Suite 705
                         New York, New York 10001
                              and
                         RICHARD J. CARDINALE, ESQ.
                         26 Court Street, Suite 1815
                         Brooklyn, New York 11242


For the Defendants:         ZABELL & ASSOCIATES, P.C.
                         1 Corporate Drive, Suite 103
                         Bohemia, New York 11716
                         BY:  SAUL D. ZABELL, ESQ.
                             LAURA E. JOHNSON, ESQ.


Official Court Reporter:    Ellen S. Combs, CSR
                         100 Federal Plaza - Suite 1180
                         Central Islip, New York 11722
                         (631) 712-6107


Proceedings recorded by mechanical stenography
Transcript produced by Computer

466

1    (The following took place at 10:00 a.m.)

2    THE CLERK:  Calling 13-CV-4334, Zarda vs

3  Altitude Express.

4    (Appearances previously noted.)

5    THE COURT:  The jurors are all here.

6    Is there anything we need to discuss?

7    MR. ANTOLLINO:  Yes.  A couple of issues.

8    First of all, this is an adverse witness, so

9  without any further ado, I assume that there is not going

10  to be any objection if I'm leading the witness.

11    THE COURT:  Yes, you can lead the witness.

12    MR. ANTOLLINO:  And second, while you were out,

13  we showed the witness several videos and nothing was put

14  on the record.  But he saw a total of at least four.

15    Third, could you please -- is going to get

16  something from the hotel, so he will be joining us at

17  counsel table as soon as he gets back.

18    Bill Moore will be a replacement for the estate

19  this week, so could you tell the jurors that Melissa Zarda

20  had to go home on Friday and Bill Moore will be

21  substituting for the estate.  He's just going to walk

22  right in and sit down at the counsel table.  I told him to

23  do that.

24    THE COURT:  Any objection to that?

25    MR. ANTOLLINO:  No.

467

1          MR. ZABELL:  No objection.

2          THE COURT:  Bill Moore or William Moore.

3          MR. ANTOLLINO:  William Moore.

4          THE COURT:  Just so we avoid going to the

5     sidebar, just so I understand.  What are the three videos

6     you will be introducing through Mr. Maynard?

7          MR. ANTOLLINO:  One is of David Kengle.  Another

8     is of Don Zarda.  Another is of Duncan Shaw.  And another

9     is called camel toe (ph) video.

10          THE COURT:  Any objections to those videos

11     coming in?

12          MR. ZABELL:  Yes, judge.  I object to all of

13     those videos coming in.  None of them were identified in

14     the pretrial order in the list of exhibits.  They weren't

15     documents that we had seen in discovery but counsel failed

16     to identify any of them in the pretrial order.

17          MR. ANTOLLINO:  I don't think that is true,

18     judge.

19          But they were marked as exhibits to

20     Mr. Maynard's deposition, which itself is an exhibit.

21          THE COURT:  What are these?  What is the

22     relevance of these videos?

23          MR. ANTOLLINO:  The relevance of the Kengle

24     video is that Rosana is there, Kengle is there.  Kengle is

25     the one that made the complaint.  Kengle had a fantastic

468

1    time, in our opinion.

2         Second, the Duncan video shows Duncan doing

3    similar things to what Don was doing, pointing.  And the

4    Don video shows him doing similar things, hamming it up

5    for the camera behind the passengers.

6         And finally, the camel toe video was something

7    we got off of the Skydive Long Island website, which they

8    presented as a scene of the best of the year 2012.

9         And camel toe, I recently learned, is a woman

10   who -- whose pants are so stretched up that you can see

11   the lines of her vagina through her pants.  And this is

12   what they chose to put on their website as the highlight

13   of the 2012 season.

14        And in the meantime, they're complaining that

15   Don made a creepy face to Rosana whereas the placement of

16   the camel toe video, in the highlights, seems to

17   contradict the suggestion there was anything wrong or

18   unprofessional, quote-unquote, about anything that Don did

19   in his video.

20        MR. ZABELL:  We're going to start with

21   Mr. Kengle's video.  My client has never seen the video

22   before today.  I saw it today.  He is not the person to

23   authenticate it.  Mr. Kengle is.  Mr. Kengle is due here

24   at 11 o'clock.  I think if he comes in at all, it should

25   come in through Mr. Kengle.

469

1          I have objections based upon relevance, but I'm

2    willing to waive them if they come in through Mr. Kengle.

3          With regard to Duncan, Duncan Shaw is supposed

4    to be coming today at 12:30 during the lunch break.  We

5    expect to put him in on our case.

6          Again, Mr. Maynard has never seen the video

7    before.  He is not in a position to authenticate it.

8          I have no objection to it coming in, once it's

9    authenticated by Mr. Duncan.  Again, I fail to see the

10   relevance but I would waive the relevance argument if it

11   is authenticated through Duncan Shaw.

12         The Don video, I believe counsel says it's Don

13   hamming it up with another customer.  That was never

14   identified.  It was disclosed over the weekend to me that

15   Mr. Antollino would like to introduce it.  My client has

16   never seen it before today and is not in a position to

17   authenticate it.  Mr. Zarda, unfortunately, is not here to

18   authenticate it, and the individual in the video is not

19   here to authenticate it.  So I'm going to object based

20   upon relevance.  And I'm going to object because I don't

21   think counsel can authenticate it.

22         With regard to the video, and I'm sorry to say

23   this in Federal Court, the camel toe video, I fail to see

24   any relevance to a customer making a comment about what

25   she may or may not have been enduring at that time from a

470

1    wardrobe point of view.  It's just not relevant and there

2    is no ability to authenticate it.

3            THE COURT:  It's in a customer complaint.

4            MR. ZABELL:  She is not complaining that the

5    jump altered that.  It seems to me that she is excited

6    about the jump and was concerned how that film could be

7    portrayed in the video.

8            THE COURT:  Okay.

9            I don't understand.  I agree with Mr. Zabell

10   with respect to Mr. Kengle and Shaw.  They will be

11   witnesses here.  Mr. Maynard has reviewed the videos.  If

12   he can't authenticate them, he has never reviewed them, he

13   never made a decision regarding them, I don't know how you

14   can get those videos in through him.

15           MR. ZABELL:  Your Honor, one moment.  We have a

16   witness that just appeared and we're ushering him out.  I

17   apologize.

18           THE COURT:  He has left are the room.

19           MR. ANTOLLINO:  Is he intending on starting with

20   Mr. Kengle?

21           MR. ZABELL:  Yes.

22           THE COURT:  So I don't believe that Mr. Maynard

23   can provide testimony on the video today.  He was not

24   involved in the making, he never reviewed it in contention

25   with any employment decision.  So you should wait for

471

1    Mr. Kengle and Mr. Shaw to get those videos in.

2           MR. ANTOLLINO:  With respect to Mr. Shaw, we're

3    moving to preclude him on the basis that he wasn't

4    identified in the pretrial order.  And that, you know, if

5    you want to overrule that objection, we have the objection

6    of the person who is identified as a witness whose address

7    was never given during discovery.  Kengle is clearly

8    coming in.

9           THE COURT:  You're saying Shaw wasn't on the

10   pretrial order?

11          MR. ANTOLLINO:  Shaw was -- no, I'm sorry.  Shaw

12   was on the pretrial order but he was not in the initial

13   disclosures.  They did give us his address in the -- New

14   York along with several other employees.  However, he was

15   not on the initial disclosures.  The whole point of the

16   Federal rules, judge, you know, you don't dump 60

17   witnesses that are not on your amended pretrial

18   disclosures at trial and expect us to figure out who

19   you're going to call.  That's gamesmanship, trial by

20   ambush.

21          So I object to all of those witnesses and, at a

22   minimum, Curt Kellinger, whose address we were never given

23   and we don't know anything about him whatsoever.

24          THE COURT:  Okay.

25          Mr. Zabell, do you want to respond?

472

1        MR. ZABELL:  Sure.

2        First, with regard to Curt Kellinger, he was

3    mentioned throughout discovery and his name was identified

4    in numerous places during Don Zarda's deposition.  In

5    fact, your Honor precluded me from introducing Don Zarda's

6    testimony about how honest and how much of a straight

7    shooter Don Zarda believed Curt Kellinger to be.

8        These were individuals that were brought, the --

9    the issue of not permitting Duncan Shaw, Wayne Burrell and

10   Curt Kellinger was addressed before, your Honor.  And your

11   Honor has already ruled out and your Honor did give

12   Mr. Antollino an opportunity to write a formal motion

13   seeking to preclude.  And Mr. Antollino didn't take your

14   Honor up on that issue.

15       Your Honor specifically said that they are going

16   to testify, but I will not have all 60 people testify.

17   Again, the reason why we listed as many people as we did

18   is because skydivers are a transient lot.  They're hard to

19   pin down, they're hard to get a hold of.

20       So we listed -- we were overinclusive just to

21   make sure that we were able to get some people to come and

22   testify as to the behavior that they observed.

23       THE COURT:  I'm going to allow him to testify.

24   I'll put the reason on the record later.  I don't want to

25   keep the jury waiting anymore.

473

1          MR. ANTOLLINO:  All three are going to testify,

2    even the one whose address we weren't given?

3          THE COURT:  Yes.

4          Okay, so my ruling is that these videos can't

5    come in through Mr. Maynard if he has never seen them

6    before today and had no involvement in them.

7          MR. ANTOLLINO:  Well, one of them, judge, came

8    from the Skydive Long Island website.  And so, you know,

9    Mr. Zabell didn't talk to his client.  Mr. Maynard has not

10    testified as to his oversight of the Skydive Long Island

11    website and what they put there.  So as far as the camel

12    toe --

13          THE COURT:  Which one was on the website?

14          MR. ANTOLLINO:  The camel toe video.

15          THE COURT:  That one is not coming in under 403

16    and I'll put the reasons on the record later.  That is

17    definitely not coming in.

18          So if that is the one that is on the website,

19    you can't question him regarding his oversight of the

20    website.  And with the one with Mr. Zarda, again, I don't

21    know how he can authenticate a video of Zarda that he

22    wasn't involved in.

23          MR. ANTOLLINO:  They turned it over to us.  We

24    asked for 20 videos chosen arbitrarily.  They turned it

25    over to us.  He can identify the plane.  He can identify

474

```
1    the Drop Zone.  He can identify Mr. Zarda.  He can

2    identify the procedure.

3              THE COURT:  Did you turn the video over?

4              MR. ZABELL:  Oh, yes.

5              THE COURT:  So why can't -- the representative

6    of the company can't authenticate that through him.  He is

7    the owner of the company, so he wasn't involved in the

8    making of the video.  It certainly is in their records.

9    He can authenticate it as being a business record of --

10             MR. ZABELL:  I have no problem with that, judge.

11             THE COURT:  Okay.  So I will let that video in.

12   Okay.

13             MR. ANTOLLINO:  Through Mr. Maynard.

14             And there is going to be no objection to

15   introducing the videos of Mr. Kengle through Mr. Kengle?

16             THE COURT:  That's what I heard.  If there is an

17   objection, I'm overruling it.  Okay?

18             MR. ZABELL:  I can't imagine why he wouldn't,

19   nor Duncan Shaw.

20             MR. ANTOLLINO:  Now, as far as Mr. Kengle is

21   concerned, without taking a position on that, is

22   Mr. Zabell's preference to call him now rather than have

23   him wait until after Mr. Zabell's testimony?

24             THE COURT:  Mr. Maynard's.

25             MR. ANTOLLINO:  Mr. Maynard's testimony.
```

475

1    MR. ZABELL:  I would have taken up counsel on

2    that but we just sent him back to his car to return in

3    about 45 minutes.

4    THE COURT:  Okay.  Do you think Mr. Maynard will

5    be done in about 45 minutes?

6    MR. ZABELL:  No, I think he will be done in an

7    hour but I --

8    MR. ANTOLLINO:  I'm not so sure I'll be done in

9    an hour.  If you want to text Mr. Kengle and have him come

10   back up, feel free.

11   THE COURT:  Do you want to text?  Do you have

12   your cell phone?

13   MR. ZABELL:  I do.

14   THE COURT:  Do you want to call him and ask him

15   to come back now?

16   MR. ZABELL:  I imagine it will take him a few

17   minutes to get his phone but I still want to start with

18   Mr. Maynard.

19   THE COURT:  So let's just start, okay?

20   MR. ANTOLLINO:  He is available all day, I think

21   I'll need more than 45 minutes.

22   MR. ZABELL:  I understand that.

23   MR. ANTOLLINO:  I want to stop at some point and

24   take the morning break and have him come up and testify

25   and then go back to Maynard.

476

1          THE COURT:  We'll go an hour and see where we

2     are, okay?

3          MR. ANTOLLINO:  Okay.

4          THE COURT:  All right.  Bring in the jury.

5          (The jury entered the courtroom.)

6          THE COURT:  Good morning, members of the jury.

7     Good to see you all this morning.  I hope you enjoyed your

8     weekend.  I apologize for keeping you waiting.  But we are

9     ready to proceed now.

10          So I'm going to ask Mr. Antollino to call his

11     next witness.

12          MR. ANTOLLINO:  Thank you, judge.

13          Plaintiffs call Raymond -- oh, would you tell

14     the jury --

15          THE COURT:  Yes.  As you can see, Melissa Zarda,

16     who is representing the estate, is not with us.  She had

17     to return home.  But Mr. William Moore is a representative

18     of the estate and he will be arriving shortly.  So you

19     will see him arriving shortly at plaintiff's table.  Okay?

20          Please remain standing.

21     **RAYMOND MAYNARD**

22          called as a witness, having been first duly sworn,

23          was examined and testified as follows:

24          THE CLERK:  Please state and spell your name for

25     the record.

Maynard - Direct/Mr. Antollino

477

```
 1              THE WITNESS:  Raymond Maynard, M-A-Y-N-A-R-D.

 2              THE COURT:  Please be seated.

 3              And just so you understand, when Mr. Zabell gets

 4    to cross-examine.  I'm going to allow him to proceed in

 5    the scope of a direct examination so that he doesn't have

 6    to recall Mr. Maynard during his case.  So that when he

 7    gets to the defense case, you can call Mr. Maynard and he

 8    will be asking the defense questions during the cross,

 9    okay?

10              Go ahead.

11    DIRECT EXAMINATION

12    BY MR. ANTOLLINO:

13    Q    Good morning, Mr. Maynard.

14    A    Good morning.

15    Q    You have been skydiving for some 45 years.

16         Is that true?

17    A    That's correct.

18    Q    And you agree that skydiving is not an activity that

19    everyone would enjoy, true?

20    A    True.

21    Q    As you once said that to a reporter, correct?

22    A    That's right.

23    Q    You told the reporter that, in your opinion, being

24    crazy helps.

25         Isn't that true?
```

Maynard - Direct/Mr. Antollino

478

1   A    I don't know if I said it like that.

2   Q    Why don't you take a look at your deposition,

3   page 31, 32, and look at line 13.

4        You were asked the question:  Would you agree

5   with me people think skydivers are just a bunch of

6   crazies?  You don't have to be crazy, but it helps.

7        Answer:  That's something I've said.

8   A    If that is what I said, it's within the deposition.

9   Not the way you first stated it.

10  Q    So to be clear, you don't have to be crazy, but it

11  does help?

12  A    That is my opinion, yes.

13  Q    Now, when a passenger gets to the Drop Zone, one of

14  the first things he or she does is sign a release.

15       Is that true?

16  A    That's true.

17  Q    And I'm going to hand you -- we have already seen

18  this, you saw the last week, correct?

19  A    Yes, we did.

20  Q    Mr. Kengle also signed a release.

21       Is that right?

22  A    I believe he did.

23  Q    I'm going to hand you what is, I believe Defendant

24  Exhibit X and Plaintiff Exhibit 36 and ask you if you

25  recognize this.

Maynard - Direct/Mr. Antollino

479

1   A    Yes.  This is the waiver that we use.

2   Q    This is the waiver that you use at the Skydive Long

3   Island.  And this was the one that was filled out David

4   Kengle, correct?

5   A    That's his name.  I mean, I have never seen this

6   personally.  I mean, I don't see these every day.

7   Q    Sure.

8           THE COURT:  Is that the same objection?

9           MR. ANTOLLINO:  Is there any objection to

10  admitting this at this point?

11          MR. ZABELL:  No.

12          THE COURT:  Plaintiff's 36 is admitted.

13          (Plaintiff Exhibit 36 in evidence.)

14  BY MR. ANTOLLINO:

15  Q    Now, I'm going to ask you some questions about the

16  exhibit at some point and if you need to look at it before

17  you answer the question, please ask me.

18          All right.  Now, when the customer arrives at

19  the Drop Zone, he not only -- when I say he, I mean it

20  could be a he or a she and, in fact, that she -- I mean,

21  it could be a she or a he.

22          She signs the waiver, correct?

23  A    Correct.

24  Q    And you want that customer to read the entire waiver,

25  correct?

Maynard - Direct/Mr. Antollino

480

1   A    They should.

2   Q    Why should they?

3   A    Because they're giving up their legal rights.

4   Q    They're giving up legal rights and you want them to

5   understand that skydiving is not a normal activity,

6   correct?

7   A    Correct.

8   Q    Now, in addition to signing this release and giving

9   up their rights, the customer watches a video about the

10  process, correct?

11  A    Correct.

12  Q    You have had several videos that you have shown to

13  customers over the years at Skydive Long Island.

14       Is that true?

15  A    That's right.

16  Q    And now in your most recent video, you appear and

17  explain the process to the students, correct?

18  A    Correct.

19  Q    All right.  And you explained in the video that

20  skydiving is a dangerous sport, correct?

21  A    Correct.

22  Q    You explain that you can be injured skydiving,

23  correct?

24  A    Correct.

25  Q    You explain that you can even be killed, correct?

Maynard - Direct/Mr. Antollino

481

1    A    Correct.

2    Q    Now, you explain on the video that you, the customer,

3    agree that by signing the Skydive Long Island release, you

4    give up your rights to sue Skydive Long Island and anyone

5    remotely connected with the skydive from liability if

6    something happens to you, the customer, correct?

7    A    Correct.

8    Q    And the customer agrees to that release, even if it

9    happened as a result of the skydive instructor's

10   negligence, correct?

11   A    Correct.

12   Q    Now, by liability, that means holding you responsible

13   for something that goes wrong to them, correct?

14   A    Could you ask that again?  I'm not sure what you're

15   getting at.

16   Q    All right.  Do you understand what the word liability

17   means?

18   A    Yes.

19   Q    And the customer is giving up his right to hold you

20   liable for anything that goes wrong on the jump, correct?

21   A    Correct.

22   Q    Now, you explain, and you explained on the video,

23   quote, You have assumed the entire risk of the skydiving.

24        Is that true?

25   A    That's true.

Maynard - Direct/Mr. Antollino

482

1    Q    You also explain on the video that, quote, The bottom

2    line on the release is that you're agreeing not to sue us,

3    correct?

4    A    Correct.

5    Q    And you also say that if you do sue us, you can't

6    win, correct?

7    A    Correct.

8    Q    This is what you tell potential paying customers,

9    correct?

10   A    Correct.

11   Q    And if they do sue you, they have to pay your

12   attorney's fees, correct?

13   A    Correct.

14   Q    You used to use a video by a guy named Bill Booth,

15   correct?

16   A    Correct.

17   Q    Before the video that you used, there was a similar

18   video that had similar information but it showed a video

19   of Bill Booth, correct?

20   A    Correct.

21   Q    According to you, Bill Booth is a very knowledgeable

22   guy with respect to skydiving, correct?

23   A    Correct.

24   Q    He has a couple of skydiving patents.

25        Isn't that true?

Maynard - Direct/Mr. Antollino

483

1   A    That's true.

2   Q    In your opinion, he is an expert in the area of

3   parachuting and skydiving, correct?

4   A    Correct.

5   Q    Now, this expert, Bill Booth was recorded in a video

6   talking to potential passengers before they went up on

7   their jump, correct?

8   A    Correct.

9   Q    And when you talk about potential passengers, a lot

10  of them are going to be novices who have never gone up on

11  a skydive, correct?

12  A    Correct.

13  Q    Now, in the Booth video, he told your passengers

14  about the inherent risk that they would be taking by

15  making a tandem parachute jump, correct?

16  A    Correct.

17  Q    He told your students that each of the parachute

18  systems and people, all necessary for use to make a

19  parachute jump, is subject to malfunction or human error,

20  correct?

21  A    Correct.

22  Q    In the video he told your students there are -- in

23  the video he told your students that there is not now, nor

24  will there ever been a perfect parachute, correct?

25  A    Correct.

Maynard - Direct/Mr. Antollino

484

1    MR. ZABELL:  Objection, your Honor.  The entire

2    line of questioning has to do with the video that wasn't

3    shown to Ms. Orellana or Mr. Kengle.  He is talking about

4    a video that was heard.

5    MR. ANTOLLINO:  We don't need to show the video

6    to them.

7    THE COURT:  Well, you should focus on what

8    was -- if it is the same that was in the video and the

9    substance, that is fine.  But you should --

10   MR. ANTOLLINO:  I'm going to wrap it up.

11   BY MR. ANTOLLINO:

12   Q    Mr. Booth also said that there is no perfect

13   airplane, correct?

14   A    Correct.

15   Q    Mr. Booth also said there is no perfect parachute

16   instructor, correct?

17   A    Correct.

18   Q    And he also said, for that matter, there is no

19   perfect passenger/student, correct?

20   A    Correct.

21   Q    And you believe that what Bill Booth said was true,

22   correct?

23   A    Correct.

24   Q    So therefore you agree that there is not a perfect

25   student?

Maynard - Direct/Mr. Antollino

485

1    A    Correct.

2    Q    And the same thing is saying there is no perfect

3    student, that is like saying there is no perfect customer,

4    correct?

5    A    Correct.

6    Q    You have thousands of people coming through Skydive

7    Long Island in the summer, correct?

8    A    Correct.

9    Q    You can't have every customer happy, correct?

10   A    I don't -- what do you mean by happy?

11   Q    When they come through the Drop Zone, you can't have

12   everyone happy with the experience, correct?

13   A    Correct.

14   Q    Okay.  And you can't have everyone return, correct?

15   A    Correct.

16   Q    You know that to be true because this is a very

17   unusual activity, correct?

18   A    Correct.

19   Q    It's something very risky, correct?

20   A    Correct.

21   Q    It is inherently dangerous, correct?

22   A    Correct.

23   Q    Some students have unrealistic expectations about

24   what a skydive will be, correct?

25   A    Some do.

486

1   Q    And that's why you show them a video and make them

2   read the release, correct?

3   A    Correct.

4   Q    All right.  You do not want them reading the release

5   at the same time that they watch the video.  Do you?

6   A    No.

7   Q    You want them to read the release separately from

8   watching the video, correct?

9   A    Correct.

10   Q    All right.  Now, if two people come together, you

11   don't want one person explaining the release to another

12   person.  Do you?

13   A    No.

14   Q    And, in fact, you even tell the customers in your

15   video that if they want to, they can take this release,

16   consult an attorney and come back another day, correct?

17   A    Correct.

18   Q    Because they're giving up very important rights,

19   correct?

20   A    Correct.

21   Q    And you would welcome them to do that, correct?

22   A    Correct.

23   Q    You want passengers to have proper expectations when

24   they go up on the jump by watching the video and reading

25   the release, correct?

Maynard - Direct/Mr. Antollino

487

1  A    What do you mean by Drop Zone?

2  Q    Well, you want them to have expectations that are set

3  forth in this release, and the expectations that are set

4  forth in the video, correct?

5  A    I'm not sure what you mean by expectations.

6  Q    Well, you want them to know that there is no telling

7  what's going to happen up in the sky, correct?

8  A    To a point, yes.

9  Q    All right.  They could end up dead after the skydive,

10 correct?

11 A    Correct.

12 Q    All right.  Or they could have an exhilarating time?

13 A    Correct.

14 Q    So that would be the two polar opposites of the

15 experience in the skydive.

16        Would you agree?

17 A    Yes.

18 Q    Now, the first page of the release says that the USPA

19 recommends that a student be examined by a physician

20 before going on a skydive, correct?

21 A    Can I see that?

22 Q    Sure.

23        I'm directing your attention to the portion that

24 says medical certification.

25 A    I would like to read the rest of it.

Maynard - Direct/Mr. Antollino

488

1   Q     Well, we'll get to the rest of it.

2              But it does say in the first sentence that the

3   USPA recommends that all parachuters have a medical

4   examination.

5              Is that correct?

6              MR. ZABELL:  Your Honor, your Honor, I'm going

7   to object.

8              What he is showing him is not the Exhibit 36

9   that is in evidence.

10             MR. ANTOLLINO:  Well, this is an appendage to

11  the exhibit.

12             THE COURT:  We should make it clear.

13             MR. ANTOLLINO:  Well, we're making clear --

14  we've made clear that this document that I have held and

15  shown Mr. Maynard is the release signed by David Kengle,

16  correct?

17             MR. ZABELL:  Objection.

18  A     Read the rest of that, what you're reading to me.

19  The next paragraph would make sense.

20  Q     Okay --

21             MR. ZABELL:  Your Honor, I'm going to object.

22  He is asking him about a document that he is not moving

23  into evidence and he has not moved into evidence.

24             THE COURT:  All right.  Sidebar.

25             (Continued on the following page.)

Maynard - Direct/Mr. Antollino

489

1          (The following occurred at sidebar.)

2          MR. ANTOLLINO:  That is marked both Plaintiff's

3    Exhibit 36 and Defendants' X.

4          MR. ZABELL:  This is the only document that we

5    have that is 36.  That is a separate document that we know

6    what that is.  But that's not what was moved into

7    evidence.  This is counsel's binder.  This is what was

8    sent to me.

9          THE COURT:  What is the difference?  This is

10   part of the release?

11         MR. ZABELL:  It is a separate medical

12   certification that is not part of the release.  It is

13   given to them at the time they sign the release.

14         THE COURT:  You have these two as one document?

15         MR. ANTOLLINO:  Yes.

16         THE COURT:  Do you have any objection to this

17   coming in as a business record?

18         MR. ZABELL:  I don't have a problem with it

19   coming in, as long as it is introduced separately and not

20   as Exhibit 36.

21         MR. ANTOLLINO:  Well, the whole thing is, it's

22   Exhibit X.

23         THE COURT:  I'll make it clear to the jury that

24   it is coming in and I'll keep the number the same but it

25   is a separate document from the release.  Okay.

Maynard - Direct/Mr. Antollino

490

1    MR. ZABELL:  Thank you, judge.

2    MR. ANTOLLINO:  Thank you.

3    (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maynard - Direct/Mr. Antollino

491

1      (The following occurred in open court.)

2      THE COURT:  Members of the jury, this is another

3   document that is part of Plaintiff's Exhibit 36.  It is a

4   release and there is a document that is on top of the

5   release that there is no objection to its admission.  So

6   this one-page document is going to come in as well as part

7   of Exhibit 36.  Okay?

8      MR. ANTOLLINO:  And Defendants' X, judge.  It is

9   also Defendants' X.

10      MR. ZABELL:  We can call it 36-A.

11      THE COURT:  It is one document, if you want --

12   let me deem it 36-A, okay?

13      (Plaintiff Exhibit 36-A in evidence.)

14   BY MR. ANTOLLINO:

15   Q    What is the USPA?

16   A    It's the governing body for skydiving in the United

17   States.

18   Q    So they set the standards for what is safe and proper

19   for student skydivers, correct?

20   A    They use the guidelines what we should be doing, yes.

21   Q    What does USPA stand for?

22   A    United States Parachute Association.

23   Q    Now, you wanted me, on two occasions, to read the

24   second paragraph and I'm going to get to that now.

25      If they don't get examined, they have to certify

Maynard - Direct/Mr. Antollino

492

1   that they're not being treated for any ailments, correct?

2   A    Correct.

3   Q    All right.  And in that paragraph there is a point

4   about medical disorders, correct?

5   A    Correct.

6   Q    Do you know why?

7   A    Do I know why that's in there?

8   Q    Yes.

9   A    Because when people come to skydive, USPA recommends

10  they get a medical.  Nobody is going to do that.  So

11  saying that we want you to tell us to the best of your

12  ability that you are physically and mentally able to make

13  a skydive.  And that is what we're asking them to sign.

14  Q    And when you say mentally, you make specific mention

15  of nervous disorders, correct?

16  A    Yes.

17  Q    And why would nervous disorders be included in the

18  release?

19  A    Everyone is going to be nervous when they make a

20  skydive.  That's put in the release for an extreme,

21  extreme person that would not be able to do it.

22  Q    It doesn't say extreme, extreme person.  It says,

23  nervous disorder, correct?

24  A    Yes.

25  Q    It doesn't say extremely nervous.  It says, simply,

Maynard - Direct/Mr. Antollino

493

1   nervous disorder, true?

2   A    True.

3   Q    So because they sign this release, they cannot hold

4   Skydive Long Island liable for any injury, correct?

5              MR. ZABELL:  Objection.  Asked and answered.

6              THE COURT:  Sustained.

7   BY MR. ANTOLLINO:

8   Q    And any injury would be physical or emotional injury,

9   true?

10             MR. ZABELL:  Objection.

11             THE COURT:  I'll allow that question.

12             You can answer that.

13  A    What was the question again?

14             THE COURT:  Does injury include physical or

15  emotional injury?

16  A    Correct.

17  Q    In any way connected to the jump, correct?

18             MR. ZABELL:  Objection.

19             THE COURT:  You can answer that.  You can answer

20  again.

21  A    Correct.

22  Q    That's because you can never predict what's going to

23  happen on a jump, correct?

24  A    Correct.

25  Q    Now, since skydiving is an inherently dangerous

494

1    activity, you are aware that people have died from

2    skydiving in general, correct?

3    A    Correct.

4    Q    There have even been deaths at Skydive Long Island,

5    correct?

6    A    Correct.

7    Q    There was an incident where two experienced skydivers

8    crashed into each other during a skydive.

9              Is that correct?

10             MR. ZABELL:  Objection.

11             THE COURT:  Sustained on relevance grounds.

12             You don't have to go into that.

13   BY MR. ANTOLLINO:

14   Q    But some customers want the thrill of an inherently

15   dangerous activity, true?

16   A    True.

17   Q    And that person can't blame Skydive Long Island

18   because she chooses to go on an inherently dangerous

19   activity if something goes wrong, correct?

20             MR. ZABELL:  Objection.

21             THE COURT:  I think you can handle this.

22   BY MR. ANTOLLINO:

23   Q    Paragraph 3 of this release specifically alludes to

24   parties included in the jump, correct?

25   A    Correct.

Maynard - Direct/Mr. Antollino

495

1   Q    And among the parties included is not only you and

2   the Board of Directors, but it also includes jump masters,

3   flyers of the aircraft and instructors, correct?

4   A    Correct.

5   Q    In every jump an instructor will try to avoid it and

6   adapt to the situation as best he can?

7   A    Avoid what?

8   Q    Avoid any danger and adapt the skydive to the

9   situation as best the skydive instructor can?

10  A    Correct.

11  Q    All right.  Now, earlier today you saw a video of Don

12  with a passenger not involved in this case.

13         Is that right?

14  A    Correct.

15  Q    Okay.  And you recognized Don on that video.  You

16  recognize Don on that video?

17  A    Correct.

18  Q    That was a video that was taken at Skydive Long

19  Island and produced to plaintiff in the litigation leading

20  up to this trial, correct?

21  A    Correct.

22         MR. ZABELL:  Your Honor, I'm just going to ask

23  for a moment.

24         (There was a pause in the proceedings.)

25         MR. ANTOLLINO:  I would deem this Plaintiff's

Maynard - Direct/Mr. Antollino

496

1    Exhibit 53.

2            THE COURT:  Any objection?

3            MR. ZABELL:  No objection.

4            THE COURT:  All right.  53 is admitted and you

5    can play it for the jury.

6            (Plaintiff Exhibit 53 in evidence.)

7    BY MR. ANTOLLINO:

8    Q    Let me just ask you, what is that helmet that says

9    Get Some on it?

10   A    What was the question?

11   Q    Can you read it back?

12           (Question was read back.)

13   A    It's a helmet that says Get Some on it.

14   Q    And it says more than one video at Skydive Long

15   Island.

16           Is that correct?

17           MR. ZABELL:  Objection.

18           THE COURT:  Sustained.

19   Q    Do you know who owns it?

20   A    No, I do not.

21   Q    Okay.  Have you seen it in videos of customers that

22   purchased them at Skydive Long Island?

23   A    No, I have not.

24           (The tape was played.)

25           (The tape was stopped.)

Maynard - Direct/Mr. Antollino

497

1    BY MR. ANTOLLINO:

2    Q    All right.  Who do you recognize as being the

3    instructor of the African American gentleman there?

4    A    Don Zarda.

5              (The tape was played.)

6              (The tape was stopped.)

7    Q    All right.  Would you say that's a typical atmosphere

8    before someone jumps?

9    A    Yes.

10   Q    And you saw Don in the background, quote-unquote,

11   hamming it up for the camera, correct?

12   A    Correct.

13   Q    You heard Rich Winstock last week referred to that as

14   enhancing the video, correct?

15   A    Correct.

16   Q    That is what he was doing, correct?

17   A    Correct.

18             (The tape was played.)

19             (The tape was stopped.)

20   BY MR. ANTOLLINO:

21   Q    Now, you notice there that the gentlemen that is on

22   his left -- let's just go back a little bit.

23             (The tape was played.)

24             (The tape was stopped.)

25   Q    There.  Did you see that?  The gentleman that Don was

Maynard - Direct/Mr. Antollino

498

1    with and how close they were?

2    A    He is what?

3    Q    Do you see how close Don and the customer were?

4    A    Yes.

5    Q    Was there anything inappropriate about them being

6    that close?

7    A    No.

8              (The tape was played.)

9              (The tape was stopped.)

10   Q    Okay.  Do you see anything unusual about that video,

11   whatsoever, in comparison to the typical Skydive Long

12   Island video of a customer jump?

13   A    No.

14   Q    Now, if a customer is uncomfortable, it is the job of

15   the skydive instructor to do his best to make sure that

16   the customer is as comfortable as he or she can possibly

17   do, correct?

18   A    Correct.

19   Q    If there is a physical danger, the instructor will

20   try to avoid it, correct?

21   A    Correct.

22   Q    All right.  Now, if the customer says something is

23   bothering her, you expect the skydive instructor to

24   respond to that, correct?

25   A    Correct.

Maynard - Direct/Mr. Antollino

499

1   Q    It might be that something is happening because it is
2   part of the skydive, correct?
3   A    Could be.
4   Q    And it would be good in that instance to explain to
5   the customer that this is happening because of whatever
6   reason, correct?
7   A    Correct.
8   Q    And there might be some instances where the customer
9   is strapped too tight and -- I'm sorry -- that the
10  passenger is strapped too tight and the instructor says,
11  Well, if I loosen this, it's going to put you in physical
12  danger, correct?
13  A    If they were strapped too tight, yes.
14  Q    Sometimes they might be strapped too tight and the
15  instructor says, Well, there is a little bit I can give,
16  and I'll loosen it a half an inch or so, correct?
17  A    No.  When an instructor straps you in, they know how
18  tight to make it so they're not strapped too tight.
19  Q    So it's one size fits all?
20  A    No.  They're the harness is completely adjustable.
21  Q    It's not like when you go to bowling and you say, My
22  shoe size is 10, correct?
23  A    Correct.
24  Q    There is one size tandem jumpsuit and it has to be
25  adjusted for each passenger, correct?

Maynard - Direct/Mr. Antollino

500

1    A    We don't put jumpsuits on.

2    Q    Well, what would you call them, harnesses?

3    A    Harness.

4    Q    Okay.  When you strapped on a harness to a customer,

5    it's one size fits all and it has to be adjusted to the

6    customer and to the instructor, correct?

7    A    I believe that there may be different size harnesses,

8    but most likely we adjust it based on each person.

9    Q    Okay.  Now, in paragraph 5 of the waiver, it talks

10   about risks contemplated on the jump, correct?

11   A    Correct.

12   Q    And in this paragraph -- by the way, before you --

13   let me withdraw that question and ask you.

14        You require all of your students to initial each

15   paragraph on the release, correct?

16   A    Correct.

17   Q    So they sign the first page as the medical

18   certificate, correct?

19   A    Correct.

20   Q    They initial each paragraph from 1 to 24, correct?

21   A    Correct.

22   Q    You want to be able to show that the potential

23   passenger had the opportunity to read the paragraph and

24   that his eyes were on that page, at least, correct?

25   A    Correct.

Maynard - Direct/Mr. Antollino

501

1    Q    And preferably you want the passenger to read the

2    entire release and understand it, correct?

3    A    Correct.

4    Q    If they have a question about it, you want them to

5    bring it up to you at the skydive center, correct?

6    A    Correct.

7    Q    And you, if you cannot answer the question, you

8    advise them to consult an attorney, correct?

9    A    Correct.

10    Q    So, in paragraph 5, the passenger releases Skydive

11    Long Island even if someone at Skydive Long Island is

12    negligent, correct?

13    A    Correct.

14    Q    That means that if, by mistake, someone does

15    something unsafe, you can't sue Skydive Long Island,

16    correct?

17    A    Correct.

18    Q    And we already went over paragraph 9 that says if you

19    do sue, you have to pay your attorney's fees in defending

20    the suit, correct?

21            MR. ZABELL:  Objection.

22            THE COURT:  Sustained.  We've been through this

23    already.

24    BY MR. ANTOLLINO:

25    Q    Alright.

Maynard - Direct/Mr. Antollino

502

1          Now I want you to read aloud paragraph 13 to

2     this release?

3               MR. ZABELL:  Objection, your Honor.

4               THE COURT:  What's the objection?

5               MR. ZABELL:  Relevance.

6               THE COURT:  Why don't you come up.

7               (Continued on the following page.

Maynard - Direct/Mr. Antollino

503

1          (The following occurred at sidebar.)

2          MR. ZABELL:  He already testified on multiple

3    occasions about the closeness.  There is no -- we

4    stipulate that the jumper --

5          THE COURT:  You're going too slow.  You have

6    been 45 minutes already.

7          MR. ANTOLLINO:  If I go too fast there will be

8    objections.  And I don't know what to tell you, judge.

9          THE COURT:  You're rehashing every aspect of the

10   waiver multiple times.

11         MR. ANTOLLINO:  I'm almost finished with the

12   waiver.

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Maynard - Direct/Mr. Antollino

504

1          (The following occurred in open court.)

2     BY MR. ANTOLLINO:

3     Q    Can you read paragraph 3?

4     A    I am making a student jump.  I understand that I will

5     be wearing a harness which needs to be adjusted by a jump

6     master.  My jump is a tandem jump.

7          I understand the tandem master will attach my

8     harness to his and that this part of my body goes in close

9     proximity to the tandem master.

10         I specifically agree to this physical contact

11    between me and the tandem master and myself.

12    Q    So you tell the potential customers that they're

13    going to be touched by the instructor, correct?

14    A    Correct.

15    Q    And you make them initial that paragraph, correct?

16    A    Correct.

17    Q    And men and women have to read that paragraph and

18    initial it, correct?

19    A    Correct.

20    Q    And that's true whether the instructor or the

21    passenger is straight or gay, correct?

22    A    Correct.

23    Q    Anyone who does not read that paragraph cannot

24    understand the nature of tandem skydiving.

25         Would you agree with that?

Maynard - Direct/Mr. Antollino

505

```
 1                  MR. ZABELL:  Objection.

 2                  THE COURT:  Sustained.

 3    BY MR. ANTOLLINO:

 4    Q    Do you expect a potential passenger to read that

 5    paragraph in order to understand every aspect of the

 6    skydive and what's going to happen?

 7                  MR. ZABELL:  Objection.

 8                  THE COURT:  He can answer that.

 9    A    I want them to read that and initial it, correct.

10    Q    Could you answer the question?

11                  MR. ZABELL:  Objection.

12                  THE COURT:  Sustained.

13                  He can't answer the question.

14    BY MR. ANTOLLINO:

15    Q    You don't expect passengers to know how to strap on

16    gear, correct?

17    A    Correct.

18    Q    You don't expect them to know how to manipulate the

19    gear, correct?

20    A    Correct.

21    Q    You would not expect the clients to know the

22    intricacies of what is safe and not safe?

23    A    Correct.

24    Q    Now, Rich Winstock last week described this as

25    invading the passenger's space.
```

506

1    Would you agree with that assessment?

2    A    Yes.

3    Q    Now, if the student gets -- has signed a release,

4    watched the video and gets into the aircraft, can she ask

5    to get out of the aircraft if it has not taken off?

6    A    Yes.

7    Q    And this is true even if she is strapped up or not

8    strapped up.

9         Is that correct?

10   A    Correct.

11   Q    Has there ever been a situation like that, that you

12   can recall, at Skydive Long Island?

13   A    No, I do not.

14   Q    But it would be allowable if someone said, I've

15   changed my mind, I don't like how this feels, let me out?

16   A    Yes.

17   Q    Now, what if the passenger is up in the air and has a

18   change of heart, she doesn't want to go out on the jump?

19   Have you ever had a situation like that where the

20   passenger doesn't make the jump when they go up in the

21   air?

22   A    Yes.

23   Q    So therefore, it would be logical to conclude that it

24   is completely allowable for someone to say, I changed my

25   mind, I'm not going to jump, when the airplane is up in

Maynard - Direct/Mr. Antollino

507

1  the air, correct?

2  A    Correct.

3  Q    Would you agree that a student who is uncomfortable

4  should tell the instructor that she is uncomfortable?

5  A    Yes.

6  Q    And that way the instructor can either explain why

7  she might have to be uncomfortable or adjust the harness

8  to her comfort, correct?

9  A    Correct.

10 Q    Or give her a chance to get off the ride altogether,

11 correct?

12 A    Correct.

13 Q    Now, you expect your instructors to have experience,

14 correct?

15 A    Yes.

16 Q    Don had all the experience that you were looking for,

17 correct?

18 A    Correct.

19 Q    And you expect all of your instructors to use their

20 best judgment in adjusting the straps during the dive,

21 correct?

22 A    Correct.

23 Q    Now, at the time that he died, Don Zarda had over

24 5,000 jumps to his credit, correct?

25 A    I don't know how many jumps Don had when he died.

Maynard - Direct/Mr. Antollino

508

```
1    Q    Well, he had more than you when you were deposed.

2         Is that correct?

3    A    Yes.

4    Q    Now, aside from deaths, there is about at least one

5    accident a year at Skydive Long Island, correct?

6         MR. ZABELL:  Objection.

7         THE COURT:  I already sustained the objection.

8    We're not going to go into that.

9    BY MR. ANTOLLINO:

10   Q    Okay.  You have gotten cases -- you have had people

11   sue you?

12        MR. ZABELL:  Objection.

13        THE COURT:  Sustained.

14        When I sustained that objection, that doesn't

15   mean to ask the same question on the same topic, okay?

16   You move to a different topic.

17   BY MR. ANTOLLINO:

18   Q    And you thought Don was a good instructor, correct?

19   A    Correct.

20   Q    He was liked by his he co-workers, correct?

21   A    Correct.

22   Q    Do you recognize the e-mail address

23   Ray@optonline.net?

24   A    That was an old e-mail I had, yes.

25   Q    And do you recognize the e-mail
```

Maynard - Direct/Mr. Antollino

509

1    funjumps@SkydiveLongIsland.com, correct?

2    A    That's the e-mail address that we used then, yes.

3    Q    Now, I'm handing you Defendants' Exhibit N and I'm

4    going to ask you if this is, in fact, an e-mail that you

5    received at JumperRay@optonline.net and you sent to

6    FunJump@SkydiveLongIsland.

7              MR. ZABELL:  Objection.

8              It's not -- I'm looking at my Exhibit N and that

9    is not Exhibit N.

10             THE COURT:  Do you want to show it to him?

11             MR. ZABELL:  Okay.  It is one page of an

12   exhibit.

13             MR. ANTOLLINO:  Is there another page?

14             MR. ZABELL:  There is many pages, that is why it

15   says 1 of 4.

16             MR. ANTOLLINO:  Is there another page?

17             MR. ZABELL:  Your Honor, I think we need a

18   sidebar on this.  This was one of the issues that we

19   raised.

20             THE COURT:  Why don't we take a break.  You

21   don't have to say anything, okay?

22             We'll take the morning break.

23             (The jury left the courtroom.)

24             THE COURT:  What is the issue, Mr. Zabell?

25             MR. ZABELL:  Okay.  This is page 24 of

Maynard - Direct/Mr. Antollino

510

1   Exhibit -- of Defendants' Exhibit X.  Defendants'

2   Exhibit N is the declaration, Don Zarda's declaration.

3   And counsel wants to introduce it into evidence with the

4   subject of this weekend's motions.

5          MR. ANTOLLINO:  No, a separate portion of it.

6          THE COURT:  Hold on.

7          MR. ANTOLLINO:  I do want -- may I show it to

8   you?

9          THE COURT:  I understand, obviously, the issue

10  with the declarations which I'll get to when we finish

11  with Mr. Maynard.  But just because something is attached

12  to the declaration doesn't mean he can't try to get it in

13  through his demands.

14         MR. ZABELL:  No, no, I understand that.  I have

15  to say, I kind of panicked a little bit when I looked at

16  Exhibit N and I did not see this and then saw where it

17  came from.  The e-mail itself, I don't have an objection

18  to.  It's a -- somebody submitted an e-mail complimenting

19  Mr. Zarda -- their jumper, Mr. Zarda.  I don't think it is

20  relevant, but I don't have any objection.

21         THE COURT:  Are there other documents that

22  you're asking Mr. Maynard about?  I don't want to chance

23  sidebars.  Are there other ones?

24         MR. ANTOLLINO:  Well, there were many things he

25  looked at at his deposition, including how to strap up.

Maynard - Direct/Mr. Antollino

511

1   And that's -- his deposition is marked as an exhibit and

2   were an exhibit to his exhibits.  There are also pictures

3   on his Facebook page.  There are also comments on his

4   Skydive Long Island page.  There are also things that I

5   would give him to refresh his recollection.  And I'm

6   trying to use the Defendants' exhibits to avoid a problem

7   in authenticity.

8       THE COURT:  So there is a document about how to

9   strap someone up?

10      MR. ANTOLLINO:  That is a document that shows a

11  picture of about how someone is strapped up.

12      THE COURT:  Any objection to that?

13      MR. ZABELL:  No, as long as he lays a proper

14  foundation.

15      I'm concerned that counsel thinks that just

16  because he questioned Mr. Maynard at his deposition about

17  a document or we turned the document over in discovery,

18  that it is automatically admissible.

19      THE COURT:  That is not the case.

20      So he is not -- just because it was shown at

21  deposition doesn't mean it's going to come in at the

22  trial.

23      MR. ANTOLLINO:  I agree, judge.  But I'm going

24  to ask him a question about it.  And further, you know,

25  the pretrial order is for him to say what is authentic and

512

1   what is not.  And we seem to have to lay a foundation for

2   something that he hasn't objected to on the grounds of

3   business records or foundation or whatnot.

4           THE COURT:  I haven't seen that.  I saw him

5   agree to certain things that come in as business records

6   without laying a foundation.  But what about the Facebook

7   page?

8           MR. ANTOLLINO:  Well, the Facebook page has lots

9   of personal comments.  And this is not his personal

10  Facebook page.  This is Skydive Long Island's Face --

11  business Facebook page where he makes lots of personal

12  comments about his life to his customers.

13          MR. ZABELL:  If I can for a moment put myself in

14  Mr. Antollino's mind, I think he is talking about comments

15  that were posted on a Facebook page about his

16  deteriorating relationship with his ex-wife.

17          I don't see how that is relevant.  Again,

18  through plaintiff's case, the actual jumper came in and

19  talked about what she complained about.  It wasn't that

20  Mr. Zarda has shared personal facts with her.  It was the

21  timing of the sharing of the personal facts.

22          THE COURT:  This Facebook page is a website

23  Facebook page or his personal Facebook page?

24          MR. ANTOLLINO:  The company's Facebook page.

25          THE COURT:  Do you have an exhibit number?

Maynard - Direct/Mr. Antollino

513

1          MR. ANTOLLINO:  Yes.  That is Exhibit 7.

2          THE COURT:  All right.  I'll look at it during

3    the break.  Okay?  Let's take a break.

4          MR. ANTOLLINO:  Okay, judge.

5          (A recess was taken.)

6          (After recess the following occurred.)

7          THE COURT:  On the posting of the website,

8    again, my understanding is that this is the Skydive Long

9    Island page and it looks like this is an entry that

10   Mr. Maynard put on that page regarding his ex-wife.  I

11   think that certainly is relevant on the issue of the

12   timing of it and whether or not there is a difference

13   because it's not during a dive versus posting it for

14   anyone to ignore it.  If they would just ignore it, I

15   think it goes to the weight.  But I think it should come

16   in.

17          It looks like it's -- there are two of these,

18   right?  I assume it is the same edition, cumulative?

19          MR. ANTOLLINO:  Right.

20          THE COURT:  How many are you using, just those

21   two?

22          MR. ANTOLLINO:  Just a couple.

23          THE COURT:  What do you mean a couple?  Beyond

24   what I see here?  I see one where he has his arm around

25   his wife.

Maynard - Direct/Mr. Antollino

514

1          MR. ANTOLLINO:  Yes.

2          THE COURT:  And there is another one, a picture

3     of them over coffee or something or a soda?

4          MR. ANTOLLINO:  Yes.

5          THE COURT:  Is that --

6          MR. ANTOLLINO:  The comment about his pathetic,

7     crazy ex-wife, which she testified, Why did you feel the

8     need to mention this on the business Facebook page?

9          THE COURT:  I'm going to allow it in.  I just

10    want to make sure there is not a series of those.

11         MR. ANTOLLINO:  No.

12         MR. ZABELL:  Your Honor, I have the ruling.  I'm

13    not arguing.  But full disclosure, there are, there are

14    two different Skydive Long Island or Skydive LI Facebook

15    pages.  My client is prepared to testify about both of

16    them and who was able to see them.

17         I just don't want to mislead in my silence that

18    this is something that is completely available to

19    everybody.

20         MR. ANTOLLINO:  It was available to me.  I liked

21    it and I've been following Skydive Long Island for five

22    years.

23         THE COURT:  I'm just saying it goes to weight.

24    You can cross-examine your client on who can see this and

25    all of the circumstances surrounding this, but your

Maynard - Direct/Mr. Antollino

515

1  silence is not acquiesce --

2         MR. ZABELL:  I just did not want to mislead

3  anyone by my silence.

4         THE COURT:  All right.

5         I'm going to ask you to try to move it along

6  more quickly.  I don't know how much more background you

7  have.

8         MR. ANTOLLINO:  When I go too fast, judge, the

9  tensions rise and people get upset.  I'm just trying to go

10 as smoothly as possible.  I understand, judge, we're in

11 the second week.  I just want it to go as smoothly as

12 possible without objections.  So by going slow and asking

13 questions that end with, correct, I don't get an objection

14 from him that I didn't ask a question, I just made a

15 statement.  And that avoids the sidebar.  So I'm doing it

16 very carefully to avoid other mishegas, so --

17        THE COURT:  I'm the judge.  I'm telling you it's

18 going too slow.  I don't know why you're doing it.  If

19 you're anticipating to go a little faster that Mr. Zabell

20 may be jumping up and down.  I don't know why you're doing

21 it.  I'm just telling you, you're taking too long.  So for

22 whatever reasons you have for doing it, it's taking too

23 long.

24        I have been patient.  I'm waiting.  We have 45

25 minutes.  But I'm just telling you to try to move it along

516

1  a lit quicker, okay?

2         MR. ZABELL:  Judge, I do note that Mr. Kengle

3  has returned, so we can take him now.

4         THE COURT:  Do you want to do that,

5  Mr. Antollino?

6         MR. ANTOLLINO:  Let me consult with counsel.

7         As long as we can agree that Mr. Cardinale can

8  call him and we -- we can agree to that now, we'll call

9  him and have Mr. Cardinale ask questions and lead rather

10 than have to go through what we went through last week.

11        THE COURT:  Well, you can call him, I guess, but

12 I -- again, I haven't heard his deposition testimony but I

13 assume he is adverse in the same way that Mr. --

14        MR. ANTOLLINO:  He was the one that made the

15 complaint.

16        THE COURT:  I understand.  I understand that.

17        Okay.  Any objection?

18        MR. ZABELL:  No.

19        THE COURT:  So you can step down.  You can say

20 that for the record.

21        MR. ZABELL:  Yes, I'm sorry.

22        I have no objection.

23        MR. ANTOLLINO:  I need a second to set up

24 Mr. Kengle's video and move these things over so Rich can

25 call Mr. Kengle and ask the questions.

Maynard - Direct/Mr. Antollino

517

1          THE COURT:  Has Mr. Kengle seen the video yet?

2          MR. ANTOLLINO:  Yes.

3          THE COURT:  Okay.

4          MR. ANTOLLINO:  Judge, do you want me to seat

5     Mr. Kengle?

6          THE COURT:  Yes, he can come up.

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

518

1          THE COURT:  Are we ready?

2          MR. ANTOLLINO:  Judge, this witness has seen the

3   video, is that correct, Mr. Kengle?

4          MR. KENGLE:  Yes.

5          MR. ANTOLLINO:  You've seen the video of

6   yourself.

7          MR. KENGLE:  My video.

8          THE COURT:  All right.

9          (Whereupon, the jury at this time enters the

10  courtroom.)

11         THE COURT:  If everyone will be seated.  As we

12  did last week, we'll take a witness out of order.  The

13  order of a witness doesn't matter obviously so we'll

14  interrupt Mr. Maynard's testimony and then we'll go back

15  to it.

16         MR. CARDINALE:  Plaintiff calls David Kengle.

17         THE CLERK:  Raise your right hand.

18  **DAVID KENGLE**

19         having been first duly sworn, was examined and

20         testified as follows:

21         THE CLERK:  Please spell your name for the

22  record.

23         THE WITNESS:  David K-E-N-G-L-E.

24         THE COURT:  Have a seat, Mr. Kengle.

25

Kengle - Direct/Cardinale

519

1    DIRECT EXAMINATION

2    BY MR. CARDINALE:

3    Q    You and I never met before?

4    A    I don't believe so.

5    Q    And we've never seen each other before?

6    A    No.

7    Q    Mr. Kengle, in which county do you reside in?

8    A    Suffolk County.

9    Q    Are you presently employed?

10   A    Yes.

11   Q    What is your employment?

12   A    I'm a bartender.

13   Q    I'll direct your attention to June 18, 2010.  Do you

14   remember that date?

15   A    Yes.

16   Q    That was the day you went skydiving with Skydive Long

17   Island?

18   A    Yes.

19   Q    And you went with your girlfriend Rosana Orelana?

20   A    Orelana.

21   Q    And you are still with Ms. Orelana today?

22   A    Yes.

23   Q    And she was your girlfriend on June 18, 2010?

24   A    Yes.

25   Q    And when -- before you went on the plane at Skydive

Kengle - Direct/Cardinale

520

1    Long Island on June 18, 2010, you watched a video which

2    gave you instructions; am I correct?

3    A    Yes.

4    Q    And the video explained to you that you and Rosana

5    would be in close physical proximity with the skydiving

6    instructor; is that correct?

7    A    Correct.

8    Q    You and Rosana also signed some forms, is that true?

9    A    Yes.

10   Q    And you read those forms?

11   A    Yes.

12   Q    And those forms stated you would not hold Skydive

13   Long Island responsible for any harm that came to you

14   while skydiving, correct?

15   A    Yes.

16   Q    The forms also state that you consented to being

17   touched by a instructor, true?

18   A    Yes.

19   Q    And the form also stated that you consented that you

20   would be in close physical proximity to the instructor, is

21   that true?

22   A    If you are telling me if that's true, I don't

23   remember the form.

24   Q    Okay.  I'll hand you what has been received in

25   evidence as Plaintiff's Exhibit 36.

Kengle - Direct/Cardinale

521

1          May I approach the witness, your Honor?

2   A    Yes.

3   Q    That document is in evidence.  Did you sign that

4   document?

5   A    Yes.

6   Q    Please read paragraph 13 for the jury.

7   A    If I am making a student jump I understand I'll be

8   wearing a harness which will need to be adjusted by the

9   jumpmaster.  If my jump is a tandem jump I understand that

10  the tandem master will attach my harness to his and this

11  will put my body in close proximity to that of the tandem

12  master.  I specifically agree to physical contact between

13  the tandem master and myself.

14  Q    Do you remember signing that document?

15  A    I do.

16  Q    And Rosana also signed the same document?

17  A    Yes.

18  Q    And did -- do you know if Rosana read the form before

19  signing that?

20  A    She did.

21  Q    Now, with regard to your relationship with Rosana,

22  you have referred to yourself as the brains of the

23  operation; is that right?

24  A    True.

25  Q    And you also described yourself as the legal person

522

1    in the relationship?

2    A    I guess.  I don't know.  I don't know what that means

3    by that, but okay.

4    Q    Do you remember testifying at a pretrial deposition

5    in this case?

6    A    It sounds like you are referring to a joke I made at

7    the time or something like that, but I'm not aware.  We

8    don't have any lawyers, so I mean the legal -- I don't

9    know.

10   Q    You described yourself in your deposition as being

11   the legal person in the relationship.  Those were the

12   words you used; is that correct?

13   A    I don't know what you are talking about.

14   Q    Do you remember giving a deposition in this case on

15   November 9, 2011?

16   A    Yes.

17   Q    You were under oath?

18   A    Yes.

19   Q    You testified truthfully?

20   A    I did.

21   Q    I will refer you to page 16 of the deposition,

22   line 7.

23         Question:  Was she reading the document?

24         Answer:  Yes, I mean she probably skimmed it.  I

25   don't think she read it as attentive as I did.  I don't

Kengle - Direct/Cardinale

523

1   recall.  She may have, I done know, just knowing that I

2   assume, you know.  I would assume you know she probably

3   left it for me.  She trusts my judgment.  I'm kind of the

4   brains of the operation, I guess.  I'm the legal person,

5   you know.

6   Q    Did you give that -- were you asked that question and

7   did you give that answer during your deposition.

8        MR. ZABELL:  Objection, your Honor.  He doesn't

9   have the deposition transcript in front of him.

10        THE COURT:  Do you want to show it to him?

11        MR. CARDINALE:  Sure?

12        Handing you a transcript of your deposition.

13   Please read line 7.

14   A    It's what you just read, yes.

15        MR. CARDINALE:  Is that correct?

16        THE WITNESS:  Yes.

17   Q    You did testify that you were the legal person in the

18   relationship, yes?

19   A    In the middle of my testimony it seems like I made a

20   joke so I don't know what that means.  But yes, true.

21   Q    Thank you.

22        Now, before you went up on the plane, you paid

23   for the jump for you and Rosana; is that correct?

24   A    Yes.

25   Q    And were you employed at the time?

Kengle - Direct/Cardinale

524

1    A    Yeah.

2    Q    And you also paid extra money to have the jump

3    videotaped, is that true?

4    A    Yes.

5    Q    And you've seen this videotape?

6    A    I have.

7         MR. CARDINALE:  Your Honor, may I have a second,

8    please.

9         Your Honor, I'll play Plaintiff's Exhibit 53.

10        THE COURT:  Okay.  Is there any objection to the

11   admission of 53?

12        MR. ZABELL:  No, your Honor.

13        THE COURT:  Exhibit 53 is admitted and may be

14   played for the jury.

15        MR. CARDINALE:  Mr. Kengle, it should be on the

16   screen.

17        MR. ZABELL:  53 was already admitted.

18        THE COURT:  Hold on.

19        MR. ZABELL:  53 was already admitted, was

20   something called Don's video.

21        MR. ANTOLLINO:  54 then, your Honor, I'm sorry.

22        THE COURT:  Okay, 54.

23        (Whereupon, Plaintiff Exhibit 54 was received in

24   evidence.)

25        (Video clip played.)

Kengle - Direct/Cardinale

525

BY MR. CARDINALE:

Q    Mr. King, how many times have you seen this video since June of 2010?

A    Not many.  Couple times.

Q    Couple times, meaning two?

A    I don't know.

Q    You were able to hear what was said on the video when you were seated?

A    Yes.

Q    Isn't it true that during the video you were asked by one of the instructors how you were feeling?

A    Yes.

Q    And you testified you felt great?

A    Uh-huh.

Q    You also testified that you were doing good?

A    Yes.

Q    You also made the thumbs up hand gestures, is that true, to the videographer?

A    Yes.

Q    What did that mean, the thumbs up hand gesture?

A    We were ready to jump out of the plane.

Q    You were having a good time?

A    Yes.

Q    Is it fair to say your girlfriend Rosana seemed happy on the video?

Kengle - Direct/Cardinale

526

1    A    Yes.

2    Q    And at one point you saw her pucker her lips for the

3    camera?

4    A    Yes.

5    Q    At the end of the video, you were asked how was the

6    jump in sum and substance.

7         Do you remember that?

8    A    Yes.

9    Q    What was your response?

10   A    I said great, awesome.

11   Q    What were the exact words she used?

12   A    Do you want to play it again?

13   Q    I'll hand you your deposition.

14        Page 48, line 17.

15        Mr. Kengle, please turn to page 48, line 17.

16        Tell me when you get there?

17   A    I'm there.

18        Read it?

19   Q    Yes.  During your deposition, were you asked these

20   questions and did you give these answers?

21        Question:  I see at some point at the very end

22   you were asked how your experience was and what were your

23   exact words?

24        Answer:  Awesome.

25        Question:  Was it anything more than that?

527

1          Answer:  I'm sorry?

2          Question:  Was there something awesome or an

3    adjective to describe awesome?

4          Answer:  Fucking awesome, I believe it was.

5          "Question:  Was that true at that time?

6          Answer:  Jumps out of the plane, yeah, it was

7    pretty fucking awesome."

8          Did you give that testimony during your

9    deposition?

10   A    I did.

11   Q    I'm sorry?

12   A    I did.

13   Q    Now, you remember skydiving on June 18, 2010,

14   correct?

15   A    I do.

16   Q    Do you remember being on the plane with your

17   instructor?

18   A    I do.

19   Q    Do you remember your instructor's name?

20   A    I do not.

21   Q    Okay.  Did your instructor inform you that he was

22   from New Zealand?

23   A    I don't remember.

24   Q    Did you discuss anything personal with your

25   instructor about where he was from?

Kengle - Direct/Cardinale

528

1    A    Did I discuss anything where he was from?

2    Q    Did he discuss anything personal with you, the

3    instructor, like where he was from?

4    A    I don't consider telling me where he was from being

5    personal, but sure, if you tell me that he told me where

6    he was from yes.  But he didn't tell me --

7    Q    When you were flying on the plane to the Drop Zone,

8    you were in close physical proximity with your instructor?

9    A    I was.

10    Q    While you were on the plane, your body was touching

11    your instructor's body?

12    A    It was.

13    Q    You were sitting between your instructor's open legs?

14    A    Yes.

15    Q    Your back was attached to the front of his body?

16    A    It was.

17    Q    You are attached to the instructor's hips?

18    A    I was.

19    Q    How long were you on the plane before you got to the

20    Drop Zone?

21    A    I don't know.  A few minutes.

22    Q    Ten, fifteen minutes, or longer when you say a few?

23    A    I don't know.  I don't know the exact number.

24    Q    During the time in the plane, you observed your

25    girlfriend Rosana being strapped to her instructor?

Kengle - Direct/Cardinale

529

1   A    Yes.

2   Q    And he was Don Zarda?

3   A    He was.

4   Q    And while Rosana was being attached to Mr. Zarda, one

5   of the other instructed stated how do you feel about your

6   girlfriend being strapped to another guy?

7           MR. ZABELL:  Objection.

8           THE COURT:  What is the objection?

9           MR. ZABELL:  It's misleading the witness based

10  upon the testimony that has been adduced so far during the

11  trial.

12          THE COURT:  The witness can answer independent

13  of any other testimony.

14  A    Somebody made a joke to that effect.

15  Q    What was said exactly?

16  A    Along the lines, you know, your girlfriend will be

17  strapped to another guy, ah-ha.

18  Q    And Don Zarda did not make the comment, true?

19  A    I don't know who made it.

20  Q    But did Don Zarda make it?

21          MR. ZABELL:  Objection, asked and answered.

22          THE COURT:  You can answer that, if you

23  remember.

24  A    Somebody made it.  I mean I really don't remember who

25  made it, but somebody made it.

Kengle - Direct/Cardinale

530

1   Q    Okay.  Do you still have your deposition in front of

2   you?

3   A    I do.

4   Q    I refer you to page 20, line 8.  Tell me when you get

5   there?

6   A    I'm there.

7            Question:  Who made the joke about, did you know

8   that your girlfriend was going to be strapped to another

9   guy?

10           Answer:  I think it was a third instructor that

11  was neither one of our instructors.

12           Question:  Did everyone laugh?

13           Answer:  I think it was the guy with the camera,

14  actually.

15           Question:  The guy with the camera?

16           Answer:  Maybe."

17           Were you asked those questions and did you give

18  those answers during your deposition?

19  A    I did.

20  Q    I also refer you to page 42 of your deposition,

21  line 23.  Tell me when you get there?

22  A    I'm there.

23           Question:  Who made the joke about being

24  strapped to your girlfriend, was that that Don or someone

25  else?

Kengle - Direct/Cardinale

531

1            Answer:  It was definitely somebody else because

2    it was -- I remember it being how do you feel about this

3    guy getting strapped to your girlfriend?  I don't remember

4    exactly which of the instructors it was but it was

5    definitely not Don.

6            Did you give that testimony?

7    A    I did.

8    Q    As you sit here today, do you recall that Don did not

9    make that comment?

10   A    It was probably somebody else because where I say

11   about somebody else being strapped to your girlfriend,

12   yeah.

13   Q    You said probably it was somebody else?

14   A    Yes.

15   Q    Isn't it true during your deposition you said it was

16   definitely not Don?

17   A    This was four years ago.  The jump was five years

18   ago, so I mean I probably have a better memory of it then,

19   but --

20   Q    During your deposition, you didn't use the word

21   "definitely," true?

22   A    I did.

23   Q    Did you like that joke?  Were you offended by it?

24   A    I wasn't offended by it.  Did I like it?  You know,

25   it was a type of joke -- I'm not thrilled about it.  I can

Kengle - Direct/Cardinale

532

1    take a joke.

2    Q    Is it fair to say that you believe Don Zarda touched

3    Rosana in an inappropriate manner on the plane?

4    A    Yes.

5    Q    When you saw them you weren't so concerned about your

6    judgment, correct?

7    A    Yes.

8    Q    You realized when you go skydiving you have to rely

9    on your judgment of the instructor, isn't that true?

10   A    Correct.

11   Q    Your life is in the instructor's hands.

12   A    It is.

13   Q    But you didn't say anything to Mr. Zarda about the

14   touching, did you?

15   A    I did not, no.

16   Q    And you didn't ask to be brought back to the ground

17   to receive a replacement instructor for Rosana?

18   A    No, I did not.

19   Q    You allowed your girlfriend's life to be placed in

20   the hands of whose judgment you questioned?

21   A    Now that I think about it, you are taking it a little

22   too far because I questioned the appropriateness of his

23   behavior, but I don't think all judgment is, you know,

24   created equal.  I don't think that, you know, me feeling

25   that he did something inappropriate was now I felt her

533

1    life was in danger.  I don't agree with that.

2    Q    You consider yourself a very focal person who stands

3    up for himself; isn't that right?

4    A    Yes.

5    Q    Would you say Rosana is a talkative person?

6    A    She's talkative but she's not, you know, she doesn't

7    stand up -- I mean she's not whatever you described me as.

8    Q    While you were on the plane, you did not observe

9    Rosana say anything to Mr. Zarda about inappropriate

10   touching, did you?

11   A    No, she said it to me on the way home.

12   Q    Never said it on the plane to Mr. Zarda, isn't that

13   true?

14   A    I don't believe so.

15   Q    She did not ask to be brought down and given a

16   different instructor, isn't that true?

17   A    It is not.

18   Q    You jumped out of the plane?

19   A    Yes.

20   Q    And Rosana jumped out of the plane?

21   A    Yes.

22   Q    She landed safely?

23   A    Yes.

24   Q    Do you recall what she said when she landed?

25   A    I do not.

Kengle - Direct/Cardinale

534

1    Q    Do you recall that she said her experience was

2    awesome?

3    A    I do not, but it sounds like.

4    Q    Now that you are safely on the ground, did you say

5    anything to Mr. Zarda about inappropriate touching of

6    Rosana?

7    A    No.

8    Q    And Rosana did not say anything to Mr. Zarda about

9    being inappropriately touched, did she?

10   A    She did not.

11   Q    In fact you observed Rosana pose for a picture with

12   Mr. Zarda at landing site, isn't that true?

13   A    I don't remember but --

14   Q    Okay.  I'll refer you again to your deposition,

15   page 57.  Tell me when you get there.

16   A    Okay.

17   Q    Line 13.  Are you there?

18   A    Uh-huh.

19        Question:  Were you asked these questions and

20   did you give these answers:

21        "Question:  At the very end of the frame she

22   moved her face in close to Mr. Zarda's to take a picture,

23   right?

24        Answer:  Yes.

25        Question:  Did anyone force her to do that?

Kengle - Direct/Cardinale

535

1          Answer:  No.

2          Question:  You went in and took a picture too?

3          Answer:  Sure."

4          Were you asked those questions and did you give

5    those answers?

6    A    Yes.

7    Q    Now, you testified a minute ago that she didn't

8    complain to Mr. Zarda about inappropriately touching

9    Rosana, isn't that true?

10   A    Yes.

11   Q    And after you landed, did you ask to speak to someone

12   in charge like a manager or an owner to complain?

13   A    No.

14   Q    Did you hear Rosana ask to speak to someone in charge

15   in order to complain?

16   A    No.

17   Q    Now, Rosana told you later on the way home that

18   Mr. Zarda had told her at one point prior to landing not

19   to worry because he's gay, is that true?

20   A    Yes.

21   Q    Do you consider that to be an offensive comment?

22   A    No.

23   Q    Based on what Rosana was telling you, did you feel

24   Mr. Zarda was trying to reassure Rosana?

25   A    It sounds like he was trying to reassure her whatever

Kengle - Direct/Cardinale

536

1   he said was okay because he was gay.  That's what it

2   sounds like to me.

3   Q    The day you and Rosana went skydiving on June 18,

4   2010, do you recall what day of the week that was?

5   A    I do not.

6   Q    Was it a Friday?

7   A    I believe it was sometime over the weekend, yes.

8   Q    Okay.  Now, at any point on June 18, 2010, you did

9   not complain to anyone at Skydive Long Island, isn't that

10  true?

11  A    Correct.

12  Q    And you didn't complain the next day either?

13  A    I believe it was over the weekend that I complained

14  on Monday.

15  Q    You complained on Monday.  June 18, 2010, you didn't

16  complain, true?

17  A    It was her birthday.

18  Q    Saturday you didn't complain?

19  A    Okay.

20  Q    Sunday you didn't complain?

21  A    Okay.

22  Q    And you waited until Monday to complain?

23  A    Yes.

24  Q    You realized when you complained, there was a chance

25  you would get your money back, isn't that true?

Kengle - Direct/Cardinale

537

1    A    Actually I didn't realize there was a chance to get

2    my money back.  I didn't make the complaint in order to

3    get my money back.

4              I was complaining, and he gave me my money back,

5    but I wasn't expecting it.

6    Q    Who did you ask to speak with when you complained?

7    A    I don't remember.

8    Q    But you did speak with Maynard, isn't that true?

9    A    At first I spoke to a woman over the phone who took a

10   message, and he called me back.

11   Q    Isn't it true, Mr. Maynard never spoke with Rosana?

12   A    Correct.

13   Q    He got the whole story from you?

14   A    Correct.

15   Q    And Mr. Maynard refunded your money?

16   A    He did.

17   Q    You accepted the refund?

18   A    I did.

19   Q    You didn't have to accept it, true?

20   A    Did I have to?  No, I guess I didn't have to.

21   Q    Mr. Maynard sent you a check?

22   A    I believe so.

23   Q    And you didn't call him back and say I'm not taking

24   the check, I just wanted to complain to you about what

25   happened?

Kengle - Direct/Cardinale

538

1    A    No, I didn't do that.

2    Q    When you discussed the incident with Mr. Maynard, you

3    never told him that Mr. Zarda discussed his sex life with

4    Rosana, isn't that true?

5    A    I'm sorry?

6    Q    You never told Mr. Maynard that Mr. Zarda discussed

7    his sex life with Rosana, isn't that true?

8    A    I never discussed --

9    Q    Did you ever tell Mr. Maynard that Mr. Zarda

10   discussed his sex life with Rosana?

11   A    First of all, I don't remember exactly the

12   conversation that we had.  I made a complaint based on

13   what I felt was inappropriate and the story that my

14   girlfriend Rosana gave me at the time.  Exactly what I

15   told him, I don't remember the details, but he did refer

16   to his personal life, reference his personal life in some

17   capacity.  I felt that added inappropriateness, and that

18   was my complaint.

19   Q    You still have your deposition in front of you?

20   A    Yes.

21   Q    I refer you to page 36, line 20.  Tell me when you

22   get there?

23   A    Okay.

24   Q    Were you asked these questions and did you give these

25   answers at your deposition?

Kengle - Cross/Zabell

539

1    Question:  You said something earlier about that

2    you said Don was mentioning something about his sex life?

3    Answer:  Well, his sexual preference.

4    Question:  That's not the same as sex life?

5    Answer:  Well, he mentioned his boyfriend.  I

6    don't remember.  Yeah, I guess not."

7    Were you asked those questions and did you give

8    those answers?

9    A    I did.

10   Q    You did tell Mr. Maynard that Mr. Zarda told Rosana

11   that he was gay, isn't that true?

12   A    I did.

13   MR. CARDINALE:  No further questions, your

14   Honor.

15   THE COURT:  Cross-examination.

16   CROSS-EXAMINATION

17   BY MR. ZABELL:

18   Q    Mr. Kengle, do you still have your deposition in

19   front of you?

20   A    I do.

21   Q    I'll ask you to read on page 37, right after

22   Mr. Cardinale had you read.  Doesn't that follow-up the

23   question on line 3?  What if he had mentioned his wife,

24   would that just been just as bad?

25   Read back your answer beginning at line 5?

Kengle - Cross/Zabell

540

1          MR. CARDINALE:  Objection, your Honor.

2          THE COURT:  What is the objection?

3          MR. CARDINALE:  His testimony has nothing to do

4     with the question I just asked.

5          THE COURT:  Come up to side bar.

6          (Whereupon, at this time the following took

7     place at the sidebar.)

8          (Continued.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kengle - Cross/Zabell

541

1              (Out of the presence of the jury.)

2              MR. ZABELL:  This is the condensed.

3              THE COURT:  Which line is it?

4              MR. ZABELL:  (Indicating).

5              THE COURT:  I think I'll allow it under the rule

6    of completeness.

7              MR. ZABELL:  Thank you.

8              (End of sidebar conference.)

9              (Continued.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kengle - Cross/Zabell

542

1          (In open court.)

2     Q     Mr. Kengle, so Mr. Antollino asked you a question,

3     what if he had mentioned his wife?

4             Could you read back what your answer was?

5             Answer:  It's more the way it was.  I think it

6     should not even come up.  First of all, the sentence I

7     hope you don't feel uncomfortable because you know I'm

8     gay, the fact that she had had anything to feel

9     uncomfortable in the beginning, the fact that he was aware

10    of that event that there was something inappropriate.  Why

11    else would she feel inappropriate?

12    Q     Mr. Kengle, I don't know why I didn't ask this of you

13    before.  Did you complain about Don Zarda?

14    A     Did I complain?

15    Q     Yes.

16    A     Yes, I was the one who called Ray Maynard or Skydive

17    Long Island and issued a complaint.

18    Q     What was that?

19    A     That he acted inappropriately.

20    Q     Did you explain how he acted inappropriately?

21    A     I did explain how he acted inappropriately.

22    Q     And did you relay to Mr. Maynard that you felt

23    Mr. Zarda was being flirtatious with Rosana?

24    A     I did, yes.

25    Q     And did you relay that to Mr. Maynard that Mr. Zarda

Kengle - Cross/Zabell

543

1    kept his hands on her hips or thigh area throughout the

2    jump?

3    A    I did.

4    Q    Did you relay to Mr. Maynard that Don Zarda was

5    whispering in her ear?

6              MR. CARDINALE:  Objection to leading, your

7    Honor.

8              THE COURT:  It's cross-examination.

9    A    I did.

10   Q    Did you relay to Mr. Maynard that Mr. Zarda was

11   making gestures around his face and pointing at

12   Ms. Orelana?

13   A    I did.

14   Q    I'm going to show you a video, and if you could

15   identify for me this video.

16             Your Honor, this is this is a video previously

17   admitted into evidence.  This is Ms. Orelana's jump?

18             THE COURT:  Okay.

19   Q    Now, Mr. Kengle, can you identify the two people in

20   this video?

21   A    Yes.

22   Q    Who were the two people in the video?

23   A    On the left is Don Zarda.  On the right is my

24   girlfriend Rosana Orelana.

25   Q    Okay.  Let me wind it back a little bit.

Kengle - Cross/Zabell

544

1              Is that something you complained about to

2     Mr. Maynard?

3     A    Yes, one of the main things I complained about was

4     the fact that I noticed him kind of gesturing to his

5     mouth, his fellow instructors, as if to say, you know,

6     look at the girl.  And the fact that I noticed it, it was

7     that blatant and on the video was something that, yeah, it

8     definitely bothered me, and I complained about it.

9     Q    Did you complain to Mr. Maynard that someone said how

10    do you feel about your girlfriend being strapped to

11    another dude?

12    A    I did not.

13    Q    Was that something that you felt was something that

14    you should have complained about?

15    A    No.

16    Q    Did you see that?

17    A    Yes.

18    Q    Could you describe what you saw?

19    A    I saw her instructor Don gesturing to my girlfriend,

20    you know, surrounding his fingers around his mouth, you

21    know, implying something to the camera.

22    Q    Were you able to see that during the jump?

23    A    I was.

24    Q    And did you complain about that to Mr. Maynard?

25    A    I did.

Kengle - Cross/Zabell

545

1    Q    Now, did you tell -- who is that?

2    A    That's me.

3    Q    Okay.  Did you tell Mr. Maynard that you were going

4    to sue him?

5    A    No.

6    Q    Did you tell Mr. Maynard that you don't care what

7    release you signed, you were still going to file a

8    lawsuit?

9    A    No.

10    Q    Now, when you were falling from the airplane, were

11    you having a discussion with your instructor?

12    A    I was.

13    Q    What were you discussing?

14    A    He was kind of giving me, you know, the layout of the

15    land and the history of whatever area we were in kind of

16    thing.  Very skydive-related.

17    Q    And when you were jumping with your instructor, when

18    you were in the plane with your instructor, did he have

19    your hands on your hips?

20    A    I don't think so.  Not with my hips.  We were in

21    contact but it was not inappropriate the way I viewed

22    Don's contact as inappropriate in the sense that he was

23    kind of taking advantage of the situation by being overly

24    familiar with me.

25    Q    Is that how you describe Don Zarda's behavior with

Kengle - Cross/Zabell

546

1    Rosana?

2    A    Yes, I don't think -- my complaint was not that he

3    touched her in like he groped her.  My complaint is he

4    used the proximity, everything we signed off on, as if

5    that gives him free license to be as familiar as he wants

6    to be.  So even reading that before, that doesn't -- that

7    doesn't mean you can just act any way you want to act or

8    touch anybody you want to touch.  There is a line that is

9    still there.

10            I felt he was overly familiar in the fact that

11   he was touching his lips, he was referencing what my

12   girlfriend looked like, and putting his chin on her

13   shoulder, and things like that.

14   Q    Did there come a time you discussed your observations

15   of the jump with Rosana?

16   A    Yes.

17   Q    When was that?

18   A    We talked about it on the way home.  When it came

19   altogether, I did notice things in the plane that kind of,

20   you know, irritated me, annoyed me, but we really had a

21   conversation about it driving home, and that's when I

22   started becoming angry about what had happened.

23            Over the course of the weekend I became angry

24   enough that I called on Monday morning.

25   Q    And did you mention Rosana's birthday at all when you

547

1   spoke to Ray Maynard?

2   A    I probably did.  It was her birthday.

3   Q    Do you recall what you may have mentioned?

4   A    I was trying to make it a special day.

5            MR. CARDINALE:  Objection.

6            THE COURT:  What is the question?

7            MR. ZABELL:  The question was what happened and

8   he is testifying how he felt.

9            THE COURT:  About what you relayed.

10           THE WITNESS:  I relayed the information and I

11  was trying to make it a special day.

12  Q    How did your experience from the jump on that Friday

13  make you feel about that special day?

14  A    I felt like --

15           MR. CARDINALE:  Objection.  This wasn't in the

16  complaint.  He should be not be testifying as to his

17  feelings.  I want him to testify about his background, why

18  he complained.

19           THE COURT:  Okay, overruled.

20           MR. ZABELL:  May I ask the reporter to read back

21  the question, please?

22           THE COURT:  Owen, please read back the question.

23           (Whereupon, the record was read back by the

24  reporter.)

25  A    I felt especially being this is our only experience

548

1    with skydiving, it was slightly tainted, that, you know,

2    we would have preferred.  The first thing I asked her

3    driving home was what she thought.

4              MR. CARDINALE:  Objection to hearsay.

5              THE COURT:  Again, he's testifying as to the

6    background as to why he made the call.

7              Overruled.

8    A    The first thing she said to me, she wished she had

9    had a different instructor because it made her feel

10   uncomfortable.  So that kind of, you know, sums up I'm

11   glad we went skydiving, glad we had the experience, but it

12   wasn't as perfect as it could have been.

13             MR. ZABELL:  Thank you.

14             I have nothing further.

15             THE COURT:

16   REDIRECT EXAMINATION

17   BY MR. CARDINALE:

18   Q    Mr. Kengle, when I was questioning you, you indicated

19   that that the skydiving occurred approximately five years

20   ago and you don't recall it as well as you did in your

21   deposition?

22   A    Something I do recall pretty vividly.

23   Q    When I asked you, you didn't recall what you said in

24   the deposition, true?

25   A    The deposition I probably don't recall as of the

549

1    incident.

2    Q    And you didn't recall some of the details when I

3    asked you about the incident?

4    A    I recall the experience.  If you are asking me a

5    specific detail about the number of minutes, no, I don't

6    think anybody would recall details like that.

7    Q    So you don't remember specific details, is that what

8    you are saying?

9    A    I do remember specific details.  I didn't remember

10   every specific detail.

11   Q    When Mr. Zabell was questioning you, you remembered

12   every detail what he was asking you?

13   A    I remember a lot of details.

14   Q    Like when Mr. Zabell was questioning you, you recall

15   all the details about your complaints, isn't that true?

16            MR. ZABELL:  Objection.

17            THE COURT:  Sustained.

18   Q    How many times since June 18, 2010, have you met with

19   an attorney for Skydive Long Island?

20   A    How many times?  I mean we had a deposition.  We had

21   a meeting before the deposition.  I believe that was it.

22            Maybe there were two meetings.

23            I remember at some point we were discussing we

24   would have a deposition.

25   Q    So it's your testimony that you met two times?

Kengle - Redirect/Cardinale

550

1    A    I really don't remember.

2    Q    Did you meet more than five times?

3    A    No.

4    Q    Did you meet three times?

5    A    Two to three, tops.

6    Q    Okay.  How many times did you meet with Mr. Zabell

7    before testifying here today?

8    A    Two to three times, tops.

9    Q    The first time you met an attorney from Skydive Long

10   Island, he came to your home, isn't that true?

11   A    I believe so.

12   Q    Okay.  Well, do you have your deposition in front of

13   you?

14          Page 8, line 11.  Tell me when you get there,

15   please?

16          Are you there?

17   A    I'm there.

18   Q    Were you asked these questions and did you give these

19   answers:

20          Question:  When was the first time you met

21   Mr. Zabell?

22          Answer:  He came to -- by my apartment once.  I

23   think it was late spring, early summer.

24          Question:  What happened?

25          Answer:  You know he -- we had spoken on the

Kengle - Redirect/Cardinale

551

1   phone first, he let us know everything that was going on

2   and he said he needed to get my statements, so he came

3   over and we gave him our statements.

4          Did you give that testimony in your deposition?

5   A   I did.

6   Q   So you remember Mr. Zabell coming to your home?

7   A   Vaguely.

8   Q   Now, when Mr. Zabell came to your home, you were

9   living with Rosana at the time, true?

10  A   I was.

11  Q   And he met with Rosana as well?

12  A   I believe so.

13  Q   Was she there when Mr. Zabell was questioning you?

14  A   I think so, yes.

15  Q   And was she in the other room?

16  A   No.

17  Q   Now, a second time you met with Mr. Zabell was the

18  afternoon of your deposition on November 9, 2011, isn't

19  that true?

20  A   I don't remember if it was the second time.  I feel

21  like you are asking me, you are trying to catch me in

22  details.  I don't know what you mean by that.

23  Q   Did you meet with Mr. Zabell the day of your

24  deposition?

25  A   I met with him the day of the deposition.

Kengle - Redirect/Cardinale

552

1    Q    Rosana was there as well?

2    A    Yes.

3    Q    And you went to a steakhouse?

4    A    We did.

5    Q    And Skydive Long Island picked up the tab?

6    A    I don't know.

7    Q    Did you pay?

8    A    I did not pay.

9    Q    Who paid for it?

10   A    I think Saul did.

11   Q    You ordered a steak?

12   A    I really don't remember what I had for lunch four

13   years ago, but I probably had a steak.

14   Q    Do you recall what Rosana ordered?

15   A    I don't.

16   Q    You were unemployed when your deposition was taken at

17   that time, isn't that true?

18   A    I don't know.

19   Q    Now, I'm going to hand you what has been marked as

20   Defendants' Exhibit L.

21              MR. CARDINALE:  May I approach the witness, your

22   Honor?

23              THE COURT:  Yes.

24   Q    Please take a look that the document.

25              Do you recognize it?

Kengle - Redirect/Cardinale

553

1    A    Do I recognize it?  It's an affidavit.

2    Q    An affidavit signed by you?

3    A    Yes.

4    Q    Under oath?

5    A    Yes.

6         MR. CARDINALE:  Your Honor, I move Defendants'

7    Exhibit L into evidence.

8         MR. ZABELL:  I object, your Honor, based on

9    relevance.

10        THE COURT:  Why don't you approach.

11        (Whereupon, at this time the following took

12   place at the sidebar.)

13        (Continued.)

14

15

16

17

18

19

20

21

22

23

24

25

Kengle - Redirect/Cardinale

554

1        (Out of the presence of the jury.)

2            MR. ANTOLLINO:  Judge, this goes to the issue of

3    after he signed his deposition, he supplied this affidavit

4    which came out of nowhere changing his deposition for

5    Mr. Zabell's purposes, and it shows the connection between

6    the two and Mr. Zabell's manipulation or what I could

7    argue is his manipulation of the witness.

8            I will just ask questions, where did you get

9    this; why did you sign this.

10           MR. CARDINALE:  Your Honor, to put it another

11   way, the witness testified at his deposition that he did

12   not authorize Mr. Zabell to accept the subpoena on his

13   behalf.  He never corrected his deposition.  He didn't

14   make any changes on his errata sheet, and he met with

15   Mr. Zabell the third time and signed this affidavit saying

16   he did authorize Mr. Zabell to accept the subpoena on his

17   behalf.  So it's an inconsistent statement.

18           MR. ANTOLLINO:  The point is that he's changed

19   his testimony.

20           MR. ZABELL:  The document itself is prejudicial.

21   The fact that he signed an affidavit and submitted it to

22   our office doesn't mean he met with us, only that someone

23   from my office --

24           THE COURT:  The issue whether or not who

25   authorized it and who accepted service is not applicable

Kengle - Redirect/Cardinale

555

1    to the testimony here today.

2              MR. ANTOLLINO:  The point is he did, not whether

3    he accepted the subpoena or not.

4              THE COURT:  But the point you are trying to make

5    is a general assumption, that he prepared an errata sheet

6    through Mr. Zabell's office.

7              MR. ANTOLLINO:  I gave him an errata sheet to

8    sign and he signed it without any changes, but then after

9    that Mr. Zabell sent us this.

10             THE COURT:  I'm sustaining the objection under

11   403.

12             MR. ANTOLLINO:  Thank you, your Honor.

13             (End of sidebar conference.)

14             (Continued.)

15

16

17

18

19

20

21

22

23

24

25

Kengle - Redirect/Cardinale

556

1           (In open court.)

2    Q    Mr. Kengle, prior to testifying in court today, in

3    the last month how many times have you spoken on the

4    telephone with Mr. Zabell?

5    A    On the phone, a couple times.

6    Q    Couple being two?

7    A    A couple meaning we're talking about scheduling what

8    time I had to be in court.  So I don't know how many times

9    one of us had to call one back.

10          I have had one regular conversation about the

11   fact that I had to come here.

12   Q    And you also discussed what your complaints to

13   Mr. Maynard were?

14   A    No, he even asked me if I wanted to read my

15   deposition and I told him I didn't have to because I know

16   what happened.  I know what to say.

17          MR. CARDINALE:  No further questions.

18          THE COURT:  Mr. Zabell?

19          MR. ZABELL:  I have nothing further.

20          THE COURT:  You may step down, Mr. Kengle.

21          Thank you.

22          (Witness excused).

23          MR. ANTOLLINO:  Your Honor, it's 12:30.  I don't

24   know if you wanted to take a break for lunch or take a

25   short break.

Kengle - Redirect/Cardinale

557

1          THE COURT:  Why don't we break for lunch early

2    then rather than take a break.  So we'll reconvene at

3    1:30.  Is that okay for everybody?

4          Have a good lunch.  Don't discuss the case.

5          (Whereupon, at this time the jury exits the

6    courtroom.)

7          THE COURT:  If everybody can be seated.  Just

8    two rulings before the break.

9          There were two objections during the cross of

10   Mr. Kengle about how he felt about the experience and then

11   there was another objection to hearsay on the ground of

12   what his girlfriend told him about the experience.  I

13   overruled both of those objections for the following

14   reasons:  First, he obviously was the conduit from the

15   girlfriend to Mr. Maynard and therefore that is one of the

16   critical issues in the case what complaint did Mr. Maynard

17   receive.  In order for the jury to understand how

18   Mr. Maynard received the complaint, they have to know how

19   Mr. Kengle received that information.  So it's not for the

20   truth of the matter asserted as to whether or not she was

21   or was not touched inappropriately or inappropriate

22   comments were made to her but simply to convey what the

23   information was according to his testimony provided to

24   Mr. Maynard.

25          On the issue how he felt about the jump, I

Kengle - Redirect/Cardinale

558

1    believe the direct examination opened the door.  There was

2    a lot of questioning regarding how long he took to

3    complain.  He waited three days to complain and therefore

4    with respect to this questioning regarding the complaint

5    and the delay behind the complaint, I believe as to any

6    questioning about his state of mind was or has been

7    implicated about the direct examination, so I don't want

8    him to testify about his background, what caused him to

9    complain on that Monday morning.  Okay.

10           On the last thing at sidebar, the affidavit of

11   Mr. Kengle where he clarifies something, I guess he said

12   in his deposition regarding whether or not Mr. Zabell was

13   authorized to accept a subpoena on his behalf, is

14   completely collateral to the testimony that he gave.

15   Obviously that particular question and answer has no

16   probative value in the case whatsoever.  The fact that he

17   did not notice that question and answer, according to him,

18   and that it was in error and I guess that he did not

19   correct it on the errata sheet that was provided to him, I

20   don't believe it is sufficiently probative on his

21   credibility and/or his relationship with Mr. Zabell to

22   allow this affidavit to come in, and then to obviously

23   have to allow him to explain the circumstances surrounding

24   that issue, it is just completely collateral to the

25   questions and answers he gave with respect to the

Kengle - Redirect/Cardinale

559

1    incidents that are the subject of the litigation.

2            So, under 403 I believe any probative value is

3    substantially outweighed by a danger of unfair prejudice

4    and confusion of issues that are fully collateral to the

5    case.

6            All right.  So we'll take the break and we'll

7    reconvene with Mr. Maynard.

8            MR. ZABELL:  Thank you, your Honor.

9            MR. CARDINALE:  Thank you, your Honor.

10           (Whereupon, an afternoon recess was taken.)

560

1          **AFTERNOON SESSION**

2               (The jury entered the courtroom.)

3

4          THE COURT:  Now we're going to continue with

5    Mr. Maynard's direct examination.

6               I remind you, you're still under oath,

7    Mr. Maynard.

8               THE WITNESS:  Yes.

9               MR. ANTOLLINO:  All right, thank you, judge.

10              I believe this is Exhibit 10, page 24.

11              THE COURT:  Yes, that is admitted, page 24.

12              (Plaintiff Exhibit 10, page 24 in evidence.)

13   **RAYMOND MAYNARD**

14         called as a witness, having been previously duly

15         sworn, was examined and testified furtherer as

16         follows:

17   DIRECT EXAMINATION   (Continued)

18   BY MR. ANTOLLINO:

19   Q    All right Mr. Maynard, could you read the body of the

20   e-mail at page 24?

21   A    I just want to drop a note to compliment your tandem

22   jump master, jump instructor Don from Kansas.  He was very

23   professional in every way and made the entire experience

24   even better.  Employees like Don are the reason for your

25   continued success.  Looking forward to my next jump.  Jim

Maynard - Direct/Mr. Antollino

561

1    McVie.

2    Q    Mr. Maynard, I want to take you back to the Drop

3    Zone, all right?

4         After the passengers get into the airplane, do

5    they strap up before or after getting into the airplane?

6    I can't remember before what you said.

7    A    They are harnessed up before the airplane.

8    Q    So they're in the airplane harnessed up.  And can you

9    picture in your mind a full airplane of people harnessed

10   up with instructors?

11   A    Yes, I can.

12   Q    All right, we agree that it's a fairly small area?

13   A    It's confined.  I don't consider it a small area.

14   It's confined.

15   Q    Why don't you take a look at your deposition on page

16   15.

17        Question on line 12.

18        Question:  Are passengers in a tandem skydive

19   situation placed in a confined area?

20        Answer:  The cab of the aircraft is a fairly

21   small answer.

22        Were you asked that question and did you give

23   that answer?

24        MR. ZABELL:  Your Honor, he may have -- it's

25   just not on line, page 15 line 12.

Maynard - Direct/Mr. Antollino

562

1          MR. ANTOLLINO:  It's on page 15, line 22.

2          THE COURT:  You said, answer.

3          Could you read the answer again.

4          BY MR. ANTOLLINO:

5     Q    The cab of the aircraft is a fairly small area.

6     A    All right.  It's a fairly small area.

7     Q    You were asked that question and you gave that

8     answer, correct?

9     A    Correct.

10    Q    The passengers in the airplane are very closely

11    strapped to the customers, correct?

12         MR. ZABELL:  Objection.

13         The passengers are closely strapped --

14         MR. ANTOLLINO:  I'm sorry.

15    BY MR. ANTOLLINO:

16    Q    The passengers are closely strapped to their

17    instructor, correct?

18    A    Correct.

19    Q    Someone who is uncomfortable being touched should not

20    be skydiving, correct?

21    A    Correct.

22    Q    I want you to imagine a person -- well withdrawn.

23         A person -- now if a person complained about

24    being touched, you believe that the best thing to do would

25    be to investigate further, correct?

Maynard - Direct/Mr. Antollino

563

1    A    If they were touched in an inappropriate manner, yes.

2    Q    If there was a complaint about being touched, you

3    believe that the best course of action would be to

4    investigate, correct?

5         MR. ZABELL:  Objection, asked and answered.

6         THE COURT:  Sustained.

7    Q    Because touching is part of the sport, correct?

8    A    Touching is only done when you are putting on the

9    harness to make everything safe.

10   Q    And close physical contact is part of the sport, is

11   it not?

12   A    It is absolutely necessary to be close when you're

13   strapped to another person, yes.

14   Q    Now a person who didn't read the release might not

15   know this.

16        Isn't that correct?

17   A    The people that are dressing him and the instructors

18   are letting him know that they're going to be in close

19   proximity.

20   Q    Well, you don't want them to rely simply on what

21   people tell them.  You want them to watch the video and

22   read the waiver and listen to what your instructors say,

23   correct?

24   A    Absolutely.

25   Q    I'm going to show you Exhibit 15 and ask you if you--

Maynard - Direct/Mr. Antollino

564

1          THE COURT:  Hold on.

2          Is there an objection to 15?

3          MR. ZABELL:  It was in the package, I believe.

4          MR. ANTOLLINO:  That is the one.  There are

5    several pages I'm just using one.  I don't know -- do you

6    want to look at it?

7          MR. ZABELL:  I have no objection, judge.

8          THE COURT:  All right, let's be clear for the

9    record, it's a one page exhibit?

10         MR. ANTOLLINO:  Yes.

11   BY MR. ANTOLLINO:

12   Q    Do you recognize that?

13   A    Yes, I do.

14   Q    Does that fairly and accurately represent how close

15   the passenger is to the instructor?

16   A    Yes, I do.

17   Q    Yes, it is?

18   A    Yes.

19   Q    Now you want your passengers to know as much about

20   the process as possible before they go up on the skydive.

21         Would you agree with that?

22   A    We want them to know what they need to know to help

23   them to know what we're going to do, yes.

24   Q    And as far as you know Rosana did not complain to Don

25   about being uncomfortable.

Maynard - Direct/Mr. Antollino

565

1        Is that correct?

2    A    She did not express anything to Don, no.

3    Q    You saw the video with Skydive, correct?

4    A    I saw a video?

5    Q    Yes.

6    A    Yes, I did.

7    Q    There was no evidence in that video that a reasonable

8    person could ascertain that she was uncomfortable.

9        Would you agree with that statement?

10   A    No.

11   Q    Well what was it that you can recall that you believe

12   showed that she was uncomfortable?

13   A    The way Don was acting behind her when he was

14   videotaping.  The way he was looking at her.  Putting his

15   finger in his mouth, rubbing it around and looking at her

16   like this, like this is something that, you know.  So it

17   was very -- it wasn't normal what he was doing.

18   Q    You heard her say that she could not see behind her,

19   correct?  Did you hear her say that she could not see

20   behind her, correct?

21   A    She said that.

22   Q    And that activity took place behind her, correct?

23   A    It was behind her.

24   Q    Now I'm asking you, sir.  Was there any activity or

25   demonstration on the part of Rosana that showed that she

Maynard - Direct/Mr. Antollino

566

 1    was uncomfortable, not what Don did, but that she was

 2    uncomfortable?

 3    A    The video is only a couple of seconds long.  They

 4    were in the airplane 10 to 20 minutes.  And I believe what

 5    they were talking about was not -- I know it wasn't on

 6    video.  She was in the airplane.  She testified that his

 7    head was on her shoulder and he was whispering in her ear,

 8    and he never left -- he had his hands on her legs or hips

 9    the whole time.  All of that was totally inappropriate.

10    Q    And you heard that from David Kengle, correct?

11    A    Yes, I did.

12    Q    All right, the question is simple.  We know that

13    there is more that was up there.  But there is nothing on

14    the video that shows that she is uncomfortable, correct?

15    A    There is nothing on the video, but there is also a

16    history of what had happened in the past.

17    Q    A history of what had happened, well we'll get to

18    that.  But I just want to focus on the video for now,

19    okay?

20         At the very end of the video she said that it

21    was awesome, correct?

22    A    Yes, she did.

23    Q    And she put her face very closely to Don's.  Did she

24    not?

25    A    She was being instructed by the videographer to take

Maynard - Direct/Mr. Antollino

567

 1   a picture.  So it would be like, let's have a video.

 2   That's what they do.

 3   Q    All right were you able to read her mind as to why

 4   she did that?

 5          MR. ZABELL:  Objection.

 6   Q    You saw her voluntarily pose with Don, correct?

 7          MR. ZABELL:  Objection.

 8          THE COURT:  Sustained to the form.

 9   Q    Did anyone force her to pose with Don?

10   A    Nobody forced her to do anything.

11   Q    And she moved towards Don, Don didn't move towards

12   her, correct?

13          MR. ZABELL:  Objection.

14          THE COURT:  Yes.  The video speaks for itself.

15   We don't need to go through every aspect of the video.

16          MR. ANTOLLINO:  All right.

17   BY MR. ANTOLLINO:

18   Q    At the end of the video both of the passengers

19   expressed happiness, Ms. Orelana said it was awesome and

20   Mr. Kengle said it was fucking awesome, correct?

21   A    Correct.

22   Q    Now there were also pictures taken on this jump by

23   the video master.  Isn't that correct?

24   A    That's correct.

25   Q    And you looked at many of them at your deposition,

Maynard - Direct/Mr. Antollino

568

1    correct?

2    A    Yes, I did.

3    Q    And you didn't notice any evidence that anyone was

4    uncomfortable on any of those pictures, did you?

5    A    I believe when they landed I expressed that she did

6    not look really happy.

7    Q    Do you believe that her happiness was a lie?  Let's

8    see some other pictures?

9         MR. ZABELL:  Objection.

10        THE COURT:  Sustained.  The jury will disregard

11   that statement.

12   BY MR. ANTOLLINO:

13   Q    All right, what was it about her happiness in the

14   pictures that you thought was a lie?

15   A    I already told you.  The expression on her face to me

16   was not somebody that had just come down and had a great

17   time skydiving.  She did not look happy.

18   Q    Some people are not happy by the skydiving

19   experience, correct?

20   A    Say that one more time.

21   Q    Some people are not happy about the skydiving

22   experience, correct?

23   A    Very few.

24   Q    Some actually express happiness in different ways,

25   don't they?

Maynard - Direct/Mr. Antollino

569

1    A    Most people do.

2    Q    Okay, I want to show you a few pictures.

3              MR. ANTOLLINO:  Are there any objection to the

4    pictures from the deposition?  And you can look at them

5    right here.  They are, they were e-mailed to you and they

6    are part, they are exhibits from Ray's deposition/?

7              MR. ZABELL:  What exhibit number?

8              MR. ANTOLLINO:  Ray's deposition 222, 223, 210

9    and 211.

10             MR. ZABELL:  May I, your Honor?

11             THE COURT:  You might as well look at them on

12   the screen.

13             MR. ANTOLLINO:  I have them on the screen right

14   there.  This is Ray's deposition 2.

15             Do you have an objection to that?  Ray's

16   deposition, that is 2.  Do you have an objection to that?

17             MR. ZABELL:  No.

18             MR. ANTOLLINO:  2-3.  Do you have any objection

19   to that.

20             MR. ZABELL:  Keep on going.  I'll let you know

21   if I have an objection.

22             MR. ANTOLLINO: So there is four pictures I'm

23   going to show the witness.  And there is no objection to

24   any of them.  All right?

25             Exhibit, Ray's deposition 2, Ray's deposition

Maynard - Direct/Mr. Antollino

570

1   2.2, 2.3 and 2.10.  We're going to show them on the

2   screen.

3              THE COURT:  Those four, any objection?

4              MR. ZABELL:  I do.  But I do think that we need

5   hard copies of the pictures at some point.

6              MR. ANTOLLINO:  I don't have hard copies of the

7   pictures.  I only have these pictures.

8              THE COURT:  Okay.  They're admitted.  And at

9   some point you need to provide hard copies for the record.

10             MR. ANTOLLINO:  All right, I will get hard

11  copies before the trial is over.  But for right now, you

12  can see Ray's deposition 2.

13             THE COURT:  Those four exhibits are admitted.

14             Okay, go ahead.

15             (Plaintiff Exhibits Ray's 222, 223, 210 and 211

16  in evidence.)

17  BY MR. ANTOLLINO:

18  Q    You don't recognize any up happiness in Rosana's face

19  here, do you?

20  A    No.

21  Q    And behind her it is Don, correct?

22  A    Should be.

23  Q    Do you see a smile on her face, do you not?

24  A    Yes.

25  Q    Okay, she is about to get out of the plane.

Maynard - Direct/Mr. Antollino

571

1        Is that correct?

2   A    They're moving towards the door.

3   Q    Okay, now this is Ray's deposition 2.2.

4        Do you recognize Don and Rosana there, correct?

5   A    Yes, I do.

6   Q    And it looks like Rosana is having a fantastic time.

7   Does it not?

8   A    She is smiling.  I'm sure the adrenaline is flowing.

9   Q    Well, she has just jumped out of a plane.  How fast

10  does adrenaline take, in the second you get out of the

11  plane?

12  A    It kicks in a few minutes before that, as you are

13  approaching the door.

14  Q    So are you saying that that smile was involuntary?

15  A    I'm not saying that at all.

16        MR. ZABELL:  Objection, your Honor.

17        THE COURT:  Sustained.

18  Q    What was it about the adrenaline that caused her to

19  smile?

20        MR. ANTOLLINO:  He brought it up, judge.

21        MR. ZABELL:  Objection.

22        THE COURT:  Sustained.

23  Q    But you would agree, adrenaline or not she looks

24  happy here, correct?

25  A    Yes, she looks happy.

Maynard - Direct/Mr. Antollino

572

1    Q    Okay, and I'm going to show you Ray's 2.3.  This

2    shows that she is happy.  You can see the smile on her

3    face, correct?

4    A    Yes.

5    Q    Okay, and I'm going to show you Ray's deposition

6    2.10.

7              Here is David Kengle.  He appears to be happy.

8    Is that correct?

9    A    He looks a little scared but I'm sure he is happy

10   too.

11   Q    He is not being instructed by Don Zarda.

12             Is that right?

13   A    No, that is not Don Zarda.

14   Q    That's Duncan Shaw behind him.  Is that correct?

15   A    That is Duncan, yes.

16   Q    Now I want you to assume that the person is given an

17   opportunity to be informed about skydiving and its

18   inherently unpredictable nature.

19             MR. ZABELL:  I'm going to object to being

20   instructed about.

21             THE COURT:  Well, let me hear the question.

22             Go ahead.  What is the question?

23   BY MR. ANTOLLINO:

24   Q    If a person chooses to go on a tandem skydive and

25   later complains that she was closely attached to the

Maynard - Direct/Mr. Antollino

573

1   instructor, it would not be a reasonable complaint, would

2   it?

3           MR. ZABELL:  Objection.

4           THE COURT:  Yes, sustained to the form.

5   BY MR. ANTOLLINO:

6   Q   Would it be a reasonable complaint for someone who

7   has been explained the entire process of skydiving to say

8   that I was attached to someone during that entire jump?

9           MR. ZABELL:  Objection.

10          THE COURT:  No, go ahead.

11          We're not talking about reasonableness under the

12  law.  I think the jury understands that he is --

13          MR. ANTOLLINO:  Yes.

14          MR. ZABELL:  I'm just going to object based on

15  relevance.  We have this all in his testimony as to what

16  she complained about.  That wasn't what she complained

17  about.

18          THE COURT:  I'm going to allow it in.  Okay.

19          MR. ANTOLLINO:  If the court reporter could read

20  it back.

21          (The testimony was read back.)

22  A   That wouldn't be a can complaint.

23  Q   That would be an illegitimate complaint, correct?

24  A   Yes.

25  Q   Now if a person choses to skydive and then is

574

1    complaining that the person was adjusting straps around

2    her body and she felt uncomfortable, that would not be a

3    legitimate complaint either, would it?

4    A    If it was not -- one more time, please?

5    Q    Could you read it back?

6              MR. ZABELL:  Please.

7              (The last question was read back.)

8    A    No.  That would mean explaining that, this is what's

9    going to go on.

10   Q    Everyone is explained in the video, and in the

11   release, correct?

12   A    Yes.

13   Q    You don't want to rely on the instructor's

14   instruction ad hoc before you get on the airplane, do you?

15   A    No.  That is why we have the video and the waiver.

16   Q    It's very important for the person to watch the

17   entire video, correct?

18             MR. ZABELL:  Objection.

19             THE COURT:  Yes.

20   Q    I don't know if I asked this question.

21             You would not want one person to explain the

22   waiver to another, would you?

23             MR. ZABELL:  Objection.

24             THE COURT:  We did that already.

25             MR. ANTOLLINO:  We did?

Maynard - Direct/Mr. Antollino

575

1          THE COURT:  Yes, the waiver many times.

2          MR. ANTOLLINO:  I understand that, but that

3  well --

4  BY MR. ANTOLLINO:

5  Q    I don't know if I asked this.

6          You don't want the waiver read at the same time

7  the video is playing, correct?

8          MR. ZABELL:  Objection.

9          THE COURT:  You asked that question.

10  Q    Now there are four points of attachment in the tandem

11  suit built for two, correct?

12  A    Are you referring to the harness?

13  Q    The harness, four points of attachment?

14  A    That's correct.

15  Q    And in those four points of attachment, there are 12

16  points of a adjustment, correct?

17  A    That's correct.

18  Q    So you're going to attach the student to the

19  instructor and there are 12 little straps they have to

20  adjust to make sure that the students is safe, correct?

21          MR. ZABELL:  Objection, asked and answered and

22  relevance.

23          THE COURT:  I'll allow him to go through the

24  basics of what the strapping entailed, okay?

25          Go ahead.  You can answer.

Maynard - Direct/Mr. Antollino

576

1    A    No, you're wrong.

2    Q    All right, could you explain what those 12 points of

3    adjustment are for?

4    A    Can I tell you how it really goes?

5    Q    Well, I'm basing this on your deposition.

6    A    Okay, there are 12 points of adjustment on a harness.

7    Most of our harnesses are pre-adjusted to people in

8    general.  So when the harnesses are put on the students by

9    the person that is dressing them, which is not the

10   instructor, that is where most of all harness adjustments

11   are made.

12          The instructor does not do very much adjusting

13   of the harness at all, maybe one or two places.  And that

14   is because everything is done on the ground, because we

15   never expect this to be done in the airplane by the

16   instructor.

17          So we have people on the ground that dress them,

18   as we say in the harness.  And that is who does all of the

19   adjustments on the passengers, on the passenger's harness,

20   not the instructor.

21   Q    So you say special dressers, quote-unquote, that come

22   out and put on the harnesses?

23   A    That's correct.

24   Q    And the dressers attach the instructor to the

25   students?

Maynard - Direct/Mr. Antollino

577

1  A    No.  The dressers put the harness on the student.

2  They make all of those adjustments, probably 10 or 15

3  minutes before they get on the airplane.  They make sure

4  that all of those adjustments are correct.

5        When they're introduced to their instructor, the

6  instructor may make one or two small adjustments for the

7  way they want that harness to sit on them when they put

8  the four points of attachment to the tandem master.

9  Q    So the instructor has to make adjustments so that the

10  tandem harness fits him, correct?

11  A    That is not what I said.  The tandem master makes

12  adjustments, very few things on that passenger harness, so

13  that his height where his attachment is.  So they may move

14  up the harness a little bit because of the different sizes

15  and how it;s going to be attached to the tandem master.

16  Q    But they need to be adjusted?

17  A    Very, very little.

18        THE COURT:  Let him finish the question.

19  BY MR. ANTOLLINO:

20  Q    They need to be adjusted by the instructor, correct?

21  A    Yes.

22  Q    Okay, they need to be a adjusted for the safety and

23  the comfort of the passenger, correct?

24  A    You're correct.

25  Q    All right, so when the dresser comes out and puts it

Maynard - Direct/Mr. Antollino

578

1   on the students, the instructor has to go through a second

2   adjustment to make sure that he is comfortable and the

3   student is comfortable, correct?

4   A    Not necessarily.  If the dresser has adjusted the

5   harness to the way that particular instructor normally

6   does it, then there are no adjustments that have to be

7   made.

8   Q    And if the dresser does not make the adjustment as

9   the instructor wants it, the instructor has to make

10  adjustments himself, correct?

11  A    That's correct.

12  Q    And you would agree that safety is more important

13  than comfort, correct?

14       MR. ZABELL:  Objection.

15       THE COURT:  I'll allow it.  You can answer.

16  A    Yes.

17  Q    Two of the attachments of the four we talked about

18  are at the hip, correct?

19  A    That's correct.

20  Q    So adjustments at the hips may be necessary depending

21  on the situation, correct?

22  A    I disagree with what you're trying to get me to say.

23       They are, if you're in the airplane and you

24  already have your harness on, and it has already been

25  adjusted, the attaching points at the hip, that's not an

Maynard - Direct/Mr. Antollino

579

1    adjustment that is made on the passenger harness.  It's

2    made from the tandem master.

3    Q    It's made from the tandem master?

4    A    That's correct.

5    Q    That's correct at the hips, correct?

6    A    Correct.

7    Q    Right.

8              Now, very often joking may be heard as men are

9    being strapped to one.  We've heard many examples of that,

10   correct?

11             MR. ZABELL:  Objection.

12             THE COURT:  Sustain to the form.

13   BY MR. ANTOLLINO:

14   Q    There are often jokes made at the Drop Zone about men

15   being strapped to women, or men being strapped to men,

16   correct?

17   A    That's correct.

18   Q    And this is in order to keep them calm and let them

19   know that they're going to make a skydive, correct?

20   A    Correct.

21   Q    And the joking occurs in the rig -- by the way, what

22   is the rig?

23   A    That's the harness we were just talking about.

24   Q    You want to make a joke to loosen the tension,

25   correct?

Maynard - Direct/Mr. Antollino

580

1   A    Yes.  But it's not something that is said, every

2   jump, every time, every where.  Sometimes that is said.

3   Q    Sometimes that's said.

4        You have never fired someone for making a

5   statement or a joke like that, correct?

6   A    No one has ever complained about the jokes.

7   Q    Okay, and you're kidding?

8   A    No, I'm not.

9   Q    So the answer is no.

10       And you have never fired an instructor where a

11  passenger had an injury, correct?

12  A    No.

13  Q    Now touching and manipulating the straps is done in

14  the manner that the skydiver knows best, correct?

15  A    There is a line that you can not cross regardless of

16  what you sign into that waiver.  And the instructors know

17  the line, where it's inappropriate and it's appropriate.

18  Just because they sign the waiver, my instructors are not

19  going to do inappropriate touching.

20  Q    Of course not.  But in this case you didn't speak to

21  Rosana to find out where she was touched, did you?

22            MR. ZABELL:  Objection asked and answered.

23            THE COURT:  Sustained.

24  BY MR. ANTOLLINO:

25  Q    Could you answer the question?  A skydiver has to use

581

1    his best judgment to know how to adjust the straps?

2              MR. ZABELL:  Objection.  Asked and answered.

3              THE COURT:  He answered that question.  Next

4    question.

5    BY MR. ANTOLLINO:

6    Q    Now you had a Skydive Long Island Facebook page,

7    correct?

8    A    Yes, we do.

9    Q    It was set up for your business, correct?

10   A    That's correct.

11   Q    All you have to do is like it in order to join,

12   correct?

13   A    There are actually two, there are actually two pages

14   for Skydive Long Island on Facebook.  In order to get a

15   business page you must have a page first for that.  And

16   when you go to the one that you go to normally, or when --

17   the page that our jumpers, experienced jumpers and staff

18   go to all the time is Skydive LI.

19              And for you to get on that you, you have to like

20   that page, and then you can go there.  And then from that

21   page you can go to the business page.

22              The business page is out there for new customers

23   that are coming in, the tandem people.  And it's not

24   usually the general public that will go to the business

25   page.  That's where the general public goes, is to the

Maynard - Direct/Mr. Antollino

582

1   business page, not to SDLI, which is almost like a

2   personal page where people post what they have been doing

3   and the jumps they have been liking.  And people get to

4   comment if they like it and what else is going on in their

5   life.

6   Q    So you never agreed to allow me for example to become

7   part of this personal Skydive Long Island page, did you?

8            MR. ZABELL:  Objection.

9            THE COURT:  Yes.  Sustained as to form.

10  BY MR. ANTOLLINO:

11  Q    Now I'm going to show you --

12           THE COURT:  This is th e one we discussed this

13  morning?

14           MR. ANTOLLINO:  The one we discussed before.

15           THE COURT:  What number is it?

16           MR. ANTOLLINO:  This is, we'll just say this is

17  7 B.  This is part of 7 that you narrowed down to two

18  documents.  And we'll call this collectively 7 B.

19           THE COURT:  In evidence?

20           MR. ANTOLLINO:  Yes.

21           THE COURT:  7 B is admitted.

22           (Plaintiff Exhibit 7 B in evidence.)

23  BY MR. ANTOLLINO:

24  Q    Now on the business page you presented a picture of

25  yourself and your then girlfriend.  Isn't that correct?

Maynard - Direct/Mr. Antollino

583

1    A    That's correct.

2    Q    And in your business page you made a comment about

3    your girlfriend and your ex-wife.

4            Isn't that correct?

5    A    That is not the business page.

6    Q    But it is the -- it is you --

7    A    That is not the business page.

8    Q    Wait a minute.  This is the business page, right?

9    A    I don't believe so.  I don't do the posting on this.

10   Q    Well what about this then?

11           Thanks everyone.

12           Do you see that portion, can you read it?

13   A    Yes.  And that is not the business page.

14   Q    But this is connected to this.  You said you didn't

15   know if this was the business page and you described the

16   Skydive Long Island as being the business page, and there

17   are all sorts of comments that follow it, correct?

18           MR. ZABELL:  I object to the form.  And I object

19   to the representation that this is linked to this.

20           There has been no testimony to that.

21           THE COURT:  Sustained.

22           Disregard that.

23           He's trying to describe that and an attorney

24   can't testify.

25           You have to just ask questions.

Maynard - Direct/Mr. Antollino

584

1    BY MR. ANTOLLINO:

2    Q    This was public information that people in any office

3    were able to get off Skydive Long Island.

4              So would it be fair to say that this is

5    information pertaining to your business that anyone in the

6    world can access from their computers?

7              MR. ZABELL:  Objection to the form.

8              THE COURT:  Yes, sustained.

9              The jury will disregard.

10             Just Mr. Antollino, I'm asking you again just to

11   ask some questions without -- any witness's testimony.

12   BY MR. ANTOLLINO:

13   Q    This is what anyone in the world is able to get from

14   your Internet by going to this particular page and liking

15   it.

16             Isn't that true?

17             MR. ZABELL:  Objection.

18             THE COURT:  No.  It's okay if he knows the

19   answer to the question.

20             Can anyone access this?

21   A    At that time people working in the office were

22   letting anybody like that page and go there.

23   Q    Okay, and you believe that the first picture of you

24   and your girlfriend, that personal information, it shows

25   you and your girlfriend having fun, correct?

Maynard - Direct/Mr. Antollino

585

1    A    On my birthday, yes.

2    Q    And personal information, correct?

3    A    Can you define personal information?

4    Q    What do you believe personal information to be?

5    A    Personal information could be maybe many things.

6    Q    Okay, it would include your birthday and your

7    birthday with your girlfriend, correct?

8    A    Yes.

9    Q    So that's personal information, correct?

10   A    Yes.

11   Q    All right.  And then this next page, where you make a

12   long comment that says -- can you read where I'm pointing?

13   Thanks everyone.  Can you read that aloud?

14   A    Thanks everyone.  Unfortunately my pathetic ex will

15   not leave us alone and continues to try to disrupt our

16   lives.  Like dancing as close as she can get to me at

17   Dockers last Tuesday night.  Well that did not work.

18   Barbara and I could not be happier.  As a matter of fact

19   this Wednesday, 6/29 -- and this was a typo -- it should

20   have been 6/29/2011 will be the first of many

21   anniversaries we will share.  That's the first night we

22   met and I we've never been happier.

23   Q    Congratulations.

24        That's personal information?  Is it not?

25   A    Yes.

Maynard - Direct/Mr. Antollino

586

1   Q     Okay.  Now you were, you received some complaints on

2   the Internet, correct?

3               MR. ZABELL:  Objection.

4               THE COURT:  What is the objection?

5               MR. ZABELL:  Relevance.

6               THE COURT:  No, I'll allow it.

7   BY MR. ANTOLLINO:

8   Q     One person complained that the weight --

9               MR. ZABELL:  Objection.

10              THE COURT:  Why don't you approach.

11              (Continued on the following page.

Maynard - Direct/Mr. Antollino

587

1          (The following occurred at sidebar.)

2          MR. ANTOLLINO:  I'm just going to get into a

3   couple of complaints and whether they're legitimate and

4   what his reaction to them would be.  That's all.

5          THE COURT:  What is your objection?

6          MR. ZABELL:  My objection at that point was, he

7   is reading in the complaint without introducing it into

8   evidence.  If he was introducing it into evidence, I would

9   object to the relevance.  But you have already ruled on

10  that.

11         THE COURT:  So do you want to introduce the

12  complaints in your question?

13         MR. ANTOLLINO:  Well, we would you rather,

14  judge?

15         MR. ZABELL:  My preference is to neither if I'm

16  going to be asked.

17         THE COURT:  Well he is questioning your client

18  about complaints, and what he did and did not do.

19         MR. ZABELL:  I think it would be to ask him if

20  he recalls and if he doesn't recall show him the document

21  to refresh your recollection.  But just identify it for

22  us.

23         (Continued on the following page.)

24

25

Maynard - Direct/Mr. Antollino

588

1          (The following occurred in open court.)

2          MR. ANTOLLINO:  All right, can you read the last

3    question back?

4          (The testimony was read back.)

5    BY MR. ANTOLLINO:

6    Q    One person complained that the wait was interminable,

7    correct?

8    A    We tell people when they make the reservation that

9    they should expect --

10         THE COURT:  First, do you recall a complaint

11   that he is claiming?

12   Q    Would you like to see your deposition to refresh your

13   recollection?

14   A    Sure.

15   Q    Turn to page 62 line 21.

16   A    What line now?

17   Q    21?

18   A    Yes.

19   Q    All right, so do you recall that there was a

20   complaint on the Internet that the weight was

21   interminable.  But you believe that was an unfair

22   complaint because there is any number of factors that

23   could affect the wait for someone who goes to skydive on

24   Long Island, correct?

25   A    That's correct.

589

```
 1    Q    And there was also another complaint where someone
 2    said that the ladies in the office were rude, correct?
 3    A    I heard about that.
 4    Q    And that is only one side of the story, correct?
 5    A    That's the one side of the story.
 6    Q    And you would have to investigate to make sure that
 7    it's true, correct?
 8    A    Correct.
 9    Q    You can only find the truth by investigating,
10    correct?
11    A    Correct.
12    Q    Now you testified before you believe that Don made a
13    creepy face in the video, correct?
14    A    Correct.
15    Q    But you did not fire Don for making that creepy face,
16    did you?
17    A    Nope.
18    Q    Now in 2001 apparently there were some ladies that
19    were crying about Don.
20             Do you recall that?
21             MR. ZABELL:  Objection.
22             THE COURT:  What is your objection?
23             MR. ZABELL:  It assumes facts not in evidence.
24             THE COURT:  I guess he's asking him whether or
25    not he heard that.
```

Maynard - Direct/Mr. Antollino

590

1       MR. ANTOLLINO:  That is correct.

2       THE COURT:  Overruled.  You can answer that.

3   BY MR. ANTOLLINO:

4   Q    Is that right?

5   A    Yes.

6   Q    And that's why you fired him, correct?

7   A    There were a little bit more than two complaints.

8   There were a few weeks a part.

9   Q    He said he was gay to these women, correct?

10  A    Under canopy when there is no one else around, these

11  women told me that he was telling them that he recently

12  came out and was talking about homosexual sex.

13      And the first time it happened I had a

14  conversation with Don.  Don told me he was gay when I

15  hired him.  I have no problem with what other people do.

16  And I said, but keep it to yourself and nobody -- you

17  should doing your job talking about what skydiving is

18  about and nothing else.

19      And it happened.  So I talked to him the first

20  time.  A few weeks later it happened again.  The woman

21  wasn't really crying, crying.  She was on the verge of

22  tears.  And I told him he had to go.

23  Q    All right.  I want you to take a look at your

24  deposition, page 139, line 22.  Do you see that?

25  A    Yes.

Maynard - Direct/Mr. Antollino

591

1  Q    Question:  And what was it that Don said that made

2  these women cry?

3         Answer:  Him talking about being gay.

4         Question:  Anything else?

5         Answer:  No.

6         Were you asked those questions and did you give

7  those answers.

8  A    Yes, I did.

9  Q    And you said nothing about homosexual activity, did

10  you, at your sworn deposition, correct?

11  A    In my answer on line 24 there, that's what he was

12  talking about when I said he was talking about being gay.

13  Q    And you said, and it has nothing to do with sex.  It

14  had simply to do with being gay, correct?

15  A    No.

16         MR. ZABELL:  Objection.

17         THE COURT:  What's that?

18         MR. ZABELL:  He is trying to impeach his own

19  witness.  And asked and answered.

20         THE COURT:  Overruled.

21         I didn't hear your answer.

22  A    I said that in that 24 when he said that he was gay,

23  I was talking about that those women were saying those

24  other things.  I didn't say them, all of his words in that

25  deposition.

Maynard - Direct/Mr. Antollino

592

1   Q    So to you being gay is the same thing as talking

2   about sex, sex?

3   A    This has nothing to do with that.  Don was fired

4   because the customers complained.  And my business is

5   built on customer service.  And if people go out and

6   they're not happy, then word of mouth is not going to

7   happen.

8         If a customer complains, it wouldn't matter what

9   they complained about.

10  Q    It wouldn't matter what they complained about, so --

11  A    If it was a valid complaint.

12  Q    So a valid complaint was simply that Don said he was

13  gay, correct?

14       MR. ZABELL:  Objection.

15       MR. ANTOLLINO:  I just want to clarify.

16  Q    The only complaint was that he was gay, right?

17       MR. ZABELL:  Same objection.

18       THE COURT:  You already asked that question.

19  Q    You did not, even then you did not tell him not to

20  tell customers that he is gay, correct?

21  A    I did not tell him not to tell people that they were

22  gay.  He should be treating people and not making people

23  upset.

24  Q    I want you to take a look at your deposition on page

25  140, line 3.

Maynard - Direct/Mr. Antollino

593

1          Question:  All right, but yet even then you

2     didn't tell him not to tell customers that he's gay,

3     correct?

4          Answer:  Say that one more time?

5          MR. ZABELL:  Your Honor.  I'm going to object.

6     He is trying to impeach him with a consistent statement in

7     his deposition.

8          MR. ANTOLLINO:  Well that is up to the jury to

9     decide whether it's consistent.

10         THE COURT:  The jury will hear both sides if

11    permitted.  If the lawyers think that the witness says

12    something inconsistent in a deposition, they're permitted

13    to read that portion of the deposition.

14         Whether or not it is inconsistent or not, and if

15    it is inconsistent how much weight to give to the

16    inconsistency is up to the jury to decide.  That is up to

17    the jury to decide.  Okay?

18         So go ahead.  You can finish reading what you're

19    reading.

20    BY MR. ANTOLLINO:

21    Q    All right, but yet even then you didn't tell him not

22    to tell customers he's gay, correct?

23         Answer:  I didn't tell him not to tell them.

24         Were you asked that question and did you give

25    that answer.

Maynard - Direct/Mr. Antollino

594

1    A    Right.

2    Q    Okay, and you don't have any documentation whatsoever

3    about these complaints, correct?

4    A    They complained directly to me, and I'm sworn under

5    oath, and I told the truth.

6         No, I don't have, I do not have documentation.

7    Q    Okay, thank you.

8         If you can just stick to the questions we'll get

9    through this more quickly.

10        MR. ZABELL:  Objection.

11        THE COURT:  Sustained.

12        The jury will disregard the statement.

13        I don't want any comments to the witness.

14        MR. ANTOLLINO:  I apologize, judge, I'm trying

15   to move it along.

16   BY MR. ANTOLLINO:

17   Q    All right, I'll ask the next question.

18        You have no records of any of these passengers

19   that complained about Don in 2001.  Is that correct?

20        MR. ZABELL:  Objection.  Asked and answered.

21        THE COURT:  Sustained.  He said he has no

22   documentation.

23   BY MR. ANTOLLINO:

24   Q    Now there are various levels of discipline at this

25   Drop Zone that you can use against your employees,

Maynard - Direct/Mr. Antollino

595

1    correct?

2    A    Yes.

3    Q    And in Don's case you used the most severe form of

4    discipline which was ultimately termination, correct?

5    A    For very serious complaints from my customers, yes.

6    Q    And below that there is also a suspension which you

7    also did to Don Zarda, correct?

8    A    Yes.

9    Q    And there is also a reprimand that you can give to an

10   employee.  That is below suspension, correct?

11   A    Yes.

12   Q    And there is also counseling and retraining that is

13   some other type of corrective training that would address

14   a customer complaint, correct?

15   A    Are you asking me if I did counseling?  No.

16   Q    Now I know you didn't do counseling.  But you can do

17   counseling, correct?

18   A    I'm not trained in counseling.

19   Q    Well, when I say counseling, I mean counseling

20   someone as to how to deal with your customers in the

21   workplace, correct?

22   A    Correct.

23   Q    Now there were employees other than Don that told

24   your customers about Don's sexual orientation.

25              Is that not true?

Maynard - Direct/Mr. Antollino

596

1   A    Don told most people he, that he was gay.

2   Q    All right, I understand that.  But I am asking you

3   this.

4           There were employees other than Don who told

5   customers about Don's sexual orientation.  Yes or no?

6   A    No.

7   Q    Okay.  That is not true.

8           Why don't you take a look at --

9           MR. ZABELL:  Objection.

10          THE COURT:  He asked the question.  Go ahead.

11  BY MR. ANTOLLINO:

12  Q    Why don't you look at 125.  You were looking at an

13  e-mail.  And it says  --

14          THE COURT:  Hold on.

15          MR. ANTOLLINO:  I'm sorry, 125 line 12.

16  BY MR. ANTOLLINO:

17  Q    Were you asked these questions and did you give these

18  answers ?

19          Question:  It says in an e-mail that the

20  instructors who went up in the tandem were telling the gay

21  guys about the gay skydiver.  Do you see that?

22          Answer:  Yes.

23          Question:  Was that appropriate for them to do?

24          Answer:  I can't answer that.  I don't know who

25  started what or what said what.  I don't even know.  I

Maynard - Direct/Mr. Antollino

597

1    don't even know that.

2            Question:  Well, what?

3            Answer:  If this is true.

4            Question:  We're just assuming that it's true,

5    hypothetically.

6            Question:  You're assuming it's true that your

7    skydivers mentioned Don's sexuality.  Was that

8    inappropriate?

9            Answer:  It would depend on what's being said.

10           Question:  It's personal information, isn't it?

11           Answer:  I guess so.

12           MR. ZABELL:  Your Honor I'm going to object to

13   the entire reading and move that it be struck.

14           THE COURT:  Sustained.

15           The jury will disregard that.

16   BY MR. ANTOLLINO:

17   Q    Now, if your coworkers or Don's coworkers told others

18   about being gay, that would be personal information about

19   Don that they were giving to the customers, correct?

20           MR. ZABELL:  Objection, hypothetical.

21           THE COURT:  Sustained.

22   BY MR. ANTOLLINO:

23   Q    There were employees other than Don -- withdrawn.

24           Now I'm going to --

25           MR. ANTOLLINO:  Now you're not going to allow me

Maynard - Direct/Mr. Antollino

598

1   to ask any hypothetical questions?

2            THE COURT:  No.

3   BY MR. ANTOLLINO:

4   Q    Now there was an incident that you're aware of where

5   a large-busted woman was caught on videotape.

6            Is that correct?

7   A    Over the years there has been more than one, a lot of

8   people.

9   Q    And the instructors, your male instructors rushed

10  into the video room to see her falling and in free fall,

11  correct?

12  A    I don't believe that my instructors or video guys

13  were rushing to the room to see what you're talking about.

14  Q    Well why don't you take a look at 133?

15           MR. ZABELL:  Your Honor, I'm going to object to

16  this line of questioning on relevance.

17           THE COURT:  Sustained.

18  BY MR. ANTOLLINO:

19  Q    Now at some point in 2001 you found out that Don was

20  gay, correct?

21  A    He told me right away.  Or actually Curt Kellinger

22  told my he was gay.  And when I talked to Don, that was

23  one of the first things he told me.  And I said it don't

24  bother me.  My sister was gay.  I have nothing, you know,

25  it doesn't matter.  I was told that you were a good

Maynard - Direct/Mr. Antollino

599

1    instructor and you had much experience, and I had an

2    opening on Long Island for you.

3    Q    And when you found that out, did you not inform him

4    not to reveal his sexual orientation to passengers.

5            Is that correct?

6            MR. ZABELL:  Objection to the form of the

7    question.

8            THE COURT:  Yes.  Sustained to the form.

9    BY MR. ANTOLLINO:

10   Q    Did you tell Don at that time not to inform any of

11   your customers of his sexual or orientation, yes or no?

12   A    Yes.

13   Q    Okay, take a look at page 136 line 2.

14           Question:  Did you tell him not to reveal his

15   sexual orientation to anyone else?

16           Answer:  No.

17           Were you asked that question and did you give

18   that answer.

19   A    It's in there.  I guess I did.

20   Q    And you believed that Don was a good instructor,

21   correct?

22   A    Yes, I do.

23   Q    And he was a safe instructor, correct?

24   A    Correct.

25   Q    You even testified at the deposition you thought he

600

1    was a good guy?

2    A    I said I did.

3    Q    At one point in 2009 Don had an accident where he was

4    injured.

5         Is that right?

6    A    That's right.

7    Q    You saw the tape of that accident, correct, or the

8    tape that led to that accident, right?

9    A    I don't remember if I saw that or not.

10   Q    Well take a look at your deposition page 151.  I'm

11   sorry, page 150, line 21.

12        Do you remember if you did anything improper in

13   that jump that caused his injury?

14        Answer:  No.

15        Were you asked that question and did you give

16   that answer.

17        MR. ZABELL:  I'm going to ask that the question

18   before that be read which most closely matches the

19   question that was previously asked, beginning at line 17,

20   asking, Did you see the video of the jump?

21        MR. ANTOLLINO:  If he would like to read it,

22   judge, he is free to.

23        THE COURT:  Well, then we'll do it twice.  For

24   more completeness he wants another portion for the

25   evidence so you can go back.

Maynard - Direct/Mr. Antollino

601

1    MR. ANTOLLINO:  So you want me to start at line,

2  at the top and go through all the way?

3    MR. ZABELL:  Line 17.

4  BY MR. ANTOLLINO:

5  Q   Did you see the video of the jump in which he

6  suffered an injury?

7    Answer:  I probably did but I don't remember it.

8    Question:  Do you remember if he did anything

9  improper in that jump that caused his injury?

10    Answer:  No.

11    Question:  Did it in fact just look like a

12  regular old jump?

13    Page 151, line 13?

14    Yeah, I'm not sure.

15    Were you asked those questions and did you give

16  those answers?

17    MR. ZABELL:  I'm going to object.  He is

18  answering yeah.  I'm not sure, in response to the

19  colloquy.

20    MR. ANTOLLINO:  I'll clarify that, judge.  I'll

21  clarify.

22    THE COURT:  You can clarify.

23    MR. ANTOLLINO:  I would clarify the facts to the

24  best of his recollection.

25    MR. ZABELL:  No, your Honor, page 151 is in.

Maynard - Direct/Mr. Antollino

602

1    There is a response in colloquy not a response to the

2    question.

3              MR. ANTOLLINO:  I skipped the colloquy, judge.

4              THE COURT:  What page is it?

5              MR. ANTOLLINO:  151.

6              MR. ZABELL:  And there is another question

7    before that line 4 on page 151.

8              THE COURT:  Why don't you come up.

9              (Continued on the following page.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maynard - Direct/Mr. Antollino

603

1          (The following occurred at sidebar.)

2          THE COURT:  Read those two together, okay?

3          MR. ANTOLLINO:  Okay.

4          MR. ZABELL:  Thank you.

5          (Continued on the following page.)

Maynard - Direct/Mr. Antollino

604

1        (The following occurred in open court.)

2    BY MR. ANTOLLINO:

3    Q    On line 4.

4        Question:  All right, that would not have

5    resulted in any injury.

6        And then line 10, you can answer.

7        And you answered:  Yeah.  I'm not sure.

8        Were asked this --  this is on page 151, line 4.

9        Did you follow me?

10   A    Yes.

11   Q    All right, that would not have resulted in an injury.

12       Question:  You may answer.

13       Answer:  Yeah, I'm not sure.

14       And then turn to page 152, you say:  It looked

15   like a normal skydive.

16       Question:  It did not look like Don did anything

17   negligent, correct?

18       Answer:  No.

19       Were you asked those questions and did you give

20   those answers.

21   A    Yes.

22   Q    And you testified to the best of the ability of your

23   memory at the time?

24   A    Yes.

25   Q    And that is the best of your recollection at this

Maynard - Direct/Mr. Antollino

605

1   time?

2   A    Yes.

3   Q    All right now we heard a lot about Workers'

4   Compensation insurance in this case from your side.  You

5   were aware that after --

6          MR. ZABELL:  Objection.

7          THE COURT:  Sustained.  Just ask the question.

8   Q    You were aware that Don applied for Workers'

9   Compensation insurance, correct?

10  A    Yes.

11  Q    And you know that it is the right of every employee

12  to apply for Workers' Compensation if they are injured on

13  the job, correct?

14         MR. ZABELL:  Objection.

15         THE COURT:  No, I'll allow that.  Go ahead.

16         You can answer.

17  A    Yes.

18  Q    You are aware that you can not discriminate against

19  an employee for utilizing Workers' Compensation, correct?

20  A    I'm not sure what you mean by neutralizing.

21  Q    I'm sorry you're not sure what?

22  A    I'm not sure what you mean by neutralizing.

23  Q    I didn't use the word neutralizing.

24  A    I'm sorry.

25  Q    You are aware that you can not discriminate against

Maynard - Direct/Mr. Antollino

606

1   an employee for utilizing Workers' Compensation insurance,

2   correct?

3   A    Correct.

4   Q    You know it is against the law to fire an employee

5   because they use Workers' Compensation, correct?

6          MR. ZABELL:  Objection.

7          THE COURT:  I'll allow the question.  But there

8   is no claim in this case for termination, unlawful

9   termination because of filing of a Workers' Compensation

10  claim.  It is based upon sexual orientation.  But I'll

11  with allow him to answer that question.  Go ahead.

12  A    Yes.

13  Q    And you did not fire Don because he filed for

14  Workers' Compensation or anything related thereto,

15  correct?

16  A    Correct.

17  Q    Now after Don get injured, there was a mandatory

18  staff meeting at the Drop Zone.

19          Is that correct?

20  A    Yes, there was.

21  Q    And you believe that Don went to that meeting,

22  correct?

23  A    Don was not an employee at that point because he was

24  out on Workers' Comp and he was hurt.

25  Q    He was sent a letter saying there was a mandatory

Maynard - Direct/Mr. Antollino

607

1   meeting.

2           Is that correct?

3   A    No.

4   Q    How do you know that?

5   A    Because we don't send letters for meetings.

6   Q    Don did appear at that meeting though, did he not?

7   A    He inadvertently was still on the employee e-mail

8   list that I don't control, and it was a mistake made by

9   the office.

10  Q    So he followed what instruction was given not knowing

11  that there was an inadvertence on your end.

12          Is that fair to say?

13          MR. ZABELL:  Objection.

14  A    No.

15  Q    So there was an inadvertence on your end, and you

16  sent Don an e-mail to come to a mandatory meeting,

17  correct?

18  A    Employee mandatory meeting.  He was no longer an

19  employee and he knew that.

20  Q    How do you know that he knew that?

21  A    Because he was no longer working for me.

22  Q    His intention was to get back into skydiving as soon

23  as possible.

24          Isn't that correct?

25  A    Yeah.

Maynard - Direct/Mr. Antollino

608

1    He had a cast on his leg and he was in crutches.

2   He knew he could not get back to work for many months.

3   And there was no reason for him to be at my website in a

4   cast on crutches for my customers to now have a little

5   more fear that, that not coming there.  And that is my

6   answer.

7   Q    Okay.  He did not know when his cast would be taken

8   off, did he?

9            MR. ZABELL:  Objection.

10           THE COURT:  Sustained to the form.

11   BY MR. ANTOLLINO:

12   Q    Were you aware that Don knew when his cast was going

13   to be taken off?

14   A    It was a recent injury.  I had broken my ankle and it

15   was a minimum of six weeks.

16   Q    Okay.

17   A    No.  I did not know when he was going to get it off.

18   Sorry.

19   Q    I'm sorry, what was that?

20   A    No, I do not, I did not k now when his cast was

21   coming off, to answer your question.

22   Q    You did not know when had the cast was coming off,

23   correct?

24           MR. ZABELL:  Objection.

25           THE COURT:  Sustained to form.

Maynard - Direct/Mr. Antollino

609

```
1
2    BY MR. ANTOLLINO:
3    Q    As far as you know --
4              MR. ZABELL:  Objection.
5              THE COURT:  I'll let him finish.
6              Did you have a conversation with Mr. Zarda about
7    when his cast was coming off?
8              THE WITNESS:  No, I did not.
9    BY MR. ANTOLLINO:
10   Q    He essentially came out saying  that he was hoping to
11   get back to work as soon as possible.  Did he not?
12   A    Yes.
13   Q    Now 2/21/2010 the office received a call from David
14   Kengle, correct?
15   A    Correct.
16   Q    Kengle had taken a tandem jump a few days earlier on
17   6/18/2010, correct?
18   A    Correct.
19   Q    That was three days before his call, correct?
20   A    Correct.
21   Q    You're open during the weekend, correct?
22   A    Yes, we are.
23   Q    So he could have called Friday to complain, he could
24   have called Saturday to complain, he could have called
25   Sunday and complained.
```

Maynard - Direct/Mr. Antollino

610

1        Is that correct?

2              MR. ZABELL:  Objection.

3              THE COURT:  Sustained.

4    BY MR. ANTOLLINO:

5    Q    He did not complain for three days until after his

6    jump.

7              Is that a fair characterization?

8              MR. ZABELL:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10             MR. ANTOLLINO:  Is that sustained as to form?

11             THE COURT:  No, asked and answered.

12             MR. ANTOLLINO:  Asked and answered.  All right.

13   BY MR. ANTOLLINO:

14   Q    No one has the right to expect a perfect skydive, do

15   they?

16             MR. ZABELL:  Objection.

17             THE COURT:  Limit it.

18   Q    There is nothing in Mr. Kengle's video that verified

19   his complaint about what his girlfriend told you, correct?

20             MR. ZABELL:  Objection.

21             THE COURT:  We've already gone through.

22   BY MR. ANTOLLINO:

23   Q    So Kengle told you that his girlfriend said to him,

24   Don't worry that I'm so close because I'm gay, and that

25   made her feel uncomfortable?

Maynard - Direct/Mr. Antollino

611

1    MR. ZABELL:  Objection.

2    THE COURT:  That is okay.  He can answer that.

3  A    I believe that she was already feeling uncomfortable

4  because he was placing his hands on her hip and it

5  shouldn't have been there for that amount of time.  And I

6  believe that is when she started feeling uncomfortable.

7  And after that was when Don said, Don't worry, I'm gay.

8  Q    You did not ask Don anything about this particular

9  jump, did you?

10 A    Yes, I did.

11 Q    In fact, he asked you to see the video so he could

12 remind himself who you were talking about.  Didn't he?

13    MR. ZABELL:  Objection.

14    THE COURT:  That's okay.  You can answer that.

15    MR. ZABELL:  Your Honor, my objection is only to

16 the portion of the question as to what he may use viewing

17 the videotape for, not that he didn't ask to see the

18 videotape.

19    THE COURT:  Well, it could have been part of the

20 discussion.  Overruled.

21    Do you remember the question?

22 A    No, I did not show Don the video.

23 Q    And he specifically asked for it because he wanted to

24 be able to understand what the complaint was, correct?

25    MR. ZABELL:  Objection.

612

1    THE COURT:  No, it's okay.  Again, part of the

2  discussion.

3  A    That discussion did not happen at the initial

4  meeting.  He never asked to see the videotape.

5  Q    So it's only until the second meeting that he asked

6  to see the videotape?

7  A    That's correct.

8  Q    He didn't ask anything about the jump at the

9  suspension meeting?

10  A    Yes, I asked him.

11    MR. ZABELL:  Objection.

12  A    Yes, I did ask him.

13  Q    You did ask him.

14    And he told you, That's 30 jumps ago, I can't

15  remember who you're talking about.  Didn't he?

16  A    Yes, he did.

17  Q    All right.  It could be reasonable for someone who

18  had gone through three days of skydiving not to remember

19  one particular person that they had taken on a skydive

20  three days ago, correct?

21    MR. ZABELL:  Objection.

22    THE COURT:  That's argumentative.

23    MR. ANTOLLINO:  What?

24    THE COURT:  That's argumentative.

25  Q    Do you believe it would be reasonable -- well,

613

1    withdrawn.

2              How many jumps can a person have on a good day?

3    Would it be fair to say up to 12?

4    A    Yes.

5    Q    So if Don jumped for three days, he would have had

6    approximately 30 to 36 jumps during the period of time

7    that Rosana took a jump and that you confronted him with

8    this allegation, correct?

9              MR. ZABELL:  Objection.

10             THE COURT:  You can answer that.

11   A    Yes, 12 jumps on a good day, on weekends.  On

12   weekdays, probably half of that.

13   Q    Okay.  So at least 24, correct?

14   A    Correct.

15   Q    So it would be kind of hard for someone to remember

16   exactly who had made a complaint when you confronted him

17   with this complaint three days later, even if it was over

18   a weekend, correct?

19             MR. ZABELL:  Objection to the form.

20             THE COURT:  Sustained as argumentative.

21   BY MR. ANTOLLINO:

22   Q    There would have been 24 jumps, approximately, in

23   between Rosana's jump and your presenting him with this

24   accusation, correct?

25             MR. ZABELL:  Objection.  Asked and answered.

Maynard - Direct/Mr. Antollino

614

1    THE COURT:  Sustained.

2    BY MR. ANTOLLINO:

3    Q    Don did not know which of the 24 customers you were

4    talking about, did he?

5    A    I described what happened on Friday.  We do have

6    couples come out and celebrate birthdays and different

7    things.  It does not happen all the time.  This was the

8    only one in probably several weeks, the girl was

9    celebrating her birthday.  I asked Don if he remembered

10   her and he said no.  And I told him about everything that

11   Mr. -- her boyfriend testified to, told me.

12         First time I asked him, he said, I don't

13   remember the jump.  And I described that it was her

14   birthday, who the girl was, who the guy was.  And again,

15   he said, I have no recollection.

16   Q    All right.  And so that was all of the information

17   you gave.  There was guy and a girl, the girl had a

18   birthday and you told the girl that you were gay, correct?

19         MR. ZABELL:  Objection.

20         THE COURT:  No, that is okay.  You can answer

21   that.

22   A    No.  He told me that she felt that he was touching

23   her where he shouldn't have been, and not in a good way,

24   and she felt very uncomfortable.  And not that he said

25   that he was gay.  It was what he did and what he said

615

1   under canopy, made her very -- feel very, very

2   uncomfortable.

3          So part of my investigation of trying to find

4   out what happened is that when I got the phone call, I

5   called Don and asked him those questions.  And he could

6   not -- he said he did not remember.

7   Q   And you didn't do anything to help him remember, did

8   you?

9   A   I needed to do -- I needed to go do some

10  investigation.  And because of the history and this had

11  happened two times before, I had this exact conversation

12  with him twice before.  And now here it is the third time

13  that I had to worry about my customers having complaints,

14  leaving my place being unhappy.

15         And my business is dependent on my customer

16  service of my employees when they leave there.  So I did

17  not terminate that Monday because I was very angry.  I

18  wanted to take some time.  I wanted to look at the

19  videotape.

20         When I watched the videotape and what he said,

21  it really -- I actually agreed with what I saw.

22  Q   You agreed that Don wanted to -- Don -- you knew that

23  Don was a gay male, correct?

24  A   That is not what we're talking about.

25  Q   You knew that Don was a gay male, correct?

Maynard - Direct/Mr. Antollino

616

1    A    Yes.

2    Q    All right.  And this guy said that he didn't want his

3    girlfriend to hear that Don was a gay male, correct?

4    A    That is not what he said, and that is not what I

5    said.

6    Q    Didn't you hear him testify today that that is what

7    he told you?

8              MR. ZABELL:  Objection.

9              THE COURT:  Sustained.

10             The jury will disregard that.

11             Please don't refer to other people's testimony.

12   He is a fact witness.  You ask him what he remembers and

13   the jury will hear what each witness remembers.  You can't

14   be asking each witness to comment on what they remember

15   about another witness' testimony.

16   BY MR. ANTOLLINO:

17   Q    All right.

18             So your recollection is that Mr. Kengle didn't

19   say anything about gay whatsoever?

20   A    I didn't say that either.

21   Q    Well --

22   A    Listen to his testimony.

23             MR. ZABELL:  Objection.

24             THE COURT:  Sustained.  The jury will disregard

25   that.

Maynard - Direct/Mr. Antollino

617

1   BY MR. ANTOLLINO:

2   Q    Did he mention that Don Zarda said he was gay or he

3   did not mention that Don Zarda said he was gay?

4           MR. ZABELL:  I'm going to object to the form of

5   the question.

6           THE COURT:  When you say he, you're talking

7   about Mr. Kengle?

8           MR. ANTOLLINO:  I just want find out what his

9   position is.

10          THE COURT:  You can answer that.

11  A    Yes, Mr. Kengle did say that Don told her he was gay.

12  Q    But you also credited -- is it your testimony today

13  that you credited the allegation that Don Zarda improperly

14  touched Rosana Orellana?

15  A    Yes.

16  Q    All right.  I want you to take a look at your

17  deposition on page 196.  Take a look at line 19.

18          MR. ZABELL:  Your Honor, I ask that the question

19  before that be read, the question and answer before that,

20  beginning on line 8.

21          THE COURT:  Yes.

22  BY MR. ANTOLLINO:

23  Q    All right.

24          Question:  Did you think that Don was hitting on

25  her?

618

1           MR. ZABELL:  Your Honor.

2           MR. ANTOLLINO:  I haven't read the previous

3    questions because I'm focusing on this one which relates

4    to the question that I just asked him.

5           THE COURT:  Okay, come up.

6           (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

619

1          (The following occurred at sidebar.)

2          MR. ANTOLLINO:  I have asked that line 8 start

3     the question.

4          THE COURT:  Where do you want to read from?

5          MR. ANTOLLINO:  Just at 19 through 25.

6          THE COURT:  You should read that part first,

7     okay?

8          MR. ANTOLLINO:  Yes.

9          MR. ZABELL:  Thank you, your Honor.

10         I would like a copy of the testimony.  We have

11    an extra.

12         THE COURT:  Yes.

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Maynard - Direct/Mr. Antollino

620

1    (The following occurred in open court.)

2    BY MR. ANTOLLINO:

3    Q    All right.  At line 8 you were asked, And what did

4    you discuss with Mr. Kengle on this 20 minutes or 30

5    minutes?

6          Answer:  We discussed the complaint from the

7    gentleman about his girlfriend and then he made his

8    girlfriend feel very uncomfortable with the way he was

9    touching her on her legs, the way he was putting his head

10   on her shoulder and just the girl was very, very

11   uncomfortable for the entire jump and she even thought

12   that maybe he was hitting on her and he was covering up

13   this stuff by telling her he was gay.

14          Question:  Did you think that Don was hitting on

15   her?

16          Answer:  It doesn't matter what I think.

17          Were you asked those questions and did you give

18   those answers.

19   A    Yes, I did.

20   Q    Does it matter what you think?

21   A    It matters what the actions were, not what I think.

22   Q    But you were not there to see the actions, were you?

23   A    No, I was not.

24   Q    All right.  And then were you further asked, I'm

25   asking you if you think that Don was hitting on her?

Maynard - Direct/Mr. Antollino

621

1    Answer:  I couldn't say if I thought he was or

2  not.

3    Were you asked that question and did you give

4  that answer?

5  A    Yes.

6  Q    And I gave Mr. Kengle his money back solely on his

7  complaint, correct?

8  A    Yes.

9  Q    And you took that money away from Don Zarda and sent

10  him home suspended without pay for a week, correct?

11  A    No.

12  Q    How long was it?

13    MR. ZABELL:  Objection.

14    THE COURT:  No, it's okay.  Go ahead, you can

15  answer.

16  A    Those jumps were made on a Friday.  The payroll goes

17  through to the next Saturday is when any jumps -- a week

18  goes from Monday to Sunday.  So if you make a jump on

19  Friday, the 18th, you don't get paid on Saturday.  Our

20  payday is Saturday.  You don't get paid on Saturday, the

21  19th.  The payroll goes to the following week and that's

22  how it has always been.

23    So when I told Don I was docking his pay, he

24  wasn't going to get paid until that following Saturday.

25  The next time I saw Don was on the Monday.  And I had

622

1  talked -- and I had spoken with my attorney.  And I know

2  that I shouldn't have told him I was going to dock his

3  pay.  So he wouldn't have been paid on Saturday.  He

4  didn't show up.  He came on Monday.  He got his check with

5  the docked money along with a second check for that, which

6  gave him a full amount of money so we're talking maybe a

7  day and-a-half.

8  Q    Okay.  So between Saturday and Sunday and Monday of

9  the following week he did not have that money in his hand?

10 A    If he came in on Saturday and picked up his pay he

11 would have had it.

12 Q    Well, you didn't ask him to come in on Saturday, did

13 you?

14 A    I don't think I have asked anybody to come in and get

15 their payroll.

16 Q    You suspended him from the drops zone, correct?

17 A    I suspended him for a week.  I didn't tell him he

18 couldn't come in and get his paycheck.

19 Q    And you suspended him without pay, correct?

20 A    I took the money from those two jumps out of his pay

21 during that week.  I told the payroll service to do that.

22 Okay.  And then that Saturday is when the checks are

23 issued.  Before that happened, I wrote out a check for the

24 full amount of money so that when he came to get paid, he

25 would have had the full check in his hand.  I would have

623

1   had that on the payday of Saturday if he came.  He came in

2   on Monday and I gave him all his money.  If he had come in

3   on Saturday, I would have gotten all his money.

4           From that jump on Friday, he would have never

5   gotten that money until the following Saturday because

6   that is how payroll works.

7   Q    But he had no idea that you were going to give him

8   his money because you told him you were going to dock his

9   pay, correct?

10  A    And I changed my mind and I wrote a check out for

11  him.

12  Q    You changed your mind but you didn't tell Don that

13  you changed your mind, did you?

14  A    I didn't call Don, Don didn't call me.

15  Q    And you didn't tell Rich who was in contact with Don,

16  correct?

17  A    Rich who?

18  Q    Rich Winstock.

19  A    What does he have to do with this?

20  Q    Rich Winstock was your second in command, correct?

21  A    Unofficially, probably.

22  Q    He was in contact with Don during this period,

23  correct?

24  A    I didn't know that.

25  Q    You didn't talk to Rich about --

Maynard - Direct/Mr. Antollino

624

1    A    I talked to Rich about it.

2    Q    And Rich recommended of that you simply give him a

3    written reprimand and move on at that point, correct?

4    A    Rich did not know Don's history from 2001 when this

5    happened two times before.

6    Q    Did you explain that to him?

7    A    Yes, I did.

8    Q    All right.  And he still recommended a written

9    reprimand, correct?

10        MR. ZABELL:  Objection.

11   A    No.

12        THE COURT:  Overruled.

13   BY MR. ANTOLLINO:

14   Q    You can answer.

15        THE COURT:  He did answer.  He said, no.

16        You said no?

17   A    Yes.

18   Q    Now, you understand that --

19        THE COURT:  Let's just go ahead, so it's

20   quicker, I'm going to ask the court reporter read back the

21   question and answer again, okay?

22        (Question and answer read back.)

23   BY MR. ANTOLLINO:

24   Q    What did he recommend at this point?  Did he

25   recommend that you fire Don?

Maynard - Direct/Mr. Antollino

625

1    A    There wasn't much more conversation about it.

2    Q    So he didn't say anything?

3    A    No, he did not.

4    Q    And when you talked about these other two people, you

5    just said that he told them that he was gay, correct?

6    A    He told two people he was gay?

7    Q    Yes, in 2001.

8    A    On a skydive, he upset two other women to the point

9    they were almost in tears talking about what he was doing

10   and he wasn't talking about the stuff on the job, yes.

11   Q    When you say stuff he was doing, you're talking about

12   his being gay, correct?

13   A    It wouldn't matter what my instructors are saying to

14   customers if they're not talking about what they're

15   supposed to be talking about.  A skydive is not about him,

16   the skydive is about a skydive.  So if any instructor puts

17   them before the job, they would be terminated if there is

18   a complaint.

19   Q    So you would fire anyone if there was any complaint?

20   A    Any complaint such as this.

21   Q    But yet we've gone through the complaints that have

22   been online and you didn't fire anybody because of those,

23   correct?

24   A    Who, what did they complain about?

25   Q    They complained about the videographer, they

Maynard - Direct/Mr. Antollino

626

1   complained about the waiting area, they complained about

2   the wait.  They complained about the prices on the

3   dropzone.com.

4           Isn't that correct?

5   A    Those are things that happen inadvertently.  I mean,

6   you have to wait all the time.  Everybody is told that.

7   When you make a reservation, you're told, expect to be in

8   there for half the day.  And if the weather changes or if

9   something else goes on, we doesn't have control over that.

10  Q    But there were people complaining about the ladies in

11  the -- in the --

12  A    It's a one-sided conversation.  You have no idea what

13  they said to them.

14  Q    I didn't finish asking the question.

15          There was someone who was asking and complaining

16  about the ladies in the office, I know you're busy but

17  please don't get frustrated with me, when after two

18  hours --

19          MR. ZABELL:  Objection, judge.

20          THE COURT:  Sustained.

21  BY MR. ANTOLLINO:

22  Q    All right.  May I hand this up to the witness?  This

23  is plaintiff's can Exhibit 6.  And ask if you recognize

24  this?

25  A    There is not any truth in this whatsoever.

Maynard - Direct/Mr. Antollino

627

1   Q   These are complaints about Skydive Long Island,

2   correct?

3   A   Online with some lady that won't even give their

4   name.  They're anonymous.

5   Q   I just want to make it clear that these are

6   complaints about Skydive Long Island, correct?

7           MR. ZABELL:  Objection, your Honor.

8           MR. ANTOLLINO:  Just make it clear.

9           MR. ZABELL:  They are not in evidence.

10          MR. ANTOLLINO:  All right.  I'll move them into

11  evidence, judge, Plaintiff's Exhibit 6.

12          MR. ZABELL:  I object for lack of foundation.

13          THE COURT:  Let's take a break, okay?  The

14  afternoon break.  Don't discuss the case.

15          (The jury left the courtroom.)

16          THE COURT:  I don't notice if we had customers

17  earlier in the testimony.  Are these the ones --

18          MR. ANTOLLINO:  These are different.

19          THE COURT:  They're anonymous?

20          MR. ANTOLLINO:  No, they're not quite anonymous.

21          MR. ZABELL:  Kevin W. from New York, New York on

22  October 26th.

23          THE COURT:  What exhibit is this?

24          MR. ZABELL:  Exhibit 6, Defendant Exhibit 6.

25          THE COURT:  Plaintiff's.

Maynard - Direct/Mr. Antollino

628

1      MR. ZABELL:  Plaintiff's, I'm sorry.  A 2.

2      THE COURT:  This is a question about the

3  deposition, these complaints.

4      MR. ZABELL:  I don't believe he was aware of

5  them.  There are complaints that occurred after the

6  incident in question, was October 26, 2010, the other is

7  September 11, 2011.

8      MR. ANTOLLINO:  The question is what he would do

9  if there was complaint and he just testified as long as

10  there is a complaint, I would fire.

11      MR. ZABELL:  That is not what he testified to.

12      THE COURT:  That is not -- we have to break it

13  down.  We were going okay for a while and we're starting

14  to break down, okay?

15      The question regarding these other complaints, I

16  think he was about to explain why he didn't act on these

17  complaints and I think that is fair game.  Let him explain

18  for him to point out that other complaints were taken,

19  there was no adverse actions taken with respect to any

20  employees and obviously Mr. Maynard is free to explain,

21  assuming that he was aware of these, and why did he decide

22  to take no action, whether he did any investigation or

23  based upon nature of the complaint, he did not credit

24  them, whatever it is.

25      MR. ZABELL:  I understand that.  But shouldn't

Maynard - Direct/Mr. Antollino

629

1    they come in with a proper foundation, be admitted into

2    evidence and then be read in, instead of having --

3           THE COURT:  Certainly before they're read out

4    loud they should come into evidence, but you say proper

5    foundation, yes.  If he thinks this is off the website and

6    he reviewed them, he should bring that out first.

7           MR. ZABELL:  This is not his business website.

8    This is Yelp review.  Yelp is a public opinion website.

9           THE COURT:  So I guess if it's not on his

10   website, then the method of authentication would be that

11   he was aware of these.

12          MR. ZABELL:  Absolutely.  But those questions

13   should be asked in the normal course.

14          THE COURT:  Okay.

15          MR. ZABELL:  It would be like asking your Honor

16   to comment on a comment that was written about you on The

17   Robing Room.  Sometimes I'm sure you could read and figure

18   out who it was that said it, but you would have to ask

19   that foundation question.

20          THE COURT:  All right.  You have to ask him

21   whether he saw this.  I didn't realize it was on Yelp.

22   You have to ask him whether he saw it.

23          MR. ANTOLLINO:  He saw it in his deposition.

24          THE COURT:  Then if you had seen this, what

25   would you have done, so...

630

1    MR. ZABELL:  Maybe to ask him if he had seen it

2  in October of 2010 when it was posted.

3    THE COURT:  Well, for sure we can.  Well, if he

4  hasn't seen these, then there is no probative value.  I'm

5  not allowing you to ask a hypothetical if he had seen

6  this.

7    MR. ANTOLLINO:  Not if he had seen it.  He saw

8  it at his deposition.  It was marked as an exhibit at his

9  deposition and he was asked questions about it.

10    THE COURT:  But if he saw it at the deposition

11  doesn't mean he saw it in the course of his business and

12  made a decision during his business not to take action on

13  it.  There is a big difference.

14    Anybody can show anything at their deposition,

15  it doesn't make it admissible.  It he saw it in the course

16  of his business and analyzed it and made a decision, do

17  something or not to do something, that would be fair game.

18  But the first time he ever saw this was at the deposition,

19  zero probative value, okay?

20    MR. ANTOLLINO:  What about the second time?

21    MR. ZABELL:  If he saw it the second time after

22  seeing it the first time at the deposition?

23    THE COURT:  We're talking about the second time.

24    MR. ANTOLLINO:  We talked about this at length,

25  and I don't know what this person, what Mr. Maynard saw

631

1   after his deposition.

2            THE COURT:  It doesn't matter what he saw after

3   the deposition.  Okay.  The question is, did he see it

4   before you showed it to him for the first time at the

5   deposition.  He hasn't seen it.  If he hasn't seen it then

6   you can't ask someone, why didn't you take action on this.

7   If there is testimony that he never saw it, it was on Yelp

8   and he never saw it.  Okay?

9            And the same would be for the second one.  I

10  don't know if the second one is in the same category.  Is

11  the second one off his website or --

12           MR. ZABELL:  It's Yelp.

13           THE COURT:  The questions, then they become

14  hypothetical, if you had seen this, what would you have

15  done.  I'm not going to allow that, okay?

16           MR. ANTOLLINO:  All right.

17           THE COURT:  How much more do you have?  I hope

18  you're getting to the end.

19           MR. ANTOLLINO:  I'm near the end.

20           THE COURT:  All right.  Okay.  Let's take our

21  break.

22           MR. ZABELL:  Thank you, your Honor.

23           (A recess was taken at 3:24 p.m.)

24           (After recess the following occurred.)

25           THE COURT:  You think we are still going to

632

1   finish the testimony by tomorrow, correct?

2          MR. ZABELL:  I'm hoping.  I would like very much

3   to get in some of my witnesses done today.

4          MR. ANTOLLINO:  I don't think I'll be done

5   within 45 minutes today, judge, based on how it's going.

6   He stands up and objects to every question.

7          THE COURT:  How do you say you need another 45

8   minutes?

9          What topics haven't you covered that you have

10  covered already?  We have gone through now, obviously,

11  Ms. Orellana's incident.  What's left?

12         MR. ANTOLLINO:  Judge, I cut it down, as I told

13  you, as best I can, as best my judgment.  And I believe

14  that I can do it in 15 minutes, but for every answer there

15  is an explanation and an objection.  That's what takes so

16  long.

17         THE COURT:  Let's try to do it.  Let's shoot for

18  15 minutes.

19         MR. ANTOLLINO:  All right.  Then ask Mr. Zabell

20  and Mr. -- not to object -- and Mr. Maynard not to object

21  and explain every question.

22         THE COURT:  Let's bring in the jury.

23         (The jury entered the courtroom.)

24         THE COURT:  All right.

25

Maynard - Direct/Mr. Antollino

633

1    BY MR. ANTOLLINO:

2    Q    Mr. Maynard, you are familiar with Yelp.

3         Is that not true?

4    A    Yes, I am.

5    Q    In fact, you have an account on Yelp in which you

6    respond to customer complaints, correct?

7    A    Yes, we do.

8    Q    All right.  Now, I'm going to show you what's

9    Plaintiff's Exhibit 6 and ask you if you recognize these

10   complaints from Yelp.

11   A    I don't remember seeing this one.

12   Q    But you do recognize that is a Yelp complaint with

13   those stars there, correct?

14   A    Yes.

15   Q    Yes?

16   A    Yes.  And I think I remember seeing this one also.

17   Q    You do remember seeing this one?

18   A    I do.

19        MR. ANTOLLINO:  I ask that this be admitted,

20   judge.

21        THE COURT:  The first one you remembered seeing

22   as well?  I didn't hear the answer.

23   A    No, not that one.

24   Q    So you remember seeing the first one?

25   A    I remember seeing this, yes.

Maynard - Direct/Mr. Antollino

634

1    Q    And the second one which is also a Yelp complaint, do

2    you remember seeing this?

3    A    No, I don't.

4    Q    All right.

5            MR. ANTOLLINO:  Well, I would ask to admit the

6    first page of Exhibit 6, and I'll tell you what.

7            THE COURT:  I want to see if there is any

8    objection.

9            MR. ZABELL:  No.  But I want to hear what he

10   wants to tell us.

11           MR. ANTOLLINO:  I'll tell you what.  I won't ask

12   any further questions.  We'll go into this on summation,

13   okay?

14           THE COURT:  Okay.  So it's admitted, just the

15   one page.

16           MR. ANTOLLINO:  Yes.

17           (Plaintiff Exhibit 6 evidence.)

18   BY MR. ANTOLLINO:

19   Q    So before you fired Don, you didn't speak to anyone

20   who was on the plane other than Don or Mr. Kengle,

21   correct?

22   A    Correct.

23   Q    So the video which you saw, you remember him making a

24   goofy face.

25           Is that right?

Maynard - Direct/Mr. Antollino

635

1   A    I would not characterize that as goofy.

2   Q    All right.  Well, I'm going to show you, take a look

3   at your deposition, page 200.

4           Do you see page 200?

5   A    Yes, I do.

6   Q    And, in fact, you describe page 200 as goofy antics

7   going on in the airplane.

8   A    I think you're saying that.

9   Q    All right.  Well, let me look at the question.  I

10  don't happen to have that page with me.

11          MR. ZABELL:  Here you go.

12  BY MR. ANTOLLINO:

13  Q    Okay.  Were you asked this question, Isn't there

14  usually a goofy atmosphere that goes on in the rig before

15  a jump?

16          MR. ZABELL:  Objection.  That is not on page

17  200.

18          MR. ANTOLLINO:  That is 200, line 20.

19  BY MR. ANTOLLINO:

20  Q    Isn't there usually a goofy atmosphere that goes on

21  in the rig before a jump?

22          You were asked that question, correct?

23  A    In the rig?  What is the rig?

24  Q    That is what I said at my deposition.  You were asked

25  that question at the deposition, correct?

Maynard - Direct/Mr. Antollino

636

1    A    Yes.

2    Q    And you answered, There are times, yes, there are

3    goofy times.

4         That was your answer, correct?

5    A    Yes, but that wasn't what I said about Don.  And I

6    didn't say that about Don's video.

7    Q    But you would characterize the atmosphere as goofy

8    according to this, correct?

9    A    He kept saying goofy so I agreed with you.

10   Q    All right.  And you agreed with me because it was the

11   truth, correct?

12   A    We try to have our -- we try to make it fun up there.

13   Our first job is to make everything as safe as possible.

14   And by having a little fun atmosphere, we try to make the

15   customers relax, yes.

16   Q    Okay.  And by having them relax, you're funny, you

17   make jokes, you're goofy, you're childlike, all of those

18   things, correct?

19            MR. ZABELL:  Objection.

20            THE COURT:  We went through this already in his

21   testimony.

22   BY MR. ANTOLLINO:

23   Q    All right now, you saw -- you have seen pictures of

24   someone putting their hand on someone else's behind as

25   they're getting out of an aircraft, correct?

Maynard - Direct/Mr. Antollino

637

1    A    Yes.

2    Q    That's necessary because the person getting out of an

3    aircraft doesn't have something to stand on, correct?

4    A    Yes.

5    Q    Okay.  When an instructor is exiting an airplane with

6    a passenger, his mouth is very close to the passenger's

7    ears, correct?

8    A    Yes.

9    Q    All right.  And that's because if the instructor is

10   talking to the helmet, the passenger is not going to hear

11   as well as if he is on the right side or the left side,

12   correct?

13   A    What you're saying, yes.

14   Q    Now, do you remember the video where a bunch of

15   people were about to jump out of a plane and they all

16   exclaimed, Make shit happen?

17   A    Yes.

18   Q    Okay.  And there is nothing inappropriate about that,

19   given the context in which it's happening, correct?

20   A    Correct.

21   Q    You saw a picture of Rich Winstock having his hand on

22   a passengers's shoulder and you thought nothing wrong of

23   it, correct?

24   A    Correct.

25   Q    Now, you were not aware, were you, at the time you

Maynard - Direct/Mr. Antollino

638

1    fired Don, that Rosana was kissing the camera, were you?

2              MR. ZABELL:  Objection as to facts not in

3    evidence.

4              THE COURT:  Sustained to the form.

5    BY MR. ANTOLLINO:

6    Q    You saw Mr. Kengle's video this morning, correct?

7    A    Yes, I did.

8    Q    And there was a portion there where Rosana was

9    pursing her lips at the camera, correct?

10   A    She was going along with what was going on in the

11   airplane.

12   Q    Can you answer the question, was she pursing her

13   lips?

14   A    Yes.

15   Q    In the form of a kiss, correct?

16   A    Could be termed that way.

17   Q    Now, Mr. Kengle did not tell you that there had been

18   a joke in the aircraft to the effect that, I bet you

19   didn't think that your girlfriend was going to get

20   strapped to another guy, correct?

21   A    That said -- I read that more than once, yes.

22   Q    And Mr. Kengle didn't tell you that when he called

23   you, correct?

24   A    I'm not sure.  I don't remember.

25   Q    Why don't you take a look at your deposition,

Maynard - Direct/Mr. Antollino

639

1    page 210, and I'll ask you if that refreshes your

2    recollection.

3              THE COURT:  Do you have the deposition?

4    A    You took my copy.

5    Q    I'm sorry.

6              Do you see that?  On line 15, Did Mr. Kengle

7    tell you that there has been a joke before the passengers

8    exited the airplane?

9              Answer:  I don't recall.

10             Question:  In fact, did he in fact tell you that

11   one of the instructors other than Don made a joke to the

12   effect that, Hey, I bet you didn't think that your

13   girlfriend was going to get strapped to another guy.

14             And you answered, I don't know.

15             Question:  You don't know if he told you that?

16             No.

17             You answered -- you were asked those questions

18   and you were given those answers, correct?

19   A    Yes.

20   Q    All right.  Now, if that joke was made, it wasn't an

21   inappropriate joke according to you, correct?

22   A    Correct.

23   Q    Now, that comment would have been on Mr. Kengle's

24   mind during the jump, wouldn't that be fair to say, it was

25   made before the jump?

Maynard - Direct/Mr. Antollino

640

1          MR. ZABELL:  Objection.

2          THE COURT:  Sustained.

3    BY MR. ANTOLLINO:

4    Q    You did not think it is inappropriate for Rich

5    Winstock to tell a customer that he was married and had

6    children, do you?

7    A    No.

8    Q    That's personal information, correct?

9    A    Yes.

10   Q    If he felt that was appropriate under the

11   circumstances, you respect his judgment, correct?

12   A    Yes.

13   Q    And you knew that when you took your deposition in

14   2011, right?

15   A    Correct.

16   Q    He used that personal information in his best

17   judgment to ease the tension, correct?

18   A    That is what he said.

19   Q    You didn't fire Rich Winstock for that, correct?

20   A    Nobody complained.

21   Q    You didn't suspend him, correct?

22   A    Nobody complained.

23   Q    If someone had complained --

24          MR. ANTOLLINO:  Are you going to let me ask this

25   judge?

Maynard - Direct/Mr. Antollino

641

1   Q    If someone had complained, are you going to fire

2   someone for saying they're married and have children?

3   A    No.

4   Q    Now, you believe that Don's comment about being gay

5   is a comment about an escapade, correct?

6            MR. ZABELL:  Objection.

7            THE COURT:  Sustained to the form.

8   BY MR. ANTOLLINO:

9   Q    What is an escapade?

10  A    An escapade could be an event, be someplace you're

11  going, it could be a date.  Just another word for doing

12  something.

13  Q    And you heard on the tape last week that you referred

14  to Don telling Ms. Orellana about his escapades, correct?

15           MR. ZABELL:  Objection.

16           THE COURT:  Overruled.  You can answer that.

17  A    Yes.

18  Q    And his escapades were being gay, correct?

19  A    No.

20           Like I said, an escapade could be going

21  somewhere, doing something, going on a date.

22  Q    So you don't know what escapades you were referring

23  to in that tape?

24  A    Do I know what escapade?

25  Q    Yes.  You don't know what escapades you were

642

1   referring to in that tape, do you?

2   A    I don't understand.

3   Q    You referred -- now, let's just focus for a minute.

4   You referred to escapades in a tape that you heard last

5   week, correct?

6   A    Correct.

7   Q    What escapades were you talking about?

8   A    Don, you mean, with Ms. Orellana?

9   Q    Yes.

10  A    As you heard testimony from her, she told -- she

11  spoke about Don was talking about, he had just broken up

12  with his boyfriend and he was very unhappy.  And that was

13  what I considered an escapade.

14  Q    Breaking up with a boyfriend is an escapade?

15  A    Why not?

16  Q    All right.  You never asked what it was about the

17  hips that made Rosana uncomfortable, did you?

18  A    About the what?

19  Q    You never asked what it was about her hips that made

20  Rosana uncomfortable, did you?

21  A    No, I did not ask.

22  Q    It could have been that Don was adjusting the straps

23  down there, correct?

24  A    No.

25  Q    All right.  Take a look at your deposition, page 250.

643

```
1            Do you have page 250 there?

2    A    Yes.

3    Q    All right.  Take a look at page 149, line 25.

4            Question:  And it could have been something,

5    page 250, like he was adjusting the straps down there,

6    correct?

7            Answer:  It could.

8            Were you asked that question and did you give

9    that answer?

10   A    Yes.

11   Q    And then I also asked you, And if he was adjusting

12   the straps down there, that would not be a legitimate

13   complaint, correct?

14           Answer:  Correct.

15   A    If he was just adjusting the straps, correct.

16   Q    That's okay.

17           You trusted Don's judgment in adjusting the

18   straps, to give as much safety and balance with

19   customers -- withdrawn.

20           You trusted Don's judgment in adjusting the

21   straps to give as much safety and balance with comfort for

22   the passenger.

23           Is that correct?

24   A    Correct.

25   Q    What Rosana felt might well have been -- withdrawn.
```

Maynard - Direct/Mr. Antollino

644

1    Now, a tandem instructor wants to check the

2    attachments to make sure that they are in place, correct?

3    A    Correct.

4    Q    That would require him to touch the attachments,

5    correct?

6    A    Correct.

7    Q    Now, Mr. Kengle was paired with Duncan Shaw, correct?

8    A    Correct.

9    Q    And there is nothing wrong with the fact that Duncan

10   Shaw told Mr. Kengle that he was from New Zealand,

11   correct?

12   A    Correct.

13   Q    Even though being from New Zealand is personal

14   information, correct?

15   A    Correct.

16   Q    When you are under canopy -- before I forget, I just

17   want to ask this question.

18        Rosana testified last week that she was in free

19   fall for ten minutes.  Is that an exaggeration or is that

20   accurate?

21        MR. ZABELL:  Objection.

22        THE COURT:  Sustained to form.

23   BY MR. ANTOLLINO:

24   Q    How long are you in free fall in a typical dive?

25   A    About 60 seconds.

645

1    Q    So if she said ten minutes, that would be a

2    mis-memory, correct?

3    A    She was --

4    Q    Let me finish asking the question.

5          If she said ten minutes, that would be

6    incorrect, correct?

7    A    Correct.

8    Q    All right.  Now, when you were under canopy, that's

9    when you go up after the parachute is deployed.

10         Is that correct?

11   A    The parachute does not go up.  It actually --

12   Q    So the parachute opens and it takes you up, correct?

13   A    No.

14   Q    Explain what being under canopy means.

15   A    Initially in a free fall, and when you deploy the

16   parachute you're throwing out what we call a drogue, a

17   drogue chute.  And then when they're in free fall with the

18   drogue chute, that's stabilizing them at 120 miles an

19   hour, and you do that about 50 seconds.  And when he pulls

20   the rip cord and releases the pin, it opens up a

21   container, a deployment bag comes out, you get what we

22   call line stretch.  And then the parachute, or what we

23   call canopy, then opens up.  But you don't go up.

24   Q    It just comes down?

25   A    Correct.  What you're seeing on the videotape is

Maynard - Direct/Mr. Antollino

**646**

1    because the videographer continues to fall and continues

2    to videotape.  What you're seeing, it looks like you're

3    going up, but you're just slowing down and he is not.

4    Q    Okay.  Now under canopy you have to loosen the straps

5    as you land, correct?

6    A    Yes.

7    Q    And you have to loosen the straps at the hips at that

8    time, correct?

9    A    Yes.

10   Q    Otherwise an injury could occur, correct?

11   A    It's more for comfort than you're worried about

12   injury.

13   Q    And comfort is important, correct?

14   A    Yes.

15   Q    It makes it better to have them loosened up as you

16   reach the ground rather than loosen them just as you are

17   landing.

18        Is that true?

19   A    Yes.

20   Q    All right.  Now, when an instructor is strapped to a

21   passenger, the instructor has to position his chin on

22   either the right or the left side of the passenger to

23   avoid hitting the passenger's head with his mouth,

24   correct?

25   A    What are you talking about, on the jump?

Maynard - Direct/Mr. Antollino

647

1   Q    At any point.

2   A    When you're sitting down in an airplane, that is

3   when is the closest proximity to that.  In free fall you

4   can see that there is distance between them so that they

5   don't have their head to one side or the other.  And under

6   the canopy, the same situation is because when they're --

7   after the parachute is opened and you're hanging from the

8   harness, you are lower than the tandem master.

9           So no, your head does not have to be on the

10   right or the left of him, you're directly behind him

11   because the distance is horizontally.

12   Q    Take a look at page 259 of your deposition, line 6.

13           Are you there?

14   A    259, yes.

15   Q    Line 6.

16           Question:  Isn't it true that when an instructor

17   is strapped to a passenger, the instructor has to position

18   his chin on either the right or the left side of the

19   passenger to avoid hitting the passenger's head with his

20   mouth?

21           Answer:  Sitting in the airplane?

22           Question:  Either sitting in the airplane or up

23   in the air.

24           Answer:  Yes.

25           Were you asked those questions and did you give

Maynard - Direct/Mr. Antollino

648

1    those answers?

2  A    Yes.

3  Q    Okay.

4          MR. ZABELL:  Your Honor, may we approach?

5          THE COURT:  Yes.

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maynard - Direct/Mr. Antollino

649

1              (The following occurred at sidebar.)

2              MR. ZABELL:  I think we have been very patient.

3     We were shooting for 15 minutes.  I kept any objections to

4     the bare minimum.

5              I have a witness that I would like very much to

6     get done with today.  He is a ten-minute witness.  I can't

7     imagine being any more than that.  If there is some way we

8     can fit him in.

9              MR. ANTOLLINO:  I'm almost done, judge.  The

10    more objections there are -- I don't have that much more.

11             THE COURT:  Why don't we -- we did the other

12    witness, why don't we try to get that witness in now?

13             MR. ANTOLLINO:  All right, if you would like to

14    do that now, we'll start with, at this point tomorrow.

15             THE COURT:  Okay.  But I have to leave promptly

16    at 4:30.

17             MR. ZABELL:  I got you.

18             (Continued on the following page.)

19

20

21

22

23

24

25

Burrell - Direct/Mr. Zabell

650

1          (The following occurred in open court.)

2          THE COURT:  Mr. Zabell has a witness that we

3    want to take, a short witness we want to take in now so

4    the witness doesn't have to come back tomorrow.  So we're

5    going to interrupt Mr. Maynard.

6          Will you step down and we'll do this now.

7          Thank you, Mr. Zabell.

8          MR. ZABELL:  Your Honor, at this time we call

9    Wayne Burrell.  My associate is getting him now.

10         (There was a pause in the proceedings.)

11         THE COURT:  Mr. Burrell, if you could come up to

12   the witness stand and remain standing once you get there.

13   **WAYNE BURRELL**

14         called as a witness, having been first duly sworn,

15         was examined and testified as follows:

16         THE COURT:  Please state your name and spell

17   your last name for the record.

18         THE WITNESS:  Wayne Burrell, B-U-R-R-E-L-L.

19         THE COURT:  All right, Mr. Zabell.

20   DIRECT EXAMINATION

21   BY MR. ZABELL:

22   Q    Mr. Burrell, are you currently employed?

23   A    Yes.

24   Q    By whom are you currently employed?

25   A    I'm self-employed.

651

1    Q    In what type of business?

2    A    Custom carpentry.

3    Q    Are you familiar with the company called Skydive Long

4    Island?

5    A    Yes.  I used to work there.

6    Q    And how -- you worked there.  How long did you work

7    there?

8    A    24 years.

9    Q    What did you do there for 24 years?

10   A    I was an instructor.

11   Q    Do you remember working with an employee by the name

12   of Don Zarda?

13   A    Yes, I do.

14   Q    What do you remember of Mr. Zarda?

15        MR. ANTOLLINO:  Objection.

16        THE COURT:  No.

17   BY MR. ZABELL:

18   Q    Did you have the opportunity to personally work with

19   Mr. Zarda?

20   A    Yes, sir.

21   Q    Want does that mean to you?

22   A    We would be on the plane together as an instructor.

23   Q    Did you ever socialize with Don Zarda?

24   A    Yeah, we would chit-chat when we would be jumping or

25   whatever at the end of the day.

Burrell - Direct/Mr. Zabell

652

1    Q    Did the two of you have any common interests?

2    A    Yeah.  I think he was into construction work.  He did

3    a little bit of electrical work, a little bit of

4    carpentry, I believe.

5    Q    Did you ever observe Don Zarda's skydiving skills?

6    A    Yes.

7    Q    Did you observe Mr. Zarda to be a competent skydiver?

8    A    Yes.

9    Q    Did you observe him to be a good skydiver?

10   A    Yes.

11   Q    Did you ever have occasion to see Mr. Zarda interact

12   with skydiving students?

13   A    Yes, sir.

14   Q    And how did you see that?

15   A    Just being like, I'm with a student and he would be

16   with a student and we would get on the plane together and

17   be on the plane together.

18   Q    Now, what did you actually observe of Mr. Zarda

19   jumping with skydiving students?

20            MR. ANTOLLINO:  Objection to form.

21            THE COURT:  Overruled.  You can answer.

22   A    Well, I mean on the plane, I just remember seeing him

23   being, especially with female students, being a little

24   unprofessional, rude, not talking to them, not being

25   friendly.

Burrell - Direct/Mr. Zabell

653

1   Q    And you only noticed that with Mr. Zarda with female

2   students?

3              MR. ANTOLLINO:  Objection.  Leading.

4              THE COURT:  Overruled.

5              You can answer.

6   BY MR. ZABELL:

7   Q    Did you ever say anything to him about that?

8   A    I never said anything to Don.

9   Q    Did you ever say anything about that to anybody else

10  at Skydive?

11  A    I mentioned it to Ray's, but not formally.

12  Q    Well, what did you mention?

13  A    I would just say to Ray's that, you know, he's being

14  unprofessional.  He's not being nice to some of the

15  students.  And I don't agree with it and I don't like it.

16  Q    And did you ever observe Mr. Zarda asking to trade

17  passengers with you?

18  A    I think I recollect that, on occasion, yeah.

19  Q    What was the occasion?

20  A    Well, he would prefer taking the male students over

21  the female students.

22  Q    Did you find that odd?

23  A    Yes.

24  Q    Why?

25  A    You should just take whoever you're given.

Burrell - Direct/Mr. Zabell

654

1   Q    Is it easier to jump with a female student?

2   A    Not necessarily, no.

3   Q    Did you know that Don Zarda was gay?

4   A    Yes.

5   Q    How did you know he was gay?

6   A    I just heard it at -- I just heard that the owner of

7   the Dropzone had hired a gay skydiver.

8   Q    And did Mr. Zarda ever introduce himself to you?

9   A    I don't really recall.  You know, like, just formal

10  meeting.  He didn't say anything.  Just, you know, because

11  when you get -- an instructor comes on the Dropzone, we

12  just know he is a new instructor and you just get to know

13  each other when you're on the plane, so...

14  Q    And did you ever hear Don Zarda introduce himself as

15  gay Don?

16  A    I think I heard him say that on occasion.

17  Q    And did you ever hear Don Zarda talk about his

18  sexuality on the plane?

19  A    Sure.

20  Q    Did you ever hear any of your, any co-workers other

21  than Don Zarda pick on Don because he was gay?

22  A    No.

23  Q    Did you ever hear any negative comments made to Don

24  about his sexual orientation?

25  A    No.

Burrell - Direct/Mr. Zabell

655

1  Q    Do you think Don was treated differently at Skydive

2  Long Island because of his sexual orientation?

3  A    No.

4            MR. ANTOLLINO:  Objection.

5            THE COURT:  Overruled.

6  BY MR. ZABELL:

7  Q    Do you know why Don Zarda --

8            MR. ANTOLLINO:  Is there an answer?

9            MR. ZABELL:  I thought he already had.

10           THE COURT:  Yes, the answer was no, right?

11           THE WITNESS:  I'm sorry, what question?

12           THE COURT:  The question was, did you think that

13  Don was treated differently.

14           THE WITNESS:  No.  I said no, he was not treated

15  differently.

16  BY MR. ZABELL:

17  Q    How often would you hear Don Zarda bring up his

18  sexuality?

19  A    I don't really recall exactly.  It wasn't all the

20  time, no.

21  Q    Do you know why Don Zarda was terminated?

22  A    Yes, I do.

23  Q    Why was he terminated?

24           MR. ANTOLLINO:  Objection.  Calls for --

25           THE COURT:  Yes, you need to ask him how he

656

1  knows first.

2  BY MR. ZABELL:

3  Q    How do you know how Don Zarda was terminated?

4  A    How do I know?  Well, I worked with him and I heard

5  that he had been let go.

6  Q    Did he tell you or did somebody else tell you?

7  A    I heard from one of the instructors, I believe.

8        MR. ANTOLLINO:  All right.  I'm going to object

9  to that line of questioning.

10       THE COURT:  Yes.

11  BY. MR. ZABELL:

12  Q    Did you stay in contact with Don Zarda after he was

13  terminated?

14  A    No, I didn't.

15  Q    Did you ever have any discussion was Don Zarda about

16  base jumping?

17  A    I had heard him talk about base jumping, but not

18  specifically talking with him about it.

19  Q    Do you recall when you heard him talking about base

20  jumping?

21  A    Well, I recall him being -- working at Skydive Long

22  Island in 2001 and I remember hearing him talk about base

23  jumping then.

24  Q    Did you ever hear Don Zarda talk about jumping with a

25  wing suit?

Maynard - Direct/Mr. Antollino

657

1    A    Not that I recall.

2              MR. ZABELL:  I have no further questions, judge.

3              THE COURT:  Any cross-examination?

4              MR. ANTOLLINO:  All right.  No further

5    questions, no questions at all.

6              THE COURT:  All right.  You may step down, thank

7    you.

8              Mr. Maynard, if you can please take the stand

9    again.

10              You're still under oath.

11              THE WITNESS:  Yes, sir.

12    DIRECT EXAMINATION   (Continued)

13    BY MR. ANTOLLINO:

14    Q    I don't know where I was.

15              But do you believe it was not reasonable for

16    Mr. Kengle to have felt uncomfortable about the comment

17    that Mr. Kengle's girlfriend was going to get strapped to

18    another guy, correct?

19    A    Say that again.

20    Q    Do you believe that it was not reasonable for

21    Mr. Kengle to have felt uncomfortable by the comment that

22    his girlfriend was getting strapped to another guy?

23    A    I believe it was a joke.  I don't think he took it

24    any other way.

25    Q    So therefore, it would not be reasonable for him to

Maynard - Direct/Mr. Antollino

658

1  feel uncomfortable about that, correct?

2  A    I didn't say that.

3  Q    Well, why don't you take a look at your deposition,

4  page 260, line 3.

5        The question is, Do you think it might have been

6  reasonable for Mr. Kengle --

7  A    Sorry, 250?

8  Q    260, line 3.

9  A    Okay.

10  Q    Do you think it might have been reasonable for

11  Mr. Kengle or Ms. Orellana to have felt uncomfortable by a

12  comment that Mr. Kengle's girlfriend was getting strapped

13  to another guy?

14        Question:  You can answer.

15        Answer:  No.

16        Were you asked those questions and did you give

17  those answers?

18  A    Yes.

19  Q    All right.  Did you think it was unreasonable that

20  Don might have felt uncomfortable about that statement?

21  A    No.

22  Q    Do you think that Don had to go along with the idea

23  that he was in a heterosexual triangle trying to hit on

24  another woman?

25        MR. ZABELL:  Objection.

Maynard - Direct/Mr. Antollino

659

1      THE COURT:  Sustained.

2  BY MR. ANTOLLINO:

3  Q    So someone who is making that comment or joke,

4  whatever you call it, is implying that Don is being

5  strapped up to his girlfriend, correct?

6      MR. ZABELL:  Objection.

7      THE COURT:  Sustained.  I'll sustain this line

8  of questioning.

9  BY MR. ANTOLLINO:

10  Q    Do you think it was unreasonable for Don to take

11  himself out of that situation and say, I have no interest

12  in you sexually by saying, Don't worry, I'm not gay?

13      MR. ZABELL:  Objection.

14      THE COURT:  Sustained as to form and I think he

15  already commented on that generally.

16  Q    It was Don's reasonable choice to mention that he was

17  gay, in order to take himself out of that scenario,

18  correct?

19      MR. ZABELL:  Objection.

20  Q    It was Don's reasonable choice to take himself out of

21  the equation that suggested that he was heterosexual,

22  correct?

23      MR. ZABELL:  Same objection.

24      THE COURT:  Sustained as to all questions

25  regarding what was going on in Mr. Zarda's mind, okay?

Maynard - Direct/Mr. Antollino

660

1    BY MR. ANTOLLINO:

2    Q    Now, sometimes that is the atmosphere when you're up

3    in the air, people are making jokes like that, correct?

4    We have already established that.

5    A    Yes, jokes are made up in the air.

6    Q    And if any tandem passenger complained about the

7    goofy atmosphere, there would be nothing improper about

8    that, correct?

9    A    It would depend on the content and what the exact

10   complaint was.

11   Q    Okay.  And you don't believe that this other comment

12   about being strapped to another guy was in any way

13   improper, correct?

14   A    Correct.

15   Q    Now, when you saw Don's jump, when it was played a

16   couple of days ago, you would have given him an 8 or 9 out

17   of 10, based on what you saw, correct?

18   A    Correct.

19   Q    You instruct your instructors to contribute to the

20   fun of the job and the skydive that these students are

21   taking, correct?

22   A    Correct.

23   Q    And you heard Rich Winstock testify that they're

24   supposed to, quote-unquote, enhance the video, correct?

25   A    Correct.

Maynard - Direct/Mr. Antollino

661

1    Q    You agree with enhancing the video, correct?

2    A    Correct.

3    Q    On this particular video, the only thing that was

4    showing of Don was his face and his hand, correct?

5    A    Correct.

6    Q    So in his situation, the only way he could enhance

7    the video was with his face and his hand, correct?

8    A    Correct.

9    Q    Now, at some point you got annoyed that Don had

10   applied for unemployment benefits, correct?

11          MR. ZABELL:  Objection.

12          THE COURT:  We already went through that.

13          MR. ANTOLLINO:  All right.

14   BY MR. ANTOLLINO:

15   Q    What is the main skydive season?

16   A    On Long Island it's about the beginning of April

17   through the middle of November.

18   Q    How much do skydivers make per jump?  It's $40,

19   correct?

20   A    That's correct.

21   Q    Now, on a good day, how many jumps would there be?

22   A    It would depend on the time of the year and the day

23   of the week.

24   Q    All right.  Well, from what to what?

25   A    As low as one or two, to as many as 15, depending on

662

1    the day of the week and what the time of the season is.

2    Q    When it's colder there are fewer customers and when

3    it's warmer there are more customers --

4    A    WELL --

5    Q    Let me finish asking the question.

6              When it's colder there are fewer customers and

7    when it's warmer there are more customers, correct?

8    A    Correct.

9    Q    And they also get tips, correct?

10   A    Yes.

11   Q    What would you say would be a good take-home pay for

12   a tandem skydiver at the end of the summer?

13              MR. ZABELL:  Objection.

14              THE COURT:  What is the basis?

15              MR. ZABELL:  He is asking him to speculate.

16   There is no limit as to time, this is now, this is then.

17              THE COURT:  You should specify.

18   BY MR. ANTOLLINO:

19   Q    At the time Mr. Zarda was working there, which was

20   2011 and 2010, what would be a good take-home pay at the

21   end of the summer?

22   A    I would really have to look at the records in that.

23   I really don't know.

24   Q    Would you say 25,000?

25   A    I would have to look at the records and I really

Maynard - Direct/Mr. Antollino

663

1   don't know.

2   Q    So you couldn't say whether it was more or less than

3   25,000?

4   A    I answered that, no.

5   Q    You couldn't say if it was more or less than 30,000?

6   A    I would have to look at the records.  I don't know.

7              MR. ANTOLLINO:  All right, judge, I think I'm

8   done.  I would just like to approach on one thing.

9              THE COURT:  Okay.

10              (Continued on the following page.)

Maynard - Direct/Mr. Antollino

664

1            (The following occurred at sidebar.)

2            MR. ANTOLLINO:  When I talked about

3    unemployment, you stopped me, you said we've been over

4    this before.  We have only been over it with another

5    witness.  We've been over the Workers' Comp. with this

6    witness.  Are you saying that because we brought it in

7    with another witness, we don't have to bring it in with

8    this witness or are you -- were you mistaken that Workers'

9    Comp. and Unemployment Insurance are the same thing?

10           THE COURT:  I'm not sure.  You already asked

11   this witness about if it was part of the discrimination --

12           MR. ANTOLLINO:  No, no, that is Workers' Comp.

13           THE COURT:  What are you asking him about now?

14           MR. ANTOLLINO:  Unemployment Insurance.

15           THE COURT:  I was confused.  This is on damages.

16           MR. ANTOLLINO:  This goes to damages and his

17   reasons.

18           THE COURT:  I misheard.  I'm sorry.  Okay.

19           MR. ANTOLLINO:  Okay.  Thank you.

20           (Continued on the following page.)

21

22

23

24

25

Maynard - Direct/Mr. Antollino

665

1          (The following occurred in open court.)

2          THE COURT:  There was a mistake.  There were

3    some questions regarding Unemployment benefits, and I said

4    we've gone over this.  I was thinking of Workman's Comp.

5          So I'm going let him question on Unemployment

6    benefits because of the issue of damages.

7          Go ahead.

8          MR. ZABELL:  I object to your characterization

9    for the decision being a mistake, judge.

10         THE COURT:  Okay, judges can make mistakes.

11         Go ahead.

12         MR. ANTOLLINO:  Thank you, judge.

13   BY MR. ANTOLLINO:

14   Q    At some point you got a notice that Don had applied

15   for Unemployment after you fired him.

16         Is that correct?

17   A    Correct.

18   Q    And you contested Don's Unemployment benefits.

19         Is that correct?

20   A    I didn't contest it.  I wrote a letter just to give

21   them -- they wanted more information, I believe, or

22   something.  I think Lauren had gotten the -- that letter

23   and we discussed it and we sent a letter because they said

24   if we had any more information about this, we should send

25   it to them.

666

1        I wasn't really sure what all of the

2   Unemployment laws and stuff were, but I knew that Don

3   owned a company, and in the year of 2010 which he did

4   testify he got paid money from, and he was working at that

5   company the entire time.  So I was just letting them know

6   that while he was applying for Unemployment, and I thought

7   if you were working somewhere you were not eligible.  And

8   we only sent a letter and told them what we knew.

9   Q    But you also told them about the reason why he was

10  fired, correct?

11  A    Lauren wrote that letter.  The only thing I saw in

12  there and what I asked for was that he was fired for a

13  customer complaint.

14  Q    That is right.  And Lauren showed you the letter

15  before she sent it out, correct?

16  A    I briefly saw it and asked her if what I said was in

17  there.  And she sent it.

18  Q    And you didn't ask her to add anything or take

19  anything out, did you?

20  A    No.

21            MR. ANTOLLINO:  No further questions.

22            THE COURT:  Okay.  We'll continue tomorrow.

23            The schedule I told you still applies.  So we'll

24  complete the testimony and presentation of the evidence

25  tomorrow and summations will be on Wednesday morning.

Maynard - Direct/Mr. Antollino

667

1    Okay?

2            Don't discuss the case.

3            Have a safe trip home.  Good night.

4            (The jury left the courtroom.)

5            THE COURT:  Can you come in at 9:15 tomorrow so

6    we can go over the declaration and the EOC complaint?

7            MR. ZABELL:  Yes.

8            MR. ANTOLLINO:  Yes, your Honor.

9            (The trial was adjourned at 4:28 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

668

<u>I N D E X</u>

**RAYMOND MAYNARD**                                              476
DIRECT EXAMINATION                                              477
BY MR. ANTOLLINO

**DAVID KENGLE**                                                518
DIRECT EXAMINATION                                             518
BY MR. CARDINALE
CROSS-EXAMINATION                                              539
BY MR. ZABELL
REDIRECT EXAMINATION                                           548
BY MR. CARDINALE

**RAYMOND MAYNARD**                                            560
DIRECT EXAMINATION   (Continued)                               560
BY MR. ANTOLLINO
                                                               650
**WAYNE BURRELL**                                              650
DIRECT EXAMINATION                                             650
BY MR. ZABELL
DIRECT EXAMINATION   (Continued)                               657
BY MR. ANTOLLINO


### EXHIBITS

Plaintiff Exhibit 7 B in evidence                              582
Plaintiff Exhibit 36 in evidence                              479
Plaintiff Exhibit 36-A in evidence                            491
Plaintiff Exhibit 53 in evidence                              496
Plaintiff Exhibit 54 in evidence                              524
Plaintiff Exhibit 10, page 24 in evidence.                    560
Plaintiff Exhibits Ray's 222, 223, 210 and                    570
211 in evidence.

## $

$40 [1] - 661:18

## 1

1 [3] - 465:19, 500:20, 509:15
10 [8] - 499:22, 560:10, 560:12, 566:4, 577:2, 604:6, 660:17, 668:17
100 [1] - 465:23
1001 [1] - 465:15
103 [1] - 465:19
10:00 [1] - 466:1
11 [3] - 468:24, 550:14, 628:7
11242 [1] - 465:17
11716 [1] - 465:20
11722 [1] - 465:23
1180 [1] - 465:23
12 [9] - 561:17, 561:25, 575:15, 575:19, 576:2, 576:6, 596:15, 613:3, 613:11
120 [1] - 645:18
125 [2] - 596:12, 596:15
12:30 [2] - 469:4, 556:23
13 [5] - 478:3, 502:1, 521:6, 534:17, 601:13
13-CV-4334 [1] - 466:2
133 [1] - 598:14
136 [1] - 599:13
139 [1] - 590:24
140 [1] - 592:25
149 [1] - 643:3
15 [11] - 561:16, 561:25, 562:1, 563:25, 564:2, 577:2, 632:14, 632:18, 639:6, 649:3, 661:25
150 [1] - 600:11
151 [6] - 600:10, 601:13, 601:25, 602:5, 602:7, 604:8
152 [1] - 604:14
16 [2] - 471:16, 522:21
17 [4] - 526:14, 526:15, 600:19, 601:3
18 [6] - 519:13, 519:23, 520:1, 527:13, 536:3, 536:8, 536:15, 549:18
1815 [1] - 465:17
18th [1] - 621:19
19 [3] - 465:8, 617:17, 619:5
196 [1] - 617:17
19th [1] - 621:21
1:30 [1] - 557:3

## 2

2 [6] - 569:14, 569:16, 569:25, 570:12, 599:13, 628:1
2-3 [1] - 569:18
2.10 [2] - 570:1, 572:6
2.2 [2] - 570:1, 571:3

## 2.3 [2] - 570:1, 572:1
2/21/2010 [1] - 609:13
20 [6] - 473:24, 530:4, 538:21, 566:4, 620:4, 635:18
200 [5] - 635:3, 635:4, 635:6, 635:17, 635:18
2001 [6] - 589:18, 594:19, 598:19, 624:4, 625:7, 656:22
2009 [1] - 600:3
2010 [13] - 519:13, 519:23, 520:1, 525:3, 527:13, 536:4, 536:8, 536:15, 549:18, 628:6, 630:2, 662:20, 666:3
2011 [5] - 522:15, 551:18, 628:7, 640:14, 662:20
2012 [2] - 468:8, 468:13
2015 [1] - 465:8
21 [3] - 588:15, 588:17, 600:11
210 [4] - 569:8, 570:15, 639:1, 668:18
211 [3] - 569:9, 570:15, 668:18
22 [2] - 562:1, 590:24
222 [3] - 569:8, 570:15, 668:18
223 [3] - 569:8, 570:15, 668:18
23 [1] - 530:21
24 [14] - 500:20, 509:25, 560:10, 560:11, 560:12, 560:20, 591:11, 591:22, 613:13, 613:22, 614:3, 651:8, 651:9, 668:17
25 [2] - 619:5, 643:3
25,000 [2] - 662:24, 663:3
250 [4] - 642:25, 643:1, 643:5, 658:7
259 [2] - 647:12, 647:14
26 [2] - 465:17, 628:6
260 [2] - 658:4, 658:8
26th [1] - 627:22
275 [1] - 465:15

## 3

3 [6] - 494:23, 504:3, 539:23, 592:25, 658:4, 658:8
30 [3] - 612:14, 613:6, 620:4
30,000 [1] - 663:5
31 [1] - 478:3
32 [1] - 478:3
36 [13] - 478:24, 479:12, 479:13, 488:8, 489:3, 489:5, 489:20, 491:3, 491:7, 520:25, 538:21, 613:6, 668:15
36-A [4] - 491:10, 491:12, 491:13, 668:16
37 [1] - 539:21
3:24 [1] - 631:23

## 4

4 [4] - 509:15, 602:7, 604:3, 604:8

403 [3] - 473:15, 555:11, 559:2
42 [1] - 530:20
45 [8] - 475:3, 475:5, 475:21, 477:15, 503:6, 515:24, 632:5, 632:7
476 [1] - 668:2
477 [1] - 668:3
479 [1] - 668:15
48 [2] - 526:14, 526:15
491 [1] - 668:16
496 [1] - 668:16
4:28 [1] - 667:9
4:30 [1] - 649:16

## 5

5 [3] - 500:9, 501:10, 539:25
5,000 [1] - 507:24
50 [1] - 645:19
518 [2] - 668:4, 668:5
524 [1] - 668:17
53 [9] - 496:1, 496:4, 496:6, 524:9, 524:11, 524:13, 524:17, 524:19, 668:16
539 [1] - 668:6
54 [4] - 524:21, 524:22, 524:23, 668:17
548 [1] - 668:7
560 [3] - 668:8, 668:9, 668:17
57 [1] - 534:15
570 [1] - 668:18
582 [1] - 668:15

## 6

6 [9] - 626:23, 627:11, 627:24, 633:9, 634:6, 634:17, 647:12, 647:14, 668:19
6/18/2010 [1] - 609:17
6/29 [1] - 585:19
6/29/2011 [1] - 585:20
60 [2] - 472:16, 644:25
62 [1] - 588:15
631 [1] - 465:24
650 [3] - 668:10, 668:10, 668:11
657 [1] - 668:12

## 7

7 [9] - 513:1, 522:22, 523:13, 582:17, 582:18, 582:21, 582:22, 668:15
705 [1] - 465:15
712-6107 [1] - 465:24

## 8

8 [6] - 530:4, 550:14, 617:20, 619:2, 620:3, 660:16

## (column 4 - 9)

9 [4] - 501:18, 522:15, 551:18, 660:16
9:15 [1] - 667:5
9:30 [1] - 465:8

## A

a.m [2] - 465:8, 466:1
ability [3] - 470:2, 492:12, 604:22
able [11] - 472:21, 492:12, 492:21, 500:22, 514:16, 525:7, 544:22, 567:3, 584:3, 584:13, 611:24
absolutely [3] - 563:12, 563:24, 629:12
accept [4] - 537:19, 554:12, 554:16, 558:13
accepted [3] - 537:17, 554:25, 555:3
access [2] - 584:6, 584:20
accident [4] - 508:5, 600:3, 600:7, 600:8
according [5] - 482:21, 557:23, 558:17, 636:8, 639:21
account [1] - 633:5
accurate [1] - 644:20
accurately [1] - 564:14
accusation [1] - 613:24
acquiesce [1] - 515:1
act [3] - 546:7, 628:16
acted [3] - 542:19, 542:20, 542:21
acting [1] - 565:13
action [4] - 563:3, 628:22, 630:12, 631:6
actions [3] - 620:21, 620:22, 628:19
activity [9] - 477:18, 480:5, 485:17, 494:1, 494:15, 494:19, 565:22, 565:24, 591:9
actual [1] - 512:18
ad [1] - 574:14
adapt [2] - 495:6, 495:8
add [1] - 666:18
added [2] - 538:17
addition [1] - 480:8
address [7] - 471:6, 471:13, 471:22, 473:2, 508:22, 509:2, 595:13
addressed [1] - 472:10
adduced [1] - 529:10
adjective [1] - 527:3
adjourned [1] - 667:9
adjust [4] - 500:8, 507:7, 575:20, 581:1
adjustable [1] - 499:20
adjusted [10] - 499:25, 500:5, 504:5, 521:8, 576:7, 577:16,

2

adjusting [1] - 507:20, 574:1, 576:12, 642:22, 643:5, 643:11, 643:15, 643:17, 643:20
adjustment [6] - 575:16, 576:3, 576:6, 578:2, 578:8, 579:1
adjustments [10] - 576:10, 576:19, 577:2, 577:4, 577:6, 577:9, 577:12, 578:6, 578:10, 578:20
admissible [2] - 511:18, 630:15
admission [2] - 491:5, 524:11
admit [1] - 634:5
admitted [13] - 479:12, 496:4, 524:13, 524:17, 524:19, 543:17, 560:11, 570:8, 570:13, 582:21, 629:1, 633:19, 634:14
admitting [1] - 479:10
ado [1] - 466:9
adrenaline [4] - 571:8, 571:10, 571:18, 571:23
advantage [1] - 545:23
adverse [3] - 466:8, 516:13, 628:19
advise [1] - 501:8
affect [1] - 588:23
affidavit [7] - 553:1, 553:2, 554:3, 554:15, 554:21, 558:10, 558:22
African [1] - 497:3
AFTERNOON [1] - 560:1
afternoon [3] - 551:18, 559:10, 627:14
ago [8] - 531:17, 531:18, 535:7, 548:20, 552:13, 612:14, 612:20, 660:16
agree [23] - 470:9, 477:18, 478:4, 481:3, 484:24, 487:16, 504:10, 504:25, 506:1, 507:3, 511:23, 512:5, 516:7, 516:8, 521:12, 533:1, 561:12, 564:21, 565:9, 571:23, 578:12, 653:15, 661:1
agreed [5] - 582:6, 615:21, 615:22, 636:9, 636:10
agreeing [1] - 482:2
agrees [1] - 481:8
ah-ha [1] - 529:17
ahead [13] - 477:10, 570:14, 572:22, 573:10, 575:25, 593:18, 596:10, 605:15, 606:11, 621:14, 624:19, 665:7, 665:11
ailments [1] - 492:1
air [6] - 506:17, 506:21, 507:1, 647:23, 660:3, 660:5
aircraft [8] - 495:3, 506:4, 506:5, 561:20, 562:5, 636:25, 637:3, 638:18
airplane [22] - 484:13, 506:25, 545:10, 561:4, 561:5, 561:7,

561:8, 561:9, 562:10, 566:4, 566:6, 574:14, 576:15, 577:3, 578:23, 635:7, 637:5, 638:11, 639:8, 647:2, 647:21, 647:22
allegation [2] - 613:8, 617:13
allow [17] - 472:23, 477:4, 493:11, 514:9, 541:5, 558:22, 558:23, 573:18, 575:23, 578:15, 582:6, 586:6, 597:25, 605:15, 606:7, 606:11, 631:15
allowable [2] - 506:14, 506:24
allowed [1] - 532:19
allowing [1] - 630:5
alludes [1] - 494:23
almost [4] - 503:11, 582:1, 625:9, 649:9
alone [1] - 585:15
aloud [2] - 502:1, 585:13
alright [1] - 501:25
altered [1] - 470:5
ALTITUDE [1] - 465:6
Altitude [1] - 466:3
altogether [2] - 507:10, 546:19
ambush [1] - 471:20
amended [1] - 471:17
American [1] - 497:3
amount [2] - 611:5, 622:6, 622:24
analyzed [1] - 630:16
and-a-half [1] - 622:7
angry [3] - 546:22, 546:23, 615:17
ankle [1] - 608:14
anniversaries [1] - 585:21
annoyed [2] - 546:20, 661:9
anonymous [3] - 627:4, 627:19, 627:20
Answer [42] - 478:7, 522:24, 526:24, 527:1, 527:4, 527:6, 530:10, 530:13, 530:16, 531:1, 534:24, 535:1, 535:3, 539:3, 539:5, 542:5, 550:22, 550:25, 561:20, 591:3, 591:5, 593:4, 593:23, 596:22, 596:24, 597:3, 597:9, 597:11, 599:16, 600:14, 601:7, 601:10, 604:13, 604:18, 620:6, 620:16, 621:1, 639:9, 643:7, 643:14, 647:24, 658:15
answer [62] - 479:17, 493:12, 493:19, 501:7, 505:8, 505:10, 505:13, 523:7, 529:12, 529:22, 539:25, 542:4, 558:15, 558:17, 561:21, 561:23, 562:2, 562:3, 562:8, 575:25, 578:15, 580:9, 580:25, 584:19, 590:2, 591:11, 591:21, 593:25, 596:24, 599:18, 600:16, 604:6, 604:12, 605:16, 606:11, 608:6, 608:21, 611:2, 611:14, 613:10, 614:20, 617:10, 617:19, 621:4, 621:15, 624:14, 624:15, 624:21,

624:22, 632:14, 633:22, 636:4, 638:12, 641:16, 643:9, 647:21, 652:21, 653:5, 655:9, 655:10, 658:14
answered [18] - 493:5, 529:21, 563:5, 575:21, 580:22, 581:2, 581:3, 591:19, 594:20, 604:7, 610:8, 610:11, 610:12, 613:25, 636:2, 639:14, 639:17, 663:4
answering [1] - 601:18
answers [16] - 526:20, 530:18, 534:20, 535:5, 538:25, 539:8, 550:19, 558:25, 591:7, 596:18, 601:16, 604:20, 620:18, 639:18, 648:1, 658:17
anticipating [1] - 515:19
antics [1] - 635:6
Antollino [7] - 469:15, 472:12, 472:13, 476:10, 516:5, 542:2, 584:10
ANTOLLINO [237] - 465:14, 466:7, 466:12, 466:25, 467:3, 467:7, 467:17, 467:23, 470:19, 471:2, 471:11, 473:1, 473:7, 473:14, 473:23, 474:13, 474:20, 474:25, 475:8, 475:20, 475:23, 476:3, 476:12, 477:12, 479:9, 479:14, 484:5, 484:10, 484:11, 488:10, 488:13, 489:2, 489:15, 489:21, 490:2, 491:8, 491:14, 493:7, 494:13, 494:22, 495:25, 496:7, 497:1, 497:20, 501:24, 503:7, 503:11, 504:2, 505:3, 505:14, 508:9, 508:17, 509:13, 509:16, 510:5, 510:7, 510:24, 511:10, 511:23, 512:8, 512:24, 513:1, 513:4, 513:19, 513:22, 514:1, 514:4, 514:6, 514:11, 514:20, 515:8, 516:6, 516:14, 516:23, 517:2, 517:4, 518:2, 518:5, 524:21, 554:2, 554:18, 555:2, 555:7, 555:12, 556:23, 560:9, 560:18, 562:1, 562:4, 562:14, 562:15, 564:4, 564:10, 564:11, 567:16, 567:17, 568:12, 569:3, 569:8, 569:13, 569:18, 569:22, 570:6, 570:10, 570:17, 571:20, 572:23, 573:5, 573:13, 573:19, 574:25, 575:2, 575:4, 577:19, 579:13, 580:24, 581:5, 582:10, 582:14, 582:16, 582:20, 582:23, 584:1, 584:12, 586:7, 587:2, 587:13, 588:2, 588:5, 590:1, 590:3, 592:15, 593:8, 593:20, 594:14, 594:16, 594:23, 596:11, 596:15, 596:16, 597:16, 597:22, 597:25, 598:3, 598:18, 599:9, 600:21, 601:1, 601:4, 601:20, 601:23, 602:3, 602:5, 603:3, 604:2, 608:11, 609:2, 609:9,

610:4, 610:10, 610:12, 610:13, 610:22, 612:23, 613:21, 614:2, 616:16, 617:1, 617:8, 617:22, 618:2, 619:2, 619:5, 619:8, 620:2, 624:13, 624:23, 626:21, 627:8, 627:10, 627:18, 627:20, 628:8, 629:23, 630:7, 630:20, 630:24, 631:16, 631:19, 632:4, 632:12, 632:19, 633:1, 633:19, 634:5, 634:11, 634:16, 634:18, 635:12, 635:18, 635:19, 636:22, 638:5, 640:3, 640:24, 641:8, 644:23, 649:9, 649:13, 651:15, 652:20, 653:3, 655:4, 655:8, 655:24, 656:8, 657:4, 657:13, 659:2, 659:9, 660:1, 661:13, 661:14, 662:18, 663:7, 664:2, 664:12, 664:14, 664:16, 664:19, 665:12, 665:13, 666:21, 667:8, 668:3, 668:9, 668:12
Antollino's [1] - 512:14
apartment [1] - 550:22
apologize [3] - 470:17, 476:8, 594:14
appear [2] - 480:16, 607:6
APPEARANCES [1] - 465:13
Appearances [1] - 466:4
appeared [1] - 470:16
appendage [1] - 488:10
applicable [1] - 554:25
applied [3] - 605:8, 661:10, 665:14
applies [1] - 666:23
apply [1] - 605:12
applying [1] - 666:6
approach [6] - 521:1, 552:21, 553:10, 586:10, 648:4, 663:8
approaching [1] - 571:13
appropriate [3] - 580:17, 596:23, 640:10
appropriateness [1] - 532:22
April [1] - 661:16
arbitrarily [1] - 473:24
area [9] - 483:2, 543:1, 545:15, 561:12, 561:13, 561:19, 562:5, 562:6, 626:1
argue [1] - 554:7
arguing [1] - 514:13
argument [1] - 469:10
argumentative [2] - 612:22, 612:24, 613:20
arm [1] - 513:24
arrives [1] - 479:18
arriving [2] - 476:18, 476:19
ascertain [1] - 565:8
aside [1] - 508:4
aspect [3] - 503:9, 505:5, 567:15
asserted [1] - 557:20
assessment [1] - 506:1

3

**associate** [1] - 650:9
**ASSOCIATES** [1] - 465:19
**association** [1] - 491:22
**assume** [6] - 466:9, 513:18, 516:13, 523:2, 572:16
**assumed** [1] - 481:23
**assumes** [1] - 589:23
**assuming** [3] - 597:4, 597:6, 628:21
**assumption** [1] - 555:5
**atmosphere** [7] - 497:7, 635:14, 635:20, 636:7, 636:14, 660:2, 660:7
**attach** [4] - 504:7, 521:10, 575:18, 576:24
**attached** [7] - 510:11, 528:15, 528:17, 529:4, 572:25, 573:8, 577:15
**attaching** [1] - 578:25
**attachment** [5] - 575:10, 575:13, 575:15, 577:8, 577:13
**attachments** [3] - 578:17, 644:2, 644:4
**attention** [2] - 487:23, 519:13
**attentive** [1] - 522:25
**attorney** [6] - 486:16, 501:8, 549:19, 550:9, 583:23, 622:1
**attorney's** [2] - 482:12, 501:19
**authentic** [1] - 511:25
**authenticate** [11] - 468:23, 469:7, 469:17, 469:18, 469:19, 469:21, 470:2, 470:12, 473:21, 474:6, 474:9
**authenticated** [2] - 469:9, 469:11
**authentication** [1] - 629:10
**authenticity** [1] - 511:7
**authorize** [2] - 554:12, 554:16
**authorized** [2] - 554:25, 558:13
**automatically** [1] - 511:18
**available** [3] - 475:20, 514:18, 514:20
**Avenue** [1] - 465:15
**avoid** [9] - 467:4, 495:5, 495:7, 495:8, 498:20, 511:6, 515:16, 646:23, 647:19
**avoids** [1] - 515:15
**aware** [13] - 494:1, 522:7, 542:9, 598:4, 605:5, 605:8, 605:18, 605:25, 608:12, 628:4, 628:21, 629:11, 637:25
**awesome** [12] - 526:10, 526:24, 527:2, 527:3, 527:4, 527:7, 534:2, 566:21, 567:19, 567:20

**B**

**B-U-R-R-E-L-L** [1] - 650:18
**background** [5] - 497:10, 515:6, 547:17, 548:6, 558:8
**bad** [1] - 539:24

**bag** [1] - 645:21
**balance** [2] - 643:18, 643:21
**bar** [1] - 540:5
**Barbara** [1] - 585:18
**bare** [1] - 649:4
**bartender** [1] - 519:12
**base** [4] - 656:16, 656:17, 656:19, 656:22
**based** [12] - 469:1, 469:19, 500:8, 529:9, 535:23, 538:12, 553:8, 573:14, 606:10, 628:23, 632:5, 660:17
**basics** [1] - 575:24
**basing** [1] - 576:5
**basis** [2] - 471:3, 662:14
**became** [1] - 546:23
**become** [2] - 582:6, 631:13
**becoming** [1] - 546:22
**BEFORE** [1] - 465:11
**beginning** [5] - 539:25, 542:9, 600:19, 617:20, 661:16
**behalf** [3] - 554:13, 554:17, 558:13
**behavior** [3] - 472:22, 532:23, 545:25
**behind** [11] - 468:5, 558:5, 565:13, 565:18, 565:20, 565:22, 565:23, 570:21, 572:14, 636:24, 647:10
**below** [2] - 595:6, 595:10
**benefits** [4] - 661:10, 665:3, 665:6, 665:18
**best** [16] - 468:8, 492:11, 495:6, 495:9, 498:15, 507:20, 562:24, 563:3, 580:14, 581:1, 601:24, 604:22, 604:25, 632:13, 640:16
**bet** [2] - 638:18, 639:12
**better** [3] - 531:18, 560:24, 646:15
**between** [7] - 504:11, 521:12, 528:13, 554:5, 613:23, 622:8, 647:4
**beyond** [1] - 513:23
**BIANCO** [1] - 465:11
**big** [1] - 630:13
**bill** [3] - 466:18, 466:20, 467:2
**Bill** [5] - 482:14, 482:19, 482:21, 483:5, 484:21
**binder** [1] - 489:7
**birthday** [9] - 536:17, 546:25, 547:2, 585:1, 585:6, 585:7, 614:9, 614:14, 614:18
**birthdays** [1] - 614:6
**bit** [8] - 497:22, 499:15, 510:15, 543:25, 577:14, 590:7, 652:3
**blame** [1] - 494:17
**blatant** [1] - 544:7
**Board** [1] - 495:2
**body** [8] - 491:16, 504:8, 521:11, 528:10, 528:11, 528:15, 560:19, 574:2

**Bohemia** [1] - 465:20
**Booth** [5] - 482:14, 482:19, 482:21, 483:5, 484:21
**booth** [3] - 483:13, 484:12, 484:15
**bother** [1] - 598:24
**bothered** [1] - 544:8
**bothering** [1] - 498:23
**bottom** [1] - 482:1
**bowling** [1] - 499:21
**boyfriend** [4] - 539:5, 614:11, 642:12, 642:14
**brains** [2] - 521:22, 523:4
**break** [17] - 469:4, 475:24, 509:20, 509:22, 513:3, 556:24, 556:25, 557:1, 557:2, 557:8, 559:6, 627:13, 627:14, 628:12, 628:14, 631:21
**breaking** [1] - 642:14
**briefly** [1] - 666:16
**bring** [6] - 476:4, 501:5, 629:6, 632:22, 655:17, 664:7
**broken** [2] - 608:14, 642:11
**Brooklyn** [1] - 465:17
**brought** [5] - 472:8, 532:16, 533:15, 571:20, 664:6
**built** [2] - 575:11, 592:5
**bunch** [2] - 478:5, 637:14
**BURRELL** [2] - 650:13, 668:10
**Burrell** [5] - 472:9, 650:9, 650:11, 650:18, 650:22
**business** [28] - 474:9, 489:17, 512:3, 512:5, 512:11, 514:8, 581:9, 581:15, 581:21, 581:22, 581:24, 582:1, 582:24, 583:2, 583:5, 583:7, 583:8, 583:13, 583:15, 583:16, 584:5, 592:4, 615:15, 629:7, 630:11, 630:12, 630:16, 651:1
**busted** [1] - 598:5
**busy** [1] - 626:16
**BY** [99] - 465:20, 477:12, 479:14, 484:11, 491:14, 493:7, 494:13, 494:22, 496:7, 497:1, 497:20, 501:24, 504:2, 505:3, 505:14, 508:9, 508:17, 519:2, 525:1, 539:17, 548:17, 560:18, 562:4, 562:15, 564:11, 567:17, 568:12, 570:17, 572:23, 573:5, 575:4, 577:19, 579:13, 580:24, 581:5, 582:10, 582:23, 584:1, 584:12, 586:7, 588:5, 590:3, 593:20, 594:16, 594:23, 596:11, 596:16, 597:16, 597:22, 598:3, 598:18, 599:9, 601:4, 604:2, 608:11, 609:2, 609:9, 610:4, 610:13, 610:22, 613:21, 614:2, 616:16, 617:1, 617:22, 620:2, 624:13, 624:23, 626:21, 633:1, 634:18, 635:12, 635:19, 636:22, 638:5, 640:3,

641:8, 644:23, 650:21, 651:17, 653:6, 655:6, 655:16, 656:2, 656:11, 657:13, 659:2, 659:9, 660:1, 661:14, 662:18, 665:13, 668:3, 668:5, 668:6, 668:7, 668:9, 668:11, 668:12

**C**

**cab** [2] - 561:20, 562:5
**calm** [1] - 579:18
**camel** [7] - 467:9, 468:6, 468:9, 468:16, 469:23, 473:11, 473:14
**camera** [8] - 468:5, 497:11, 526:3, 530:13, 530:15, 544:21, 638:1, 638:9
**cannot** [3] - 493:3, 501:7, 504:23
**canopy** [6] - 590:10, 615:1, 644:16, 645:8, 645:14, 645:23, 646:4, 647:6
**capacity** [1] - 538:17
**car** [1] - 475:2
**Cardinale** [3] - 516:7, 516:9, 539:22
**CARDINALE** [23] - 465:16, 518:16, 519:2, 523:11, 523:15, 524:7, 524:15, 525:1, 539:13, 540:1, 540:3, 543:6, 547:5, 547:15, 548:4, 548:17, 552:21, 553:6, 554:10, 556:17, 559:9, 668:5, 668:7
**care** [1] - 545:6
**carefully** [1] - 515:16
**carpentry** [2] - 651:2, 652:4
**case** [18] - 469:5, 477:6, 477:7, 495:12, 511:19, 512:18, 522:5, 522:14, 557:4, 557:16, 558:16, 559:5, 580:20, 595:3, 605:4, 606:8, 627:14, 667:2
**cases** [1] - 508:10
**cast** [7] - 608:1, 608:4, 608:7, 608:12, 608:20, 608:22, 609:7
**catch** [1] - 551:21
**category** [1] - 631:10
**caught** [1] - 598:5
**caused** [4] - 558:8, 571:18, 600:13, 601:9
**celebrate** [1] - 614:6
**celebrating** [1] - 614:9
**cell** [1] - 475:12
**center** [1] - 501:5
**Central** [2] - 465:5, 465:23
**certain** [1] - 512:5
**certainly** [3] - 474:8, 513:11, 629:3
**certificate** [1] - 500:18
**certification** [2] - 487:24, 489:12
**certify** [1] - 491:25
**chance** [4] - 507:10, 510:22,

4

536:24, 537:1
**change** [1] - 506:18
**changed** [6] - 506:15, 506:24, 554:18, 623:10, 623:12, 623:13
**changes** [3] - 554:14, 555:8, 626:8
**changing** [1] - 554:4
**characterization** [2] - 610:7, 665:8
**characterize** [2] - 635:1, 636:7
**charge** [2] - 535:12, 535:14
**chat** [1] - 651:24
**check** [8] - 537:21, 537:24, 622:4, 622:5, 622:23, 622:25, 623:10, 644:1
**checks** [1] - 622:22
**childlike** [1] - 636:17
**children** [2] - 640:6, 641:2
**chin** [3] - 546:12, 646:21, 647:18
**chit** [1] - 651:24
**chit-chat** [1] - 651:24
**choice** [2] - 659:16, 659:20
**chooses** [2] - 494:18, 572:24
**chose** [1] - 468:12
**chosen** [1] - 473:24
**choses** [1] - 573:25
**chute** [2] - 645:17, 645:18
**circumstances** [3] - 514:25, 558:23, 640:11
**claim** [2] - 606:8, 606:10
**claiming** [1] - 588:11
**clarifies** [1] - 558:11
**clarify** [5] - 592:15, 601:20, 601:21, 601:22, 601:23
**clear** [8] - 478:10, 488:12, 488:13, 488:14, 489:23, 564:8, 627:5, 627:8
**clearly** [1] - 471:7
**CLERK** [4] - 466:2, 476:24, 518:17, 518:21
**client** [6] - 468:21, 469:15, 473:9, 514:15, 514:24, 587:17
**clients** [1] - 505:21
**clip** [1] - 524:25
**close** [16] - 498:1, 498:3, 498:6, 504:8, 520:5, 520:20, 521:11, 528:8, 534:22, 563:10, 563:12, 563:18, 564:14, 585:16, 610:24, 637:6
**closely** [6] - 562:10, 562:13, 562:16, 566:23, 572:25, 600:18
**closeness** [1] - 503:3
**closest** [1] - 647:3
**co** [2] - 508:20, 654:20
**co-workers** [2] - 508:20, 654:20
**coffee** [1] - 514:3
**colder** [2] - 662:2, 662:6
**collateral** [3] - 558:14, 558:24, 559:4
**collectively** [1] - 582:18

**colloquy** [3] - 601:19, 602:1, 602:3
**comfort** [6] - 507:8, 577:23, 578:13, 643:21, 646:11, 646:13
**comfortable** [3] - 498:16, 578:2, 578:3
**coming** [17] - 467:11, 467:13, 469:4, 469:8, 471:8, 473:15, 473:17, 485:6, 489:17, 489:19, 489:24, 551:6, 581:23, 608:5, 608:21, 608:22, 609:7
**command** [1] - 623:20
**comment** [19] - 469:24, 514:6, 529:18, 531:9, 535:21, 582:4, 583:2, 585:12, 616:14, 629:16, 639:23, 641:4, 641:5, 657:16, 657:21, 658:12, 659:3, 660:11
**commented** [1] - 659:15
**comments** [8] - 511:3, 512:9, 512:12, 512:14, 557:22, 583:17, 594:13, 654:23
**common** [1] - 652:1
**Comp** [5] - 606:24, 664:5, 664:9, 664:12, 665:4
**company** [4] - 474:6, 474:7, 651:3, 666:3, 666:5
**company's** [1] - 512:24
**comparison** [1] - 498:11
**Compensation** [8] - 605:4, 605:9, 605:12, 605:19, 606:1, 606:5, 606:9, 606:14
**competent** [1] - 652:7
**complain** [22] - 535:8, 535:12, 535:15, 536:9, 536:12, 536:16, 536:18, 536:20, 536:22, 537:24, 542:13, 542:14, 544:9, 544:24, 558:3, 558:9, 564:24, 609:23, 609:24, 610:5, 625:24
**complained** [31] - 512:19, 536:13, 536:15, 536:24, 537:6, 544:1, 544:3, 544:8, 544:14, 547:18, 562:23, 573:16, 580:6, 586:8, 588:6, 592:4, 592:9, 592:10, 594:4, 594:19, 609:25, 625:25, 626:1, 626:2, 640:20, 640:22, 640:23, 641:1, 660:6
**complaining** [6] - 468:14, 470:4, 537:4, 574:1, 626:10, 626:15
**complains** [2] - 572:25, 592:8
**complaint** [47] - 467:25, 470:3, 516:15, 537:2, 538:12, 538:18, 542:17, 546:2, 546:3, 547:16, 557:16, 557:18, 558:4, 558:5, 563:2, 573:1, 573:6, 573:22, 573:23, 574:3, 587:7, 588:10, 588:20, 588:22, 589:1, 592:11, 592:12, 592:16, 595:14, 610:19, 611:24, 613:16, 613:17, 620:6, 621:7, 625:18, 625:19, 625:20, 628:9, 628:10,

628:23, 633:12, 634:1, 643:13, 660:10, 666:13, 667:6
**complaints** [20] - 549:15, 556:12, 586:1, 587:3, 587:12, 587:18, 590:7, 594:3, 595:5, 615:13, 625:21, 627:1, 627:6, 628:3, 628:5, 628:15, 628:17, 628:18, 633:6, 633:10
**complete** [1] - 666:24
**completely** [5] - 499:20, 506:24, 514:18, 558:14, 558:24
**completeness** [2] - 541:6, 600:24
**compliment** [1] - 560:21
**complimenting** [1] - 510:18
**Computer** [1] - 465:25
**computers** [1] - 584:6
**concerned** [4] - 470:6, 474:21, 511:15, 532:5
**conclude** [1] - 506:23
**condensed** [1] - 541:2
**conduit** [1] - 557:14
**conference** [2] - 541:8, 555:13
**confined** [3] - 561:13, 561:14, 561:19
**confronted** [2] - 613:7, 613:16
**confused** [1] - 646:15
**confusion** [1] - 559:4
**congratulations** [1] - 585:23
**connected** [3] - 481:5, 493:17, 583:14
**connection** [1] - 554:5
**consented** [2] - 520:16, 520:19
**consider** [4] - 528:4, 533:2, 535:21, 561:13
**considered** [1] - 642:13
**consistent** [2] - 593:6, 593:9
**construction** [1] - 652:2
**consult** [3] - 486:16, 501:8, 516:6
**contact** [8] - 504:10, 521:12, 545:21, 545:22, 563:10, 623:15, 623:22, 656:12
**container** [1] - 645:21
**contemplated** [1] - 500:10
**content** [1] - 660:9
**contention** [1] - 470:24
**contest** [1] - 665:20
**contested** [1] - 665:18
**context** [1] - 637:19
**continue** [2] - 560:4, 666:22
**Continued** [23] - 488:25, 490:3, 502:7, 503:13, 517:7, 540:8, 541:9, 553:13, 555:14, 560:17, 586:11, 587:23, 602:9, 603:5, 618:6, 619:13, 648:6, 649:18, 657:12, 663:10, 664:20, 668:9, 668:12
**continued** [1] - 560:25
**continues** [3] - 585:15, 646:1
**contradict** [1] - 468:17

**contribute** [1] - 660:19
**control** [2] - 607:8, 626:9
**conversation** [6] - 538:12, 546:21, 556:10, 590:14, 609:6, 615:11, 625:1, 626:12
**convey** [1] - 557:22
**copies** [4] - 570:5, 570:6, 570:9, 570:11
**copy** [2] - 619:10, 639:4
**cord** [1] - 645:20
**Corporate** [1] - 465:19
**correct** [491] - 477:17, 477:21, 478:18, 479:4, 479:22, 479:23, 479:25, 480:6, 480:7, 480:10, 480:11, 480:17, 480:18, 480:20, 480:21, 480:23, 480:24, 480:25, 481:1, 481:6, 481:7, 481:10, 481:11, 481:13, 481:20, 481:21, 482:3, 482:4, 482:6, 482:7, 482:9, 482:10, 482:12, 482:13, 482:15, 482:19, 482:19, 482:20, 482:22, 482:23, 483:3, 483:4, 483:7, 483:8, 483:11, 483:12, 483:15, 483:16, 483:20, 483:21, 483:24, 483:25, 484:13, 484:14, 484:16, 484:17, 484:19, 484:20, 484:22, 484:23, 485:1, 485:4, 485:5, 485:7, 485:8, 485:9, 485:12, 485:13, 485:14, 485:15, 485:17, 485:18, 485:19, 485:20, 485:21, 485:22, 485:24, 486:2, 486:3, 486:8, 486:9, 486:16, 486:17, 486:19, 486:20, 486:21, 486:22, 486:25, 487:4, 487:7, 487:10, 487:11, 487:13, 487:20, 488:5, 488:16, 491:19, 492:1, 492:2, 492:4, 492:5, 492:15, 492:23, 493:4, 493:16, 493:17, 493:21, 493:23, 493:24, 494:2, 494:3, 494:5, 494:6, 494:9, 494:19, 494:24, 494:25, 495:3, 495:4, 495:10, 495:14, 495:17, 495:20, 495:21, 496:16, 497:11, 497:12, 497:14, 497:15, 497:16, 497:17, 498:17, 498:18, 498:20, 498:21, 498:24, 498:25, 499:2, 499:6, 499:7, 499:12, 499:16, 499:22, 499:23, 499:25, 500:6, 500:10, 500:11, 500:15, 500:16, 500:18, 500:19, 500:20, 500:21, 500:24, 500:25, 501:2, 501:3, 501:5, 501:6, 501:8, 501:9, 501:12, 501:13, 501:16, 501:17, 501:20, 504:13, 504:14, 504:15, 504:16, 504:18, 504:19, 504:21, 504:22, 505:9, 505:16, 505:17,

5

505:19, 505:20, 505:23, 506:9, 506:10, 507:1, 507:2, 507:8, 507:9, 507:11, 507:12, 507:14, 507:17, 507:18, 507:21, 507:22, 507:24, 508:2, 508:5, 508:18, 508:19, 508:20, 508:21, 509:1, 515:13, 518:3, 520:2, 520:6, 520:7, 520:14, 522:12, 523:15, 523:23, 527:14, 532:6, 532:10, 536:11, 537:12, 537:14, 558:19, 562:8, 562:9, 562:11, 562:17, 562:18, 562:20, 562:21, 562:25, 563:4, 563:7, 563:16, 563:23, 565:1, 565:3, 565:19, 565:20, 565:22, 566:10, 566:14, 566:21, 567:6, 567:12, 567:20, 567:21, 567:23, 567:24, 568:1, 568:19, 568:22, 570:21, 571:1, 571:4, 571:24, 572:3, 572:8, 572:14, 573:23, 574:11, 574:17, 575:7, 575:11, 575:14, 575:16, 575:17, 575:20, 576:23, 577:4, 577:10, 577:20, 577:23, 577:24, 578:3, 578:10, 578:11, 578:13, 578:18, 578:19, 578:21, 579:4, 579:5, 579:6, 579:10, 579:16, 579:17, 579:19, 579:20, 579:25, 580:5, 580:11, 580:14, 581:7, 581:9, 581:10, 581:12, 582:25, 583:1, 583:4, 583:17, 584:25, 585:2, 585:7, 585:9, 586:2, 588:7, 588:24, 588:25, 589:2, 589:4, 589:7, 589:8, 589:10, 589:11, 589:13, 589:14, 590:1, 590:6, 590:9, 591:10, 591:14, 592:13, 592:20, 593:3, 593:22, 594:3, 594:19, 595:1, 595:4, 595:7, 595:10, 595:14, 595:17, 595:21, 595:22, 597:19, 598:6, 598:11, 598:20, 599:5, 599:21, 599:23, 599:24, 600:7, 604:17, 605:9, 605:13, 605:19, 606:2, 606:3, 606:5, 606:15, 606:16, 606:19, 606:22, 607:2, 607:17, 607:24, 608:23, 609:14, 609:15, 609:17, 609:18, 609:19, 609:20, 609:21, 610:1, 610:19, 611:24, 612:7, 612:20, 613:8, 613:13, 613:14, 613:18, 613:24, 614:18, 615:23, 615:25, 616:3, 621:7, 621:10, 622:16, 622:19, 623:9, 623:16, 623:20, 623:23, 624:3, 624:9, 625:5, 625:12, 625:23, 626:4, 627:2, 627:6, 632:1, 633:6, 633:13, 634:21, 634:22, 635:22, 635:25, 636:4, 636:8, 636:11, 636:18, 636:25, 637:3, 637:7, 637:12, 637:19, 637:20, 637:23, 637:24, 638:6, 638:9,

638:15, 638:20, 638:23, 639:18, 639:21, 639:22, 640:8, 640:11, 640:15, 640:17, 640:19, 640:21, 641:5, 641:14, 641:18, 642:5, 642:6, 642:23, 643:6, 643:13, 643:14, 643:15, 643:23, 643:24, 644:2, 644:3, 644:5, 644:6, 644:7, 644:8, 644:11, 644:12, 644:14, 644:15, 645:2, 645:6, 645:7, 645:10, 645:12, 645:25, 646:5, 646:8, 646:10, 646:13, 646:24, 657:18, 658:1, 659:5, 659:18, 659:22, 660:3, 660:8, 660:13, 660:14, 660:17, 660:18, 660:21, 660:22, 660:24, 660:25, 661:1, 661:2, 661:4, 661:5, 661:7, 661:8, 661:10, 661:19, 661:20, 662:7, 662:8, 662:9, 665:16, 665:17, 665:19, 666:10, 666:15

**corrected** [1] - 554:13
**corrective** [1] - 595:13
**counsel** [9] - 466:17, 466:22, 467:15, 469:12, 469:21, 475:1, 510:3, 511:15, 516:6
**counsel's** [1] - 489:7
**counseling** [7] - 595:12, 595:15, 595:16, 595:17, 595:18, 595:19
**county** [1] - 519:7
**County** [1] - 519:8
**couple** [12] - 466:7, 482:24, 513:22, 513:23, 525:4, 525:5, 556:5, 556:6, 556:7, 566:3, 587:3, 660:16
**couples** [1] - 614:6
**course** [6] - 546:23, 563:3, 580:20, 629:13, 630:11, 630:15
**COURT** [294] - 465:1, 465:11, 466:5, 466:11, 466:24, 467:2, 467:4, 467:10, 467:21, 470:3, 470:8, 470:18, 470:22, 471:9, 471:24, 472:23, 473:3, 473:13, 473:15, 474:3, 474:5, 474:11, 474:16, 474:24, 475:4, 475:11, 475:14, 475:19, 476:1, 476:4, 476:6, 476:15, 477:2, 479:8, 479:12, 484:7, 488:12, 488:24, 489:9, 489:14, 489:16, 489:23, 491:2, 491:11, 493:6, 493:11, 493:14, 493:19, 494:11, 494:21, 496:2, 496:4, 496:18, 501:22, 502:4, 502:6, 503:5, 503:9, 505:2, 505:8, 505:12, 508:7, 508:13, 509:10, 509:20, 509:24, 510:6, 510:9, 510:21, 511:8, 511:12, 511:19, 512:4, 512:22, 512:25, 513:2, 513:7, 513:20, 513:23, 514:2, 514:5, 514:9, 514:23, 515:4, 515:17, 516:4, 516:11, 516:16, 516:19, 517:1, 517:3, 517:6, 518:1,

518:8, 518:11, 518:24, 523:10, 524:10, 524:13, 524:18, 524:22, 529:8, 529:12, 529:22, 539:15, 540:2, 540:5, 541:3, 541:5, 543:8, 543:18, 547:6, 547:9, 547:19, 547:22, 548:5, 548:15, 549:17, 552:23, 553:10, 554:24, 555:4, 555:10, 556:18, 556:20, 557:1, 557:7, 560:4, 560:11, 562:2, 563:6, 564:1, 564:8, 567:8, 567:14, 568:10, 569:11, 570:3, 570:8, 570:13, 571:17, 571:22, 572:21, 573:4, 573:10, 573:18, 574:19, 574:24, 575:1, 575:9, 575:23, 577:18, 578:15, 579:12, 580:23, 581:3, 582:9, 582:12, 582:15, 582:19, 582:21, 583:21, 584:8, 584:18, 586:4, 586:6, 586:10, 587:5, 587:11, 587:17, 588:10, 589:22, 589:24, 590:2, 591:17, 591:20, 592:18, 593:10, 594:11, 594:21, 596:10, 596:14, 597:14, 597:21, 598:2, 598:17, 599:8, 600:23, 601:22, 602:4, 602:8, 603:2, 605:7, 605:15, 606:7, 608:10, 608:25, 609:5, 610:3, 610:9, 610:11, 610:17, 610:21, 611:2, 611:14, 611:19, 612:1, 612:22, 612:24, 613:10, 613:20, 614:1, 614:20, 616:9, 616:24, 617:6, 617:10, 617:21, 618:5, 619:4, 619:6, 619:12, 621:14, 624:12, 624:15, 624:19, 626:20, 627:13, 627:16, 627:19, 627:23, 627:25, 628:2, 628:12, 629:3, 629:9, 629:14, 629:20, 629:24, 630:3, 630:10, 630:23, 631:2, 631:13, 631:17, 631:20, 631:25, 632:7, 632:17, 632:22, 632:24, 633:21, 634:7, 634:14, 636:20, 638:4, 639:3, 640:2, 641:7, 641:16, 644:22, 648:5, 649:11, 649:15, 650:2, 650:11, 650:16, 650:19, 651:16, 652:21, 653:4, 655:5, 655:10, 655:12, 655:25, 656:10, 657:3, 657:6, 659:1, 659:7, 659:14, 659:24, 661:12, 662:14, 662:17, 663:9, 664:10, 664:13, 664:15, 664:18, 665:2, 665:10, 666:22, 667:5
**court** [13] - 491:1, 504:1, 542:1, 556:1, 556:2, 556:8, 573:19, 588:1, 604:1, 620:1, 624:20, 650:1, 665:1
**Court** [3] - 465:17, 465:22, 469:23
**Courthouse** [1] - 465:5
**courtroom** [8] - 476:5, 509:23,

518:10, 557:6, 560:2, 627:15, 632:23, 667:4
**covered** [2] - 632:9, 632:10
**covering** [1] - 620:12
**coworkers** [2] - 597:17
**crashed** [1] - 494:8
**crazies** [1] - 478:6
**crazy** [4] - 477:24, 478:6, 478:10, 514:7
**created** [1] - 532:24
**credibility** [1] - 558:21
**credit** [2] - 507:24, 628:23
**credited** [2] - 617:12, 617:13
**creepy** [3] - 468:15, 589:13, 589:15
**critical** [1] - 557:16
**cross** [8] - 477:4, 477:8, 514:24, 539:15, 543:8, 557:9, 580:15, 657:3
**CROSS** [2] - 539:16, 668:6
**cross-examination** [3] - 539:15, 543:8, 657:3
**CROSS-EXAMINATION** [2] - 539:16, 668:6
**cross-examine** [2] - 477:4, 514:24
**crutches** [2] - 608:1, 608:4
**cry** [1] - 591:2
**crying** [3] - 589:19, 590:21
**cumulative** [1] - 513:18
**Curt** [5] - 471:22, 472:2, 472:7, 472:10, 598:21
**custom** [1] - 651:2
**customer** [28] - 469:13, 469:24, 470:3, 479:18, 479:24, 480:9, 481:2, 481:6, 481:8, 481:19, 485:3, 485:9, 498:3, 498:12, 498:14, 498:16, 498:22, 499:5, 499:8, 500:4, 500:6, 592:5, 592:8, 595:14, 615:15, 633:6, 640:5, 666:13
**customers** [30] - 480:13, 482:8, 486:14, 494:14, 496:21, 504:12, 512:12, 562:11, 581:22, 592:4, 592:20, 593:2, 593:22, 595:5, 595:20, 595:24, 596:5, 597:19, 599:11, 608:4, 614:3, 615:13, 625:14, 627:16, 636:15, 643:19, 662:2, 662:3, 662:6, 662:7
**cut** [1] - 632:12
**cV-10-4334** [1] - 465:4

**D**

**d/b/a** [1] - 465:6
**damages** [3] - 664:15, 664:16, 665:6
**dancing** [1] - 585:16
**danger** [5] - 495:8, 498:19, 499:12, 533:1, 559:3

6

**dangerous** [5] - 480:20, 485:21, 493:25, 494:15, 494:18
**date** [3] - 519:14, 641:11, 641:21
**David** [8] - 467:7, 479:3, 488:15, 518:16, 518:23, 566:10, 572:7, 609:13
**DAVID** [2] - 518:18, 668:4
**days** [9] - 558:3, 609:16, 609:19, 610:5, 612:18, 612:20, 613:5, 613:17, 660:16
**dead** [1] - 487:9
**deal** [1] - 595:20
**deaths** [2] - 494:4, 508:4
**decide** [4] - 593:9, 593:16, 593:17, 628:21
**decision** [5] - 470:13, 470:25, 630:12, 630:16, 665:9
**declaration** [4] - 510:2, 510:12, 667:6
**declarations** [1] - 510:10
**deem** [2] - 491:12, 495:25
**defendant** [1] - 627:24
**Defendant** [1] - 478:23
**Defendants** [2] - 465:8, 465:19
**Defendants'** [4] - 509:3, 511:6, 552:20, 553:6
**defendants'** [5] - 489:3, 491:8, 491:9, 510:1
**defending** [1] - 501:19
**defense** [2] - 477:7, 477:8
**define** [1] - 585:3
**definitely** [6] - 473:17, 531:1, 531:5, 531:16, 531:21, 544:8
**delay** [1] - 558:5
**demands** [1] - 510:13
**demonstration** [1] - 565:25
**dependent** [1] - 615:15
**deploy** [1] - 645:15
**deployed** [1] - 645:9
**deployment** [1] - 645:21
**deposed** [1] - 508:1
**deposition** [90] - 467:20, 472:4, 478:2, 478:8, 510:25, 511:1, 511:16, 511:21, 516:12, 522:4, 522:10, 522:14, 522:21, 523:7, 523:9, 523:12, 526:13, 526:19, 527:9, 530:1, 530:18, 530:20, 531:15, 531:20, 534:14, 538:19, 538:25, 539:18, 548:21, 548:24, 548:25, 549:20, 549:21, 549:24, 550:12, 551:4, 551:18, 551:24, 551:25, 552:16, 554:3, 554:4, 554:11, 554:13, 556:15, 558:12, 561:15, 567:25, 569:4, 569:6, 569:8, 569:14, 569:16, 569:25, 570:12, 571:3, 572:5, 576:5, 588:12, 590:24, 591:10, 591:25, 592:24, 593:7, 593:12, 593:13, 599:25, 600:10,

617:17, 628:3, 629:23, 630:8, 630:9, 630:10, 630:14, 630:18, 630:22, 631:1, 631:3, 631:5, 635:3, 635:24, 635:25, 638:25, 639:3, 640:13, 642:25, 647:12, 658:3
**describe** [5] - 527:3, 544:18, 545:25, 583:23, 635:6
**described** [7] - 505:24, 521:25, 522:10, 533:7, 583:15, 614:5, 614:13
**detail** [3] - 549:5, 549:10, 549:12
**details** [8] - 538:15, 549:2, 549:6, 549:7, 549:9, 549:13, 549:15, 551:22
**deteriorating** [1] - 512:16
**died** [3] - 494:1, 507:23, 507:25
**difference** [3] - 489:9, 513:12, 630:13
**different** [9] - 500:7, 508:16, 514:14, 533:16, 548:9, 568:24, 577:14, 614:6, 627:18
**differently** [3] - 655:1, 655:13, 655:15
**DIRECT** [10] - 477:11, 519:1, 560:17, 650:20, 657:12, 668:3, 668:5, 668:9, 668:11, 668:12
**direct** [5] - 477:5, 519:13, 558:1, 558:7, 560:5
**directing** [1] - 487:23
**directly** [2] - 594:4, 647:10
**Directors** [1] - 495:2
**disagree** [1] - 578:22
**discipline** [2] - 594:24, 595:4
**disclosed** [1] - 469:14
**disclosure** [1] - 514:13
**disclosures** [3] - 471:13, 471:15, 471:18
**discovery** [4] - 467:15, 471:7, 472:3, 511:17
**discriminate** [2] - 605:18, 605:25
**discrimination** [1] - 664:11
**discuss** [8] - 466:6, 527:24, 528:1, 528:2, 557:4, 620:4, 627:14, 667:2
**discussed** [11] - 538:2, 538:3, 538:6, 538:8, 538:10, 546:14, 556:12, 582:12, 582:14, 620:6, 665:23
**discussing** [2] - 545:13, 549:23
**discussion** [5] - 545:11, 611:20, 612:2, 612:3, 656:15
**disorder** [2] - 492:23, 493:1
**disorders** [3] - 492:4, 492:15, 492:17
**disregard** [7] - 568:10, 583:22, 584:9, 594:12, 597:15, 616:10, 616:24
**disrupt** [1] - 585:15

**distance** [2] - 647:4, 647:11
**DISTRICT** [3] - 465:1, 465:1, 465:11
**dive** [3] - 507:20, 513:13, 644:24
**dock** [2] - 622:2, 623:8
**docked** [1] - 622:5
**Dockers** [1] - 585:17
**docking** [1] - 621:23
**document** [22] - 488:14, 488:22, 489:4, 489:5, 489:14, 489:25, 491:3, 491:4, 491:6, 491:11, 511:8, 511:10, 511:17, 521:3, 521:4, 521:14, 521:16, 522:23, 552:24, 554:20, 587:20
**documentation** [3] - 594:2, 594:6, 594:22
**documents** [3] - 467:15, 510:21, 582:18
**don** [22] - 507:16, 592:3, 592:12, 594:19, 595:23, 596:1, 596:4, 597:23, 600:3, 604:16, 606:13, 606:17, 607:16, 611:7, 611:22, 613:5, 614:3, 615:22, 623:14, 624:25, 634:20
**Don** [122] - 467:8, 468:3, 468:4, 468:15, 468:18, 469:12, 472:4, 472:5, 472:7, 493:11, 495:15, 495:16, 497:4, 497:10, 497:25, 498:3, 507:23, 507:25, 508:18, 510:2, 529:2, 529:18, 529:20, 530:24, 531:5, 531:8, 531:16, 532:2, 539:2, 542:13, 543:4, 543:23, 544:19, 545:25, 560:22, 560:24, 564:24, 565:2, 565:13, 566:1, 567:6, 567:9, 567:11, 570:21, 571:4, 572:11, 572:13, 589:12, 589:15, 589:19, 590:14, 591:1, 595:7, 597:19, 598:19, 598:22, 599:10, 599:20, 605:8, 606:21, 606:23, 607:6, 608:12, 611:8, 614:9, 615:5, 615:22, 615:23, 615:25, 616:3, 617:2, 617:3, 617:11, 617:13, 617:24, 620:14, 620:25, 621:9, 621:23, 621:25, 623:12, 623:15, 623:22, 634:19, 636:5, 638:1, 639:11, 641:14, 642:8, 642:11, 642:22, 651:12, 651:23, 652:5, 653:8, 654:3, 654:14, 654:15, 654:17, 654:21, 654:23, 655:1, 655:7, 655:13, 655:17, 655:21, 656:3, 656:12, 656:15, 656:24, 658:20, 658:22, 659:4, 659:10, 661:4, 661:9, 665:14, 666:2
**Don's** [7] - 524:20, 545:22, 566:23, 595:3, 595:24, 596:5, 597:7, 597:17, 624:4, 636:6, 641:4, 643:17, 643:20, 659:16, 659:20, 660:15, 665:18
**DONALD** [1] - 465:3
**done** [15] - 475:5, 475:6, 475:8,

523:1, 563:8, 576:14, 576:15, 580:13, 629:25, 631:15, 632:3, 632:4, 649:6, 649:9, 663:8
**door** [3] - 558:1, 571:2, 571:13
**down** [19] - 466:22, 472:19, 515:20, 516:19, 533:15, 556:20, 568:16, 582:17, 628:13, 628:14, 632:12, 642:23, 643:5, 643:12, 645:24, 646:3, 647:2, 650:6, 657:6
**dress** [1] - 576:17
**dresser** [3] - 577:25, 578:4, 578:8
**dressers** [3] - 576:21, 576:24, 577:1
**dressing** [2] - 563:17, 576:9
**Drive** [1] - 465:19
**driving** [2] - 546:21, 548:3
**drogue** [3] - 645:16, 645:17, 645:18
**Drop** [11] - 474:1, 478:13, 479:19, 485:11, 487:1, 528:7, 528:20, 561:2, 579:14, 594:25, 606:18
**drop** [1] - 560:21
**drops** [1] - 622:16
**dropzone** [1] - 654:7
**Dropzone** [1] - 654:11
**dropzone.com** [1] - 626:3
**dude** [1] - 544:11
**due** [1] - 468:23
**duly** [4] - 476:22, 518:19, 560:14, 650:14
**dump** [1] - 471:16
**Duncan** [13] - 467:8, 468:2, 469:3, 469:9, 469:11, 472:9, 474:19, 572:14, 572:15, 644:7, 644:9
**during** [27] - 469:4, 471:7, 472:4, 477:6, 477:8, 494:8, 507:20, 513:2, 513:13, 523:7, 525:10, 526:19, 527:8, 528:24, 529:10, 530:18, 531:15, 531:20, 544:22, 557:9, 573:8, 609:21, 613:6, 622:21, 623:22, 630:12, 639:24

**E**

**e-mail** [12] - 508:22, 508:24, 508:25, 509:2, 509:4, 510:17, 510:18, 560:20, 596:13, 596:19, 607:7, 607:16
**e-mailed** [1] - 569:5
**ear** [2] - 543:5, 566:7
**early** [2] - 550:23, 557:1
**ears** [1] - 637:7
**ease** [1] - 640:17
**easier** [1] - 654:1
**EASTERN** [1] - 465:1
**edition** [1] - 513:18

7

**effect** [3] - 529:14, 638:18, 639:12
**either** [7] - 507:6, 536:12, 574:3, 616:20, 646:22, 647:18, 647:22
**electrical** [1] - 652:3
**eligible** [1] - 666:7
**emotional** [2] - 493:8, 493:15
**employed** [5] - 519:9, 523:25, 650:22, 650:24, 650:25
**employee** [10] - 595:10, 605:11, 605:19, 606:1, 606:4, 606:23, 607:7, 607:18, 607:19, 651:11
**employees** [8] - 471:14, 560:24, 594:25, 595:23, 596:4, 597:23, 615:16, 628:20
**employment** [2] - 470:25, 519:11
**End** [2] - 541:8, 555:13
**end** [14] - 487:9, 515:13, 526:5, 526:21, 534:21, 566:20, 567:18, 607:11, 607:15, 631:18, 631:19, 651:25, 662:12, 662:21
**enduring** [1] - 469:25
**enhance** [2] - 660:24, 661:6
**enhancing** [2] - 497:14, 661:1
**enjoy** [1] - 477:19
**enjoyed** [1] - 476:7
**entailed** [1] - 575:24
**entered** [3] - 476:5, 560:2, 632:23
**enters** [1] - 518:9
**entire** [11] - 479:24, 481:23, 484:1, 501:2, 560:23, 573:7, 573:8, 574:17, 597:13, 620:11, 666:5
**entry** [1] - 513:9
**EOC** [1] - 667:6
**equal** [1] - 532:24
**equation** [1] - 659:21
**errata** [4] - 554:14, 555:5, 555:7, 558:19
**error** [2] - 483:19, 558:18
**escapade** [7] - 641:5, 641:9, 641:10, 641:20, 641:24, 642:13, 642:14
**escapades** [6] - 641:14, 641:18, 641:22, 641:25, 642:4, 642:7
**especially** [2] - 547:25, 652:23
**ESQ** [4] - 465:14, 465:16, 465:20, 465:21
**essentially** [1] - 609:10
**established** [1] - 660:4
**estate** [4] - 466:18, 466:21, 476:16, 476:18
**event** [2] - 542:10, 641:10
**evidence** [37] - 479:13, 488:9, 488:23, 489:7, 491:13, 496:6, 510:3, 520:25, 521:3, 524:24, 543:17, 553:7, 560:12, 565:7, 568:3, 570:16, 582:19, 582:22,

587:8, 589:23, 600:25, 627:9, 627:11, 629:2, 629:4, 634:17, 638:3, 666:24, 668:15, 668:15, 668:16, 668:16, 668:17, 668:17, 668:18
**ex** [5] - 512:16, 513:10, 514:7, 583:3, 585:14
**ex-wife** [4] - 512:16, 513:10, 514:7, 583:3
**exact** [5] - 526:11, 526:23, 528:23, 615:11, 660:9
**exactly** [6] - 529:15, 531:4, 538:11, 538:14, 613:16, 655:19
**exaggeration** [1] - 644:19
**examination** [4] - 477:5, 488:4, 539:15, 543:8, 558:1, 558:7, 560:5, 657:3
**EXAMINATION** [14] - 477:11, 519:1, 539:16, 548:16, 560:17, 650:20, 657:12, 668:3, 668:5, 668:6, 668:7, 668:9, 668:11, 668:12
**examine** [2] - 477:4, 514:24
**examined** [6] - 476:23, 487:19, 491:25, 518:19, 560:15, 650:15
**example** [1] - 582:6
**examples** [1] - 579:9
**excited** [1] - 470:5
**exclaimed** [1] - 637:16
**excused** [1] - 556:22
**Exhibit** [43] - 478:24, 479:13, 489:3, 489:20, 489:22, 491:3, 491:7, 491:13, 496:1, 496:6, 509:3, 509:8, 509:9, 510:1, 510:2, 510:16, 513:1, 520:25, 524:9, 524:13, 524:23, 552:20, 553:7, 560:10, 560:12, 563:25, 569:25, 582:22, 626:23, 627:11, 627:24, 633:9, 634:6, 634:17, 668:15, 668:15, 668:16, 668:16, 668:17, 668:17
**exhibit** [12] - 467:20, 479:16, 488:8, 488:11, 509:12, 511:1, 511:2, 512:25, 564:9, 569:7, 627:23, 630:8
**Exhibits** [2] - 570:15, 668:18
**exhibits** [4] - 467:14, 467:19, 511:2, 511:6, 569:6, 570:13
**EXHIBITS** [1] - 668:14
**exhilarating** [1] - 487:12
**exited** [1] - 639:8
**exiting** [1] - 637:5
**exits** [1] - 557:5
**expect** [13] - 469:5, 471:18, 498:23, 505:4, 505:15, 505:18, 505:21, 507:13, 507:19, 576:15, 588:9, 610:14, 626:7
**expectations** [1] - 485:23, 486:23, 487:2, 487:3, 487:5
**expecting** [1] - 537:5
**experience** [16] - 485:12,

487:15, 507:13, 507:16, 526:22, 534:1, 547:12, 547:25, 548:11, 549:4, 557:10, 557:12, 560:23, 568:19, 568:22, 599:1
**experienced** [2] - 494:7, 581:17
**expert** [2] - 483:2, 483:5
**explain** [19] - 480:17, 480:22, 480:25, 481:2, 481:22, 482:1, 499:4, 507:6, 542:20, 542:21, 558:23, 574:21, 576:2, 624:6, 628:16, 628:17, 628:20, 632:21, 645:14
**explained** [2] - 480:19, 481:22, 520:4, 573:7, 574:10
**explaining** [2] - 486:11, 574:8
**explanation** [1] - 632:15
**Express** [1] - 466:3
**EXPRESS** [1] - 465:6
**express** [2] - 565:2, 568:24
**expressed** [2] - 567:19, 568:5
**expression** [1] - 568:15
**extra** [2] - 524:2, 619:11
**extreme** [4] - 492:20, 492:21, 492:22
**extremely** [1] - 492:25
**eyes** [1] - 500:24

## F

**face** [14] - 468:15, 512:10, 534:22, 543:11, 566:23, 568:15, 570:18, 570:23, 572:3, 589:13, 589:15, 634:24, 661:4, 661:7
**facebook** [1] - 514:14
**Facebook** [13] - 511:3, 512:6, 512:8, 512:10, 512:11, 512:15, 512:22, 512:23, 512:24, 514:8, 581:6, 581:14
**fact** [22] - 472:5, 479:20, 486:14, 509:4, 534:11, 542:8, 542:9, 544:4, 544:6, 546:10, 554:21, 556:11, 558:16, 585:18, 601:11, 611:11, 616:12, 633:5, 635:6, 639:10, 644:9
**factors** [1] - 588:22
**facts** [5] - 512:20, 512:21, 589:23, 601:23, 638:2
**fail** [2] - 469:9, 469:23
**failed** [1] - 467:15
**fair** [9] - 525:24, 532:2, 584:4, 607:12, 610:7, 613:3, 628:17, 630:17, 639:24
**fairly** [5] - 561:12, 561:20, 562:5, 562:6, 564:19
**fall** [7] - 598:10, 644:19, 644:24, 645:15, 645:17, 646:1, 647:3
**falling** [5] - 545:10, 598:10
**familiar** [5] - 545:24, 546:5, 546:10, 633:2, 651:3
**fantastic** [2] - 467:25, 571:6

**far** [6] - 473:11, 474:20, 529:10, 532:22, 564:24, 609:3
**fast** [3] - 503:7, 515:8, 571:9
**faster** [1] - 515:19
**fear** [1] - 608:5
**federal** [1] - 471:16
**Federal** [2] - 465:23, 469:23
**feelings** [1] - 547:17
**fees** [2] - 482:12, 501:19
**fellow** [1] - 544:5
**felt** [21] - 525:13, 532:25, 538:13, 538:17, 542:22, 544:13, 546:10, 547:8, 547:14, 547:25, 557:10, 557:25, 574:2, 614:22, 614:24, 640:10, 643:25, 657:16, 657:21, 658:11, 658:20
**female** [4] - 652:23, 653:1, 653:21, 654:1
**few** [10] - 475:16, 528:21, 528:22, 568:23, 569:2, 571:12, 577:12, 590:8, 590:20, 609:16
**fewer** [2] - 662:2, 662:6
**fifteen** [1] - 528:22
**figure** [2] - 471:18, 629:17
**file** [1] - 545:7
**filed** [1] - 606:13
**filing** [1] - 606:9
**filled** [1] - 479:3
**film** [1] - 470:6
**finally** [1] - 468:6
**fine** [1] - 484:9
**finger** [1] - 565:15
**fingers** [1] - 544:20
**finish** [8] - 510:10, 577:18, 593:18, 609:5, 626:14, 632:1, 645:4, 662:5
**finished** [1] - 503:11
**fire** [9] - 589:15, 606:4, 606:13, 624:25, 625:19, 625:22, 628:10, 640:19, 641:1
**fired** [9] - 580:4, 580:10, 590:6, 592:3, 634:19, 638:1, 665:15, 666:10, 666:12
**first** [38] - 466:8, 472:2, 476:22, 478:9, 478:14, 487:18, 488:2, 500:17, 518:19, 537:9, 538:11, 542:6, 548:2, 548:8, 550:9, 550:20, 551:1, 557:14, 581:15, 584:23, 585:20, 585:21, 588:10, 590:13, 590:19, 598:23, 614:12, 619:6, 629:6, 630:18, 630:22, 631:4, 633:21, 633:24, 634:6, 636:13, 650:14, 656:1
**fit** [1] - 649:8
**fits** [3] - 499:19, 500:5, 577:10
**five** [4] - 514:21, 531:17, 548:19, 550:2
**flirtatious** [1] - 542:23
**flowing** [1] - 571:8

8

**flyers** [1] - 495:3
**flying** [1] - 528:7
**focal** [1] - 533:2
**focus** [3] - 484:7, 566:18, 642:3
**focusing** [1] - 618:3
**follow** [3] - 539:22, 583:17, 604:9
**follow-up** [1] - 539:22
**followed** [1] - 607:10
**following** [40] - 466:1, 488:25, 489:1, 490:3, 491:1, 502:7, 503:1, 503:13, 504:1, 513:6, 514:21, 517:7, 540:6, 553:11, 557:13, 586:11, 587:1, 587:23, 588:1, 602:9, 603:1, 603:5, 604:1, 618:6, 619:1, 619:13, 620:1, 621:21, 621:24, 622:9, 623:5, 631:24, 648:6, 649:1, 649:18, 650:1, 663:10, 664:1, 664:20, 665:1
**follows** [4] - 476:23, 518:20, 560:16, 650:15
**force** [2] - 534:25, 567:9
**forced** [1] - 567:10
**forget** [1] - 644:16
**form** [23] - 520:19, 520:23, 521:18, 567:8, 573:4, 579:12, 582:9, 583:18, 584:7, 595:3, 599:6, 599:8, 608:10, 608:25, 610:10, 613:19, 617:4, 638:4, 638:15, 641:7, 644:22, 652:20, 659:14
**formal** [2] - 472:12, 654:9
**formally** [1] - 653:11
**forms** [4] - 520:8, 520:10, 520:12, 520:16
**forth** [2] - 487:3, 487:4
**forward** [1] - 560:25
**foundation** [8] - 511:14, 512:1, 512:3, 512:6, 627:12, 629:1, 629:5, 629:19
**four** [11] - 466:14, 531:17, 552:12, 569:22, 570:3, 570:10, 575:10, 575:13, 575:15, 577:8, 578:17
**frame** [1] - 534:21
**free** [10] - 475:10, 546:5, 598:10, 600:22, 628:20, 644:18, 644:24, 645:15, 645:17, 647:3
**Friday** [8] - 466:20, 536:6, 547:12, 609:23, 614:5, 621:16, 621:19, 623:4
**friendly** [1] - 652:25
**front** [6] - 523:9, 528:15, 530:1, 538:19, 539:19, 550:12
**frustrated** [1] - 626:17
**fucking** [3] - 527:4, 527:7, 567:20
**full** [5] - 514:13, 561:9, 622:6, 622:24, 622:25
**fully** [1] - 559:4

**fun** [4] - 584:25, 636:12, 636:14, 660:20
**FunJump@ SkydiveLongIsland** [1] - 509:6
**funjumps@ SkydiveLongIsland.com** [1] - 509:1
**funny** [1] - 636:16
**furtherer** [1] - 560:15

## G

**game** [2] - 628:17, 630:17
**gamesmanship** [1] - 471:19
**gay** [49] - 504:21, 535:19, 536:1, 539:11, 542:8, 590:9, 590:14, 591:3, 591:12, 591:14, 591:22, 592:1, 592:13, 592:16, 592:20, 592:22, 593:2, 593:22, 596:1, 596:20, 596:21, 597:18, 598:20, 598:22, 598:24, 610:24, 611:7, 614:18, 614:25, 615:23, 615:25, 616:3, 616:19, 617:2, 617:3, 617:11, 620:13, 625:5, 625:6, 625:12, 641:4, 641:18, 654:3, 654:5, 654:7, 654:15, 654:21, 659:12, 659:17
**gear** [2] - 505:16, 505:19
**general** [5] - 494:2, 555:5, 576:8, 581:24, 581:25
**generally** [1] - 659:15
**gentleman** [3] - 497:3, 497:25, 620:7
**gentlemen** [1] - 497:21
**gesture** [1] - 525:20
**gestures** [2] - 525:17, 543:11
**gesturing** [2] - 544:4, 544:19
**girl** [7] - 544:6, 614:8, 614:14, 614:17, 614:18, 620:10
**girlfriend** [33] - 519:19, 519:23, 525:24, 528:25, 529:6, 529:16, 530:8, 530:24, 531:3, 531:11, 538:14, 543:24, 544:10, 544:19, 546:12, 557:12, 557:15, 582:25, 583:3, 584:24, 584:25, 585:7, 610:19, 610:23, 616:3, 620:7, 620:8, 638:19, 639:13, 657:17, 657:22, 658:12, 659:5
**girlfriend's** [1] - 532:19
**given** [11] - 471:7, 471:22, 473:2, 489:13, 533:15, 572:16, 607:10, 637:19, 639:18, 653:25, 660:16
**glad** [2] - 545:1
**goofy** [10] - 634:24, 635:1, 635:6, 635:14, 635:20, 636:3, 636:7, 636:9, 636:17, 660:7
**governing** [1] - 491:16
**great** [3] - 525:13, 526:10, 568:16

**GREGORY** [1] - 465:14
**groped** [1] - 546:3
**ground** [6] - 532:16, 534:4, 557:11, 576:14, 576:17, 646:16
**grounds** [2] - 494:11, 512:2
**guess** [11] - 516:11, 522:2, 523:4, 537:20, 539:6, 558:11, 558:18, 589:24, 597:11, 599:19, 629:9
**guidelines** [1] - 491:20
**guy** [18] - 482:14, 482:22, 529:6, 529:17, 530:9, 530:13, 530:15, 531:3, 600:1, 614:14, 614:17, 616:2, 638:20, 639:13, 657:18, 657:22, 658:13, 660:12
**guys** [2] - 596:21, 598:12

## H

**half** [4] - 499:16, 613:12, 622:7, 626:8
**hamming** [3] - 468:4, 469:13, 497:11
**hand** [15] - 478:17, 478:23, 518:17, 520:24, 525:17, 525:20, 526:13, 552:19, 622:9, 622:25, 626:22, 636:24, 637:21, 661:4, 661:7
**handing** [2] - 509:3, 523:12
**handle** [1] - 494:21
**hands** [6] - 532:11, 532:20, 543:1, 545:19, 566:8, 611:4
**hanging** [1] - 647:7
**happier** [2] - 585:18, 585:22
**happiness** [5] - 567:19, 568:7, 568:13, 568:24, 570:18
**happy** [14] - 485:9, 485:10, 485:12, 525:24, 568:6, 568:17, 568:18, 568:21, 571:24, 571:25, 572:2, 572:7, 572:9, 592:6
**hard** [7] - 472:18, 472:19, 570:5, 570:6, 570:9, 570:10, 613:15
**harm** [1] - 520:13
**harness** [26] - 499:20, 500:3, 500:4, 504:5, 504:8, 507:7, 521:8, 521:10, 563:9, 575:12, 575:13, 576:6, 576:10, 576:13, 576:18, 576:19, 577:1, 577:7, 577:10, 577:12, 577:14, 578:5, 578:24, 579:1, 579:23, 647:8
**harnessed** [3] - 561:7, 561:8, 561:9
**harnesses** [5] - 500:2, 500:7, 576:7, 576:8, 576:22
**head** [6] - 566:7, 620:9, 646:23, 647:5, 647:9, 647:19
**hear** [18] - 525:7, 535:14, 565:19, 572:21, 591:21, 593:10, 616:3, 616:6, 616:13, 633:22, 634:9, 637:10, 654:14,

**hard** [...] 654:17, 654:20, 654:23, 655:17, 656:24
**heard** [22] - 474:16, 484:4, 497:13, 516:12, 565:18, 566:10, 579:8, 579:9, 589:3, 589:25, 605:3, 641:13, 642:4, 642:10, 654:6, 654:16, 656:4, 656:7, 656:17, 656:19, 660:23
**hearing** [1] - 656:22
**hearsay** [2] - 548:4, 557:11
**heart** [1] - 506:18
**height** [1] - 577:13
**held** [1] - 488:14
**helmet** [2] - 496:8, 496:13, 637:10
**help** [3] - 478:11, 564:22, 615:7
**helps** [2] - 477:24, 478:6
**heterosexual** [2] - 658:23, 659:21
**highlight** [1] - 468:12
**highlights** [1] - 468:16
**himself** [8] - 533:3, 578:10, 611:12, 654:8, 654:14, 659:11, 659:17, 659:20
**hip** [3] - 578:18, 578:25, 611:4
**hips** [10] - 528:17, 543:1, 545:19, 545:20, 566:8, 578:20, 579:5, 642:17, 642:19, 646:7
**hired** [2] - 590:15, 654:7
**history** [5] - 545:15, 566:16, 566:17, 615:10, 624:4
**hit** [1] - 658:23
**hitting** [6] - 617:24, 620:12, 620:14, 620:25, 646:23, 647:19
**hoc** [1] - 574:14
**Hold** [1] - 596:14
**hold** [7] - 472:19, 481:19, 493:3, 510:6, 520:12, 524:18, 564:1
**holding** [1] - 481:12
**home** [14] - 466:20, 476:17, 533:11, 535:17, 546:18, 546:21, 548:3, 550:10, 551:6, 551:8, 621:10, 662:11, 662:20, 667:3
**homosexual** [2] - 590:12, 591:9
**honest** [1] - 472:6
**Honor** [50] - 470:15, 472:5, 472:10, 472:11, 472:14, 472:15, 484:1, 488:6, 488:21, 495:22, 502:3, 509:17, 514:12, 521:1, 523:8, 524:7, 524:9, 524:12, 524:21, 539:14, 540:1, 543:7, 543:16, 552:22, 553:6, 553:8, 554:10, 555:12, 556:23, 559:8, 559:9, 561:24, 569:10, 571:16, 593:5, 597:12, 598:15, 601:25, 611:15, 617:18, 618:1, 619:9, 627:7, 629:15, 631:22, 648:4, 650:8, 667:8
**HONORABLE** [1] - 465:11
**hope** [3] - 476:7, 542:7, 631:17

9

**hoping** [2] - 609:10, 632:2
**horizontally** [1] - 647:11
**hotel** [1] - 466:16
**hour** [4] - 475:7, 475:9, 476:1, 645:19
**hours** [1] - 626:18
**human** [1] - 483:19
**hurt** [1] - 606:24
**hypothetical** [4] - 597:20, 598:1, 630:5, 631:14
**hypothetically** [1] - 597:5

## I

**idea** [3] - 623:7, 626:12, 658:22
**identified** [5] - 467:13, 469:14, 471:4, 471:6, 472:3
**identify** [8] - 467:16, 473:25, 474:1, 474:2, 543:15, 543:19, 587:21
**ignore** [2] - 513:14
**illegitimate** [1] - 573:23
**imagine** [4] - 474:18, 475:16, 562:22, 649:7
**impeach** [2] - 591:18, 593:6
**implicated** [1] - 558:7
**implying** [2] - 544:21, 659:4
**important** [4] - 486:18, 574:16, 578:12, 646:13
**improper** [4] - 600:12, 601:9, 660:7, 660:13
**improperly** [1] - 617:13
**inadvertence** [2] - 607:11, 607:15
**inadvertently** [2] - 607:7, 626:5
**inappropriate** [19] - 498:5, 532:3, 532:25, 533:9, 534:5, 538:13, 542:10, 542:11, 545:21, 545:22, 557:21, 563:1, 566:9, 580:17, 580:19, 597:8, 637:18, 639:21, 640:4
**inappropriately** [6] - 534:9, 535:8, 542:19, 542:20, 542:21, 557:21
**inappropriateness** [1] - 538:17
**INC** [1] - 465:6
**inch** [1] - 499:16
**incident** [7] - 494:7, 538:2, 549:1, 549:3, 598:4, 628:6, 632:11
**incidents** [1] - 559:1
**include** [2] - 493:14, 585:6
**included** [3] - 492:17, 494:24, 495:1
**includes** [1] - 495:2
**including** [1] - 510:25
**inconsistency** [1] - 593:16
**inconsistent** [4] - 554:17, 593:12, 593:14, 593:15
**incorrect** [1] - 645:6
**independent** [1] - 529:12

**indicated** [1] - 548:18
**indicating)** [1] - 541:4
**individual** [1] - 469:18
**individuals** [1] - 472:8
**inform** [3] - 527:21, 599:3, 599:10
**information** [21] - 482:18, 547:10, 557:19, 557:23, 584:2, 584:5, 584:24, 585:2, 585:3, 585:4, 585:5, 585:9, 585:24, 597:10, 597:18, 614:16, 640:8, 640:16, 644:14, 665:21, 665:24
**informed** [1] - 572:17
**inherent** [1] - 483:14
**inherently** [5] - 485:21, 493:25, 494:14, 494:18, 572:18
**initial** [8] - 471:12, 471:15, 500:14, 500:20, 504:15, 504:18, 505:9, 612:3
**injured** [4] - 480:22, 600:4, 605:12, 606:17
**injury** [14] - 493:4, 493:8, 493:14, 493:15, 580:11, 600:13, 601:6, 601:9, 604:5, 604:11, 608:14, 646:10, 646:12
**instance** [1] - 499:4
**instances** [1] - 499:8
**instead** [1] - 629:2
**instruct** [1] - 660:19
**instructed** [4] - 529:5, 566:25, 572:11, 572:20
**instruction** [2] - 574:14, 607:10
**instructions** [1] - 520:2
**instructor** [68] - 484:16, 495:5, 495:9, 497:3, 498:15, 498:19, 498:23, 499:10, 499:15, 499:17, 500:6, 504:13, 504:20, 507:4, 507:6, 508:18, 520:6, 520:17, 520:20, 527:17, 527:21, 527:25, 528:3, 528:8, 528:25, 530:10, 532:9, 532:17, 533:16, 544:19, 545:11, 545:17, 545:18, 548:9, 560:22, 562:17, 564:15, 573:1, 575:19, 576:10, 576:12, 576:16, 576:20, 576:24, 577:5, 577:6, 577:9, 577:20, 578:1, 578:5, 578:9, 580:10, 599:1, 599:20, 599:23, 625:16, 637:5, 637:9, 644:1, 646:20, 646:21, 647:16, 647:17, 651:10, 651:22, 654:11, 654:12
**instructor's** [7] - 481:9, 527:19, 528:11, 528:13, 528:17, 532:11, 574:13
**instructors** [20] - 495:3, 507:13, 507:19, 525:11, 530:11, 531:4, 544:5, 561:10, 563:17, 563:22, 580:16, 580:18, 596:20, 598:9, 598:12, 625:13, 639:11, 656:7, 660:19

**Insurance** [1] - 664:9
**insurance** [4] - 605:4, 605:9, 606:1, 664:14
**intending** [1] - 470:19
**intention** [1] - 607:22
**interact** [1] - 652:11
**interest** [1] - 659:11
**interests** [1] - 652:1
**interminable** [2] - 588:6, 588:21
**Internet** [3] - 584:14, 586:2, 588:20
**interrupt** [2] - 518:14, 650:5
**intricacies** [1] - 565:22
**introduce** [5] - 469:15, 510:3, 587:11, 654:8, 654:14
**introduced** [2] - 489:19, 577:5
**introducing** [5] - 467:6, 472:5, 474:15, 587:7, 587:8
**invading** [1] - 505:25
**investigate** [3] - 562:25, 563:4, 589:6
**investigating** [1] - 589:9
**investigation** [3] - 615:3, 615:10, 628:22
**involuntary** [1] - 571:14
**involved** [4] - 470:24, 473:22, 474:7, 495:12
**involvement** [1] - 473:6
**irritated** [1] - 546:20
**Island** [45] - 468:7, 473:8, 473:10, 479:3, 480:13, 481:3, 481:4, 485:7, 493:4, 494:4, 494:17, 495:19, 496:15, 496:22, 498:12, 501:11, 501:15, 506:12, 508:5, 511:4, 513:9, 514:14, 514:21, 519:17, 520:1, 520:13, 536:9, 542:17, 549:19, 550:10, 552:5, 581:6, 581:14, 582:7, 583:16, 584:3, 588:24, 599:2, 627:1, 627:6, 651:4, 655:2, 656:22, 661:16
**ISLAND** [1] - 465:7
**Island's** [1] - 512:10
**Islip** [2] - 465:5, 465:23
**issue** [10] - 472:9, 472:14, 509:24, 510:9, 513:11, 554:2, 554:24, 557:25, 558:24, 665:6
**issued** [2] - 542:17, 622:23
**issues** [4] - 466:7, 509:18, 557:16, 559:4
**it;s** [1] - 577:15
**itself** [4] - 467:20, 510:17, 554:20, 567:14

## J

**Jim** [1] - 560:25
**job** [7] - 498:14, 590:17, 605:13, 625:10, 625:17, 636:13, 660:20
**JOHNSON** [1] - 465:21
**join** [1] - 581:11

**joining** [1] - 466:16
**joke** [17] - 522:6, 523:20, 529:14, 530:7, 530:23, 531:23, 531:25, 532:1, 579:24, 580:5, 638:18, 639:7, 639:11, 639:20, 639:21, 657:23, 659:3
**jokes** [5] - 579:14, 580:6, 636:17, 660:3, 660:5
**joking** [2] - 579:8, 579:21
**JOSEPH** [1] - 465:11
**judge** [33] - 467:12, 467:18, 471:16, 473:7, 474:10, 476:12, 490:1, 491:8, 503:8, 511:23, 513:4, 515:8, 515:10, 515:17, 560:9, 564:7, 571:20, 587:14, 594:14, 600:22, 601:20, 602:3, 626:19, 627:11, 632:5, 632:12, 633:20, 640:25, 649:9, 657:2, 663:7, 665:9, 665:12
**JUDGE** [1] - 465:11
**Judge** [4] - 516:2, 517:4, 518:2, 554:2
**judges** [1] - 665:10
**judgment** [12] - 507:20, 523:3, 532:6, 532:9, 532:20, 532:23, 581:1, 632:13, 640:11, 640:17, 643:17, 643:20
**jump** [65] - 470:5, 470:6, 481:20, 483:7, 483:15, 483:19, 486:24, 493:17, 493:23, 494:24, 495:2, 495:5, 498:12, 500:10, 504:4, 504:5, 504:6, 506:18, 506:20, 506:25, 521:7, 521:9, 523:23, 524:2, 525:21, 526:6, 531:17, 543:2, 543:17, 544:22, 546:15, 547:12, 557:25, 560:22, 560:25, 567:22, 573:8, 580:2, 600:13, 600:20, 601:5, 601:9, 601:12, 609:16, 610:6, 611:9, 612:8, 613:7, 613:23, 614:13, 620:11, 621:18, 623:4, 635:15, 635:21, 637:15, 639:24, 639:25, 646:25, 654:1, 660:15, 661:18
**jumped** [4] - 533:18, 533:20, 571:9, 613:5
**jumper** [3] - 503:4, 510:19, 512:18
**JumperRay@optonline.net** [1] - 509:5
**jumpers** [2] - 581:17
**jumping** [9] - 515:20, 545:17, 651:24, 652:19, 656:16, 656:17, 656:20, 656:23, 656:24
**jumpmaster** [1] - 521:9
**jumps** [14] - 497:8, 507:24, 507:25, 527:6, 582:3, 612:14, 613:2, 613:6, 613:11, 613:22, 621:16, 621:17, 622:20, 661:21
**jumpsuit** [1] - 499:24
**jumpsuits** [1] - 500:1

**June** [9] - 519:13, 519:23, 520:1, 525:3, 527:13, 536:3, 536:8, 536:15, 549:18
**jurors** [2] - 466:5, 466:19
**Jury** [1] - 465:11
**jury** [33] - 472:25, 476:4, 476:5, 476:6, 476:14, 489:23, 491:2, 496:5, 509:23, 518:9, 521:6, 524:14, 541:1, 554:1, 557:5, 557:17, 560:2, 568:10, 573:12, 584:9, 593:8, 593:10, 593:16, 593:17, 594:12, 597:15, 616:10, 616:13, 616:24, 627:15, 632:22, 632:23, 667:4

## K

**K-E-N-G-L-E** [1] - 518:23
**Kansas** [1] - 560:22
**keep** [5] - 472:25, 489:24, 569:20, 579:18, 590:16
**keeping** [1] - 476:8
**Kellinger** [5] - 471:22, 472:2, 472:7, 472:10, 598:21
**KENGLE** [4] - 518:4, 518:7, 518:18, 668:4
**Kengle** [62] - 467:7, 467:23, 467:24, 467:25, 468:23, 468:25, 469:2, 470:10, 470:20, 471:1, 471:7, 474:15, 474:20, 475:9, 478:20, 479:4, 484:3, 488:15, 516:2, 516:25, 517:1, 517:5, 518:3, 518:16, 518:24, 519:7, 524:15, 526:15, 539:18, 542:2, 542:12, 543:19, 548:18, 556:2, 556:20, 557:10, 557:19, 558:11, 566:10, 567:20, 572:7, 609:14, 609:16, 610:23, 616:18, 617:7, 617:11, 620:4, 621:6, 634:20, 638:17, 638:22, 639:6, 644:7, 644:10, 657:16, 657:21, 658:6, 658:11
**Kengle's** [7] - 468:21, 516:24, 610:18, 638:6, 639:23, 657:17, 658:12
**kept** [3] - 543:1, 636:9, 649:3
**Kevin** [1] - 627:21
**kicks** [1] - 571:12
**kidding** [1] - 580:7
**killed** [1] - 480:25
**kind** [9] - 510:15, 523:3, 544:4, 545:14, 545:15, 545:23, 546:19, 548:10, 613:15
**king** [1] - 525:2
**kiss** [1] - 638:15
**kissing** [1] - 638:1
**knowing** [2] - 523:1, 607:10
**knowledgeable** [1] - 482:21
**knows** [3] - 580:14, 584:18, 656:1

## L

**lack** [1] - 627:12
**ladies** [4] - 589:2, 589:18, 626:10, 626:16
**lady** [1] - 627:3
**land** [2] - 545:15, 646:5
**landed** [2] - 533:22, 533:24, 535:11, 568:5
**landing** [1] - 534:12, 535:18, 646:17
**large** [1] - 598:5
**large-busted** [1] - 598:5
**last** [14] - 478:18, 497:13, 505:24, 516:10, 518:12, 556:3, 558:10, 574:7, 585:17, 588:2, 641:13, 642:4, 644:18, 650:17
**late** [1] - 550:23
**laugh** [1] - 530:12
**LAURA** [1] - 465:21
**Lauren** [3] - 665:22, 666:11, 666:14
**law** [2] - 573:12, 606:4
**laws** [1] - 666:2
**lawsuit** [1] - 545:8
**lawyers** [2] - 522:8, 593:11
**lay** [1] - 512:1
**laying** [1] - 512:6
**layout** [1] - 545:14
**lays** [1] - 511:13
**lead** [2] - 466:11, 516:9
**leading** [4] - 466:10, 495:19, 543:6, 653:3
**learned** [1] - 468:9
**least** [4] - 466:14, 500:24, 508:4, 613:13
**leave** [1] - 585:15, 615:16, 649:15
**leaving** [1] - 615:14
**led** [1] - 600:8
**left** [13] - 470:18, 497:22, 509:23, 523:3, 543:23, 566:8, 627:15, 632:11, 637:11, 646:22, 647:10, 647:18, 667:4
**leg** [1] - 608:1
**legal** [7] - 480:3, 480:4, 521:25, 522:8, 522:11, 523:4, 523:17
**legitimate** [3] - 574:3, 587:3, 643:12
**legs** [3] - 528:13, 566:8, 620:9
**length** [1] - 630:24
**less** [2] - 663:2, 663:5
**letter** [7] - 606:25, 665:20, 665:22, 665:23, 666:8, 666:11, 666:14
**letters** [1] - 607:5
**letting** [3] - 563:18, 584:22, 666:5
**levels** [1] - 594:24
**LI** [2] - 514:14, 581:18
**liability** [3] - 481:5, 481:12,
481:16
**liable** [2] - 481:20, 493:4
**license** [1] - 546:5
**lie** [2] - 568:7, 568:14
**life** [12] - 512:12, 532:11, 532:19, 533:1, 538:3, 538:7, 538:10, 538:16, 539:2, 539:4, 582:5
**likely** [1] - 500:8
**limit** [2] - 610:17, 662:16
**line** [53] - 478:3, 482:2, 484:2, 522:22, 523:13, 526:14, 526:15, 530:4, 530:21, 534:17, 538:21, 539:23, 539:25, 541:3, 546:8, 550:14, 561:17, 561:25, 562:1, 580:15, 580:17, 588:15, 588:16, 590:24, 591:11, 592:25, 596:15, 598:16, 599:13, 600:11, 600:19, 601:1, 601:3, 601:13, 602:7, 604:3, 604:6, 604:8, 617:17, 617:20, 619:2, 620:3, 635:18, 639:6, 643:3, 645:22, 647:12, 647:15, 656:9, 658:4, 658:8, 659:7
**lines** [2] - 468:11, 529:16
**linked** [1] - 583:19
**lips** [4] - 526:2, 546:11, 638:9, 638:13
**list** [2] - 467:14, 607:8
**listed** [2] - 472:17, 472:20
**listen** [2] - 563:22, 616:22
**lit** [1] - 516:1
**litigation** [2] - 495:19, 559:1
**lives** [1] - 585:16
**living** [1] - 551:9
**logical** [1] - 506:23
**LONG** [1] - 465:7
**look** [34] - 478:2, 478:3, 479:16, 513:2, 544:6, 552:24, 561:15, 564:6, 568:6, 568:17, 569:4, 569:11, 590:23, 592:24, 596:8, 596:12, 598:14, 599:13, 600:10, 601:11, 604:16, 615:18, 617:16, 617:17, 635:2, 635:9, 638:25, 642:25, 643:3, 647:12, 658:3, 662:22, 662:25, 663:6
**looked** [5] - 510:15, 510:25, 546:12, 567:25, 604:14
**looking** [6] - 507:16, 509:8, 560:25, 565:14, 565:15, 596:12
**looks** [7] - 513:9, 513:17, 571:6, 571:23, 571:25, 572:9, 646:2
**loosen** [6] - 499:11, 499:16, 579:24, 646:4, 646:7, 646:16
**loosened** [1] - 646:15
**loud** [1] - 629:4
**low** [1] - 661:25
**lower** [1] - 647:8
**lunch** [5] - 469:4, 552:12, 556:24, 557:1, 557:4

## M

**M-A-Y-N-A-R-D** [1] - 477:1
**mail** [12] - 508:22, 508:24, 508:25, 509:2, 509:4, 510:17, 510:18, 560:20, 596:13, 596:19, 607:7, 607:16
**mailed** [1] - 569:5
**main** [2] - 544:3, 661:15
**male** [5] - 598:9, 615:23, 615:25, 616:3, 653:20
**malfunction** [1] - 483:19
**manager** [1] - 535:12
**mandatory** [4] - 606:17, 606:25, 607:16, 607:18
**manipulate** [1] - 505:18
**manipulating** [1] - 580:13
**manipulation** [2] - 554:6, 554:7
**manner** [3] - 532:3, 563:1, 580:14
**marked** [5] - 467:19, 489:2, 511:1, 552:19, 630:8
**married** [2] - 640:5, 641:2
**master** [15] - 504:6, 504:7, 504:9, 504:11, 521:10, 521:12, 521:13, 560:22, 567:23, 577:8, 577:11, 577:15, 579:2, 579:3, 647:8
**masters** [1] - 495:2
**matches** [1] - 467:8
**matter** [11] - 484:18, 518:13, 557:20, 585:18, 592:8, 592:10, 598:25, 620:16, 620:20, 625:13, 631:2
**matters** [1] - 620:21
**MAYNARD** [5] - 465:7, 476:21, 560:13, 668:2, 668:8
**Maynard** [53] - 467:6, 469:6, 470:11, 470:22, 473:5, 473:9, 474:13, 475:4, 475:18, 475:25, 477:1, 477:6, 477:7, 477:13, 488:15, 510:11, 510:22, 511:16, 513:10, 537:8, 537:11, 537:15, 537:21, 538:2, 538:6, 538:9, 539:10, 542:16, 542:22, 542:25, 543:4, 543:10, 544:2, 544:9, 544:24, 545:3, 545:6, 547:1, 556:13, 557:15, 557:16, 557:18, 557:24, 559:7, 560:7, 560:19, 561:2, 628:20, 630:25, 632:20, 633:2, 650:5, 657:8
**Maynard's** [5] - 467:20, 474:24, 474:25, 518:14, 560:5
**McVie** [1] - 561:1
**mean** [30] - 479:5, 479:6, 479:19, 479:20, 485:10, 487:1, 487:5, 508:15, 510:12, 511:21, 513:23, 522:8, 522:24, 525:20, 529:24, 531:18, 533:7, 546:7, 549:20, 551:22, 554:22, 574:8, 595:19, 605:20, 605:22, 626:5,

630:11, 642:8, 651:21, 652:22
**meaning** [2] - 525:5, 556:7
**means** [6] - 481:12, 481:17, 501:14, 522:2, 523:20, 645:14
**meantime** [1] - 468:14
**mechanical** [1] - 465:25
**medical** [6] - 487:24, 488:3, 489:11, 492:4, 492:10, 500:17
**meet** [4] - 550:2, 550:4, 550:6, 551:23
**meeting** [11] - 549:21, 606:18, 606:21, 607:1, 607:6, 607:16, 607:18, 612:4, 612:5, 612:9, 654:10
**meetings** [2] - 549:22, 607:5
**Melissa** [2] - 466:19, 476:15
**members** [2] - 476:6, 491:2
**memory** [3] - 531:18, 604:23, 645:2
**men** [5] - 504:17, 579:8, 579:14, 579:15
**mentally** [2] - 492:12, 492:14
**mention** [7] - 492:14, 514:8, 546:25, 617:2, 617:3, 653:12, 659:16
**mentioned** [7] - 472:3, 539:5, 539:23, 542:3, 547:3, 597:7, 653:11
**mentioning** [1] - 539:2
**message** [1] - 537:10
**met** [11] - 519:3, 549:18, 549:25, 550:9, 550:20, 551:11, 551:17, 551:25, 554:14, 554:22, 585:22
**method** [1] - 629:10
**middle** [2] - 523:19, 661:17
**might** [10] - 499:1, 499:8, 499:14, 507:7, 563:14, 569:11, 643:25, 658:5, 658:10, 658:20
**miles** [1] - 645:18
**mind** [11] - 506:15, 506:25, 512:14, 558:6, 561:9, 567:3, 623:10, 623:12, 623:13, 639:24, 659:25
**minimum** [3] - 471:22, 608:15, 649:4
**minute** [4] - 535:7, 583:8, 642:3, 649:6
**minutes** [22] - 475:3, 475:5, 475:17, 475:21, 503:6, 515:25, 528:21, 528:22, 549:5, 566:4, 571:12, 577:3, 620:4, 620:5, 632:5, 632:8, 632:14, 632:18, 644:19, 645:1, 645:5, 649:3
**mis** [1] - 645:2
**mis-memory** [1] - 645:2
**misheard** [1] - 664:18
**mishegas** [1] - 515:16
**mislead** [2] - 514:17, 515:2
**misleading** [1] - 529:9
**mistake** [4] - 501:14, 607:8, 665:2, 665:9

**mistaken** [1] - 664:8
**mistakes** [1] - 665:10
**moment** [3] - 470:15, 495:23, 512:13
**Monday** [11] - 536:14, 536:15, 536:22, 546:24, 558:9, 615:17, 621:18, 621:25, 622:4, 622:8, 623:2
**money** [18] - 524:2, 536:25, 537:2, 537:3, 537:4, 537:15, 621:6, 621:9, 622:5, 622:6, 622:9, 622:20, 622:24, 623:2, 623:3, 623:5, 623:8, 666:4
**month** [1] - 556:3
**months** [1] - 608:2
**Moore** [6] - 466:18, 466:20, 467:2, 467:3, 476:17
**morning** [11] - 475:24, 476:6, 476:7, 477:13, 477:14, 509:22, 546:24, 558:9, 582:13, 638:6, 666:25
**most** [8] - 480:16, 500:8, 569:1, 576:7, 576:10, 595:3, 596:1, 600:18
**motion** [1] - 472:12
**motions** [1] - 510:4
**mouth** [7] - 544:5, 544:20, 565:15, 592:6, 637:6, 646:23, 647:20
**move** [11] - 508:16, 515:5, 515:25, 516:24, 553:6, 567:11, 577:13, 594:15, 597:13, 624:3, 627:10
**moved** [4] - 488:23, 489:6, 534:22, 567:11
**moving** [3] - 471:3, 488:22, 571:2
**MR** [474] - 466:7, 466:12, 466:25, 467:1, 467:3, 467:7, 467:12, 467:17, 467:23, 468:20, 470:4, 470:15, 470:19, 470:21, 471:2, 471:11, 472:1, 473:1, 473:7, 473:14, 473:23, 474:4, 474:10, 474:13, 474:18, 474:20, 474:25, 475:1, 475:6, 475:8, 475:13, 475:16, 475:20, 475:22, 475:23, 476:3, 476:12, 477:12, 477:9, 479:11, 479:14, 484:1, 484:5, 484:10, 484:11, 488:6, 488:10, 488:13, 488:17, 488:21, 489:2, 489:4, 489:11, 489:15, 489:18, 489:21, 490:1, 490:2, 491:8, 491:10, 491:14, 493:5, 493:7, 493:10, 493:18, 494:10, 494:13, 494:20, 494:22, 495:22, 495:25, 496:3, 496:7, 496:17, 497:1, 497:20, 501:21, 501:24, 502:3, 502:5, 503:2, 503:7, 503:11, 504:2, 505:1, 505:3, 505:7, 505:11, 505:14, 508:6, 508:9, 508:12, 508:17, 509:7, 509:11, 509:13,

509:14, 509:16, 509:17, 509:25, 510:5, 510:7, 510:14, 510:24, 511:10, 511:13, 511:23, 512:8, 512:13, 512:24, 513:1, 513:4, 513:19, 513:22, 514:1, 514:4, 514:6, 514:11, 514:12, 514:20, 515:2, 515:8, 516:2, 516:6, 516:14, 516:18, 516:21, 516:23, 517:2, 517:4, 518:2, 518:4, 518:5, 518:7, 518:16, 519:2, 523:8, 523:11, 523:15, 524:7, 524:12, 524:15, 524:17, 524:19, 524:21, 525:1, 529:7, 529:9, 529:21, 539:13, 539:17, 540:1, 540:3, 541:2, 541:4, 541:7, 543:6, 547:5, 547:7, 547:15, 547:20, 548:4, 548:13, 548:17, 549:16, 552:21, 553:6, 553:8, 554:2, 554:10, 554:18, 554:20, 555:2, 555:7, 555:12, 556:17, 556:19, 556:23, 559:8, 559:9, 560:9, 560:18, 561:24, 562:1, 562:4, 562:12, 562:14, 562:15, 563:5, 564:3, 564:4, 564:7, 564:10, 564:11, 567:5, 567:7, 567:13, 567:16, 567:17, 568:9, 568:12, 569:3, 569:7, 569:8, 569:10, 569:13, 569:17, 569:18, 569:20, 569:22, 570:4, 570:6, 570:10, 570:17, 571:16, 571:20, 571:21, 572:19, 572:23, 573:3, 573:5, 573:9, 573:13, 573:14, 573:19, 574:6, 574:18, 574:23, 574:25, 575:2, 575:4, 575:8, 575:21, 577:19, 578:14, 579:11, 579:13, 580:22, 580:24, 581:2, 581:5, 582:8, 582:10, 582:14, 582:16, 582:20, 582:23, 583:18, 584:1, 584:7, 584:12, 584:17, 586:3, 586:5, 586:7, 586:9, 587:2, 587:6, 587:13, 587:15, 587:19, 588:2, 588:5, 589:21, 589:23, 590:1, 590:3, 591:16, 591:18, 592:14, 592:15, 592:17, 593:5, 593:8, 593:20, 594:10, 594:14, 594:16, 594:20, 594:23, 596:9, 596:11, 596:15, 596:16, 597:12, 597:16, 597:20, 597:22, 597:25, 598:3, 598:15, 598:18, 599:6, 599:9, 600:17, 600:21, 601:1, 601:3, 601:4, 601:17, 601:20, 601:23, 601:25, 602:3, 602:5, 602:6, 603:3, 603:4, 604:2, 605:6, 605:14, 606:6, 607:13, 608:9, 608:11, 608:24, 609:2, 609:4, 609:9, 610:2, 610:4, 610:8, 610:10, 610:12, 610:13, 610:16, 610:20, 610:22, 611:1, 611:13, 611:15, 611:25,

612:11, 612:21, 612:23, 613:9, 613:19, 613:21, 613:25, 614:2, 614:19, 616:8, 616:16, 616:23, 617:1, 617:4, 617:8, 617:18, 617:22, 618:1, 618:2, 619:2, 619:5, 619:8, 619:9, 620:2, 621:13, 624:10, 624:13, 624:23, 626:19, 626:21, 627:7, 627:8, 627:9, 627:10, 627:12, 627:18, 627:20, 627:21, 627:24, 628:1, 628:4, 628:8, 628:11, 628:25, 629:7, 629:12, 629:15, 629:23, 630:1, 630:7, 630:20, 630:21, 630:24, 631:12, 631:16, 631:19, 631:22, 632:2, 632:4, 632:12, 632:19, 633:1, 633:19, 634:5, 634:9, 634:11, 634:16, 634:18, 635:11, 635:12, 635:16, 635:18, 635:19, 636:19, 636:22, 638:2, 638:5, 640:1, 640:3, 640:24, 641:6, 641:8, 641:15, 644:21, 644:23, 648:4, 649:2, 649:9, 649:13, 649:17, 650:8, 650:21, 651:15, 651:17, 652:20, 653:3, 653:6, 655:4, 655:6, 655:8, 655:9, 655:16, 655:24, 656:2, 656:8, 656:11, 657:2, 657:4, 657:13, 658:25, 659:2, 659:6, 659:9, 659:13, 659:19, 659:23, 660:1, 661:11, 661:13, 661:14, 662:13, 662:15, 662:18, 663:7, 664:2, 664:12, 664:14, 664:16, 664:19, 665:8, 665:12, 665:13, 666:21, 667:7, 667:8, 668:3, 668:5, 668:6, 668:9, 668:11, 668:12
**multiple** [2] - 503:2, 503:10
**must** [1] - 581:15

**N**

**name** [9] - 472:3, 476:24, 479:5, 518:21, 527:19, 627:4, 650:16, 650:17, 651:11
**named** [1] - 482:14
**narrowed** [1] - 582:17
**nature** [3] - 504:24, 572:18, 628:23
**near** [1] - 631:19
**necessarily** [2] - 578:4, 654:2
**necessary** [4] - 483:18, 563:12, 578:20, 637:2
**need** [17] - 466:6, 475:21, 479:16, 484:5, 509:17, 514:8, 516:23, 521:8, 564:22, 567:15, 570:4, 570:9, 577:16, 577:20, 577:22, 632:7, 655:25
**needed** [3] - 551:2, 615:9
**needs** [1] - 504:5
**negative** [1] - 654:23

**negligence** [1] - 481:10
**negligent** [2] - 501:12, 604:17
**nervous** [6] - 492:15, 492:17, 492:19, 492:23, 492:25, 493:1
**neutralizing** [3] - 605:20, 605:22, 605:23
**never** [34] - 468:21, 469:6, 469:13, 469:16, 470:12, 470:13, 470:24, 471:7, 471:22, 473:5, 479:5, 483:10, 493:22, 519:3, 519:5, 533:12, 537:11, 538:3, 538:6, 538:8, 554:13, 566:8, 576:15, 580:4, 580:10, 582:6, 585:22, 612:4, 623:4, 631:7, 631:8, 642:16, 642:19, 653:8
**new** [4] - 581:22, 644:10, 644:13, 654:12
**NEW** [1] - 465:1
**New** [9] - 465:15, 465:17, 465:20, 465:23, 471:13, 527:22, 627:21
**next** [9] - 476:11, 488:19, 536:12, 560:25, 581:3, 585:11, 594:17, 621:17, 621:25
**nice** [1] - 653:14
**night** [3] - 585:17, 585:21, 667:3
**nobody** [5] - 492:10, 567:10, 590:16, 640:20, 640:22
**none** [1] - 467:13
**normal** [4] - 480:5, 565:17, 604:15, 629:13
**normally** [2] - 578:5, 581:16
**note** [2] - 516:2, 560:21
**noted** [1] - 466:4
**nothing** [16] - 466:13, 540:3, 548:14, 556:19, 566:13, 566:15, 590:18, 591:9, 591:13, 592:3, 598:24, 610:18, 637:18, 637:22, 644:9, 660:7
**notice** [6] - 497:21, 546:19, 558:17, 568:3, 627:16, 665:14
**noticed** [3] - 544:4, 544:6, 653:1
**November** [3] - 522:15, 551:18, 661:17
**novices** [1] - 483:10
**nowhere** [1] - 554:4
**number** [7] - 489:24, 512:25, 528:23, 549:5, 569:7, 582:15, 588:22
**numerous** [1] - 472:4
**NY** [1] - 465:5

**O**

**o'clock** [1] - 468:24
**oath** [5] - 522:17, 553:4, 560:6, 594:5, 657:10
**object** [22] - 467:12, 469:19, 469:20, 471:21, 488:7, 488:21, 553:8, 572:19, 573:14, 583:18,

587:9, 593:5, 597:12, 598:15, 601:17, 617:4, 627:12, 632:20, 656:8, 665:8
**objected** [1] - 512:2
**Objection** [2] - 496:17, 626:19
**objection** [144] - 466:10, 466:24, 467:1, 469:8, 471:5, 474:14, 474:17, 479:8, 479:9, 484:1, 488:17, 489:16, 491:5, 493:5, 493:10, 493:18, 494:10, 494:20, 496:2, 496:3, 501:21, 502:3, 502:4, 505:1, 505:7, 505:11, 508:6, 508:7, 508:12, 508:14, 509:7, 510:17, 510:20, 511:12, 515:13, 516:17, 516:22, 523:8, 524:10, 529:7, 529:8, 529:21, 540:1, 540:2, 543:6, 547:5, 547:15, 548:4, 549:16, 555:10, 557:11, 562:12, 563:5, 564:2, 564:7, 567:5, 567:7, 567:13, 568:9, 569:3, 569:15, 569:16, 569:18, 569:21, 569:23, 570:3, 571:16, 571:21, 573:3, 573:9, 574:18, 575:8, 575:21, 578:14, 579:11, 580:22, 581:2, 582:8, 584:7, 584:17, 586:3, 586:4, 586:9, 587:5, 587:6, 589:21, 589:22, 591:16, 592:14, 592:17, 594:10, 594:20, 596:9, 597:20, 599:6, 605:6, 605:14, 606:6, 607:13, 608:9, 608:24, 609:4, 610:2, 610:8, 610:16, 610:20, 611:1, 611:13, 611:15, 611:25, 612:11, 612:21, 613:9, 613:19, 613:25, 614:19, 616:8, 616:23, 621:13, 624:10, 627:7, 632:15, 634:8, 635:16, 636:19, 638:2, 640:1, 641:6, 641:15, 644:21, 651:15, 652:20, 653:3, 655:4, 655:24, 658:25, 659:6, 659:13, 659:19, 659:23, 661:11, 662:13
**objections** [8] - 467:10, 469:1, 503:8, 515:12, 557:9, 557:13, 649:3, 649:10
**objects** [1] - 632:6
**observations** [1] - 546:14
**observe** [6] - 533:8, 652:5, 652:7, 652:9, 652:18, 653:16
**observed** [3] - 472:22, 528:24, 534:11
**obviously** [7] - 510:9, 518:13, 557:14, 558:15, 558:22, 628:20, 632:10
**occasion** [2] - 652:11, 653:18, 653:19, 654:16
**occasions** [2] - 491:23, 503:3
**occur** [1] - 646:10
**occurred** [18] - 489:1, 491:1, 503:1, 504:1, 513:6, 548:19, 587:1, 588:1, 603:1, 604:1,

619:1, 620:1, 628:5, 631:24, 649:1, 650:1, 664:1, 665:1
**occurs** [1] - 579:21
**October** [4] - 465:8, 627:22, 628:6, 630:2
**odd** [1] - 653:22
**OF** [2] - 465:1, 465:10
**offended** [2] - 531:23, 531:24
**offensive** [1] - 535:21
**office** [9] - 554:22, 554:23, 555:6, 584:2, 584:21, 589:2, 607:9, 609:13, 626:16
**Official** [1] - 465:22
**often** [3] - 579:8, 579:14, 655:17
**old** [2] - 508:24, 601:12
**once** [5] - 469:8, 477:21, 550:22, 638:21, 650:12
**one** [79] - 467:7, 467:25, 470:15, 473:2, 473:7, 473:13, 473:15, 473:18, 473:20, 478:3, 479:3, 486:11, 489:14, 491:6, 491:11, 496:14, 499:19, 499:24, 500:5, 508:4, 509:11, 509:18, 513:24, 514:2, 516:14, 525:11, 526:2, 529:4, 530:11, 535:18, 542:16, 544:3, 556:9, 556:10, 557:15, 564:4, 564:5, 564:9, 568:20, 574:4, 574:21, 576:13, 577:6, 579:9, 580:6, 581:16, 582:12, 582:14, 586:8, 588:6, 589:4, 589:5, 590:10, 593:4, 598:7, 598:23, 600:3, 610:14, 612:19, 614:8, 618:3, 626:12, 631:9, 631:10, 631:11, 633:11, 633:16, 633:17, 633:21, 633:23, 633:24, 634:1, 634:15, 639:11, 647:5, 656:7, 661:25, 663:8
**one-page** [1] - 491:6
**one-sided** [1] - 626:12
**ones** [2] - 510:23, 627:17
**online** [2] - 625:22, 627:3
**open** [11] - 491:1, 504:1, 528:13, 542:1, 556:1, 588:1, 604:1, 609:21, 620:1, 650:1, 665:1
**opened** [2] - 558:1, 647:7
**opening** [1] - 599:2
**opens** [3] - 645:12, 645:20, 645:23
**operation** [2] - 521:23, 523:4
**opinion** [5] - 468:1, 477:23, 478:12, 483:2, 629:8
**opportunity** [4] - 472:12, 500:23, 572:17, 651:18
**opposites** [1] - 487:14
**order** [16] - 467:14, 467:16, 471:4, 471:10, 471:12, 505:5, 511:25, 518:12, 518:13, 535:15, 537:2, 557:17, 579:18, 581:11, 581:14, 659:17
**ordered** [2] - 552:11, 552:14

**Orelana** [6] - 519:19, 519:20, 519:21, 543:12, 543:24, 567:19
**Orelana's** [1] - 543:17
**Orellana** [5] - 484:3, 617:14, 641:14, 642:8, 658:11
**Orellana's** [1] - 632:11
**orientation** [8] - 595:24, 596:5, 599:4, 599:11, 599:15, 606:10, 654:24, 655:2
**otherwise** [1] - 646:10
**outweighed** [1] - 559:3
**overinclusive** [1] - 472:20
**overly** [2] - 545:23, 546:10
**overrule** [1] - 471:5
**overruled** [11] - 547:19, 548:7, 557:13, 590:2, 591:20, 611:20, 624:12, 641:16, 652:21, 653:4, 655:5
**overruling** [1] - 474:17
**oversight** [2] - 473:10, 473:19
**Owen** [1] - 547:22
**own** [1] - 591:18
**owned** [1] - 666:3
**owner** [3] - 474:7, 535:12, 654:6
**owns** [1] - 496:19

**P**

**P.C** [1] - 465:19
**p.m** [2] - 631:23, 667:9
**package** [1] - 564:3
**page** [106] - 478:3, 487:18, 488:25, 490:3, 491:6, 500:17, 500:24, 502:7, 503:13, 509:11, 509:13, 509:16, 509:25, 511:3, 511:4, 512:7, 512:8, 512:10, 512:11, 512:15, 512:22, 512:23, 512:24, 513:9, 513:10, 514:8, 517:7, 522:21, 526:14, 526:15, 530:4, 530:20, 534:15, 538:21, 539:21, 550:14, 560:10, 560:11, 560:12, 560:20, 561:15, 561:25, 562:1, 564:9, 581:6, 581:15, 581:17, 581:20, 581:21, 581:22, 581:25, 582:1, 582:2, 582:7, 582:24, 583:2, 583:5, 583:7, 583:8, 583:13, 583:15, 583:16, 584:14, 584:22, 585:11, 586:11, 587:23, 588:15, 590:24, 592:24, 599:13, 600:10, 600:11, 601:13, 601:25, 602:4, 602:7, 602:9, 603:5, 604:8, 604:14, 617:17, 618:6, 619:13, 634:6, 634:15, 635:3, 635:4, 635:6, 635:10, 635:16, 639:1, 642:25, 643:1, 643:3, 643:5, 647:12, 648:6, 649:18, 658:4, 663:10, 664:20, 668:17
**pages** [4] - 509:14, 514:15,

13

564:5, 581:13
**paid** [9] - 523:22, 524:2, 552:9, 621:19, 621:20, 621:24, 622:3, 622:24, 666:4
**paired** [1] - 644:7
**panicked** [1] - 510:15
**pants** [2] - 468:10, 468:11
**parachute** [11] - 483:15, 483:17, 483:19, 483:24, 484:15, 645:9, 645:11, 645:12, 645:16, 645:22, 647:7
**Parachute** [1] - 491:22
**parachuters** [1] - 488:3
**parachuting** [1] - 483:3
**paragraph** [18] - 488:19, 491:24, 492:3, 494:23, 500:9, 500:12, 500:15, 500:20, 500:23, 501:10, 501:18, 502:1, 504:3, 504:15, 504:17, 504:23, 505:5, 521:6
**part** [18] - 489:10, 489:12, 491:3, 491:6, 499:2, 504:8, 563:7, 563:10, 565:25, 569:6, 582:7, 582:17, 590:8, 611:19, 612:1, 615:3, 619:6, 664:11
**particular** [6] - 558:15, 578:5, 584:14, 611:8, 612:19, 661:3
**parties** [2] - 494:24, 495:1
**passenger** [24] - 478:13, 495:12, 499:10, 499:25, 500:23, 501:1, 501:10, 504:21, 505:4, 506:17, 506:20, 564:15, 577:12, 577:23, 579:1, 580:11, 637:6, 637:10, 643:22, 646:21, 646:22, 647:17, 647:19, 660:6
**passenger's** [5] - 505:25, 576:19, 637:6, 646:23, 647:19
**passenger/student** [1] - 484:19
**passengers** [18] - 468:5, 483:6, 483:9, 483:13, 486:23, 505:15, 561:4, 561:18, 562:10, 562:13, 562:16, 564:19, 567:18, 576:19, 594:18, 599:4, 639:7, 653:17
**passengers's** [1] - 637:22
**past** [1] - 566:16
**patents** [1] - 482:24
**pathetic** [2] - 514:6, 585:14
**patient** [2] - 515:24, 649:2
**pause** [2] - 495:24, 650:10
**pay** [13] - 482:11, 501:19, 552:7, 552:8, 621:10, 621:23, 622:3, 622:10, 622:19, 622:20, 623:9, 662:11, 662:20
**paycheck** [1] - 622:18
**payday** [2] - 621:20, 623:1
**paying** [1] - 482:8
**payroll** [5] - 621:16, 621:21, 622:15, 622:21, 623:6
**people** [39] - 472:16, 472:17, 472:21, 478:5, 483:18, 485:6,

486:10, 492:9, 494:1, 508:10, 515:9, 543:19, 543:22, 561:9, 563:17, 563:21, 568:18, 568:21, 569:1, 576:7, 576:17, 581:23, 582:2, 582:3, 584:2, 584:21, 588:8, 590:15, 592:5, 592:21, 592:22, 596:1, 598:8, 625:4, 625:6, 626:10, 637:15, 660:3
**people's** [1] - 616:11
**per** [1] - 661:18
**perfect** [9] - 483:24, 484:12, 484:15, 484:19, 484:24, 485:2, 485:3, 548:12, 610:14
**period** [2] - 613:6, 623:22
**permitted** [2] - 593:11, 593:12
**permitting** [1] - 472:9
**person** [33] - 468:22, 471:6, 486:11, 486:12, 492:21, 492:22, 494:17, 500:8, 521:25, 522:11, 523:4, 523:17, 533:2, 533:5, 562:22, 562:23, 563:13, 563:14, 565:8, 572:16, 572:24, 573:25, 574:1, 574:16, 574:21, 576:9, 586:8, 588:6, 612:19, 613:2, 630:25, 637:2
**personal** [2] - 512:9, 512:11, 512:20, 512:21, 512:23, 527:24, 528:2, 528:5, 538:16, 582:2, 582:7, 584:24, 585:2, 585:3, 585:4, 585:5, 585:9, 585:24, 597:10, 597:18, 640:8, 640:16, 644:13
**personally** [2] - 479:6, 651:18
**pertaining** [1] - 584:5
**ph** [1] - 467:9
**phone** [6] - 475:12, 475:17, 537:9, 551:1, 556:5, 615:4
**physical** [10] - 493:8, 493:14, 498:19, 499:11, 504:10, 520:5, 520:20, 521:12, 528:8, 563:10
**physically** [1] - 492:12
**physician** [1] - 487:19
**pick** [1] - 654:21
**picked** [2] - 552:5, 622:10
**picture** [10] - 511:11, 514:2, 534:11, 534:22, 535:2, 561:9, 567:1, 582:24, 584:23, 637:21
**pictures** [12] - 511:2, 567:22, 568:4, 568:8, 568:14, 569:2, 569:4, 569:22, 570:5, 570:7, 636:23
**pin** [2] - 472:19, 645:20
**place** [6] - 466:1, 540:7, 553:12, 565:22, 615:14, 644:2
**placed** [2] - 532:19, 561:19
**placement** [1] - 468:15
**places** [2] - 472:4, 576:13
**placing** [1] - 611:4
**Plaintiff** [18] - 465:4, 465:14, 478:24, 479:13, 491:13, 496:6,

524:23, 560:12, 570:15, 582:22, 634:17, 668:15, 668:15, 668:16, 668:16, 668:17, 668:17, 668:18
**plaintiff** [2] - 495:19, 518:16
**Plaintiff's** [3] - 520:25, 524:9, 633:9
**plaintiff's** [10] - 476:19, 479:12, 489:2, 491:3, 495:25, 512:18, 626:23, 627:11, 627:25, 628:1
**plaintiffs** [1] - 476:13
**plane** [28] - 473:25, 519:25, 523:22, 525:21, 527:6, 527:16, 528:7, 528:10, 528:19, 528:24, 532:3, 533:8, 533:12, 533:18, 533:20, 545:18, 546:19, 570:25, 571:9, 571:11, 634:20, 637:15, 651:22, 652:16, 652:17, 652:22, 654:13, 654:18
**play** [3] - 496:5, 524:9, 526:12
**played** [8] - 496:24, 497:5, 497:18, 497:23, 498:8, 524:14, 524:25, 660:15
**playing** [1] - 575:7
**Plaza** [1] - 465:23
**point** [29] - 470:1, 471:15, 475:23, 479:10, 479:16, 487:8, 492:3, 526:2, 526:21, 535:18, 536:8, 549:23, 554:18, 555:2, 555:4, 570:5, 570:9, 587:6, 598:19, 600:3, 606:23, 624:3, 624:24, 625:8, 628:18, 647:1, 649:14, 661:9, 665:14
**pointing** [3] - 468:3, 543:11, 585:12
**points** [8] - 575:10, 575:13, 575:15, 575:16, 576:2, 576:6, 577:8, 578:25
**polar** [1] - 487:14
**portion** [7] - 487:23, 510:5, 583:12, 593:13, 600:24, 611:16, 638:8
**portrayed** [1] - 470:7
**pose** [3] - 534:11, 567:6, 567:9
**position** [6] - 469:7, 469:16, 474:21, 617:9, 646:21, 647:17
**possible** [6] - 515:10, 515:12, 564:20, 607:23, 609:11, 636:13
**possibly** [1] - 498:16
**post** [1] - 582:2
**posted** [2] - 512:15, 630:2
**posting** [3] - 513:7, 513:13, 583:9
**potential** [5] - 482:8, 483:6, 483:9, 500:22, 504:12, 505:4
**pre** [1] - 576:7
**pre-adjusted** [1] - 576:7
**preclude** [2] - 471:3, 472:13
**precluded** [1] - 472:5
**predict** [1] - 493:22
**prefer** [1] - 653:20

**preferably** [1] - 501:1
**preference** [3] - 474:22, 539:3, 587:15
**preferred** [1] - 548:2
**prejudice** [1] - 559:3
**prejudicial** [1] - 554:20
**prepared** [2] - 514:15, 555:5
**presence** [2] - 541:1, 554:1
**presentation** [1] - 666:24
**presented** [2] - 488:6, 582:24
**presenting** [1] - 613:23
**presently** [1] - 519:9
**pretrial** [8] - 467:14, 467:16, 471:4, 471:10, 471:12, 471:17, 511:25, 522:4
**pretty** [2] - 527:7, 548:22
**previous** [1] - 618:2
**previously** [4] - 466:4, 543:16, 560:14, 600:19
**prices** [1] - 626:2
**probative** [5] - 558:16, 558:20, 559:2, 630:4, 630:19
**problem** [4] - 474:10, 489:18, 511:6, 590:15
**procedure** [1] - 474:2
**proceed** [2] - 476:9, 477:4
**Proceedings** [1] - 465:25
**proceedings** [2] - 495:24, 650:10
**process** [4] - 480:10, 480:17, 564:20, 573:7
**produced** [2] - 465:25, 495:19
**professional** [1] - 560:23
**promptly** [1] - 649:15
**proper** [5] - 486:23, 491:18, 511:13, 629:1, 629:4
**provide** [2] - 470:23, 570:9
**provided** [2] - 557:23, 558:19
**proximity** [8] - 504:9, 520:5, 520:20, 521:11, 528:8, 546:4, 563:19, 647:3
**public** [4] - 581:24, 581:25, 584:2, 629:8
**pucker** [1] - 526:2
**pulls** [1] - 645:19
**purchased** [1] - 496:22
**purposes** [1] - 554:5
**pursing** [2] - 638:9, 638:12
**put** [18] - 466:13, 468:12, 469:5, 472:24, 473:11, 473:16, 492:20, 499:11, 500:1, 512:13, 513:10, 521:11, 554:10, 566:23, 576:8, 576:22, 577:1, 577:7
**puts** [2] - 577:25, 625:16
**putting** [2] - 546:12, 563:8, 565:14, 620:9, 636:24

---

**Q**

---

**questioned** [3] - 511:16,

14

532:20, 532:22
**questioning** [12] - 484:2, 548:18, 549:11, 549:14, 551:13, 558:2, 558:4, 558:6, 587:17, 598:16, 656:9, 659:8
**questions** [40] - 477:8, 479:15, 515:13, 516:9, 516:25, 526:20, 530:17, 534:19, 535:4, 538:24, 539:7, 539:13, 550:18, 554:8, 556:17, 558:25, 583:25, 584:11, 591:6, 594:8, 596:17, 598:1, 601:15, 604:19, 615:5, 618:3, 620:17, 629:12, 630:9, 631:13, 634:12, 639:17, 647:25, 657:2, 657:5, 658:16, 659:24, 665:3, 666:21
**quicker** [2] - 516:1, 624:20
**quickly** [2] - 515:6, 594:9
**quite** [1] - 627:20
**quote** [6] - 468:18, 481:23, 482:1, 497:10, 576:21, 660:24
**quote-unquote** [4] - 468:18, 497:10, 576:21, 660:24

### R

**raise** [1] - 518:17
**raised** [1] - 509:19
**rather** [5] - 474:22, 516:9, 557:2, 587:13, 646:16
**Ray** [2] - 542:16, 547:1
**RAY** [1] - 465:7
**Ray's** [13] - 569:6, 569:14, 569:15, 569:25, 570:12, 570:15, 571:3, 572:1, 572:5, 653:11, 653:13, 668:18
**ray's** [1] - 569:8
**ray@optonline.net** [1] - 508:23
**Raymond** [2] - 476:13, 477:1
**RAYMOND** [4] - 476:21, 560:13, 668:2, 668:8
**reach** [1] - 646:16
**reaction** [1] - 587:4
**read** [60] - 479:24, 486:2, 486:7, 487:25, 488:18, 491:23, 496:11, 496:12, 500:23, 501:1, 502:1, 504:3, 504:17, 504:23, 505:4, 505:9, 520:10, 521:6, 521:18, 522:25, 523:13, 523:14, 526:18, 539:21, 539:22, 539:25, 542:4, 547:20, 547:22, 547:23, 556:14, 560:19, 562:3, 563:14, 563:22, 567:3, 573:19, 573:21, 574:5, 574:7, 575:6, 583:12, 585:12, 585:13, 588:2, 588:4, 593:13, 600:18, 600:21, 603:2, 617:19, 618:2, 619:4, 619:6, 624:20, 624:22, 629:2, 629:3, 629:17, 638:21
**reading** [9] - 486:4, 486:24,

488:18, 522:23, 546:6, 587:7, 593:18, 593:19, 597:13
**ready** [3] - 476:9, 518:1, 525:21
**realize** [2] - 537:1, 629:21
**realized** [2] - 532:8, 536:24
**really** [14] - 529:24, 546:20, 550:1, 552:12, 568:6, 576:4, 590:21, 615:21, 654:9, 655:19, 662:22, 662:23, 662:25, 666:1
**reason** [6] - 472:17, 472:24, 499:6, 560:24, 608:3, 666:9
**reasonable** [7] - 565:7, 573:1, 573:6, 612:17, 612:25, 657:15, 657:20, 657:25, 658:6, 658:10, 659:16, 659:20
**reasonableness** [1] - 573:11
**reasons** [4] - 473:16, 515:22, 557:14, 664:17
**reassure** [2] - 535:24, 535:25
**receive** [2] - 532:17, 557:17
**received** [7] - 509:5, 520:24, 524:23, 557:18, 557:19, 586:1, 609:13
**recent** [2] - 480:16, 608:14
**recently** [2] - 468:9, 590:11
**recess** [5] - 513:5, 513:6, 559:10, 631:23, 631:24
**recognize** [13] - 478:25, 495:16, 497:2, 508:22, 508:25, 552:25, 553:1, 564:12, 570:18, 571:4, 626:23, 633:9, 633:12
**recognized** [1] - 495:15
**recollect** [1] - 653:18
**recollection** [8] - 511:5, 587:21, 588:13, 601:24, 604:25, 614:15, 616:18, 639:2
**recommend** [2] - 624:24, 624:25
**recommended** [2] - 624:2, 624:8
**recommends** [3] - 487:19, 488:3, 492:9
**reconvene** [2] - 557:2, 559:7
**record** [12] - 466:14, 472:24, 473:16, 474:9, 476:25, 489:17, 516:20, 518:22, 547:23, 564:9, 570:9, 650:17
**recorded** [2] - 465:25, 483:5
**records** [7] - 474:8, 512:3, 512:5, 594:18, 662:22, 662:25, 663:6
**REDIRECT** [2] - 548:16, 668:7
**refer** [7] - 522:21, 530:4, 530:20, 534:14, 538:15, 538:21, 616:11
**reference** [1] - 538:16
**referencing** [1] - 546:11
**referred** [5] - 497:13, 521:22, 641:13, 642:3, 642:4
**referring** [4] - 522:6, 575:12, 641:22, 642:1
**refresh** [3] - 511:5, 587:21,

588:12
**refreshes** [1] - 639:1
**refund** [1] - 537:17
**refunded** [1] - 537:15
**regard** [4] - 469:3, 469:22, 472:2, 521:21
**regarding** [9] - 470:13, 473:19, 513:10, 558:2, 558:4, 558:12, 628:15, 659:25, 665:3
**regardless** [1] - 580:15
**regular** [2] - 556:10, 601:12
**rehashing** [1] - 503:9
**related** [2] - 545:16, 606:14
**relates** [1] - 618:3
**relationship** [6] - 512:16, 521:21, 522:1, 522:11, 523:18, 558:21
**relax** [2] - 636:15, 636:16
**relay** [4] - 542:22, 542:25, 543:4, 543:10
**relayed** [2] - 547:9, 547:10
**release** [32] - 474:14, 478:20, 480:8, 481:3, 481:8, 482:2, 486:2, 486:4, 486:7, 486:11, 486:15, 486:25, 487:3, 487:18, 488:15, 489:10, 489:12, 489:13, 489:25, 491:4, 491:5, 492:18, 492:20, 493:3, 494:23, 500:15, 501:2, 502:2, 506:3, 545:7, 563:14, 574:11
**releases** [2] - 501:10, 645:20
**relevance** [15] - 467:22, 467:23, 469:1, 469:10, 469:20, 469:24, 494:11, 502:5, 553:9, 573:15, 575:22, 586:5, 587:9, 598:16
**relevant** [4] - 470:1, 510:20, 512:17, 513:11
**rely** [3] - 532:8, 563:20, 574:13
**remain** [2] - 476:20, 650:12
**remember** [54] - 519:14, 520:23, 521:14, 522:4, 522:14, 526:7, 527:13, 527:16, 527:19, 527:23, 529:23, 529:24, 531:2, 531:3, 534:13, 537:7, 538:11, 538:15, 539:6, 549:7, 549:9, 549:13, 549:23, 550:1, 551:6, 551:20, 552:12, 561:6, 600:9, 600:12, 601:7, 601:8, 611:21, 612:15, 612:18, 613:15, 614:13, 615:6, 615:7, 616:14, 633:11, 633:16, 633:17, 633:24, 633:25, 634:2, 634:23, 637:14, 638:24, 651:11, 651:14, 652:22, 656:22
**remembered** [2] - 549:11, 614:9, 633:21
**remembers** [2] - 616:12, 616:13
**remind** [2] - 560:6, 611:12
**remotely** [1] - 481:5
**replacement** [2] - 466:18, 532:17

**reporter** [6] - 477:21, 477:23, 547:20, 547:24, 573:19, 624:20
**Reporter** [1] - 465:22
**represent** [1] - 564:14
**representation** [1] - 583:19
**representative** [2] - 474:5, 476:17
**representing** [1] - 476:16
**reprimand** [3] - 595:9, 624:3, 624:9
**require** [2] - 500:14, 644:4
**reservation** [2] - 588:8, 626:7
**reside** [1] - 519:7
**respect** [7] - 470:10, 471:2, 482:22, 558:4, 558:25, 628:19, 640:11
**respond** [3] - 471:25, 498:24, 633:6
**response** [4] - 526:9, 601:18, 602:1
**responsible** [2] - 481:12, 520:13
**rest** [3] - 487:25, 488:1, 488:18
**result** [1] - 481:9
**resulted** [2] - 604:5, 604:11
**retraining** [1] - 595:12
**return** [3] - 475:2, 476:17, 485:14
**returned** [1] - 516:3
**reveal** [2] - 599:4, 599:14
**review** [1] - 629:8
**reviewed** [4] - 470:11, 470:12, 470:24, 629:6
**rich** [9] - 497:13, 505:24, 516:24, 623:15, 623:17, 623:18, 623:20, 623:25, 624:1
**Rich** [6] - 624:2, 624:4, 637:21, 640:4, 640:19, 660:23
**RICHARD** [1] - 465:16
**ride** [1] - 507:10
**rig** [6] - 579:21, 579:22, 635:14, 635:21, 635:23
**rights** [5] - 480:3, 480:4, 480:9, 481:4, 486:18
**rip** [1] - 645:20
**rise** [1] - 515:9
**risk** [2] - 481:23, 483:14
**risks** [1] - 500:10
**risky** [1] - 485:19
**Robing** [1] - 629:17
**room** [4] - 470:18, 551:15, 598:10, 598:13
**Room** [1] - 629:17
**Rosana** [53] - 467:24, 468:15, 519:19, 520:4, 520:8, 521:16, 521:18, 521:21, 523:23, 525:24, 528:25, 529:4, 532:3, 532:17, 533:5, 533:9, 533:20, 534:6, 534:8, 534:11, 535:9, 535:14, 535:17, 535:23, 535:24, 536:3, 537:11, 538:4,

538:7, 538:10, 538:14, 539:10, 542:23, 543:24, 546:1, 546:15, 551:9, 551:11, 552:1, 552:14, 564:24, 565:25, 571:4, 571:6, 580:21, 613:7, 617:14, 638:1, 638:8, 642:17, 642:20, 643:25, 644:18
**Rosana's** [3] - 546:25, 570:18, 613:23
**rubbing** [1] - 565:15
**rude** [2] - 589:2, 652:24
**rule** [1] - 541:5
**ruled** [2] - 472:11, 587:9
**rules** [1] - 471:16
**ruling** [2] - 473:4, 514:12
**rulings** [1] - 557:8
**rushed** [1] - 598:9
**rushing** [1] - 598:13

**S**

**safe** [8] - 491:18, 505:22, 563:9, 575:20, 599:23, 636:13, 667:3
**safely** [2] - 533:22, 534:4
**safety** [4] - 577:22, 578:12, 643:18, 643:21
**Saturday** [15] - 536:18, 609:24, 621:17, 621:19, 621:20, 621:24, 622:3, 622:8, 622:10, 622:12, 622:22, 623:1, 623:3, 623:5
**Saul** [1] - 552:10
**SAUL** [1] - 465:20
**saw** [39] - 466:14, 468:22, 478:18, 495:11, 497:10, 510:16, 512:4, 526:2, 532:5, 544:18, 544:19, 565:3, 565:4, 567:6, 600:7, 600:9, 615:21, 621:25, 629:21, 629:22, 629:23, 630:7, 630:10, 630:11, 630:15, 630:18, 630:21, 630:25, 631:2, 631:7, 631:8, 634:23, 636:23, 637:21, 638:6, 660:15, 660:17, 666:11, 666:16
**scared** [1] - 572:9
**scenario** [1] - 659:17
**scene** [1] - 468:8
**schedule** [1] - 666:23
**scheduling** [1] - 556:7
**scope** [1] - 477:5
**screen** [4] - 524:16, 569:12, 569:13, 570:2
**SDLI** [1] - 582:1
**season** [3] - 468:13, 661:15, 662:1
**seat** [2] - 517:4, 518:24
**seated** [4] - 477:2, 518:11, 525:8, 557:7
**second** [20] - 466:12, 468:2, 491:24, 515:11, 516:23, 524:7, 551:17, 551:20, 571:10, 578:1,

612:5, 622:5, 623:20, 630:20, 630:21, 630:23, 631:9, 631:10, 631:11, 634:1
**seconds** [3] - 566:3, 644:25, 645:19
**see** [47] - 468:10, 469:9, 469:23, 476:1, 476:7, 476:15, 476:19, 479:6, 487:21, 497:25, 498:3, 498:10, 510:16, 512:17, 513:24, 514:16, 514:24, 526:21, 544:16, 544:22, 565:18, 565:19, 568:8, 570:12, 570:23, 572:2, 583:12, 588:12, 590:24, 596:21, 598:10, 598:13, 600:20, 601:5, 611:11, 611:17, 612:4, 612:6, 620:22, 631:3, 634:7, 635:4, 639:6, 647:4, 652:11, 652:14
**seeing** [11] - 630:22, 633:11, 633:16, 633:17, 633:21, 633:24, 633:25, 634:2, 645:25, 646:2, 652:22
**seeking** [1] - 472:13
**seem** [1] - 512:1
**self** [1] - 650:25
**self-employed** [1] - 650:25
**send** [2] - 607:5, 665:24
**sense** [2] - 488:19, 545:22
**sent** [12] - 475:2, 489:8, 509:5, 537:21, 555:9, 606:25, 607:16, 621:9, 665:23, 666:8, 666:15, 666:17
**sentence** [2] - 488:2, 542:6
**separate** [4] - 489:5, 489:11, 489:25, 510:5
**separately** [2] - 486:7, 489:19
**September** [1] - 628:7
**series** [1] - 514:10
**serious** [1] - 595:5
**service** [4] - 554:25, 592:5, 615:16, 622:21
**SESSION** [1] - 560:1
**set** [5] - 487:2, 487:3, 491:18, 516:23, 581:9
**Seventh** [1] - 465:15
**several** [5] - 466:13, 471:14, 480:12, 564:5, 614:8
**severe** [1] - 595:3
**sex** [9] - 538:3, 538:7, 538:10, 539:2, 539:4, 590:12, 591:13, 592:2
**sexual** [9] - 539:3, 595:24, 596:5, 599:4, 599:11, 599:15, 606:10, 654:24, 655:2
**sexuality** [3] - 597:7, 654:18, 655:18
**sexually** [1] - 659:12
**share** [1] - 585:21
**shared** [1] - 512:20
**sharing** [1] - 512:21
**Shaw** [14] - 467:8, 469:3,

469:11, 470:10, 471:1, 471:2, 471:9, 471:11, 472:9, 474:19, 572:14, 644:7, 644:10
**sheet** [4] - 554:14, 555:5, 555:7, 558:19
**shit** [1] - 637:16
**shoe** [1] - 499:22
**shoot** [1] - 632:17
**shooter** [1] - 472:7
**shooting** [1] - 649:3
**short** [2] - 556:25, 650:3
**shortly** [2] - 476:18, 476:19
**shoulder** [4] - 546:13, 566:7, 620:10, 637:22
**show** [20] - 484:5, 486:1, 500:22, 509:10, 510:7, 523:10, 543:14, 563:25, 569:2, 569:23, 570:1, 572:1, 572:5, 582:11, 587:20, 611:22, 622:4, 630:14, 633:8, 635:2
**showed** [6] - 466:13, 482:18, 565:12, 565:25, 631:4, 666:14
**showing** [2] - 488:8, 661:4
**shown** [4] - 480:12, 484:3, 488:15, 511:20
**shows** [7] - 466:2, 468:4, 511:10, 554:5, 566:14, 572:2, 584:24
**side** [9] - 540:5, 589:4, 589:5, 605:4, 637:11, 646:22, 647:5, 647:18
**sidebar** [16] - 467:5, 488:24, 489:1, 503:1, 509:18, 515:15, 540:7, 541:8, 553:12, 555:13, 558:10, 587:1, 603:1, 619:1, 649:1, 664:1
**sidebars** [1] - 510:23
**sided** [1] - 626:12
**sides** [1] - 593:10
**sign** [10] - 478:14, 489:13, 492:13, 493:3, 500:17, 521:3, 554:9, 555:8, 580:16, 580:18
**signed** [12] - 478:20, 488:15, 506:3, 520:8, 521:16, 545:7, 546:4, 553:2, 554:3, 554:15, 554:21, 555:8
**signing** [4] - 480:8, 481:3, 521:14, 521:19
**signs** [1] - 479:22
**silence** [3] - 514:17, 515:1, 515:3
**similar** [4] - 468:3, 468:4, 482:17, 482:18
**simple** [1] - 566:12
**simply** [6] - 492:25, 557:22, 563:20, 591:14, 592:12, 624:2
**sister** [1] - 598:24
**sit** [3] - 466:22, 531:8, 577:7
**site** [1] - 534:12
**sitting** [4] - 528:13, 647:2, 647:21, 647:22

**situation** [10] - 495:6, 495:9, 506:11, 506:19, 545:23, 561:19, 578:21, 647:6, 659:11, 661:6
**six** [1] - 608:15
**size** [5] - 499:19, 499:22, 499:24, 500:5, 500:7
**sizes** [1] - 577:14
**skills** [1] - 652:5
**skimmed** [1] - 522:24
**skipped** [1] - 602:3
**sky** [1] - 487:7
**SKYDIVE** [1] - 465:7
**skydive** [40] - 468:7, 473:8, 481:5, 481:9, 483:11, 485:24, 487:9, 487:15, 487:20, 492:9, 492:13, 492:20, 494:8, 495:8, 495:9, 498:15, 498:23, 499:2, 501:5, 505:6, 508:5, 514:14, 545:16, 561:18, 564:20, 572:24, 573:25, 579:19, 588:23, 604:15, 610:14, 612:19, 625:8, 625:15, 625:16, 627:1, 653:10, 660:20, 661:15
**Skydive** [31] - 473:10, 479:2, 480:13, 481:3, 481:4, 485:6, 493:4, 494:4, 494:17, 495:18, 496:14, 496:22, 498:11, 501:10, 501:11, 501:15, 506:12, 511:4, 512:10, 513:8, 514:14, 514:21, 519:16, 519:25, 520:12, 536:9, 542:16, 549:19, 550:9, 552:5, 565:3, 581:6, 581:14, 581:18, 582:7, 583:16, 584:3, 627:6, 651:3, 655:1, 656:21
**skydive-related** [1] - 545:16
**skydiver** [5] - 580:14, 580:25, 596:21, 652:7, 652:9, 654:7, 662:12
**skydivers** [6] - 472:18, 478:5, 491:19, 494:7, 597:7, 661:18
**skydiving** [34] - 477:15, 477:18, 480:5, 480:20, 480:22, 481:23, 482:22, 482:24, 483:3, 491:16, 493:25, 494:2, 504:24, 519:16, 520:5, 520:14, 527:13, 532:8, 536:3, 548:1, 548:11, 548:19, 562:20, 568:17, 568:18, 568:21, 572:17, 573:7, 590:17, 607:22, 612:18, 652:5, 652:12, 652:19
**slightly** [1] - 548:1
**slow** [3] - 503:5, 515:12, 515:18
**slowing** [1] - 646:3
**small** [6] - 561:12, 561:13, 561:21, 562:5, 562:6, 577:6
**smile** [4] - 570:23, 571:14, 571:19, 572:2
**smiling** [1] - 571:8
**smoothly** [2] - 515:10, 515:11

16

**so..** [2] - 629:25, 654:13
**socialize** [1] - 651:23
**soda** [1] - 514:3
**solely** [1] - 621:6
**someone** [29] - 497:8, 501:11, 501:14, 506:14, 506:24, 511:9, 511:11, 530:24, 535:11, 535:14, 544:9, 554:22, 562:19, 573:6, 573:8, 580:4, 588:23, 589:1, 595:20, 612:17, 613:15, 626:15, 631:6, 636:24, 640:23, 641:1, 641:2, 659:3
**someplace** [1] - 641:10
**sometime** [1] - 536:7
**sometimes** [5] - 499:14, 580:2, 580:3, 629:17, 660:2
**somewhere** [2] - 641:21, 666:7
**soon** [3] - 466:17, 607:22, 609:11
**sorry** [20] - 469:22, 471:11, 499:9, 516:21, 524:21, 527:1, 527:11, 538:5, 562:14, 596:15, 600:11, 605:21, 605:24, 608:18, 608:19, 628:1, 639:5, 655:11, 658:7, 664:18
**sorts** [1] - 583:17
**sounds** [3] - 522:6, 534:3, 535:25, 536:2
**space** [1] - 505:25
**speaks** [1] - 567:14
**special** [4] - 547:4, 547:11, 547:13, 576:21
**specific** [5] - 492:14, 549:5, 549:7, 549:9, 549:10
**specifically** [6] - 472:15, 494:23, 504:10, 521:12, 611:23, 656:18
**specify** [1] - 662:17
**speculate** [1] - 662:15
**spell** [3] - 476:24, 518:21, 650:16
**spoken** [3] - 550:25, 556:3, 622:1
**sport** [3] - 480:20, 563:7, 563:10
**spring** [1] - 550:23
**stabilizing** [1] - 645:18
**staff** [2] - 581:17, 606:18
**stand** [5] - 491:21, 533:7, 637:3, 650:12, 657:8
**standards** [1] - 491:18
**standing** [2] - 476:20, 650:12
**stands** [2] - 533:2, 632:6
**stars** [1] - 633:13
**start** [6] - 468:20, 475:17, 475:19, 601:1, 619:2, 649:14
**started** [3] - 546:22, 596:25, 611:6
**starting** [2] - 470:19, 628:13
**state** [4] - 476:24, 520:16, 558:6, 650:16
**statement** [8] - 515:15, 554:17,

565:9, 568:11, 580:5, 593:6, 594:12, 658:20
**statements** [2] - 551:2, 551:3
**States** [2] - 491:17, 491:22
**STATES** [2] - 465:1, 465:11
**stay** [1] - 656:12
**steak** [2] - 552:11, 552:13
**steakhouse** [1] - 552:3
**stenography** [1] - 465:25
**step** [4] - 516:19, 556:20, 650:6, 657:6
**stick** [1] - 594:8
**still** [13] - 475:17, 519:21, 530:1, 538:19, 539:18, 545:7, 546:9, 560:6, 607:7, 624:8, 631:25, 657:10, 666:23
**stipulate** [1] - 503:4
**stop** [1] - 475:23
**stopped** [6] - 496:25, 497:6, 497:19, 497:24, 498:9, 664:3
**story** [4] - 537:13, 538:13, 589:4, 589:5
**straight** [2] - 472:6, 504:21
**strap** [4] - 505:15, 510:25, 511:9, 561:5
**strapped** [33] - 499:9, 499:10, 499:13, 499:14, 499:18, 500:4, 506:7, 506:8, 511:11, 528:25, 529:6, 529:17, 530:8, 530:24, 531:3, 531:11, 544:10, 562:11, 562:13, 562:16, 563:13, 579:9, 579:15, 638:20, 639:13, 646:20, 647:17, 657:17, 657:22, 658:12, 659:5, 660:12
**strapping** [1] - 575:24
**straps** [14] - 499:17, 507:20, 574:1, 575:19, 580:13, 581:1, 642:22, 643:5, 643:12, 643:15, 643:18, 643:21, 646:4, 646:7
**Street** [1] - 465:17
**stretch** [1] - 645:22
**stretched** [1] - 468:10
**struck** [1] - 597:13
**student** [14] - 484:25, 485:3, 487:19, 491:19, 504:4, 506:3, 507:3, 521:7, 575:18, 577:1, 578:3, 652:15, 652:16, 654:1
**students** [18] - 480:17, 483:17, 483:22, 483:23, 485:23, 500:14, 575:20, 576:8, 576:25, 578:1, 652:12, 652:19, 652:23, 653:2, 653:15, 653:20, 653:21, 660:20
**stuff** [4] - 620:13, 625:10, 625:11, 666:2
**subject** [3] - 483:19, 510:4, 559:1
**submitted** [2] - 510:18, 554:21
**subpoena** [4] - 554:12, 554:16, 555:3, 558:13
**substance** [2] - 484:9, 526:6

**substantially** [1] - 559:3
**substituting** [1] - 466:21
**success** [1] - 560:25
**sue** [8] - 481:4, 482:2, 482:5, 482:11, 501:15, 501:19, 508:11, 545:4
**suffered** [1] - 601:6
**sufficiently** [1] - 558:20
**Suffolk** [1] - 519:8
**suggested** [1] - 659:21
**suggestion** [1] - 468:17
**suit** [3] - 501:20, 575:11, 656:25
**Suite** [4] - 465:15, 465:17, 465:19, 465:23
**sum** [1] - 526:6
**summation** [1] - 634:12
**summations** [1] - 666:25
**summer** [4] - 485:7, 550:23, 662:12, 662:21
**sums** [1] - 548:10
**Sunday** [4] - 536:20, 609:25, 621:18, 622:8
**supplied** [1] - 554:3
**supposed** [3] - 469:3, 625:15, 660:24
**surrounding** [3] - 514:25, 544:20, 558:23
**suspend** [1] - 640:21
**suspended** [4] - 621:10, 622:16, 622:17, 622:19
**suspension** [3] - 595:6, 595:10, 612:9
**sustain** [2] - 579:12, 659:7
**Sustained** [1] - 563:6
**sustained** [44] - 493:6, 494:11, 496:18, 501:22, 505:2, 505:12, 508:7, 508:13, 508:14, 549:17, 567:8, 568:10, 571:17, 571:22, 573:4, 580:23, 582:9, 583:21, 584:8, 594:11, 594:21, 597:14, 597:21, 598:17, 599:8, 605:7, 608:10, 608:25, 610:3, 610:9, 610:10, 613:20, 614:1, 616:9, 616:24, 626:20, 638:4, 640:2, 641:7, 644:22, 659:1, 659:7, 659:14, 659:24
**sustaining** [1] - 555:10
**sworn** [6] - 476:22, 518:19, 560:15, 591:10, 594:4, 650:14
**systems** [1] - 483:18

## T

**tab** [1] - 552:5
**table** [3] - 466:17, 466:22, 476:19
**tainted** [1] - 548:1
**take-home** [2] - 662:11, 662:20
**talkative** [1] - 533:5, 533:6
**talks** [1] - 500:9
**tandem** [28] - 483:15, 499:24,

504:6, 504:7, 504:9, 504:11, 504:24, 521:9, 521:10, 521:11, 521:13, 560:21, 561:18, 572:24, 575:10, 577:8, 577:10, 577:11, 577:15, 579:2, 579:3, 581:23, 596:20, 609:16, 644:1, 647:8, 660:6, 662:12
**tape** [16] - 496:24, 496:25, 497:5, 497:6, 497:18, 497:19, 497:23, 497:24, 498:8, 498:9, 600:7, 600:8, 641:13, 641:23, 642:1, 642:4
**tears** [2] - 590:22, 625:9
**telephone** [1] - 556:4
**ten** [5] - 528:22, 644:19, 645:1, 645:5, 649:6
**ten-minute** [1] - 649:6
**tension** [2] - 579:24, 640:17
**tensions** [1] - 515:9
**termed** [1] - 638:16
**terminate** [1] - 615:17
**terminated** [5] - 625:17, 655:21, 655:23, 656:3, 656:13
**termination** [3] - 595:4, 606:8, 606:9
**testified** [20] - 473:10, 476:23, 503:2, 514:7, 518:20, 522:19, 525:13, 525:15, 535:7, 554:11, 560:15, 566:6, 589:12, 599:25, 604:22, 614:11, 628:9, 628:11, 644:18, 650:15
**testify** [14] - 472:16, 472:22, 472:23, 473:1, 475:24, 514:15, 523:17, 547:17, 558:8, 583:24, 616:6, 660:23, 666:4
**testifying** [6] - 522:4, 547:8, 547:16, 548:5, 550:7, 556:2
**testimony** [34] - 470:23, 472:6, 474:23, 474:25, 516:12, 518:14, 523:19, 527:8, 529:10, 529:13, 531:6, 540:3, 549:25, 551:4, 554:19, 555:1, 557:23, 558:14, 573:15, 573:21, 583:20, 584:11, 588:4, 616:11, 616:15, 616:22, 617:12, 619:10, 627:17, 631:7, 632:1, 636:21, 642:10, 666:24
**text** [2] - 475:9, 475:11
**th** [1] - 582:12
**THE** [307] - 465:11, 466:2, 466:5, 466:11, 466:24, 467:2, 467:4, 467:10, 467:21, 470:3, 470:8, 470:18, 470:22, 471:9, 471:24, 472:23, 473:3, 473:13, 473:15, 474:3, 474:5, 474:11, 474:16, 474:24, 475:4, 475:11, 475:14, 475:19, 476:1, 476:4, 476:6, 476:15, 476:24, 477:1, 477:2, 479:8, 479:12, 484:7, 488:12, 488:24, 489:9, 489:14, 489:16, 489:23, 491:2, 491:11, 493:6, 493:11, 493:14, 493:19,

494:11, 494:21, 496:2, 496:4, 496:18, 501:22, 502:4, 502:6, 503:5, 503:9, 505:2, 505:8, 505:12, 508:7, 508:13, 509:10, 509:20, 509:24, 510:6, 510:9, 510:21, 511:8, 511:12, 511:19, 512:4, 512:22, 512:25, 513:2, 513:7, 513:20, 513:23, 514:2, 514:5, 514:9, 514:23, 515:4, 515:17, 516:4, 516:11, 516:16, 516:19, 517:1, 517:3, 517:6, 518:1, 518:8, 518:11, 518:17, 518:21, 518:23, 518:24, 523:10, 523:16, 524:10, 524:13, 524:18, 524:22, 529:8, 529:12, 529:22, 539:15, 540:2, 540:5, 541:3, 541:5, 543:8, 543:18, 547:6, 547:9, 547:10, 547:19, 547:22, 548:5, 548:15, 549:17, 552:23, 553:10, 554:24, 555:4, 555:10, 556:18, 556:20, 557:1, 557:7, 560:4, 560:8, 560:11, 562:2, 563:6, 564:1, 564:8, 567:8, 567:14, 568:10, 569:11, 570:3, 570:8, 570:13, 571:17, 571:22, 572:21, 573:4, 573:10, 573:18, 574:19, 574:24, 575:1, 575:9, 575:23, 577:18, 578:15, 579:12, 580:23, 581:3, 582:9, 582:12, 582:15, 582:19, 582:21, 583:21, 584:8, 584:18, 586:4, 586:6, 586:10, 587:5, 587:11, 587:17, 588:10, 589:22, 589:24, 590:2, 591:17, 591:20, 592:18, 593:10, 594:11, 594:21, 596:10, 596:14, 597:14, 597:21, 598:2, 598:17, 599:8, 600:23, 601:22, 602:4, 602:8, 603:2, 605:7, 605:15, 606:7, 608:10, 608:25, 609:5, 609:8, 610:3, 610:9, 610:11, 610:17, 610:21, 611:2, 611:14, 611:19, 612:1, 612:22, 612:24, 613:10, 613:20, 614:1, 614:20, 616:9, 616:24, 617:6, 617:10, 617:21, 618:5, 619:4, 619:6, 619:12, 621:14, 624:12, 624:15, 624:19, 626:20, 627:13, 627:16, 627:19, 627:23, 627:25, 628:2, 628:12, 629:3, 629:9, 629:14, 629:20, 629:24, 630:3, 630:10, 630:23, 631:2, 631:13, 631:17, 631:20, 631:25, 632:7, 632:17, 632:22, 632:24, 633:21, 634:7, 634:14, 636:20, 638:4, 639:3, 640:2, 641:7, 641:16, 644:22, 648:5, 649:11, 649:15, 650:2, 650:11, 650:16, 650:18, 650:19, 651:16, 652:21, 653:4, 655:5, 655:10, 655:11, 655:12,

655:14, 655:25, 656:10, 657:3, 657:6, 657:11, 659:1, 659:7, 659:14, 659:24, 661:12, 662:14, 662:17, 663:9, 664:10, 664:13, 664:15, 664:18, 665:2, 665:10, 666:22, 667:5
**therefore** [5] - 484:24, 506:23, 557:15, 558:3, 657:25
**thereto** [1] - 606:14
**thigh** [1] - 543:1
**thinking** [1] - 665:4
**thinks** [2] - 511:15, 629:5
**third** [4] - 466:15, 530:10, 554:15, 615:12
**thousands** [1] - 485:6
**three** [12] - 467:5, 473:1, 550:4, 550:5, 550:8, 558:3, 609:19, 610:5, 612:18, 612:20, 613:5, 613:17
**thrill** [1] - 494:14
**thrilled** [1] - 531:25
**throughout** [2] - 472:3, 543:1
**throwing** [1] - 645:16
**thumbs** [2] - 525:17, 525:20
**tight** [6] - 499:9, 499:10, 499:13, 499:14, 499:18
**timing** [2] - 512:21, 513:12
**tips** [1] - 662:9
**today** [17] - 468:22, 469:4, 469:16, 470:23, 473:6, 495:11, 519:21, 531:8, 550:7, 555:1, 556:2, 616:6, 617:12, 632:3, 632:5, 649:6
**toe** [7] - 467:9, 468:6, 468:9, 468:16, 469:23, 473:12, 473:14
**together** [5] - 486:10, 603:2, 651:22, 652:16, 652:17
**tomorrow** [6] - 632:1, 649:14, 650:4, 666:22, 666:25, 667:5
**took** [13] - 466:1, 535:2, 537:9, 540:6, 553:11, 558:2, 565:22, 613:7, 621:9, 622:20, 639:4, 640:13, 657:23
**top** [2] - 491:4, 601:2
**topic** [2] - 508:15, 508:16
**topics** [1] - 632:9
**tops** [2] - 550:5, 550:8
**total** [1] - 466:14
**totally** [1] - 566:9
**touch** [3] - 546:8, 644:4
**touched** [12] - 504:13, 520:17, 532:2, 534:9, 546:3, 557:21, 562:19, 562:24, 563:1, 563:2, 580:21, 617:14
**touching** [12] - 528:10, 532:14, 533:10, 534:5, 535:8, 546:11, 563:7, 563:8, 580:13, 580:19, 614:22, 620:9
**towards** [3] - 567:11, 571:2
**trade** [1] - 653:16
**trained** [1] - 595:18

**training** [1] - 595:13
**TRANSCRIPT** [1] - 465:10
**Transcript** [1] - 465:25
**transcript** [2] - 523:9, 523:12
**transient** [1] - 472:18
**treated** [4] - 492:1, 655:1, 655:13, 655:14
**treating** [1] - 592:22
**TRIAL** [1] - 465:10
**trial** [7] - 471:18, 471:19, 495:20, 511:22, 529:11, 570:11, 667:9
**triangle** [1] - 658:23
**trip** [1] - 667:3
**true** [65] - 467:17, 477:16, 477:19, 477:20, 477:25, 478:15, 478:16, 480:14, 481:24, 481:25, 482:25, 483:1, 484:21, 485:16, 493:1, 493:2, 493:9, 494:15, 494:16, 504:20, 506:7, 520:8, 520:17, 520:21, 520:22, 521:24, 523:20, 524:3, 525:10, 525:18, 527:5, 529:18, 531:15, 531:21, 532:9, 533:13, 533:16, 534:12, 535:9, 535:19, 536:10, 536:16, 536:25, 537:8, 537:11, 537:19, 538:4, 538:7, 539:11, 548:24, 549:15, 550:10, 551:9, 551:19, 552:17, 584:16, 589:7, 595:25, 596:7, 597:3, 597:4, 597:6, 633:3, 646:18, 647:16
**trusted** [2] - 643:17, 643:20
**trusts** [1] - 523:3
**truth** [5] - 557:20, 589:9, 594:5, 626:25, 636:11
**truthfully** [1] - 522:19
**try** [11] - 495:5, 498:20, 510:12, 515:5, 515:25, 585:15, 632:17, 636:12, 636:14, 649:12
**trying** [15] - 511:6, 515:9, 535:24, 535:25, 547:4, 547:11, 551:21, 555:4, 578:22, 583:23, 591:18, 593:6, 594:14, 615:3, 658:23
**Tuesday** [1] - 585:17
**turn** [4] - 474:3, 526:15, 588:15, 604:14
**turned** [3] - 473:23, 473:24, 511:17
**twice** [2] - 600:23, 615:12
**two** [37] - 486:10, 487:14, 489:14, 491:23, 494:7, 513:17, 513:21, 514:14, 525:5, 543:19, 543:22, 549:22, 549:25, 550:5, 550:8, 554:6, 556:6, 557:8, 557:9, 575:11, 576:13, 577:6, 578:17, 581:13, 582:17, 590:7, 603:2, 615:11, 622:20, 624:5, 625:4, 625:6, 625:8, 626:17, 652:1, 661:25

**type** [3] - 531:25, 595:13, 651:1
**typical** [3] - 497:7, 498:11, 644:24
**typo** [1] - 585:19

## U

**ultimately** [1] - 595:4
**uncomfortable** [30] - 498:14, 507:3, 507:4, 507:7, 542:7, 542:9, 548:10, 562:19, 564:25, 565:8, 565:12, 566:1, 566:2, 566:14, 568:4, 574:2, 610:25, 611:3, 611:6, 614:24, 615:2, 620:8, 620:11, 642:17, 642:20, 657:16, 657:21, 658:1, 658:11, 658:20
**under** [18] - 473:15, 522:17, 541:5, 553:4, 555:10, 559:2, 560:6, 573:11, 590:10, 594:4, 615:1, 640:10, 644:16, 645:8, 645:14, 646:4, 647:5, 657:10
**unemployed** [1] - 552:16
**Unemployment** [1] - 664:9
**unemployment** [9] - 661:10, 664:3, 664:14, 665:3, 665:5, 665:15, 665:18, 666:2, 666:6
**unfair** [2] - 559:3, 588:21
**unfortunately** [2] - 469:17, 585:14
**unhappy** [2] - 615:14, 642:12
**United** [2] - 491:16, 491:22
**UNITED** [2] - 465:1, 465:11
**unlawful** [1] - 606:8
**unofficially** [1] - 623:21
**unpredictable** [1] - 572:18
**unprofessional** [3] - 468:18, 652:24, 653:14
**unquote** [4] - 468:18, 497:10, 576:21, 660:24
**unrealistic** [1] - 485:23
**unreasonable** [2] - 658:19, 659:10
**unsafe** [1] - 501:15
**unusual** [2] - 485:17, 498:10
**up** [83] - 468:4, 468:10, 469:13, 472:14, 475:1, 475:10, 475:24, 480:3, 480:4, 480:9, 481:4, 481:19, 483:6, 483:10, 484:10, 486:18, 486:24, 487:7, 487:9, 495:20, 497:11, 501:5, 502:6, 506:7, 506:8, 506:17, 506:20, 506:25, 510:25, 511:9, 511:11, 515:20, 516:23, 517:6, 523:22, 525:17, 525:20, 533:3, 533:7, 539:22, 540:5, 542:6, 548:10, 552:5, 561:5, 561:7, 561:8, 561:10, 564:20, 566:13, 570:18, 571:20, 577:14, 581:9, 593:8, 593:16, 596:20, 602:8, 613:3, 618:5, 620:12, 622:4,

622:10, 626:22, 632:6, 636:12, 642:11, 642:14, 645:9, 645:11, 645:12, 645:20, 645:23, 646:3, 646:15, 647:22, 650:11, 655:17, 659:5, 660:2, 660:5
**upset** [3] - 515:9, 592:23, 625:8
**US** [1] - 465:5
**ushering** [1] - 470:16
**USPA** [5] - 487:18, 488:3, 491:15, 491:21, 492:9
**utilizing** [2] - 605:19, 606:1

## V

**vagina** [1] - 468:11
**vaguely** [1] - 551:7
**valid** [2] - 592:11, 592:12
**value** [4] - 558:16, 559:2, 630:4, 630:19
**various** [1] - 594:24
**verge** [1] - 590:21
**verified** [1] - 610:18
**versus** [1] - 513:13
**video** [109] - 467:9, 467:24, 468:2, 468:4, 468:6, 468:16, 468:19, 468:21, 469:6, 469:12, 469:18, 469:22, 469:23, 470:7, 470:23, 473:14, 473:21, 474:3, 474:8, 474:11, 480:9, 480:16, 480:19, 481:2, 481:22, 482:1, 482:14, 482:17, 482:18, 483:5, 483:13, 483:22, 483:23, 484:2, 484:4, 484:5, 484:8, 486:1, 486:5, 486:8, 486:15, 486:24, 487:4, 495:11, 495:15, 495:16, 495:18, 496:14, 497:14, 498:10, 498:12, 506:4, 516:24, 517:1, 518:3, 518:5, 518:7, 520:1, 520:4, 524:20, 524:25, 525:2, 525:7, 525:10, 525:25, 526:5, 543:14, 543:15, 543:16, 543:20, 543:22, 544:7, 563:21, 565:3, 565:4, 565:7, 566:3, 566:6, 566:14, 566:15, 566:18, 566:20, 567:1, 567:14, 567:15, 567:18, 567:23, 574:10, 574:15, 574:17, 575:7, 589:13, 598:10, 598:12, 600:20, 601:5, 610:18, 611:11, 611:22, 634:23, 636:6, 637:14, 638:6, 660:24, 661:1, 661:3, 661:7
**videographer** [4] - 525:18, 566:25, 625:25, 646:1
**videos** [13] - 466:13, 467:5, 467:10, 467:13, 467:22, 470:11, 470:14, 471:1, 473:4, 473:24, 474:15, 480:12, 496:21
**videotape** [10] - 524:5, 598:5, 611:17, 611:18, 612:4, 612:6, 615:19, 615:20, 645:25, 646:2
**videotaped** [1] - 524:3

**videotaping** [1] - 565:14
**view** [1] - 470:1
**viewed** [1] - 545:21
**viewing** [1] - 611:16
**vividly** [1] - 548:22
**voluntarily** [1] - 567:6
**vs** [1] - 466:2

## W

**wait** [7] - 470:25, 474:23, 583:8, 588:6, 588:23, 626:2, 626:6
**waited** [2] - 536:22, 558:3
**waiting** [4] - 472:25, 476:8, 515:24, 626:1
**waive** [2] - 469:2, 469:10
**waiver** [14] - 479:1, 479:2, 479:22, 479:24, 500:9, 503:10, 503:12, 563:22, 574:15, 574:22, 575:1, 575:6, 580:16, 580:18
**walk** [1] - 466:21
**wants** [6] - 510:3, 546:5, 578:9, 600:24, 634:10, 644:1
**wardrobe** [1] - 470:1
**warmer** [2] - 662:3, 662:7
**watch** [3] - 486:5, 563:21, 574:16
**watched** [3] - 506:4, 520:1, 615:20
**watches** [1] - 480:9
**watching** [2] - 486:8, 486:24
**WAYNE** [2] - 650:13, 668:10
**Wayne** [3] - 472:9, 650:9, 650:18
**ways** [1] - 568:24
**wearing** [2] - 504:5, 521:8
**weather** [1] - 626:8
**website** [15] - 468:7, 468:12, 473:8, 473:11, 473:13, 473:18, 473:20, 512:22, 513:7, 608:3, 629:5, 629:7, 629:8, 629:10, 631:11
**Wednesday** [2] - 585:19, 666:25
**week** [19] - 466:19, 478:18, 497:13, 505:24, 515:11, 516:10, 518:12, 536:4, 621:10, 621:17, 621:21, 622:9, 622:17, 622:21, 641:13, 642:5, 644:18, 661:23, 662:1
**weekdays** [1] - 613:12
**weekend** [7] - 469:14, 476:8, 536:7, 536:13, 546:23, 609:21, 613:18
**weekend's** [1] - 510:4
**weekends** [1] - 613:11
**weeks** [4] - 590:8, 590:20, 608:15, 614:8
**weight** [5] - 513:15, 514:23, 586:8, 588:20, 593:15
**welcome** [1] - 486:21

**WELL** [1] - 662:4
**whatnot** [1] - 512:3
**whatsoever** [6] - 471:23, 498:11, 558:16, 594:2, 616:19, 626:25
**whereas** [1] - 468:15
**whispering** [2] - 543:5, 566:7
**whole** [4] - 471:15, 489:21, 537:13, 566:9
**wife** [7] - 512:16, 513:10, 513:25, 514:7, 539:23, 542:3, 583:3
**William** [3] - 467:2, 467:3, 476:17
**willing** [1] - 469:2
**win** [1] - 482:6
**wind** [1] - 543:25
**wing** [1] - 656:25
**Winstock** [8] - 497:13, 505:24, 623:18, 623:20, 637:21, 640:5, 640:19, 660:23
**wished** [1] - 548:8
**withdraw** [1] - 500:13
**withdrawn** [5] - 562:22, 597:23, 613:1, 643:19, 643:25
**witness** [41] - 466:8, 466:10, 466:11, 466:13, 470:16, 471:6, 476:11, 476:22, 518:2, 518:12, 518:13, 521:1, 529:9, 529:12, 552:21, 554:7, 554:11, 556:22, 560:14, 569:23, 591:19, 593:11, 594:13, 616:12, 616:13, 616:14, 626:22, 649:5, 649:6, 649:12, 650:2, 650:3, 650:4, 650:12, 650:14, 664:5, 664:6, 664:7, 664:8, 664:11
**WITNESS** [10] - 477:1, 518:23, 523:16, 547:10, 560:8, 609:8, 650:18, 655:11, 655:14, 657:11
**witness'** [1] - 616:15
**witness's** [1] - 584:11
**witnesses** [4] - 470:11, 471:17, 471:21, 632:3
**woman** [5] - 468:9, 537:9, 590:20, 598:5, 658:24
**women** [7] - 504:17, 579:15, 590:9, 590:11, 591:2, 591:23, 625:8
**word** [5] - 481:16, 531:20, 592:6, 605:23, 641:11
**words** [4] - 522:12, 526:11, 526:23, 591:24
**workers** [2] - 508:20, 654:20
**workers'** [3] - 664:5, 664:8, 664:12
**Workers'** [9] - 605:3, 605:8, 605:12, 605:19, 606:1, 606:5, 606:9, 606:14, 606:24
**workman's** [1] - 665:4
**workplace** [1] - 595:21
**works** [1] - 623:6

**world** [2] - 584:6, 584:13
**worried** [1] - 646:11
**worry** [5] - 535:19, 610:24, 611:7, 615:13, 659:12
**wrap** [1] - 484:10
**write** [1] - 472:12
**written** [3] - 624:3, 624:8, 629:16
**wrote** [4] - 622:23, 623:10, 665:20, 666:11

## Y

**year** [4] - 468:8, 508:5, 661:22, 666:3
**years** [10] - 477:15, 480:13, 514:22, 531:17, 548:19, 552:13, 598:7, 651:8, 651:9
**Yelp** [10] - 629:8, 629:21, 631:7, 631:12, 633:2, 633:5, 633:10, 633:12, 634:1
**YORK** [1] - 465:1
**York** [8] - 465:15, 465:17, 465:20, 465:23, 471:14, 627:21
**yourself** [7] - 518:6, 521:22, 521:25, 522:10, 533:2, 582:25, 590:16

## Z

**Zabell** [27] - 470:9, 471:25, 473:9, 477:3, 509:24, 515:19, 549:11, 549:14, 550:6, 550:21, 551:6, 551:8, 551:13, 551:17, 551:23, 554:12, 554:15, 554:16, 555:9, 556:4, 556:18, 558:12, 558:21, 632:19, 650:2, 650:7, 650:19
**ZABELL** [216] - 465:19, 465:20, 467:1, 467:12, 468:20, 470:4, 470:15, 470:21, 472:1, 474:4, 474:10, 474:18, 475:1, 475:6, 475:13, 475:16, 475:22, 479:11, 484:1, 488:6, 488:17, 488:21, 489:4, 489:11, 489:18, 490:1, 491:10, 493:5, 493:10, 493:18, 494:10, 494:20, 495:22, 496:3, 496:17, 501:21, 502:3, 502:5, 503:2, 505:1, 505:7, 505:11, 508:6, 508:12, 509:7, 509:11, 509:14, 509:17, 509:25, 510:14, 511:13, 512:13, 514:12, 515:2, 516:2, 516:18, 516:21, 523:8, 524:12, 524:17, 524:19, 529:7, 529:9, 529:21, 539:17, 541:2, 541:4, 541:7, 547:7, 547:20, 548:13, 549:16, 553:8, 554:20, 556:19, 559:8, 561:24, 562:12, 563:5, 564:3, 564:7, 567:5, 567:7, 567:13, 568:9, 569:7, 569:10,

19

569:17, 569:20, 570:4, 571:16, 571:21, 572:19, 573:3, 573:9, 573:14, 574:6, 574:18, 574:23, 575:8, 575:21, 578:14, 579:11, 580:22, 581:2, 582:8, 583:18, 584:7, 584:17, 586:3, 586:5, 586:9, 587:6, 587:15, 587:19, 589:21, 589:23, 591:16, 591:18, 592:14, 592:17, 593:5, 594:10, 594:20, 596:9, 597:12, 597:20, 598:15, 599:6, 600:17, 601:3, 601:17, 601:25, 602:6, 603:4, 605:6, 605:14, 606:6, 607:13, 608:9, 608:24, 609:4, 610:2, 610:8, 610:16, 610:20, 611:1, 611:13, 611:15, 611:25, 612:11, 612:21, 613:9, 613:19, 613:25, 614:19, 616:8, 616:23, 617:4, 617:18, 618:1, 619:9, 621:13, 624:10, 626:19, 627:7, 627:9, 627:12, 627:21, 627:24, 628:1, 628:4, 628:11, 628:25, 629:7, 629:12, 629:15, 630:1, 630:21, 631:12, 631:22, 632:2, 634:9, 635:11, 635:16, 636:19, 638:2, 640:1, 641:6, 641:15, 644:21, 648:4, 649:2, 649:17, 650:8, 650:21, 651:17, 653:6, 655:6, 655:9, 655:16, 656:2, 656:11, 657:2, 658:25, 659:6, 659:13, 659:19, 659:23, 661:11, 662:13, 662:15, 665:8, 667:7, 668:6, 668:11

**Zabell's** [5] - 474:22, 474:23, 554:5, 554:6, 555:6

**ZARDA** [1] - 465:3

**Zarda** [68] - 466:2, 466:19, 467:8, 469:17, 472:7, 473:20, 473:21, 474:1, 476:15, 497:4, 507:23, 510:19, 512:20, 529:2, 529:4, 529:18, 529:20, 532:2, 532:13, 533:9, 533:12, 534:5, 534:8, 534:12, 535:8, 535:18, 535:24, 538:3, 538:6, 538:9, 539:10, 542:13, 542:23, 542:25, 543:4, 543:10, 543:23, 572:11, 572:13, 595:7, 609:6, 617:2, 617:3, 617:13, 621:9, 651:12, 651:14, 651:19, 651:23, 652:7, 652:11, 652:18, 653:1, 653:16, 654:3, 654:8, 654:14, 654:17, 654:21, 655:7, 655:17, 655:21, 656:3, 656:12, 656:15, 656:24, 662:19

**Zarda's** [7] - 472:4, 472:5, 510:2, 534:22, 545:25, 652:5, 659:25

**Zealand** [3] - 527:22, 644:10, 644:13

**zero** [1] - 630:19

**Zone** [11] - 474:1, 478:13, 479:19, 485:11, 487:1, 528:7,

528:20, 561:3, 579:14, 594:25, 606:18

**zone** [1] - 622:16