**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**MELISSA ZARDA AND WILLIAM**
**MOORE, CO-INDEPENDENT EXECUTORS**
**OF THE ESTATE OF DONALD ZARDA**

      Plaintiffs,

          against

**RAYMOND MAYNARD as the**
**predecessor in interest, the sole**
**shareholder and Alter Ego to**
**ALTITUDE EXPRESS, Inc. &**
**RAYMOND MAYNARD, individually.**

      Defendants.

               **SECOND**
               **AMENDED**
               **COMPLAINT**

          10-cv-04334 (SJF)(ARL)

               **JURY TRIAL**
               **DEMANDED**

Plaintiffs (the executors of the Estate of Donald Zarda) now allege upon personal knowledge and information and belief as follows:

<u>NATURE OF THE CASE AND PROCEDURAL HISTORY</u>

1.    This action was brought by now deceased Plaintiff, Donald Zarda, a gay man, to recover damages for Defendants' discriminatory conduct in discharging him because he told a customer he was gay. The termination was a violation under Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 1981.

2.    Plaintiff, before he died, filed a charge and complaint charge under Title VII. The district court dismissed the claim under Title based on Second

Circuit precedent (at the time). After his death, plaintiffs, who volunteered to substitute for Donald Zarda, appealed this issue and won after an en banc rehearing at the Second Circuit Court of Appeals.

3.    Between 2015 to approximately March 2017 (when it dissolved), Maynard worked for had been planning to sell Altitude Express. Indeed, Skydive Long Island, Inc., was incorporated in 2016, well before he dissolved Altitude Express. Since Altitude Express used the dba moniker "Skydive Long Island," there was a continuity of using the goodwill that the S.D.L.I. enjoyed, and the new and the old S.D.L.I. used it at the same time.

4.    These intentions were never made known to the Plaintiff, who found out by happenstance. Indeed, Maynard could well have turned over the rights reigns to the New Skydive Long Island and was just waiting as long as he could until the lawsuit was over.

5.    But even as a former Officer and Sole Shareholder, Raymond Maynard and the now-defunct Altitude Express, Inc. petitioned for a Writ of Certiorari to the U.S. Supreme Court, which granted the petition in April 2019.

6.    The decision speaks for itself, but it held, on June 15, 2020, that for an employer to consider sex – which includes a person's gender identity or sexual orientation – would be illegal under Title VII. This improper consideration would be unlawful whether the employer's focus was on the

employee's gender identity or sexual orientation, or whether the adverse taken was the "but for" cause of the termination or whether the information played a "motivating factor" in the decision.

7.      Plaintiffs, having reopened the case, demand relief under Title VII as interpreted in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), which the Supreme Court consolidated with *Altitude Express v. Zarda*.

8.      Though his purchasers disclaim liability for any pending lawsuits in the bill of sale, that is not necessarily the final answer. A court *could* hold Skydive Long Island liable under the "substantial continuity test." But because the question of the predecessor's ability to pay is a factor in determining successor liability, and since Maynard, as former C.E.O. and sole shareholder, can afford a judgment, plaintiffs choose not to shoehorn the new S.D.L.I. into this action – at least not based on what plaintiffs know now.

9.      If Maynard pleads insolvency, that might change the inquiry. Without revealing details about Maynard's solvency, we choose not to lay it out publicly. If Maynard denies solvency, with what we know now plus additional discovery, plaintiffs can detail with specificity Maynard's ability to pay.

<u>JURISDICTION AND VENUE</u>

10.      Jurisdiction is proper under 28 U.S.C. § 1331. This action arises under the Constitution and laws of the United States, including Title VII of the

Civil Rights Act of 1964 as amended. Ancillary claims arise under the same operative facts. Additionally, all parties are citizens of different states.

11.     Venue is placed correctly in this district under 28 U.S.C. § 1391(b) in that a substantial portion of the acts or omissions occurred in this judicial district. Additionally, defendant Maynard resided in this judicial district at the time of the acts or omissions.

## PLAINTIFFS

12.     Plaintiff Melissa Zarda is a citizen of Kansas; William Moore and the Estate have domiciles in Texas. Donald Zarda was a citizen of the state of Missouri at the time he filed this lawsuit.

## DEFENDANTS

13.     Defendant Altitude Express, Inc. did business as "Skydive Long Island" in Calverton, New York. Maynard organized it under the State of New York laws. It operated as a "drop zone," i.e., a place where individuals went skydiving under the close supervision of experienced Skydive instructors. It was dissolved on or about March 16, 2016, though not before its predecessor in interest, starting using its corporate name "Skydive Long Island."

14.     Defendant Ray Maynard was the Chief Executive Officer of Skydive Long Island and its sole shareholder, as outlined in its corporate documents.

15.     Maynard sold the goodwill and name (and perhaps more) to an entity

known as Sky Dive Long Island, Inc., which – although S.D.L.I. was the name Altitude Express did business as – incorporated before Altitude Express dissolved.

16.    In the contract of sale – as reported to plaintiffs after an in-camera review – S.D.L.I., Inc. bought the entity but disclaimed liability for any pending civil litigation on account of Altitude Express.

17.    Maynard, who sold and benefitted from the sale, is the only possible defendant in interest (or more appropriately, predecessor in interest) to the original defendant. The law does not allow an employer to divest itself from liability by selling a business, profiting from the exchange, receiving some consideration – and leaving a civil-rights plaintiff without a remedy.

18.    Indeed, in most situations, federal courts will apply the "substantial continuity test" as outlined in *Battino v. Cornelia Fifth Ave., L.L.C.*, 861 F. Supp. 2d 392, 404 (S.D.N.Y. 2012) and impose liability on the successor.

19.    However, although there was a continuity of operations between the former Altitude Express and S.D.L.I., the sole predecessor in interest is Raymond Maynard. He can pay his former corporation's debts as the sole shareholder of a defunct corporation which he dissolved.

20.    Furthermore, a court considering the imposition on the liability of a successor is whether the *predecessor* (Ray Maynard) can "provide adequate

relief directly, such that it would be unfair to place that obligation on the successor." Courts have also considered that "notice and the predecessor's ability to provide relief"— factors that collectively address whether successor liability would be equitable under any circumstances — and are "indispensable" to the inquiry, even if there are other factors. *Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 89-91 (S.D.N.Y. 2017) (collecting cases).

21.    Here it is almost certain to these plaintiffs that S.D.L.I. knew about this lawsuit, and that is why it expressly disclaimed liability for it in the sales contract.

22.    While a federal court might weigh the new corporation's in successor liability, it will never ignore its ability to pay.

23.    Plaintiffs have done appropriate research into public records and have insight into Maynard's ability to pay a judgment.

24.    Without going into detail to spare his privacy, Maynard can afford to pay a reasonable sum to resolve this lawsuit.

25.    Furthermore, under New York law, an aggrieved party can still seek to impose liability on an individual associated with the successor entity under a corporate veil-piercing theory, whereby plaintiffs must establish: (i) that the owner exercised complete domination over the corporation for the transaction at

issue; and (ii) that Maynard used this power to commit a fraud or wrong that injured the party seeking to pierce the veil.'"

26.     Such fraud need not be actual; it may be constructive.

27.     Maynard planned this sale to time with the lawsuit and delayed the deal for that purpose. The case proceeded before the appeal, and Maynard and his and the counsel appeared in court as if there had been no corporate machinations behind the scenes.

28.     Maynard planned the sale before the trial on the state law claim in 2015. At or about that time, Maynard and his wife appeared on numerous local T.V. spots bidding "farewell" to the community.

29.     Maynard, the sole decision-maker for the defunct Altitude Express, agreed to S.D.L.I.'s terms in signing the sale agreement.

30.     If S.D.L.I., Inc. is not the liable successor in interest, then liability logically devolves to Raymond Maynard as a matter of law.

31.     Maynard planned the sale during the litigation. He knew what he was doing and intended to disclaim liability by dissolving the corporation.

## UNDERLYING FACTS

32.     Plaintiff repeats and realleges the allegations outlined in all previous paragraphs as if fully set forth herein.

33.     Donald Zarda was an experienced Tandem and Freefall (i.e., Skydive)

instructor, and was an employee at Skydive Long Island for various summers in the last decade until his termination in July 2010.

34.     Don worked at Altitude Express, Inc., dba Skydive Long Island (from now on "Skydive Long Island" or "S.D.L.I.") as a Tandem & Accelerated Freefall Instructor. His employment had initially been was in the summers of 2001, then in 2009 and 2010. Altitude Express has approximately 20-30 employees.

35.     Plaintiff had been a licensed instructor in his field from 1995 until he died in 2014.

36.     Don participated in approximately 3500 jumps throughout his distinguished career and never was a passenger injured in his care.

37.     He worked for the Altitude Express in the summers of 2001, 2009, and 2010. Skydiving is a seasonal sport, and defendants operate mostly in the warmer weather, although not exclusively so.

38.     A skydive is a forcibly intimate experience for the safety of the passenger. Novices who yearn for the thrill of a skydive cannot do so on their own; thus, the instructor must strap himself hip-to-hip and shoulder-to-shoulder with the client.

39.     Because of this, before they dive, students at Skydive Long Island (or passengers, as they were known) must sign a release that contains the

following language:

> I understand that I will be wearing a harness, which will need to be adjusted by the jumpmaster. If my jump is a tandem jump, I know that the tandem master will attach my harness to his and put my body in close proximity to that of the tandem master. I specifically agree to this physical contact between the tandem master and myself.

40.    Before the client and instructor jump leave the plane, the client sits on the instructor's lap. The tandem-skydiving experience is typically tense for a novice; she is about to jump out of a plane with a stranger strapped to her.

41.    A person with no expectations or training might think nothing of the experience or think that it was so unusual as to be up to snuff.

42.    Notwithstanding the waiver, to break the ice and make the client more comfortable, instructors often make light of the intimate situation by making a joke about it.

43.    For example, when a man is strapped to another man, Plaintiff witnessed instructors saying something like, "I bet you didn't know you were going to be strapped so close to a man." Plaintiff also heard instructors state, about a bulge protruding from the equipment, "That's the straps you're feeling."

44.    On more than one occasion, Plaintiff heard straight instructors say, jokingly, when strapped to male clients, "Don't worry, I'm a lesbian." For another example, a straight man is strapped to a straight man; his girlfriend is present, so the instructor might say something touching on teenage humor

such as, "Does your girlfriend know that you're gay?"

45.    This was an openly tolerated form of banter, even if it bordered on the insensitive. Plaintiff, as an openly gay man, was often the butt of jokes about his sexual orientation. He had mixed feelings about that but was not troubled when sexual banter was a way of breaking the ice in a tense situation. On occasion, over the years, when tightly connected to a woman (whose boyfriend might be in tow), don might say something like, "You don't have to worry about us being so close because I'm gay."

46.    This plan worked for him and was never a problem until one customer who wanted his money back – and got it – complained.

47.    On June 18, 2010, Maynard suspended Plaintiff to so remark to a woman whose name is Rosanna.

48.    Everyone at work knew that Plaintiff was gay, and he was open about it. Notwithstanding, however, employment terms and conditions were not the same compared between Plaintiff and other similarly situated instructors.

49.    Ray Maynard was hostile to any expression of sexual orientation that did not conform to sex stereotypes. Plaintiff has a typically masculine demeanor, but as one example, he criticized Plaintiff's wearing of the color pink at work. Women at the workplace were allowed to wear pink and did without criticism.

50.     On one occasion, for example, Plaintiff broke his ankle and had to wear a cast. It so happened that the color of the cast plaintiff chose was pink. When Ray saw the pink cast for the first time, he scoffed at it and said, "That looks gay!" Later, at a staff meeting, he said, "If you're going to remain here for the day, you're going to have to paint that black," pointing to Plaintiff's cast. It was not a joke.

51.     Plaintiff also painted his toenails pink, which at the time was Plaintiff's preference. Women often wore open-toed sandals to work, as well as pink toenail polish.

52.     Additionally, many other instructors were barefoot at the drop zone. When Ray saw Plaintiff's pink toenail polish, however, he insisted that Plaintiff wear a sock and cover up his foot.

53.     The Plaintiff would have begrudgingly tolerated these backward attitudes towards men, and the use of manly colors was enforced, if not in policy, in practice.

54.      Ray openly tolerated men discussing women and their physical attributes. Specifically, Ray and the men at the office would ogle at women's breasts, including videos that the company had procured for passengers who had hired the company for a joy ride skydive with an accompanying video. Men often talked of their sexual exploits, and Ray openly discussed his former problematic marriage. Richard Winstock, Maynard's second in

command, assuaged some passengers, mainly middle-aged women, by telling them, "Don't worry, I have a wife and kids, and I intend to go home to them tonight."

55. Plaintiff mentioning that he is gay to a passenger, however, got him fired – or at least the mention was a motivating factor in his termination.

56. In his termination interview, which Don recorded, Ray said that he was firing Plaintiff because Plaintiff had discussed his "personal escapades" outside of the office with passengerRosanna.

57. All of the men at Altitude Express made light of the intimate nature of being strapped to a member of the opposite sex. Maynard fired Plaintiff, however, because the levity he used honestly referred to his sexual orientation – to extricate himself from a sexual joke imposed upon him – and did not conform to the straight male macho stereotype.

58. But mentioning one's sexual orientation is as much a protected activity as saying that one is Catholic, Scottish, or Hispanic.

59. Plaintiff stated he was gay – as immutable a characteristic as his German Ancestry– because the jokes in the plane suggested he was moving in on Rosanna, with her boyfriend present.

60. Ray also made other statements regarding Plaintiff's termination, including that Plaintiff had allegedly touched Rosanna inappropriately.

61. Rosanna never told this to Maynard, who did not investigate.

Maynard told Plaintiff that Rosanna had made such a statement about touching. But on the contrary, in a written objection to Plaintiff's request for unemployment benefits, a representative of Altitude Express did not mention the touching, but rather that Plaintiff had revealed "personal information" about himself to a customer.

62.     The "personal information" revealed was that Plaintiff is gay; Maynard argued to the Unemployment Division that this was "misconduct" that should disqualify Plaintiff from benefits.

63.     Unemployment disagreed, and the Plaintiff was awarded benefits. Neither Maynard nor the Labor Department mentioned anything connected with the alleged touching because it did not happen, was uninvestigated, or, more likely, Maynard did not believe it.

64.     We will assume that Rosanna made this complaint of touching her boyfriend. Still, the fact that she would simultaneously complain that Plaintiff stated he was gay *and* that he touched her inappropriately underscores the facially pretextual manner of the reason for Plaintiff's termination – they seem inconsistent. Why would a gay guy have a desire to feel up a woman?

65.     The idea that a gay man would do anything sexually inappropriate is a common – if antiquated – stereotype to which gay men are subject. And, in

this case, not only was Don gay, and not only did his job require close contact for safety, But the release that all passengers must sign, acknowledge that they will be in close bodily contact with instructors.

66.     However, Maynard did not even investigate Rosanna's allegations by inquiring of Plaintiff's side of the story. He did not question Plaintiff about the claims. Still, he decided to accept her story as a pretextual reason for termination because, after all, she was a woman. Maynard was inconsistent in his use of the allegation as the reason for terminating him. However, grabbing for such low-hanging fruit such as Rosanna's second-hand complaint would give Maynard cover for firing Plaintiff. Maynard was of a generation that believed a woman's complaint, in general, would be more likely accepted in the context of alleged inappropriate touching by a man. That belief, often untrue, is sexist in itself.

67.     Even though there was a videotape of the jump that showed no inappropriate touching, Maynard dismissed said evidence and purposely lost custody of the tape so that Plaintiff could not use it in his defense.

68.     In all, the allegation of touching, if Rosanna even made it, was a false pretext for Plaintiff's termination, which happened because of her boyfriend's uninvestigated complaint about being near a gay person.

69.     Maynard knew that Plaintiff was gay and would have no motive to touch a female passenger in any manner other than to protect her safety

following proper procedures.

70.    Maynard knew that Rosanna had signed a release wherein she knew she would in close bodily contact with an instructor. Altitude Express used that release to defeat a wrongful death claim, yet Maynard conveniently ignored this, especially in the context of a gay man who had to be strapped tightly to a woman to do his job.

71.    Maynard's reaction to Rosanna's baseless complaint – without even as much as asking for Plaintiff's side of the story - is an instance of sex stereotyping. It validates a woman's complaint against a man, whereas a man's protest against a woman – gay or straight – would never have been accorded credence.

72.    Ray knew this, yet he was more than happy to use what he knew to be a patently false complaint against a man as a pretext for firing for being – and saying – that he was gay.

73.    Plaintiff, sadly, died before this litigation ended, yet his Executors sue for redress.

<u>FIRST</u> <u>CAUSE OF ACTION</u>
<u>SEX DISCRIMINATION UNDER TITLE VII</u>

74.    Plaintiffs repeat and reallege the allegations outlined in all previous paragraphs.

75.    Plaintiff's sex was a motivating factor in his termination.

76.     Such actions violated Title VII.

77.     By the preceding, Plaintiffs have been damaged.

SECOND CAUSE OF ACTION
COLLECTION OF COSTS AWARDED TO PLAINTIFFS

78.     Plaintiff repeats and realleges the allegations outlined in all previous allegations as if fully set forth herein.

79.     The en banc court of the Second Circuit Court of Appeals and the U.S. Supreme Court awarded plaintiffs, respectively, and to counsel, Stephen Bergstein and Gregory Antollino $3,693; and to The Stanford University Clinic (which fronted the cost of an appendix it need not have), $2,530.50.

80.     Raymond Maynard was responsible for those amounts personally and as predecessor-in-interest to Altitude Express.

81.     Since Maynard has known about these judgments – as anyone must impute – through his counsel, which has been the same throughout, and though plaintiffs made several attempts at collecting them quietly – Maynard has willfully refused. He should pay double costs and such sanctions as the court deem appropriate.

THIRD CAUSE OF ACTION
RAY MAYNARD, ALTER EGO OF ALTITUDE EXPRESS, IS LIABLE

82.     Plaintiff repeats and realleges the allegations outlined in all previous allegations as if fully set forth herein.

83.     Courts will disregard the corporate form or "pierce the corporate veil," whenever necessary "to prevent fraud or to achieve equity."

84.     Plaintiffs assert this doctrine, which seeks to go behind the corporate existence to circumvent the owners' limited liability and hold them liable for some underlying corporate obligation.

85.     Adequately understood, an attempt to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; instead, it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners."

86.     Here, as alleged above, Raymond Maynard was the sole shareholder and C.E.O. of Altitude Express.

87.     There were no other corporate officers, and other niceties of the corporate form were not always followed upon information and belief.

88.     Significantly, before the new S.D.L.I. acquired Altitude Express, both of them were using the moniker "Skydive Long Island" at the same time – one as an official corporate name and the other as the name Altitude Express did

business as.

89.     Maynard alone had the power to allow a prospective purchaser (or anyone) to use his corporation's dba, which shows a manifest disregard for the corporate form.

90.     As the former sole shareholder of Altitude Express, Maynard has sufficient assets to pay for this litigation, and the liability should not be imposed upon S.D.L.I., Inc. as a knee-jerk reaction as a matter of fundamental fairness.

91.     Under New York law, Maynard (1) exercised complete domination of the corporation concerning the pre-sale and sale; and (2) his power was used to commit a fraud or wrong against the plaintiffs – to confuse the issue of liability, to attempt to extinguish it on grounds other than the merits. It also prejudices Plaintiffs insofar as collecting the modest costs awarded in their favor.

92.     For the above-stated reasons, plaintiffs demand that Maynard be held to the predecessor in interest for the former Altitude Express, liable for any judgment herein and that plaintiffs be awarded attorneys' fees to the extent that New York Law allows.

<u>FOURTH CAUSE OF ACTION</u>
<u>FRAUDULENT OR VOIDABLE TRANSFER</u>
<u>NEW YORK UNIFORM VOIDABLE TRANSACTIONS ACT</u>

93.     Plaintiff repeats and realleges the allegations outlined in all previous

allegations as if fully set forth herein.

94.     N.Y. Debtor & Creditor Law Article 10 has been superseded by the nearly identical New York Uniform Voidable Transactions Act.

95.     The update might not affect proceedings, acts, or omissions before the act was adopted as law in 2019 and begins its application in 2020. Without much discovery on this issue, plaintiffs cannot know which law would apply. Still, they know that when Raymond Maynard, as the sole shareholder, made every decision to divest himself as liable on any aspect of the case.

96.     Under New York Law, a transfer made by a debtor (here Maynard, who is an actual debtor and a putative debtor) is voidable as to a creditor (here S.D.L.I., Inc.), whether the creditor's claim arose before or after the transfer, if the debtor made the transfer or incurred the obligation:

(A) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(B) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur or believed or reasonably should have believed

that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

93.    In determining actual intent under paragraph one of subdivision (a) of this section, consideration may be given, among other factors, to whether:

(A)  the debtor retained possession or control of the property transferred after the transfer. In this case, Maynard did not disincorporate after Skydive Long Island took its name. The delay was purely to disincorporate at the right time to defeat plaintiffs' rights.

(B) the transfer or obligation was disclosed or concealed. Here, it was. Plaintiffs knew nothing of it until the case was about to go to the U.S. Supreme Court.

(C) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. This is certainly true.

(D) the transfer was of substantially all the debtor's assets. Upon information and belief, this is true.

(E) the debtor absconded. Indeed, Maynard lives in a different part of the country. This is purely legal, even if he lived in Long Island for his entire life.

(F) the debtor removed or concealed assets. Plaintiffs need discovery on this question.

(G) the value of the debtor's consideration was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. Plaintiffs needs discovery on this; we have no idea what a fair market price was or what the corporation sold for.

(H) the transfer occurred shortly before or shortly after a substantial debt was incurred. This is true in this case, at least potentially.

(I) and the debtor transferred the business's essential assets to a lienor that transferred the assets to an insider of the debtor. Plaintiffs need discovery on this issue.

94. Without discovery, Plaintiff knows some of these elements to be true; upon information and belief, they believe the rest to be accurate based on all of the information they have learned about the sale of Altitude Express, Inc. after 2018.

95. In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitations, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee if available under applicable law; and

(3) subject to applicable principles of equity and following applicable

rules of civil procedure:

(i) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or other property.

(ii) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(iii) any other relief the circumstances may require.

96. If a creditor has obtained a judgment on a claim against the debtor, and if Maynard does not may the judgments for costs voluntarily, the court may levy execution on the asset transferred or the debtors' proceeds.

97. Separately from any other laws for which plaintiffs might be entitled to fees, attorneys' fees are also available under New York Debtor and Creditor law § 276-a.

98. The en banc court of the Second Circuit Court of Appeals and the U.S. Supreme Court awarded plaintiffs, respectively, and to counsel, Stephen Bergstein and Gregory Antollino $3,693; and to The Stanford University Supreme Court Clinic in the amount of $2,530.50.[1]

99. Raymond Maynard was responsible for those amounts personally <u>and</u> as the predecessor interested in Altitude Express. Maynard has known about these judgments – as anyone must impute; his counsel, who has been the same

---

[1] The parties in a Supreme Court litigation file a bill for expenses for the clerk such that it will be included in the mandate if one party is entitled to costs. Here, the Clerk imposed costs, but Maynard's counsel, in an email dated shortly after the imposition of costs, said the undersigned would have to "file a writ" in order to get those costs.

throughout the litigation, knew about them. Plaintiff's counsel has attempted to collecting them quietly. Though counsel, Maynard has willfully refused and should pay double costs and such fees and sanctions as the court deem appropriate.

100.    To see an attorney so flagrantly ignore a judgment of the country's highest court is not only an insult to the profession but a demoralizing sign. The attorney cannot appeal the judgment, so he and his client expect to get away with it?

101.    Plaintiffs hope not and pray the Court will enforce payment of the judgments, and any judgment that might be obtained in this lawsuit.

    **WHEREFORE,** Plaintiffs demands as follows:

A.      A finding that Raymond Maynard, as "Predecessor in Interest" to Altitude Express, Inc., and can pay the judgment.

B.      Restraining Maynard or any person to whom he distributed assets from the corporation's sale from further waste of the assets.

C.      A finding as a matter of law that sex was a motivating factor in Donald Zarda's termination.

D.      Compensatory damages.

E.      Punitive damages.

F.       Cost of suit and attorneys' fees.

G.      Such other relief as the court may deem just and proper.

Dated:       New York, New York
             December 16, 2020

_Greg S. Antollino_
GREGORY ANTOLLINO
Antollino PLLC
Attorney for Plaintiffs
275 Seventh Avenue, 7th Floor
New York, NY 10001
Gregory@Antollino.com
212-334-7397